## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

KIDDE-FENWAL, INC.,[1]

      Debtor.

Chapter 11

Case No. 23-10638 (___)

## DECLARATION OF JAMES A. MESTERHARM IN SUPPORT OF
## CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, James A. Mesterharm, hereby declare under penalty of perjury as follows:

1.      I am the Chief Transformation Officer of Kidde-Fenwal, Inc. ("KFI" or the "Debtor"), a Delaware corporation headquartered in Ashland, Massachusetts. I have served as Chief Transformation Officer ("CTO") of the Debtor since April 18, 2023. I am also a Partner, Managing Director and Co-Head of the Turnaround and Restructuring Services Practice at AlixPartners, LLP ("AlixPartners"), an affiliate of AP Services, LLC ("APS"), which has served as financial advisor to the Debtor since March 13, 2023. I have over 30 years of experience in the restructuring industry and have served in senior management positions in numerous turnarounds and restructurings.

2.      As part of overseeing the Debtor's preparations for the above-captioned case (the "Chapter 11 Case"), I was involved in advising on and assisting with the Debtor's day-to-day activities and transactions, including liquidity management and cash flow modeling, coordinating with counterparties, advising on the financial condition of the Debtor at various points in time and managing the related diligence processes. In my capacity as CTO, I have

---

[1]    The last four digits of Kidde-Fenwal, Inc.'s tax identification number are 5282. The Debtor's corporate headquarters is located at 400 Main Street, Ashland, Massachusetts 01721.

familiarized myself with the Debtor's day-to-day functions and financial and business affairs.

Except as otherwise stated in this declaration (the "Declaration"), the statements set forth herein

are based on (a) my personal knowledge or my opinion based on my experience, (b) information

that I have received from the Debtor and its affiliates, my colleagues at APS working directly

with me or under my supervision, direction or control or other advisors of the Debtor and/or

(c) my review of relevant documents.  References to the Bankruptcy Code (as defined below),

the chapter 11 process and related legal matters are based on my understanding of such matters

in reliance on the explanations provided by, and the advice of, counsel.  I am over the age of 18

and authorized to submit this Declaration on behalf of the Debtor.  If called upon to testify, I

would testify to the facts set forth herein.

       3.       On the date hereof (the "Petition Date"), the Debtor filed a voluntary

petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*

(the "Bankruptcy Code").  The Debtor continues to operate its business and manage its

properties as a debtor-in-possession pursuant to sections 1007(a) and 1008 of the Bankruptcy

Code.

       4.       In order to minimize the adverse effects of the commencement of this

Chapter 11 Case on its business operations, the Debtor has requested various types of relief in

"First Day" motions (collectively, the "First Day Motions").  The First Day Motions seek relief

aimed at, among other goals, (a) continuing the Debtor's cash management systems, shared

services arrangement and other business operations, (b) preserving customer and vendor

relationships, (c) maintaining the Debtor's workforce and (d) establishing certain administrative

procedures to facilitate a smooth transition into chapter 11.  The requested relief is essential to

the success of this Chapter 11 Case and the Debtor's reorganization efforts.

5.      I submit this Declaration in support of the First Day Motions.  I am familiar with the contents of each of the First Day Motions, including the exhibits attached thereto, and believe that the relief sought (a) is necessary to preserve the value and productivity of the Debtor's operations, (b) is critical to the successful reorganization of the Debtor and (c) serves the best interest of the Debtor's estate, its creditors and other parties-in-interest.

## PART I

### I.      Overview of the Debtor's Business

#### A.      The Debtor's Business Lines and Products

6.      KFI is a U.S.-based manufacturing company located in Ashland, Massachusetts.  Formed as a Delaware corporation in 1987, it has since that time continuously owned and operated numerous lines of business related to industrial fire detection and suppression, as well as temperature control products and products to light and control gas burners.  Today, KFI is a market leader in the highly-regulated fire detection and suppression industry and offers the broadest array of products of any of its competitors.

7.      The core of KFI's operations are housed within two leased buildings—totaling approximately 218,000 square feet—in Ashland, where KFI manufactures its products and maintains its corporate headquarters.  KFI also subleases a small industrial building in Holliston, Massachusetts, which it uses as a testing facility.  KFI employs approximately 250 employees, all of whom are based in the United States.  Some employees who support KFI are also based in Canada, Dubai, Latin America and Asia, among other places.

8.      KFI is primarily comprised of two business lines: Kidde Fire Systems ("KFS") and Fenwal Controls.  In 2022, KFI had approximately $200 million in sales revenues, with approximately $145 million coming from KFS and approximately $55 million coming from Fenwal Controls.

a. *Kidde Fire Systems*

9.    KFI's primary business line is KFS, which is the world leader in providing total system solutions for special hazard fire protection.  KFS offers a comprehensive portfolio of detection, notification, suppression and control products that can be tailored to fit specific applications.  KFS products protect the United States military and a wide range of industries around the world, such as data centers, marine, power, oil and gas, manufacturing, semiconductor, commercial cooking and cultural and heritage.

10.    KFS's product portfolio is comprised of three product groups: (a) gaseous engineered suppression products, which generally suppress fires that involve (i) common combustibles such as such as wood, paper, cloth, rubber, trash and plastics ("Class A" fires), (ii) flammable liquids, solvents, oil, gasoline, paints, lacquers and other oil-based or chemical products ("Class B" fires) and (iii) energized electrical equipment such as data servers, electrical cabinets, motor control centers, switchgear controls, machinery or appliances ("Class C" fires), (b) chemical pre-engineered suppression products, which generally suppress fires that involve cooking liquids, such as cooking oil and greases ("Class K" fires) and (c) detection alarm and control products.

i.  **Gaseous Engineered Suppression Products and Systems**

11.    Gaseous engineered suppression products are generally used in industrial applications, including data centers, power generation facilities, marine vessels, warehouses, pharmaceutical storage facilities, bank vaults and museums.

12.    The following is a diagram showing the typical parts and configuration of a gaseous engineered suppression system:



13.     For use with its gaseous engineered suppression products, KFI supplies

highly sensitive smoke detectors called "air sampling detectors" (or "ASDs").  These smoke

detectors are capable of detecting one or two parts per million of smoke in indoor spaces with

rapid air changes and movements (such as a server or processor room in a data center).  KFI's air

sampling smoke detectors are approximately 1,000 to 3,000 times more sensitive than in-home

smoke detectors and are able to detect smoke in the "incipient" stage of a fire before the smoke is

visible.

14.     Because gaseous engineered suppression products are expensive (relative

to water-sprinkler systems), and inadvertent or unnecessary release would be costly, KFI

recommends detection by more than one detector before release of any suppression product is

triggered.  KFI therefore also supplies standard sensitivity detectors, such as the "Spot Detector"

shown in the illustration above.  These devices detect smoke approximately 30 to 45 minutes

*after* ASDs detect smoke.  Generally, once both detectors have detected smoke, the fire alarm

control unit (or "FACU" in the illustration above) will be alerted to release the suppression

product through a system of piping and nozzles.

15.     There are three types of gaseous engineered suppression products:

(a) chemical clean agents, (b) inert gases and (c) carbon dioxide.  Chemical clean agents and

inert gases are largely interchangeable, except that a lower volume of chemical clean agent will suppress the same fire. These agents suppress fire by absorbing heat from the surface of the burning material and effectively lowering its temperature below the ignition point. The agents do not harm equipment or personnel in the protected area or cause any mess. They suppress fires within seconds of being discharged into the protected area.

16.    Carbon dioxide suppresses a fire by removing the oxygen from the protected space. It is therefore suitable as a suppression product only in spaces that are not occupiable by humans.

17.    In 2022, gaseous engineered suppression products generated approximately $100 million of KFS's revenues.

ii.    **Chemical Pre-Engineered Suppression Products and Systems**

18.    Chemical pre-engineered suppression products are comprised of two types: wet and dry. Wet chemical pre-engineered suppression products are generally used in commercial cooking applications to suppress Class K fires. The following is a diagram of a typical wet chemical agent system:



19.    KFI supplies highly sensitive heat detectors for use with its chemical pre-engineered suppression products.  Once a certain level of heat is detected, the chemical agent—aqueous potassium carbonate—is released.

20.    Dry chemical pre-engineered suppression products are generally used in paint spray applications, such as car painting assembly lines, and hazmat storage.  In paint spray application settings, the device that sprays paint conducts heat, creating a risk of fire.

21.    In 2022, chemical pre-engineered suppression products generated approximately $30 million of KFS's revenues.[2]  Customers that purchase KFI pre-engineered suppression products range from large kitchen-hood manufacturers, which integrate the system into their own offering for final sales to a restaurant or similar commercial cooking establishment, to small dealers or distributors for onward sales and installations at mom-and-pop restaurants.

b.    *Fenwal Controls*

22.    Fenwal Controls, KFI's other business line, is an original equipment manufacturer.  Fenwal Controls manufactures two types of related products, each of which assists in the prevention of fire: (a) gas ignition controls and (b) temperature controls.

23.    Gas ignition controls operate and monitor gas burners and, if they detect a safety hazard or other malfunction, shut the burner down.  These products are generally used in commercial applications, such as kitchen equipment, recreational vehicles, pools, spas, restaurants, factories and boiler rooms.  Fenwal Controls recently launched new gas ignition

---

[2]    Although KFS primarily operates through KFI, KFS also does some of its business outside the United States through two non-Debtor affiliates of the Debtor: Kidde Products Limited (UK) and Carrier Airconditioning & Refrigeration Limited (India).  KFS sells similar products in the UK and India through these legal entities due to local regulatory requirements.  The operations of these non-Debtor affiliates are not part of KFI, and their assets and liabilities are not part of KFI's balance sheet.

control products that allow users to monitor system operations and malfunctions remotely and in real time.

24.    Temperature controls perform a function similar to gas ignition controls but with respect to temperature.  These products are used in a large variety of applications, including MRI machines, agricultural equipment, offshore oil drilling platforms, gas stations and railways.

25.    Fenwal Control products vary in size and form based on the nature of the specific application.  Typically, a customer provides Fenwal Controls with the specifications of the application, and Fenwal Controls creates a bespoke product for the customer's needs.

26.    In 2022, Fenwal Controls produced 2.5 million gas burner controls and related accessories, and 2.8 million temperature controls of various types.  In 2022, gas burner control products generated approximately $35 million, and temperature control products generated approximately $20 million, of Fenwal Controls' revenues.  While end-users of Fenwal Controls' products span a number of different industries, top markets include the (a) HVAC, (b) food service and (c) recreational vehicle sectors, which accounted for approximately 22%, 15% and 14% of sales in 2022, respectively.

B.    The Debtor's Corporate History

27.    KFI was incorporated in Delaware on September 30, 1987.  On March 8, 2007, KFI merged with a sister company, Kidde Fire Fighting, Inc. ("Kidde Fire Fighting").  Kidde Fire Fighting produced and distributed aqueous film-forming foams ("AFFF") as part of its "National Foam" line of business.  KFI previously did not own or operate any AFFF-related businesses.

28.    Following the merger, KFI owned and operated the National Foam business, alongside its other businesses, until June 28, 2013, when the National Foam business

was sold to an entity controlled by Lloyd's Development Capital and subsequently renamed National Foam, Inc. ("New National Foam").  KFI has not owned or operated any AFFF-related businesses since that time.

29.    Attached as Exhibit A is a true and complete copy of the Share and Business Sale Agreement, dated as of June 28, 2013 (the "National Foam Sale Agreement"), pursuant to which KFI sold the National Foam business to New National Foam.  Under the National Foam Sale Agreement, entities that ultimately became New National Foam and Angus Fire Limited ("Angus Fire") assumed all liabilities relating to defective products sold by the acquired businesses prior to June 28, 2013.  (National Foam Sale Agreement § 2.3.5.)  New National Foam and Angus Fire agreed to indemnify KFI against such liabilities.  (*Id.* § 8.1.1.)

30.    After disposing of National Foam, KFI continued to operate its KFS and Fenwal Controls business lines and continues to do so today.

C.    Ownership of the Debtor

31.    KFI was originally owned by Hanson Trust, an industrial company based in the United Kingdom.  In 1988, Hanson Trust sold KFI and certain affiliated companies comprising the "Kidde" fire protection business to Pilgrim House Group, which, in turn, was subsequently acquired by Williams Holdings plc.  From 1988 to 2000, Williams Holdings plc was the ultimate parent company of KFI.

32.    In November 2000, Williams Holdings plc spun-off its fire protection subsidiaries to a new publicly-listed company, Kidde plc.  From 2000 to 2005, Kidde plc was the ultimate parent company of KFI.

33.    In April 2005, United Technologies Corporation ("UTC") acquired Kidde plc from the public market.  From 2005 to 2020, UTC was the ultimate parent company of KFI.

34.     Following UTC's acquisition of Kidde plc, UTC combined Kidde plc's firefighting business with that of Chubb plc, an affiliate of Chubb Fire, Ltd., which UTC had acquired in 2003.  Chubb Fire, Ltd. was a corporate affiliate of KFI during the period when it sold AFFF.

35.     In April 2020, UTC[3] spun off KFI and certain other businesses to Carrier Global Corporation ("Carrier" and, together with its non-KFI affiliates, the "Carrier Group"). Today, the stock of KFI is indirectly wholly owned by Carrier, other than certain *de minimis* employee shares.  A subsidiary of Carrier, Carrier Fire & Security America Corp., Inc. (f/k/a UTC Fire & Security Americas Corporation) is the indirect parent of KFI.

## II.     Summary of Assets and Liabilities

### A.     Assets

36.     The Debtor had approximately $318 million in total assets as of December 31, 2022, the majority of which related to intercompany receivables due from Carrier totaling approximately $232 million in the aggregate and which stemmed primarily from the Debtor's participation in Carrier's cash pool (the "Prepetition Cash Pool").  Other assets of the Debtor as of December 31, 2022 included trade receivables ($42 million), inventories ($39 million) and property, plant and equipment ($5 million).

37.     On May 11, 2023, in connection with the termination of the Prepetition Cash Pool in respect of the Debtor and as part of the ongoing reconciliation of the Debtor's intercompany receivables due from Carrier, Carrier remitted to the Debtor approximately $134 million in cash (the "Pool Balance Undisputed Cash") constituting the Debtor's balance against

---

[3]     UTC is now known as Raytheon Technologies Corp. ("Raytheon") as a result of a merger of UTC and the Raytheon Company in April of 2020.

the Prepetition Cash Pool, net of certain agreed offsets and deductibles and approximately $40 million of additional offsets and deductions proposed by Carrier (the "Disputed Offsets"). All parties' rights are reserved with respect to the Disputed Offsets, which are being reviewed by the Special Committee (as defined below).

38.     At the same time, KFI and Carrier agreed that Carrier would withhold $21,444,553 (the "Advance Payment Deposit") as security for payment of services provided on a go-forward basis pursuant to the Amended and Restated Master Services Agreement, dated May 13, 2023, between Carrier Corporation, Carrier Global Corporation and Kidde-Fenwal, Inc. Carrier will charge certain fees and costs against the Advance Payment Deposit, and any unused portion will be returned to KFI.

39.     As of the date of this Declaration, in addition to the Disputed Offsets and the Advance Payment Deposit, the Debtor holds approximately $133 million of unrestricted cash.

B.     Liabilities

40.     The Debtor's primary liabilities are contingent and disputed liabilities related to the AFFF Litigation (as defined below). Other liabilities of the Debtor include trade accounts payable and accrued expenses, which collectively totaled approximately $29 million as of December 31, 2022.

## PART II

### III.     Events Preceding This Chapter 11 Case

A.     AFFF

41.     As described above, KFI acquired the National Foam business by merger in 2007 and owned and operated that business until selling it to New National Foam in 2013. National Foam produced and distributed AFFF.

42.     AFFF is a firefighting foam, developed by 3M and the U.S. military in the late 1960s, used to extinguish certain types of hydrocarbon-fueled fires primarily at military bases and airports.  It creates a foam "blanket" when sprayed over burning fuel or liquids, which rapidly spreads to block oxygen supply and thus smother the fire and combustible vapors.

43.     National Foam began manufacturing AFFF in the early 1970s.  National Foam manufactured AFFF for sale to governments (including the U.S. federal government) and non-governmental customers in the U.S. at a single facility in West Chester, Pennsylvania.

44.     The key components of AFFF that contribute to its fire-extinguishing capabilities are known as fluorosurfactants.  Historically, the AFFF products that National Foam produced and distributed were made with fluorosurfactants procured from third-party suppliers.  Neither National Foam nor KFI manufactured fluorosurfactants.  The fluorosurfactants in National Foam's AFFF products are alleged to have contained trace amounts of a chemical called perfluorooctanoic acid ("PFOA") and/or other chemicals that allegedly degrade to PFOA over time in the environment.  PFOA is a type of per- and polyfluoroalkyl substance, or "PFAS," a family of chemical compounds that are alleged to be environmentally persistent, bio-accumulative and harmful to human health.  PFAS are found in thousands of products, including food packaging, plastic water bottles, cosmetics, weather-resistant outerwear and firefighting turnout gear.

45.     As discussed above, New National Foam and Angus Fire agreed to indemnify KFI for liabilities relating to AFFF in the National Foam Sale Agreement.  KFI has informed New National Foam and Angus Fire of KFI's determination that they are contractually responsible to indemnify KFI and others for substantially all AFFF-related liabilities as a result of allegedly defective products sold by National Foam.  New National Foam and Angus Fire

have denied that they have an indemnity obligation with respect to AFFF liabilities.  KFI has

financial information concerning New National Foam and Angus Fire which information

suggests that neither company has the financial capacity to perform its indemnification

obligations in any material respect.

        B.    <u>Litigation Against the Debtor</u>

        46.    KFI and various of its affiliates have been named as defendants in more

than 4,400 lawsuits filed by governmental entities, corporate entities and individuals alleging that

the historic use of AFFF caused the contamination of drinking water and soil, personal injuries

and/or property damage (collectively, the "<u>AFFF Litigation</u>").  KFI faces claims for its

ownership and operation of the National Foam business from 2007-2013 as well as for AFFF

produced and distributed by that business prior to 2007.  In 2018, AFFF-related litigations were

consolidated into multi-district litigation (the "<u>MDL</u>") in Charleston, South Carolina, with Judge

Richard Gergel presiding.  A handful of AFFF-based cases are proceeding outside of the MDL in

state courts.

        47.    The MDL encompasses claims against not only KFI and its affiliates, but

also against numerous other companies not affiliated with KFI that designed, manufactured,

distributed, and sold various AFFF products and/or other components used in the manufacture of

AFFF, including fluorosurfactants.  In each particular case within the MDL, factual questions

exist surrounding the presence of PFAS at contamination sites and whether and to what extent

various defendants' AFFF products or components thereof allegedly contributed to PFAS

contamination at those sites.

        48.    The first AFFF Litigation was commenced in late 2016, more than three

years after the sale of the National Foam business by KFI.  KFI has not sold or manufactured

AFFF-related products since that sale.

49.     The MDL is comprised of four primary types of litigation involving KFI: (a) water provider cases, (b) personal injury cases, (c) state attorney general actions and (d) putative class actions.  The MDL includes approximately 315 water provider cases, 4,000 personal injury cases, 30 state attorney general cases and 28 putative class actions.  New AFFF cases continue to be filed and added to the MDL on a regular basis.

        a.   *Water Provider Cases*

50.     In the water provider cases, private and government water supplier plaintiffs claim that AFFF manufacturers and AFFF-component manufacturers are liable for PFAS water contamination.  The causes of action in these cases include: (a) Defective Product – Strict Liability Failure to Warn, (b) Negligent Failure to Warn, (c) Defective Product – Design Defect, (d) Negligence, (e) Private Nuisance, (f) Public Nuisance and (g) Trespass.  Plaintiffs in these cases seek compensatory and punitive damages.  Claims for compensatory damages in these cases are generally premised on alleged remediation costs to treat water and soil to remove two types of PFAS:  PFOA and perfluorooctane sulfonic acid ("PFOS").  General fact discovery has been completed in the water provider cases selected for potential bellwether trials.  While more than 300 water provider cases have been filed to date, new water provider cases continue to be filed, and KFI expects many more such cases to be filed by water providers whose water sources have tested, or will test, positive for PFAS contamination.

        b.   *Personal Injury Cases*

51.     In the personal injury cases, individual plaintiffs claim that they are suffering illness caused by PFAS attributable to AFFF and its components, including various cancers, thyroid diseases, elevated liver enzymes and decreased fertility.  Many of the personal injury actions also include as plaintiffs spouses of individuals allegedly suffering illness, who are suing for loss of consortium.  The causes of action in these cases include: (a) Negligence/Gross

Negligence, (b) Strict Liability, (c) Defective Design, (d) Defective Product – Failure to Warn,

(e) Violation of State Consumer Protection, Unfair Competition and Product Liability Laws, (f)

Fraudulent Concealment, (g) Medical Monitoring, (h) Battery, (i) Breach of Warranties, (j)

Wrongful Death and (k) Loss of Consortium.  Plaintiffs in these cases seek compensatory and

punitive damages.  The parties are in the process of selecting personal injury cases in the MDL

for bellwether trials and additional discovery.

> c. *State Attorney General Actions*

52.     The state attorney general actions comprise *parens patriae* cases by state

attorneys general on behalf of state residents, seeking damages for costs incurred to identify,

monitor and remediate PFAS contamination allegedly attributable to AFFF and for harms to the

state and state residents.  The causes of action in these cases include: (a) Products Liability and

Negligence, (b) Various State or Federal Competition, Consumer or Environmental Protection

Laws, (c) Public Nuisance, (d) Trespass and (e) Unjust Enrichment.  The states in these cases

seek compensatory and punitive damages.  State attorney general actions filed by Alaska,

Arkansas, California, Florida, Illinois, Massachusetts, Maine, Michigan, Mississippi, New

Hampshire, New Jersey, New York, North Caroline, Ohio, Pennsylvania, South Carolina,

Vermont and Wisconsin have named the Debtor and/or affiliates of the Debtor as defendants.

> d. *Putative Class Actions*

53.     Class claims relate to injuries allegedly caused by AFFF that are common

to individuals residing in proximity to sites where AFFF was allegedly stored or used.  Alleged

common injuries to class members that purported class representatives have asserted include: (a)

property damage to class members resulting from contamination near sites where AFFF was

discharged or stored and (b) medical monitoring necessary for all individuals residing near AFFF

use or storage sites in order to enable early detection of any illness caused by contamination. These actions must obtain class certification in order to proceed to trial as class actions.

54.     Given KFI's potential direct liability exposure in the AFFF Litigation, as well as the uncertain financial situation of New National Foam and Angus Fire, KFI has been forced to take a leading role in defending claims based on the manufacture and sale of AFFF by the National Foam business prior to the sale, despite KFI's indemnification rights.  KFI has reserved its rights against New National Foam and Angus Fire.

55.     In 2023 alone, KFI has incurred over $6 million of litigation-related fees and expenses, and these amounts would be expected to increase substantially absent this Chapter 11 Case.

56.     Based on the number and nature of AFFF claims and recent, confidential settlement demands, KFI believes the alleged AFFF liability substantially exceeds the capacity of KFI to pay.

e.  *Insurance*

57.     KFI may be entitled to insurance coverage under historical liability policies issued to various corporate entities affiliated with KFI and predecessor manufacturers of AFFF beginning in the 1960s.  UTC obtained access to these insurance policies in 2005 when UTC acquired Kidde PLC and the National Foam business.  KFI then obtained access when UTC spun off Carrier and its subsidiaries, including KFI.  KFI is aware of at least several hundred million dollars of potential coverage but no insurer to date has agreed to provide indemnity coverage to KFI.  KFI is assessing its right against these insurers.

C.     The Decision to File for Chapter 11

a.     *Independent Directors*

58.     On March 29, 2023, Carrier determined that given the financial situation

of KFI, it was appropriate for the KFI Board to have a majority of independent directors.

Accordingly, KFI's board of directors (the "KFI Board") was reconstituted to include Francesca

Campbell, as the sole representative of Carrier, and two new independent directors: Steve

Hannan and Alexander D. Greene. Neither independent director had a prior relationship with

KFI or Carrier.

59.     Mr. Hannan, KFI's Chairman of the Board, founded and has been a

managing member of Springer Bridge Associates LLC since 2021. Prior to that, he was a Senior

Managing Director in the Debt Advisory & Restructuring Group of Evercore Partners for 11

years. In that role, he provided independent advice to companies, creditors, shareholders and

other stakeholders in both in-court and out-of-court financial restructurings and liability

management transactions.

60.     Mr. Greene was a Managing Partner and Head of U.S. Private Equity at

Brookfield Asset Management from 2005-2014. Since then, he has served as a director on

various boards. Mr. Greene has 40 years of experience in corporate finance leading private

equity, restructuring and advisory transactions and as an independent member and non-executive

chair of public and private company boards of directors. Mr. Greene is also a volunteer

firefighter in Armonk, New York.

b.      *Consideration of Strategic Alternatives*

61.     Following the appointment of Messrs. Hannan and Greene, the KFI Board

immediately began a strategic review process to explore potential alternatives for KFI. As part

of this process, the KFI Board engaged legal counsel and AlixPartners. The KFI Board also

determined that a sale of KFI should be considered among other strategic alternatives, and

engaged Guggenheim Securities, LLC ("Guggenheim") as its investment banker after a competitive selection process.

62.     The KFI Board also formed a Special Committee, comprised only of the two independent directors, in order to investigate any potential claims against Carrier, Raytheon or their affiliates.  To support this investigation, the Special Committee retained Schulte Roth & Zabel LLP as counsel.

63.     In connection with their review of strategic alternatives, the KFI Board directed its advisors to begin contingency planning for a potential chapter 11 filing in order to effectuate a sale of KFI free and clear of the AFFF liabilities or consummate an alternative restructuring transaction.  The KFI Board has been meeting at least weekly in the six weeks leading up to the Petition Date, including two in-person, full-day meetings.  Messrs. Hannan and Greene also visited the Debtor's headquarters in Ashland to meet with management of KFI and familiarize themselves with the Debtor's operations and business, and participated in additional meetings of the Special Committee.

64.     KFI has requested confirmation from Carrier of its position that it will not be providing financial support to KFI going forward, other than the arm's-length corporate services provided for under the Shared Services Agreement (as defined below), discussed in further detail below.  Carrier has confirmed that it does not plan to provide financial support to KFI.

65.     On May 13, 2023, the KFI Board met and considered the effect of the AFFF overhang on its business prospects and all available strategic options.  After consultation with Guggenheim and its other advisors, the KFI Board determined to authorize the filing of this Chapter 11 Case and request the relief in the First Day Motions.

# PART III

### IV.    Relief Sought in the Debtors' First Day Pleadings

66.    In the First Day Motions, the Debtor requests authorization to make

payments as set forth in the table below:

| Motion | Final Amount (Inclusive of Interim Amount) | Interim Amount |
|---|---|---|
| Utilities | $40,000 | $40,000 |
| Customer Programs | All customer obligations | $520,000 |
| Contractor | $570,000 | $475,000 |
| Cash Management | $27,500 | $27,500 |
| Vendors | $6,500,000 | $3,250,000 |
| **Total** | **$7,137,500** | **$4,312,500** |

A.    Motion of Debtor for Entry of an Order (I) Authorizing the Debtor to (A) File Under Seal Portions of the Creditor Matrix Containing Certain Individual Creditor Information, (B) List Addresses of Tort Claimants' Counsel in the Creditor Matrix and Other Filings in Lieu of Tort Claimants' Addresses and Serve Tort Claimants at Such Addresses and (C) List the Twenty Law Firms Representing the Largest Number of Tort Claimants Instead of the Twenty Largest Unsecured Creditors, (II) Approving Notice of Commencement Procedures and (III) Waiving Certain Caption Requirements (the "Creditor Matrix Motion").

67.    By the Creditor Matrix Motion, the Debtor requests entry of an order

(a) authorizing the Debtor, in its sole discretion, to (i) file under seal portions of its list of

creditors (the "Creditor Matrix") containing certain individual creditor information, (ii) list the

addresses of counsel for the tort claimants in the Creditor Matrix and other filings in lieu of the

tort claimants' addresses and serve all notices, mailings and other communications in this

Chapter 11 Case on the tort claimants' counsel and (iii) file a list of the law firms representing

the largest number of tort claimants (the "Top Twenty Counsel List") in lieu of filing a list of the

20 largest unsecured creditors, (b) authorizing the Debtor to implement certain procedures for the

mailing and publication of the notice announcing the commencement of this Chapter 11 Case

and the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code (the "Notice of Commencement") and (c) waiving certain caption requirements.

68.     The Debtor is a defendant in thousands of tort cases, and almost all plaintiffs in such lawsuits are personal injury claimants.  I understand that they are represented by numerous law firms, which will have the most current knowledge of their clients' contact information and are likely better positioned to receive communications on behalf of the tort claimants.  Further, the contact information of such law firms is more likely to remain unchanged over time.  In comparison, the individual plaintiff information that the Debtor possesses is often incomplete, obsolete or unreliable.  Additionally, I have been advised that, even where the Debtor has a record of a tort claimant's contact information, such information is subject to a protective order.

69.     In addition, the Debtor has historically not tracked the names of individual tort claimants.  As a result, I understand that the Creditor Matrix filed concurrently with the Creditor Matrix Motion lists only the named plaintiffs in the tort cases.  However, the Debtor is currently working with its proposed claims and noticing agent, Stretto, Inc. ("Stretto"), on assembling a list of all names of individual tort claimants and will supplement the Creditor Matrix once that information becomes available.  I therefore believe that publication of the Notice of Commencement in *The New York Times* is most likely to reach those parties-in-interest who may not have received notice by mail before the Debtor has been able to supplement the Creditor Matrix.  For these reasons, I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtor, its creditors and all other parties-in-interest.

B.      Application of the Debtor for an Order Authorizing the Retention and Employment of Stretto, Inc. as Claims and Noticing Agent (the "Stretto Retention Application").

70.     By the Stretto Retention Application, the Debtor requests entry of an order

appointing Stretto as the Claims and Noticing Agent for the Debtor and its Chapter 11 Case,

including assuming full responsibility for the distribution of notices and the maintenance,

processing, and docketing of proofs of claim filed in the Debtor's Chapter 11 Case *nunc pro tunc*

to the Petition Date.  Prior to retaining Stretto, the Debtor obtained and reviewed engagement

proposals from at least two other court-approved claims and noticing agents to ensure selection

through a competitive process.  Based on all engagement proposals obtained and reviewed, I

believe that Stretto's rates are competitive and reasonable given Stretto's quality of services and

expertise.  It is also my view that by appointing Stretto as the Claims and Noticing Agent in this

Chapter 11 Case, the distribution of notices and the processing of claims will be expedited, and

the Clerk will be relieved of the administrative burden of processing what may be an

overwhelming number of claims.  For these reasons, I believe that the relief requested in the

Stretto Retention Application is in the best interests of the Debtor, its creditors and all other

parties-in-interest.

<blockquote>

C.      <u>Motion of Debtor for Entry of Interim and Final Orders (I) Approving Form of
Adequate Assurance of Payment to Utility Companies, (II) Establishing
Procedures for Resolving Objections by Utility Companies, (III) Prohibiting
Utility Companies from Altering, Refusing or Discontinuing Service and (IV)
Granting Related Relief (the "Utilities Motion").</u>

</blockquote>

71.      Pursuant to the Utilities Motion, the Debtor seeks entry of interim and

final orders (a) approving the Debtor's Proposed Adequate Assurance of payment (as defined

below) for postpetition Utility Services (as defined below), (b) establishing procedures for

resolving objections by Utility Companies (as defined below) relating to the adequacy of the

Proposed Adequate Assurance and (c) prohibiting the Utility Companies from altering, refusing

or discontinuing service to, or discriminating against, the Debtor on the basis of the

commencement of this Chapter 11 Case or outstanding prepetition invoices.  In particular, the

Debtor requests authorization to make payments as set forth in the table below:

| Category | Final Amount (Inclusive of Interim Amount) | Interim Amount |
|---|---|---|
| Proposed Adequate Assurance Deposit | $40,000 | $40,000 |
| **Total** | **$40,000** | **$40,000** |

72.     To operate its business and manage its property, the Debtor obtains telecommunications, waste removal, water, gas, electricity, propane and other utility services (collectively, the "Utility Services") from a number of utility companies (collectively, the "Utility Companies").  Uninterrupted Utility Services are essential to the Debtor's ongoing operations.  I believe that, should any utility company refuse or discontinue service, even for a brief period, the Debtor's business operations could be severely disrupted, and such disruption would jeopardize the Debtor's ability to manage its reorganization efforts.

73.     Historically, the Debtor has a good payment record with the Utility Companies.  I understand that there are no defaults or arrearages of any significance for the Debtor's undisputed invoices for prepetition Utility Services, other than payment interruptions that may be caused by the commencement of this Chapter 11 Case.  Based on its monthly average for the 12 months prior to the Petition Date, the estimated total cost of Utility Services for the Debtor for the next 30 days is approximately $81,000.

74.     The Debtor intends to pay all postpetition obligations owed to the Utility Companies in a timely manner and anticipates having sufficient funds to do so.  Nevertheless, to provide the Utility Companies with adequate assurance, the Debtor proposes to deposit cash into a segregated account for the benefit of the Utility Companies in an amount equal to two weeks' payment for the Utility Services, calculated using the historical average for such payments during the past 12 months (the "Adequate Assurance Deposit" and together with the Debtor's ability to pay for future Utility Services in the ordinary course, the "Proposed Adequate

-22-

Assurance"). Based on the foregoing, the proposed total amount of the Adequate Assurance

Deposit is approximately $40,000.

75.    I believe that the relief requested in the Utilities Motion will ensure the

continuation of the Debtor's business as the Debtor transitions into chapter 11. It is also my

view that the relief requested provides the Utility Companies with a fair and orderly procedure

for determining requests for additional adequate assurance. For these reasons, I believe that the

relief requested in the Utilities Motion is in the best interests of the Debtor, its creditors and all

other parties-in-interest.

D.    Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing the
      Debtor to Maintain its Customer Programs and Honor Related Prepetition
      Obligations, (II) Authorizing Financial Institutions to Honor and Process Related
      Checks and Transfers and (III) Granting Related Relief (the "Customer Programs
      Motion").

76.    Pursuant to the Customer Programs Motion, the Debtor seeks entry of

interim and final orders authorizing the Debtor, in its sole discretion, to (a) maintain and

administer its Customer Programs (as defined below) and honor all Prepetition Customer

Obligations (as defined below) in the ordinary course of business and in a manner consistent

with past practice and (b) renew, replace, implement, modify or terminate Customer Programs as

the Debtor deems appropriate in its business judgment, in the ordinary course of business and

consistent with past practice, without further order of the Court. In particular, the Debtor

requests authorization to make payments as set forth in the table below:

| Category | Final Amount (Inclusive of Interim Amount) | Interim Amount |
|---|---|---|
| Customer Obligations | All customer Obligations | $520,000 |
| **Total** | **All customer Obligations** | **$520,000** |

77.    The Debtor offers its customers certain discounts, incentives and other

accommodations designed to increase the Debtor's sales and attract and retain customers (the

"Customer Programs" and the obligations arising under the Customer Programs, the "Customer Obligations").  My understanding is that it is standard in the Debtor's industry to offer Customer Programs.  As a result, I believe they are critical to the Debtor's ability to compete effectively in the marketplace and maintain customer goodwill and satisfaction.

78.    The Debtor provides certain customers with discounts (the "Discount Program"), with applicable discounts varying from customer to customer and order to order. These discounts may be negotiated or based on volume.  The Discount Program involves no cash outlay by the Debtor and only grants of discounts by the Debtor.

79.    Consistent with industry standards, the Debtor also provides its customers with limited warranties in connection with the purchase of the Debtor's products, in each case subject to the terms of a written agreement (the "Warranty Program").  The warranties for goods typically cover a 36-month period, with some limited number of products having shorter periods ranging from 12 to 24 months, from the date the goods are shipped to the customer.  All claims for breach of warranty must be made in writing by the customer within 30 days after the alleged defect becomes or should have become apparent to the customer.  With respect to services, the Debtor warrants that services will be performed in accordance with generally accepted industry standards and practice by competent personnel for 90 days following the provision of such services.  Upon submission of a claim under the Warranty Program, the Debtor may, at its option (a) repair or replace the defective product, (b) refund the service fees or product purchase price, less a reasonable charge for any actual use by the customer or (c) in the case of a service warranty, re-perform the non-complying services at no additional charge to the customer.  If the Debtor fails to honor its obligations under the Warranty Program during this Chapter 11 Case, many repeat customers, upon which the Debtor's business relies, may discontinue their business

with the Debtor, causing irreparable harm.

80.     It is my understanding that within the last 12 months, the accrued value of Customer Obligations ranges between approximately $400,000 and $550,000 at any one time. This estimate is based on the variation in the Debtor's reserves for the Customer Programs.  It is also my understanding that the Debtor does not anticipate that the aggregate amount of Customer Obligations arising before the Petition Date (collectively, the "<u>Prepetition Customer Obligations</u>") exceeds this estimate.  On an interim basis, the estimated value of the Prepetition Customer Obligations is approximately $520,000, during which time the Debtor does not anticipate making any significant direct cash disbursements.  On a final basis, I understand that the Debtor expects to honor the entirety of the Prepetition Customer Obligations.

81.     I believe that the relief requested in the Customer Programs Motion represents a sound exercise of the Debtor's business judgment and is necessary for the preservation of the resources and going-concern value of its estate.  Maintaining the Customer Programs and honoring the Prepetition Customer Obligations is critical to the Debtor's reorganization efforts.  It is my view that allowing the Debtor to do so will facilitate a smooth transition into chapter 11 and advance the restructuring of the Debtor's business, both in terms of profitability and the engendering of goodwill with essential customers.  I believe that the cost of honoring the Prepetition Customer Obligations will be more than offset by the revenue generated by virtue of the Customer Programs remaining in place.  For these reasons, I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtor, its creditors and all other parties-in-interest.

E.    Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing the
Debtor to Pay Prepetition Contract Worker Obligations, (II) Authorizing the
Debtor to Continue the Contract Worker Obligations, (III) Authorizing Financial
Institutions to Honor and Process Related Checks and Transfers and (IV)
Granting Related Relief (the "Contractor Motion").

82.    Pursuant to the Contractor Motion, the Debtor seeks entry of interim and

final orders authorizing the Debtor, in its sole discretion, to pay prepetition contract worker

obligations and continue such obligations postpetition in the ordinary course of business.  In

particular, the Debtor requests authorization to make payments as set forth in the table below:

| Category | Final Amount (Inclusive of Interim Amount) | Interim Amount |
|---|---|---|
| Contract Worker Obligations | $570,000 | $475,000 |
| Total | $570,000 | $475,000 |

83.    In the ordinary course of business, the Debtor supplements its workforce

with outsourced service workers (the "Outsourced Service Workers") and independent sales

representatives who receive monthly commission payments only (the "Commissioned Workers"

and together with the Outsourced Service Workers, the "Contract Workers").   The Outsourced

Service Workers are employed directly by approximately eight staffing agencies, which send

invoices to the Debtor.  The Debtor pays approximately five firms on behalf of the

Commissioned Workers on a monthly basis based on sales and associated commissions.  As of

the Petition Date, the Debtor has approximately 55 Contract Workers, consisting of 48

Outsourced Service Workers and seven Commissioned Workers.

84.    I believe that the Contract Workers are critical to the operation of the

Debtor's business.  Contract Workers perform a wide variety of job functions, including

engineering, manufacturing, field technicians, maintenance, marketing and communications,

information technology, sales, finance and other facility and office management functions.

Many of these individuals are also highly trained and have an essential working knowledge of the Debtor's operations and infrastructure and, therefore, cannot be easily replaced.  As of the Petition Date, the Debtor estimates that it has accrued approximately $475,000 on an interim basis and $570,000 on a final basis of amounts owed to Contract Workers prepetition.

85.    I believe that the relief requested in the Contractor Motion represents a sound exercise of the Debtor's business judgment and is necessary for the preservation of the Debtor's resources and going-concern value of its estate.  It is my view that payment of the prepetition contract worker obligations is critical to the Debtor's uninterrupted operations.  The Contract Workers comprise a critical part of the Debtor's workforce.  Failure to pay outstanding prepetition amounts owed to the Contract Workers could result in their departures, which in turn would disrupt the Debtor's operations at this critical juncture.  For these reasons, I believe that the relief requested in the Contractor Motion is in the best interests of the Debtor, its creditors and all other parties-in-interest.

F.    <u>Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Prepetition Trade Claims, (II) Granting Administrative Expense Priority to All Undisputed Obligations on Account of Outstanding Orders, (III) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers and (IV) Granting Related Relief (the "Vendor Motion").</u>

86.    Pursuant to the Vendor Motion, the Debtor seeks entry of interim and final orders (a) authorizing the Debtor, in its sole discretion, to pay prepetition Trade Claims (as defined below) and (b) granting administrative expense priority to all undisputed obligations on account of Outstanding Orders (as defined below).  In particular, the Debtor requests authorization to make payments as set forth in the table below:

| Category | Final Amount (inclusive of the Interim Amount) | Interim Amount |
|---|---|---|
| Critical Vendors | $3,350,000 | $1,675,000 |
| Foreign Vendors | $1,650,000 | $825,000 |
| Health and Safety Claims | $40,000 | $20,000 |
| Lien Claims | $1,460,000 | $730,000 |
| **Total** | **$6,500,000** | **$3,250,000** |

a. *Critical Vendors*

87.     The Debtor's supply chain consists of certain indispensable vendors and suppliers (collectively, the "Critical Vendors") that provide raw materials and services that are essential to the Debtor's operations (collectively, the "Critical Products and Services").  I believe that, without these Critical Products and Services, the Debtor would be unable to meet the needs of its business, produce its products, effectively serve its customers or maintain its market share and reputation within the fire suppression and safety industry.

88.     The Debtor obtains the Critical Products and Services from highly specialized vendors, often on an order-by-order basis and without long-term contracts.  I believe that the trade relationships with the Critical Vendors may materially deteriorate if, due to the commencement of this Chapter 11 Case, the Debtor is unable to pay the Critical Vendor Claims (as defined below) as requested in the Vendor Motion.  As such, I believe it is essential that the Debtor retains the ability to pay a portion of prepetition claims by Critical Vendors (the "Critical Vendor Claims") that are necessary to maintain the stability of the Debtor's supply chain.

89.     The Debtor relies on the Critical Vendors to fulfill its customer obligations.  Many of the Critical Vendors provide unique materials and services that would be difficult, if not impossible, to replace without incurring significant costs or significant disruption to the Debtor's business.  These essential materials and services include high/low pressure cylinders, specialized fire suppressant gases, flex hoses and couplings, valves, storage for

-28-

compressed chemicals, electronics, fabrication, switches, relays, sensors, castings and chemicals. Given their nature, many of the Critical Products and Services are available only from a sole or limited source. If the Critical Vendors cease providing the Critical Products and Services to the Debtor, the Debtor may not be able to locate alternative sources on reasonable commercial terms, or at all. I have been advised that a change in vendor or materials due to the failure of Critical Vendors to fulfill their obligations to the Debtor would result in the requirement of new governmental or regulatory and customer approvals such that replacing such vendors may take six to eight months, if not more. Therefore, even a temporary halt of the provision of Critical Products and Services would significantly reduce the efficiency of the Debtor's operations and, in certain instances, could require the suspension of operations altogether. Such a delay would also prevent the Debtor from honoring existing commitments to customers. I believe that this potential harm and disruption would far outweigh the costs of payment of the Critical Vendor Claims. Accordingly, it is my view that maintaining the ability to pay Critical Vendor Claims will stabilize the Debtor's operations, assist with the Debtor's reorganization efforts and ultimately maintain stakeholder value.

90.     In the 12 months prior to the Petition Date, the Debtor paid approximately $147 million on account of all accounts payable to the Debtor's vendors and suppliers. The Debtor is only seeking authority to pay an amount necessary to preserve the value of its estate, which shall not exceed $1.68 million on an interim basis and $3.35 million on a final basis, on account of the Critical Vendor Claims.

b. *Foreign Vendors*

91.     A critical component of the Debtor's business also involves transactions with foreign vendors (collectively, "Foreign Vendors"). In the ordinary course of business, the Debtor incurs obligations to numerous suppliers of goods and services that are crucial to the

Debtor's ongoing operations and whose assets are located exclusively outside of the United States. Maintaining existing relationships with the Foreign Vendors is critical to continuing the Debtor's business, and replacing these Foreign Vendors would be time-consuming, impracticable (and in many local jurisdictions, impossible) and cost prohibitive. I believe that payment of all prepetition claims held by Foreign Vendors and accrued in the ordinary course of business (the "Foreign Vendor Claims") is essential to avoid disruption of the Debtor's operations during this Chapter 11 Case.

92.     In the 12 months prior to the Petition Date, the Debtor paid approximately $34.5 million on account of all accounts payable to the Debtor's Foreign Vendors. As of the Petition Date, the Debtor estimates that there is approximately $1.65 million owed on account of Foreign Vendor Claims. The Debtor is seeking authority to pay the Foreign Vendors Claims in an amount not to exceed $825,000 on an interim basis and $1.65 million on a final basis.

c.  *Health and Safety Claims*

93.     In the ordinary course of business, the Debtor also incurs obligations to certain suppliers of goods and services utilized in the Debtor's operations, payment of which may be reasonably necessary to ensure the health, safety, environmental and regulatory compliance and integrity of the Debtor's operations (collectively, the "HSE Vendors"). The HSE Vendors provide services such as health and safety inspections and evaluations of the production environment, equipment and processes in working areas to ensure compliance with government safety regulations and industry standards. Health suppliers typically provide goods or services that test, measure and report effects of the Debtor's materials on the physical environment, customers and employees. Safety suppliers provide goods or services that protect personnel from risk involved during any type of operation and duties, such as providing safety uniforms and defining protocols for onsite hazards. The environmental suppliers provide

products, services and recommendations to promote protection of environments, which may be

affected by certain activities associated with the Debtor's operations.  Finally, certain of the HSE

Vendors also provide back-office goods and services, the interruption of which would pose

significant safety risks to on-site operations.

94.     It is my view that the Debtor needs to satisfy the HSE Claims in the

ordinary course to ensure the continued health, safety and environmental compliance of its

operations.  Accordingly, I believe that payment of all prepetition claims held by HSE Vendors

and accrued in the ordinary course of business (the "HSE Claims") is essential.  In the 12 months

prior to the Petition Date, the Debtor paid approximately $78,500 on account of all accounts

payable to the HSE Vendors.  As of the Petition Date, the Debtor does not believe that it owes

any amounts on account of the HSE Claims.  Out of an abundance of caution, however, the

Debtor is seeking authority to pay any HSE Claims that may exist, in an amount not to exceed

$20,000 on an interim basis and $40,000 on a final basis.

d.  *503(b)(9) Claims*

95.     I understand that certain Critical Vendors, Foreign Vendors or HSE

Vendors (the "503(b)(9) Claimants") may have delivered goods to the Debtor within 20 days

prior to the Petition Date.   As of the Petition Date, the Debtor estimates that approximately $3.6

million is owed to the 503(b)(9) Claimants (the "503(b)(9) Claims").  I believe that payment of

such 503(b)(9) Claims is in the best interest of the Debtor's estate and will prevent detrimental

changes to trade terms or a refusal to do business together.  It is my view that such payments will

further induce Critical Vendors, Foreign Vendors or HSE Vendors to adhere to favorable trade

terms and continue business on a go-forward basis.  I also believe that failure to honor these

claims in the ordinary course of business may cause the Debtor's vendor base to withhold

support for the Debtor during the chapter 11 process.  It is my understanding that the payment of

503(b)(9) claims will prevent material disruptions to the Debtor's business, and failure to pay could impair the Debtor's ability to stabilize its business at this critical juncture to the detriment of stakeholders.

e.  *Outstanding Orders*

96.     I understand that, in the ordinary course of business, the Debtor may have ordered goods prior to the Petition Date which were not, or will not be, delivered until after the Petition Date (the "Outstanding Orders").  It is my understanding that, in the mistaken belief that they would be general unsecured creditors of the Debtor's estate with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtor issues substitute purchase orders postpetition.  To prevent any disruption to the Debtor's business operations, and given that I have been advised that goods delivered after the Petition Date are afforded administrative expense priority under section 503(b) of the Bankruptcy Code, I believe that an order (a) granting administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtor arising from the postpetition acceptance of goods subject to Outstanding Orders and (b) authorizing the Debtor to pay amounts due on account of Outstanding Orders in the ordinary course of business, is in the best interest of the Debtor's estate.

f.  *Lien Claims*

97.     The Debtor also transacts business with third parties (the "Lien Claimants")  who I understand (a) may assert various statutory liens against the Debtor and its property if the Debtor fails to pay for services rendered or (b) subcontract with parties who may assert various statutory liens against the Debtor and its property if the Debtor fails to pay the contractor (the "Lien Claims").  The Lien Claimants consist of vendors who provide shipping,

freight, storage, construction and other related services.  To the extent any Lien Claimant has

perfected a lien on any of the Debtor's property or, in the Debtor's estimation, could assert and

perfect a lien on any such property, I believe that it is imperative that the Debtor be authorized to

pay such Lien Claimant, regardless of whether their claim arose prior to or after the Petition

Date.  The Debtor is seeking authority to pay Lien Claims in an amount not to exceed $730,000

on an interim basis and $1.46 million on a final basis.

   98. I believe that the relief requested in the Vendor Motion represents a sound

exercise of the Debtor's business judgment and is necessary for the preservation of the resources

and value of their estates.  Payment of the Trade Claims as they become due in the ordinary

course of business is critical to the Debtor's uninterrupted operations as such payments will

facilitate the ongoing delivery of goods and services required by the Debtor to fulfill customer

orders and continue generating revenue.  Nonpayment of the Trade Claims would likely result in

vendors refusing to provide essential goods and services and/or conditioning the delivery of such

goods and services in compliance with onerous and commercially unreasonable terms.  This

could cause irreparable harm to the Debtor's business, goodwill and market share.  Replacement

vendors and the search for such vendors, to the extent even available, would likely result in

substantially higher costs for the Debtor and subject the Debtor to risk of operational shutdown

and noncompliance with health and safety regulations.  For these reasons, the relief requested in

the Vendor Motion is in the best interest of the Debtor, its creditors and all other parties-in-

interest.

  G. <u>Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing the
Debtor to (A) Continue to Operate its Cash Management System, (B) Pay or
Honor Certain Prepetition Obligations Related Thereto and (C) Maintain its Bank
Accounts and Existing Business Forms, (II) Authorizing Affiliate Transactions
and (III) Granting Related Relief (the "Cash Management Motion").</u>

   99. By the Cash Management Motion, the Debtor requests entry of an order

(a) authorizing the Debtor, in its sole discretion, to (i) continue to operate its Cash Management System (as defined below), (ii) pay or honor certain prepetition obligations related thereto and (iii) maintain its existing Bank Accounts (as defined below) and existing Business Forms (as defined below) and (b) authorizing Affiliate Transactions (as defined below).  In particular, the Debtor requests authorization to make payments as set forth in the table below:

| Category | Final Amount (Inclusive of Interim Amount) | Interim Amount |
|---|---|---|
| Bank Fees | $15,000 | $15,000 |
| Processing Fees | $12,500 | $12,500 |
| Card Obligations | $20,000 | $20,000 |
| **Total** | **$47,500** | **$47,500** |

a.   *The Cash Management System*

100.    The Debtor maintains a cash management system to operate its business in the ordinary course (the "Cash Management System").  The Cash Management System allows the Debtor to efficiently collect, transfer and distribute the funds generated by the Debtor's business operations.

101.    The Cash Management System is comprised of four bank accounts (such accounts, together with any other bank accounts the Debtor may open in the ordinary course of business, the "Bank Accounts").  The Bank Accounts consist of (a) an operating account in the name of the Debtor (the "Debtor Operating Account"), into which cash receipts from customers on account of the Debtor's business operations are deposited in the ordinary course and from which wire and ACH payments are disbursed in the ordinary course, (b) a disbursement account in the name of the Debtor (the "Debtor Disbursement Account"), which is used primarily to process check disbursements to third parties and certain non-Debtor affiliates to satisfy obligations arising from the day-to-day operation of the business and (c) an operating account (the "Autronica Operating Account" and, together with the Debtor Operating Account, the

"Operating Accounts") and a disbursement account (the "Autronica Disbursement Account" and, together with the Debtor Disbursement Accounts, the "Disbursement Accounts") which, until recently, were used to collect receipts and process disbursements attributable to the domestic business activities of non-Debtor affiliate Autronica Fire & Security AS ("Autronica"). The Autronica Operating Account will be repurposed to be used as the Debtor's utility deposit account and the Autronica Disbursement Account will be maintained by the Debtor.

102.    Historically, subject to certain exceptions, any cash remaining in the Operating Accounts at the close of each business day was swept upstream to a pooling account held by Kidde PLC Inc., an indirect parent of the Debtor (the "Kidde Pooling Account"), and then further swept upstream to a concentration account held by the Debtor's ultimate parent, Carrier (the "Carrier Concentration Account" and, together with the Kidde Pooling Account, the "Prepetition Cash Pooling Accounts"). To the extent that additional cash was needed to cover disbursements processed from either the Operating Accounts or the Disbursement Accounts, those amounts were funded from the Prepetition Cash Pooling Accounts. Through this cash pooling arrangement (the "Prepetition Cash Pool"), the Debtor and other non-Debtor affiliates utilized non-Debtor Carrier as a central cash repository, and accounting records of amounts due from or owing to the Debtor and each Carrier affiliate were maintained based on net amounts swept or funded, as applicable. The Prepetition Cash Pool also facilitated Affiliate Transactions (as defined below) and enabled Carrier to make payments in satisfaction of certain operational and financial obligations of the Debtor, including (but not limited to) certain payroll, tax, and insurance obligations.[4]

---

[4]    As set forth in the Shared Services Agreement Motion (as defined below), Carrier also allocated certain charges to the Debtor on account of certain corporate and overhead services. These allocations are not addressed by this Motion and the Debtor is not seeking any relief with respect to such charges or allocations in this Motion.

103.    At the close of business on May 5, 2023, the Debtor disabled the "zero balance account" functionality at its Bank Accounts, discontinuing the automatic sweeping of the Debtor's excess cash to the Prepetition Cash Pooling Accounts, and began to pool their excess cash at the Debtor Operating Account.  On the same day, Autronica ceased using the Autronica Operating Account and Autronica Disbursement Account and Autronica's cash was transferred to a separate, non-Debtor bank account.  The Debtor owns, and are authorized parties to, the Autronica Operating Account and the Autronica Disbursement Account.

104.    On May 11, 2023, in connection with the termination of the Prepetition Cash Pool in respect of the Debtor and as part of the ongoing reconciliation of the Debtor's intercompany receivables due from Carrier, Carrier remitted to the Debtor approximately $134 million (the "Pool Balance Undisputed Cash") constituting the Debtor's balance against the Prepetition Cash Pool, net of certain agreed offsets and deductions and approximately $40 million of additional offsets and deductions proposed by Carrier (the "Disputed Offsets").  All parties' rights are reserved with respect to the Disputed Offsets.  As of the Petition Date, substantially all of the Debtor's cash on hand is comprised of proceeds from its sales operations and the Pool Balance Undisputed Cash.

105.    It is my view that the Cash Management System enables the Debtor to efficiently track and control funds, ensure cash availability and reduce administrative costs.  I believe that requiring the Debtor to dismantle the Cash Management System and adopt a new cash management system would, among other things, impair the Debtor's day-to-day operations. It is also my view that adopting a new cash management system would result in the Debtor incurring material expenses, create unnecessary burdens on its employees and disrupt relationships with its key customers and suppliers.

106.    In contrast, I believe that maintaining the Cash Management System will facilitate the Debtor's reorganization efforts by preserving a "business as usual" atmosphere and avoiding costly delays, distraction and unnecessary confusion.  It is also my view that maintaining the Cash Management System would facilitate the Debtor's transition into chapter 11 by, among other things, minimizing delays in making postpetition payments, eliminating administrative efficiencies and allowing the Debtor's employees to focus on their day-to-day responsibilities.

107.    I believe that parties-in-interest will not be harmed by maintaining the Cash Management System.  The Debtor has implemented appropriate measures to ensure that payments will not be made on account of obligations incurred before the Petition Date other than those authorized by the Court.  The Debtor will also work closely with the Bank to ensure that appropriate procedures are in place to prevent checks issued prepetition from being honored without the Court's approval.

b.    *The Bank Accounts and Fees*

108.    The Bank Accounts are maintained at Bank of America, N.A. (the "Bank").  Disbursements from the Bank Accounts that are made by wire transfer are manually initiated by the Debtor, while ACH payments may be initiated either by the Debtor or by a select group of third-party payment processors.  As of the Petition Date, the Bank Accounts contained a total of approximately $133 million.

109.    In the ordinary course of business, the Bank charges, and the Debtor pays, honors or allows to be deducted from the applicable Bank Account, certain service charges and other fees, costs and expenses charged by the Bank (collectively, the "Bank Fees").  The Bank Fees total approximately $10,000 per month in the aggregate, which are automatically deducted from the applicable Bank Accounts on or around the 15th day of each calendar month.  The

Debtor estimates approximately $15,000 of accrued but unpaid Bank Fees are outstanding as of the Petition Date (collectively, the "Prepetition Bank Fees").

110.    To maximize flexibility for customers wishing to make payments by credit card, the Debtor permits certain credit card processors to auto-debit the Bank Accounts—on a recurring, monthly basis—for payment processing fees incurred by the Debtor in the ordinary course when customers pay with credit cards (collectively, the "Processing Fees").  The Processing Fees are approximately $12,500 per month in the aggregate, and the Debtor estimates approximately $12,500 of accrued but unpaid Processing Fees are outstanding as of the Petition Date (collectively, the "Prepetition Processing Fees").

111.    It is my view that payment of the Prepetition Bank Fees and Prepetition Processing Fees is necessary to maintain the Cash Management System and avoid any disruption in the administration of the Bank Accounts.  Therefore, I believe that payment of the Prepetition Bank Fees and Prepetition Processing Fees represents a sound exercise of the Debtor's business judgment and is necessary for the preservation of the Debtor's operations and going-concern value of its estate.

c.    *Ordinary Course Cash Flows*

112.    The Debtor generates cash primarily through sales of its products to third parties and affiliates.  Generally, customers that are not affiliates of the Debtor remit payments to the Debtor in cash directly into the Debtor Operating Account.  Customers that are affiliates of the Debtor remit payments to the Debtor as described below.

113.    Historically, the Debtor satisfied its obligations via a combination of disbursements (a) made by the Debtor from the Bank Accounts or (b) made by Carrier on behalf of the Debtor.  Disbursements made by the Debtor from the Bank Accounts consisted primarily of payments to third-party vendors or certain non-Debtor affiliates that do not participate in the

Prepetition Cash Pool, and historically included, but were not limited to, payments (a) for products and services, (b) for utilities and (c) on account of rent obligations. Disbursements made by Carrier on behalf of the Debtor historically included, but were not limited to, payments (a) for payroll and employee benefits, (b) on account of certain tax obligations and (c) on account of insurance obligations. Historically, on average, the Debtor made approximately $12 million per month of third-party and non-Debtor affiliate disbursements from the Bank Accounts. Carrier made approximately $4 million per month of disbursements on behalf of the Debtor, which were charged to the Debtor by way of an adjustment to the Prepetition Cash Pooling Account as described below.

        d.  *Affiliate Transactions*

       114.    Prior to the Petition Date, in the ordinary course of business, the Debtor engaged in certain affiliate transactions (the "Affiliate Transactions") with non-Debtor affiliates, resulting in receivables and payables (collectively, the "Affiliate Claims").

       115.    Up to and including May 5, 2023, ordinary course Affiliate Transactions between the Debtor and non-Debtor affiliates that participated in the Prepetition Cash Pool were settled by debiting or crediting, as applicable, the respective entity's balances with the Prepetition Cash Pooling Accounts. For example, to settle an Affiliate Claim a non-Debtor affiliate owed the Debtor on account of goods provided by the Debtor, the balance attributed to the Debtor in the Prepetition Cash Pooling Account would be increased, with a corresponding reduction to the balance attributed to the non-Debtor affiliate who received the goods. The Debtor closely monitored and recorded all Affiliate Transactions, including those settled through the netting process, in general ledgers maintained at non-Debtor Carrier. At the close of business on May 5, 2023, the Debtor ceased participating in the Prepetition Cash Pooling Account.

116.     Additionally, certain non-Debtor affiliates do not participate in the Prepetition Cash Pool.  When the Debtor engaged in Affiliate Transactions with such non-Debtor affiliates, the resulting Affiliate Claims were settled either by (a) a netting process or (b) by a direct disbursement either from the Debtor to the non-Debtor affiliate or from the non-Debtor affiliate to the Debtor, as applicable.  Affiliate Claims between the Debtor and non-Debtor affiliates that do not participate in the Prepetition Cash Pool are settled periodically in the ordinary course of business.

117.     The Debtor tracks all fund transfers in the Cash Management System and can therefore ascertain, trace and account for all Affiliate Transactions and all resulting Affiliate Claims.  The Debtor will also continue to maintain records of all such Affiliate Transactions and Affiliate Claims.  I believe that continuation of Affiliate Transactions is crucial to the Debtor's overall business operations.  The Debtor generally provides more goods to non-Debtor affiliates than it purchases, and therefore any disruption to Affiliate Transactions would result in a reduction of the Debtor's revenue, to the detriment of the Debtor's estate.

e.   *Commercial Cards*

118.     The Debtor provides certain employees with purchasing cards issued by JPMorgan Chase Bank NA ("JPM Chase") under a commercial card program (the "Card Program").  As of the Petition Date, approximately 17 purchasing cards were issued (the "Commercial Cards").  The employees use the Commercial Cards primarily for equipment and supplies relied on by the Debtor in the ordinary course of business.  Payment of costs incurred through the use of the Commercial Cards (the "Card Obligations") is made once a month to JPM Chase.  The Debtor estimates that there are no amounts outstanding with respect to the Commercial Cards as of the Petition Date.  I believe that payment of the Card Obligations represents a sound exercise of the Debtor's business judgment and is necessary for the

preservation of the Debtor's operations and going-concern value of its estate.  Further, it is my view that payment of the Card Obligations is necessary to maintain the Cash Management System and avoid any disruption in payment from customers by credit card.

f.  *Business Forms*

119.    The Debtor uses a variety of checks, preprinted business forms including business letterhead, purchase orders, invoices, envelopes, promotional materials and other business forms and correspondence in the ordinary course of business (collectively, the "Business Forms").  In particular, the Debtor issues a variety of checks on existing stock that cannot be easily altered.  I believe that utilizing all existing Business Forms, without reference to the Debtor's status as a debtor-in-possession until such Business Forms are exhausted,  would avoid confusion during this Chapter 11 Case and minimize expense to the estate.

120.    For these reasons, I believe that the relief requested in the Cash Management Motion represents a sound exercise of the Debtor's business judgment and is necessary for the preservation of the resources and value of their estates.  I also believe that the relief requested in the Cash Management Motion is in the best interest of the Debtor, its creditors and all other parties-in-interest.

H.    Motion of Debtor for Entry of (I) An Interim Order (A) Authorizing the Debtor to Continue Operating Under the Shared Services Agreement and (B) Granting Related Relief and (II) A Final Order Authorizing the Debtor's Assumption of the Shared Services Agreement (the "Shared Services Agreement Motion").

121.    By the Shared Services Agreement Motion, the Debtor requests entry of an (a) interim order authorizing the Debtor to continue operating under that certain Amended and Restated Master Services Agreement, dated May 13, 2023, between Carrier Corporation, Carrier and KFI (the "Shared Services Agreement") and (b) a final order authorizing the Debtor to assume the Shared Services Agreement *nunc pro tunc* to the Petition Date.

i. *Historical Shared Services*

122.    The Debtor historically has relied upon certain non-Debtor affiliates for the provision of goods and corporate and other services important to its operation.  Since the Debtor's spinoff in 2020 to Carrier, the Carrier Group has provided certain shared services ("Services") to the Debtor pursuant to that certain Master Services Agreement dated January 1, 2021 (as amended, modified or supplemented, the "Original Shared Services Agreement").  These Services include, but are not limited to, human resources support, operations and sourcing, controllership, collections, finance and accounting, treasury and paymaster services, information technology, legal, tax, facilities, environmental, health, safety and regulatory ("EHSR"), R&D/engineering, marketing and communications/sales, strategy and real estate.  The Debtor also provides certain services to businesses within the Carrier Group that are necessary for those businesses' continued operations.  The Debtor and Carrier negotiated and agreed, in good faith and at arm's length, fees for the Services that were memorialized in the Original Shared Services Agreement.  The Debtor's outsourcing of the Services to the Carrier Group has enabled the Debtor to efficiently operate its business and is critical to the Debtor's ongoing operations.  Additionally, pursuant to the Original Shared Services Agreement, Carrier also made payments in satisfaction of certain operational and financial obligations on behalf of the Debtor.

ii. *The Amended and Restated Master Services Agreement*

123.    On May 13, 2023, in contemplation of this Chapter 11 Case, the Debtor, Carrier Corporation and Carrier entered into the Shared Services Agreement.  The parties agreed to preserve the historical status quo, and provided for the following changes from the Original Shared Services Agreement:

- Scope of Services.  The Shared Services Agreement updates the scope of services to reflect the services expected to be provided by the Carrier

Group to the Debtor, as well as by the Debtor to the Carrier Group, during this Chapter 11 Case.

- Advance Payment Deposit.  Historically, charges for certain Services and goods provided by the Carrier Group or by the Debtor were settled through an intercompany cash pooling arrangement (the "Carrier Cash Pool").  Reimbursements by the Debtor to Carrier Corporation for payments made by Carrier Corporation on behalf of the Debtor were also settled through the Carrier Cash Pool.   The Shared Services Agreement provides that Carrier Corporation shall retain an Advance Payment Deposit (the "Advance Payment Deposit") in the amount of $21,444,553.  The Advance Payment Deposit shall be available to satisfy certain of the Debtor's obligations to Carrier Corporation under the Shared Services Agreement on a postpetition basis, since the Debtor is no longer a participant in the Carrier Cash Pool.

- Payment of Fees.  The Shared Services Agreement sets up new fee and payment procedures to facilitate payment of fees between the Debtor and Carrier Corporation.  Promptly at the end of each quarter, Carrier Corporation will provide the Debtor with an accounting for (i) the proposed charges for the quarter for services provided by Carrier Corporation to the Debtor (the "Carrier Balance") and (ii) the proposed charges for the quarter for services provided by the Debtor to Carrier (the "KFI Balance").  The Carrier Balance will be netted against the KFI Balance on a quarterly basis.  If the Carrier Balance exceeds the KFI Balance, Carrier Corporation is authorized to debit the Advance Payment Deposit by an amount equal to the difference between (i) the Carrier Balance and (ii) the KFI Balance (the "Quarterly Payment").  To the extent any portion of any Quarterly Payment exceeds the Advance Payment Deposit, the Debtor will promptly pay any remaining balance to Carrier Corporation in cash.  If the KFI Balance exceeds the Carrier Services Balance, Carrier Corporation will promptly pay such excess amount to the Debtor in cash.  KFI will have 15 days to review the proposed quarterly charges prior to settlement and will work together in good faith to resolve any disputes.[5]

- Qualifying Sale.  The Shared Services Agreement provides that Carrier Corporation shall, following the consummation of a Qualifying Sale (as defined in the Shared Services Agreement), offer the purchaser in such

---

[5]   Two payment procedures will take place outside the quarterly reconciliation pursuant to the Shared Services Agreement.  Invoices furnished by the Carrier Group to the Debtor on account of payroll costs or payroll related expenses incurred by the Carrier Group on the Debtor's behalf will be paid promptly (and, in any event, within seven days of receipt of the invoices) by the Debtor in cash.  Additionally, the Shared Services Agreement provides that the Debtor will provide invoices for goods sold to the Carrier Group and the applicable member of the Carrier Group will pay the Debtor in cash on payment terms consistent with past practice, as set forth in the Cash Management Motion.

Qualifying Sale the opportunity to enter into a transition services arrangement for a period of at least 12 months on terms substantially similar to those Carrier Corporation generally offers to similar purchasers in connection with carve-out transactions or dispositions.

- <u>Termination by the Debtor</u>. The Shared Services Agreement provides the Debtor with the right to terminate the Shared Services Agreement (i) in its entirety upon 30 days' written notice to Carrier Corporation and (ii) with respect to any particular service(s) provided by Carrier, upon 30 days' written notice to the extent the Debtor has determined, in its sole discretion, that (x) such service(s) is no longer needed or (y) a replacement of such service(s) by a third party is in the best interest of the Debtor.

- <u>Termination by Carrier</u>. The Shared Services Agreement provides Carrier with the right to terminate the Shared Services Agreement (i) immediately upon (a) the conversion of this Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, (b) dismissal of this Chapter 11 Case or (c) the appointment of a trustee in this Chapter 11 Case, (ii) immediately upon 45 days from the Petition Date unless an order in form and substance reasonably satisfactory to Carrier Corporation authorizing the assumption of the Shared Services Agreement has been entered, (iii) immediately upon (a) any determination by any court reversing or vacating court approval of the assumption of the Shared Services Agreement, (b) the filing by the Debtor of a motion to reject the assumption of, or otherwise seeking the termination of the Shared Services Agreement, (c) any determination by any court modifying the Shared Services Agreement in a manner materially adverse to Carrier Corporation, without the consent of Carrier Corporation or (d) the failure of the Debtor to file this Motion on the Petition Date, (iv) no earlier than 60 days following either (a) the termination or expiration of the Debtor's exclusive period to file a chapter 11 plan or (b) the Debtor's failure to file a motion seeking approval of bidding procedures within 90 days of the Petition Date, (v) promptly following the consummation of a Qualifying Sale; *provided* that Carrier Corporation has offered the purchaser in a Qualifying Sale the opportunity to enter into a transition services arrangement as contemplated above, (vi) immediately upon a material breach by the Debtor of the terms of the Shared Services Agreement and if such breach is curable, such breach fails to be cured within 30 days to the satisfaction of Carrier Corporation, such satisfaction not to be unreasonably withheld, conditioned or delayed, (vii) promptly after the balance of the Advance Payment Deposit is reduced to zero, if the Debtor has failed to provide adequate assurance of continued payment of amounts due to Carrier Corporation under the Shared Services Agreement within 30 days of a written request therefor by Carrier Corporation or (viii) with respect to any particular service(s) provided by the Debtor, upon 30 days' written notice.

- <u>Indemnification</u>.  The Shared Services Agreement provides that both Carrier Corporation and the Debtor agree to indemnify each other from and against any claims incurred, to the extent in connection with the performance of the Shared Services Agreement or any services provided on or after the Effective Date.

124.    Other than the foregoing provisions, the Shared Services Agreement is substantially similar to the Original Shared Services Agreement.  Critically, the changes in the Shared Services Agreement from the Original Shared Services Agreement were not intended to change the relationship between the Debtor and the Carrier Group, but to accurately reflect the historical ordinary course transactions.

iii.    *The Affiliate Claims*

125.    As described above, the Debtor had a prepetition balance against the Carrier Cash Pool on account of its prepetition affiliate transactions.  On May 11, 2023, Carrier remitted to the Debtor approximately $134 million in cash (the "<u>Pool Balance Undisputed Cash</u>") constituting the Debtor's balance against the Carrier Cash Pool, net of certain agreed offsets and deductions and approximately $40 million of additional offsets and deductions proposed by Carrier (the "<u>Disputed Offsets</u>").  All parties' rights are reserved with respect to the Disputed Offsets, which are being reviewed by a Special Committee of the Debtor's Board of Directors.  As a result, the ultimate prepetition affiliate balance between the Debtor and Carrier is undetermined at this time.  The Debtor seeks, on an interim basis subject to entry of a final order, to continue operating under the Shared Services Agreement and does not seek authorization, prior to the entry of a final order, to reimburse Carrier for any expenditure relating to any period prior to the Petition Date.  The Debtor seeks authorization, pursuant to a final order, to pay any cure amount by the earlier of (a) when the Debtor and Carrier agree to an amount or (b) the date specified in a final and non-appealable order entered by this Court determining such amount.

iv. *Employee Wages and Benefits Services*

**1. Employee Wages**

126.     As of the Petition Date, the Debtor directly employed approximately 250 individuals, with the majority of the workforce located in Massachusetts (collectively, the "Direct Employees").  Approximately 33 employees of certain non-Debtor affiliates of the Debtor also perform services for the Debtor as of the Petition Date (collectively and together with the Direct Employees, the "Employees").  In the ordinary course of business, Employees are paid base wages or salaries (the "Wage Obligations") through a Carrier payroll system on behalf of the Debtor, and the Debtor then reimburses Carrier.  The Debtor expects to incur costs not exceeding approximately $22.8 million per year on account of the Wage Obligations.

**2. Employee Benefits**

127.     Eligible Employees may participate in a shared health and welfare benefits program managed by Carrier, including medical, vision, and dental insurance plans and life, accidental death, short-term disability, long-term disability, and certain other risk and disability insurance benefits (the "Health and Welfare Coverage and Benefits"), which are administered through various third-party providers.  The Debtor expects to incur costs not exceeding approximately $60,000 per year related to the administration of Health and Welfare Coverage and Benefits.  Additionally, Carrier manages for the Debtor's eligible Employees participation in a retirement savings plan that satisfies the requirements of sections 401(a) and 401(k) of the Internal Revenue Code (the "401(k) Plan").  The Debtor expects to incur costs not exceeding approximately $1.8 million per year in connection with matching and automatic contributions on behalf of the Debtor's Employees on account of the 401(k) Plan.

128.     Employees are also eligible for vacation, sick days and holidays (collectively, the "PTO Benefits").  Employees are paid their regular salaried or hourly rate when

they elect to exercise PTO Benefits.  Carrier also manages paid leave benefit programs (the "Paid Leave Benefits," and together with the PTO Benefits, the "Time Off Benefits") for the Debtor's eligible Employees.  Employees are eligible to be paid only for specific types of leave, including medical leave, bereavement leave, U.S. military leave, birth & adoption leave, parental leave and jury duty.

### 3.  Bonus Programs

129.    In order to properly incentivize the Employees, Employees participated in certain bonus programs, including the AIP, SIP, Attendance Bonus Program, Discretionary Bonus Program and Special Awards Policy (as such terms are defined below) (collectively, the "Bonus Programs").  The Bonus Programs include an annual incentive program (the "AIP") and a sales incentive program for sales Employees (the "SIP"), each of which is a program in which eligible Employees are offered the opportunity to earn one or more cash bonus payments (each, a "Bonus").  The AIP is an annual cash incentive program designed to drive short-term, in-year performance based on established business metrics.  Bonuses under the AIP are earned and paid annually, with payment made in the first quarter of the year following the year in respect of which such payment is earned.  The Debtor expects to incur costs not exceeding approximately $450,000 per year on account of the AIP.  The SIP provides eligible Employees with the opportunity to earn a Bonus for achieving applicable sales-based objectives.  Bonuses under the SIP are paid on a quarterly basis after the end of the applicable calendar quarter.  The Debtor expects to incur costs not exceeding approximately $105,000 per year on account of the SIP.

130.    The Perfect Attendance Bonus program (the "Attendance Bonus Program") offers a cash bonus opportunity of up to $750 for achieving perfect attendance each year ($150 per quarter, plus an additional $150 at year end).  The Debtor expects to incur costs not exceeding approximately $50,000 per year on account of the Attendance Bonus Program.

The discretionary bonus program (the "Discretionary Bonus Program") offers a $5,000 cash bonus to designated Employees who achieve specified collections targets.  There are two Employees eligible to participate in the Discretionary Bonus Program as of the Petition Date.

131.    Certain Employees are also eligible to participate in the Special Awards Policy (the "Special Awards Policy"), another cash awards program managed by Carrier.  The Special Awards Policy rewards extraordinary performance and contributions through cash awards ranging from $200 up to a maximum of 10% of an Employee's base salary.  The Debtor expects to incur costs not exceeding approximately $18,000 per year on account of the Special Awards Policy.

132.    It is my understanding that the Debtor does not seek authorization to reimburse any amounts arising from the Bonus Programs to any Employees who are insiders (as such term is defined in section 101(31) of the Bankruptcy Code), but reserves the right to request such authority upon separate motion to the Court.

**4.   Severance Practice**

133.    The Debtor maintains a severance practice (the "Severance Practice") in the ordinary course of business that provides for payments to Employees whose employment is involuntarily terminated (each, a "Severance Payment").  Severance Payments are payable in a lump sum following execution and non-revocation of a general release of claims, depending on the Employee's tenure and other factors.  Severance Payments are provided only to Employees who have executed and not revoked a release of claims.  It is my understanding that the Debtor does not seek permission to reimburse any Severance Payments which would violate section 503(c) of the Bankruptcy Code.

**5.   Other Employee Programs**

134.    The Debtor also provides certain other benefits to Employees, including

-48-

tuition reimbursement, reimbursement of business expenses in accordance with applicable policies and relocation expenses (collectively, the "Other Employee Programs").  The Debtor expects to incur costs not exceeding approximately $1,850,000 per year on account of the Other Employee Programs.

## 6.   Withholding and Deduction Obligations

135.    I am advised that various laws require that the Debtor withhold certain amounts from Employees' gross pay for remittance to the appropriate federal, state, or local taxing authorities or as required by statute, including for garnishments, child support, Social Security, and Medicare taxes (the "Withholding Obligations").  It is my understanding that deductions on account of tax obligations to the federal government are remitted immediately while remittances to various state authorities may lag by one or more weeks.

136.    The Debtor also routinely deducts certain amounts from Employees' paychecks, including pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed herein, such as an Employee's share of healthcare benefits and insurance premiums, 401(k) contributions, and miscellaneous deductions (collectively, the "Deductions" and, together with the Withholding Obligations, the "Withholding and Deduction Obligations"). Those amounts are forwarded to various third-party recipients or retained for any self-insured benefit programs as applicable.

137.    In addition to the Withholding and Deduction Obligations, the Debtor incurs obligations on account of U.S. Social Security and income taxes in the states and localities in which the Debtor operates (the "Employer Payroll Taxes") for remittance to the appropriate federal, state, and local taxing authorities.

### v.   *Other Shared Services*

138.    Under the Shared Services Agreement, Carrier or the Carrier Group

provides other services to the Debtor in the ordinary course of business. Under the Shared

Services Agreement, the Debtor reimburses Carrier for applicable costs incurred by Carrier

associated with such services. These services include but are not limited to:

- Taxes and Fees. In the ordinary course of business, the Debtor must process, remit and pay certain taxes and fees, including regulatory and filing fees and property, income and sales taxes accrued by the Debtor in the ordinary course of business (collectively, the "Taxes and Fees"). Under the Shared Services Agreement, Carrier may pay the Taxes and Fees on the Debtor's behalf directly to the respective taxing authority in the ordinary course as they come due. Over the past 12 months, costs for such Taxes and Fees were approximately $8 million.

- Insurance. In the ordinary course of business, the Debtor maintains coverage under a group insurance program (the "Insurance Program") managed by Carrier that provides millions of dollars of coverage on behalf of the Debtor. The Insurance Program includes coverage for, among other things, property, general liability, automobile liability, cyber liability, workers' compensation, umbrella coverage, employer liability, professional liability, nuclear liability, aircraft products liability, crime, fiduciary liability, marine cargo/transit, excess liability, and directors' and officers' liability. Over the past 12 months, costs for such Insurance Programs were approximately $5 million.

- Surety Bonds. In the ordinary course of business, the Debtor is required to provide surety bonds to certain governmental units or other public agencies to secure the Debtor's payment or performance of certain obligations (the "Surety Bond Program"). The Debtor maintains three surety bonds managed by Carrier (the "Surety Bonds"), two with Fidelity and Deposit Company of Maryland and one with Federal Insurance Company.[6] Over the past 12 months, costs for such Surety Bond Programs were approximately $20,000.

- Customer Programs. The Debtor offers its customers certain discounts, incentives and other accommodations designed to increase the Debtor's sales and attract and retain customers (the "Customer Programs"). These are typically provided and paid for by the Debtor. However, in the ordinary course of business, Carrier may also pay on the Debtor's behalf for certain incentives for the Debtor's customers. This includes an annual incentive-based trip for high volume sales distributors that takes place

---

[6] A standby trust account is maintained to support one of the surety bonds, for which the Debtor reimburses Carrier for the annual fee.

every May.  Over the past 12 months, costs for such Customer Programs were approximately $150,000.

- <u>Information Technology</u>.  The Carrier Group provides overall IT consulting and infrastructure services to the Debtor, including hardware and software maintenance and management, global network security, emails, website maintenance and updates, and third-party vendors management.  Over the past 12 months, costs for such information technology services were approximately $1-1.5 million.

- <u>Finance and Accounting</u>.  The Carrier Group provides finance and accounting services to the Debtor, including accounts receivables services, accounts payable services, treasury, budgets and forecasts.  Over the past 12 months, costs for such finance and accounting services were approximately $750,000.

- <u>EHSR</u>.  The Carrier Group provides EHSR services to the Debtor, including regulatory compliance, permitting, establishing global programs for EHSR practices and procedures, physical security systems, and third party vendor management, which amount to less than $50,000 per year.

139.    Operating under the Shared Services Agreement is consistent with the Debtor's ordinary course prepetition practice.  The Original Shared Services Agreement was put into place upon the spinoff of the Debtor to Carrier, and had since been relied upon by the Debtor to obtain critical services from the Carrier Group.  The Shared Services Agreement preserved the historical status quo, and implemented certain changes to the Original Shared Services Agreement to better facilitate affiliated transactions.

140.    It is also my view that assumption of the Shared Services Agreement is a proper exercise of the Debtor's business judgment.  I believe that the Shared Services Agreement is critical to the success of the Debtor's business and, particularly, to the Debtor's smooth transition into chapter 11.  The Debtor has historically outsourced these functions and continuing to do so, with a service provider with whom the Debtor has an established relationship and systems already in place for the provision of such services, is in the best interest of the Debtor's estate and creditors.  Any disruption to the Debtor's and the Carrier Group's arrangements could

severely disrupt the Debtor's operations and cause severe, irreparable harm to the Debtor's business.  Therefore, given the indispensable nature of the Services and other transactions contemplated by the Shared Services Agreement to the ordinary course business operations of the Debtor and the economic benefits to the Debtor generated from the overall fee arrangement thereof, I believe that the assumption of the Shared Services Agreement is a proper exercise of the Debtor's business judgment.

141.    For these reasons, I believe that the relief requested in the Shared Services Motion is in the best interests of the Debtor, its creditors and all other parties-in-interest.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  May 14, 2023                              */s/ James A. Mesterharm*
                                                  Name:  James A. Mesterharm
                                                  Title:  Chief Transformation Officer