# EXHIBIT A

**National Foam Sale Agreement**

Dated 28 June 2013

**(1) KIDDE PRODUCTS LIMITED**

and

**(2) KIDDE-FENWAL, INC.**

and

**(3) SICLI HOLDING S.A.S.**

and

**(4) UTC FIRE & SECURITY SERVICES**

and

**(5) UTC FIRE & SECURITY CORPORATION**

and

**(6) EUROSTAR HOLDCO LIMITED**

and

**(7) EUROSTAR BIDCO LIMITED**

and

**(8) EUROSTAR TRADECO LIMITED**

and

**(9) EUROSTAR US TRADECO, INC.**

SHARE AND BUSINESS SALE AGREEMENT

relating to the sale and purchase of certain of the business and assets of each of Kidde Products Limited and Kidde-Fenwal, Inc., and the entire issued share capital of each of Eau et Feu SAS and Vanrullen Uniser SAS

**Linklaters**
Linklaters LLP
One Silk Street
London
EC2Y 8HQ

Telephone (44-20) 7456 2000
Facsimile (44-20) 7456 2222

Ref  L-199525

PJK/PJK/53220/120037/UKM/51132055.3

**Table of Contents**

**Contents**                                                                                                                         **Page**

1    Interpretation ............................................................................................................. 3

2    Agreement to Sell the Group ..................................................................................... 25

3    Consideration ............................................................................................................ 31

4    Closing ...................................................................................................................... 33

5    Transfer of Contracts................................................................................................. 34

6    Accounts Receivables................................................................................................ 35

7    Post-Closing Adjustments ......................................................................................... 35

8    Post-Closing Obligations........................................................................................... 37

9    Warranties ................................................................................................................. 44

10   Indemnities................................................................................................................ 45

11   Limitation of Sellers' Liability ..................................................................................... 52

12   Claims ....................................................................................................................... 56

13   Restrictions on the Sellers ........................................................................................ 58

14   Insurance................................................................................................................... 64

15   Guarantee and Indemnity.......................................................................................... 64

16   Other Provisions........................................................................................................ 66

Schedule 1 Part 1 Details of the Share Sellers, Shares etc. (Clause 1.1) ...................... 75

Schedule 1 Part 2 Details of the Business Sellers, Business Purchasers, Group Businesses etc. (Clause 1.1) ................................................................................................................. 76

Schedule 2 Companies and Subsidiary ........................................................................... 77

Schedule 3 Part 1 The Properties (Clauses 1.1 and 2.3.1)  Business Freehold Properties of the Business Sellers ........................................................................................................... 79

Schedule 3 Part 2 Terms of Transfer of Business Freehold Properties ........................... 80

Schedule 3 Part 3 Business Leasehold Properties - particulars of leases........................ 81

Schedule 3 Part 4 Terms of Transfer of Business Leasehold Properties........................................82

Schedule 3 Part 5 Company Properties....................................................................................83

Schedule 3 Part 6 Former Properties......................................................................................84

Schedule 4 Contracts and Third Party Consents (Clause 2.3.1) ....................................................85

Schedule 5 Part 1 Business IPR .............................................................................................88

Schedule 5 Part 2 ............................................................................................................108

Schedule 5 Part 3 ............................................................................................................109

Schedule 5 Part 4 ............................................................................................................110

Schedule 6 ....................................................................................................................112

Moveable Assets excluded from the sale of the Group Businesses .............................................112

Schedule 6 ....................................................................................................................114

Schedule 7 UK Relevant Employees (Clause 2.5.1)..................................................................118

Annex A to Schedule 7 Current Employees .............................................................................123

Part 1 UK Relevant Employees.............................................................................................123

Part 2 US Relevant Employees.............................................................................................124

Annex B to Schedule 7 Collective Agreements........................................................................125

Schedule 8 Part 1 Allocation of Purchase Price (Clauses 3.2 and 7.3) .........................................126

Schedule 9 VAT (Clause 3.4) ..............................................................................................131

Schedule 10 Closing Obligations (Clause 4)............................................................................133

Schedule 11 Part 1 Closing Statement (Clause 7)....................................................................137

Schedule 11 Part 2 Form of Closing Statement (Numbers are for illustration only) (Clause 7)....140

Schedule 12 Part 1 General Warranties (Clause 9.1).................................................................141

Schedule 12 Part 2 US Warranties .......................................................................................172

Schedule 12 Part 3 French Warranties ..................................................................................178

Schedule 13 Warranties given by the Purchasers under Clause 9.3..............................................181

Schedule 14 Trading Names, Registered Trade Marks and Unregistered Trade Marks not to be used by the Purchasers under Clause 8.5.1 (subject to the documents in the Agreed Terms) .... 182

Schedule 15 Sellers' Knowledge Persons (Clause 9.1.5) ............................................................ 183

Schedule 16 Employees Subject to Non-Solicitation .................................................................... 184

Schedule 17 Guarantees (Clauses 8.3.2 and 8.3.3) .................................................................... 186

Schedule 18 Product Approvals ................................................................................................... 194

Schedule 19 Other Contracts ....................................................................................................... 197

Schedule 20 Part 1 Computer Systems ....................................................................................... 202

Schedule 20 Part 2 Moveable Assets ........................................................................................... 203

Schedule 21 Kirkby Powder Assets .............................................................................................. 204

Schedule 21 Kirkby Powder Assets .............................................................................................. 205

Schedule 22 ITAR Items ............................................................................................................... 206

Schedule 23 Guarantor Balance Sheet ........................................................................................ 211

Schedule 24 Kirkby Powder Assets - Transfer Provisions ........................................................... 212

**Documents in the Agreed Terms**

Assignments of Accounts Receivables

Bill of Sale and Instrument of Assignment

Board minutes: Business Sellers

Board minutes: Group Companies

Board minutes: Purchasers

Business Trade Creditors List

Directors' letters of resignation

Disclosure Letter

Exton Lease Assignment

General Warranty Deed: Angier

General Warranty Deed: West Chester

Kidde Canada Agreement

Kidde Australia Agreement

Local Transfer Documents

Monnex Agreement

Notice of assignment of Contracts

Property Transfer Form

Quitclaim Deed: Angier

Suppression Agreement

Suppression Lease

Tax Indemnity

Transitional Services Agreement

US Domain Name Assignment

US Trademark Assignment

UK Domain Name Assignments

UK Trademark Assignment

**Share and Business Sale Agreement**

**This Agreement** is made on                                              *28*      June 2013

**between:**

(1)     **Kidde Products Limited**, a company incorporated in England and Wales with number 4622271 whose registered office is at Mathisen Way, Colnbrook, Slough, Berkshire SL3 0HB ("**Kidde Products**");

(2)     **Kidde-Fenwal, Inc.**, a corporation incorporated in the state of Delaware, United States of America with an office located at 400 Main Street, Ashland, Massachusetts, USA ("**Kidde-Fenwal**");

(3)     **SICLI Holding SAS**, a French *société par actions simplifiée* whose registered office is at bâtiment Magellan 1, parc Saint Christophe, avenue de l'Entreprise, 95865 Cergy (France), registered with the trade register of Pontoise under number 351 967 922 ("**SICLI**"); and

(4)     **UTC Fire & Security Services**, a French *société en commandite simple* whose registered office is at bâtiment Magellan 1, parc Saint Christophe, avenue de l'Entreprise, 95865 Cergy (France), registered with the trade register of Pontoise under number 702 000 522 ("**UTCFS**");

(each of Kidde Products, Kidde-Fenwal, SICLI and UTCFS a "**Seller**" and together the "**Sellers**");

(5)     **UTC Fire & Security Corporation**, a corporation incorporated in the state of Delaware, United States of America with an office located at 400 Main Street, Ashland Massachusetts USA (the "**Guarantor**");

(6)     **Eurostar Holdco Limited**, a company incorporated in England and Wales with number 8441763 whose registered office is at 118 Panorama Road, Sandbanks, Poole, Dorset BH13 7RG ("**Purchaser Holdco**");

(7)     **Eurostar Bidco Limited**, a company incorporated in England and Wales with number 8441921 whose registered office is at 118 Panorama Road, Sandbanks, Poole, Dorset BH13 7RG ("**Purchaser One**");

(8)     **Eurostar Tradeco Limited**, a company incorporated in England and Wales with number 8441992 whose registered office is at 118 Panorama Road, Sandbanks, Poole, Dorset BH13 7RG ("**Purchaser Two**"); and

(9)     **Eurostar US Tradeco, Inc.**, a corporation incorporated in Delaware, whose registered office is at 1209 Orange Street, Wilmington, Delaware 19801 ("**Purchaser Three**"),

(each of Purchaser One, Purchaser Two and Purchaser Three a "**Purchaser**" and together the "**Purchasers**").

---

**Whereas**:

(A)     Kidde Products has agreed to sell the Angus Fire Businesses and to assume the obligations imposed on it under this Agreement.

(B)     Kidde-Fenwal has agreed to sell the National Foam Business and to assume the obligations imposed on it under this Agreement.

(C)     SICLI and UTCFS have agreed to sell the Shares and to assume the respective obligations imposed on each of them, respectively, under this Agreement.

(D)     The Guarantor has agreed to guarantee the obligations imposed on each Seller under this Agreement.

(E)     Purchaser One has agreed to purchase the Shares, Purchaser Two has agreed to purchase the Angus Fire Businesses and Purchaser Three has agreed to purchase the National Foam Business and the Purchasers agree to assume the respective obligations imposed on each of them, respectively, under this Agreement.

(F)     Purchaser Holdco has agreed to give certain undertakings in favour of the Sellers regarding, *inter alia*, the conduct of the Purchasers in the fifteen month period following the Closing Date.

**It is agreed** as follows:

**1       Interpretation**

In this Agreement, unless the context otherwise requires, the provisions in this Clause 1 apply:

**1.1      Definitions**

"**24-Month Bonds**" means the guarantees listed in Part 4 of Schedule 17 granted by one or more banks on behalf of one or more Group Companies to third parties  (each, a "**24-Month Bond**");

"**Accounting Standards**" means:

(i)      in the case of the Company Accounts, generally accepted accounting principles in France; and

(ii)     in all other cases, generally accepted accounting principles in the United States of America;

"**Accounts Date**" means 31 December 2012;

"**Accounts Receivables**" means the book and other debts or accounts receivable by, or owed to, either of the Business Sellers to the extent related to the Group Businesses at Closing whether or not yet due or payable (including trade debts, deposits, prepayments, accrued income, retrospective rebates and overpayments) and interest thereon and the benefit of all securities, guarantees, indemnities and rights relating to those debts or other sums, but excluding:

(i)      debts owed to either of the Business Sellers by any employee who is not a Relevant Employee;

(ii)     debts owed to either of the Business Sellers by any relevant Tax Authority in respect of Taxation including, for the avoidance of doubt, any bond or other security

issued by any Tax Authority or other governmental agency representing any such debts;

(iii)     any item which falls to be treated as part of the Cash Balances held by or on behalf of either of the Business Sellers at the close of business on the Closing Date exclusively in relation to the Group Businesses; and

(iv)     debts in relation to any Excluded Asset or Excluded Liability;

**"Actuary"** means an independent suitably qualified actuary of international standing and repute to be agreed by the Sellers' Representative and Purchaser Two within seven days of a notice being served by one to the other requiring such agreement or, failing such agreement, to be nominated on the application by either of them by or on behalf of the President of the Institute and Faculty of Actuaries;

**"Acquisition Documents"** means this Agreement, the Disclosure Letter, documents in the Agreed Terms and any other documents to be delivered on Closing;

**"AF Business"** means the unincorporated business trading as "Angus Fire" currently carried on by Kidde Products and being sold under this Agreement;

**"AFE Business"** means the unincorporated business trading as "Angus Fire Engineering" currently carried on by Kidde Products and being sold under this Agreement;

**"Affiliate"** means, with respect to any person, any other person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with such person. "Control" for this purpose means the possession, directly or indirectly, of more than 50 per cent. of the voting power of a person;

**"Agency and Distribution Contracts"** means the agency and distribution contracts entered into by or on behalf of any Business Seller wholly or mainly relating to the Angus Fire Businesses and/or the National Foam Business including those details of which are set out in Part 1 of Schedule 19, and **"Agency and Distribution Contract"** means any one of them;

**"Agreed Terms"** means, in relation to a document, such document in the terms agreed between the Sellers' Representative and the Purchasers and signed for identification by the Purchasers and the Sellers' Representative and attached hereto, with such alterations as may be agreed in writing between the Sellers' Representative and the Purchasers from time to time;

**"Agreement"** means this agreement;

**"Angus Fire Assets"** means the Business Assets related to the Angus Fire Businesses and **"Angus Fire Asset"** means any one of them;

**"Angus Fire Businesses"** means together, the AF Business and the AFE Business;

**"Anti-Corruption Laws"** means:

(a)     the OECD Convention on Combating Bribery of Foreign Public Officials in International Transactions 1997 (the **"OECD Convention"**);

(b)     the Bribery Act 2010;

(c)     the Foreign Corrupt Practices Act of the United States of America (**"FCPA"**); and

(d)     any other Law (including any (a) statute, ordinance, rule or regulation; (b) order of any court, tribunal or any other judicial body; and (c) rule, regulation, guideline or order of any public body, or any other administrative requirement of a public body) which:

      (i)     prohibits the conferring of any gift, payment or other benefit on any person or any officer, employee, agent or adviser of such person; and/or

      (ii)    is broadly equivalent to the FCPA and/or the Bribery Act 2010 or was intended to enact the provisions of the OECD Convention;

**"Assignments of Accounts Receivables"** means the assignments of Accounts Receivables to be entered into on Closing in the Agreed Terms;

**"Assumed Liabilities"** means the Liabilities of the Business Sellers (other than the Excluded Liabilities) to be assumed by the Purchasers under or pursuant to Clause 2.3.5 and **"Assumed Liability"** means any one of them;

**"Back-Stopped Guarantees"** has the meaning given to it in Clause 8.3.2 and Part 1 of Schedule 17;

**"Base Working Capital"** means the sum of forty million, six hundred and fifty one thousand US dollars ($40,651,000);

**"Bid Amount"** means in relation to any Shares or Group Business, the amount set out against the name of the relevant Shares or Group Business in column (4) of paragraph 1 of Schedule 8 and, in aggregate, in relation to all the Shares and Group Businesses, US$77,000,000;

**"Bill of Sale and Instrument of Assignment"** means the agreement relating to the transfer of the National Foam Business to be entered into on Closing in the Agreed Terms;

**"Business Accounts"** means the monthly unaudited profit and loss account and balance sheets of each Group Business and Group Company as extracted from the Group's Hyperion financial reporting system, prepared in the same form as the accounts set out in *Angus Fire _Eurostar data related to the consolidated business: G.\YTD Trading results – 2013 - Project Eurostar Business Accounts* of the Data Room, such accounts having been carved out of a larger business entity's accounts based upon various estimates, allocations and assumptions which have been reflected in the Business Financial Datapacks;

**Business Assets"** means all the property, rights and assets agreed to be sold under Clause 2.3.1 or, where relevant, any Local Transfer Document but excluding all property, rights and assets described in Clause 2.3.4;

**"Business Confidential Information"** means all and any information which is not in the public domain and which belongs to the Group Businesses (including information relating to the products or services, processes and operations of the Group Businesses, their customer and supplier lists, price lists, contractual arrangements, market opportunities, plans and intentions, developments, data, results, inventions (whether patentable or not), Know-how, show how, Trade Secrets, forecasts, analyses, evaluations, research methodologies, technical or business information, personnel information and other matters concerning the business, trading or financial or other affairs of, or relating to, the Group Businesses or their customers, clients or other persons having dealings with them), whether such information is oral, in writing, electronic or other form, whether tangible or

otherwise or marked in writing as "confidential", and all and any information which has been or may be derived or obtained from any such information;

"**Business Day**" means a day which is not a Saturday, a Sunday or a public holiday in London, New York or Paris;

"**Business Financial Datapacks**" means the unaudited financial datapacks relating to each of the Group Businesses and for the Group Companies for the 2 financial years to the Accounts Date set out in *Angus Fire_AFE Dataroom: C.2 \ Draft Project Eurostar - Angus Fire Engineering.xlsx, Angus Fire_Angus Fire Dataroom: C.2 \ Draft Project Eurostar - Angus Fire.xlsx, National Foam Dataroom: C.3 \ Draft Project Eurostar - Kidde Fire Fighting 1.28.13.xlsx, Eau et Feu Dataroom: C.4 \ Draft Project Eurostar - Eau et Feu 1.28.13.xlsx* of the Data Room;

"**Business Freehold Properties**" means the freehold properties set out in Part 1 of Schedule 3 and "**Business Freehold Property**" means any one of them;

"**Business IPR**" means all Intellectual Property Rights which immediately before Closing are used wholly or mainly relating to the Group Businesses, including the Intellectual Property Rights, details of which are set out in Schedule 5;

"**Business Know-how**" means all rights and interest held by the Business Sellers in Know-how (whether as owner, licensee or otherwise) which immediately before Closing is used wholly or mainly in relation to the Group Businesses;

"**Business Leasehold Properties**" means the leasehold properties set out in Schedule 3 Part 3 of Schedule 3 and "**Business Leasehold Property**" means any one of them;

"**Business Licences In**" means those licences, permissions or other contractual rights which continue in force at the Closing Date, whether or not documented in writing, granting the Business Sellers the right to use any Licensed in IP;

"**Business Licences Out**" means those licences, permissions or other contractual rights which continue in force at the Closing Date, whether or not documented in writing, granted by the Business Sellers to third parties concerning the use of any Business IPR;

"**Business Management Accounts**" means the unaudited balance sheet of each Group Business and the unaudited profit and loss account of each Group Business for the three month period to 31 March 2013 in the relating to each of the Group Businesses for the three month period to 31 March 2013, which are set out in *Angus Fire _Eurostar data related to the consolidated business: G.\YTD Trading results – 2013 - 2013 Mgmt Accounts through May for LDC.xlsx* of the Data Room, such accounts having been carved out of a larger business entity's accounts based upon various estimates, allocations and assumptions which have been reflected in the Business Financial Datapacks;

"**Business Properties**" means the Business Freehold Properties and the Business Leasehold Properties and "**Business Property**" means any one of them;

"**Business Purchasers**" means, together, Purchaser Two and Purchaser Three;

"**Business Records**" means all books of account, records, documents and information of the Business Sellers (in whatever form held) to the extent relating to all or any part of the Group Businesses, the Business Assets or the Current Employees, but does not mean the Business Accounts, the Business Financial Datapacks, the Business Management Accounts, the Company Accounts or the Company Management Accounts;

"**Business Sellers**" means Kidde Products and Kidde-Fenwal and "**Business Seller**" means any one of them;

"**Business Trade Creditors**" means the book and other debts or accounts payable by either of the Business Sellers to the extent related to the Group Businesses at Closing whether or not yet due as listed in the Business Trade Creditor List;

"**Business Trade Creditors List**" means the list of Business Trade Creditors in the Agreed Terms;

"**CAA**" has the meaning given to it in Clause 3.3;

"**Cash Balances**" means cash in hand or credited to any account with a financial institution, in each case, having regard to the reconciled cash book balances of the Group Companies;

"**Claims**" means all rights and claims of any Business Seller arising at any time whether before or after Closing to the extent in relation to any of the Business Assets including all rights and claims of the Business Sellers under any warranties, conditions, guarantees or indemnities, whether express or implied, in favour of the Business Sellers in relation to any of the Business Assets or any Assumed Liability but excluding:

(i)      any rights or claims under the Sellers' Group Insurance Policies; and

(ii)     any claims against any relevant Tax Authority in respect of Taxation,

and "**Claim**" means any one of them;

"**Closing**" means the completion of the sale of the Shares and of the Group Businesses pursuant to Clause 4 and the Local Transfer Document;

"**Closing Amount**" has the meaning given in Clause 4.3;

"**Closing Date**" means the date on which Closing takes place;

"**Closing Statement**" means the statement setting out the Working Capital, the Group Companies' Cash Balances, and the Group Companies' Indebtedness, to be prepared by the Purchasers in accordance with Clause 7 and Schedule 11;

"**Companies**" means the companies being sold pursuant to this Agreement, details of which are set out in Schedule 2 and "**Company**" means any one of them;

"**Company Accounts**" means the audited accounts of the Group Companies for the two financial years ended on the 31 December 2011 as set out in Section *Eau et Feu Dataroom: C.1 3 Years audited financial statements including signed audit reports and balance sheet specifications:*

*KF C-15 2009 Financial Statement from PWC - Eau et Feu n°1.pdf*

*KF C-15 2009 Financial Statement from PWC - Eau et Feu n°2.pdf*

*KF C-15 2009 Financial Statement from PWC - VRB.pdf*

*KF C-15 2010 Financial Statement from PWC - Eau et Feu.pdf*

*KF C-15 2010 Financial Statement from PWC - VRB.pdf*

*KF C-15 2011 Financial Statements from PWC - Eau et Feu.pdf* of the Data Room;

"**Company Freehold Property**" means the property listed at paragraph (i) of Part 5 of Schedule 3;

"**Company Leasehold Property**" means the property listed at paragraph (ii) of Part 5 of Schedule 3;

"**Company Management Accounts**" means the unaudited balance sheet of each Group Company and the unaudited profit and loss account of each Group Company for the three month period to 31 March 2013 as set out in *Section Angus Fire _Eurostar data related to the consolidated business: G.\YTD Trading results – 2013 - 2013 Mgmt Accounts through May for LDC.xlsx* of the Data Room;

"**Competing Business**" means the development and/or manufacturing of (i) fire fighting and industrial hose and (ii) fire fighting foam but, for the avoidance of doubt, excludes any activities carried out in connection with fire extinguishers and/or lifts;

"**Competition Laws**" means all applicable competition, state aid, anti-trust or anti-restrictive trade practice Laws (including Articles 101, 102 and 106 to 109 of the Treaty on the Functioning of the European Union, sections 2 and 18 of the Competition Act 1988, section 188 of the Enterprise Act 2002, Council Regulation 139/2004/EC on the control of concentrations between undertakings, the Sherman Act, as amended, the Clayton Act, as amended, the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, the Federal Trade Commission Act, as amended, and all other federal, state and foreign, if any, statutes, rules, regulations, orders, decrees, administrative and judicial doctrines and other laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition);

"**Computer Systems**" means any computer systems used wholly or mainly by or for the benefit of the Group Businesses and the Group Company Businesses, and includes:

(i)      computer hardware and peripherals, telecommunications equipment and infrastructure and any other Information Technology related plant and equipment;

(ii)     all software, firmware or middleware and accompanying Source Code and supporting documentation; and

(iii)    any other Information Technology related documentation and data entered into such computer systems or created by the Sellers,

including those detailed in Part 1 of Schedule 20;

"**Confidentiality Agreements**" means the three confidentiality agreements dated 22 August 2012 between LDC (Managers) Limited and each of Kidde Products, Kidde Fenwal and SICLI, pursuant to which the Sellers made available to LDC (Managers) Limited (and its advisers), certain confidential information relating to the Sellers' Group and the Group;

"**Consultancy Agreement**" means an agreement other than a contract of employment with a Group Company or a Group Business pursuant to which an individual provides services in relation to the business of any Group Company or to any Group Business;

"**Consultant**" means an individual providing services to a Group Company or a Group Business pursuant to a Consultancy Agreement on an annual fee (on the basis of a full time consultancy) in excess of €20,000 or the local equivalent;

"**Contamination**" means the presence on or before the Closing Date of Hazardous Substances in, on or under the soil, groundwater or surface water at the Properties or the Former Properties and/or the migration of such Hazardous Substances from the Properties beyond their boundaries at any time;

"**Contracts**" means all contracts, undertakings, arrangements and agreements entered into on or prior to Closing by or on behalf of either Business Seller wholly or mainly in relation to the Group Businesses, to the extent that at Closing the same remain to be completed or performed (in whole or in part) by the Business Sellers or remain in force at Closing, including, without prejudice to the generality of the foregoing;

(i)     the Customer Contracts;

(ii)    the Supply Contracts;

(iii)   the Agency and Distribution Contracts;

(iv)   the IP Contracts;

(v)    the Lease Contracts; and

(vi)   the other written contracts entered into by or on behalf of the Business Sellers in relation to the Group Businesses details of which are set out in Part of Schedule 19, but excluding:

(vii)  employment and other agreements with Relevant Employees; and

(viii) the Sellers' Group Insurance Policies,

but excluding the temporary services agreement with regard to Mark Cobb and Paula Henry,

and "**Contract**" means any one of them;

"**Conversion Rate**" has the meaning given to it in Clause 1.15;

"**Current Employees**" means the employees of the Group Companies and the employees who are assigned to work in the Group Businesses as at the date of this Agreement and are listed in Annex A to Schedule 7 and "**Current Employee**" means any one of them;

"**Customer**" means any person who at any time during the two year period prior to the Closing Date is or was a customer or client of the either of Group Businesses or the Group Company Businesses;

"**Customer Contracts**" means those contracts entered into by or on behalf of any Business Seller wholly or mainly in relation to the Angus Fire Businesses and/or the National Foam Business for the sale of goods and/or the provision of services by either of the Business Sellers (other than those contracts pursuant to which such sale of goods and/or such provision of services has been completed as at the Closing Date), including those detailed in Part of Schedule 19;

"**Customer Database**" means all the information and records of the Sellers in relation to the Group Businesses regarding the customers and potential customers of the Group Businesses and the Group Company Businesses, in whatever form held;

"**Data Room**" means the electronic data room and supplementary data room containing documents and information relating to the Group made available by the Sellers electronically, a copy of each of which has been provided on DVD to the Purchasers;

"**Debts**" means:

(i) any debts or other sums which have been invoiced by any of the Sellers, or in respect of which any of the Sellers are entitled to raise an invoice, which arise out of or are attributable to the carrying on of the Group Businesses or the Group Company Businesses prior to Closing;

(ii) any interest payable on those debts or other sums; and

(iii) the benefit of all securities, guarantees, indemnities and rights relating to those debts;

"**Defined Contribution Plans**" has the meaning given to it in Clause 2.5.2;

"**Disclosed**" means fairly disclosed in the Disclosure Letter or included in the Data Room with sufficient detail to enable the Purchasers to identify the nature, scope and effect of the matter disclosed;

"**Disclosure Letter**" means the letter dated on the Closing Date from the Sellers to the Purchasers relating to the Sellers' Warranties;

"**Dispute**" means any civil, criminal, regulatory or administrative action, claim, proceeding, suit, investigation (of which a Seller is aware), arbitration or any form of alternative dispute resolution or any other proceeding;

"**Draft Closing Statement**" has the meaning given to it in Clause 7;

"**Effective Time**" means 11.59pm on the Closing Date;

"**Employee Database**" means all the information and records of the Sellers in relation to the Current Employees and the Relevant Employees in whatever form held;

"**Employee Liability Information**" has the same meaning as in the Transfer Regulations;

"**Employee Transfer Time**" means the Closing Time or any other time that any Court or other tribunal of competent jurisdiction shall deem to be the "time to transfer" under the Transfer Regulations or other applicable law or regulation;

"**Employment Losses**" means all costs, claims, losses, liabilities, expenses, charges, penalties and fines arising from or connected with employment or an employment relationship;

"**Encumbrance**" means any claim, charge, mortgage, lien, deposit by way of security, bill of sale, option, assignment (contingent or otherwise), equitable right, power of sale, pledge, hypothecation, usufruct, retention of title, right of pre-emption, right of first refusal or other third party right or security interest, right to acquire of any kind or an agreement, arrangement or obligation to create any of the foregoing;

"**Environment**", "**Environmental Authority**" and "**Environmental Permit**" have the meanings given to them in paragraph 22.1 of Schedule 12;

"**Environmental Law**" will have the meaning given either in clause 10.5.1 or paragraph 22.1.4 of Part 1 of Schedule 12, as appropriate;

"**ERP System**" means the enterprise resource planning system used by the Group including the hardware and software used in such system;

"**Estimated Cash**" means an amount equal to EUR 970,000 (US$ equivalent of 1,270,000), being an estimate as at Closing of the aggregate of the Group Companies' Cash Balances;

"**Estimated Group Companies Indebtedness**" means an amount equal to US$0 (zero), being an estimate as at Closing of the net indebtedness of the Group Companies;

"**Excluded Assets**" means the property, rights and assets referred to in Clause 2.3.4;

"**Excluded Liabilities**" means the Liabilities referred to in Clause 2.3.7;

"**Executable Object Code**" means computer programming code, substantially or entirely in binary form, which is directly executable by a computer after suitable processing but without the intervening steps of compilation for assembly;

"**Expired Guarantees**" has the meaning given to it in Clause 8.3.3 and Part 2 of Schedule 17;

"**Exton Lease Assignment**" means the assignment and assumption of lease agreement for the "Exton Property" in the Agreed Terms;

"**Final Payment Date**" means 10 Business Days after the date on which the process described in paragraph 3 of Part 1 of Schedule 11 for the preparation of the Closing Statement is complete;

"**Former Properties**" means the properties listed in Schedule 3;

"**French Bonds**" means the guarantees listed in Part 3 of Schedule 17, granted by one or more banks on behalf of one or more Group Companies to third parties (each, a "**French Bond**");

"**French Collateral**" has the meaning given in clause 8.3.4;

"**Fundamental Warranties**" means any of the following Sellers' Warranties in Schedule 12:

(i)      paragraph 1 of Part 1 (Sellers' Capacity);

(ii)     paragraph 4.4 of Part 1 (Ownership of Assets);

(iii)    paragraphs 1.1.1 to 1.1.8 (inclusive) and paragraph 1.1.11 of Part 3 (Ownership of Shares and Share Capital);

"**General Warranties**" means the warranties given by each of the Sellers pursuant to Clause 9 and Part 1 of Schedule 12 and "**General Warranty**" means any one of them;

"**Goodwill**" means the goodwill of the Business Sellers jointly and severally in relation to the Group Businesses as at Closing together with the exclusive right (so far as the Business Sellers can grant the same) for the Purchasers' Group to represent itself as carrying on the Angus Fire Businesses under the name "Angus Fire" and under the name "Angus Fire Engineering" and the National Foam Business under the name "National Foam" or "Angus" in succession to the Business Sellers;

"**Governmental Authority**" means any foreign, domestic, federal, territorial, state, provincial or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission, tribunal or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing, in each case to the extent exercising authority having the force of law;

"**Governmental Authorisation**" means any approval, consent, ratification, waiver or other authorization, license, franchise, permit, exemption, clearance or registration issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any applicable Law;

"**Government Contract**" means any prime contract, subcontract, teaming agreement or arrangement, joint venture, basic ordering agreement, letter contract, purchase order, delivery order, task order, change order, option or other contractual arrangement between a Person and either (a) any Governmental Authority, (b) any prime contractor of any Governmental Authority or (c) any subcontractor with respect to any contract described in Clauses (a) or (b) of this definition, where the ultimate customer is a Governmental Authority;

"**Group**" means the Group Companies and the Group Businesses, taken as a whole;

"**Group Businesses**" means each of the Angus Fire Businesses and the National Foam Business particulars of which are contained or referred to in Part 2 of Schedule 1 and "**Group Business**" means any one of them;

"**Group Companies**" means the Companies and the Subsidiary and "**Group Company**" means any one of them;

"**Group Companies' Cash Balances**" means the aggregate amount of the Cash Balances held by or on behalf of the Group Companies at close of business on the Closing Date;

"**Group Companies' Indebtedness**" means the aggregate amount as at the close of business on the Closing Date of all outstanding Indebtedness (but excluding any item included in respect of any Group Companies' Cash Balances) owed or payable by the Group Companies to any party ignoring the outstanding balance of the EUR500,000 loan facility made available to Eau et Feu by Vanrullen for funding purposes;

"**Group Company Assets**" means the assets of each of the Group Companies on Closing;

"**Group Company Business Confidential Information**" means all and any information which is not in the public domain and that belongs to a Group Company relates to the operation and/or conduct of the Group Company Businesses (including information relating to the products or services, processes and operations of the Group Company Businesses, their customer and supplier lists, price lists, contractual arrangements, market opportunities, plans and intentions, developments, data, results, inventions (whether patentable or not), Know-How, show how, Trade Secrets, forecasts, analyses, evaluations, research methodologies, technical or business information, personnel information and other matters concerning the business, trading or financial or other affairs of, or relating to, the Group Company Businesses or their customers, clients or other persons having dealings with them), whether such information is oral, in writing, electronic or other form, whether tangible or otherwise or marked in writing as "confidential", and all and any information which has been or may be derived or obtained from any such information;

"**Group Company Businesses**" means any business carried on by the Group Companies as at the Closing Date or during the period of 12 months ending on the Closing Date;

"**Group Company Contracts**" means any agreement, arrangement or obligation to which any Group Company is a party or subject and under which such Group Company has a continuing right, obligation or liability;

"**Guaranteed Obligations**" has the meaning given to it in Clause 15.1;

"**Hazardous Substances**" has the meaning given to it in paragraph 22.1 of Schedule 12;

"**Health and Safety Laws**" means all Laws and all applicable approved governmental codes of practice and guidance notes each having the force of law before, on, or after the date of this Agreement, except to the extent that any such code of practice or guidance note given the force of law after the date of this Agreement would increase or extend the liability of the Sellers under this Agreement which relate to the health and safety of those who work for the Sellers in relation to the Group Businesses or Group Company Businesses (whether as employees or otherwise) and/or of any persons who visit the Properties or are affected by the condition of the Properties or activities or processes carried on at the Property or by persons working for the Sellers in relation to the Group Businesses or the Group Company Businesses;

"**Indebtedness**" means, in relation to the Group, the redemption amount of all loans or other financing liabilities or obligations (including any break or prepayment fees) of each Group Company and of each of the Business Sellers or any other member of the United Technologies Corporation group of companies in relation to the Group Businesses, excluding the outstanding balance of the EUR500,000 loan facility made available to Eau et Feu by Vanrullen for funding purposes, but including:

(i)     overdrafts, any moneys borrowed and any other liabilities of a funding nature, including any early repayment penalties or similar as at Closing;

(ii)    any amount raised pursuant to any note purchase facility or the issue of bonds, notes, debentures, loan stock or any similar instrument, as at Closing;

(iii)   any amount raised by acceptance under any acceptance credit facility as at Closing;

(iv)    the amount of any liability in respect of any lease which would, in accordance with generally accepted accounting principles in the United States of America, be treated as a finance lease as at Closing;

(v)     the amount required to discharge any liabilities in respect of a hire purchase, credit sale or conditional sale agreement as at Closing;

(vi)    the amount of any inter or intragroup debt owed by any of or to any of the Group Companies or by any of the Group Businesses, and to any of the Sellers, and/or to any member of the United Technologies Corporation group of companies (excluding any Group Company);

(vii)   Taxation comprising tax on the income, profits or gains of any Group Company, or of any Business Seller in relation to the Group Businesses, arising, or deemed for the purposes of such tax to arise, in any Tax Period ended on or before the Closing Date (in France, the United Kingdom, the USA or any other part of the World) where in each case (i) the Closing Date shall be deemed to be the end of a Tax Period (ii) such Tax shall be accounted for adopting the bases, principles, policies, treatments and categorisations applied for the purposes of the Company Accounts and the Business Accounts and as if the Closing Date constituted the end of a Tax Period and (iii) (for the avoidance of doubt) VAT and Income Tax and National Insurance under Pay As You Earn in the United Kingdom (and similar employment and social security taxes in jurisdictions outside the United Kingdom) shall be excluded from Indebtedness and included in the Closing Statement in accordance

with the bases, principles, policies, treatments and categorisations applied for the purposes of the Company Accounts and the Business Accounts;

(viii)    any amount owing under any other transaction (including any forward sale or purchase agreement) which would be treated as financial borrowing under the relevant Accounting Standards applicable to that Group Company or Business Seller (in relation to the relevant Group Businesses) including any relevant invoice or receivables discounting arrangement as at Closing,

in each case, having regard to the reconciled book balances of each Group Company and the Business Sellers (in relation to the Group Businesses) and including as Indebtedness any professional or other advisers' fees, commissions, costs, expenses, or transaction fees or bonuses incurred by a Group Company or a Business Seller (in relation to the Group Businesses) at any time prior to Closing for advice on the transaction contemplated hereby or which are triggered automatically by Closing, having been committed to prior to Closing by or on behalf of one or more of the Sellers on behalf of a Group Company or a Group Business, any and all break fees and other amounts or fees that are due from the Sellers as a result of any payment or prepayment of any debt, transaction bonuses or fees, in each case which remain unpaid,

together with interest accrued,

but excluding Business Trade Creditors, Accounts Receivables, French Bonds and 24-Month Bonds;

"**Information Technology**" means computer systems, communication systems, software and hardware;

"**Insolvency Event**" means, in relation to a person, any of the following:

(i)    the existence of circumstances by which it may be deemed to be, or otherwise declare itself to be, insolvent or unable to pay its debts as they fall due;

(ii)    the cessation or suspension of the payment of all, or a particular class of, its creditors, or a threat to do so;

(iii)    the taking of any formal or informal steps with a view to the deferral, rescheduling or other readjustment of all, or a particular class of, its creditors, or the taking of any formal steps to make a general assignment or arrangement or composition with or for the benefit of the relevant creditors;

(iv)    any form of liquidation, receivership, administrative receivership, administration, arrangement or scheme with creditors, moratorium, stay or limitation of creditors' rights, interim or provisional supervision by the court or by persons appointed by the court (or any equivalent or similar provision under the Laws of any jurisdiction under which the relevant person is incorporated, registered, domiciled or resident or carries on business or has assets) being commenced or otherwise in place or under way in relation to it, whether in or out of court;

(v)    any distress, execution or other process being levied against any of its assets which has not been satisfied in full; or

(vi)    any circumstance, matter or proceeding in any jurisdiction analogous to those set forth above;

"**Intellectual Property Rights**" means trade marks, service marks, rights in trade names, business names, logos or get-up, patents, petty patents, utility models, supplementary protection certificates, rights in inventions, plant variety rights, registered and unregistered design rights, copyrights, semi-conductor topography rights, database rights, rights in domain names and URLs, rights to sue for passing off and in unfair competition, rights in opposition proceedings and all other similar rights or forms of protection having equivalent or similar effect in any part of the world (including in Know-how) including, where such rights are obtained or enhanced by registration, any registration of such rights and applications and rights to apply for such registrations and all rights to sue for any present infringement of them;

"**Inventories**" means (save to the extent constituting Accounts Receivables) the stock-in-trade of finished and unfinished goods, raw materials, consumables and work-in-progress owned by the Business Sellers wholly for the purposes of the Group Businesses at Closing, wherever held (including items which, although supplied to the Business Sellers under reservation of title by suppliers, are under the control of the Business Sellers);

"**IP Contracts**" means the Business Licences In and the Business Licences Out;

"**IRC**" means the U.S. Internal Revenue Code of 1986, as amended, and the applicable rulings and regulations under that statute;

"**ITAR**" means the International Traffic in Arms Regulations of the United States of America, 22 C.F.R. Chapter I, Subchapter M, Parts 120-130;

"**ITAR Items**" means the ITAR Products and any other article or item to the extent it directly relates to an ITAR Product (including, without limitation, plans, drawings, bills of material, other Intellectual Property Rights, accounts receivable and inventory, in each case to the extent that they directly relate to an ITAR Product);

"**ITAR Products**" means the products, listed by part number, set out in Schedule 22;

"**Judgment**" means any judgment, order, decree, award, demand, ruling, injunction or decision from any Governmental Authority;

"**Kidde Australia Agreement**" means the licence agreement to be entered into on Closing between (1) Purchaser Two and (2) Kidde Australia Pty Ltd., in the Agreed Terms;

"**Kidde Canada Agreement**" means the trademark agreement to be entered into on the date hereof by (1) Kidde Canada Inc. and (2) Purchaser Two;

"**Kirkby Decommissioning Period**" means the period from the Closing Date to the date falling 90 days after which the Sellers cease all production at the Kirkby Site;

"**Kirkby Powder Assets**" means those assets details of which are set out in Schedule 21;

"**Kirkby Powder Business**" means the business of manufacturing the Monnex dry chemical powder extinguishing agent carried on at the Kirkby Site by Kidde Products;

"**Kirkby Site**" means Ashcroft Road, Knowlsey Industrial Estate, Kirkby, Liverpool L33 7TS;

"**Know-how**" means non-trivial industrial and commercial information and techniques in any form not in the public domain including drawings, formulae, test results, reports, project reports and testing procedures, instruction and training manuals, tables of operating conditions, market forecasts, lists and particulars of customers and suppliers;

"**Law**" or "**Laws**" has the meaning given to it in Clause 1.10.3;

"**Lease Contracts**" means the lease and hire purchase agreements entered into by or on behalf of any Business Seller wholly or mainly in relation to the Angus Fire Businesses and/or the National Foam Business, details of which are set out in Part of Schedule 19 (together with details of the assets to which each such agreement relates);

"**Liabilities**" means all liabilities, duties and obligations of every description, whether deriving from contract, common law, statute or otherwise, whether present or future, actual or contingent, ascertained or unascertained or disputed and whether owed or incurred severally or jointly or as principal or surety and "**Liability**" means any one of them;

"**Licensed In IP**" has the meaning given it in paragraph 5.1 of Part 1 of Schedule 12;

"**Licences**" has the meaning given it in paragraph 10.1 of Part 1 of Schedule 12;

"**Local Transfer Document**" means the Bill of Sale and Instrument of Assignment;

"**Losses**" means all direct or reasonably foreseeable losses, liabilities, costs (including legal costs and experts' and consultants' fees), charges, expenses, actions, proceedings, claims and demands but excluding speculative, special and indirect losses which are not reasonably foreseeable other than those paid or payable to a third party as a result of an action by such third party against a Group Company or Purchaser with respect to a Group Business (each, a "**Loss**");

"**Material Customer**" means any Customer of a Business Seller or Share Seller in relation to the Group Businesses or the Group Company Businesses which:

(i)     in the financial year ended on the Accounts Date accounted for, or in the current financial year is likely to account for, revenue in excess of £1,000,000; or

(ii)    the cessation of transactions with whom would have a material and adverse effect on the Group;

"**Material Supplier**" means any supplier to a Business Seller in relation to the Group Businesses or the Group Company Businesses which:

(i)     in the financial year ended on the Accounts Date accounted for, or in the current financial year is likely to account for, expenditure in excess of £1,000,000; or

(ii)    cannot readily be replaced without material disruption, interruption or cost to the Group Businesses or the Group Company Businesses;

"**Monnex Agreement**" means the supply agreement to be entered into by (1) Kidde Products and (2) Purchaser Two on the date hereof in relation to "Monnex" products in the Agreed Terms;

"**Moveable Assets**" means the plant and machinery, vehicles, equipment, tools, motor vehicles, furniture, trade utensils, computer hardware and peripherals, excluding those used in the ERP System, telecommunications equipment and infrastructure, other Information Technology related to plant and equipment and other chattels owned by any Business Seller and used wholly or mainly in relation to the Group Businesses at the Closing Date, whether or not physically located at the Properties, including those assets details of which are set out in Part 2A of Schedule 20;

"**National Foam Assets**" means the Business Assets related to the National Foam Business and "**National Foam Asset**" means any one of them;

"**National Foam Business**" means the unincorporated business trading as National Foam and Angus as currently carried on by Kidde-Fenwal;

"**Other Seller Businesses**" has the meaning set out in Clause 2.3.4(i);

"**Overhead Services**" means overhead and administrative services including human resources, treasury, audit, information technology, payroll, accounting, risk management, environmental, health and safety, tax, business practices office and legal services provided to the Group Businesses or the Group Companies by a member of the Sellers' Group;

"**Owned Business IPR**" means all Business IPR which is owned by a Business Seller or any other member of the United Technologies Corporation group of companies;

"**Party**" means each party to this Agreement;

"**Permits**" means licenses, franchises, permits, certificates, approvals, concessions, decrees, resolutions, permissions or other similar authorisations granted by a Governmental Authority;

"**Person**" means an individual, corporation, partnership, limited liability company, joint venture, unincorporated organization, association, trust, estate or other entity or organization, including a Governmental Authority;

"**Plans**" means all employee benefit plans (as defined in Section 3(3) of ERISA) and all bonus, stock option, stock purchase, restricted stock, incentive, deferred compensation, retiree medical or life insurance, supplemental retirement, severance or other benefit plans, programs or arrangements, and all employment, termination, severance, or other contracts or agreements, to which any Seller is a party, with respect to which any Seller has any obligation or which are maintained, contributed to, or sponsored by any Seller for the benefit of any current or former employee, officer, or director of the National Foam Business;

"**Potential Customer**" means any person who at any time during the period of 12 months ending on the Closing Date was negotiating with or was in bona fide, good faith, discussions (beyond initial or preliminary discussions) concerning a specific bid on a project by either the Group Businesses or the Group Company Businesses, in either case, with a view to that person becoming a customer or client of either the Group Businesses or the Group Company Businesses;

"**Pre-Closing Share Rights**" means any option granted in connection with employment by a Seller or an Affiliate of a Seller in respect of, or the vesting or other acquisition of rights over, shares, stock or securities of any kind, in each case pursuant to an arrangement that applies to a Current Employee and that existed prior to Closing but excluding any rights in securities held with a pension benefit plan or scheme;

"**Pre-Existing Conditions**" means any Contamination which gives rise to any Losses suffered by any of the Purchasers in order to comply with any Environmental Law (including common law duties of care) or the requirements of any Environmental Authority having the force of law;

"**Product Approvals**" means those product approvals listed in Schedule 18.

"**Properties**" means the properties set out in Part 1, Part 3 and Part 4 of Schedule 3 and "**Property**" means any one of them;

"**Property Transfer Forms**" means:

(a)     the Land Registry Form TR5 relating to the transfer of the "Bentham" property to Purchaser Two in the Agreed Terms; and

(b)     the Land Registry form TR1 relating to the transfer of the "Bentham Leasehold" property to Purchaser Two in the Agreed Form;

**"Purchase Price"** has the meaning set out in Clause 3.1.1;

**"Purchaser Indemnified Matters"** has the meaning given in Clause 10.1;

**"Purchasers' Group"** means the Purchasers and their subsidiaries from time to time;

**"Purchasers' Lawyers"** means DLA Piper UK LLP of 101 Barbirolli Square, Manchester M2 3DL;

**"Purchasers' Representative"** means Purchaser Two;

**"Registered Business IPR"** means such of the Business IPR as is registered or the subject of applications for registration in any Intellectual Property Rights registry anywhere in the world;

**"Relevant Employees"** means the UK Relevant Employees and the U.S. Relevant Employees, and **"Relevant Employee"** means any one of them;

**"Relief"** means any loss, allowance, credit, deduction, exemption or set off in respect of Taxation or any right to repayment of Taxation, and in the case of a right to repayment of Taxation includes any interest or repayment supplement;

**"Reporting Accountants"** means a firm of accountants to be agreed by the Sellers' Representative and the Purchasers within seven days of a notice by one to the other requiring such agreement or failing such agreement to be nominated on the application of either of them by or on behalf of the President of The Institute of Chartered Accounts in England and Wales;

**"Restricted Name"** means:

(i)     any name or names identical or similar to or including the words "Angus Fire", "Angus Fire Protection", "Angus Fire Engineering", "National Foam", "Eau et Feu" "Monnex", or any colourable imitation of such words; and

(ii)    any trade or service mark, business or domain name, design or logo, used exclusively by the Group Businesses or the Group Company Businesses;

**"Restricted List"** means the persons listed in Schedule 16;

**"Restructuring Programme"** means dismissal as set out in a document headed "Kidde UK Pension Plan Early Retirement Factors. Effective 1 June 2006. Guidance issued by the Company to Business Unit Managers and Human Resource Personnel".

**"Retained ITAR Assets"** means the ITAR Items excluded from the sale of the Group Business pursuant to Clause 2.3.4;

**"SDLT"** means stamp duty land tax;

**"Sellers' Group"** means the Sellers and their Affiliates from time to time;

**"Sellers' Group Insurance Policies"** means all insurance policies (whether under policies maintained with third party insurers or any member of the Sellers' Group), other than Target Group Insurance Policies, maintained by the Sellers or any member of the Sellers'

Group in relation to the Group, and "**Sellers' Group Insurance Policy**" means any one of them;

"**Sellers' Group Restricted Employee**" means any person who at the Closing Date was employed in the businesses of Silvani or Guardfire;

"**Sellers' Pension Scheme**" means the United Technologies Corporation (UK) Pension Scheme.

"**Sellers' Representative**" means Robert Donnelly of United Technologies Corporation or such other person as the Sellers may notify to the Purchasers in accordance with Clause 16.13;

"**Sellers' Warranties**" means together the General Warranties, the US Warranties and the Share Warranties and "**Sellers' Warranty**" means any one of them;

"**Sellers' Warranty Claim**" means any claim for or in respect of any breach of any Sellers' Warranty;

"**Senior Employee**" means any employee employed or engaged in relation to the Group on an annual salary (on the basis of full-time employment) in excess of €70,000 or the local equivalent;

"**Shares**" means all the issued shares in the capital of the Companies specified in Part 1 of Schedule 1;

"**Share Sellers**" means SICLI and UTCFS and "**Share Seller**" means any one of them;

"**Share Warranties**" means the warranties given by each of the Sellers pursuant to Clause 9 and Part 2 of Schedule 12 and "**Share Warranty**" means any one of them;

"**Source Code**" means computer programming codes (other than Executable Object Code) and related system documentation procedural codes, notes and flow charts but excluding that related to commercially licensed software;

"**South Africa Agreement**" means the licence agreement entered into on Closing between (1) Kidde Products and (2) Chubb Security SA (Pty) Limited on 15 November 2012;

"**Stock Options or Incentives**" means any rights of Current Employees granted in connection with their employment by a Seller or an Affiliate of a Seller or a Group Company over, or in respect of, or by reference to any shares or securities of any kind or the value thereof (including options, restricted stock rights, share application rights and other similar rights but excluding any rights in securities held with a pension benefit plan or scheme);

"**Subsidiary**" means the company listed in paragraph 2 of Schedule 2;

"**Supply Contracts**" means all the contracts entered into by or on behalf of any Business Seller wholly or mainly in relation to the Angus Fire Businesses and/or the National Foam Business respectively, for the purchase of raw materials, components and other goods or services by the Business Sellers, including those details of which are set out in Part  of Schedule 19;

"**Suppression Agreement**" means the trademark licence to be made between (i) Purchaser Two and (2) Kidde Products, in the Agreed Terms;

"**Suppression Lease**" means the lease of part of the "Bentham" property to be made between (i) Purchaser Two and (2) Kidde Products, in the Agreed Terms;

"**Target Group Insurance Policies**" means all insurance policies held exclusively for the benefit of the Group or any member thereof which are not part of the Sellers' Group's controlled master programme and do not participate in any manner in such programme and "**Target Group Insurance Policy**" means any one of them;

"**Taxation**" or "**Tax**" means all forms of taxation whether direct or indirect and whether levied by reference to income, profits, gains, net wealth, asset values, turnover, added value or other reference and statutory, governmental, federal, state, provincial, local governmental or municipal impositions, duties, contributions, rates and levies (including national insurance and social security contributions and any other payroll taxes), whenever and wherever imposed (whether imposed by way of a withholding or deduction for or on account of tax or otherwise) and wherever imposed and whether chargeable directly or primarily against or attributable directly or primarily to a Group Company, Group Business or any other person and all penalties and interest relating thereto and all penalties, charges, costs and interest relating thereto and to any statutory obligations in relation to returns, filings and other compliance matters;

"**Tax Authority**" means any taxing or other Authority competent to impose any liability in respect of Taxation or responsible for the administration and/or collection of Taxation or enforcement of any law in relation to Taxation;

"**Tax Indemnity**" means the deed of covenant against Taxation in the Agreed Terms to be entered into at Closing;

"**Tax Period**" means in respect of each Group Company and Group Company Business, any period in respect of which Taxation is assessed or charged on such Group Company or Group Company Business; "**Tax Warranties**" means those warranties set out in paragraph 23 of Part 1 of Schedule 12;

"**Third Party Claim**" shall have the meaning given in Clause 12.5;

"**Third Party Consents**" means all consents, licences, approvals, Permits, authorisations or waivers required from third parties for the assignment or transfer to the relevant Business Purchasers of any of the Contracts and "**Third Party Consent**" means any one of them;

"**Tier 1 Bonds**" means the guarantees listed in Part 5 of Schedule 17 granted by one or more banks to third parties (each, a "**Tier 1 Bond**");

"**Tier 2 Bonds**" means the guarantees listed in Part 6 of Schedule 17 granted by one or more banks to third parties (each, a "**Tier 2 Bond**");

"**Tier 3 Bonds**" means the guarantees listed in Part 7 of Schedule 17 granted by one or more banks to third parties (each, a "**Tier 3 Bond**");

"**Tier 4 Bonds**" means the guarantees listed in Part 8 of Schedule 17 granted by one or more banks to third parties (each, a "**Tier 4 Bond**");

"**Trade Secrets**" means all "Trade Secrets" as defined in the Uniform Trade Secrets Act;

"**Transfer Regulations**" means the Transfer of Undertakings (Protection of Employment) Regulations 2006;

"**Transfer Tax**" means all Taxes imposed in respect of (i) the transfer of shares and (ii) the transfer of assets or liabilities of any kind (in each case pursuant to this Agreement and any Local Transfer Document), including stamp duties, real estate transfer taxes, registration fees, notarial fees and taxes and capital duties or their equivalents in all jurisdictions whenever and wherever imposed and, for the avoidance of doubt, shall include all taxes payable in relation to any deemed transfer of assets as the result of a sale of shares and all penalties, surcharges, charges and interest relating thereto but "**Transfer Tax**" shall not include any charge to capital gains or income taxes and shall not include VAT;

"**Transitional Services Agreement**" means the agreement between the Business Sellers and the Purchasers, in the Agreed Terms, to be entered into at Closing in respect of the provision of certain services by the Sellers' Group to the Purchasers in relation to the Group and the provision of certain services by the Group to the Business Sellers;

"**UK Domain Name Assignments**" means the assignments of the domain names used in connection with the Angus Fire Business to be entered into on Closing in the Agreed Terms;

"**UK Relevant Employees**" means those Current Employees who are employed in the United Kingdom by the Business Sellers and are assigned to work exclusively in any Group Businesses immediately prior to the Employee Transfer Time and whose names are set out at Part 1 of Annex A to Schedule 7, and "**UK Relevant Employee**" means any one of them;

"**UK Trademark Assignments**" means the assignments of trademarks used in connection with the Angus Fire Business to be entered into on Closing in the Agreed Terms;

"**UK Undisclosed Employees**" shall have the meaning given in Paragraph 2.3.1 of Schedule 7;

"**US Transfer Date**" has the meaning given to it in clause 2.5.2;

"**US Domain Name Assignment**" means the assignment of the domain names used in connection with the National Foam Business to be entered into on Closing in the Agreed Terms;

"**U.S. Relevant Employees**" means those employees listed in  Part 2 of Annex A to Schedule 7 and "**U.S. Relevant Employee**" means any one of them;

"**US Trademark Assignment**" means the assignment of trademarks used in connection with the National Foam Business to be entered into on Closing in the Agreed Terms;

"**US Transfer Date 1**" shall have the meaning given in clause 2.5.2;

"**US Transfer Date 2**" shall have the meaning given in clause 2.5.2;

"**US Warranties**" means the warranties given by the Sellers pursuant to clause 9  and Part 2 of Schedule 12 and "**US Warranty**" means any one of them;

"**VAT**" means within the European Union such Taxation as may be levied in accordance with (but subject to derogations from) the Directive 2006/112/EC and outside the European Union any Taxation levied by reference to added value or sales;

"**Vulnerable Transaction**" means any transaction or arrangement which is capable of being set aside, stayed, reversed or rescinded, avoided or otherwise affected in whole or in

part under any Laws (including the Insolvency Act 1986 and any equivalent or similar Laws);

"**Welfare Plans**" has the meaning given to it in Clause 2.5.2(ii);

"**Working Capital**" means the aggregate amount of the current assets and current liabilities excluding Cash Balances and Indebtedness of the Group Companies and Group Businesses as at the respective close of business on the Closing Date, as shown in the Closing Statement; and

"**Working Capital Adjustment**" means the amount by which the Working Capital exceeds the Base Working Capital (which amount shall be added to the Closing Amount for the purposes of Clause 3.1), or the amount by which the Working Capital is less than the Base Working Capital (which amount shall be deducted from the Closing Amount for the purposes of Clause 3.1).

1.2   **Rights of the Purchaser' Representative**

The Purchasers agree that where any right is given to the Purchasers' Representative under this Agreement, such right shall be exercisable exclusively by the Purchasers' Representative and any such exercise shall be binding on the other Purchasers.

1.3   **Rights of the Sellers' Representative**

The Sellers agree that where any right is given to the Sellers' Representative under this Agreement, such right shall be exercisable exclusively by the Sellers' Representative and any such exercise shall be binding on the other Sellers.

1.4   **Rights and Liabilities of the Sellers**

Each Seller shall only have rights and liabilities (including in relation to payment) under or in relation to a breach of this Agreement:

1.4.1   to the extent that those rights and liabilities or the relevant breach relate to or affect the Shares (including the relevant underlying business(es)) it agrees to sell under this Agreement or otherwise arise in connection with the sale of those Shares to the relevant Purchaser;

1.4.2   to the extent that those rights and liabilities or the relevant breach relate to or affect the Group Business or Business Assets it agrees to sell under this Agreement or otherwise arise in connection with the sale of that Group Business or Business Assets to the relevant Purchaser; and

1.4.3   on a several basis.

1.5   **Singular, plural, gender**

References to one gender include all genders and references to the singular include the plural and vice versa.

1.6   **References to persons and companies**

References to:

1.6.1   a person include any individual, corporation, partnership, limited liability company, joint venture, unincorporated organisation (whether or not having separate legal

personality), association, trust, estate or other entity or organisation, including a Governmental Authority; and

1.6.2    a company include any company, corporation or any body corporate, wherever incorporated.

1.7    **References to subsidiaries and undertakings**

In this agreement (unless the context requires otherwise):

1.7.1    the terms **"company"**, **"subsidiary"**, **"holding company"**, **"undertaking"**, **"subsidiary undertaking"** and **"parent undertaking"** have the meanings set out in the Companies Act 2006, but, for the purposes of section 1159(1) of the Companies Act 2006 a company shall be treated as a member of another company if any shares in that other company are registered in the name of either (a) a person by way of security (where the company has provided the security) or (b) a person as nominee for the company;

1.7.2    the term **"group"**; in relation to a body corporate, means the body corporate, any other body corporate which is its holding company or subsidiary, and any other person shall be deemed to be connected with another if that person is so connected within the meaning of section 1122 CTA 2010.

1.8    **References to Indemnities**

In this Agreement (unless the context otherwise requires), **"indemnify"** or **"indemnifying"** any person **"against any loss"** in connection with or arising out of a given circumstance shall include indemnifying such person on an After Tax Basis and holding such person harmless from and against all actions, costs, claims, demands, expenses and other liabilities which such person may incur or suffer from time to time in connection with or arising out of such circumstance, as the case may be (including all payments, legal and other costs and expenses incurred as a consequence of or which would not have arisen but for such circumstance).

1.9    **After Tax Basis**

Any indemnity or covenant to pay (**"Payment Obligation"**) being given on an **"After Tax Basis"** or expressed to be **"calculated on an After Tax Basis"** means that, to the extent that the amount payable pursuant to such Payment Obligation (**"Payment"**) is subject to a deduction or withholding required by Law in respect of Tax or is chargeable to any Tax in the hands of the recipient, (ignoring the availability of any Relief) such amount shall be increased so as to ensure that, after taking into account:

1.9.1    the amount of Tax required to be deducted or withheld from, and the Tax chargeable on, such amount (including on the increased amount); and

1.9.2    any Tax credit, repayment or other benefit which is available to the indemnified party or the recipient of the Payment solely as a result of the matter or thing giving rise to the Payment Obligation, receiving the Payment or the deduction or withholding in question,

the recipient of the Payment is in the same financial position as it would have been in if the matter or thing giving rise to the Payment Obligation had not occurred.

1.10    **General Interpretation**

In this Agreement (unless the context requires otherwise), any reference to:

1.10.1    any professional firm or company includes any firm or company effectively succeeding to the whole, or substantially the whole, of its practice or business;

1.10.2    any time of day or date is to that time or date in the United Kingdom;

1.10.3    "**Law**" or "**Laws**" includes all applicable laws (whether civil, criminal or administrative), common laws or civil codes, statutes, subordinate legislation, treaties, regulations, directives and bye laws in any jurisdiction, in each case for the time being in force (whether before, on or after the date of this Agreement), except to the extent that any of the foregoing made after the date of this Agreement would increase or extend the liability under the Sellers' Warranties;

1.10.4    a specific Law or provision of a Law includes:

(i)    that Law or provision as amended or re enacted;

(ii)    any Law which that Law or provision re enacts (with or without modification); and

(iii)    any Law made under it,

in each case for the time being in force (whether before, on or after the date of this agreement), except to the extent that any amendment, re enactment or Law made after the date of this agreement would increase or extend the liability of any party under the Sellers' Warranties;

1.10.5    writing or written includes any method of representing or reproducing words in a legible form; and

1.10.6    for the purposes of Part 1 of Schedule 12, reference to a Business Seller shall also be deemed to be a reference to a Share Seller and vice versa, and reference to the Group Company Assets shall also be deemed to be a reference to the Business Assets.

1.11    **Agreement, Recitals, Clauses, Schedules etc.**

References to this Agreement shall include any Recitals and Schedules to it and references to Clauses and Schedules are to Clauses of, and Schedules to, this Agreement. References to paragraphs and Parts are to paragraphs and Parts of the Schedules.

1.12    **Information**

References to books, records or other information mean books, records or other information in any form including paper, electronically stored data, magnetic media, film and microfilm.

1.13    **Non-limiting effect of words**

The words "including", "include", "in particular" and words of similar effect shall not be deemed to limit the general effect of the words which precede them.

1.14    **Legal Terms**

References to any English legal term shall, in respect of any jurisdiction other than England and Wales, be construed as references to the term or concept which most nearly

corresponds to it in that jurisdiction. Specific reference to the Laws or legal terms of any other jurisdiction shall be interpreted in accordance with the Laws of such jurisdiction.

### 1.15 Currency Conversion

Any amount to be converted from one currency into another currency for the purposes of clause 7 and Schedule 11 shall be converted into an equivalent amount as follows:

£ Sterling 1 to US Dollars 1.54; and

€ Euro 1 to US Dollars 1.31.

## 2 Agreement to Sell the Group

### 2.1 Sale and Purchase of the Group

On and subject to the terms of this Agreement and the Local Transfer Documents:

2.1.1 the Sellers (each only as to the Shares or Group Businesses set out against its name in Schedule 1) agree to sell; and

2.1.2 with effect from Closing, the Purchasers (each only as to the Shares or Group Businesses set out against its name in Schedule 1) agree to purchase,

the whole of the Group.

### 2.2 Sale of the Shares

2.2.1 The Shares shall be sold free from Encumbrances and together with all rights and advantages attaching to them as at Closing (including the right to receive all dividends or distributions declared, made or paid on or after Closing).

2.2.2 The Share Sellers shall procure that on or prior to Closing any and all rights of pre-emption over the Shares, as well as any other right or obligation restricting the transfer of the Shares, are waived irrevocably by the persons entitled thereto.

2.2.3 The Share Sellers:

(i) covenant with the Purchasers that they have the right to transfer or to procure the transfer of the full legal and beneficial interest in the Shares to Purchaser One on the terms set out in this Agreement; and

(ii) covenant with the Purchasers that they shall at their own expense do everything reasonably required from time to time in order to vest any of the Shares in Purchaser One.

2.2.4 Part 1 of the Law of Property (Miscellaneous Provisions) Act 1994 shall not apply to the sale and purchase of the Shares.

### 2.3 Sale of the Group Businesses

2.3.1 Subject to the terms of this Agreement and the Local Transfer Documents, there shall be included in the sale of the Group Businesses under this Agreement or where relevant the Local Transfer Documents, which, save as set out in this Clause 2.3.1, shall be sold free from Encumbrances, the following:

(i) the Inventories (subject to any third party retention of title rights arising in the ordinary course of business);

(ii)     the Business Freehold Properties set out in Part 1 of Schedule 3 on the terms of the Property Transfer Form with respect to the "Bentham" property and pursuant to general warranty deeds in the Agreed Terms with respect to the "Angier" property and the "West Chester" property, and a quitclaim deed in the Agreed Terms for the relevant portion of the "Angier" property not covered by the relevant general warranty deed in the Agreed Terms, as set out in Part 2 of Schedule 3, in each case subject to their respective title documents located at Document *National Foam Dataroom \ K. Facilities \ K.3. Registered titles to the property (or purchase agreements in case no registration of title has taken place), mortgage deeds and extracts from the property register.* of the Data Room;

(iii)    the benefit (subject to the burden) of the leases with respect to the Business Leasehold Properties set out in Part 3 of Schedule 3 on the terms set out in Part 4 of Schedule 3 including the requirement to obtain Third Party Consents where relevant;

(iv)    the Business IPR (subject to the terms set out in Schedule 5);

(v)     the Business Know-how;

(vi)    the Goodwill;

(vii)   the Moveable Assets;

(viii)  the Kirkby Powder Assets, subject to Schedule 24;

(ix)    the benefit (subject to the burden) of the Contracts (subject to the terms set out in Schedule 4);

(x)     the benefit (so far as the same can lawfully be assigned or transferred to or held in trust for the Purchasers) of the Claims;

(xi)    the Accounts Receivables;

(xii)   the rights in the Business Confidential Information;

(xiii)  the Business Records; and

(xiv)   (to the extent possible or permitted in accordance with the terms of each such Environmental Permit) all Environmental Permits and all pending applications therefore or renewals thereof.

2.3.2   Each of the Business Sellers covenants with the Purchasers that:

(i)     (subject to (i) any Contract which is not assignable without Third Party Consent pursuant to Schedule 4, (ii) any third party retention of title rights arising in in the ordinary course of business (iii) any restrictions in the title documents relevant to any Business Freehold Property and (iv) the terms of the Environmental Permits) it has the right to transfer or to procure the transfer of the full legal and beneficial interest in the Business Assets to the Purchasers on the terms set out in this Agreement; and

(ii)    it shall, at its own expense do everything reasonably required from time to time in order to vest any of the Business Assets in the Purchasers on the terms set out in this Agreement.

2.3.3    Part 1 of the Law of Property (Miscellaneous Provisions) Act 1994 shall not apply to the sale and purchase of the Business Assets.

2.3.4    Notwithstanding Clause 2.3.1, for the avoidance of doubt, there shall be excluded from the sale of the Group Businesses under this Agreement the following:

    (i)    all other businesses and assets, which are not Business Assets and which are owned and operated by the Business Sellers directly and through divisions, units, groups, partnerships, joint ventures, subsidiaries, by contract and through other entities and arrangements including, without limitation, Airsense Technology Limited, Fenwal Protection Systems, Fenwal Industrial Explosion Protection, the suppression business of Kidde Products (the "**Other Seller Businesses**");

    (ii)    the Overhead Services and the assets used to provide the Overhead Services;

    (iii)    the ITAR Items or devices containing any ITAR Items;

    (iv)    except for the Owned Business IPR and without prejudice to any Business IPR licensed to any of the Purchasers, all Intellectual Property Rights of the Sellers' Group including (without limitation) the names "Kidde", "Kidde Products", "Kidde-Fenwal, Inc.", "UTC", "United Technologies Corporation", "UTC Fire & Security Corporation" and the names of the Other Seller Businesses and all rights in any trade name, slogan, trademark, fictitious name, service mark or like property, used by or in the other products, services, in such businesses and divisions, and all variants of any of them, and all applications therefor or registrations thereof, including any trading names or registered or unregistered trademarks or as listed in Schedule 14;

    (v)    any amounts due from Other Seller Businesses or members of the Sellers' Group not arising from ordinary course commercial transactions;

    (vi)    the Cash Balances held by or on behalf of the Business Sellers on Closing in relation to the Group Businesses;

    (vii)    the benefit of any claim under any Sellers' Group Insurance Policy other than for statutorily required insurances of Employers Liability and Workers Compensation;

    (viii)    amounts due to the Business Sellers from any relevant Tax Authority in respect of Taxation; and

    (ix)    the Moveable Assets listed in Schedule 6.

**Assumed Liabilities**

2.3.5    Subject to Clause 2.3.7, Clause 10 and paragraph 11.2 of Schedule 12, the Business Purchasers shall with effect from Closing assume, duly and punctually pay, satisfy, discharge, perform or fulfil:

    (i)    all Liabilities related to a Business Asset to the extent that they are incurred by the Purchasers in relation to the Group Businesses following Closing (including, for the avoidance of doubt, the obligation from Closing to

provide product warranties and service warranties to customers of the Group Businesses);

(ii)     all product warranties and service warranties given by the Group Businesses whether relating to pre- or post-Closing sales;

(iii)    all Liabilities for defective products or services sold by the Group Businesses prior to or following the Closing Date; and

(iv)    all Liabilities relating to the Group Businesses specifically provided for in the balance sheet included in the Closing Statement.

2.3.6    The Business Sellers agree with the Business Purchasers that the Liabilities referred to in Clause 2.3.5 are assumed by the Business Purchasers so that the Business Purchasers shall have and be entitled to the benefit of the same rights, powers, remedies, claims, defences, obligations, conditions and incidents (including rights of set-off and counterclaim) as the Business Sellers enjoyed.

**Excluded Liabilities**

2.3.7    Save as set out in Clause 2.3.5, Clauses 2.3.5 and 2.3.6 shall not apply to, and the Business Purchasers shall not be obliged to assume, duly and punctually pay, satisfy, discharge, perform or fulfil any Liabilities incurred before Closing or which relate to any period prior to Closing in relation to the Group Businesses including without limitation:

(i)     any Liability expressly reserved to either Business Seller, or specifically excluded, under this Agreement;

(ii)     any Liability arising from any Purchaser Indemnified Matter (to the extent set out in Clause 10);

(iii)    any Liability in respect of Indebtedness in relation to the Group Businesses or any security, guarantee (other than the obligations specified herein regarding the Back-Stopped Guarantees), comfort or other financial accommodation in respect of such Indebtedness;

(iv)    any Liability in respect of Taxation arising in respect of any period or any part period for Taxation purposes ending on or prior to Closing and any liabilities of the Sellers to Taxation relating to the conduct of the Group Businesses prior to Closing;

(v)     any Liability in relation to the sale, supply, manufacture and production of Monnex powder by any member of the Sellers Group prior to Closing other than by any of the Businesses;

(vi)    any Liability to the extent it relates to an Excluded Asset; and

(vii)   any Liability for fines or penalties imposed on either Business Seller or on the Group Businesses by any Authority in respect of any act or omission of such Business Seller prior to Closing including for the avoidance of doubt any associated Losses.

2.4    **Local Transfer Document**

2.4.1    If there is an adjustment to the Purchase Price under Clause 7.3 which relates to a Group Company or a Group Business which is the subject of the Local Transfer

Document, then, if required to implement the adjustment and so far as permissible under the laws of the relevant jurisdiction, the Sellers and the relevant Purchasers shall enter into a supplemental agreement reflecting such adjustment and the allocation of such adjustment (and each party will bear its own costs in respect of such supplemental agreement).

2.4.2    No Seller shall bring any claim against the Purchasers in respect of or based upon the Local Transfer Document save to the extent necessary to implement any transfer of the Shares, the Group Businesses (including the Business Assets) or the provisions of Clause 2.3.5 in accordance with this Agreement. To the extent that a Seller does bring a claim in breach of this Clause, that Seller shall indemnify the Purchasers against all Losses which the Purchasers may suffer through or arising from the bringing of such a claim.

2.4.3    No Purchaser shall bring any claim against the Sellers in respect of or based upon the Local Transfer Document save to the extent necessary to implement any transfer of the Shares and the Group Businesses (including the Business Assets) in accordance with this Agreement. To the extent that a Purchaser does bring a claim in breach of this Clause, that Purchaser shall indemnify the Sellers against all Losses which the Sellers may suffer through or arising from the bringing of such a claim.

## 2.5    Group Retirement Benefit Arrangements and Relevant Employees

2.5.1    The provisions of Schedule 7 shall apply in respect of the UK Relevant Employees.

2.5.2    The Purchasers shall offer employment to all U.S. Relevant Employees.  The Purchasers may extend such offers of employment on the Closing Date, except as otherwise specified in Part 2 of Annex A to Schedule 7 and except that with respect to any such employees out on approved sick or disability leave as of Closing, such offers shall be made at the time such individuals are cleared to return to work.

(i)    **Defined Contribution Plan.** As of the Closing Date or, if later as specified above, the date the relevant US Relevant Employee becomes employed by the Purchasers (with regard to Steven M. Adolteach, **"US Transfer Date 1"**, and with regard to Frank J. Taraborelli, Jr. Stephen M. Tolbert and Pancu M. Ionescu together, **"US Transfer Date 2"**) (each of the Closing Date, the US Transfer Date 1, and the US Transfer Date 2, being a **"US Transfer Date"**), the U.S. Relevant Employees who have an account balance in any defined contribution plan (the **"Defined Contribution Plans"**) maintained by Kidde-Fenwal or any of its Affiliates shall be deemed fully vested in, and entitled to receive a distribution of, their entire account balances in accordance with the terms of the Defined Contribution Plans (and Kidde-Fenwal or an Affiliate shall take all appropriate actions to cause the foregoing) and shall be permitted to rollover their "eligible rollover distribution" (as defined under Section 402(C)(4) of the IRC) in cash to a qualified retirement plan established or maintained by Purchasers that contains a cash or deferred arrangement under Section 401(k) of the IRC. U.S. Relevant Employees shall be permitted to continue to repay outstanding participant loans after their severance from employment under the Defined Contribution Plans provided, however, that Employees otherwise eligible for a rollover distribution will not be able to take such

distribution until their participant loans are fully repaid or offset. As of the relevant US Transfer Date, the U.S. Relevant Employees shall cease to be eligible to make or receive contributions under the Defined Contribution Plans of Kidde-Fenwal.

(ii)   ***Welfare Benefit Plans***. Effective as of the relevant US Transfer Date, the U.S. Relevant Employees shall cease to be covered by Kidde-Fenwal's welfare benefit Plans, including, but not limited to, Plans, programs and arrangements which provide medical and dental coverage, life and accident insurance, disability insurance and severance pay (the **"Welfare Plans"**). Kidde-Fenwal shall retain responsibility for those claims incurred by the U.S. Relevant Employees (or their eligible dependents) under Kidde-Fenwal's Welfare Plans on or prior to the relevant US Transfer Date. For purposes of this Clause 2.5.2(ii), however, a claim shall be deemed to be incurred, in the case of a medical or health plan, on the date on which medical or other treatment or service was rendered (and not the date of inception of an illness or injury or the date on which a claim for treatment or service is submitted); in the case of a life insurance benefits plan, on the date of the employee's death (or the participant's death, as the case may be); and in the case of a disability plan, the date on which the injury or illness occurred giving rise to the disability.

(iii)   ***COBRA***. Kidde-Fenwal shall retain the responsibility to provide COBRA continuation coverage (as defined in Section 4980B(f)(2) of the IRC) to those U.S. Relevant Employees and their dependents who incur a qualifying event on or prior to the relevant US Transfer Date and including employees who do not become employees of the Purchasers as of the Closing Date. The Purchasers shall be responsible for providing COBRA continuation coverage to U.S. Relevant Employees who incur a qualifying event after the relevant US Transfer Date.

(iv)   ***Benefit Plans***. From the relevant US Transfer Date until the first anniversary of the Closing Date, the Purchasers shall pay each U.S. Relevant Employee an amount that is no less than such employee's salary or wages, as applicable, as of the Closing Date, as compensation for such employee's services to the Purchasers during such period of time, if any. For the same period, the Purchasers shall provide employee benefits that , in the aggregate, are substantially comparable to those in effect immediately prior to Closing. For purposes of any employee benefits provided to U.S. Relevant Employees after the Closing Date, the Purchasers shall credit (or cause to be credited) service accrued as an employee of Kidde-Fenwal by such U.S. Relevant Employee as of the Closing Date and all pre-existing condition exclusions and actively-at-work requirements of such plans shall be waived for such employees and their covered dependents (other than limitations or waiting periods that are already in effect with respect to such employees and dependents that have not been satisfied). Purchaser Three shall recognize past service for vacation accruals for all of the U.S. Relevant Employees and honour all vacation that is accrued but unused for calendar year 2013 through the relevant US Transfer Date for all of the U.S. Relevant Employees.

(v)     ***Wage Reporting.***  Kidde-Fenwal and the Purchasers agree to utilize the standard procedure set forth in Revenue Procedure 2004-53 under the IRC with respect to wage reporting for U.S. Relevant Employees who are employed by the Purchasers following the Closing Date so that Kidde-Fenwal shall perform all the tax reporting duties for the wages and other compensation it pays.

(vi)    Subject to Clauses 2.5.1 and 2.5.2 and  Schedule 7, no provision of this Agreement shall (i) create any right in any individual to continued employment with the Purchasers or preclude the ability of the Purchasers to terminate the employment of any employee for any reason, (ii) require the Purchasers or any of their Affiliates to establish or maintain any particular employee benefit plans or arrangements or prevent the amendment, modification or termination thereof after the Closing Date, or (iii) confer upon any employee any rights or remedies under or by reason of this Agreement.

## 3      Consideration

## 3.1    Amount

3.1.1   The consideration for the purchase of the Group under this Agreement and the Local Transfer Documents (the "**Purchase Price**") shall be the assumption of the Assumed Liabilities pursuant to Clause 2.3.5 together with an amount in cash equal to the sum of:

(i)     the Bid Amount;

plus

(ii)    the Group Companies' Cash Balances;

minus

(iii)   the Group Companies Indebtedness (treated as a positive number);

plus or minus

(iv)    the Working Capital Adjustment.

## 3.2    Allocation of Purchase Price

3.2.1   The Purchase Price shall be allocated in accordance with Schedule 8 and the Sellers and the Purchasers shall adopt that allocation for all Tax purposes to the extent they can lawfully do so.

3.2.2   The initial allocation in Schedule 8 shall be adjusted once the Closing Statement becomes final and binding pursuant to Clause 7.2.1 to reflect the payments made pursuant to Clause 7.3 and any interest on such payments pursuant to Clause 7.4 and the Sellers and the Purchasers shall adopt that allocation, as so adjusted, for all Tax purposes.

3.3 **Fixed Plant and Machinery Apportionment**

3.3.1 For the purposes of this Clause 3.3, the terms "disposal value", "fixtures" and "integral features" shall have the meaning attributed to those terms in the Capital Allowances Act 2001 ("**CAA**").

3.3.2 Kidde Products warrants and confirms to the Purchaser that:

(i) it will be required to bring a disposal value into account in relation to the fixtures and integral features which form part of the Business Properties being transferred and which are listed in the draft form of election set out in Part 2 of Schedule 8; and

(ii) in relation to the fixtures and integral features, Kidde Products is not and has not been required to bring a disposal value into account in accordance with item 2 or 3 of the Table in section 196 CAA or item 7 of the Table in section 61 CAA.

3.3.3 Not later than Closing, Kidde Products and Purchaser Two shall enter into an election under section 198 CAA (signed in duplicate) in relation to the fixtures and integral features which form part of the Business Properties being transferred and in relation to which Kidde Products is required to bring a disposal value into account (the "**Election**"). The Election is to be in the form set out in Part 2 of Schedule 8.

3.3.4 Purchaser Two and Kidde Products shall each:

(i) provide a copy of the Election to their respective Inspector of Taxes in accordance with the provisions of section 201 CAA;

(ii) ensure that all of their dealings with HM Revenue and Customs are consistent with the terms of the election; and

(iii) promptly supply to the other such information and assistance as the other may reasonably require to enable it to claim capital allowances in relation to any relevant fixtures and integral features forming part of the Business Properties being transferred, subject to such information and assistance being within the supplying party's control.

3.4 **VAT**

The provisions of Schedule 9 shall apply in respect of VAT.

3.5 **Treatment of Payments by Sellers**

3.5.1 If any payment is made by a Seller to the Purchasers in respect of any claim for any breach of this Agreement or any Local Transfer Document or pursuant to an indemnity under this Agreement or the Tax Indemnity, the payment shall be treated as an adjustment of the consideration paid by the relevant Purchasers for the Shares or the particular category of Business to which the payment and/or claim relates under this Agreement and the Purchase Price shall be deemed to have been reduced by the amount of such payment.

3.5.2 If:

(i) the payment and/or claim relates to the shares in more than one Group Company or to more than one category of Business Asset, it shall be

allocated in a manner which reflects the impact of the matter to which the payment and/or claim relates, failing which it shall, in the case of a payment related to Business Assets, be allocated firstly to goodwill, and then, to the extent that the payment and/or claim exceeds the goodwill, it shall be allocated rateably to all other Business Assets or in the case of a payment relating to Shares, to the shares in the Group Companies concerned, in either case by reference to the proportions in which the Purchase Price is allocated in accordance with Schedule 8; or

(ii)     the payment and/or claim relates to no particular shares in any Group Company or no particular category of Business Asset, it shall, in the case of a payment related to Business Assets, be allocated firstly to goodwill, and then, to the extent that the payment and/or claim exceeds the goodwill it shall be allocated rateably to all other Business Assets or, in the case of a payment relating to Shares, to all the Shares by reference to the proportions in which the Purchase Price is allocated in accordance with Schedule 8,

and in each case the Purchase Price shall be deemed to have been reduced by the amount of such payment.

# 4     Closing

## 4.1     Date and Place

Closing shall take place simultaneously with execution of this Agreement at the Purchasers' Lawyers' offices, or at such other location, time or date as may be agreed between the Purchasers and the Sellers' Representative, and shall be deemed effective from the Effective Time.

## 4.2     Closing Events

On Closing, the parties shall comply with their respective obligations specified in Schedule 10. The Sellers' Representative may waive some or all of the obligations of the Purchasers as set out in Schedule 10 and the Purchasers may waive some or all of the obligations of the Sellers as set out in Schedule 10.

## 4.3     Payment on Closing

4.3.1     On Closing the Purchasers shall pay (in accordance with Clause 16.7) an amount in cleared funds to the Sellers which is equal to the sum of:

(i)     the Bid Amount;

plus

(ii)     the Estimated Cash;

minus

(iii)     the Estimated Group Companies Indebtedness (treated as a positive number),

(the "**Closing Amount**").

4.3.2    The Purchase Price shall initially be allocated in accordance with paragraph 2 of Schedule 8.

4.4    **Breach of Closing Obligations**

4.4.1    The Purchasers shall not be obliged to complete the purchase of any of the Business Assets or the Shares:

(i)    unless each of the Sellers comply fully with their obligations set out in Schedule 10; and

(ii)    unless the purchase of all the Business Assets and the Shares is completed simultaneously, but so that completion of the purchase of some of the Business Assets or the Shares will not affect the rights of the Purchaser with respect to the others.

4.4.2    The Sellers shall not be obliged to complete the sale of any of the Business Assets or the Shares unless each Purchaser complies with its obligations set out in Schedule 10.

4.5    **Title and Risk**

Title and risk of loss or damage to the Business Assets shall pass to the relevant Purchaser on Closing, except as otherwise agreed, including, for the avoidance of doubt, as set out in Schedule 24 with respect to the Kirkby Powder Assets.

5    **Transfer of Contracts**

5.1    Subject to Clauses 5.2 and 5.3, this Agreement constitutes an assignment to the Business Purchasers of the benefit of each Contract:

5.1.1    which can be assigned by the Business Sellers without any Third Party Consent; and

5.1.2    which cannot be so assigned, but in respect of which such Third Party Consent has been obtained at or before the Closing Date.

in each case, with effect from Closing.

5.2    The assignment of the Contracts relating to the National Foam Business shall be subject to the provisions of Bill of Sale and Instrument of Assignment.

5.3    Insofar as the benefit of any of the Contracts cannot effectively be transferred to the Purchaser except by way of novation or with a Third Party Consent to an assignment and such novation or Third Party Consent (as the case may be) has not been obtained at or before Closing, the provisions of Schedule 4 shall apply.

**6      Accounts Receivables**

6.1    This Agreement constitutes an assignment of the benefit of each of the Accounts Receivables to Purchaser Two and Purchaser Three, as appropriate, with effect from Closing, and the relevant Purchaser shall be entitled to invoice, collect and receive the Accounts Receivables for its own account from Closing.

6.2    Each of the Business Sellers shall:

6.2.1    at the request and reasonable expense of the relevant Purchaser take such steps as such Purchaser shall reasonably require to assist the relevant Purchaser to collect the Accounts Receivables (including, where reasonable, commencing or threatening to commence legal proceedings, at Purchaser's cost, for the recovery of any Accounts Receivables in its name); and

6.2.2    account for and pay to the relevant Purchaser any Accounts Receivables paid to such Business Seller (without any deduction or set-off) all such Accounts Receivables so received within 5 Business Days of the day upon which payment was received by such Business Seller.

6.3    Save as set out in this Clause 6, the Sellers shall take no other action in relation to the Accounts Receivables.

**7      Post-Closing Adjustments**

**7.1    Closing Statement**

The Purchasers shall procure that there shall be drawn up a draft of the Closing Statement (the "**Draft Closing Statement**") in accordance with Part 1 of Schedule 11.

**7.2    Determination of Closing Statement**

7.2.1    The Draft Closing Statement as agreed or determined pursuant to paragraph 3 of Part 1 of Schedule 11:

(i)      shall constitute the Closing Statement for the purposes of this Agreement; and

(ii)     shall be final and binding on the parties.

7.2.2    The Working Capital, the Group Companies' Cash Balances, and the Group Companies Indebtedness shall be derived from the Closing Statement.

**7.3    Adjustments to Purchase Price**

**7.3.1    Group Companies' Cash Balances**

(i)      If the Group Companies' Cash Balances are less than the Estimated Cash, the Sellers shall repay to the Purchasers an amount equal to the deficiency; or

(ii)     if the Group Companies' Cash Balances are greater than the Estimated Cash, the Purchasers shall pay to the Sellers an additional amount equal to the excess.

7.3.2 **Group Companies Indebtedness**

    (i)    If the Group Companies Indebtedness is greater than the Estimated Group Companies Indebtedness, the Sellers shall repay to the Purchasers an amount equal to the excess; or

    (ii)    if the Group Companies Indebtedness is less than the Estimated Group Companies Indebtedness, the Purchasers shall pay to the Sellers an additional amount equal to the deficiency.

7.3.3 **Working Capital**

    (i)    If the Working Capital is less than the Base Working Capital, the Sellers shall repay to the Purchasers an amount equal to the deficiency; or

    (ii)    if the Working Capital exceeds the Base Working Capital, the Purchasers shall pay to the Sellers an additional amount equal to the excess.

7.4 **Interest**

Any payment to be made in accordance with this Clause 7 shall include interest thereon calculated from the Closing Date to the date of payment at a rate per annum of 2 per cent. above the prime rate from time to time of the Bank of England. Such interest shall accrue from day to day.

7.5 **Payment**

Any payment pursuant to Clause 7.3, and any interest payable pursuant to Clause 7.4, shall be made on or before the Final Payment Date.

7.6 **Allocation**

Where any payment is required to be made pursuant to this Clause 7:

7.6.1    the payment made on account of the Purchase Price shall be reduced or increased accordingly; and

7.6.2    the allocation of the Purchase Price shall be adjusted pursuant to Schedule 8.

7.7 **Set-off**

The respective amounts payable under this Clause 7 by:

    (i)    the Purchasers (on the one hand); and

    (ii)    the Sellers (on the other hand),

shall each be aggregated and set-off against each other and the resulting amount (if any) shall be paid on or before the Final Payment Date.

**8      Post-Closing Obligations**

8.1    **Indemnities**

8.1.1    **Indemnity by Purchasers against Assumed Liabilities**

The Business Purchasers shall indemnify and keep indemnified the Business Sellers against:

(i)      all Assumed Liabilities; and

(ii)     any Losses which any of the Business Sellers may suffer by reason of such Business Sellers taking any reasonable action to avoid, resist or defend against any Assumed Liability.

8.1.2    **Indemnity by Business Sellers against Excluded Liabilities**

The Business Sellers shall indemnify and keep indemnified the Business Purchasers against:

(i)      any Excluded Liability; and

(ii)     any Losses which the Business Purchasers may suffer by reason of the Business Purchasers taking any reasonable action to avoid, resist or defend against any Excluded Liability.

8.1.3    **VAT**

Where:

(i)      any Assumed Liability includes VAT in respect of which the Business Sellers are entitled to credit or refund from a Tax Authority, the Business Sellers shall promptly make a payment to the Purchaser in respect of such VAT; and

(ii)     the Business Sellers receive an amount of VAT in respect of a supply in the course of the Business in respect of which the Purchaser or a member of the Purchasers' Group is required to account for VAT, the Business Sellers shall promptly pay such VAT to the Purchaser,

Provided that this Clause 8.1.3 shall not apply where any such VAT is taken into account in preparing the Closing Statement or the Working Capital Adjustment and accordingly has resulted in the purchase price being lower than it otherwise would have been had the VAT not been so taken into account.

8.2    **Conduct of Claims**

8.2.1    **Assumed Liabilities**

(i)      If a Business Seller becomes aware after Closing of any claim which constitutes or may constitute an Assumed Liability, that Business Seller shall as soon as reasonably practicable (but in any event within such period as will afford the Business Purchasers reasonable opportunity of requiring that Business Seller to lodge a timely appeal) give written notice thereof to the Business Purchasers and shall not admit, compromise, settle, discharge or otherwise deal with such claim without the prior agreement of the Business Purchasers.

(ii)    A Business Seller shall take or cause to be taken such action as the Business Purchasers may reasonably request to avoid, dispute, resist, appeal, compromise, defend or mitigate any claim which constitutes or may constitute an Assumed Liability subject to that Business Seller being indemnified to its reasonable satisfaction by the Business Purchasers against all Losses which may thereby be incurred. In connection therewith the Business Seller shall make or procure to be made available to the Business Purchasers or its duly authorised agents on reasonable notice during normal business hours all relevant books of account, records and correspondence relating to the Group Business which have been retained by that Business Seller (and shall permit the Business Purchasers to take copies thereof) for the purposes of enabling the Business Purchasers to ascertain or extract any information relevant to the claim.

8.2.2    **Excluded Liabilities etc.**

(i)    If the Business Purchasers become aware after Closing of any claim which constitutes or may constitute an Excluded Liability, the Business Purchasers shall as soon as reasonably practicable (but in any event within such period as will afford that Business Seller reasonable opportunity of requiring the Business Purchasers to lodge a timely appeal) give written notice thereof to that Business Seller and shall not admit, compromise, settle, discharge or otherwise deal with such claim without the prior agreement of that Business Seller.

(ii)    The Business Purchasers shall take such action as a Business Seller may reasonably request to avoid, dispute, resist, appeal, compromise, defend or mitigate any claim which constitutes or may constitute an Excluded Liability subject to the Business Purchasers being indemnified to their reasonable satisfaction by that Business Seller against all Losses which may thereby be incurred. In connection therewith the Business Purchasers shall make or procure to be made available to that Business Seller or its duly authorised agents on reasonable notice during normal business hours all relevant books of account, records and correspondence relating to the relevant Group Business which are in the possession of the Business Purchasers (and shall permit that Business Seller to take copies thereof) for the purposes of enabling that Business Seller to ascertain or extract any information relevant to the claim.

8.3    **Release of Guarantees etc.**

8.3.1    Subject to Clauses 8.3.2 and 8.3.3, the Sellers shall procure by Closing the release of each Business Seller or any member of the Sellers' Group from any securities, guarantees or indemnities given by or binding upon each Business Seller or any member of the Sellers' Group in respect of the Assumed Liabilities and/or the Business Leasehold Properties to the extent transferred to the Purchasers.

8.3.2    The provisions of Clause 8.3.1 shall not apply to those securities, guarantees or indemnities granted by the Sellers' Affiliate(s) to third parties in respect of the performance guarantees listed in Part 1 of Schedule 17 (the "**Back-Stopped Guarantees**"). The parties shall not seek the release of the Back-Stopped Guarantees prior to Closing and the obligations of the Sellers' Affiliate(s) under the

Back-Stopped Guarantees shall survive beyond Closing. The Purchasers, jointly and severally, agree to:

(i)    fully perform the relevant contracts underlying each of the Back-Stopped Guarantees;

(ii)   indemnify the relevant Seller or member of the Sellers' Group in full for any liability it incurs after Closing under the Back-Stopped Guarantees in the event that a Back-Stopped Guarantee is called upon in accordance with its terms and for regular maintenance costs, charges or other fees owed to issuing banks (up to a maximum aggregate amount of £70,000 per annum in respect of any such maintenance costs, charges or other fees (provided always that the Sellers hereby undertake to the Purchasers that they shall act in good faith in their dealings with the relevant issuing banks and shall not knowingly take any action which results in an increase in such maintenance costs, charges or other fees levied by such issuing banks)) making payment within ten (10) Business Days of receiving notice in writing that such a payment is due provided always that such indemnity will not apply in respect of those matters for the amounts for which the Sellers indemnify the Purchasers pursuant to any liquidated damages claims referred to in clause 10.1.1 and the parties hereby acknowledge that the Purchasers may set-off the amount of any indemnity claim pursuant to clause 10.1.1 against any amounts due from the Purchasers under this clause 8.3.2(ii);

(iii)  use reasonable commercial endeavours to have the performance guarantees supported by the Back-Stopped Guarantees released and returned to the Sellers' Representative as soon as practicable once they are no longer required pursuant to contracts with customers; and

(iv)   meet with the Sellers to provide the Sellers' Representative updates on a quarterly basis of the status of such matters in a form to be reasonably agreed between the parties.

Notwithstanding the foregoing, prior to any change in control of the Purchasers or of any entity holding the Group Business or the Group Companies other than where such change of control occurs as a result of an intra-group reorganisation after the implementation of which the Purchaser Holdco still holds either directly or indirectly the entire issued share capital of each Purchaser, the Purchasers shall, unless the Sellers provide prior written consent (such consent not to be unreasonably withheld) provided that the Purchasers have agreed to provide alternative security (including cash for the full value of the relevant Back-Stopped Guarantees), the Purchasers shall procure the full release of all Affiliates of the Business Sellers and/or of the Share Sellers with respect to the Back-Stopped Guarantees which relate to the relevant Purchaser or Group Company which is the subject of the change of control.

8.3.3    The provisions of Clause 8.3.1 shall not apply to those guarantees granted by the Sellers' Affiliate(s) to third parties in respect of the performance guarantees listed in Part 2 of Schedule 17 (the "**Expired Guarantees**"). The Purchasers agree to:

    (i)    use reasonable endeavours to have the performance guarantees supported by the Expired Guarantees released and returned to the Sellers' Representative as soon as is reasonably practicable after Closing; and

    (ii)    meet with the Sellers to provide the Sellers' Representative updates on a quarterly basis of the status of such matters in a form to be reasonably agreed between the parties.

8.3.4    The Sellers further confirm and undertake to the Purchasers that in the event that the relevant issuing bank requests that any Purchaser provides cash-backing or other collateral in respect of any French Bond in the period up to and including the first anniversary of the Closing Date, the Sellers (or a member of the Sellers' Group) will provide and maintain such requested cash-backing or collateral in respect of such French Bond to the relevant issuing bank indefinitely through their expiry (except as provided in clause 8.3.2) (such amounts, and the additional collateral provided pursuant to clause 8.3.6 being "**French Collateral**"), within 10 Business Days of receiving notice in writing from a Purchaser;

8.3.5    In the event that a Seller (or a member of the Sellers' Group) has provided French Collateral pursuant to clause 8.3.4 and the Purchasers subsequently complete the closure of the businesses of the Group Companies, then the amount by which the Sellers are required to indemnify the Purchasers pursuant to clause 10.1.12 shall be reduced by the amount of such French Collateral, provided always that upon the relevant issuing bank releasing and returning the French Collateral to a Seller (or other member of the Sellers' Group), the amount by which the Sellers are required to indemnify the Purchasers pursuant to clause 10.1.12 shall be increased by the amount of collateral so returned up to a maximum of £2,000,000 as the total due under clause 10.1.12.

8.3.6    The Sellers further confirm and undertake to the Purchasers that in the event that the relevant issuing bank requests that any Purchaser provides cash-backing or other collateral in respect of any 24-Month Bond in the period up to and including the first anniversary of the Closing Date, the Sellers (or a member of the Sellers' Group) will provide and maintain such cash-backing or collateral in respect of such 24-Month Bond to the relevant issuing bank for a period of 24 months, within 10 Business Days of receiving notice in writing from a Purchaser;

8.3.7    The Sellers further confirm and undertake to the Purchasers that in the event that any customer of a Purchaser requests an extension to the term of a:

    (i)    Tier 1 Bond in the period up to and including the first anniversary of the Closing Date, the Sellers will extend the term of such Tier 1 Bond up to a maximum period of a further 12 months from the expiry date (as detailed in Schedule 17 Part 5) of that Tier 1 Bond, within 10 Business Days of receiving notice in writing from a Purchaser that such an extension has been requested;

    (ii)    Tier 2 Bond in the period up to and including the first anniversary of the Closing Date, the Sellers will extend the term of such Tier 2 Bond up to a

maximum period of a further 16 months from the expiry date (as detailed in Schedule 17 Part 6) of that Tier 2 Bond, within 10 Business Days of receiving notice in writing from a Purchaser that such an extension has been requested;

(iii) Tier 3 Bond in the period up to and including the first anniversary of the Closing Date, the Sellers will extend the term of such Tier 3 Bond up to a maximum period of a further 18 months from the expiry date (as detailed in Schedule 17 Part 7) of that Tier 3 Bond, within 10 Business Days of receiving notice in writing from a Purchaser that such an extension has been requested; and

(iv) Tier 4 Bond in the period up to and including the first anniversary of the Closing Date, the Sellers will extend the term of such Tier 4 Bond up to a maximum period of a further 12 months from the Closing Date, within 10 Business Days of receiving notice in writing from a Purchaser that such an extension has been requested.

8.3.8 A French Bond or a 24-Month Bond shall be deemed to be a Back-Stopped Guarantee with effect from the date on which a Seller (or a member of the Sellers' Group) has provided French Collateral in respect of that French Bond or 24-Month Bond. A 24-Month Bond will cease to be a Back-Stopped Guarantee on its expiry date.

8.3.9 **Purchaser Holdco Undertaking**

In consideration of the Sellers entering into, and assuming the obligations imposed on them under this Agreement, Purchaser Holdco confirms and undertakes to the Sellers that, for the period of fifteen (15) months from the Closing Date:

(i) each of the Purchasers will remain a direct or indirect wholly-owned subsidiary of Purchaser Holdco (and, for the avoidance of doubt, the restriction contained in this Clause 8.3.4(i) shall not apply to any of the Companies); and

(ii) no Purchaser will declare, make or pay any dividend or other distribution in favour of any of its member(s), other than a dividend or other distribution declared, made or paid in favour of another Purchasers' Group member;

provided always that the provisions of this Clause shall not apply in the event that a third party funder(s) of the Purchasers' Group enforces any security interest(s) over the Purchaser's Group held by such third party funder(s) from time to time.

8.4 **Business Sellers' Continuing Obligations**

8.4.1 **Wrong Pockets**

(i) Except as provided in Schedule 3, if any property, right or asset to be transferred hereunder and/or pursuant to a Local Transfer Document and forming part of the Group Businesses (other than any Excluded Asset) has not been transferred to the relevant Business Purchaser, the relevant Business Seller shall (or shall procure that the relevant member of the Sellers' Group shall) do all such things and/or execute all such documents as may be necessary to transfer, in each case, for nil consideration, such property, right or asset (and any related liability which is an Assumed

Liability) as soon as practicable to the relevant Business Purchaser or a member of the Purchasers' Group nominated by a Purchaser and, pending such transfer, such property, right or asset shall be held on trust for the relevant Business Purchaser.

(ii)    If there is any property, right or asset used predominantly for or exclusively by any Business Seller or any member of the Sellers' Group in carrying out any of the Group Businesses that is not being transferred hereunder or pursuant to a Local Transfer Document (other than any Excluded Asset) to the relevant Business Purchaser in respect of such Group Business nor is the subject of the Transitional Services Agreement, the Business Sellers shall, or shall procure that the relevant member of the Sellers' Group shall, to the extent possible having regard (acting reasonably and in good faith) to the rights and restrictions of such Business Seller or member of the Sellers' Group (as the case may be) in respect of such property, right or asset, do all such things and/or execute and deliver all such documents as may be necessary to grant to the relevant Business Purchaser a licence to use such property, right or asset in the manner used by the respective Seller and as the relevant Business Purchaser reasonably requires for the purpose of carrying on any of the Group Businesses (in the manner in which the Group Businesses were carried on as at the date of this Agreement).

### 8.4.2    Access to Information

For the period of seven years from the Closing Date, (on giving reasonable notice to the Sellers' Representative), the Purchasers and their agents shall be entitled during normal business hours:

(i)    to have access to, and to take copies of, any books of account, records, documents and information of or relating to any Group Company (in whatever form) existing at Closing that are held by the Sellers (or any other member of the Sellers' Group); and

(ii)    to consult any employee of the Sellers or any other member of the Sellers' Group, at the premises at which the relevant employee is employed, for the purpose of obtaining knowledge, know-how or other information possessed by such employee in relation to any Group Company, and the Sellers shall use their reasonable endeavours to procure that any such employee shall disclose all such information to the Purchaser or their respective agents.

Any books of account, records, documents and information referred to in this Clause 8.4.2 shall be retained by the Sellers' Group in the relevant jurisdiction of origin for at least seven years from the Closing Date.

## 8.5    Purchasers' Continuing Obligations

### 8.5.1    Trading Names etc

Subject to the terms of the Transitional Services Agreement, the Purchasers shall not, and shall procure that no member of the Purchasers' Group shall, after Closing, use in any way whatsoever any trading names or registered or unregistered trade marks listed in Schedule 14, provided that the Purchasers shall have three months from Closing to procure that all such trading names and trade

marks are removed from all business stationery, all other assets acquired by the Purchasers pursuant to this Agreement and all premises occupied by the Purchasers, or any other member of the Purchasers' Group, in connection with the Group.

8.5.2 **Wrong Pockets**

If, following Closing, any property, right or asset not forming part of the Group Businesses is found to have been transferred to the Purchaser in error, the Purchaser shall transfer such property, right or asset (and any related liability which is not an Assumed Liability) as soon as practicable to the relevant Business Seller or a member of the Sellers' Group nominated by the Sellers' Representative reasonably acceptable to the Purchaser for nil consideration.

8.5.3 **Access to Information**

For the period of four years from the Closing Date, on giving reasonable notice to the Purchasers, the Sellers and their agents shall be entitled during normal business hours to have access to, and to take copies (at the Sellers' expense) of, any books of account, records, documents and information relating to the Group (in whatever form) that are held by the Purchasers (or any other member of the Purchasers' Group) and which relate to the period prior to Closing and in the case of ITAR related matters such access shall include reasonable access to relevant personnel within Purchasers' Group which does not unreasonably or in any material way interfere with business operations, provided that such access is solely for the purposes of the Sellers :

(i)      complying with the Sellers' audit requirements;

(ii)     complying with Sellers' requirements with respect to Tax; or

(iii)    complying with (a) any Law, or (b) the requirements of any Governmental Authority, regulatory body, stock exchange .

Any books of account, records, documents and information referred to in this Clause 8.5.3 shall be retained by the Purchasers' Group in the relevant jurisdiction of origin for at least seven years from the Closing Date.

Furthermore, to the extent that employees of a Purchaser have knowledge or information which is necessary for the Sellers' compliance with clause 8.5.3 (i) to (iii) (inclusive) above, the Purchasers shall make those employees available to the Sellers upon reasonable notice for a reasonable period provided that this does not unreasonably or in any material way interfere with the business operations of the Purchasers.

8.6 **Kirkby Powder Assets**

8.6.1 The Sellers undertake to reimburse the Purchasers on demand in respect of 50% of all invoiced third-party costs to the extent such costs are incurred by the Purchasers in removing the Kirkby Powder Assets from the Kirkby Site and relocating, installing and commissioning them at the Bentham Site, provided always that the maximum sum the Sellers shall be obliged to pay pursuant to this clause 8.6 shall not exceed £200,000.

8.6.2 Purchaser Two shall pay the sum of £10,000 to Kidde Products for the Kirkby Powder Assets set out in Part 2 of Schedule 21, and the Sellers agree to contribute £5,000 toward such sum by applying it to the sums they are obliged to pay the Purchasers pursuant to clause 8.6.

# 9 Warranties

## 9.1 The Sellers' Warranties

9.1.1 The Sellers warrant to the each of the Purchasers that the statements set out in Schedule 12 are true and accurate as of the date of this Agreement.

9.1.2 Each Seller gives the Sellers' Warranties only to the extent that the Sellers' Warranties relate to or affect the Shares (including the relevant underlying businesses) or the Group Business it agrees to sell under this Agreement.

9.1.3 For the purposes of the Sellers' Warranties, the Purchasers acknowledge and agree that they have not relied upon any forecasts, estimates, projections, calculations, statements of intent or statements of opinion provided to the Purchasers or any of their directors, officers, employees, agents or advisers on or prior to the date of this Agreement, whether provided in the Data Room or otherwise, unless, and then to the extent reflected in the Sellers' Warranties.

9.1.4 Each of the Sellers' Warranties is separate and independent and, unless otherwise expressly provided and subject to Clause 11.11, the Purchasers shall have a separate claim and right of action in respect of every breach of every Sellers' Warranty.

9.1.5 Any Sellers' Warranty qualified by the expression "so far as the Sellers are aware" or any similar expression shall, unless otherwise stated, be deemed to refer to the actual knowledge of the persons whose names are set out in Schedule 15, and subject to any restrictions as to scope set out therein.

9.1.6 The limitations set out at Clauses 11.1, 11.2, and 11.3 shall not apply to any Sellers' Warranty Claim in relation to any Fundamental Warranty.

## 9.2 Sellers' Undertaking

The Sellers undertake that neither they nor any person claiming under or through them shall:

9.2.1 make any claim against any of the Group Companies or any of their officers or employees or any of the Current Employees or Relevant Employees;

9.2.2 enforce any right which they may have; or

9.2.3 raise any defence to any Sellers' Warranty Claim,

in respect of any misrepresentation, inaccuracy or omission (other than one made as a result of fraud or wilful concealment) in or from any information or advice provided by the Group Companies or any of their officers or employees or any of the Current Employees or Relevant Employees for the purpose of assisting the Sellers (or any of them) to make any representation, Sellers' Warranty, enter into this Agreement and/or prepare the Disclosure Letter.

---

9.3 **The Purchasers' Warranties**

The Purchasers warrant to the Sellers that the statements set out in Schedule 13 are true and accurate as of the Closing Date.

**10    Indemnities**

10.1    In this Clause 10, "**Purchaser Indemnified Matters**" means:

10.1.1    any Losses arising from liquidated damages claims in respect of the following Customer Contracts incurred by any Purchaser or Group Company up to an aggregate amount of £1,294,661 provided that, in each case, the relevant Purchaser or Group Company has taken ordinary course measures to mitigate its Losses:

| Order Number | Customer |
|---|---|
| CC01936 | Tecnicas Reunidas |
| CC01937 | Tecnicas Reunidas |
| CC01963 | Petrofac |
| CC01965 | JGC Tecnimont |
| CC01966 | GS Engineering |
| CC01981 | Daewoo |
| CC01982 | Daewoo |
| CC02000 | Galfar Al Misnad |
| CC02001 | Galfar Al Misnad |

10.1.2    75% of any liability as calculated by an Actuary incurred and paid at any time prior to the expiry of the twelfth anniversary of this Agreement by the Purchasers or any member of the Purchasers' Group which transfers to the Purchaser, or any member of the Purchasers' Group under the Transfer Regulations and/or any predecessor legislation and which relates in any way whatsoever to either:

(i)    pensions, retirement or death benefits payable under a Restructuring Programme, on redundancy (which for the avoidance of doubt shall include voluntary and compulsory redundancy), or on a reorganisation in the interests of business efficiency under or in connection with the Sellers' Pension Scheme; or

(ii)    pensions, retirement or death benefits payable on redundancy (which for the avoidance of doubt shall include voluntary and compulsory redundancy) or on a reorganisation in the interests of business efficiency under or in connection with an occupational pension scheme (within the meaning of section 1 Pension Schemes Act 1993) which transferred to the Group as a result of a transfer under the Transfer Regulations and/or any predecessor legislation should such benefits exist.

10.1.3    For the avoidance of doubt, the parties agree that the indemnity in clause 10.1.2 above :

(i)     will not be impaired, invalidated or restricted (wholly or partly) by any reorganisation (including any voluntary or compulsory redundancy exercise) undertaken in the interests of business efficiency by the Purchasers, and/or any member of the Purchasers' Group as long as that reorganisation is done in the normal course of business which shall include, for the avoidance of doubt a Restructuring Programme: and

(ii)    does not extend to liabilities resulting from an early retirement of an individual Relevant Employee or a number of individual Relevant Employees not otherwise part of a redundancy, Restructuring Programme, or reorganisation in the interests of business efficiency.

10.1.4  any Losses incurred by any Purchaser or Group Company arising out of the dispute relating to the commission for the Bullenbay Project with SOS Rubber International, Inc.;

10.1.5  any Losses incurred by any Purchaser or Group Company arising out of the requirement to return the Exton premises in the condition and repair in which they are required to be kept throughout the term of the lease in accordance with the terms of such lease;

10.1.6  any Losses incurred by any Purchaser or Group Company arising out of the Elysées Cosmetique litigation to which Eau et Feu SAS is a party in relation to a foam suppression system;

10.1.7  any Losses incurred by any Purchaser or Group Company arising out of the employment claim against Eau et Feu relating to Chantal Andre;

10.1.8  any Losses incurred by any Purchaser or Group Company arising out of the employment claim against Eau et Feu relating to Peter Schiffers;

10.1.9  any Losses incurred by any Purchaser or Group Company arising out of the termination of Edward Keenan and Roger McCardell from the National Foam Business;

10.1.10 save as specifically provided for in the Company Accounts or with respect to amounts misappropriated from any Group Company, any Losses incurred by any Purchaser or Group Company caused by the actions of Jean Francois Devilliers taken on behalf of a Group Company;

10.1.11 any Losses incurred by any Purchaser or Group Company arising out of Eau et Feu's non-compliance with solvent emissions flow measurements in relation to its VOC Emissions for the period up to Closing;

10.1.12 subject to clause 8.3.5, all liabilities and costs arising from the closure of the businesses of the Companies up to a maximum aggregate cost of £2,000,000 provided that: (i) announcement of such closure has been made to the appropriate works council(s) (or other analogous body(ies)) on or before 31 December 2014; and (ii) such closure results in the cessation of trading in respect of all of the businesses of the Companies, or such part of the businesses of the Companies which accounted for at least ninety-five per cent. of the gross revenues of the Companies as set out in the management accounts for the Companies for the prior 12 month period;

10.1.13 save as specifically provided for in the Closing Statement, any and all liabilities of Vanrullen Freres BVBA provided that the business of Vanrullen Freres BVBA is carried on post-Closing in substantially the same manner as it was being carried on immediately prior to Closing and specifically that only the one remaining contract of sale is completed without being expanded or extended and that Vanrullen Freres BVBA enters into no new sales contracts nor sells anything other than under such one existing contract, only entering other contracts in support of and consistent with the winding up of Vanrullen Freres BVBA in good order and, for the avoidance of doubt, no steps are taken to grow, expand or change such business;

10.1.14 any Losses incurred by any Purchaser or any member of the Purchasers' Group arising out of any third party claims brought against any of the Purchasers or any member of the Purchasers' Group challenging the ownership of any of the Owned Business IPR;

10.1.15 any Losses suffered by any of the Purchasers or any member of the Purchasers' Group arising as a result of the Owned Business IPR and the Licenced In IP not being sufficient for the purposes of owning and operating the Group Businesses and the Group Company Businesses following Closing in the same manner as they were owned and operated prior to Closing;

10.1.16 any Pre-Existing Condition and any Losses incurred by the Purchasers as a result of the Sellers exercising the right of access and/or undertaking any works pursuant to Clause 10.5.4;

10.1.17 any Losses incurred by any member of the Purchasers' Group arising from any breach of or non-compliance with the requirements of ITAR by any of the Sellers' Group or, prior to Closing, any part of the Group Businesses or from Closing pursuant to the terms of the Transitional Services Agreement;

10.1.18 any Losses incurred by Purchaser One, Purchaser Two or Purchaser Three as a consequence of any rights or compensation for loss of rights under or in relation to any Pre-Closing Share Rights; and

10.1.19 any Losses, payment or contribution which any Group Company becomes liable to make in respect of the Sellers' Pension Scheme, The Chubb Pension Plan, the Chubb Security Pension Fund, The Carrier UK Pension Scheme and/or the Goodrich (UK) Pension Scheme arising out of or in connection with The Pensions Regulator issuing a contribution notice or financial support direction pursuant to the Pensions Act 2004 and/or any regulations made under or in connection with sections 38 to 51 of the Pensions Act 2004 as modified or re-enacted from time to time.

10.2    The Sellers undertake to indemnify and keep indemnified and hold harmless the Purchasers in relation to each of the Purchaser Indemnified Matters and any Losses which the Purchasers may suffer by reason of any Purchaser (or member of the Purchasers' Group as the case may be) taking any reasonable action to avoid, resist or defend against any Purchaser Indemnified Matter.

10.3    **General**

For the avoidance of doubt, as soon as any Purchaser or Group Company has any liability in respect of the subject of the Purchaser Indemnified Matter referred to in Clause 10.1.6,

the Sellers shall immediately indemnify, pay, reimburse and hold harmless the Purchasers and the Group Companies in respect of any such liability.

10.4  **Conduct of Third-Party Claims in respect of Purchaser Indemnified Matters**

10.4.1  If (i) any third party notifies any Purchaser or (ii) any director of a Purchaser becomes aware of the filing of a claim by a third party with a court or Government Authority, in either case, with respect to any matter which may give rise to a claim for indemnification against any Seller under this Clause 10 (each, a "**Third-Party Indemnity Claim**"), then such Purchaser shall notify the Sellers' Representative thereof promptly and in any event within fifteen (15) Business Days after receiving notice from a third party or after becoming aware of the filing of a claim by such third party with a court or other Government Authority.

10.4.2  The failure of any Purchaser to give any notice required pursuant to Clause 10.4.1 shall not affect any of such party's rights under this Clause 10 or otherwise, except and to the extent that such failure is actually prejudicial to the rights or obligations of any Seller.

10.4.3  If the Sellers' Representative notifies the Purchasers' Representative within fifteen (15) Business Days after the date on which the relevant Purchaser gave notice of the matter to the Sellers' Representative pursuant to Clause 10.4.1, that the Sellers wish to assume conduct in respect of such matter:

(i)  the Sellers shall have the right to defend the matter, at the Sellers' expense, with counsel of the Sellers' choice (which choice the relevant Purchaser may reasonably disapprove only with good reason based on an actual or potential conflict of interests or upon the experience of such counsel related to the subject matter of the Third-Party Indemnity Claim);

(ii)  the relevant Purchaser may retain separate counsel at its sole cost and expense;

(iii)  the relevant Purchaser shall not consent to the entry of a judgment or enter into any settlement with respect to the matter without the written consent of the Sellers' Representative, which consent shall not be unreasonably withheld, delayed or conditioned; and

(iv)  the Sellers shall not consent to the entry of a judgment with respect to the matter or enter into any settlement which does not include a provision whereby the plaintiff or claimant in the matter releases the relevant Purchaser from all liability with respect thereto without the written consent of the relevant Purchaser, which consent shall not be unreasonably withheld, delayed or conditioned.

10.4.4  The Sellers shall not have the right to assume conduct of any Third-Party Indemnity Claim if and to the extent:

(i)  the Third-Party Indemnity Claim seeks an injunction or equitable relief against any Purchaser (or any Affiliate of any Purchaser); or

(ii)  if and to the extent of any discrete criminal proceeding, action, indictment, action or investigation against any Purchaser (or any Affiliate of any Purchaser) and not involving any Seller (or any Affiliate of any Seller).

10.4.5 The relevant Purchaser may assume conduct of a Third-Party Indemnity Claim if the Sellers have failed or are failing to reasonably prosecute or defend such claim, and in such a case Clause 10.4.3 shall be deemed to no longer apply.

10.4.6 For the avoidance of doubt, the right to defend any Third-Party Indemnity Claim pursuant to this Clause 10.4 shall expressly include an obligation on the Sellers to post any appeal bonds, sureties, security for costs, interim awards for costs or damages, guaranties or similar obligations which become payable in connection with such Third-Party Indemnity Claim or proceedings related thereto.

10.4.7 No Purchaser shall admit any liability to any third party in connection with any Third-Party Indemnity Claim to which Clause 10.4.3 applies and the relevant Purchaser shall cooperate fully with reasonable requests made by the Indemnifying Party to assist in the defence of such claim.

10.5 **Provisions relating to Pre-Existing Conditions**

10.5.1 For the purposes of this Clause 10.5 and the interpretation of the definition of Pre-Existing Condition, the definition of "**Environmental Law**" means "all applicable laws (including, for the avoidance of doubt, common law), statutes, regulations, statutory guidance notes (to the extent having the force of law) and final and binding court and other tribunal decisions of any relevant jurisdiction whose purpose is to protect, or prevent pollution of, the Environment or to regulate emissions, discharges, or releases of Hazardous Substances into the Environment, or to regulate the use, treatment, storage, burial, disposal, transport or handling of Hazardous Substances in force from time to time.

10.5.2 The Sellers and the Purchasers agree that no Purchaser shall be entitled to make any claim under Clause 10.1.16 in respect of any Pre-Existing Condition:

    (i)      for any Losses incurred after the expiry of 6 years from Closing;

    (ii)     to the extent that Losses arise as a result of any change of use at the relevant property to any use other than an industrial/commercial use;

    (iii)    to the extent that Losses arise as a result of any voluntary submission made by the Purchasers to any Environmental Authority for the purposes of inviting or otherwise encouraging regulatory action with respect to any Pre-Existing Condition provided that nothing in this Clause 10.5.2(iii) shall limit the Sellers' liability under Clause 10.1.16 where the Purchasers make any notifications or submissions which are required under any Environmental Law or required by an Environmental Authority, which are otherwise part of the normal course of dealing with such Environmental Authority or which are in response to substantial facts indicating potential material risks to human health, safety or the Environment; or

    (iv)    to the extent that Losses arise from exacerbation or worsening of any Pre-Existing Condition that results from acts or omissions of the Purchasers, in which case the Sellers shall only be liable for Losses which would have arisen had the relevant Purchaser's act or omission not exacerbated or worsened such Pre-Existing Condition.

10.5.3 In the event of a claim being made by the Purchasers in respect of a Pre-Existing Condition, the Sellers shall, if they so elect and notwithstanding any other provision

in this Agreement, conduct any work required to address such Pre-Existing Condition in accordance with Laws, taking into account the need not to unreasonably disrupt ongoing operations in so doing and Clauses 10.5.4 to 10.5.7.

10.5.4 In connection with providing indemnification in connection with Clause 10.1.16 the Sellers shall have the following rights and obligations:

(i)    the right to conduct any investigation, remediation or monitoring activities in a manner that minimises the cost of such activities so long as such activities are conducted in accordance with applicable Environmental Law PROVIDED THAT:

(a)    such right shall include but not be limited to the right to seek variances (if, and as available pursuant to Environmental Law) from applicable cleanup standards and the right to utilise and impose deed restrictions and other institutional controls such as, but not limited to, allowing Contamination to be addressed using deed restrictions and engineered controls that allow Contamination to be left in place under soil, pavement or buildings, and allowing the use of mitigation systems (e.g. vapor control systems) to address or otherwise mitigate any occupancy issues in new or existing buildings on the Properties, provided that no such additional deed restrictions or institutional control may be utilised if they materially interfere with or restrict the reasonable use and occupancy of the properties for commercial/industrial purposes;

(b)    the Purchasers shall have the right to review and approve any deed restriction or institutional control proposed by the Seller (such approval not to be unreasonably withheld or delayed) to ensure that such restriction or control shall not materially interfere with or restrict the reasonable use and occupancy of the relevant property for commercial/industrial purposes;

(c)    the right described in Clause 10.5.4(i)(a) shall include the right to impose deed restrictions and institutional controls that prohibit residential use of the properties, provided however that the exercise of any such rights by the Sellers shall not inhibit the Purchasers' right to remove such deed restrictions or institutional controls in order to permit residential development or use in the event that the Purchasers remediate any associated Contamination to residential standards at the Purchaser's cost; and

(d)    the Sellers shall in no event be required to remediate or indemnify for investigation or remediation of any of the Properties (i) to meet remediation standards for residential use and activities or (ii) with respect to Contamination which has at any time been remediated in accordance with the rights and obligations set out in the provisions of Clause 10.5, provided that such limitation shall not apply to the extent that new information about such Contamination is discovered subsequent to such remediation; and

(ii)    the right to reasonable access to conduct any necessary investigation, remediation or monitoring activities, such access to be conducted in a

manner that does not unreasonably interfere with the use of the relevant property.

10.5.5 Where the Sellers propose to exercise access in accordance with Clause 10.5.4(ii), they shall:

(i) not less than ten (10) business days prior to the date that the Sellers propose to enter the property to perform work notify the Purchasers and any successors and assigns of the Purchasers or their designee (in each such case, the identity and contact information of whom the Sellers have received notice of under this Agreement) whenever such entry is needed, which notification shall identify the proposed work to be performed and the proposed date(s) and duration of such work and the locations on the property where such work will be performed (each, a "**Scope of Work**") provided, that such notice period may be shorter in the event that access is necessary to address an emergency or a directive by an Environmental Authority that requires actions to be taken more immediately;

(ii) provide the Purchasers with reasonable opportunity to review and comment on the proposed Scope of Work to be conducted by the Sellers, including work plans, draft reports, and any engineering or institutional controls proposed by the Sellers and to observe and provide input on such work, including reasonable modifications to minimize disruption to the use of the relevant property;

(iii) use reasonable efforts to make revisions to the Scope of Works to the mutual satisfaction of the Sellers and the Purchasers, and where the Purchasers acting reasonably are not satisfied with the Scope of Works the Sellers shall not undertake any works pursuant to Clause 10.5.4; and

(iv) where any works are undertaken, promptly restore the relevant Property to the reasonable satisfaction of the Purchasers to substantially its original condition subject to modifications contemplated in connection with the Seller's environmental work or required by Environmental Authorities in connection with such work.

10.5.6 For the avoidance of doubt, the Purchasers and their successors or assigns shall have no obligation to perform maintenance or repair on monitoring well(s), well site(s), or any other equipment, systems or devices employed in the performance of the Sellers' environmental work (except with respect to the maintenance and repair of specific engineering controls recorded on the relevant Deed(s) pursuant to Clause 10.5.4(i)(a)).

10.5.7 The Sellers' rights specified in Clause 10.5.4(i)(a) to impose deed restrictions and other institutional controls after the Closing beyond those incorporated in the deeds of transfer shall apply only to the extent necessary to allow clean up to be undertaken to achieve a commercial/industrial standard and shall be memorialised in subsequent deeds of transfer for the Properties and/or other appropriate notices of record such that Sellers' rights shall run with the land and will be fully binding on the Purchasers and any successors and assigns of the Purchasers, including but not limited to any tenants or lenders of the Purchasers, subject in either case to the right of the Purchasers to remove any such deed restrictions and other institutional controls as provided for in Clause 10.5.4(i)(c). For the avoidance of doubt, the

foregoing shall in no way restrict the Sellers' choice of methodology to be employed when exercising their rights under Clause 10.5.4.

**11    Limitation of Sellers' Liability**

**11.1    Time Limitation for Claims**

Subject to the terms of this Clause 11 and Clause 12.3, no Seller shall be liable in respect of any claim pursuant to the Tax Indemnity or any Sellers' Warranty Claim unless a notice of such claim is given by any Purchaser to the Sellers' Representative specifying the matters set out in Clause 12.2 or Clause 12.1 of the Tax Indemnity (as the case may be):

11.1.1    in the case of any Sellers' Warranty Claim under paragraph 23 (Tax) of Part 1 of Schedule 12 or claim under the Tax Indemnity (other than a claim arising under the Tax Indemnity relating to any Stock Options or Incentives), within six (6) years following Closing;

11.1.2    in the case of a claim under the Tax Indemnity relating to any Stock Option or Incentives, within the later of (i) six (6) years following Closing and (ii) three (3) months after the last date on which a liability to Tax could arise in respect of the vesting or exercise of such Stock Options or Incentives;

11.1.3    in the case of any Sellers' Warranty Claim under paragraph 22 (Environment) of Part 1 of Schedule 12 within three (3) years following Closing; and

11.1.4    in the case of any other Sellers' Warranty Claim, on or before 15 March 2015.

**11.2    Minimum Claims**

11.2.1    No Seller shall be liable in respect of any individual Sellers' Warranty Claim (or a series of such claims arising from substantially similar facts or circumstances) where the liability in respect of any such claim or series of claims does not exceed US$77,000.

11.2.2    Where the liability in respect of any such claim or series of claims exceeds US$77,000, the Sellers shall be liable for both the initial US$77,000 and the excess.

**11.3    Aggregate Minimum Claims**

11.3.1    The Sellers shall not be liable in respect of any Sellers' Warranty Claim unless the aggregate amount of all such claims for which the Sellers would otherwise be liable (disregarding the provisions of this Clause 11.3) exceeds US$770,000.

11.3.2    Where the amount agreed or determined in respect of all claims referred to in Clause 11.3.1 exceeds US$770,000, the Sellers shall be liable for both the initial US$770,000 and the excess.

**11.4    Maximum Liability**

11.4.1    The aggregate liability of the Sellers in respect of all Sellers' Warranties Claims (excluding Seller's Warranties Claims relating to Fundamental Warranties) shall not exceed forty (40) per cent. of the Purchase Price as adjusted pursuant to the terms of this Agreement.

11.4.2 The aggregate liability of the Sellers in respect of all breaches of this Agreement (including all Sellers' Warranty Claims), any Local Transfer Document and claims under the Tax Indemnity shall not exceed the Purchase Price as adjusted pursuant to the terms of this Agreement.

## 11.5    Contingent Liabilities

Subject to Clause 12.3, no Seller shall be liable under a Sellers' Warranty Claim in respect of any liability which is contingent unless and until such contingent liability becomes an actual liability and is due and payable.

## 11.6    Provisions

11.6.1 No Seller shall be liable under a Sellers' Warranty Claim if proper allowance, provision, accrual or reserve is reflected in the Closing Statement or the Company Accounts.

11.6.2 No Seller shall be liable under a Sellers' Warranty Claim in respect of any speculative, special or indirect loss which is not a Loss.

## 11.7    Matters Arising Subsequent to this Agreement

No Seller shall be liable under this Agreement in respect of any Sellers' Warranty Claim, including the aggravation of a matter or circumstance and any Losses arising therefrom to the extent that the same would not have occurred but for:

### 11.7.1 Agreed Matters

any matter or thing done or omitted to be done pursuant to and in compliance with this Agreement or any Local Transfer Document or the Tax Indemnity or otherwise at the request in writing or with the approval in writing of any Purchaser;

### 11.7.2 Acts of Purchaser

any act, omission or transaction of any Purchaser or any member of the Purchasers' Group or any of the Group Companies, or their respective directors, officers, employees or agents or successors in title, after Closing, other than:

(i)    in the ordinary and usual course of business of any member of the Purchasers' Group or any of the Group Companies; or

(ii)   in connection with the performance of or compliance with any Contract entered into prior to Closing; or

(iii)  as required by Law or the regulations of any Governmental Authority in effect at the time of Closing.

### 11.7.3 Changes in Legislation

(i)    after Closing, the passing of, or any change in, after Closing, any Law, rule or regulation including (without prejudice to the generality of the foregoing) any increase in the rates of Taxation;

(ii)   any change after the date of this Agreement of any generally accepted interpretation or application of any Law;

### 11.7.4 Accounting and Taxation Policies

any change in accounting or Taxation policy, bases or practice of the Purchasers or any of the Group Companies introduced or having effect after Closing except where such change is made to comply with any Law, regulation or Accounting Standards in effect before Closing.

## 11.8 Insurance

Without prejudice to Clause 14, no Seller shall be liable under a Sellers' Warranty Claim to the extent that the Losses in respect of which such claim is made are covered by a policy of insurance and such claim is recovered by the Group or the Purchasers under that policy less all Losses (including any excess or deductible under the applicable policy of insurance or increase in policy premium resulting from any such claim) incurred by any of the Purchasers in making such recovery.

## 11.9 Disclosure

11.9.1 The Sellers shall not be liable for:

(i)     any Sellers' Warranty Claim in relation to a Fundamental Warranty to the extent that the matter or thing giving rise to such Sellers' Warranty Claim has been Disclosed with an express reference in the 'specific disclosures' section of the Disclosure Letter to that particular Fundamental Warranty; and

(ii)    any other Sellers' Warranty Claim (other than in relation to a Fundamental Warranty) to the extent that the matter or circumstance giving rise to such Sellers' Warranty Claim has been Disclosed;

11.9.2 Notwithstanding any other provision of this Agreement or the Disclosure Letter, the Sellers agree and acknowledge that no environmental, property or other due diligence reports which are addressed to any Purchaser and/or Lloyds Development Capital (Holdings) Limited (or any analogous addressee) and/or which are expressed to be in connection with 'Project Eurostar' shall not be Disclosed.

## 11.10 Mitigation of Losses

The provisions of this Clause 11 are without prejudice to any common law duty which may exist requiring the Purchasers to mitigate their loss in respect of any Sellers' Warranty Claim.

## 11.11 Purchasers' Right to Recover

### 11.11.1 Recovery for Actual Liabilities

The Sellers shall not be liable to pay an amount in discharge of any Sellers' Warranty Claim unless and until the liability in respect of which such claim is made has become due and payable or has been incurred.

### 11.11.2 Prior to Recovery from the Sellers etc.

If, before any Seller pays an amount in discharge of any Sellers' Warranty Claim, a Purchaser or any Group Company recovers or is entitled to recover (whether by payment, discount, credit, relief, insurance or otherwise) from a third party a sum

which indemnifies or compensates the Purchaser or Group Company (in whole or in part) in respect of the loss or liability which is the subject matter of the Sellers' Warranty Claim, the Purchaser shall comply with the reasonable instructions of the Sellers' Representative to enforce the recovery against the third party and any actual recovery (less any reasonable costs and expenses incurred in obtaining such recovery) shall reduce or satisfy, as the case may be, such Sellers' Warranty Claim to the extent of such recovery (less any reasonable costs and expenses incurred in obtaining such recovery) SAVE THAT the taking of such steps shall not be a condition precedent to such Purchaser or such Group Company enforcing or commencing a Sellers' Warranty Claim against any Seller.

### 11.11.3 Following Recovery from the Sellers etc.

If any Seller has paid to any Purchaser an amount in discharge of any Sellers' Warranty Claim and subsequently the Purchasers or any Group Company is entitled to recover from a third party a sum which indemnifies or compensates the Purchasers or Group Company (in whole or in part) in respect of the loss or liability which is the subject matter of the Sellers' Warranty Claim, the Purchasers shall comply with the reasonable instructions of the Sellers' Representative to enforce such recovery and shall, or shall procure that the relevant Group Company shall, pay to that Seller as soon as practicable after receipt an amount equal to (i) any sum recovered from the third party less any Losses properly incurred in obtaining such recovery (and which sum shall not exceed the amount previously paid by that Seller to the Purchasers), or if less, (ii) the amount previously paid by that Seller to the Purchasers. Any payment made by a Purchaser to a Seller under this Clause shall be made or procured by way of further adjustment of the consideration paid by the Purchasers for the Group and the provisions of Clause 3.2 shall apply *mutatis mutandis*.

For the avoidance of doubt, the Sellers acknowledge and agree that the Purchasers shall not be obliged to take any steps or actions under this Clause 11.12 if the effect of such steps or actions would or is likely to have a material adverse effect on any Purchaser or the Group.

## 11.12 No Double Claims

The Purchasers shall not be entitled to recover from any Seller under this Agreement, any Local Transfer Document or the Tax Indemnity more than once in respect of the same Losses suffered.

## 11.13 Sellers' Warranty Claims and Purchaser Indemnified Matters

No Seller shall be liable under any Seller's Warranty Claim if the specific subject matter of such Sellers' Warranty Claim is the specific subject matter of a Purchaser Indemnified Matter under clause 10.1.1 (liquidated damages in respect of all the contracts referred to in the document at Data Room reference Eurostar-Angus Fire/Document Sharing/Deloitte Items to close list/A Promoted Documents/#24), 10.1.3 (France closure) or 10.1.13 (restructuring programme).

**11.14 Fraud**

None of the limitations contained in Clause 10.5.1 shall apply to any claim which arises or is increased, or to the extent to which it arises or is increased, as the consequence of, or which is delayed as a result of, fraud or wilful concealment by any Seller.

**12      Claims**

**12.1    Notification of Potential Claims**

Without prejudice to the obligations of the Purchasers under Clause 12.2, if a director, the finance director or managing director of a Purchaser or any Group Company becomes aware of any fact, matter or circumstance that is reasonably likely to give rise to a Sellers' Warranty Claim, the relevant Purchaser (acting by its board of directors) shall act in good faith to as soon as reasonably practicable give a notice in writing to the Sellers' Representative setting out such information as is available to the relevant Purchaser or Group Company at that time, save that unless the Purchasers notify the Sellers' Representative otherwise, such notification shall not constitute formal notification of such claim for the purposes of Clause 12.2 and such notification shall not be a condition precedent to the liability of the Sellers in respect of any claim.

**12.2    Notification of Claims under this Agreement**

Notices of any Sellers' Warranty Claims  shall be given by the relevant Purchaser to the Sellers' Representative within the time limits specified in Clause 11.1 specifying in reasonable detail the basis of the claim (including where the claim is the result of or in connection with a Third Party Claim, details of the Third Party Claim) and, if reasonably possible, setting out the Purchaser's estimate of the amount of Losses which are, or are to be, the subject of the claim (including any Losses which are contingent on the occurrence of any future event).

**12.3    Commencement of Proceedings**

Any Sellers' Warranty Claim notified pursuant to Clause 12.2 shall (if it has not been previously satisfied, settled or withdrawn) be deemed to be withdrawn nine months after the notice is given pursuant to Clause 12.2 or, in the case of a contingent liability or any actual liability where the ability to bring a claim is dependent on the crystallisation of a contingent liability because of the operation of Clause 12.5, nine months after the relevant contingent liability becomes an actual liability, unless at the relevant time legal proceedings in respect of the relevant Sellers' Warranty Claim have been commenced by being issued and served and have not been withdrawn within such nine (9) month period.

**12.4    Investigation by the Sellers**

In connection with any Third Party Claim:

12.4.1   upon receipt of reasonable notice, the Purchasers shall allow, and shall procure that the relevant Group Company allows, the Sellers and their respective financial, accounting, legal or other advisers reasonable access during business hours to investigate the matter or circumstance alleged to give rise to a claim and whether and to what extent any amount is payable in respect of such claim; and

12.4.2   the Purchasers shall disclose (where legally permissible) to the Sellers' Representative all material of which the Purchaser is aware which relates to the

Third Party Claim and shall, and shall procure that any other relevant members of the Purchaser's Group shall (where legally permissible), give, subject to it being paid all reasonable out of pocket costs and expenses, all such information and assistance as is reasonably required, including access to premises and personnel, and the right to examine and copy or photograph any assets, accounts, documents and records, as any Seller or its financial, accounting or legal advisers may reasonably request subject to that Seller agreeing in such form as the Purchaser may reasonably require to keep all such information confidential and to use it only for the purpose of investigating and defending the Third Party Claim in question and provided always that no member of the Purchasers' Group shall be under any obligation to disclose or allow access to any information or documentation that is legally privileged.

## 12.5    Conduct of Third Party Claims

If a Purchaser is aware that a matter or circumstance is likely to give rise to a Sellers' Warranty Claim against any Seller under this Agreement as a result of or in connection with a claim by a third party (a "**Third Party Claim**") then:

12.5.1    the Purchasers shall notify the Sellers' Representative of the Third Party Claim as soon as reasonably practicable after the Purchasers become aware of it, but, without prejudice to Clause 11.1 and except to the extent that any Seller is prejudiced by such failure or delay, such notification shall not be a condition precedent to the liability of any Seller in respect of any Sellers' Warranty Claim; and

12.5.2    the Purchasers shall, upon notifying the Sellers' Representative, be entitled to take such action as they shall deem necessary to avoid, dispute, deny, defend, resist, appeal, compromise or contest such Third Party Claim (including making counterclaims or other claims against third parties) PROVIDED THAT the Purchasers shall:

(i)     comply with the reasonable directions of the Sellers' Representative in respect of such Third Party Claim (provided that the Sellers indemnify the Purchasers to their reasonable satisfaction in respect of Losses incurred in relation to such compliance and provided further that such compliance does not have, nor is likely to have, a material adverse effect on the Purchasers' relationships with Material Customers and/or Material Suppliers SAVE AND EXCEPT THAT in no event shall any Seller be liable to any Purchaser to the extent of any amount for which liability would likely have been avoided or for which reimbursement from a third party would likely have been made, had the relevant Purchaser taken the steps otherwise required of it pursuant to this Clause 12.5.2;

(ii)    not settle any Third Party Claim without the prior written consent of the Sellers (such consent not to be unreasonably withheld or delayed); and

(iii)   provide the Sellers with all material information in respect of each Third Party Claim within a reasonable time period of such information being provided to or obtained by any of the Purchasers.

**13      Restrictions on the Sellers**

13.1    **Restrictions**

13.1.1   Each of the Sellers covenants with the Purchasers and with each other member of the Purchasers' Group that it shall not, and it shall procure that each company, corporation, organisation, partnership, person or any other entity which is consolidated in the results of the UTC Climate, Controls & Security division in the reports filed by United Technologies Corporation with the U.S. Securities and Exchange Commission ("**Relevant Group**") shall not:

(i)     at any time after Closing in connection with any activity whatsoever use or procure or cause or (so far as it is able) permit the use of any Restricted Name except as permitted by a Purchaser in writing; or

(ii)    do or say anything which is intended to damage the goodwill or reputation of the Purchasers' Group or the Group Businesses or the Group Company Businesses.

13.1.2   Each of the Sellers covenants with the Purchasers and with each other member of the Purchasers' Group that it shall not, and it shall procure that each member of the Relevant Group shall not, for a period of three years after the Closing Date, either on its own behalf with or as an adviser, consultant, agent or in any other role for any other person, directly or indirectly:

(i)     subject to Clause 13.2.1, be engaged, concerned or interested in carrying on any Competing Business in any territory in which the Group Businesses or Group Company Businesses were carried on at the Closing Date or at any time during the period of 12 months ending on the Closing Date;

(ii)    accept, approach, canvas or solicit the custom of any Customer or any Potential Customer, or use its knowledge of or influence over any Customer or any Potential Customer for the benefit of any person carrying on a Competing Business;

(iii)   approach, canvas, solicit, engage or employ any person:

(a)    who at any time during the period of six months ending on the Closing Date was employed in the Group Businesses or the Group Company Businesses and who is on the Restricted List; or

(b)    with a view to the specific knowledge or skills of such person being used by or for the benefit of any person carrying on a Competing Business.

13.1.3   Each of the Sellers covenants with the Purchasers and with each other member of the Purchasers' Group that it shall not, and it shall procure that each member of the Relevant Group shall not, for a period of three years after the Closing Date, use the 'Kidde' brand for fire fighting or industrial hose or fire fighting foam, provided that the foregoing shall in no event apply with respect to intended application in the aerospace industry, military vehicles or elevators or when used in a company name that is in existence at Closing.

13.1.4   Each of the Sellers covenants with the Purchasers and with each other member of the Purchasers' Group that it shall procure that each member of the Relevant

Group, shall for a period of three years after the Closing Date, procure that Kidde Brazil shall not in any way be involved in the business of producing hose with a diameter in excess of 5 inches and/or nor shall it be involved in the hydraulic fracturing market.

13.1.5 In the event that any member of the Relevant Group ceases to be part of the Relevant Group pursuant to a reorganisation such that it remains ultimately owned by United Technologies Corporation but outside the Relevant Group (an "**Exiting Member**"), the Sellers will procure that such Exiting Member covenants with the Purchasers and each other member of the Purchasers' Group in the terms of Clauses 13.1.1 to 13.1.4 (inclusive) immediately prior to becoming an Exiting Member.

13.1.6 Each of the covenants contained in Clauses 13.1.1 to 13.1.5 (inclusive) shall constitute an entirely separate and independent restriction on the Sellers.

13.1.7 Each of the Sellers undertakes to the Purchasers and each other member of the Purchasers' Group that is shall (and it shall procure that each other member of the Relevant Group shall) at all times:

(i) keep confidential any Business Confidential Information and Group Company Business Confidential Information that (a) is within its knowledge, possession, custody or control at Closing or (b) subsequently becomes within its knowledge, possession, custody or control pursuant to the terms of this Agreement;

(ii) use such Business Confidential Information only for the benefit of the Purchasers or any other member of the Purchasers' Group; and

(iii) use reasonable endeavours to prevent the disclosure or misuse of any such Business Confidential Information or Group Company Business Confidential Information.

13.1.8 Clause 13.1.7 shall not apply:

(i) if and to the extent that disclosure of Business Confidential Information is required by Law or by any Authority or securities exchange to which the Sellers or any other member of the Sellers' Group is subject or submits; and

(ii) to Business Confidential Information or Group Company Business Confidential Information that comes into the public domain other than as a result of a breach of Clause 13.1.7 .

13.2 **Exceptions**

The restrictions in Clause 13.1 shall not operate to prohibit any member of the Relevant Group from:

13.2.1 continuing to operate or be engaged or economically interested in, or carrying on any business currently carried on as at the date of this Agreement by Silvani, Guardfire, Kidde Brazil subject to Clause 13.1.4 (including use of the 'Kidde' brand with respect to hoses to the extent and form it was used at Closing), Kidde Argentina, Kidde Australia (Pty) Ltd, Kidde South Africa, Shanghai Kidde Fire

Fighting (including use of the "Kidde" brand with respect to foam to the extent and form it was used at Closing), Growag and Water Mist Engineering businesses;

13.2.2    holding or being interested in up to 10 per cent. of the outstanding issued share capital of a company listed on any stock exchange;

13.2.3    holding a non-controlling interest in any company, provided that no member of the Relevant Group provides marketing or technical support to, or exercises a management function for, or exercises material influence over, a company which carries on a Restricted Business in a Relevant Territory;

13.2.4    fulfilling any obligation pursuant to this Agreement or any agreement to be entered into pursuant to this Agreement;

13.2.5    having ITAR Items manufactured and selling them; and/or

13.2.6    acquiring the whole or part of any business which carries on a Restricted Business, if in the financial year immediately preceding such acquisition, the turnover attributed to the relevant Restricted Business constituted less than 15 per cent. of such business to be acquired PROVIDED THAT:

(i)    the relevant member of the Relevant Group continues to carry on such acquired business in substantially the same manner in which it was carried on prior to acquisition and does not take steps to materially grow or expand such business; and

(ii)    within six months of the date on which such Relevant Group member has completed the acquisition of the relevant Restricted Business, such Relevant Group member shall, acting in good faith, offer (by notice to the Purchasers in writing) to sell such Restricted Business to the Purchasers on reasonable terms (including price) based on the terms (including price) of the acquisition of such Restricted Business by such Relevant Group member, and provide as soon as practicable all such information as the Purchasers shall reasonably require in relation to the Restricted Business for the purposes of acquiring it;

(iii)    such offer shall, if not earlier accepted by any Purchaser, automatically lapse on the earliest of:

(a)    the date upon which the Purchasers notify such Relevant Group member that they do not wish to accept such offer;

(b)    the date falling 60 Business Days after the date on which such offer was made if by such date the Purchasers have not responded to such offer indicating their interest in accepting such offer; and

(c)    the date falling 120 Business Days after the date on which such offer was made if by such date the sale of such Restricted Business to a Purchaser has not completed;

(iv)    if any such offer lapses in accordance with paragraph (ii), no Relevant Group member shall be:

(a)    under any obligation to the Purchasers with respect to operating such Restricted Business in the ordinary course;

(b)   restricted in any way hereunder from being interested in, operating or divesting such Restricted Business (or any part thereof),

at any time.

## 13.3   Reasonableness of Restrictions

The Sellers (having taken legal advice) agree and acknowledge that the restrictions contained in this Clause 13 are no greater than is reasonable and necessary for the protection of the interest of the Purchasers, but if any such restriction shall be held to be void but would be valid if deleted in part or reduced in application, such restriction shall apply with such deletion or modification as may be necessary to make it valid and enforceable.

## 13.4   Ongoing Distribution Arrangements

Each of the Sellers covenants with the Purchasers and with each other member of the Purchasers' Group that to the extent any member(s) of the Relevant Group provides distribution services to any member(s) of the Purchasers' Group, the Sellers shall procure that, for 3 years following the date of this Agreement, such member(s) of the Relevant Group shall continue to provide such distribution services to the relevant member(s) of the Purchasers' Group in accordance with the terms of the agreement(s) by which such distribution services are governed, and will further procure that such member(s) of the Relevant Group will only cease to provide such distribution services during such period for bona fide commercial reasons, acting in good faith and in accordance with the terms of such distribution agreements.

## 13.5   Environmental Permits

13.5.1  As regards any Environmental Permits required so as to lawfully and properly operate or conduct the Group Businesses and the Group Company Businesses following Closing in the same manner as the Group Businesses and the Group Company Businesses were operated or conducted prior to Closing which have not been obtained in the name of, transferred to or otherwise amended so as to take account of the fact that from the Closing Date the Group Companies will be owned by and operated by Purchaser One and the Business Properties will be owned by and operated by Purchaser Two and Purchaser Three, the Sellers shall at their own cost provide, or cause to be provided, to the Purchasers all reasonable assistance as is reasonably requested in connection with obtaining, amending so as to take account of the Transaction, or transferring to the relevant Purchasers of all such Environmental Permits.

13.5.2  Where the provisions of Clause 13.5.1 apply, the Sellers shall:

(i)    co-operate in good faith with any lawful and reasonable arrangements proposed by the Purchasers under which the Purchasers shall obtain the economic claims, rights and benefits of or resulting from any Environmental Permits until such time as the Environmental Permits are obtained, transferred or reissued in the name of the relevant Purchaser; and

(ii)   not cause any such Environmental Permits to be withdrawn, surrendered, suspended, revoked, cancelled or not renewed and acknowledge that the Purchasers can continue to operate under any relevant Environmental

Permits until they have been obtained, transferred or reissued in the name of the relevant Purchaser.

13.6    **[Intentionally left blank.]**

13.7    **Deed Restriction – West Chester**

13.7.1  The Sellers and the Purchasers agree that a restriction shall be incorporated into the deeds of transfer from the Sellers to the Purchasers for the West Chester Pennsylvania Property prohibiting the extraction or use of surface water or groundwater, except for investigation, remediation or monitoring purposes.

13.7.2  The Purchasers further agree to permit the Sellers to complete, at the Sellers' cost, any remaining remediation of the West Chester Property to address any Contamination at the property as and to the extent required by the Pennsylvania Department of Environmental Protection (PA DEP) under the Land Recycling and Environmental Remediation Standards Act (Act 2) such that one or more environmental covenant(s) approved by the PA DEP pursuant to the Pennsylvania Uniform Environmental Covenants Act (UECA) and Act 2 may be recorded containing restrictions substantially consistent with those restrictions as are contained in the deed to the West Chester Pennsylvania Property preventing the use of ground water at the property. The Purchasers shall promptly record such environmental covenant(s) as and when requested by Sellers, and the Purchasers shall fully comply and ensure compliance with such environmental covenants and restrictions in the deed.

13.8    **Purchasers' Covenants**

Each of the Purchasers covenants with the Sellers and each other member of the Sellers' Group that it shall not, and it shall procure that each member of the Purchasers' Group shall not, for a period of three years after the Closing Date, either on its own behalf or as an adviser, consultant, agent or in any other role for any other person, directly or indirectly approach, canvas, solicit or otherwise induce or seek to induce any Sellers' Group Restricted Employee to become employed (whether as employee, consultant or otherwise) by any of its Affiliates. The placing of an advertisement of a post and the recruitment of a person through an employment agency shall not constitute a breach of this Clause 13.8 provided that no member of the Seller's Group encourages or advises such agency to approach any such Sellers' Group Restricted Employee.

13.9    **Announcements**

13.9.1  Subject to clause 13.9.2, no announcement, communication or circular concerning the existence or the subject matter of this Agreement nor any document in the Agreed Terms shall be made or issued by or on behalf of any member of the Sellers' Group or the Purchasers' Group without the prior written approval of the Sellers' Representative and the Purchasers.

13.9.2  Clause 13.9.1 shall not apply to any announcement, communication or circular:

(i)     required by law or any governmental or regulatory body or the rules of any stock exchange on which the shares of any party (or its holding company) are listed but the party with an obligation to make an announcement or communication or issue a circular (or whose holding company has such an

obligation) shall consult with the other parties (or shall procure that its holding company consults with the other parties) insofar as is reasonably practicable before complying with such an obligation; or

(ii)    by the Purchaser Holdco to any of its shareholders and/or any investor (direct or indirect therein) or to LDC (Managers) Limited or any funds managed by or associated with such entity or any partner or investor in, or prospective partner or investor in such entities, or any person providing debt or equity finance (whether directly or indirectly) to the Purchasers.

## 13.10 Confidentiality

13.10.1 The Confidentiality Agreement shall cease to have any force or effect from Closing.

13.10.2 Subject to Clause 13.8 and Clause 13.10.3, each of the parties shall treat as strictly confidential and not disclose or use any information received or obtained as a result of entering into this Agreement (or any agreement entered into pursuant to this Agreement) (including any document in the Agreed Terms) which relates to:

(i)    the existence and provisions of this Agreement and of any agreement entered into pursuant to this Agreement;

(ii)    the negotiations relating to this Agreement (and any such other agreements);

(iii)    (in the case of the Sellers) any information relating to the Group and any other information relating to the business, financial or other affairs (including future plans and targets) of the Purchasers' Group; or

(iv)    (in the case of the Purchasers) any information relating to the business, financial or other affairs (including future plans and targets) of the Sellers' Group, for the avoidance of doubt, excluding the Group,

provided always that this Clause 13 shall not prevent the Purchasers from disclosing and using the Business Confidential Information and the confidential information of the Companies.

13.10.3 Clause 13.10.2 shall not prohibit disclosure or use of any information if and to the extent:

(i)    the disclosure or use is required by law, any governmental or regulatory body or any stock exchange on which the shares of any party (or its holding company) are listed;

(ii)    the disclosure or use is required to vest the benefit of this Agreement in any party;

(iii)    the disclosure or use is required for the purpose of any dispute, claim, arbitral or judicial proceedings arising out of this Agreement or any other agreement entered into under or pursuant to this Agreement or any agreement in the Agreed Terms or in order to enable a determination to be made by the Reporting Accountants under this Agreement;

(iv)    the disclosure is made to a Tax Authority in connection with the Tax affairs of the disclosing party;

(v)    the disclosure is made to a party to whom assignment is permitted under Clause 16.4.2 on terms that such assignee undertakes to comply with the provisions of Clause 13.10.2 in respect of such information as if it were a party to this Agreement;

(vi)    the disclosure is made to professional advisers of any party on a need to know basis and on terms that such professional advisers undertake to comply with the provisions of Clause 13.10.2 in respect of such information as if they were a party to this Agreement;

(vii)    the information is or becomes publicly available (other than by breach of the Confidentiality Agreement or of this Agreement); or

(viii)    the other party has given prior written approval to the disclosure or use

provided that prior to disclosure or use of any information pursuant to Clause 13.10.3(i), the party concerned shall, where not prohibited by law, promptly notify the other parties of such requirement with a view to providing the other parties with the opportunity to contest such disclosure or otherwise to agree the timing and content of such disclosure or use.

**14    Insurance**

The Purchasers acknowledge and agree that:

14.1    the Purchasers shall not have, and shall not be entitled to, the benefit of any Sellers' Group Insurance Policy in respect of any event, act or omission that takes place prior to the Closing Date other than for Employers Liability and Workers Compensation insurance claims, or any event, act or omission that takes place, on or after the Closing Date and it shall be the sole responsibility of the Purchasers to ensure that adequate insurances are put in place for the benefit of the Group; and

14.2    the Sellers shall not be required to maintain any Sellers' Group Insurance Policy for the benefit of the Group.

**15    Guarantee and Indemnity**

**15.1    Unconditional Guarantee and Indemnity**

In consideration of the Purchasers entering into, and assuming the obligations imposed on it under, this Agreement, the Guarantor hereby unconditionally and irrevocably guarantees to the Purchasers that if a Seller:

15.1.1    defaults in the payment of any sum due and payable by such Seller to any Purchaser under or pursuant to this Agreement, the Tax Indemnity or any document in the Agreed Terms, and/or any Accounts Receivables due and payable by such Seller or any member of the Sellers' Group; and/or

15.1.2    defaults in respect of any of its obligations, liabilities, commitments, undertakings, warranties and indemnities under or pursuant to this Agreement, the Tax Indemnity or any document in the Agreed Terms (**"Performance Obligations"**),

(together, the **"Guaranteed Obligations"**), or if any Guaranteed Obligation is not performed in accordance with its terms when the same would otherwise be due by reason

of such Guaranteed Obligation being or becoming unenforceable, invalid or illegal, the Guarantor will, as an independent and primary obligation, pay to the Purchasers immediately on demand such sum as is payable by the relevant Seller or would be payable by the relevant Seller if the relevant Guaranteed Obligation were not unenforceable, invalid or illegal, subject to any limit on the liability of such Seller in this Agreement or the Tax Indemnity, or perform or procure the performance of the Performance Obligations.

**15.2    Continuing Guarantee**

This guarantee is to be a continuing guarantee and accordingly is to remain in force until all the Guaranteed Obligations shall have been performed or satisfied. This guarantee is in addition to and without prejudice to and not in substitution for any rights or security which the Purchasers may now or hereafter have or hold for the performance and observance of the Guaranteed Obligations.

**15.3    Guarantor as Sole or Principal Obligor**

As a separate and independent stipulation the Guarantor agrees that any of the Guaranteed Obligations which may not be enforceable against or recoverable from any Seller shall nevertheless be enforceable against and recoverable from the Guarantor as though the same had been incurred by the Guarantor and the Guarantor were the sole or principal obligor in respect thereof and shall be performed or paid by the Guarantor on demand. The liability of the Guarantor under this Clause 14 shall not be released by reason of any legal limitation, disability or incapacity on or of such Seller or the dissolution, amalgamation, reconstruction or reorganisation of such Seller or any other fact or circumstance (other than any limitation imposed by this Agreement).

15.4    The obligations of the Guarantor under this Clause 15 shall not be affected by any act, omission, matter or thing which, but for this Clause 15 , would reduce, release or prejudice any of such obligations without limitation and whether or not known to the Purchasers or the Sellers, including:

15.4.1    any termination, amendment, variation, novation or supplement (however fundamental and whether or not more onerous) of or to this Agreement and/or the Guaranteed Obligations;

15.4.2    any illegality, invalidity or unenforceability of any obligation or liability of any person under this Agreement;

15.4.3    any incapacity or lack of power, authority or legal personality of or dissolution of any Seller or any other person;

15.4.4    any change in the constitution, status or control of a Seller;

15.4.5    any insolvency, liquidation, administration or other equivalent or similar proceedings;

15.4.6    the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, a Seller or any other person, or any non-presentation or non-observance of any formality or other requirement in respect of any instrument, or any failure to realise the full value of any security; or

15.4.7 the release of a Seller or any other person under the terms of any composition or arrangement with any creditor. Without prejudice to the generality of Clause 15.4, the Guarantor expressly confirms that it intends that the provisions of this Clause 15 shall extend from time to time to any variation, increase, extension, or addition of or to this Agreement.

15.5 The Guarantor warrants to the Purchasers that:

15.5.1 The Guarantor balance sheet set out at Schedule 23 fairly presents in all material respects the financial position, assets and liabilities of the Guarantor on the date which it was prepared;

15.5.2 The Guarantor is a corporation, duly incorporated and validly existing under the law of its jurisdiction of incorporation and it has the power to own its assets and carry on its business as it is being conducted;

15.5.3 The obligations expressed to be assumed by the Guarantor in this Agreement are legal, valid, binding and enforceable obligations;

15.5.4 The entry into and performance by the Guarantor of, and the transactions contemplated by, this Agreement do not and will not conflict with:

(i)      any law or regulation applicable to the Guarantor; or

(ii)     the Guarantor's constitutional documents; or

(iii)    any deed or instrument binding on the Guarantor or any of its assets;

15.5.5 It has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of, this Agreement and the transactions contemplated thereby; and

15.5.6 So far as the Guarantor is aware, no other event or circumstance is outstanding which might have a material adverse effect on the Guarantor's ability to perform its obligations under this Agreement.

## 16      Other Provisions

### 16.1     Further Assurances

16.1.1 Each of the parties shall execute, and shall use commercially reasonable endeavours to procure that any necessary third party shall, from time to time execute such documents and perform such acts and things as any party may reasonably require to transfer the Group (including without limitation, the Business Assets) to the Purchasers and to give any party the full benefit of the rights and remedies conferred in and by, and to give full effect to this Agreement, any Local Transfer Document and any documents in the Agreed Terms.

### 16.1.2  Release of Guarantees

Other than in respect of the Back-Stopped Guarantees, the Sellers shall procure the release prior to Closing of each Group Company from any securities, guarantees and indemnities given by or binding upon any Group Company or any Group Businesses in respect of any liability of the Sellers or any member of the Sellers' Group. Pending such release, the Sellers shall indemnify the Group Companies and the Group Businesses against all amounts paid by any of them or

any Purchaser pursuant to any such securities, guarantees and/or indemnities in respect of such liability of the Sellers and for the avoidance of doubt this does not include the French Bonds or the 24-Month Bonds.

### 16.1.3 Perfection of Title to Trademarks

As soon as reasonably practicable after the Closing Date, the Sellers shall (and shall procure that relevant members of the Sellers' Group shall) execute all documents and make all necessary filings ("**Filings**") required to update the relevant trademark office records around the world to the current ownership status of the Trademarks, such that upon completion of the Filings and acknowledgement by the respective trademark offices around the world, the ownership information listed in each respective trademark office around the world will match the ownership information provided by Sellers and listed in the US Trademark Assignment and the UK Trademark Assignment, and the Sellers shall provide monthly updates to the Purchasers as to the status for the Filings in each jurisdiction and provide written confirmation of the acceptance of the Filings and updated ownership details promptly upon receipt from each respective trademark office. Notwithstanding the preceding, with respect to trademarks owned by George Angus & Company Limited or Angus Fire Armour Limited the Sellers shall have no obligation to execute or deliver further instruments of conveyance, transfer or assignment, or to take further actions to convey or deliver more effectively such trademarks to Purchaser Two or to perfect Purchaser Two's title.

## 16.2 Whole Agreement

16.2.1 This Agreement contains the whole agreement between the parties relating to the subject matter of this Agreement at the date hereof and supersedes any previous written or oral agreement between the parties in relation to the matters dealt with in this Agreement.

16.2.2 The Purchasers acknowledge that, in entering into this Agreement, they are not relying on any representation, warranty or undertaking not expressly incorporated into it.

16.2.3 So far as is permitted by Law, each of the parties agrees and acknowledges that its right and remedy in relation to any provision of this Agreement shall be for the breach of the terms of this Agreement and subject to the limitations set forth in this Agreement, to the exclusion of any right to rescind this Agreement.  For the avoidance of doubt, nothing in this Clause 16.2.3 shall affect the parties' rights to injunctive relief.

16.2.4 In Clauses 16.2.1 to 16.2.2, "this Agreement" includes the Disclosure Letter, the Confidentiality Agreement, the Transitional Services Agreement (subject to Clause 16.2.2), the Local Transfer Documents and all documents entered into pursuant to this Agreement.

16.2.5 Nothing in this Clause 16.2 excludes or limits any liability for fraud, wilful misstatement, wilful misconduct or wilful concealment.

## 16.3 Reasonableness

Each of the parties confirms it has received independent legal advice relating to all the matters provided for in this Agreement, including the terms of Clause 13 and Clause 16.2

and agrees that the provisions of this Agreement (including the Disclosure Letter, the Confidentiality Agreement, the Transitional Services Agreement and all documents entered into pursuant to this Agreement) are fair and reasonable.

16.4 **No Assignment**

16.4.1 Except as permitted by Clause 16.4.2 or as otherwise expressly provided by this Agreement, no party may without the prior written consent of the other parties, assign, grant any security interest over, hold on trust or otherwise transfer the benefit of the whole or any part of this Agreement.

16.4.2 A party may, without the consent of the other parties, assign to a subsidiary or parent or holding company of the party concerned the benefit (but not the obligations) of the whole or any part of this Agreement provided that:

(i) if the assignee ceases to be a subsidiary or parent or holding company of the party concerned, it shall before ceasing to be so assign the benefit, so far as assigned to it, back to that party or assign the benefit to another subsidiary or parent or holding company of that party; and the assignee shall not be entitled to receive under this Agreement any greater amount than that to which the assigning party would have been entitled;

(ii) Each Purchaser may, at any time and on more than one occasion, assign or grant any Encumbrance over its rights under this Agreement by way of security in favour of any person who has agreed at any time to provide finance to a Purchaser or any other member of the Purchasers' Group and/or to any agent or trustee of such person for the time being.

16.4.3 This Agreement shall be binding and continue for the benefit of the successors and assignees of each party.

16.5 **Third Party Rights**

16.5.1 A person who is not a party to this Agreement has no right under the Contracts (Rights of Third Parties) Act 1999, any analogous law or otherwise to enforce any term of, or enjoy any benefit under, this Agreement, except to the extent specifically set out herein.

16.5.2 This Agreement may be amended or waived without the consent of any person who is not a party to this Agreement but who may enforce any term of, or enjoy any benefit under, this Agreement pursuant to Clause 16.5.1.

16.6 **Variation**

No variation of this Agreement shall be effective unless in writing and signed by or on behalf of each of the parties.

16.7 **Method of Payment and Set-off**

16.7.1 Subject to the terms of this Agreement, any payments pursuant to this Agreement shall be made in full, without any set-off, counterclaim, restriction or condition and without any deduction or withholding (save as may be required by Law or as expressly provided for in this Agreement).

16.7.2 Any payments pursuant to this Agreement shall be effected by crediting for same day value the account specified by the payee to the payer (reasonably in advance

and in sufficient detail to enable payment by wire transfer to be effected) on or before the due date for payment.

16.7.3 Payment of a sum in accordance with this Clause 16.7 shall constitute a payment in full of the sum payable and shall be a good discharge to the payer (and those on whose behalf such payment is made) of the payer's obligation to make such payment and the payer (and those on whose behalf such payment is made) shall not be obliged to see to the application of the payment as between those on whose behalf the payment is received.

## 16.8 Costs

16.8.1 Subject to the terms of this Agreement and the Tax Indemnity, the Sellers shall bear all costs incurred by them in connection with the preparation of, negotiation of, the entry into, and implementation of this Agreement, any Local Transfer Documents and the Tax Indemnity and the sale of the Group.

16.8.2 Subject to the terms of this Agreement and the Tax Indemnity, the Purchasers shall bear all such costs incurred by it in connection with the preparation of, negotiation of, and the entry into, and implementation of this Agreement, any Local Transfer Documents and the Tax Indemnity and the purchase of the Group.

## 16.9 Transfer Tax

The party (either a Seller or a Purchaser) which has, or which is a member of whose group has, the primary obligation (by Law or by custom) to do so shall pay, or procure payment of, any Transfer Tax to the relevant Tax Authority and shall file, or procure the filing of, all necessary documentation relating to such Transfer Taxes. For the avoidance of doubt, Kidde Fenwal shall procure filing and payment in respect of Transfer Taxes related to real property that are imposed by any U.S. state taxing authorities provided a Purchaser has paid the relevant amount to Kidde-Fenwal and for the avoidance of doubt, a Purchaser shall procure filing and payment in respect of Transfer Taxes imposed by UK and French tax authorities.

## 16.10 Interest

If any party defaults in the payment when due of any sum payable under this Agreement, the Local Transfer Documents or the Tax Indemnity, the liability of that party shall be increased to include interest on such sum from the date when such payment is due until the date of actual payment (as well after as before Judgment) at a rate per annum of 2 per cent. above the prime rate from time to time of the Bank of England. Such interest shall accrue from day to day.

## 16.11 Grossing-Up

16.11.1 Where any payment is made under this Agreement pursuant to an indemnity, payment, compensation or reimbursement provision and that sum is subject to a charge to Taxation in the hands of the recipient (ignoring the availability of any Relief) (other than Taxation attributable to a future disposal of an asset acquired by the Purchaser pursuant to this Agreement because such payment being properly treated as a reduction in or adjustment to the consideration paid by the Purchasers for the Group Businesses), the sum payable shall be increased to such sum as will ensure that after payment of such Taxation the recipient shall be left with a sum equal to the sum that it would have received in the absence of such a charge to

Taxation, provided that if any party to this Agreement shall have assigned or novated the benefit in whole or in part of this Agreement, then the liability of the other party under this Clause 16.11.1 shall be limited to that (if any) which it would have been had no such assignment or novation taken place.

16.11.2 Where any sum constituting an indemnity, payment, compensation or reimbursement to any party to this Agreement (the "**Party**") is paid to a person other than the Party but is treated as taxable in the hands of the Party, the payer shall promptly pay to the Party such sum as shall reimburse the Party for all Taxation suffered by it in respect of the payment (after giving credit for any relief available to the Party in respect of the matter giving rise to the payment), provided that if either party to this Agreement shall have assigned or novated the benefit in whole or in part of this Agreement then the liability of the other party under this Clause 16.11.2 shall be limited to that (if any) which it would have been had no such assignment or novation taken place.

16.12 **VAT**

16.12.1 Where under the terms of this Agreement one party is liable to indemnify or reimburse another party in respect of any costs, charges or expenses, the payment shall include an amount equal to any VAT thereon if applicable and not otherwise recovered from a Tax Authority as input tax by the other party or the representative member of any VAT group of which it forms part, subject to that person or representative member using reasonable endeavours to recover such amount of VAT as may be practicable.

16.12.2 Subject to Schedule 9, if any payment under this Agreement constitutes the consideration for a taxable supply for VAT purposes, then in addition to that payment the payer shall pay any VAT due, subject to provision of a valid VAT invoice.

16.13 **Notices**

16.13.1 Any notice or other communication in connection with this Agreement (each, a "**Notice**") shall be:

(i)     in writing in English;

(ii)    sent to the postal address and for the attention of the person specified in Clauses 16.13.2 to 16.13.4 below (or such other address or person as the relevant party may notify to the others in accordance with Clause 16.13.7 below); and

(iii)   served on or delivered to the relevant party:

(a)    by hand; or

(b)    by recorded delivery (or airmail if overseas) or by courier using an internationally recognised courier company.

16.13.2 A Notice to any Seller shall be sent to the following address, or such other person or address as the Sellers' Representative may notify to the Purchasers' Representative from time to time:

UTC Climate, Controls & Security
One Carrier Place
Farmington, CT 06034
USA
Attention: General Counsel

With a copy to:

Robert Donnelly

16.13.3 A Notice to any Purchaser shall be sent to the following address, or such other person or address as the Purchasers' Representative may notify to the Sellers' Representative from time to time:

Eurostar Tradeco Limited
c/o Lloyds Development Capital
1 Marsden St
Manchester M2 1HW
UK
Attention: Jonathan Bell, Director

With a copy to:

DLA Piper UK LLP
101 Barbirolli Square
Manchester M2 3DL
UK
(For the attention of James Kerrigan and Nick Roome)

16.13.4 A Notice to the Guarantor shall be sent to the following address, or such other person or address as the Guarantor may notify to the Purchasers' Representative from time to time, such notification of change of person or address only being valid 10 Business Days after it was despatched:

UTC Fire & Security Corporation
One Carrier Place
Farmington
CT 06034
USA
Attention: General Counsel

16.13.5 A Notice which has been served and delivered in accordance with Clause 16.13.1 shall be effective upon receipt and shall be deemed to have been received:

(i)     at the time of service or delivery, if served or delivered by hand; or

(ii)    at 10.00am on the second Business Day after the date of posting unless there is evidence of earlier receipt, if served or delivered by recorded delivery or courier; or

(iii)   if sent by airmail, on the seventh Business Day after posting,

provided that, if under Clause 16.13.5(i), any Notice would be deemed to have been served or delivered on a day which is not a Business Day, or after 4pm on a Business Day and before 9am on the next Business Day, such Notice shall instead be deemed to have been served or delivered at 9am on the second of such Business Days.

16.13.6 In proving service or delivery of a Notice, it shall be sufficient to prove that the Recipient has acknowledged the Notice or:

(i)    that service or delivery personally or by hand was made; or

16.13.7 in the case of posting, that the envelope containing the Notice was properly addressed and posted by recorded delivery or courier. Each of the following parties shall notify the following other parties of a change to its name or postal address or relevant contact for the purposes of this Clause 16.13 in accordance with the following:

(i)    in respect of a Seller, the Sellers' Representative shall notify the Purchasers' Representative;

(ii)    in respect of the Guarantor, the Guarantor shall notify the Purchasers' Representative; and

(iii)    in respect of a Purchaser, the Purchasers' Representative shall notify the Sellers' Representative,

such notice to be effective on the fifth Business Day after the date on which such notice is deemed to have been served or delivered in accordance with this Clause 16.13, or such later date as may be specified in the notice.

## 16.14    Invalidity

16.14.1 If any provision in this Agreement shall be held to be illegal, invalid or unenforceable, in whole or in part, the provision shall apply with whatever deletion or modification is necessary so that the provision is legal, valid and enforceable and gives effect to the commercial intention of the parties.

16.14.2 To the extent it is not possible to delete or modify the provision, in whole or in part, under Clause 16.14.1, then such provision or part of it shall, to the extent that it is illegal, invalid or unenforceable, be deemed not to form part of this Agreement and the legality, validity and enforceability of the remainder of this Agreement shall, subject to any deletion or modification made under Clause 16.14.1, not be affected.

## 16.15    Counterparts

16.15.1 This Agreement may be entered into in any number of counterparts, all of which taken together shall constitute one and the same instrument. Any party may enter into this Agreement by executing any such counterpart.

16.15.2 The exchange of copies of this Agreement and of signature pages by facsimile transmission, e-mail or other electronic means (including PDF) shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original pages of this Agreement for all purposes. Signatures of the parties transmitted by facsimile or electronic mail (including PDF) shall be deemed to be their original signatures for all purposes.

16.16  **Governing Law and Submission to Jurisdiction**

16.16.1 This Agreement and the documents to be entered into pursuant to it, save as expressly referred to therein, and any non-contractual obligations arising out of or in connection with this Agreement and such documents shall be governed by and construed in accordance with English law.

16.16.2 Each of the parties irrevocably agrees that the courts of England are to have exclusive jurisdiction to settle any Dispute which may arise out of or in connection with this Agreement and the documents to be entered into pursuant to it and that accordingly any proceedings arising out of or in connection with this Agreement and the documents to be entered into pursuant to it shall be brought in such courts. Each of the parties irrevocably submits to the jurisdiction of such courts and waives any objection to proceedings in any such court on the ground of venue or on the ground that proceedings have been brought in an inconvenient forum.

16.17  **Appointment of Process Agents**

*Seller Process Agent*

16.17.1 Each of the Sellers not incorporated in England hereby irrevocably appoints Kidde Products as its agent to accept service of process in England in any legal action or proceedings arising out of this Agreement, service upon whom shall be deemed good service upon the Sellers whether or not forwarded to or received by the relevant Seller.

16.17.2 Each of the Sellers agrees to inform the Purchasers in writing of any change of address of such process agent within 28 days of such change.

16.17.3 If such process agent ceases to be able to act as such or to have an address in England, each of the Sellers not incorporated in England irrevocably agrees to appoint a new process agent in England acceptable to the Purchaser (acting reasonably) and to deliver to the Purchasers within 14 days a notice confirming the Purchasers of the name and address of the new process agent and including a copy of a written acceptance of appointment by the process agent.

16.17.4 In the event that the Sellers or any of them fails to inform the Purchasers in writing of any change to the address or identity of the process agent, service on Kidde Products shall continue to represent good service on the Sellers.

*Guarantor Process Agent*

16.17.5 The Guarantor hereby irrevocably appoints Kidde Products as its agent to accept service of process in England in any legal action or proceedings arising out of this Agreement, service upon whom shall be deemed completed whether or not forwarded to or received by the Guarantor.

16.17.6 The Guarantor agrees to inform the Purchasers in writing of any change of address of such process agent within 28 days of such change.

16.17.7 If such process agent ceases to be able to act as such or to have an address in England, each of the Sellers not incorporated in England irrevocably agrees to appoint a new process agent in England acceptable to the Purchasers (acting reasonably) and to deliver to the Purchasers within 14 days a notice confirming the

Purchasers of the name and address of the new process agent and including a copy of a written acceptance of appointment by the process agent.

16.17.8 In the event that the Guarantor fails to inform the Purchasers in writing of any change to the address or identity of the process agent, service on Kidde Products shall continue to represent good service on the Guarantor.

*Purchaser Three Process Agent*

16.17.9 Purchaser Three hereby irrevocably appoints Purchaser Two as its agent to accept service of process in England in any legal action or proceedings arising out of this Agreement, service upon whom shall be deemed completed whether or not forwarded to or received by Purchaser Three.

16.17.10    Purchaser Three agrees to inform the Sellers' Representative in writing of any change of address of such process agent within 28 days of such change.

16.17.11    If such process agent ceases to be able to act as such or to have an address in England, each of the Purchasers not incorporated in England irrevocably agrees to appoint a new process agent in England acceptable to the Sellers' Representative (acting reasonably) and to deliver to the Sellers' Representative within 14 days a notice confirming the Purchasers of the name and address of the new process agent and including copy of a written acceptance of appointment by the process agent.

16.17.12    In the event that the Purchasers or any of them fails to inform the Sellers in writing of any change to the address or identity of the process agent, service on Purchaser Two shall continue to represent good service on Purchaser Three.

16.17.13    Nothing in this Agreement shall affect the right to serve process in any other manner permitted by law or the right to bring proceedings in any other jurisdiction for the purposes of the enforcement or execution any Judgment or other settlement in any other courts.

**Schedule 1**
**Part 1**
**Details of the Share Sellers, Shares etc.**
**(Clause 1.1)**

| (1) | (2) | (3) |
|---|---|---|
| **Name of Share Seller** | **Name of Company** | **Shares** |
| SICLI Holding SAS | Eau et Feu SAS | 375,075 ordinary shares |
| SICLI Holding SAS | Vanrullen Uniser SAS | 6,799 ordinary shares |
| UTC Fire & Security Services | Vanrullen Uniser SAS | 1 ordinary share |

**Schedule 1**
**Part 2**
**Details of the Business Sellers, Business Purchasers, Group Businesses etc.**
**(Clause 1.1)**

| (1) | (2) | (3) |
| --- | --- | --- |
| **Name of Business Seller** | **Brief Description of Group Business** | **Name of Business Purchaser** |
| Kidde Products Limited | Angus Fire and Angus Fire Engineering | Eurostar Tradeco Limited |
| Kidde-Fenwal, Inc. | National Foam | Eurostar US Tradeco, Inc. |

## Schedule 2
## Companies and Subsidiary

**1**     **Particulars of the Companies**

| | |
|---|---|
| **Name of Company:** | **Eau et Feu SAS** |
| Registration number: | 775 724 420 |
| Registered office: | Rue Aloys Senefelder ZI Sud Est 51100 Reims, France |
| Date and place of incorporation: | 19 April 1955, Reims |
| Issued share capital: | €11,436,036.75 |
| Shareholders and shares held: | SICLI Holding SAS, 375,075 ordinary shares of €30.49 each (100%) |
| President: | Etienne Huré |
| Secretary: | N/A |
| Managing Director: | Charles Delle Case |
| Finance Director | Marie-Catherine Gezegabelle |

| | |
|---|---|
| **Name of Company:** | **Vanrullen Uniser SAS** |
| Registration number: | 327 697 736 |
| Registered office: | 67 avenue des Nations Unies, espace Galilée, Cellule 6 bis, ZI 59270 Bailleul, France |
| Date and place of incorporation: | 11 February 2008, Dunkerque |
| Issued share capital: | €102,000 |
| Shareholders and shares held: | SICLI Holding SAS, 6,799 ordinary shares of €15.00 each (99.99%) UTC Fire & Security Services, 1 ordinary share of €15.00 (0.01%) |
| President: | Etienne Huré |
| Secretary: | N/A |
| Managing Director: | Charles Delle Case |
| Finance Director | Marie-Catherine Gezegabelle |

2    **Particulars of the Subsidiary**

| | |
|---|---|
| **Name of Subsidiary:** | **Vanrullen Freres BVBA** |
| Registered number: | BE 0405.523.247 |
| Principal office: | Leuvensesteenweg 555 |
| | Zaventem, 4-B-1930, Belgium |
| Date and place of incorporation: | 1 July 1937, Belgium |
| Issued share capital: | €18,549.99036 |
| Shareholders and shares held: | Eau et Feu SAS, 2,001 ordinary |
| | shares of €9.27036 each (100%) |
| Gerant: | Etienne Huré |
| Managing Director: | Charles Delle Case |
| Finance Director | Marie-Catherine Gezegabelle |

**Schedule 3**
**Part 1**
**The Properties**
**(Clauses 1.1 and 2.3.1)**

**Business Freehold Properties of the Business Sellers**

(i)       "Bentham" property: Bentham Owner: Kidde Products Limited

Address: Kidde Products Limited, Station Road, High Bentham, Lancaster LA2 7NA and Angus Sports Field, Station Road, High Bentham, Lancaster

Nature of Title: Freehold – title numbers NYK101206, NYK101210 and NYK101183;

(ii)     "West Chester" property: 350 East Union Street, Borough of West Chester, PA 1938;

(iii)    "Angier" property: 141 Sunny Road, Angier, Harnett County, NC 27501.

## Schedule 3
## Part 2
## Terms of Transfer of Business Freehold Properties

(i)     The "Bentham" property shall be transferred using the agreed Property Transfer Form.

(ii)    The "West Chester" property shall be transferred using a general warranty deed in the Agreed Terms.

(iii)   The "Angier" property shall be transferred using a general warranty deed, and in respect to part of the property, a quitclaim deed, each in the Agreed Terms.

**Schedule 3**
**Part 3**
**Business Leasehold Properties - particulars of leases**

(i)    "Bentham Leasehold" property: Leasehold Easement relating to Access over Station Road at Bentham, North Yorkshire;

Leaseholder: Kidde Products Limited

Address: Mathisen Way, Colnbrook, Slough, Berkshire SL3 0HB

Date of Lease: 28 March 2008

Registration:  Caution against first registration of the freehold registered with title number NYK333561

Parties: (1) Network Rail Infrastructure Limited and (2) Kidde Products Limited

Term: 21 years from 1 May 2005

Current rental: £13,054.84 per annum

Next rent review: 1 May 2014

Use: Access to the main "Bentham" property

(ii)    "Exton" property: 180 Sheree Boulevard, Exton, Pennsylvania PA 1934.

Lessor: Liberty Stoneridge, LLC, a Delaware limited liability company (successor-in-interest to MERS-Stoneridge Limited Partnership)

Lessee: Kidde Fenwal, Inc., a Pennsylvania corporation (successor-in-interest to Kidde Fire Fighting, Inc.)

Date of Lease: 26 December 2006

Date of First Amendment to Lease Agreement: 2 March 2012

Date of Second Amendment to Lease Agreement: 1 January 2013

Address: 180 Sheree Boulevard, Exton, Pennsylvania

Leased Premises: 12,376 rentable square feet known as Suite 3900

Term: ending 31 March 2014

Early Termination Option: None

Rent: $7,477.17 per month (1 April 2013 - 31 March 2014)

Security Deposit: None

Use: General office use

**Schedule 3**
**Part 4**
**Terms of Transfer of Business Leasehold Properties**

(i)    The "Bentham Leasehold" property shall be transferred following obtainment of Third Party Consent using the agreed Property Transfer Form.

(ii)    The lease of the "Exton" property is to be assigned upon Closing, or, if the Third Party Consent of the landlord at "Exton" has not been obtained by Closing, following obtainment of Third Party Consent and in either case using the agreed Exton Lease Assignment.

**Schedule 3**
**Part 5**
**Company Properties**

(i)     Company Freehold Property: "Eau et Feu" property: Rue Aloys Senefelder, Zone Industrielle Farman, Reims 5100, France.

(ii)    Company Leasehold Property:  Licence to occupy four office units of approximately 20sqm each in part of a building located in Bailleul (59270), France.

Leaseholder: Vanrullen Uniser, SAS

Full Address:  67, avenue des Nations Unies, Bailleul (59270)

Date of Lease:   Executed on 18 March and 15 April 2010

Registration:  Not registered

Lease Parties:          (1)  SCI Galilee

                                    (2)  Vanrullen Uniser

Lease Term and Expiry:  9 years expiring on 3 January 2019

Current Rent (annual):  €919.03 (exclusive of VAT)

Use:  Marketing offices for pipes, safety equipment, foam systems and fire extinguishing powder.

**Schedule 3**
**Part 6**
**Former Properties**

(1) 78 - 82 and 113 rue le Sage, Reims, France;

(2) Menensesteenweg 274, B-8940, Wervik, Belgium; and

(3) ZI La Gaieté, Impasse Edouard Branly, 69550 Amplepuis, France

**Schedule 4**
**Contracts and Third Party Consents**
**(Clause 2.3.1)**

**1      Third Party Consents**

**1.1**    In relation to any Contract which is not assignable without a Third Party Consent, this Agreement shall not be construed as an assignment or an attempted assignment and the relevant Business Seller shall use reasonable endeavours both before and after Closing to obtain all necessary Third Party Consents as soon as possible and shall keep the Purchasers informed of progress in obtaining such Third Party Consents. The Purchaser shall provide such reasonable assistance to the relevant Business Seller as such Seller shall reasonably request.  The relevant Business Seller shall deliver to the relevant Business Purchaser, on Closing or, if later, as soon as possible after receipt, any Third Party Consent and an assignment duly executed by the appropriate parties.  Subject to paragraph 1.2, the obligation to use reasonable endeavours set out in this paragraph 1.1 shall not in any circumstances require the relevant Business Seller or Purchaser to make any payment, give any security or provide any guarantee to any third party.

**1.2**    The cost of any fee demanded by the relevant third party as consideration for giving the Third Party Consent shall be borne by the relevant Business Seller.

**1.3**    Insofar as the benefit of any Contracts cannot effectively be transferred to the Purchasers except by way of novation or with a Third Party Consent to an assignment, and such novation has not occurred nor has such Third Party Consent been obtained at or before Closing:

**2.1.1**    this agreement shall not constitute an assignment or an attempted assignment of such Contract;

**2.1.2**    if so requested by the relevant Business Seller, the relevant Business Purchaser shall join in the execution of a novation of such Contract to the relevant Business Purchaser with effect from Closing;

**2.1.3**    the Business Sellers shall use reasonable endeavours (with the reasonable co-operation of the Purchasers) to procure that such Contracts are novated or to obtain such Third Party Consent as soon as practicable after Closing (provided that neither the Purchasers nor the Business Sellers shall be obliged to make any payment, give any security or provide any guarantee as the basis for obtaining any such novation or Third Party Consent); and

**2.1.4**    upon any such Third Party Consent being obtained, this Agreement shall constitute (subject to Clause 2.3.7) an assignment of the benefit (subject to the burden) of the Contract to which the Third Party Consent relates.

**2      Obligations until Third Party Consents are obtained/where Third Party Consents are refused**

**2.1**    In respect of any Contract, from Closing until the relevant Third Party Consent has been obtained as contemplated by paragraph 1.3 or where the Third Party Consent has been refused:

**2.1.1**    the relevant Business Seller shall hold the benefit of the Contract on trust for the relevant Business Purchasers to the extent it is lawfully able to do so or, where it is

---

51132055.2

not lawfully able to do so, the relevant Business Seller and the Purchasers shall make such other arrangements between themselves as the Business Purchasers may reasonably require to provide the benefits of the Contract for the Business Purchasers, including the enforcement at the cost and for the account of the Business Purchasers of all rights of the relevant Business Seller against any other party thereto; and

**2.1.2**    to the extent that the Business Purchasers are lawfully able to do so, the Business Purchasers shall perform the relevant Business Seller's obligations under the Contract as agent or sub-contractor. To the extent that the relevant Business Purchaser is not lawfully able to do so, the relevant Business Seller shall do all such things as the relevant Business Purchaser may reasonably require to enable due performance of the Contract.

**3      Failure to Obtain Third Party Consents**

**3.1**    If the Business Purchasers are not lawfully able to perform or procure the performance of any Contract in accordance with paragraph 2.1 or to receive the benefits of any Contract in accordance with paragraph 2.1 within 12 months of Closing:

**3.1.1**    the relevant Business Purchaser shall be entitled to procure the termination of the Contract and (without prejudice to paragraph 3.2) the obligations of the parties under this Agreement in relation to such Contract shall cease forthwith; and

**3.1.2**    references in this Agreement to the Contracts and the Group Businesses (other than in this paragraph 3) shall be construed as excluding such Contract.

**3.2**    Where a Contract is terminated pursuant to paragraph 3, the relevant Business Seller shall repay to the relevant Business Purchaser the amount of the net value ascribed to such Contract or, if no amount is ascribed, such amount as may be agreed within 14 days by that Business Seller and the relevant Business Purchaser, or, failing such agreement, as determined by the Reporting Accountants on the application of that Business Seller or relevant Business Purchaser to be its value. paragraphs 3.4 to 3.11 of Part 1 of Schedule 11 shall apply *mutatis mutandis* to the engagement and determination of the Reporting Accountants pursuant to this paragraph 3.2.

**4      Use and Occupation of Business Leasehold Properties**

In respect of any Business Leasehold Property (including the Exton property, if the consent of the landlord has not been delivered prior to Closing), until the relevant Third Party Consent has been obtained, the Purchasers may at any time after Closing go into occupation and use for all the purposes permitted by the relevant lease of such leasehold property as licensee of the relevant Business Seller and subject to the following provisions:

**4.1**    the Purchasers shall pay, or indemnify the relevant Business Seller against, all outgoings and expenses relating thereto (including irrecoverable VAT) arising after the Purchasers' occupation begins;

**4.2**    the Purchasers shall be entitled to any income thereof arising after the Purchasers' occupation begins (less any Taxation for which the relevant Business Seller is liable which would not have been incurred but for the entitlement to or receipt of that income); and

**4.3**    the Purchasers shall indemnify the Business Sellers against all Losses arising from the possession or occupation of such Business Leasehold Property by the Purchasers and in

particular shall observe and perform all the covenants and conditions contained or referred to in any relevant lease of the Business Leasehold Property.

### Schedule 5
### Part 1
### Business IPR

#### (Clause 1.1 and 2.3.4(iv))

The Business IPR is sold subject to the provisions of the IP Contracts.

#### List of Registered Business IPR Trademarks

| File number | Title | Country | Registration Number | Status | Eurostar Business |
|---|---|---|---|---|---|
| TM-0005636-AU | NATIONAL (Word) | AU | 108981 | Registered | NF |
| TM-0014683-FR | FLUOROPO LYDOL | FR | 1474080 | Registered | NF |
| TM-0017470-EM | FOAM MASTER | EM | 00009889932 | Pending | EeF |
| TM-0018599-DZ | FOAM MASTER | DZ | 112050 | Pending | EeF |
| TM-0018617-AU | FOAM MASTER | AU | 1434238 | Registered | EeF |
| TM-0018618-MA | FOAM MASTER | MA | 139303 | Registered | EeF |
| TM-0018620-TN | FOAM MASTER | TN | TN/E/2011/010 87 | Pending | EeF |
| TM-220.00005-DZ | TRIDOL | DZ | 429622 | Registered | AF |
| TM-220.00201-BX | EXPANDOL | BX | 353920 | Registered | AF |
| TM-220.00202-BX | TRIDOL | BX | 429622 | Registered | AF |
| TM-220.00657-FR | EXPANDOL | FR | 1486860 | Registered | AF |
| TM-220.00659-FR | FOREXPAN | FR | 1371118 | Registered | AF |
| TM-220.00660-FR | FP70 | FR | 1219973 | Registered | AF |
| TM-220.00661-FR | LEGESEC | FR | 1397769 | Registered | EeF |
| TM-220.00662-FR | PETROFILM (Word) | FR | 1700766 | Registered | EeF |
| TM-220.00663-FR | POLYPETR OFILM | FR | 1371117 | Registered | EeF |
| TM-220.00664-FR | REMIFLEX | FR | 1674943 | Registered | EeF |

| File number | Title | Country | Registration Number | Status | Eurostar Business |
|---|---|---|---|---|---|
| TM-220.00665-FR | SFPM | FR | 3111387 | Registered | EeF |
| TM-220.00666-FR | SOUPLESE C SPECIAL FLUO (WORDS ONLY) | FR | 1625390 | Registered | EeF |
| TM-220.00667-FR | SOUPLESE C | FR | 1596574 | Registered | EeF |
| TM-220.00668-FR | SOUPLESSE NCE | FR | 1625389 | Registered | EeF |
| TM-220.00669-FR | TRIDOL | FR | 1408956 | Registered | AF |
| | | | | | |
| TM-220.00201-DE | EXPANDOL | DE | 353920 | Registered | #N/A |
| TM-220.00201-IT | EXPANDOL | IT | 353920 | Registered | #N/A |
| TM-220.00918-IT | TRIDOL | IT | 429622 | Registered | AF |
| TM-220.00201-IB | EXPANDOL | IB | 353920 | Registered | #N/A |
| TM-220.01018-WA | POLYPETR OFILM | IB | 767304 | Registered | EeF |
| TM-220.01019-WA | TRIDOL | IB | 429622 | Registered | AF |
| TM-220.01097-MA | TRIDOL | MA | 429622 | Registered | AF |
| TM-220.01253-RU | PETROFILM | RU | 152124 | Registered | EeF |
| TM-220.01254-RU | POLYPETR OFILM | RU | 767304 | Registered | EeF |
| TM-220.01255-RU | TRIDOL | RU | 429622 | Registered | AF |
| TM-220.00201-CH | EXPANDOL | CH | 353920 | Registered | #N/A |
| TM-220.01559-UA | TRIDOL | UA | 429622 | Registered | AF |
| | | | | | |
| TM-220.01465-TW | NATIONAL FOAM | TW | 84539 | Registered | NF |
| TM-220.01490-TW | NATIONAL FOAM | TW | 771521 | Registered | NF |

| File number | Title | Country | Registration Number | Status | Eurostar Business |
|---|---|---|---|---|---|
| TM-220.01491-TW | NATIONAL FOAM | TW | 764014 | Registered | NF |
| TM-0005901-US | ARMOUR GUARD (TEXT ONLY) | US | 1965326 | Registered | NF |
| TM-0005933-US | ARMOUR JACKET (WORD) | US | 2981781 | Registered | NF |
| TM-220.00350-CA | HI-VOL (Word) | CA | TMA525419 | Registered | NF |
| TM-0005980-US | NICEROL | US | 988708 | Registered | AF |
| TM-0005902-US | PETROSEAL (Word) | US | 1312911 | Registered | AF |
| TM-0005905-US | SUPER INCH (Words Only) | US | 1276976 | Registered | None |
| TM-220.00355-CA | GASYN-CHEM | CA | TMA179157 | Registered | NF |
| TM-0005878-US | PREMIUM 200 (TEXT ONLY) | US | 1946942 | Registered | NF |
| TM-0005904-US | SUPER MARSHALL (TEXT ONLY) | US | 1276977 | Registered | NF |
| TM-0005912-US | CHEMICOIL (Word) | US | 1948966 | Registered | AF |
| TM-0005926-US | SUPER AQUADUCT (Words Only) | US | 1999259 | Registered | AF |
| TM-0005883-US | WELLMASTER | US | 1418362 | Registered | AF |
| TM-220.00212-BX | ALL CLEAR | BX | 782550 | Registered | NF |
| TM-0005897-US | FOAMINK (TEXT ONLY) | US | 1426165 | Registered | NF |
| TM-0005898-US | HI-COMBAT (TEXT ONLY) | US | 1573355 | Registered | NF |
| TM-0005927-US | HI-COMBAT (TEXT ONLY) | US | 1951353 | Registered | NF |

| File number | Title | Country | Registration Number | Status | Eurostar Business |
|---|---|---|---|---|---|
| TM-220.00058-FR | HI-EX | FR | 3338413 | Registered | #N/A |
| TM-220.00058-DE | HI-EX | DE | 30505680 | Registered | #N/A |
| TM-220.00058-LB | HI-EX | LB | 64833 | Registered | #N/A |
| TM-220.00058-US | HI-EX (Word) | US | 815781 | Registered | #N/A |
| TM-220.00058-US | HI-EX (Word) | US | 726123 | Registered | #N/A |
| TM-220.00058-IT | HI-EX (Word) | IT | RM2005C004205 | Registered | #N/A |
| TM-220.00027-AR | AER-O-FOAM (Word) | AR | 2403802 | Registered | NF |
| TM-220.01083-MX | AER-O-FOAM (Word) | MX | 225367 | Registered | NF |
| TM-220.01286-SA | AER-O-FOAM (Word) | SA | 26350 | Registered | NF |
| TM-220.01610-UK | AER-O-FOAM (Word) | GB | 733372 | Registered | NF |
| TM-220.01611-UK | AER-O-FOAM (Word) | GB | 733373 | Registered | NF |
| TM-220.01821-VE | AER-O-FOAM (Word) | VE | F113214 | Registered | NF |
| TM-0016501-CO | AER-O-FOAM X L3 | CO | 129198 | Registered | NF |
| TM-220.00473-CO | AER-O-WATER | CO | 129199 | Registered | NF |
| TM-220.01287-SA | AER-O-WATER | SA | 26351 | Registered | NF |
| TM-0005911-US | AER-O-WATER (Word) | US | 936385 | Registered | NF |
| TM-0013601-BR | DOMINATOR | BR | 826250505 | Registered | NF |
| TM-0013601-TW | DOMINATOR | TW | 1136323 | Registered | #N/A |
| TM-0013601-BX | DOMINATOR | BX | 756279 | Registered | #N/A |

| File number | Title | Country | Registration Number | Status | Eurostar Business |
|---|---|---|---|---|---|
| TM-0013601-CA | DOMINATOR | CA | TMA659315 | Registered | #N/A |
| TM-0013601-CN | DOMINATOR | CN | 3906521 | Registered | #N/A |
| TM-0013601-HK | DOMINATOR | HK | 300154773 | Registered | #N/A |
| TM-0013601-SA | DOMINATOR | SA | 96787 | Registered | #N/A |
| TM-0005874-US | DOMINATOR (WORD) | US | 2906512 | Registered | NF |
| TM-220.00367-CA | FEECON | CA | TMA632465 | Registered | NF |
| TM-0005876-US | FEECON (TEXT ONLY) | US | 2855987 | Registered | NF |
| TM-0005884-US | GLADIATOR (TEXT ONLY) | US | 2206190 | Registered | NF |
| TM-0001726-US | Hose Hopper | US | 3336160 | Registered | NF |
| TM-0005310-CA | IRON MAN | CA | TMA680578 | Registered | NF |
| TM-0005310-US | IRON MAN | US | 2924383 | Registered | #N/A |
| TM-0005310-BR | IRON MAN | BR | 826218750 | Registered | #N/A |
| TM-0005310-TW | IRON MAN | TW | 1136311 | Registered | #N/A |
| TM-0005310-BX | IRON MAN | BX | 749140 | Registered | #N/A |
| TM-0005310-CN | IRON MAN | CN | 3899097 | Registered | #N/A |
| TM-0005310-HK | IRON MAN | HK | 300146826 | Registered | #N/A |
| TM-0005310-SA | IRON MAN | SA | 65774 | Registered | #N/A |
| TM-0005882-US | KNOCKDOWN | US | 2220979 | Registered | NF |
| TM-220.00088-AU | KNOCKDOWN | AU | 933927 | Registered | NF |
| TM-220.00358-CA | KNOCKDOWN | CA | TMA627951 | Registered | NF |
| TM-220.00576-EM | KNOCKDOWN | EM | 002930907 | Registered | NF |
| TM-220.01084-MX | KNOCKDOWN | MX | 794276 | Registered | NF |
| TM-220.01125-NZ | KNOCKDOWN | NZ | 668447 | Registered | NF |
| TM-0005932-US | NATIONAL | US | 895826 | Registered | NF |
| TM-0005317-CA | NATIONAL ( IN QUOTES) | CA | UCA41460 | Registered | NF |

| File number | Title | Country | Registration Number | Status | Eurostar Business |
|---|---|---|---|---|---|
| TM-0005922-US | NATIONAL (Word) | US | 596683 | Registered | NF |
| TM-220.01080-MX | NATIONAL (Word) | MX | 229926 | Registered | NF |
| TM-220.00675-FR | NATIONAL AER-O-FOAM | FR | 1601962 | Registered | NF |
| TM-0005872-US | NATIONAL FOAM | US | 2306109 | Registered | NF |
| TM-220.00208-BX | NATIONAL FOAM | BX | 782551 | Registered | NF |
| TM-220.00808-HK | NATIONAL FOAM | HK | 1999B10443 | Registered | NF |
| TM-220.00809-HK | NATIONAL FOAM | HK | 1999B10726 | Registered | NF |
| TM-220.00810-HK | NATIONAL FOAM | HK | 1999B12002 | Registered | NF |
| TM-0005889-US | NEPTUNE | US | 3173268 | Registered | NF |
| TM-0005881-US | NF | US | 1413854 | Registered | NF |
| TM-220.00246-BR | NF & DESIGN | BR | 811681645 | Registered | NF |
| TM-220.00426-CN | NF & DESIGN | CN | 906364 | Registered | NF |
| TM-220.00427-CN | NF & DESIGN | CN | 908001 | Registered | NF |
| TM-220.00432-CN | NF & DESIGN | CN | 919869 | Registered | NF |
| TM-220.00470-CO | NF & DESIGN | CO | 129196 | Registered | NF |
| TM-220.00471-CO | NF & DESIGN | CO | 129197 | Registered | NF |
| TM-220.00811-HK | NF & DESIGN | HK | 1999B03629 | Registered | NF |
| TM-220.00812-HK | NF & DESIGN | HK | 1999B03630 | Registered | NF |
| TM-220.00813-HK | NF & DESIGN | HK | 1999B03631 | Registered | NF |
| TM-220.01476-TW | NF & DESIGN | TW | 00738779 | Registered | NF |
| TM-220.01492-TW | NF & DESIGN | TW | 0085565 | Registered | NF |

| File number | Title | Country | Registration Number | Status | Eurostar Business |
|---|---|---|---|---|---|
| TM-220.01833-VN | NF & DESIGN | VN | 20637 | Registered | NF |
| TM-0005899-US | RED ALERT | US | 2536463 | Registered | NF |
| TM-0008456-CL | Red Alert | CL | 784891 | Registered | NF |
| TM-0013604-CL | RED ALERT | CL | 639715 | Registered | NF |
| TM-220.00343-CA | RED ALERT | CA | TMA610701 | Registered | NF |
| TM-220.00529-EG | RED ALERT | EG | 153330 | Registered | NF |
| TM-220.01126-NZ | RED ALERT | NZ | 654811 | Registered | NF |
| TM-220.01188-PE | RED ALERT | PE | 30390 | Registered | NF |
| TM-220.01284-SA | RED ALERT | SA | 69269 | Registered | NF |
| TM-220.01817-VE | RED ALERT | VE | S023971 | Registered | NF |
| TM-220.00025-AR | RED ALERT (Word) | AR | 2375642 | Registered | NF |
| TM-220.00085-AU | RED ALERT (Word) | AU | 907706 | Registered | NF |
| TM-0005918-US | RED CHIEF | US | 1022072 | Registered | NF |
| TM-220.00344-CA | RED CHIEF | CA | TMA199002 | Registered | NF |
| TM-0006787-US | RESPONDER | US | 2821761 | Registered | NF |
| TM-220.00333-CA | RESPONDER | CA | TMA637943 | Registered | NF |
| TM-220.01076-MX | RESPONDER | MX | 792362 | Registered | NF |
| TM-220.01131-NZ | RESPONDER | NZ | 668446 | Registered | NF |
| TM-220.00086-AU | RESPONDER (Word) | AU | 933928 | Registered | NF |
| TM-0005870-US | SERVO COMMAND (Word) | US | 2349669 | Registered | NF |
| TM-220.01816-VE | SERVO COMMAND (Word) | VE | F124986 | Registered | NF |

| File number | Title | Country | Registration Number | Status | Eurostar Business |
|---|---|---|---|---|---|
| TM-220.00023-AR | SERVO COMMAND (Word) | AR | 1920260 | Registered | NF |
| TM-220.00469-CO | SERVO COMMAND (Word) | CO | 129350 | Registered | NF |
| TM-220.01077-MX | SERVO COMMAND (Word) | MX | 313293 | Registered | NF |
| TM-0005871-US | TERMINATOR | US | 2354803 | Registered | NF |
| TM-0005888-US | TERRA FOAM (TEXT ONLY) | US | 1783156 | Registered | NF |
| TM-0005906-US | UNIVERSAL (Word) | US | 1276604 | Registered | NF |
| TM-220.00022-AR | UNIVERSAL (Word) | AR | 1448010 | Registered | NF |
| TM-220.01074-MX | UNIVERSAL (Word) | MX | 305293 | Registered | NF |
| TM-0017133-VE | UNIVERSAL AFFF (Word) | VE | F124985 | Registered | NF |
| TM-220.00244-BR | UNIVERSAL AFFF (Word) | BR | 811681610 | Registered | NF |
| TM-220.00430-CN | UNIVERSAL GOLD | CN | 908004 | Registered | NF |
| TM-0005308-CA | UNIVERSAL PLATINUM | CA | TMA674490 | Registered | NF |
| TM-220.00410-CL | UNIVERSAL PLATINUM | CL | 639714 | Registered | NF |
| TM-220.01288-SA | UNIVERSAL PLATINUM | SA | 70982 | Registered | NF |
| TM-0012760-VE | UNIVERSAL PLATINUM (Word) | VE | 4563-2002 | Pending | NF |
| TM-220.00020-AR | UNIVERSAL PLATINUM (Word) | AR | 2369964 | Registered | NF |
| TM-220.00082-AU | UNIVERSAL PLATINUM (Word) | AU | 907536 | Registered | NF |
| TM-220.00428-CN | UNIVERSAL PLUS | CN | 908002 | Registered | NF |

| File number | Title | Country | Registration Number | Status | Eurostar Business |
|---|---|---|---|---|---|
| TM-220.01072-MX | WDP-30 (Word) | MX | 339899 | Registered | NF |
| TM-220.00245-BR | XL-3 | BR | 811653641 | Registered | NF |
| TM-220.00431-CN | XL-3 | CN | 908022 | Registered | NF |
| TM-220.01073-MX | XL-3 | MX | 315241 | Registered | NF |
| TM-220.01813-VE | XL-3 | VE | F130164 | Registered | NF |
| TM-0005917-US | XL-3 | US | 2313960 | Registered | NF |
| TM-220.00429-CN | XLX3 | CN | 908003 | Registered | NF |
| TM-220.01675-UK | CHEMICOIL | GB | 1141614 | Registered | AF |
| TM-220.01668-UK | DURALINE | GB | 872387 | Registered | AF |
| TM-220.01663-UK | HELIJECTOR (Word) | GB | 1218385 | Registered | AF |
| TM-220.00585-EM | NIAGARA | EM | 002904639 | Registered | AF |
| TM-220.01680-UK | POLARIS | GB | 2280391 | Registered | AF |
| TM-220.01661-UK | REDDAWAY | GB | 394120 | Registered | AF |
| TM-220.01674-UK | FLAMEFIGHTER | GB | 1106370 | Registered | AF |
| TM-220.01676-UK | ALCOSEAL | GB | 1188768 | Registered | AF |
| TM-220.01670-UK | AQUALITE (TEXT ONLY) | GB | 920350 | Registered | AF |
| TM-220.01703-UK | CENTRIFOAM | GB | 1289788 | Registered | AF |
| TM-220.01678-UK | GROUNDHOG SLURRY SYSTEMS | GB | 2010187 | Registered | AF |
| TM-220.01677-UK | INTEFIRE | GB | 1450454 | Registered | AF |
| TM-0016541-IE | NORSEN | IE | 140139 | Registered | AF |
| TM-220.01567-UK | NORSEN | GB | 1190051 | Registered | AF |

51132055.2

96

| File number | Title | Country | Registration Number | Status | Eurostar Business |
|---|---|---|---|---|---|
| TM-220.01563-UK | NORSEN + DEV | GB | 735116 | Registered | AF |
| TM-220.01684-UK | SYNDURA (TEXT ONLY) | GB | 2303783 | Registered | AF |
| TM-220.01679-UK | THERMOPIPE THE FLEXIBLE RELINING SYSTEM | GB | 2020399 | Registered | AF |
| TM-220.01671-UK | TURBEX | GB | 965345 | Registered | AF |
| TM-220.01667-UK | CRUSADER | GB | 713896 | Registered | AF |
| TM-220.01580-UK | CENTRIMAX | GB | 1044543 | Registered | AF |
| TM-0013606-JP | SUPER AQUADUCT (TEXT ONLY) | JP | 5116755 | Registered | AF |
| TM-220.01709-UK | TANKMASTER | GB | 2403561 | Registered | AF |
| TM-0009502-EM | WELLMASTER | EM | 006120984 | Registered | AF |
| TM-0014901-BX | NORSEN | BX | 484710 | Registered | AF |
| TM-220.00335-CA | NICEROL | CA | TMA120568 | Registered | AF |
| TM-220.00049-AU | NICEROL | AU | 106812 | Registered | #N/A |
| TM-220.00365-CA | FIRE POWER | CA | TMA202899 | Registered | NF |
| TM-220.00347-CA | MARSHALL | CA | UCA36936 | Registered | AF |
| TM-220.00371-CA | DOUBLE BOND | CA | TMA341699 | Registered | AF |
| TM-220.00331-CA | NY-FLEX | CA | UCA51002 | Registered | AF |
| TM-220.00339-CA | PYROSOL | CA | TMA271681 | Registered | AF |
| TM-0005347-CA | RACK | CA | UCA046318 | Registered | AF |
| TM-220.00327-CA | STREAMLINED BIG INCH | CA | TMA102607 | Registered | AF |

| File number | Title | Country | Registration Number | Status | Eurostar Business |
|---|---|---|---|---|---|
| TM-220.00318-CA | TRI-FLEX | CA | TMA125136 | Registered | AF |
| TM-220.01668-CA | DURALINE | CA | TMA144865 | Registered | #N/A |
| TM-220.00378-CA | CORRU-GRIP | CA | TMA258060 | Registered | NF |
| TM-0005978-BN | ANGUS | BN | 6404 | Registered | #N/A |
| TM-0005978-GH | ANGUS | GH | 20875 | Registered | #N/A |
| TM-0005978-HK | ANGUS | HK | 1970B0905 | Registered | #N/A |
| TM-0005978-MY | ANGUS | MY | M/050340 | Registered | #N/A |
| TM-0005978-SG | ANGUS | SG | T7459919T | Registered | #N/A |
| TM-220.00601-EM | NIAGARA | EM | 001319748 | Registered | AF |
| TM-220.00602-EM | POLARIS | EM | 002427854 | Registered | AF |
| TM-220.01358-ZA | PETROSEAL | ZA | 1981/05332 | Registered | AF |
| TM-0005978-BN-AA | ANGUS | BN | 6403 | Registered | #N/A |
| TM-0005978-US | ANGUS (WORD ONLY) | US | 729193 | Registered | AF |
| TM-0005974-US | ALCOSEAL (WORD ONLY) | US | 1939872 | Registered | AF |
| TM-220.01398-ES | FP70 | ES | M0696001 | Registered | AF |
| TM-0005985-US | FP70 | US | 3191771 | Registered | AF |
| TM-0005978-CH | ANGUS | CH | P331806 | Registered | #N/A |
| TM-220.01668-AU | DURALINE | AU | 264399 | Registered | #N/A |
| TM-220.01668-DE | DURALINE | DE | 821494 | Registered | #N/A |
| TM-220.01668-IN | DURALINE | IN | 226732 | Registered | #N/A |
| TM-220.01674-AU | FLAMEFIGHTER | AU | 264400 | Registered | #N/A |
| TM-220.00350-US | HI-VOL (Word) | US | 1019402 | Registered | #N/A |
| TM-220.01177-PK | NICEROL | PK | 58385 | Registered | #N/A |

| File number | Title | Country | Registration Number | Status | Eurostar Business |
|---|---|---|---|---|---|
| TM-0005231-CA | PETROSEAL | CA | TMA667668 | Registered | #N/A |
| TM-0016495-AU | PETROSEAL | AU | 363670 | Registered | #N/A |
| TM-220.00476-HR | PETROSEAL | HR | Z950902 | Registered | #N/A |
| TM-220.00626-FI | PETROSEAL | FI | 87867 | Registered | #N/A |
| TM-220.00893-IE | PETROSEAL | IE | 103979 | Registered | #N/A |
| TM-220.01337-SI | PETROSEAL | SI | 9471565 | Registered | #N/A |
| TM-0005978-AU | ANGUS | AU | 197640 | Registered | #N/A |
| TM-0005978-BR | ANGUS | BR | 904515249 | TBC | #N/A |
| TM-0005978-BR-AA | ANGUS | BR | 904516229 | TBC | #N/A |
| TM-0005978-CN | ANGUS | CN | 7993842 | Registered | #N/A |
| TM-0005978-CN-AB | ANGUS | CN | 7993844 | Pending | #N/A |
| TM-0005978-CN-AC | ANGUS | CN | 7993845 | Pending | #N/A |
| TM-0005978-FR | ANGUS | FR | 1400048 | Registered | #N/A |
| TM-0005978-ID | ANGUS | ID | IDM000124373 | Registered | #N/A |
| TM-0005978-MX | ANGUS | MX | 926544 | Registered | #N/A |
| TM-0005978-PK | ANGUS | PK | 53386 | Registered | #N/A |
| TM-0005978-SG-AA | ANGUS | SG | T74/59919I | Registered | #N/A |
| TM-0005978-TW | ANGUS (IN CHINESE CHARACTERS) | TW | 535472 | Registered | #N/A |
| TM-0005978-TW-AA | ANGUS | TW | 535471 | Registered | #N/A |
| TM-0005978-UK | ANGUS | UK | 753860 | Registered | #N/A |
| TM-0005978-UK-AA | ANGUS | UK | 685965 B | Registered | #N/A |
| TM-0005978-UK-AB | ANGUS | UK | 1027967 | Registered | #N/A |
|  |  |  |  |  |  |
| TM-0005978-WM-AA | ANGUS | WM | M/64434 | Registered | #N/A |

| File number | Title | Country | Registration Number | Status | Eurostar Business |
|---|---|---|---|---|---|
| TM-0005910-CA | AER-O-FOAM | CA | UCA018293 | Registered | #N/A |
| TM-0005910-CA-AA | AER-O-FOAM | CA | UCA018296 | Registered | #N/A |
| TM-0005910-US | AER-O-FOAM | US | 396949 | Registered | #N/A |
| TM-220.01610-VE | AER-O-FOAM (Word) | VE | F113214 | Registered | #N/A |
| TM-0005890-US-AA | ALL CLEAR | US | 3934845 | Registered | #N/A |
| TM-220.00355-US | GASYN-CHEM | US | 1024676 | Registered | #N/A |
| TM-220.00058-AU | HI-EX | AU | 192763 | Registered | #N/A |
| TM-220.00058-CA | HI-EX | CA | TMA141858 | Registered | #N/A |
| TM-220.00058-NZ | HI-EX (Word) | NZ | 77619 | Registered | #N/A |
| TM-220.00058-NZ-AA | HI-EX (Word) | NZ | 77620 | Registered | #N/A |
| TM-220.00350-MX | HI-VOL (Word) | MX | 815401 | Registered | #N/A |
| TM-0001726-CA | Hose Hopper | CA | TMA750562 | Registered | #N/A |
| TM-0014573-AR | NF NATIONAL FOAM (Word) | AR | 1789241 | Registered | #N/A |
| TM-0005311-CA | NEPTUNE | CA | TMA732796 | Registered | #N/A |
| TM-0014574-AR | XL-3 | AR | 3023632 | Pending | #N/A |
| TM-220.01618-UR | FIREPOWER | GB | 1208328 | Registered | |
| TM-0005311-CA | NEPTUNE | CA | TMA732796 | Registered | NF |
| TM-0014574-AR | XL-3 | AR | 3201101 | Registered | NF |

| File number | Title | Country | Registration Number | Status | Eurostar Business |
|---|---|---|---|---|---|
| TM-220.00051-AU | FIRECHIEF | AU | 258947 | Registered | NF |
| TM-220.00051-IN | FIRECHIEF | IN | 280587 | Registered | NF |
| TM-220.00051-NZ | FIRECHIEF | NZ | 100780 | Registered | NF |
| TM-220.00726-DE | HIGH-EX | DE | 945607 | Registered | NF |
| TM.220.00726-FR | HIGH-EX | FR | 1295863 | Registered | NF |
| TM-220.00726-IT | HIGH-EX | IT | 413147 | Registered | NF |
| TM-0005365-CA | REDSKIN | CA | TMA137290 | Registered | NF |
| TM-0005361-CA | SNAKESKIN | CA | TMA111148 | Registered | NF |
| TM-220.00324-CA | SPITFIRE | CA | TMA162787 | Registered | NF |
| TM-0005919-CA | SUREFIRE | CA | TMA134232 | Registered | NF |
| TM-0005230-AR | MONNEX | AR | 2224813 | Registered | AF |
| TM-0005230-AU | MONNEX | AU | 215877 | Registered | AF |
| TM-0005230-BX | MONNEX | BX | 0000376 | Registered | AF |
| TM-0005230-CA | MONNEX | CA | TMA163316 | Registered | AF |
| TM-0005230-CH | MONNEX | CH | 359083 | Registered | AF |
| TM-0005230-CL | MONNEX | CL | 425772 | Registered | AF |

| File number | Title | Country | Registration Number | Status | Eurostar Business |
|---|---|---|---|---|---|
| TM-0005230-CO | MONNEX | CO | 425772 | Registered | AF |
| TM-0005230-DE | MONNEX | DE | 853709 | Registered | AF |
| TM-0005230-EG | MONNEX | EG | 49176 | Registered | AF |
| TM-0005230-EM | MONNEX | EM | 000331819 | Registered | AF |
| TM-0005230-FR | MONNEX | FR | 1425511 | Registered | AF |
| TM-0005230-GR | MONNEX | GR | 56313 | Registered | AF |
| TM-0005230-ID | MONNEX | ID | IDM000100241 | Registered | AF |
| TM-0005230-IN | MONNEX | IN | 281423 | Registered | AF |
| TM-0005230-IR | MONNEX | IR | 40141 | Registered | AF |
| TM-0005230-IT | MONNEX | IT | 484538 | Registered | AF |
| TM-0005230-KW | MONNEX | KW | 6299 | Registered | AF |
| TM-0005230-NO | MONNEX | NO | 74297 | Registered | AF |
| TM-0005230-NZ | MONNEX | NZ | 106096 | Registered | AF |
| TM-0005230-SA | MONNEX | SA | 54/89 | Registered | AF |
| TM-0005230-SG | MONNEX | SG | T74/62160G | Registered | AF |
| TM-0005230-UK | MONNEX | UK | 911149 | Registered | AF |
| TM-0005230-ZA | MONNEX | ZA | 73/3200 | Registered | AF |

51132055.2

| File number | Title | Country | Registration Number | Status | Eurostar Business |
|---|---|---|---|---|---|
| TM-0005891 | Angus Surfzone 850 | US | US2952165 | Registered | AF |
| Not in FIP | ANGUS | UK | 685963 | Registered | AF |
| TM-220.01176 | FIRE ARMOUR | PK | 53387 | Registered | AF |

**List of Domain Names**

Angus Fire

| Domain Name | Registrant | Registrar | Renewal Date |
|---|---|---|---|
| angusfire.co.uk | Angus Fire, 9/10 Southampton Place, London, WC1A 2AE | Corporation Service Company (UK) Limited | 28 January 2014 |
| flexiblepipelines.co.uk | Angus Fire, 9/10 Southampton Place, London, WC1A 2AE | Corporation Service Company (UK) Limited | 15 May 2014 |
| norsen.co.uk | Angus Fire, 9/10 Southampton Place, London, WC1A 2AE | Corpex Limited | 01 July 2014 |
| reddaway.co.uk | Angus Fire, 9/10 Southampton Place, London, WC1A 2AE | Corpex Limited | 23 June 2014 |
| reddaway.com | Angus Fire, Thame Park Road, Thame, Oxfordshire OX9 3RT | Corpex Limited | 23 June 2013 |
| angus.xxx | UTC Fire & Security Corporation, 9 Farm Springs Road, Farmington, CT06455 USA | Corporate Domains Inc | 6 April 2014 |
| angusfire.xxx | Carrier Corporation, Farmington CT06032-2562, USA | Network Solutions LLC | 20 February 2014 |
| angusfire.com.au | Angus Fire Armour Pty Ltd Dissolved | TPP Wholesale | None shown |
| angusflexiblepipelines.com | UTC Fire & Security Corporation, 9 Farm Springs Road, Farmington, CT06455 USA | Corporate Domains Inc. | 26 October 2013 |

| Domain Name | Registrant | Registrar | Renewal Date |
|---|---|---|---|
| angusirrigation.com | UTC Fire & Security Corporation, 9 Farm Springs Road, Farmington, CT06455 USA | Corporate Domains Inc. | 28 February 2014 |
| angusfire.com | UTC Fire & Security Corporation, 9 Farm Springs Road, Farmington, CT06455 USA | Corporate Domains Inc. | 6 April 2014 |
| kerr-firefighting.com | UTC Fire & Security, Michael Skelps, 9 Farm Springs Road, Farmington CT06455, USA | CSC Corporate Domains Inc. | 02 February 2014 |

**Group Companies**

| | | | |
|---|---|---|---|
| eauetfeu.fr | Eau et Feu SA, zone industrielle sud-est, rue Aloys Senerfelder, B.P. 1008, 51683 Reims, France | Alpha Mosa, 14bis rue Howard Houston 51170 Arcis-le-Ponsart, France | 20 September (year not shown) |
| eauetfeu.com | Eau et Feu SA, zone industrielle sud-est, rue Aloys Senerfelder, B.P. 1008, 51683 Reims, France | Alpha Mosa, 14bis rue Howard Houston 51170 Arcis-le-Ponsart, France | 01 January 2014 |
| eauetfeu.eu | Eau et Feu SA, zone industrielle sud-est, rue Aloys Senerfelder, B.P. 1008, 51683 Reims, France | Gandi SAS, boulevard Massena, 75013 Paris, France | 30 September 2013 |
| eauetfeu.org | Eau et Feu SA, zone industrielle sud-est, rue Aloys Senerfelder, B.P. 1008, 51683 Reims, France | Alpha Mosa, 14bis rue Howard Houston 51170 Arcis-le-Ponsart, France | 04 January 2014 |
| eauetfeu.net | Eau et Feu SA, zone industrielle sud-est, rue Aloys Senerfelder, B.P. 1008, 51683 Reims, France | Gandi SAS, boulevard Massena, 75013 Paris, France | 04 January 2014 |
| vanrullen-uniser.fr | Eau et Feu SA, zone industrielle sud-est, rue Aloys Senerfelder, B.P. 1008, 51683 Reims, France | Alpha Mosa, 14bis rue Howard Houston 51170 Arcis-le-Ponsart, France | 10 April (year not shown) |

| Domain Name | Registrant | Registrar | Renewal Date |
|---|---|---|---|
| vanrullen-uniser.com | Eau et Feu SA, zone industrielle sud-est, rue Aloys Senerfelder, B.P. 1008, 51683 Reims, France | Gandi SAS, boulevard Massena, 75013 Paris, France | 08 April 2014 |
| vanrullen-uniser.eu | Eau et Feu SA, zone industrielle sud-est, rue Aloys Senerfelder, B.P. 1008, 51683 Reims, France | Gandi SAS, boulevard Massena, 75013 Paris, France | 30 April 2014 |
| vanrullen-uniser.org | Eau et Feu SA, zone industrielle sud-est, rue Aloys Senerfelder, B.P. 1008, 51683 Reims, France | Gandi SAS, boulevard Massena, 75013 Paris, France | 08 April 2014 |
| vanrullen-uniser.net | Eau et Feu SA, zone industrielle sud-est, rue Aloys Senerfelder, B.P. 1008, 51683 Reims, France | Gandi SAS, boulevard Massena, 75013 Paris, France | 08 April 2014 |
| uniser.fr | Kidde Uniser, zone industrielle impasse Edouard Branly, 69550 Amplepuis, France | Alpha Mosa, 14bis rue Howard Houston 51170 Arcis-le-Ponsart, France | 23 March (no year shown) |
| vanrullen.be | Vanrullen, Drieslaan 6, B550 Gullengem-Moorsele Andorra | Webnet4U Bvba, Technical Contact Dorpsplein 30, 8570 Anzegem, Belgium | No renewal date shown |
| vanrullen.com | Webnet4U Bvba, Technical Contact Dorpsplein 30, 8570 Anzegem, Belgium | Key Systems GMBH (address not shown) | 21 May 2013 but also shown as 21 May 2014 |
| vanrullen.eu | Vanrullen, Drieslaan 6, B550 Gullengem-Moorsele Andorra | Totaal Internet Works b.v Ijsselburcht 4e, 6825BP Arnhem, Netherlands | 31 July 2013 |

National Foam

| Domain | Owner | Expiration Date |
|---|---|---|
| national-foam.com | UTC Fire & Security Corporation | 14 April 2014 |
| national-foam-net | UTC Fire & Security Corporation | 14 April 2014 |
| national.foam.xxx | Carrier Corporation | 20 February 2014 |

| Domain | Owner | Expiration Date |
|---|---|---|
| nationalfoam.com | UTC Fire & Security Corporation | 14 April 2014 |

**Other Intellectual Property**

Kidde Products:

| | |
|---|---|
| Protein & Synthetic foam formulas | FP- 70<br>Tridol S3<br>Tridol S6 ICAO<br>Tridol C3<br>Tridol C6<br>Tridol ATF 3-6<br>Tridol ATF 3-3<br>Tridol ATF 1-3 Lastfire<br>Expandol<br>Alcoseal 3/3<br>Alcoseal 3-6<br>Alcoseal 3-6 SOUTH AFRICA ONLY!<br>Niagara 3-3<br>Petroseal 6 ICAO<br>Forexpan |
| Synthetic & foam formulas | Expandol<br>Forexpan<br>Trainol<br>Tridol 1%<br>Tridol 3%<br>Tridol 6%<br>Tridol ATF 3-3<br>Tridol ATF 3-6 |
| Foam Equipment designs | Top Pourers<br>Rimseal Pourers & generators<br>Trailers |
| Powder Formulas | Monnex |

Eau et Feu:

| | |
|---|---|
| Fluorine-Free Foam | Foam Master 3x3, 6x6 |

Kidde Fenwal Inc:

| | |
|---|---|
| Synthetic foam formulas | Aer-O-Water 3EM / 6EM from foam concentrate<br>Aer-O-Lite 3% / 6% from foam concentrate<br>Universal Plus |

| | Universal Gold |
|---|---|
| Synthetic foam formulas | Aer-O-Lite 3%<br>Aer-O-Water 6%<br>Aer-O-Water 1%<br>Universal Plus Surf.Soln.<br>Universal Plus<br>Aer-O-Foam XL-3<br>Aer-O-Foam XL-6 |
| Synthetic foam formulas | Aer-O-Water 6 C/G<br>Aer-O-Water Plus 3%<br>Aer-O-Water 6% |
| Technology contained in core patent (US 4,999,119) | Universal Plus/Gold |
| Synthetic foam & Class A formulas | Hi-Combat A<br><br>Vapor Shield |

The Registered Business IPR included in the Owned Business IPR shall be transferred by means set out in the Agreed Terms suitable for transferring on a jurisdiction-by-jurisdiction basis the agreed right, title and interest to the Purchasers and for recording the assignments in the relevant registries.

**Schedule 5**
**Part 2**

[intentionally left blank]

**Schedule 5**
**Part 3**

**Licences to Sellers or Group Companies (including Computer Software Licences)
included in the Business IPR**

[Intentionally left blank]

## Schedule 5
## Part 4

PART A

### Unregistered Business IP

Common Law Marks (in each case these marks are limited to use in connection with hose and foam)



AER-O-LITE

HI-POWER

BLUESKIN

YELLOWSKIN

CENTURION

TRIDEX

FEECON COBRA

UNIVERSAL CG

TRITON

COVERLINE

FLEXLINE

WATERSHIELD

ARMOURLINE

STRIKER

TRAINOL

KERR (for use in connection with foam and 'Monnex' powder)

### PART B

### Unregistered Trademarks With No Applicable Warranties

ERGOSOUPLE

AER O WATER

COBRA NOZZLES

SURFZONE 850

ARMOR HIDE

BLAZEGUARD

PERM I DENT II (TEXT ONLY)

TERMINATOR

UNIVERSAL PLATINUM

464

ANGUS

ANGUS HORSEMAN LOGO

**Schedule 6**

**Part 1**

**Moveable Assets excluded from the sale of the Group Businesses**

The below schematic highlights the areas of the Bentham facility which are occupied by the suppression business of Kidde Products in blue.  All production assets and movable assets (including cranes) in these areas belong to the suppression business of Kidde Products and which, accordingly, are Excluded Assets, with the exception of two ovens which belong to the AF Business and therefore form part of the Angus Fire Assets.  For avoidance of doubt, pictures of these two ovens appear below.  All permanent fixtures, including but not limited to electrical and gas supplies/connections, fire detection and fighting equipment (sprinklers, hose reels, extinguishers, alarm systems), lighting, and security systems belong to the AF Business and, accordingly, also form part of the Angus Fire Assets.



Source file location: Supplementary dataroom \ Schedule 6 – Excluded assets \ Site Drawing V2

Photographs of AF Business foam oven 1 and foam oven 2 which are located within the blue zone of the schematic above and which are Angus Fire Assets that will continue to belong to the AF Business after Closing are listed below.

AF business foam oven 1



Source file location: Supplementary dataroom \ Schedule 6 – Excluded assets \ Angus Foam Oven 1

AF business foam oven 2



Source file location: Supplementary dataroom \ Schedule 6 – Excluded assets \ Angus Foam Oven 2

**Schedule 6**
**Part 2**
**Excluded Software Assets**

The software applications listed in the table hereunder are Excluded Assets unless indicated otherwise with the word "Yes" listed in the column below entitled "transfer classification", in which case they are Business Assets, and only subject to the conditions included in that column.

| Entity Providing under TSA | Entity Receiving under TSA | Services | Software License | transfer classification |
|---|---|---|---|---|
| Kidde Fenwal Inc. | NF Business | US ERP | JD Edwards | No |
| Kidde Fenwal Inc. | NF Business | US ERP | GL Inquiry | No |
| Kidde Fenwal Inc. | NFBusiness | US ERP | Showcase | No |
| Kidde Fenwal Inc. | NF Business | US ERP | Kewill | No |
| Kidde Fenwal Inc. | NF Business | Exton / Angier software | AutoCAD LT 2012 - English | Yes if National Foam has a license on site (on paper or electronic) |
| Kidde Fenwal Inc. | NF Business | Exton / Angier software | SolidWorks eDrawings 2012 x64 Edition SP04 | Yes if National Foam has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | Business Intelligence Reporting Tool | Cognos | Yes with permission of Cognos (any transfer fees to be paid by Angus Fire Business) |
| KIDDE PRODUCTS | | Export Documentation Package | Spex | Yes with permission of Spex (any transfer fees to be paid by Angus Fire Business) |
| KIDDE PRODUCTS | Angus Fire Business | Syteline ERP System | Syteline v 6.1 | Yes with permission of Syteline (any transfer fees to be paid by Angus Fire Business) |
| KIDDE PRODUCTS | Angus Fire Business | Mechanical Engineering Drg Packages | Solid Works & Autocad | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | Word, Excel, Powerpoint, Access | MS Office | No for MS products |
| KIDDE PRODUCTS | Angus Fire Business | Word, Excel, Powerpoint, Access | MS Office | No for MS products |
| KIDDE PRODUCTS | Angus Fire Business | AP Authorisation Workflow Tool | Lotus Notes | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | R&D database | Lotus Notes | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | Time & Attendance System | Crown Open Options - Managers | Yes if Angus or AFE has a license on site (on paper or electronic) |

| | | | | |
|---|---|---|---|---|
| KIDDE PRODUCTS | Angus Fire Business | Time & Attendance System | Crown Open Options - Administrators | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | Time & Attendance System | Crown Open Options - Users | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | Payroll | KCS | No |
| Newco | Angus Fire Business | Planned Maintenance Software | Shire PM System | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | Publishing | Acrobat Writer | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | Publishing | Adobe Acrobat | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | Publishing | Adobe Page Maker | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | Publishing | Adobe Photoshop Elements | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | BACS payment remittance advice | APT Fax Mail | No |
| KIDDE PRODUCTS | Angus Fire Business | BACS payment | APT BACSTEL | No |
| KIDDE PRODUCTS | Angus Fire Business | Weighing process | Avery Wizard | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | Marketing | Coral Graphics & DRAW | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | Security | Crystal Reports | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | Production recording | Datalogger & Manager | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | T&A system support | DEUClient | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | AFE Purchasing | eDrawings | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | | IAP 2102 | Yes if Angus or AFE has a license on site (on paper or electronic) |

| KIDDE PRODUCTS | Angus Fire Business | Textile monitoring equipment | Instron Bluehill & Console | Yes if Angus or AFE has a license on site (on paper or electronic) |
|---|---|---|---|---|
| KIDDE PRODUCTS | Angus Fire Business | Monitoring equipment | CE Lite | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | Monitoring equipment | DSE Lite | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | Foam R&D | JMP 10 & Profiler | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | | Label Matrix | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | | MS Office OneNote | No for MS products |
| KIDDE PRODUCTS | Angus Fire Business | | MS Office Projects | No for MS products |
| KIDDE PRODUCTS | Angus Fire Business | | MS Office Visio | No for MS products |
| KIDDE PRODUCTS | Angus Fire Business | | MS Org Chart | No for MS products |
| KIDDE PRODUCTS | Angus Fire Business | | Microsoft SQL server | No for MS products |
| KIDDE PRODUCTS | Angus Fire Business | | Microsoft Visual Basic | No for MS products |
| KIDDE PRODUCTS | Angus Fire Business | | Minitab | No for MS products |
| KIDDE PRODUCTS | Angus Fire Business | | NiceLabel | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | | Pipe Properties Reporter | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | AFE design tool for flow systems | PipeNet Vision | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | | Power Log | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | Design Calculation Tools | Vds Argonite | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | Design Calculation Tools | FM 200 Flow Calc | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | Design Calculation Tools | Novec 1230 Fluid System | Yes if Angus or AFE has a license on site (on paper or electronic) |

| KIDDE PRODUCTS | Angus Fire Business | Design Calculation Tools | High Pressure CO2 | Yes if Angus or AFE has a license on site (on paper or electronic) |
|---|---|---|---|---|
| KIDDE PRODUCTS | Angus Fire Business | Design Calculation Tools | Hose Calc | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | Design Calculation Tools | Burst Calc | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | Design Calculation Tools | Pressure Calc | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | Design Calculation Tools | Monitor calculator tools | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | Design Calculation Tools | Pump calculator tools | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | Design Calculation Tools | Well Calc | Yes if Angus or AFE has a license on site (on paper or electronic) |
| KIDDE PRODUCTS | Angus Fire Business | | Draft Sight | |
| KIDDE PRODUCTS | Angus Fire Business | Monitoring equipment | West 4400 Program Editor | |
| KIDDE PRODUCTS | Angus Fire Business | | DWGeditor | |
| KIDDE PRODUCTS | Angus Fire Business | Monitoring equipment | Crouzet Logic Software M3 | |
| KIDDE PRODUCTS | Angus Fire Business | Monitoring equipment | Samsung Intelli studio | |

## Schedule 7
## UK Relevant Employees
## (Clause 2.5.1)

**1      Definitions and Interpretation**

**1.1**    For the purposes of this Schedule 7:

    **1.1.1**    the terms "**contract of employment**", "**collective agreement**", and "**trade union**" shall have the same meanings respectively as in the Transfer Regulations; and

    **1.1.2**    "**Subcontractor**" means any person other than Purchaser Two who becomes the employer of the UK Relevant Employees or any of them by operation of the Transfer Regulations on or after the Employee Transfer Time;

**1.2**    Terms defined in Clause 1 shall have the same meanings in this Schedule unless the context otherwise requires.

**2      Transfer of UK Relevant Employees**

**2.1**    The parties to this Agreement acknowledge and agree that the Transfer Regulations apply to the sale of the Business pursuant to this Agreement and that the contract of employment of each UK Relevant Employee will have effect at and from the Employee Transfer Time as if originally made between Purchaser Two and the UK Relevant Employee (except in relation to pension benefits which are excluded by Regulation 10 of the Transfer Regulations) and that any collective agreements listed at Annex B to this Schedule relating to any of the UK Relevant Employees shall have effect between Purchaser Two and the relevant trade union.

**2.2    Obligations in Respect of the Transfer Regulations**

    **2.2.1**    Kidde Products and/or each relevant member of the Sellers' Group shall perform and discharge all payment obligations in respect of the UK Relevant Employees which are due and payable before the Employee Transfer Time.

    **2.2.2**    Kidde Products shall be responsible for all emoluments and outgoings in relation to the UK Relevant Employees and any UK Undisclosed Employees (including all salaries or wages, bonuses, PAYE, national insurance contributions, pension contributions, accrued holiday and otherwise) in respect of the period up to the Employee Transfer Time and the relevant Purchaser shall be responsible for all such emoluments and outgoings in respect of the UK Relevant Employees in respect of the period from the Employee Transfer Time and all necessary apportionments shall be made.

    **2.2.3**    Kidde Products shall indemnify and keep indemnified Purchaser Two and each member of the Purchasers' Group against all Employment Losses arising from any failure by any member of the Sellers' Group to perform and discharge any of its payment obligations under paragraph 2.2.1 and its obligations under paragraph 2.2.2 and against any Employment Losses arising from or as a result of:

        (i)      any act of or omission by the relevant Business Seller or any member of the Sellers' Group or any other event or occurrence in any case in relation to the UK Relevant Employees or the UK Undisclosed Employees in respect of any period before the Employee Transfer Time but excluding any

Employment Losses which fall within the scope of Purchaser Two's indemnity set out in paragraph 2.2.4; or

(ii)   any failure by the relevant Business Seller or the Sellers' Group to comply with any requirement of Regulation 13 of the Transfer Regulations in respect of the UK Relevant Employees or the UK Undisclosed Employees except, in the case of the UK Relevant Employees, to the extent that such failure is caused by Purchaser Two, the Purchasers' Group or a Subcontractor to comply with Regulation 13(4) of the Transfer Regulations.

2.2.4   Subject to paragraph 2.2.2, Purchaser Two shall perform and discharge all obligations in respect of the UK Relevant Employees for its own account from the Employee Transfer Time. Purchaser Two shall indemnify the Business Sellers and the Sellers' Group from and against all Employment Losses arising from Purchaser Two's failure to perform and discharge any of its payment obligations under this paragraph 2.2.4 and its obligations under paragraph 2.2.2 and against all Employment Losses in respect of the UK Relevant Employees arising from or as a result of:

(i)   any act or omission by Purchaser Two, the Purchasers' Group or a Subcontractor or any other event or occurrence relating to a UK Relevant Employee in any case in respect of any period from the Employee Transfer Time;

(ii)   any actual or proposed change by, Purchaser Two, the Purchasers' Group or a Subcontractor to offer or effect any change to any employment benefit, term or condition of employment or working condition of any UK Relevant Employee to the material detriment of such UK Relevant Employee; and

(iii)   any failure by Purchaser Two, the Purchasers' Group or a Subcontractor to comply with Regulation 13(4) of the Transfer Regulations in respect of the transfer of the UK Relevant Employees.

## 2.3    Undisclosed Employees

2.3.1   If as a result of the transaction contemplated by this Agreement the contract of employment or any liability relating to the employment of any person other than a UK Relevant Employee ("**UK Undisclosed Employee**") transfers, or is alleged to have transferred, to Purchaser Two or any member of the Purchasers' Group pursuant to the Transfer Regulations, the following process shall apply:

(i)   Purchaser Two shall notify the Sellers' Representative in writing within 21 days of becoming aware of that fact (the "**Notification**");

(ii)   within 21 days of the Notification being received by the Sellers' Representative, the relevant Business Seller may, or may procure that a member of the Sellers' Group will, offer employment to such UK Undisclosed Employee or may take at its own cost such other steps as it feels necessary to effect a written withdrawal of the claim. If such offer of employment is accepted, Purchaser Two shall immediately release or procure the release of such UK Undisclosed Employee from its employment; and

(iii)   if no such offer of employment has been made or procured to be made by the relevant Business Seller or such offer has been made but not accepted or if such UK Undisclosed Employee has failed to withdraw the claim, then Purchaser Two may terminate or procure the termination of the employment of such UK Undisclosed Employee at any time during the period of 28 days beginning on the 28th day after the date on which the Notification was received by the Sellers' Representative. If Purchaser Two exercises its right to terminate such UK Undisclosed Employee it will notify the Sellers' Representative in writing either before or within 28 days of such termination.

**2.3.2**   Subject to the provisions of paragraph 2.3.1 being followed by the Purchaser Two, the Business Sellers shall indemnify Purchaser Two and each member of the Purchasers' Group against all Employment Losses arising from or as a result of:

(i)   any termination of employment of a UK Undisclosed Employee under paragraph 2.3.1(iii) save to any extent that such Employment Loss arises as a direct result of a breach by Purchaser Two or any member of the Purchasers' Group of the Equality Act 2010; and

(ii)   in respect of any UK Undisclosed Employee whose employment is terminated under paragraph 2.3.1(iii), all emoluments and outgoings in relation to the UK Undisclosed Employee (including all salaries or wages, bonuses, PAYE, national insurance contributions, pension contributions, accrued holiday and otherwise) in respect of any period prior to such termination.

**2.3.3**   If Purchaser Two fails to take or procure the actions outlined in paragraph 2.3.1 within the stated time periods or does not terminate the employment of any UK Undisclosed Employee then such person shall be deemed a UK Relevant Employee and the provisions of paragraph 2.2 shall apply accordingly.

**2.4**   **Employee Information**

**2.4.1**   The Purchasers and the Business Sellers, having taken independent legal advice, acknowledge the duties imposed by Regulation 11 of the Transfer Regulations in respect of the provision of Employee Liability Information and agree that such duties shall be adequately satisfied by the process of disclosure against the warranties set out in paragraphs 19.1 to 19.6 of Part 1 of Schedule 12.

**2.4.2**   The Purchasers acknowledge that its remedies under the warranties set out in paragraphs 19.1 to 19.6 of Part 1 of Schedule 12 provide adequate recourse in respect of the provision of Employee Liability Information in all the circumstances.

**2.4.3**   The Purchasers agree that it would not be just and equitable to pursue any future claim in respect of Employee Liability Information in the Employment Tribunal, and accordingly undertakes not to bring such a claim against any member of the Sellers' Group.

**2.4.4**   The Purchasers further agree that if a Purchaser should bring a claim in breach of its undertaking in paragraph 2.4.3, it shall indemnify the relevant Business Seller and each member of the Sellers' Group fully in respect of all losses, liabilities, damage, costs, claims and expenses arising from or in connection with such a claim.

## 2.5    Information and Consultation

The parties shall provide one another on request with such information as may be reasonably necessary to enable the other to comply with its obligations under Regulation 13 of the Transfer Regulations. To the extent that it has not done so at the date of this Agreement, the Purchasers shall provide the Sellers as soon as reasonably practicable with any measures it envisages taking in respect of the UK Relevant Employees in connection with the transfer and Kidde Products shall comply with its obligations under Regulations 13 and 14 of the Transfer Regulations.

## 2.6    Conduct of Employment Claims

2.6.1    If either party becomes aware of any matter that might give rise to it (the "**Beneficiary**") having a claim under an indemnity set out in this Schedule against the other party (the "**Covenantor**"), the following provisions apply:

(i)    the Beneficiary shall immediately give written notice to the Covenantor of the matter in respect of which the indemnity is being claimed (stating in reasonable detail the nature of the matter and, so far as practicable, the amount claimed) and shall consult with the Covenantor with respect to the matter. If the matter has become the subject of any proceedings, the Beneficiary shall give notice within sufficient time to enable the Covenantor time to contest the proceedings before any first instance Judgment in respect of such proceedings is given; and

(ii)    the Beneficiary shall:

(a)    take such action and institute such proceedings, and give such information and assistance, as the Covenantor or its insurers may reasonably request to dispute, resist, appeal, compromise, defend, remedy or mitigate the matter or enforce against any person (other than the Covenantor) the rights of the Beneficiary or its insurers in relation to the matter;

(b)    in connection with any proceedings related to the matter (other than against the Covenantor) use professional advisers nominated by the Covenantor or, if its insurers so request, allow the Covenantor or its insurers the exclusive conduct of the proceedings, in each case on the basis that the Covenantor shall fully indemnify the Beneficiary for all costs incurred as a result of any request or nomination by the Covenantor or its insurers and provided that the Covenantor shall take into account in the conduct of the proceedings any reasonable concern of the Beneficiary which is notified to the Covenantor by the Beneficiary provided further that the Covenantor shall provide reports to the Beneficiary upon reasonable request relating to the material aspects of any claim, including, where requested by the Beneficiary, such additional information and documentation as may be required; and

(c)    not admit liability in respect of or settle the matter without the prior written consent of the Covenantor, such consent not to be unreasonably withheld or delayed; and

       (iii)     if the Covenantor has the conduct of any litigation and negotiations in connection with a claim, the Covenantor shall promptly take all proper action to deal with the claim so as not, by any act or omission in connection with the claim, to cause the Beneficiary to be in breach of its obligations to its current or past employees or to cause the Beneficiary's business interests to be materially prejudiced.

**2.6.2**    The indemnities given by the Covenantor in this Schedule are without prejudice (but not so as to enable any double recovery) to any rights which any Beneficiary may have at law or otherwise, including, but not limited to, any right of contribution.

**2.6.3**    The indemnities contained in this Schedule shall, for the avoidance of doubt, extend to include all costs and expenses suffered or reasonably incurred by the Beneficiary in connection with enforcing its rights under this Schedule.

**2.6.4**    The rights of each party under this Schedule:

       (i)     may be exercised as often as necessary;

       (ii)     are cumulative and not exclusive of rights or remedies provided by law; and

       (iii)     may be waived only in writing and specifically.

**2.6.5**    Delay in exercising or non-exercise of any such right is not a waiver of that right.

**Annex A to Schedule 7**
**Current Employees**


**Part 1**
**UK Relevant Employees**

SCHEDULE 7 - PART 1A (UK)

| | | | | | | | | | | | Employee Data Spreadsheet | | | Country: United Kingdom | | | | | | | Contact Details of Person Providing Data: | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ID | NI Number | Title | Surname | Forenames | Gender | Disability/Possible DDA Consideration | Address 1 | Address 2 | Address 3 | Address 4 | Postcode | Date of Birth (DD/MM/YYYY) | Business Unit/Dept Name/ | Cost Centre Code | Work Location/Site | Job Title/Function | Is position covered by collective agreement (if so which one)? | Contract Type (Full-time, Part-time, Shift, etc) | Contractual Weekly Hours | FTE equivalent for those on non-standard contracts | Start Date (D/M/Y) | Birth Date (D/M/Y) or Age | Scheduled promotion due date (M/D/Y) |

RD PK

Proudly of DLA Piper

SCHEDULE 7 - PART 1A (UK)

| ID | Id Number | Title | Surname | Forename(s) | Gender | Disability/Possible DDA Consideration | Address 1 | Address 2 | Address 3 | Address 4 | Postcode | Date of Birth (DD/MM/YY) | Business Unit/Dept Name | Cost Centre Code | Work Location/Site | Job Title/ Function | Is position covered by collective agreement (if so which one)? | Contract Type (Full-time, Part-time, Fixed term, etc) | Contractual Weekly Hours | FTE equivalent for those on non-standard contracts | Start Date (D/M/Y) | Birth Date (D/M/Y) or Age | Scheduled provisible due date (M/D/Y) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

SCHEDULE 7 - PART 1A (UK)

| ID | NI Number | Title | Surname | Forenames | Monthly Payroll Date | Annual Base Salary (including 2011 annual review and any promotions) pa | Bonus /Commission % | Staff on Leave of Absence with reason | Stat Redundancy Pay Liability | Enhanced Redundancy Pay Liability | Employee's Notice Period - Weeks | PILON | Total Severance Cost Liability (Redundancy & Pay in lieu) | Is position in any current redundancy programme (Y/N)? | Legal Entity | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| SCHEDULE 7 - PART 1A (UK) | | | | | | | | | | | Telephone.................................... | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ID | NI Number: | Title: | Surname: | Forenames: | Monthly Payroll Date | Annual Base Salary (including 2011 annual review and any promotions) pa | Bonus /Commission % | Staff on Leave of Absence with reason | Stat Redundancy Pay Liability | Enhanced Redundancy Pay Liability | Employee's Notice Period - Weeks | PILON | Total Severance Cost Liability (Redundancy & Pay in lieu) | Is position in any current redundancy programme (Y/N)? | Legal Entity | Comments |
| 917 | JP182905B | Mr | Thistlethwaite | Matthew,James | Weekly Paid Every F | £17,922.65 | | | | | 5 weeks | £1,723.33 | £1,723.33 | No | Kidde Products Ltd | |
| 943 | JJ413507D | Mr | Craven | Luke,James | Weekly Paid Every F | £17,922.65 | | | | | 3 weeks | £1,034.00 | £1,034.00 | No | Kidde Products Ltd | |
| 944 | JR410131D | Mr | Chappell | Jack, | Weekly Paid Every F | £17,922.65 | | | | | 3 weeks | £1,034.00 | £1,034.00 | No | Kidde Products Ltd | |
| 945 | JR926782A | Mr | Carter | Philip,Robert | Weekly Paid Every F | £17,922.65 | | | | | 3 weeks | £1,034.00 | £1,034.00 | No | Kidde Products Ltd | |
| 951 | JE602998C | Mr | Morphet | James, | Weekly Paid Every F | £17,922.65 | | | | | 2 weeks | £689.33 | £689.33 | No | Kidde Products Ltd | |
| 952 | JP722633B | Miss | Birkbeck | Leanne,Marie | Weekly Paid Every F | £17,922.65 | | | | | 2 weeks | £689.33 | £689.33 | No | Kidde Products Ltd | |
| 959 | YT681954B | Mr | Thistlethwaite | Geoffrey, | Weekly Paid Every F | £17,922.65 | | | | | 1 week | £344.67 | £344.67 | No | Kidde Products Ltd | |
| 960 | JS492597B | Mr | Green | Jonathon,Andre | Weekly Paid Every F | £17,922.65 | | | | | 1 week | £344.67 | £344.67 | No | Kidde Products Ltd | |
| 961 | WM084371B | Mr | Standing | Peter,Reuben | Weekly Paid Every F | £17,922.65 | | | | | 1 week | £344.67 | £344.67 | No | Kidde Products Ltd | |
| 963 | JP181805B | Mr | Dobson | Mark, | Weekly Paid Every F | £17,922.65 | | | | | 1 week | £344.67 | £344.67 | No | Kidde Products Ltd | |
| 966 | JX760529B | Mr | Adam | David, | Weekly Paid Every F | £17,922.65 | | | | | 1 week | £344.67 | £344.67 | No | Kidde Products Ltd | |
| 967 | JH055978C | Mr | Bolton | Michael,John | Weekly Paid Every F | £17,922.65 | | | | | 1 week | £344.67 | £344.67 | No | Kidde Products Ltd | |
| 968 | JC791519C | Mr | Edge | Stephen, | Weekly Paid Every F | £17,922.65 | | | | | 1 week | £344.67 | £344.67 | No | Kidde Products Ltd | |
| 972 | JS955825B | Mr | Santangelo | Michael,Dominic | Weekly Paid Every F | £17,922.65 | | | | | 1 week | £344.67 | £344.67 | No | Kidde Products Ltd | |
| 973 | JA345432A | Mr | Blakeway | Simon, | Weekly Paid Every F | £17,922.65 | | | | | 1 week | £344.67 | £344.67 | No | Kidde Products Ltd | |
| 975 | JS797800A | Mr | Giddings | Daniel,Mark | Weekly Paid Every F | £17,922.65 | | | | | 1 week | £344.67 | £344.67 | No | Kidde Products Ltd | |
| 976 | JJ621708A | Mr | Preston | Shaun,Michael | Weekly Paid Every F | £17,922.65 | | | | | 1 week | £344.67 | £344.67 | No | Kidde Products Ltd | |
| 977 | NR372032D | Mr | Gardner | Darren,Anthony | Weekly Paid Every F | £17,922.65 | | | | | 1 week | £344.67 | £344.67 | No | Kidde Products Ltd | |
| 978 | JL081025C | Mr | Thomson | Stephen, | Weekly Paid Every F | £17,922.65 | | | | | 1 week | £344.67 | £344.67 | No | Kidde Products Ltd | |
| 979 | JZ080482C | Mr | Harrison | Jack,Thomas | Weekly Paid Every F | £17,922.65 | | | | | 1 week | £344.67 | £344.67 | No | Kidde Products Ltd | |
| 980 | JN608913B | Mr | Marsden | Timothy,James | Weekly Paid Every F | £17,922.65 | | | | | 1 week | £344.67 | £344.67 | No | Kidde Products Ltd | |
| 981 | JK671873B | Mr | Ellershaw | Daniel,Rober | Weekly Paid Every F | £17,922.65 | | | | | 1 week | £344.67 | £344.67 | No | Kidde Products Ltd | |
| 982 | WE414172A | Mr | Richardson | Stephen | Weekly Paid Every F | £17,922.65 | | | | | 1 week | £344.67 | £344.67 | No | Kidde Products Ltd | |
| 986 | NW642423B | Mr | Gill | Justin,Baeye | Weekly Paid Every F | £17,922.65 | | | | | 1 week | £344.67 | £344.67 | No | Kidde Products Ltd | |
| 987 | JH395781B | Mr | Curran | Daniel,James | Weekly Paid Every F | £17,922.65 | | | | | 1 week | £344.67 | £344.67 | No | Kidde Products Ltd | |
| 988 | JW619905B | Mr | Jackson | Joshua | Weekly Paid Every F | £17,922.65 | | | | | 1 week | £344.67 | £344.67 | No | Kidde Products Ltd | |
| 989 | JW449259D | Mr | Dixon | Craig | Weekly Paid Every F | £17,922.65 | | | | | 1 week | £344.67 | £344.67 | No | Kidde Products Ltd | |
| 990 | NW826068B | Mr | Gilmore | Thomas | Weekly Paid Every F | £17,922.65 | | | | | 1 week | £344.67 | £344.67 | No | Kidde Products Ltd | |
| 996 | JP071399D | Mr | Carr | Christopher | Weekly Paid Every F | £17,922.65 | | | | | 1 week | £344.67 | £344.67 | No | Kidde Products Ltd | |
| 997 | NH260181A | Mr | Hosfield | Jeffrey | Weekly Paid Every F | £17,922.65 | | | | | 1 week | £344.67 | £344.67 | No | Kidde Products Ltd | |
| 998 | JW438081B | Mr | Shallcross | Paul | Weekly Paid Every F | £17,922.65 | | | | | 1 week | £344.67 | £344.67 | No | Kidde Products Ltd | |
| 999 | JZ086845B | Mr | Ellershaw | Liam | Weekly Paid Every F | £17,922.65 | | | | | 1 week | £344.67 | £344.67 | No | Kidde Products Ltd | |
| 1000 | NW639566C | Mr | Wilson | Gary | Weekly Paid Every F | £17,922.65 | | | | | 1 week | £344.67 | £344.67 | No | Kidde Products Ltd | |
| 1004 | JA208784A | Mr | Huntley | Ian, | 24th Of Month | £25,141.00 | 5% | | | | 12 weeks | £5,801.77 | £5,801.77 | No | Kidde Products Ltd | |
| 1013 | WM674210A | Mrs | Carter | Janet, | 24th Of Month | £20,979.00 | | | | | 12 weeks | £4,841.31 | £4,841.31 | No | Kidde Products Ltd | |
| 1082 | WK750887B | Mr | Noble | David, | 24th Of Month | £20,571.00 | | | | | 12 weeks | £4,747.15 | £4,747.15 | No | Kidde Products Ltd | |
| 1244 | YM764218D | Mr | Redfern | James, | 24th Of Month | £33,000.00 | | | | | 12 weeks | £7,615.38 | £7,615.38 | No | Kidde Products Ltd | |
| 1252 | YK310571C | Mr | Ross | Ian,Edwin | 24th Of Month | £32,239.00 | | | | | 12 weeks | £7,439.77 | £7,439.77 | No | Kidde Products Ltd | |
| 1392 | YS548166B | Mr | Taylor | Colin,John | 24th Of Month | £37,365.00 | | | | | 12 weeks | £8,622.69 | £8,622.69 | No | Kidde Products Ltd | |
| 1546 | WL171167C | Mr | Boon | Charles,Logan | 24th Of Month | £75,345.00 | 25% | | | | 12 weeks | £17,387.31 | £17,387.31 | No | Kidde Products Ltd | |
| 2013 | NP882925A | Ms | Daly | Louise, | 24th Of Month | £25,248.00 | 5% | | | | 12 weeks | £5,826.00 | £5,826.00 | No | Kidde Products Ltd | |
| 2087 | SE525916A | Mrs | Coppola Bennet | Annarita, | 24th Of Month | £12,653.00 | 5% | | | | 8 weeks | £1,946.62 | £1,946.62 | No | Kidde Products Ltd | |
| 2153 | YY031463C | Ms | Copping | Rosalin, | 24th Of Month | £16,240.00 | 5% | | | | 8 weeks | £2,186.15 | £2,186.15 | No | Kidde Products Ltd | |
| 2213 | NE059982A | Mrs | Reading | Donna, | 24th Of Month | £20,805.00 | 5% | | | | 5 weeks | £2,000.48 | £2,000.48 | No | Kidde Products Ltd | |
| 2237 | NH774642A | Miss | Day-Lewis | Jo, | 24th Of Month | £22,025.00 | 5% | | | | 5 weeks | £2,117.79 | £2,117.79 | No | Kidde Products Ltd | |
| 2245 | SJ114572A | Ms | Kruger | Jill, | 24th Of Month | £34,028.00 | 5% | | | | 5 weeks | £3,271.92 | £3,271.92 | No | Kidde Products Ltd | |
| 2247 | YW358316C | Mr | Collins | Rodger,John | 24th Of Month | £52,337.00 | SIP | | | | 5 weeks | £4,361.42 | £4,361.42 | No | Kidde Products Ltd | |
| 2251 | YK660164B | Mrs | Lines | Jan, | 24th Of Month | £22,326.00 | 5% | | | | 5 weeks | £1,860.50 | £1,860.50 | No | Kidde Products Ltd | |
| 2255 | JS460959D | Miss | Smith | Ellen,Clare | 24th Of Month | £26,966.00 | | | | | 5 weeks | £2,247.17 | £2,247.17 | No | Kidde Products Ltd | |
| 2293 | JT427308A | Miss | Keighley | Leanne,Clair | 24th Of Month | £26,394.00 | | | | | 1 month | £2,199.50 | £2,199.50 | No | Kidde Products Ltd | |
| 2302 | WM730483B | Miss | Guest | Lynda,Michelle | 24th Of Month | £116,657.00 | 25% | | | | 6 months | £58,328.50 | £58,328.50 | No | Kidde Products Ltd | |
| 2304 | NA790103C | Mr | Stewart | Andrew,James | 24th Of Month | £41,239.00 | | | | | 1 month | £3,436.58 | £3,436.58 | No | Kidde Products Ltd | |
| 2305 | JP944166C | Miss | Holden | Helen,Claire | 24th Of Month | £20,141.00 | 5% | | | | 1 month | £1,678.42 | £1,678.42 | No | Kidde Products Ltd | |
| 2317 | YX165188B | Mr | Jeffrey | Ian,Charles | 24th Of Month | £42,355.00 | SIP | | | | 1 month | £3,529.58 | £3,529.58 | No | Kidde Products Ltd | |
| 2318 | YY335621A | Mr | Wildsmith | Mark, | 24th Of Month | £60,187.00 | SIP | | | | 12 weeks | £13,889.31 | £13,889.31 | No | Kidde Products Ltd | |
| 2320 | JJ586218C | Mr | Dimmer | Anthony,Charles | 24th Of Month | £82,000.00 | 20% | | | | 3 months | £20,500.00 | £20,500.00 | No | Kidde Products Ltd | |
| 2323 | PW483037B | Miss | Davies | Lauren,Marie | 24th Of Month | £24,522.00 | 5% | | | | 1 month | £2,043.50 | £2,043.50 | No | Kidde Products Ltd | |
| 2363 | NE113502A | Mr | Williams | Paul, | 24th Of Month | £158,875.00 | 25% | | | | 6 months | £79,437.50 | £79,437.50 | No | Kidde Products Ltd | |
| 2375 | NZ365824B | Mr | Cook | John,Thomas | 24th Of Month | £25,680.00 | | | | | 1 month | £2,140.00 | £2,140.00 | No | Kidde Products Ltd | |
| 2380 | SN232134C | Mr | Barry | Peter,Edward | 24th Of Month | £87,417.00 | 20% | | | | 12 weeks | £20,173.15 | £20,173.15 | No | Kidde Products Ltd | |
| 2388 | NX455691B | Ms | Leeming | Julie,Elizabeth | 24th Of Month | £19,647.00 | 5% | | | | 1 month | £1,637.25 | £1,637.25 | No | Kidde Products Ltd | |
| 2392 | WE660272B | Mr | Beaumont | Michael,Lawrenc | 24th Of Month | £39,169.00 | SIP | | | | 6 weeks | £4,519.50 | £4,519.50 | No | Kidde Products Ltd | |
| 2421 | NS882494D | Mr | Young | Gary, | 24th Of Month | £19,134.00 | 5% | | | | 1 month | £1,594.50 | £1,594.50 | No | Kidde Products Ltd | |
| 2422 | JK044263D | Miss | Sasso | Gemma, | 24th Of Month | £19,134.00 | 5% | | | | 1 month | £1,594.50 | £1,594.50 | No | Kidde Products Ltd | |
| 2423 | JG252620A | Miss | Cummings | Nina, | 24th Of Month | £18,450.00 | | | | | 1 month | £1,537.50 | £1,537.50 | No | Kidde Products Ltd | |
| 2429 | NB220078C | Miss | Tymon | Jacqueline, | 24th Of Month | £25,611.00 | | | | | 12 weeks | £5,910.23 | £5,910.23 | No | Kidde Products Ltd | |
| 2468 | NP108053C | Mr | McAteer | Scott, | 24th Of Month | £46,125.00 | 10% | | | | 1 month | £3,843.75 | £3,843.75 | No | Kidde Products Ltd | |
| 2469 | JR279459D | Miss | Taylor | Abigail,Christine | 24th Of Month | £21,525.00 | | | | | 1 month | £1,793.75 | £1,793.75 | No | Kidde Products Ltd | |
| 2471 | JB071562C | Mr | Crook | Graham,John | 24th Of Month | 45,100.00 | 10% | | | | 3 months | £11,275.00 | £11,275.00 | No | Kidde Products Ltd | |
| 2472 | NY736157C | Miss | Leith | Jennifer,Eil | 24th Of Month | 19,988.00 | | | | | 1 month | £1,665.67 | £1,665.67 | No | Kidde Products Ltd | |
| 2473 | YY976131B | Mr | Gardner | John,Charles | 24th Of Month | 31,500.00 | | | | | 1 month | £2,625.00 | £2,625.00 | No | Kidde Products Ltd | |
| 2474 | YW122904B | Mr | Gill | Trevor,Georg | 24th Of Month | 44,075.00 | 10% | | | | 1 month | £3,672.92 | £3,672.92 | No | Kidde Products Ltd | |
| 2479 | YE217899A | Mr | Conway | John | 24th Of Month | | | | | | 1 month | £0.00 | £0.00 | No | Kidde Products Ltd | |
| 2482 | SP268760A | Miss | Moss | Sophie,B,J | 24th Of Month | 19,134.00 | 5% | | | | 1 month | £1,594.50 | £1,594.50 | No | Kidde Products Ltd | |
| 2489 | JA633663D | Mr | Okome | Anthony | 24th Of Month | 32,000.00 | | | | | 1 month | £2,666.67 | £2,666.67 | No | Kidde Products Ltd | |
| 2498 | JS865857B | Miss | Blythe | Laura | 24th Of Month | 30,000.00 | | | | | 1 month | £2,500.00 | £2,666.67 | No | Kidde Products Ltd | |
| 2499 | JC352624A | Mrs | Barstow | Sarah | 24th Of Month | 23,000.00 | 5% | | | | 1 month | £1,916.67 | £2,500.00 | No | Kidde Products Ltd | |
| 3646 | YY286629A | Mr | Joslin | Nigel,Frank | 24th Of Month | £42,374.00 | | | | | 12 weeks | £9,778.62 | £9,778.62 | No | Kidde Products Ltd | |
| 3905 | NH595475B | Mr | Nicholson | Paul, | 24th Of Month | £39,011.00 | 5% | | | | 12 weeks | £9,002.54 | £9,002.54 | No | Kidde Products Ltd | |
| 4146 | YY362624B | Mr | Hough | Martin,Russell | 24th Of Month | £42,702.00 | SIP | | | | 12 weeks | £9,854.31 | £9,854.31 | No | Kidde Products Ltd | |
| 4332 | YY774103D | Mr | Johnston | Trevor, | 24th Of Month | £32,912.00 | | | | | 12 weeks | £7,595.08 | £7,595.08 | No | Kidde Products Ltd | |
| 4707 | YZ531129C | Mrs | Wilcock | Celia,Anne | 24th Of Month | £30,663.00 | | | | | 12 weeks | £7,076.08 | £7,076.08 | No | Kidde Products Ltd | |
| 5987 | WL797616D | Mr | Williams | Darren,Todd | 24th Of Month | £42,257.00 | SIP | | | | 12 weeks | £9,751.62 | £9,751.62 | No | Kidde Products Ltd | |
| 6009 | YR554531A | Mr | Illingworth | John,David | 24th Of Month | £23,995.00 | | | | | 12 weeks | £5,537.31 | £5,537.31 | No | Kidde Products Ltd | |
| 6560 | JB946474C | Miss | Murray | Sarah, | 24th Of Month | £35,946.00 | 5% | | | | 12 weeks | £8,295.23 | £8,295.23 | No | Kidde Products Ltd | |
| 7013 | NZ864549D | Mr | Marsden | Jonathan,Allan | 24th Of Month | £30,597.00 | 5% | | | | 12 weeks | £7,060.85 | £7,060.85 | No | Kidde Products Ltd | |
| 7285 | WM674147B | Mr | Chappell | Daniel, | 24th Of Month | £36,570.00 | 5% | | | | 12 weeks | £8,439.23 | £8,439.23 | No | Kidde Products Ltd | |
| 318 | NM380506C | Mrs | Ford | Nicola | 24th Of Month | £30,089.00 | | | | | 12 weeks | £6,943.62 | £6,943.62 | No | Kidde Products Ltd | |
| 4909 | NA731568B | Mrs | Agace | Tina | 24th Of Month | £27,633.00 | | | | | 12 weeks | £6,376.85 | £6,376.85 | No | Kidde Products Ltd | |
| 2501 | JR341280A | Mr | Mulenga | Simon | 24th of Month | £50,000.00 | 10% | | | | 3 months | £12,500.00 | £12,500.00 | No | Kidde Products Ltd | |
| | New Starters with Contractual Offers | | | | | | | | | | | | | | | |
| N/K | N/K | Mr | Wright | Michael | 24th of month | £56,000 | 15% | | | | 3 months | £14,000.00 | £14,000.00 | No | Kidde Products Ltd | |
| N/K | N/K | Mr | Irving | Ben | 24th of month | £27,000 | | | | | 1 month | £2,250.00 | £2,250.00 | No | Kidde Products Ltd | |
| N/K | N/K | Ms | Roberson | Chloe | 24th of month | £18,500 | | | | | 1 month | £1,542.00 | £1,542.00 | No | Kidde Products Ltd | |

| ID | Dept Name/Cost Centre Code | Surname | Bonus (Total potential under 2011 scheme) % | Commission Estimate Jan - Dec 2011 | Overtime Entitlement Y/N | Shift Allowance | Standby Payment | Call-out Payment | Cross-site Working Allowance | Location Allowance | Home Working Allowance PA | Lunch/Meal Allowance | First Aider Payment | Other Payment | Annual Salary Review Date (D/M/Y) | Future Salary Review Commitment? (please provide separate details) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **DD Summary - Salary Items** | | | | All amounts to be shown in Local Curency (please specify) per annum | | | | | | Staff with Remote Access to the IT systems are entitled to claim £16 per month towards the cost of their Broadband - this claimed monthly via | | There are First Aiders within the business however no additional payment is given for | | | |
| 12 | Quality Control,GB | Murray | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | 0.00 | 01/01/2013 | |
| 24 | Engineering Production,ET | Williamson | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | 0.00 | 01/01/2013 | |
| 32 | Textiles,E2 | Marshall | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 61 | Hose Processing,E3 | Efershaw | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover | 01/01/2013 | |
| 71 | Hose Processing,E3 | Murray | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover | 01/01/2013 | |
| 74 | Textiles,E2 | Jones | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 79 | Hose Finishing,E4 | Green | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 82 | Hose Production,E5 | Murray | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 87 | Textiles,E2 | Richardson | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Travel | 01/01/2013 | |
| 85 | Mixing,E1 | Starkie | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover,Trav | 01/01/2013 | |
| 90 | Hose Finishing,E4 | Green | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover,Trav | 01/01/2013 | |
| 94 | Textiles,E2 | Murray | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 99 | Textiles,E2 | Towler | | | Y | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 102 | Finance,A9 | Hodgkinson | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | 0.00 | 01/01/2013 | |
| 110 | Finance,A9 | Scott | 10.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | 0.00 | 01/01/2013 | |
| 119 | Textiles,E2 | Guy | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 133 | Textiles,E2 | Coates | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Travel | 01/01/2013 | |
| 151 | Textiles,E2 | Adam | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover | 01/01/2013 | |
| 154 | Hose Processing,E3 | Buckley | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | 75.00 | | 01/01/2013 | |
| 155 | Hose Processing,E3 | Carter | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover | 01/01/2013 | |
| 156 | Mixing,E1 | Carter | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | 75.00 | Handover | 01/01/2013 | |
| 168 | Hose Processing,E3 | Hall | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 173 | Foam Production,E6 | Dixon | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 175 | Sales Administration,X3 | Lunney | 5.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | 0.00 | 01/01/2013 | |
| 182 | Engineering Production,ET | Thistlethwaite | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | 0.00 | 01/01/2013 | |
| 199 | Hose Processing,E3 | Percy | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover | 01/01/2013 | |
| 200 | Sales Administration,X3 | Millard | 5.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | 0.00 | 01/01/2013 | |
| 203 | Bentham Warehouse,D1 | Chappell | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 211 | Technical Services,GJ | Swithenbank | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 216 | Hose Processing,E3 | Chetwynd | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover | 01/01/2013 | |
| 218 | Hose Finishing,E4 | Walden | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 219 | Hose Finishing,E4 | Tallon | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover | 01/01/2013 | |
| 221 | Engineering Production,ET | Thornton | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 224 | Hose Finishing,E4 | Dixon | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover | 01/01/2013 | |
| 228 | Textiles,E2 | Holly | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 239 | EH&S Shared,KC | Houldsworth | 10.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | 0.00 | 01/01/2014 | |
| 246 | Foam Production,E6 | Winn | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | 0.00 | 01/01/2013 | |
| 255 | Hose Finishing,E4 | Tennant | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 261 | Export Sales Executive,X2 | Drewer | 0.00 | 3,383.00 | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | 0.00 | 01/01/2013 | |
| 262 | Hose Production,E5 | Blackwell | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | 75.00 | Handover | 01/01/2013 | |
| 267 | Hose Finishing,E4 | Foster | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover | 01/01/2013 | |
| 270 | Foam Production,E6 | McKay | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | 75.00 | | 01/01/2013 | |
| 271 | Textiles,E2 | Parkinson | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 272 | Bentham Warehouse,D1 | Pilling | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 274 | Hose Processing,E3 | Robinson | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover,Trav | 01/01/2013 | |
| 287 | UK Sales,U1 | McWilliams | 0.00 | 3,561.00 | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover,Trav | 01/01/2013 | |
| 290 | Hose Processing,E3 | Brayshaw | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover | 01/01/2013 | |
| 299 | Hose Processing,E3 | Dixon | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover | 01/01/2013 | |
| 310 | General Marketing,M1 | Keeble | 5.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | 0.00 | 01/01/2013 | |
| 316 | Textiles,E2 | Abbott | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 318 | Hose Processing,E3 | Smith | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover,Trav | 01/01/2013 | |
| 322 | Hose Processing,E3 | Burrow | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover,Trav | 01/01/2013 | |
| 324 | Hose Production,E5 | Capstick | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover | 01/01/2013 | |
| 327 | Hose Production,E5 | Lister | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | 0.00 | 01/01/2013 | |
| 359 | Foam Production,E6 | Fulford | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 389 | Textiles,E2 | Dixon | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Travel | 01/01/2013 | |
| 422 | Business Development,BD1 | Cox | 20.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Additional Pay £80 | 01/01/2013 | |
| 425 | Textiles,E2 | Broadwell | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 448 | Textiles,E2 | Hodgson | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 452 | Foam Production,E6 | Lawson | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 459 | Foam Production,E6 | Westbury | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 461 | Export Sales Executives,X2 | Allan | 0.00 | 3,084.00 | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | 0.00 | 01/01/2013 | |
| 462 | Textiles,E2 | Broadwell | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | 0.00 | 01/01/2013 | |
| 465 | UK Sales,U1 | Russell | 0.00 | 2,624.00 | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | 0.00 | 01/01/2013 | |
| 466 | Finance,A9 | Murray | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | 0.00 | 01/01/2013 | |
| 514 | Textiles,E2 | Hutchinson | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Travel | 01/01/2013 | |
| 517 | Foam Production,E6 | McGloughlin | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | 75.00 | | 01/01/2013 | |
| 518 | Hose Processing,E3 | Marshall | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover | 01/01/2013 | |
| 530 | Sales Administration,X3 | Woodhouse | 5.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | 0.00 | 01/01/2013 | |
| 551 | Hose Finishing,E4 | Louth | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Travel | 01/01/2013 | |
| 553 | Textiles,E2 | Taylor | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | 75.00 | Handover | 01/01/2013 | |
| 555 | Hose Finishing,E4 | Green | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 559 | Hose Finishing,E4 | Hayton | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |

| ID | Dept Name/Cost Centre Code | Surname | Bonus (Total potential under 2011 scheme) % | Commission Estimate Jan - Dec 2011 | Overtime Entitlement Y/N | Shift Allowance | Standby Payment | Call-out Payment | Cross-site Working Allowance | Location Allowance | Home Working Allowance PA | Lunch/ Meal Allowance | First Aider Payment | Other Payment | Annual Salary Review Date (D/M/Y) | Future Salary Review Commitment? (please provide separate details) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | DD Summary - Salary Items | | | | All amounts to be shown in Local Curency (please specify) per annum | | | | | | | | | | | |
| | | | | | | | | | | | Staff with Remote Access to the IT systems are entitled to claim £16 per month towards the cost of their Broadband - this claimed monthly via | | There are First Aiders within the business however no additional payment is given for | | | |
| 566 | Mixing,E1 | Vincent | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover | 01/01/2013 | |
| 584 | Textiles,E2 | Johnston | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Travel | 01/01/2013 | |
| 612 | Hose P&D,VE1 | Hale | | | N | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | 0.00 | 01/01/2013 | |
| 614 | Technical Services,GJ | Birkbeck | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 619 | Technical Services,GJ | Boardman | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | 0.00 | 01/01/2013 | |
| 622 | Hose Production,E5 | Jeffery | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | 0.00 | 01/01/2013 | |
| 628 | Technical Services,GJ | Nash | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 636 | Quality Control,GR | Titterington | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Additional Pay | 01/01/2013 | |
| 644 | Technical Services,GJ | Bargh | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 648 | Finance,A9 | Titterington | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | 0.00 | 01/01/2013 | |
| 649 | Hose Finishing,E4 | Derrick | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover | 01/01/2013 | |
| 650 | Technical Services,GJ | Wilson | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 658 | Foam Production,E8 | Murphy | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | 0.00 | 01/01/2013 | |
| 659 | Mixing,E1 | Winjinscki | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover | 01/01/2013 | |
| 668 | Hose Processing,E3 | Trowell | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover | 01/01/2013 | |
| 670 | Hose Processing,E3 | Percy | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover | 01/01/2013 | |
| 679 | Bentham Warehouse,D1 | Carter | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 690 | Hose Processing,E3 | Wilson | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover | 01/01/2013 | |
| 693 | Hose Production,E5 | Clapp | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | 0.00 | 01/01/2013 | |
| 730 | Engineering Production,ET | Sutton | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 747 | Hose Production,E5 | Metcalfe | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Travel | 01/01/2013 | |
| 750 | Engineering Production,ET | Miller | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 751 | Hose Production,E5 | Pye | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 754 | Hose Production,E5 | Cockerton | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | 75.00 | Handover | 01/01/2013 | |
| 755 | Textiles,E2 | Guy | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | 0.00 | 01/01/2013 | |
| 760 | Textiles,E2 | Bell | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 762 | Hose Processing,E3 | Sharples | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 766 | Hose Processing,E3 | Page | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover,Tra | 01/01/2013 | |
| 769 | Engineering Production,ET | Ross | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Travel | 01/01/2013 | |
| 783 | Hose Processing,E3 | Nagorski | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover | 01/01/2013 | |
| 795 | Sales Administration,X3 | Phipps | 5.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | 0.00 | 01/01/2013 | |
| 798 | Textiles,E2 | Loughhead | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Travel | 01/01/2013 | |
| 805 | Technical Services,GJ | Brooks | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 815 | Technical Services,GJ | Mason | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 822 | Textiles,E2 | Stephens | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 810 | Engineering Production,ET | Goff | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Travel | 01/01/2013 | |
| 853 | Engineering Production,ET | Jackson | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 859 | Foam Production,E8 | Harrison | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 860 | Engineering Production,ET | Sinclair | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | 75.00 | 0.00 | 01/01/2013 | |
| 876 | Engineering Production,ET | Soar | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Travel | 01/01/2013 | |
| 877 | Sales Administration,X3 | Hutsal | 5.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | 0.00 | 01/01/2013 | |
| 901 | Hose Production,E5 | Lund | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 902 | Sales Administration,X3 | Lazaro | 5.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | 0.00 | 01/01/2013 | |
| 912 | Engineering Production,ET | Close | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Travel | 01/01/2013 | |
| 917 | Textiles,E2 | Thistlethwaite | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 941 | Textiles,E2 | Craven | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 944 | Textiles,E2 | Chappell | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 945 | Textiles,E2 | Carter | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 951 | Textiles,E2 | Morphet | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 952 | Textiles,E2 | Birkbeck | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 959 | Textiles,E2 | Thistlethwaite | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 960 | Hose Finishing,E4 | Green | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 961 | Hose Finishing,E4 | Standing | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 963 | Bentham Warehouse,D1 | Dobson | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 966 | Textiles,E2 | Adam | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 967 | Hose Processing,E3 | Bolton | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover | 01/01/2013 | |
| 968 | Mixing,E1 | Edge | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover | 01/01/2013 | |
| 972 | Hose Processing,E3 | Santangelo | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover | 01/01/2013 | |
| 973 | Textiles,E2 | Blakeway | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 975 | Hose Processing,E3 | Giddings | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover | 01/01/2013 | |
| 976 | Hose Finishing,E4 | Preston | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 977 | Textiles,E2 | Gardner | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 978 | Textiles,E2 | Thomson | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 979 | Textiles,E2 | Harrison | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 980 | Engineering Production,ET | Marsden | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover | 01/01/2013 | |
| 981 | Textiles,E2 | Kilcrahaw | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 982 | Textiles,E2 | Richardson | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 986 | Hose Processing,E3 | Gill | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover | 01/01/2013 | |
| 987 | Hose Processing,E3 | Curran | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | Handover | 01/01/2013 | |
| 988 | Hose Processing,E3 | Jackson | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 989 | Hose Finishing,E4 | Dixon | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |
| 990 | Engineering Production,ET | Gilmore | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy in Place | N/A | | | 01/01/2013 | |

| ID | Dept Name/Cost Centre Code | Surname | Bonus (Total potential under 2011 scheme) % | Commission Estimate Jan - Dec 2011 | Overtime Entitlement Y/N | Shift Allowance | Standby Payment | Call-out Payment | Cross-site Working Allowance | Location Allowance | Home Working Allowance PA | Lunch/ Meal Allowance | First Aider Payment | Other Payment | Annual Salary Review Date (D/M/Y) | Future Salary Review Commitment? (please provide separate details) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Staff with Remote Access to the IT systems are entitled to claim €16 per month towards the cost of their Broadband - this claimed monthly via | | There are First Aiders within the business however no additional payment is given for | | | |
| 996 | Textiles,E2 | Carr | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | | | |
| 997 | Textiles,E2 | Hosfield | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | | | |
| 998 | Textiles,E2 | Shallcross | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | | | |
| 999 | Hose Processing,E3 | Elizrshaw | | | Y | Y | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | | | |
| 1000 | Hose Finishing,E4 | Wilson | | | Y | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | Handover | | |
| 1004 | Sales Administration,X3 | Huntley | 5.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 1013 | Finance,A9 | Carter | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 1082 | Bentham Warehouse,D1 | Noble | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 1244 | Foam Production,E6 | Redfern | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 1252 | Foam Production,E6 | Ross | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 1392 | Business Development,BD1 | Taylor | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 1546 | Sales Administration,X3 | Boon | 25.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2013 | Sales Administration,X3 | Daly | 5.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2087 | Sales Administration,X3 | Coppola Bennet | 5.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2153 | Sales Administration,X3 | Copping | 5.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2213 | Sales Administration,X3 | Reading | 5.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2237 | Sales Administration,X3 | Day-Lewis | 5.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2245 | Fire Fighting Shipping,WB2 | Kruger | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2247 | Export Sales Executives,X2 | Collins | | 3,282.00 | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2251 | Fire Fighting Shipping,WB2 | Lines | 5.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2255 | Engineering Production,ET | Smith | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2293 | Hose Production,E5 | Keighley | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2302 | Central Management,A1 | Guest | 25.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2304 | Computer Department,A8 | Stewart | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2305 | Sales Administration,X3 | Holden | 5.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2317 | Export Sales Executives,X2 | Jeffroy | 0.00 | 2,772.00 | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2318 | Export Sales Executives,X2 | Wildsmith | 0.00 | 5,866.00 | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2320 | FF Manufacturing Support,GC | Dimmer | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2323 | Fire Fighting Shipping,WB2 | Davies | 5.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2363 | Central Management,A1 | Williams | 25.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | Car Allowance | 01/01/2013 | |
| 2375 | Finance,A9 | Cook | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2380 | FF Manufacturing Support,GC | Barry | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2398 | Sales Administration,X3 | Leeming | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2392 | Export Sales Executives,X2 | Beaumont | 0.00 | 3,597.00 | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2421 | Sales Administration,X3 | Young | 5.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2422 | Sales Administration,X3 | Sasso | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2423 | Finance,A9 | Cummings | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2429 | FF Manufacturing Support,GC | Tymon | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | Car Allowance DHS 32,400, utilities DH | | 01/01/2013 | |
| 2447 | Export Sales Executives,X2 | Bathish | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2468 | Quality Control,GB | McAteer | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2469 | Engineering Production,ET | Taylor | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2471 | Hose Production,E5 | Crook | | | Y | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2472 | Hose Production,E5 | Leith | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2473 | Foam R&D,VE6 | Gardner | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2474 | Foam Production,E6 | Gill | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2479 | Hose Production,E5 | Conway | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2492 | Sales Administration,X3 | Moss | | | Y | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2489 | Foam Production,E6 | Okome | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 2498 | Quality Control,GB | Blythe | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | | |
| 2499 | Fire Fighting Shipping,WB2 | Barstow | 5.00 | | Y | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | Additional Pay E | 01/01/2013 | |
| 3646 | Business Development,BD1 | Joslin | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 3905 | Engineering Production,ET | Nicholson | 5.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 4146 | UK Sales,U1 | Hough | 0.00 | 3,771.00 | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 4332 | Hose Production,E5 | Johnston | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 4707 | Hose Production,E5 | Wilcock | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 5967 | Export Sales Executives,X2 | Williams | 0.00 | 3,620.00 | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 6009 | Foam R&D,VE6 | Illingworth | | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 6585 | Finance,A9 | Murray | 5.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 7013 | Finance,A9 | Marsden | 5.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/01/2013 | |
| 7285 | Bentham Warehouse,D1 | Chappell | 5.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/03/2013 | |
| 118 | A3 | Ford | N/K | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | 0.00 | 01/03/2013 | |
| 4909 | A3 | Agace | N/K | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | Car Allowance €9800 | 01/03/2013 | |
| 2501 | IT A8 | Mulenga | 10.00 | | N | N | N/A | See Note 1 | N/A | N/A | No Home Working Policy In Place | N/A | | Car Allowance €9800 | 01/03/2014 | |

**Pension Scheme Type**

| | | Normal Scheme | | | Higher Rate Scheme for (Execs earning over 75k per ann | | |
|---|---|---|---|---|---|---|---|
| | | Age Band | Employee Minimum Contributions | Employer Contributions | Total Contributions | Employee Minimum Contributions | Employer Contributions | Total Contributions |
| Prudential Stakeholder, Money Purchase | | Under 30 | 3.0% | 3% | 6.0% | 3.0% | 9% | 12.0% |
| | | 30-45 | 3.0% | 5% | 8.0% | 3.0% | 11% | 14.0% |
| | | 45-55 | 3.0% | 7% | 10.0% | 3.0% | 13% | 16.0% |
| | Stakeholder Eer % varies with age as at 1st April | 55 over | 3.0% | 9% | 12.0% | 3.0% | 15% | 18.0% |
| UTC (UK) Pension Scheme, Defined Benefit, Contracted Out  ERS 15% (+ 9.2% uplift for 2012-13), EES 5% | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**Life Assurance**

For all pension plans there is Life Assurance cover of 4 x Basic Salary

## Health Insurance

| Type of position | Cover Type | Taxable (Y/N) |
|---|---|---|
| Business Development Manager | BUPA Single Parent Cover | Yes |
| Export Sales Executive | BUPA Single Cover | Yes |
| Export Sales Manager | BUPA Family Cover | Yes |
| Financial Accountant | BUPA Couple Cover | Yes |
| GM EMEA FF Products | BUPA Family Cover | Yes |
| Operations Director | BUPA Single Cover | Yes |
| Operations Director | BUPA Single Parent Cover | Yes |
| Sales Director | BUPA Family Cover | Yes |
| Sales Manager | BUPA Single Cover | Yes |
| Sales Manager - Major Accounts | BUPA Couple Cover | Yes |
|  | N/A | N/A |
|  | N/A | N/A |
|  | N/A | N/A |
|  | N/A | N/A |
|  | N/A | N/A |
|  | N/A | N/A |
|  | N/A | N/A |
|  | N/A | N/A |
|  | N/A | N/A |
|  | N/A | N/A |

## Annual Holiday Entitlement

| Holiday Year May-Apr | 25 Days Plus Bank Holidays | |
| --- | --- | --- |
| | | |
| | | |

## Hourly Rates of Pay

|         | Job Title 1 | Job Title 2 | Job Title 3 | Job Title 4 | Job Title 5 | Job Title 6 |
|---------|-------------|-------------|-------------|-------------|-------------|-------------|
| Bentham |             |             |             |             |             |             |
| Thame   |             |             |             |             |             |             |

Overtime & Shift Allowance

| Job Title | Shift Allowance | Normal Overtime | Bank Holidays | Xmas & New Years Day | |
|---|---|---|---|---|---|
| Production Operatives | 10% | 1.5 Weekdays/Satu | Double Pay, plus | Double Pay, plus Holiday p | Please note, we have never work |
| | 17.45% | | | | |
| | 18% | | | | |
| | 25% | | | | |
| | | | | | |
| Maintenance | £1.06 | 1.5 Weekdays/Satu | Double Pay, day | Double Pay, plus Holiday pay, day off in Lieu with no pay | |
| | | | | | |
| Hose Supervisor | 10% | 1.5 Weekdays/Satu | Double Pay, plus | Double Pay, plus Holiday p | Does not claim overtime as a rule |
| | | | | | |
| All Office Staff (as applicable) | None | 1.5 Weekdays/Satu | Double Pay, day | Double Pay, plus Holiday pay, day off in Lieu with no pay | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

ed Xmas Day!!

NVQ Participants

| Signed Up | | | | |
|---|---|---|---|---|
| Pin | Name | Location | NVQ | Level |
| | John Sinclair | Bentham | Customer Services | 2 |
| | Tara Wilson | Bentham | Business & Admin | 2 |
| | Leanne keighley | Bentham | Management | 3 |
| | Damian McKay | Bentham | Team leader | 2 |
| | Shaun McGloughlin | Bentham | Team Leader | 2 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| Pin | Name | Job Title | Length of Absence - Number of days in 2013 | Reason For Absence | Period From | Period To | Progress to Date |
|---|---|---|---|---|---|---|---|
| | Louth, Mel | Production Operative | 52 days since 1 April | Stroke | 01/04/2013 | Ongoing | |
| | Tallon, Nick | Production Operative | 22 days since 1 April | Low back pain | 22/05/2013 | Ongoing | Ongoing physio |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

<u>Benefits in kind</u>



**SCHEDULE 7 - PART 1B (UK)**

| | | | | | | | | | | Employee Data Spreadsheet | | | | | | Country United Kingdom | | | | | Contact Details of Person Providing Data | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ID | NI Number | Title | Surname | Forenames | Gender | Disability/Possible DDA Consideration | Address 1 | Address 2 | Address 3 | Address 4 | Postcode | Date of Birth (DD/MM/YY) | Business Unit/Dept Name/ | Cost Centre Code | Work Location/Site | Job Title/Function | Is position covered by collective agreement (if so which one)? | Contract Type (Full-time, Part-time, Shift, etc) | Contractual Weekly Hours | FTE equivalent for those on non-standard contracts | Start Date (D/M/Y) | Birth Date (D/M/Y) or Age |
| 16 | 932254002 | Mr | Curran | David,Shaw | Male | Not Known | 27a Daneberry Road | FELTHAM | Middlesex | | TW13 5BQ | 19/05/1951 | 2593 AFE, AFE Projects | C2 | Thame | Proposals Engineer | No | Fulltime | 35 | | 09/06/1997 | 19/05/1951 |
| 115 | NK743902C | Mr | Rodger | David,Andrew | Male | Not Known | 25 West Hill | WHEATLEY | Oxfordshire | | OX33 9QF | 27/08/1960 | 2593 AFE, AFE Projects | C2 | Thame | Contracts Manager | No | Fulltime | 35 | | 03/12/2001 | 05/08/1959 |
| 243 | WZ660426C | Mrs | King | Patricia,Joy | Female | Not Known | 3 Cherry Tree Road | CHINNOR | Oxon | | OX39 4QY | 06/06/1958 | 2533 AFE, AFE Projects | C2 | Thame | Project Consultant | No | Fulltime | 35 | | 10/06/2002 | 09/05/1959 |
| 315 | WK774356A | Mr | Chandler | Paul,Martin | Male | Not Known | 14 Nash Close | AYLESBURY | Bucks | | HP21 9YB | 09/03/1960 | 2593 AFE, AFE Projects | C2 | Thame | Technical Supp Administrator | No | Fulltime | 35 | | 02/04/1979 | 23/08/1958 |
| 1067 | WA730443C | Mr | King | Charles,Samuel | Male | Not Known | 62 Wheatley Road | Garsington | OXFORD | | OX44 9EB | 23/08/1958 | 2593 AFE, AFE Sales and | C1 | Thame | Key Accounts Manager | No | Fulltime | 35 | | 20/05/1979 | 20/05/1959 |
| 1357 | XX316446R | Mr | Burt | Malcolm,John | Male | Not Known | 20 Arnold Way | | Oxfordshire | | OX9 2UH | 02/01/1964 | 2593 AFE, AFE Projects | C2 | Thame | Supply Chain Director | No | Fulltime | 35 | | 07/06/1976 | 31/08/1962 |
| 1361 | WD099063R | Mrs | Woodbridge | Janet,Ann | Female | Not Known | 20 Victoria Mead | THAME | Oxon | | OX9 3NY | 31/04/1962 | 2593 AFE, AFE Projects | C2 | Thame | Projects Administrator | No | Fulltime | 35 | | 01/10/1973 | 25/06/1956 |
| 1446 | WM465020R | Mr | Hogcroft | Richard,Thomas | Male | Not Known | 3 Prestidge Place | Evans Lane | Kidlington | OXFORD | OX5 2RE | 25/06/1956 | 2593 AFE, AFE Sales and | C1 | Thame | Commercial Co-Ordinator | No | Part-time | 35 | 25 | 20/10/2001 | 01/02/1965 |
| 2001 | MT519720C | Mrs | Poxey | Sarah,Jane | Female | Not Known | 13 Arnold Way | THAME | Oxon | | OX9 2QA | 01/05/1962 | 2593 AFE, AFE Projects | C2 | Thame | Design Engineer | No | Fulltime | 35 | | 01/03/2004 | 26/01/1963 |
| 2026 | WM573372D | Mr | Williams | Simon,Howard | Male | Not Known | 17 Rushmore Avenue | HAZELMERE | Bucks | | HP15 7HY | 24/05/1962 | 2593 AFE, AFE Projects | C2 | Thame | General Manager | No | Fulltime | 35 | | 01/02/1986 | 29/10/1961 |
| 2145 | WM047002R | Mr | Anderson | James,Thomas | Male | Not Known | Oakwood | Kilbride Extension | Pinchampstead | Wokingham | RG40 3WU | 24/10/1961 | 2593 AFE, AFE Projects | C2 | Benham | Proposals Engineer | Yes | Fulltime | 37.5 | | 13/09/2006 | 24/02/1976 |
| 2185 | CX773713D | Mr | Simpson | Adam,Jon | Male | Yes | 41 High Road | Halton | LANCASTER | | LA3 6LX | 25/02/1976 | 2593 AFE, AFE Projects | C2 | Thame | Lead Engineer | No | Fulltime | 35 | | 01/06/2003 | 25/06/1976 |
| 2213 | JA367443R | Mr | Barnes | David,Lyol | Male | Not Known | 1 Ballays Orchard | DENTON | Oxon | | OX44 9SB | 25/06/1976 | 2593 AFE, AFE Projects | C2 | Thame | Design Manager | No | Fulltime | 35 | | 30/07/2007 | 17/05/1974 |
| 2236 | CA301230D | Mr | Southwood | Paul | Male | Not Known | 1a Stock Lane | Khaddon | MILTON KEYNES | Buckinghamshire | MK17 0LB | 17/05/1974 | 2593 AFE, AFE Projects | C2 | Thame | Project Manager | No | Fulltime | 35 | | 12/05/2008 | 22/01/1954 |
| 2250 | PG556441A | Mr | Jones | Christopher,Ern | Male | Not Known | 22 Rosebury Road | Aston Clinton | AYLESBURY | Buckinghamshire | HP22 5JY | 22/01/1954 | 2593 AFE, AFE Projects | C2 | Thame | Commercial Controller | No | Part-time | 21 | 35 | 09/07/2008 | 14/08/1980 |
| 2287 | JP162833R | Miss | Rippling | Emma,Jane | Female | Not Known | 3 Yrehah Square | Wallingford | Oxfordshire | | OX10 8JT | 14/09/1980 | 2593 AFE, AFE Projects | C2 | Thame | Buyer | No | Fulltime | 35 | | 04/06/2008 | 13/10/1958 |
| 2292 | NX501322A | Mr | Creah | Steven,Lawrence | Male | Not Known | 2 Yrehah Square | Aylesbury | Buckinghamshire | | HP19 7AD | 13/10/1958 | 2593 AFE, AFE Projects | C2 | Thame | Buyer | No | Fulltime | 35 | | 14/10/2008 | 26/06/1965 |
| 2303 | NM569764C | Mr | Scott | Alan | Male | Not Known | 21 Peel Close | Woodley | Reading | Berkshire | RG5 4SH | 26/06/1965 | 2593 AFE, AFE Projects | C2 | Thame | Shipping Executive | No | Fulltime | 35 | | 08/10/2009 | 10/06/1957 |
| 2313 | JX497174A | Miss | Walker | Natalie | Female | Not Known | 19 Princes Close | Chilton | Aylesbury | Buckinghamshire | HP18 9RG | 07/10/1957 | 2593 AFE, AFE sales and | C1 | Thame | Export Sales Engineer | No | Fulltime | 35 | | 12/07/2010 | 18/02/1971 |
| 2347 | JH361314C | Mr | Dandy | Christopher,Wil | Male | Not Known | 129 Beach End Road | Flackwell Heath | High Wycombe | | HP10 9BB | 18/02/1971 | 2593 AFE, AFE Projects | C2 | Thame | Project Manager | No | Fulltime | 35 | | 11/10/2010 | 02/03/1983 |
| 2351 | SD698712A | Mr | Lee | Graham,Howard | Male | Not Known | 14 Barry Avenue | Bicester | Oxon | | OX26 2DY | 18/02/1971 | 2593 AFE, AFE Projects | C2 | Thame | Junior Project Engineer | No | Fulltime | 35 | | 07/10/2013 | 02/03/1983 |
| 2436 | SC689335C | Mr | Seawright | Tara,Catherine | Female | Not Known | 31 The Firm | Brill | Aylesbury | Bucks | HP18 9RW | 02/03/1963 | 2593 AFE, AFE Projects | C2 | Thame | Lead Engineer | No | Fulltime | 35 | | 01/03/1963 | 11/11/1963 |
| 2453 | NK566533D | Mr | Wylam | Christopher | Male | Not Known | 8 Bridens Way | Haddenham | Aylesbury | Buckinghamshire | HP17 8DH | 24/06/1963 | 2593 AFE, AFE Projects | C2 | Thame | Project Manager | No | Fulltime | 35 | | 01/10/2012 | 11/11/1963 |
| 2484 | WB557362A | Mr | Webb | Steven,Leal | Male | Not Known | 16 Lundsfield Gardens | Houlton | Northampton | | NN9 2LF | 10/04/1984 | 2593 AFE, AFE Projects | C2 | Thame | Project Support | No | Fulltime | 35 | | 01/10/2012 | 20/03/1961 |
| 2485 | JR824347D | Miss | White | Carly,Louise | Female | Not Known | 6 North Close | Piddington | Oxon | | OX15 4JR | 18/02/1976 | 2593 AFE, AFE Projects | C2 | Thame | Project Support | No | Fulltime | 35 | | 01/10/2013 | 15/02/1975 |
| 2496 | NB705669C | Miss | Tanton | Joanne | Female | Not Known | 11 Greenwood Meadow | Chinnor | Oxon | | OX39 4QZ | 06/02/1984 | 2593 AFE, AFE Projects | C2 | Thame | Junior Engineer | No | Fulltime | 35 | | 30/10/2013 | 06/02/1988 |
| 2497 | JB371641B | Mr | Foreman | Thomas | Male | Not Known | The Cottage | London Road | Nake | Hants | LU7 0LQ | 24/06/1992 | 2593 AFE, AFE Projects | C2 | Thame | Junior Proposals Engineer | No | Fulltime | 35 | | 08/10/2012 | 24/08/1991 |
| 2498 | 273151694 | Mr | Lightfoot | William,Arthur | Male | Not Known | Bonefield | High Street | Cublington | Leighton buzzard | LU7 0LY | 24/08/1976 | 2593 AFE, AFE Projects | C2 | Thame | Proposals Engineer | No | Fulltime | 35 | | 19/12/2013 | 03/02/1972 |
| 2493 | NB633977C | Mr | Freeman | Gary,John | Male | Not Known | 4 Langdale Close | Dunstable | Bedfordshire | | LU6 3RW | 09/02/1972 | 2593 AFE, AFE Projects | C2 | Benham | Commissioning Manager | No | Fulltime | 37.5 | | 17/07/1976 | 24/09/1967 |
| 4560 | NB659640C | Mr | Swindlehurst | Nicholas,James | Male | Not Known | 4 Heeling House | Row Horsely Road | Wrey | LANCASTER | LA3 5DH | 19/11/1952 | 2593 AFE, AFE Projects | C2 | Benham | Lead Proposals Engineer | No | Fulltime | 35 | | 06/01/1994 | 19/11/1953 |
| 4553 | VK112788 | Mr | Kiatkowics | Paul,Martin | Male | Not Known | 23 South View | Dowalry | HIGH WYCOMBE | Bucks | HP13 5UL | 09/03/1948 | 2593 AFE, AFE Projects | C2 | Benham | Operations Support Manager | yes | Fulltime | 37.5 | | 13/04/1992 | 15/09/1966 |
| 6941 | YH9465000 | Mr | Dugdale | Alan,Clive | Male | Not Known | 25 Heysham Mosspale [?] | Heysham | MORECAMBE | | LA3 3JU | 09/03/1948 | 2593 AFE, AFE Projects | C2 | Benham | Operations Support Manager | yes | Fulltime | 37.5 | | 13/04/1992 | 15/09/1966 |

New Starters with Contractual Offers

SCHEDULE 7 - PART 1B (UK)

| ID | NI Number | Title | Surname | Forenames | Scheduled promotion due date (MDY) | Monthly Payroll Date | Annual Base Salary (including 2011 annual review and any promotions) pa | Bonus/Commission % | Staff on Leave of Absence with reason | Stat Redundancy Pay Liability | Enhanced Redundancy Pay Liability | Employee's Notice Period - Weeks | PILON | Total Severance Cost Liability (Redundancy & Pay in lieu) | Is position in any current redundancy programme (Y/N)? | Legal Entity | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 16 | 332560020 | Mr | Curren | David,Shaw | Not Known | 24th Of Month | £31,859.00 | 5% | | | | 12 weeks | £7,342.85 | £7,342.85 | No | Kiddie Products Ltd | |
| 115 | WK745002C | Mr | Rodger | David,Andrew | Not Known | 24th Of Month | £52,120.00 | 6% | | | | 12 weeks | £12,030.69 | £12,030.69 | No | Kiddie Products Ltd | |
| 243 | WE660420C | Mrs | King | Patricia,Joy | Not Known | 24th Of Month | £24,941.00 | 5% | | | | 11 weeks | £5,275.98 | £5,275.98 | No | Kiddie Products Ltd | |
| 315 | WE774538A | Mr | Chandler | Paul,Martin | Not Known | 24th Of Month | £24,426.00 | 5% | | | | 11 weeks | £4,697.31 | £4,697.31 | No | Kiddie Products Ltd | |
| 1268 | WA378642C | Mr | King | Charles,Samuel | Not Known | 24th Of Month | £51,320.00 | SIP | | | | 12 weeks | £11,840.77 | £11,840.77 | No | Kiddie Products Ltd | |
| 1357 | YX515441B | Mr | Burr | Malcolm,John | Not Known | 24th Of Month | £56,630.00 | 5% | | | | 12 weeks | £12,807.02 | £12,807.02 | No | Kiddie Products Ltd | |
| 1365 | WP039063B | Mrs | Woodbridge | Janet,Ann | Not Known | 24th Of Month | £21,290.00 | 5% | | | | 12 weeks | £4,513.08 | £4,513.08 | No | Kiddie Products Ltd | |
| 1446 | YM145502D | Mr | Ropcroft | Richard,Thomas | Not Known | 24th Of Month | £51,806.00 | SIP | | | | 12 weeks | £11,965.23 | £11,965.23 | No | Kiddie Products Ltd | |
| 2001 | SB751972D | Mrs | Pasey | Sally,Jane | Not Known | 24th Of Month | £13,452.00 | 5% | | | | 9 weeks | £2,155.15 | £2,155.15 | No | Kiddie Products Ltd | |
| 2026 | NM5302970 | Mr | Williams | Simon,Howard | Not Known | 24th Of Month | £35,478.00 | 5% | | | | 9 weeks | £8,140.42 | £8,140.42 | No | Kiddie Products Ltd | |
| 3144 | WM0470000 | Mr | Anderson | James,Thomas | Not Known | 24th Of Month | £90,706.00 | 25% | | | | 3 months | £22,876.50 | £22,876.50 | No | Kiddie Products Ltd | |
| 3185 | ZX577231D | Mr | Simpson | Adam,Jon | Not Known | 24th Of Month | £31,190.00 | 5% | | | | 6 weeks | £2,999.04 | £2,999.04 | No | Kiddie Products Ltd | |
| 3213 | JA557440B | Mr | Barnes | David,Lyall | Not Known | 24th Of Month | £46,125.00 | SIP | | | | 6 weeks | £4,435.10 | £4,435.10 | No | Kiddie Products Ltd | |
| 3216 | JA300125B | Mr | Southwood | Paul | Not Known | 24th Of Month | £58,300.00 | 5% | | | | 5 weeks | £5,605.77 | £5,605.77 | No | Kiddie Products Ltd | |
| 3250 | YN558041A | Mr | Jones | Christopher,Ems | Not Known | 24th Of Month | £32,664.00 | 5% | | | | 5 weeks | £3,722.00 | £3,722.00 | No | Kiddie Products Ltd | |
| 3287 | JZ741583B | Miss | Tipping | Emma,Jane | Not Known | 24th Of Month | £23,324.00 | 5% | On maternity leave from April 2013 | | | 1 month | £1,927.17 | £1,927.17 | No | Kiddie Products Ltd | |
| 2292 | WE501522A | Mr | Breah | Steven,Lawrence | Not Known | 24th Of Month | £31,089.00 | 5% | | | | 1 month | £2,590.87 | £2,590.87 | No | Kiddie Products Ltd | |
| 2301 | NM097654C | Mr | Scott | Alan | Not Known | 24th Of Month | £29,977.00 | 5% | | | | 1 month | £2,498.08 | £2,498.08 | No | Kiddie Products Ltd | |
| 2313 | JX457174A | Miss | Walker | Natalie | Not Known | 24th Of Month | £23,205.00 | 5% | | | | 1 month | £1,950.42 | £1,950.42 | No | Kiddie Products Ltd | |
| 2367 | ZH245334C | Mr | Gandy | Christopher,William | Not Known | 24th Of Month | £26,735.00 | SIP | | | | 1 month | £2,227.92 | £2,227.92 | No | Kiddie Products Ltd | |
| 2381 | BM695712A | Mr | Lee | Graham,Howard | Not Known | 24th Of Month | £33,653.00 | 5% | | | | 1 month | £2,804.42 | £2,804.42 | No | Kiddie Products Ltd | |
| 2434 | SC969330C | Ms | Seawright | Tara,Catherine | Not Known | 24th Of Month | £26,292.00 | 5% | | | | 1 month | £2,191.00 | £2,191.00 | No | Kiddie Products Ltd | |
| 2483 | NB366533b | Mr | Hylam | Christopher | Not Known | 24th Of Month | £36,900.00 | 5% | | | | 1 month | £3,075.00 | £3,075.00 | No | Kiddie Products Ltd | |
| 2484 | NB533706A | Mr | Webb | Steven,Leslie | Not Known | 24th Of Month | £46,125.00 | 5% | | | | 1 month | £3,843.75 | £3,843.75 | No | Kiddie Products Ltd | |
| 2485 | DN806347D | Miss | White | Carly,Louise | Not Known | 24th Of Month | £23,575.00 | 5% | | | | 1 month | £1,964.58 | £1,964.58 | No | Kiddie Products Ltd | |
| 2486 | SB750685C | Miss | Fenton | Joanne | Not Known | 24th Of Month | £23,575.00 | 5% | | | | 1 month | £1,964.58 | £1,964.58 | No | Kiddie Products Ltd | |
| 2487 | JX275161B | Mr | Bateman | Thomas | Not Known | 24th Of Month | £23,575.00 | 5% | | | | 1 month | £1,964.58 | £1,964.58 | No | Kiddie Products Ltd | |
| 2488 | JY133530A | Mr | Lightfoot | William,Arthur | Not Known | 24th Of Month | £21,525.00 | 5% | | | | 1 month | £1,793.75 | £1,793.75 | No | Kiddie Products Ltd | |
| 2490 | KK633977C | Mr | Freeman | Gary,John | Not Known | 24th Of Month | £33,925.00 | 5% | | | | 1 month | £2,818.75 | £2,818.75 | No | Kiddie Products Ltd | |
| 4385 | WM489042C | Mr | Swindlehurst | Nicholas,James | Not Known | 24th Of Month | £37,606.00 | 5% | | | | 12 weeks | £8,400.08 | £8,400.08 | No | Kiddie Products Ltd | |
| 6933 | YX127868 | Mr | Kielkowicz | Paul,Martin | Not Known | 24th Of Month | £36,487.00 | 5% | | | | 12 weeks | £7,716.46 | £7,716.46 | No | Kiddie Products Ltd | |
| 6947 | YH9465580 | Mr | Dugdale | Alan,Clive | Not Known | 24th Of Month | £33,438.00 | 5% | | | | 12 weeks | £7,716.46 | £7,716.46 | No | Kiddie Products Ltd | |

New Starters with Contractual Offers

|  | DD Summary - Salary Items | | | | | | | | | All amounts to be shown in Local Currency (please specify) per annum | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ID | Dept Name/Cost Centre Code | Surname | Bonus (Total potential under 2011 scheme) | Commission Estimate Jan - Dec 2011 | Overtime Entitlement Y/N | Shift Allowance | Standby Payment | Call-out Payment | Cross-site Working Allowance | Location Allowance | Home Working Allowance PA | Lunch/ Meal Allowance | First Aider Payment | Other Payment | Annual Salary Review Date (D/M/Y) | Future Salary Review Commitment? (please provide separate details) |
|  |  |  | % |  |  |  |  |  |  |  | Staff with Remote Access to the IT systems are entitled to claim £16 per month towards the cost of their Broadband - this claimed monthly via | | There are First Aiders within the business however no additional payment is given for |  |  |  |
| 10 | AFE Project | Curran | 5.00 |  | N | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 115 | AFE Project | Rodger | 5.00 |  | N | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 243 | AFE Project | King | 5.00 |  | Y | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 515 | AFE Project | Chandler | 5.00 |  | Y | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 1268 | AFE Sales a | King |  | 0.00 | N | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 1357 | AFE Project | Burr | 5.00 |  | N | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 1365 | AFE Project | Woodbridge | 5.00 |  | Y | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 1446 | AFE Sales a | Hopcroft |  | 0.00 | N | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 2001 | AFE Project | Patey | 5.00 |  | Y | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 2026 | AFE Project | Williams | 5.00 |  | N | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 2146 | AFE Project | Anderson | 25.00 |  | N | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  | Car Allowance £9, | 01/01/2013 |  |
| 2185 | AFE Project | Simpson | 5.00 |  | N | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 2212 | AFE Project | Barnes | 5.00 |  | N | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 2216 | AFE Project | Southwood | 5.00 |  | N | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 2250 | AFE Project | Janes | 5.00 |  | Y | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 2287 | AFE Project | Tipping | 5.00 |  | N | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 2292 | AFE Project | Bresh | 5.00 |  | N | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 2301 | AFE Project | Scott | 5.00 |  | N | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 2312 | AFE Project | Walker | 5.00 |  | Y | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 2367 | AFE Sales a | Dandy |  | 0.00 | N | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 2381 | AFE Project | Lee | 5.00 |  | N | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 2436 | AFE Project | Seawright |  |  | N | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 2483 | AFE Project | Wylam |  |  | N | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 2484 | AFE Project | Webb |  |  | N | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 2485 | AFE Project | White |  |  | N | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 2486 | AFE Project | Tanton |  |  | N | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 2487 | AFE Project | Pateman |  |  | N | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 2488 | AFE Sales a | Lightfoot |  |  | N | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 2493 | AFE Project | Freeman |  |  | N | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 4588 | AFE Project | Swindlehurst | 5.00 |  | N | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 4932 | AFE Project | Kielkowicz | 5.00 |  | N | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |
| 6947 | AFE Project | Dugdale |  |  | N | N | N/A | N | N/A | N/A | No Home Working Policy in Place | N/A |  |  | 01/01/2013 |  |

JD Summary - Benefits

| ID | Dept Name/Cost Centre Code | Surname | Pension Scheme Type | Pension Scheme Contribution PA Employer | Pension Scheme Contribution PA Employee | Life Assurance/Death Benefit | Health Insurance | Healthcare Payment | Dental Insurance | Personal Accident A2A2 Scheme | Critical Illness Insurance | Health Screening | Post Retirement Medical Scheme | Shared Cost Disability/Sick Pay | Disability/Long Term Disability Insurance | Company Car or Allowance (with amounts) / FROM, TO(s) fuel cost card allocated to the support centre | Company Car Fuel Card (Y/N) | Car Breakdown Insurance / Available for Company Car Drivers Only via Fleet Support Group | Personal Travel Insurance | Annual Holiday Entitlement |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 18 | APE Projects,C2 | Curzon | UTC (UK) Pension Scheme, Defined Benefit, Contracted Out | 1924.90 | 3674.76 | 4 x Basic Salary | #N/A | N/K | N/A | N/K | N/K | Yes | N/A | 26 weeks OSP, 140 days SSP | Not Known | 8,809.36 | #N/A | #N/A | Not Known | 25 |
| 215 | APE Projects,C2 | Rodger | UTC (UK) Pension Scheme, Defined Benefit, Contracted Out | 996.00 | 7096.36 | 4 x Basic Salary | #N/A | N/K | N/A | N/K | N/K | Yes | N/A | 26 weeks OSP, 140 days SSP | Not Known | #N/A | N | #N/A | Not Known | 25 |
| 315 | APE Projects,C2 | King | Prudential Stakeholder, Money Purchase, Defined Contribution Scheme | 596.20 | 1745.88 | 4 x Basic Salary | #N/A | N/K | N/A | N/K | N/K | Yes | N/A | 26 weeks OSP, 140 days SSP | Not Known | #N/A | #N/A | #N/A | Not Known | 25 |
| 615 | APE Projects,C2 | Chandler | Prudential Stakeholder, Money Purchase, Defined Contribution Scheme | 2514.00 | 7043.20 | 4 x Basic Salary | BUPA Family | N/K | N/A | N/K | N/K | Yes | N/A | 1 year OSP, 140 days SSP | Not Known | 8,998.36 | Y | Covered for Company Car Only, included in Lease Agreement | Not Known | 25 |
| 1346 | APE Sales and Admin,C1 | King | UTC (UK) Pension Scheme, Defined Benefit, Contracted Out | 2489.89 | 7489.04 | 4 x Basic Salary | #N/A | N/K | N/A | N/K | N/K | Yes | N/A | 1 year OSP, 140 days SSP | Not Known | 6,607.00 | Y | Covered for Company Car Only, included in Lease Agreement | Not Known | 25 |
| 1357 | APE Projects,C2 | Burr | UTC (UK) Pension Scheme, Defined Benefit, Contracted Out | 792.72 | 2376.16 | 4 x Basic Salary | #N/A | N/K | N/A | N/K | N/K | Yes | N/A | 1 year OSP, 140 days SSP | Not Known | #N/A | #N/A | #N/A | Not Known | 25 |
| 1565 | APE Projects,C2 | Woodbridge | UTC (UK) Pension Scheme, Defined Benefit, Contracted Out | 2039.20 | 7617.60 | 4 x Basic Salary | BUPA Single | N/K | N/A | N/K | N/K | Yes | N/A | 12 weeks OSP, 140 days SSP | Not Known | 5,922.29 | Y | #N/A | Not Known | 25 |
| 1443 | APE Sales and Admin,C1 | Hopcroft | UTC (UK) Pension Scheme, Defined Benefit, Contracted Out | 258.60 | 671.58 | 4 x Basic Salary | #N/A | N/K | N/A | N/K | N/K | Yes | N/A | 12 weeks OSP, 140 days SSP | Not Known | #N/A | #N/A | #N/A | Not Known | pro rated for Part |
| 2095 | APE Projects,C2 | Patey | Prudential Stakeholder, Money Purchase, Defined Contribution Scheme | 851.30 | 2483.50 | 4 x Basic Salary | #N/A | N/K | N/A | N/K | N/K | Yes | N/A | 1 year OSP, 140 days SSP | Not Known | 5,300.00 | #N/A | #N/A | Not Known | 25 |
| 3030 | APE Projects,C2 | Williams | Prudential Stakeholder, Money Purchase, Defined Contribution Scheme | 2176.92 | 11794.80 | 4 x Basic Salary | BUPA Family | N/K | N/A | N/K | N/K | Yes | N/A | 1 year OSP, 140 days SSP | Not Known | #N/A | #N/A | #N/A | Not Known | 25 |
| 3144 | APE Projects,C2 | Anderson | Prudential Stakeholder, Money Purchase, Defined Contribution Scheme | 0.00 | 0.00 | N/A | #N/A | N/K | N/A | N/K | N/K | Yes | N/A | 10 weeks OSP, 140 days SSP | Not Known | 5,302.29 | N | Covered for Company Car Only, included in Lease Agreement | Not Known | 25 |
| 3195 | APE Projects,C2 | Simpson | | 0.00 | 2206.28 | 4 x Basic Salary | #N/A | N/K | N/A | N/K | N/K | Yes | N/A | 12 weeks OSP, 140 days SSP | Not Known | 5,297.88 | N | Covered for Company Car Only, included in Lease Agreement | Not Known | 25 |
| 2212 | APE Projects,C2 | Barnes | Prudential Stakeholder, Money Purchase, Defined Contribution Scheme | 1107.00 | 0.00 | N/A | #N/A | N/K | N/A | N/K | N/K | Yes | N/A | 12 weeks OSP, 140 days SSP | Not Known | #N/A | #N/A | #N/A | Not Known | 25 |
| 2256 | APE Projects,C2 | Southwood | | 765.90 | 2930.76 | 4 x Basic Salary | #N/A | N/K | N/A | N/K | N/K | Yes | N/A | 12 weeks OSP, 140 days SSP | Not Known | #N/A | #N/A | #N/A | Not Known | no rated for Part |
| 3056 | APE Projects,C2 | Jones | Prudential Stakeholder, Money Purchase, Defined Contribution Scheme | 555.00 | 1156.30 | 4 x Basic Salary | #N/A | N/K | N/A | N/K | N/K | Yes | N/A | 12 weeks OSP, 140 days SSP | Not Known | #N/A | #N/A | #N/A | Not Known | 25 |
| 3247 | APE Projects,C2 | Tipping | | 0.00 | 0.00 | N/A | #N/A | N/K | N/A | N/K | N/K | Yes | N/A | 12 weeks OSP, 140 days SSP | Not Known | #N/A | #N/A | #N/A | Not Known | 25 |
| 2102 | APE Projects,C2 | Derek | Prudential Stakeholder, Money Purchase, Defined Contribution Scheme | 1076.68 | 2098.44 | 4 x Basic Salary | #N/A | N/K | N/A | N/K | N/K | Yes | N/A | 8 weeks OSP, 140 days SSP | Not Known | #N/A | #N/A | #N/A | Not Known | 25 |
| 2103 | APE Projects,C2 | Scott | Prudential Stakeholder, Money Purchase, Defined Contribution Scheme | 552.50 | 668.12 | 4 x Basic Salary | #N/A | N/K | N/A | N/K | N/K | Yes | N/A | 8 weeks OSP, 140 days SSP | Not Known | #N/A | #N/A | #N/A | Not Known | 25 |
| 2104 | APE Projects,C2 | Walker | Prudential Stakeholder, Money Purchase, Defined Contribution Scheme | 641.64 | 903.36 | 4 x Basic Salary | #N/A | N/K | N/A | N/K | N/K | Yes | N/A | 8 weeks OSP, 140 days SSP | Not Known | 5,363.29 | N | Covered for Company Car Only, included in Lease Agreement | Not Known | 29 |
| 3392 | APE Projects,C2 | Lee | | 0.00 | 0.00 | N/A | #N/A | N/K | N/A | N/K | N/K | Yes | N/A | 6 weeks OSP, 140 days SSP | Not Known | #N/A | #N/A | #N/A | Not Known | 25 |
| 3418 | APE Projects,C2 | Seawright | Prudential Stakeholder, Money Purchase, Defined Contribution Scheme | 420.90 | 1314.80 | 4 x Basic Salary | #N/A | N/K | N/A | N/K | N/K | Yes | N/A | 6 weeks OSP, 140 days SSP | Not Known | #N/A | #N/A | #N/A | Not Known | 25 |
| 2484 | APE Projects,C2 | Wylan | Prudential Stakeholder, Money Purchase, Defined Contribution Scheme | 555.60 | 2989.00 | 4 x Basic Salary | #N/A | N/K | N/A | N/K | N/K | Yes | N/A | 6 weeks OSP, 140 days SSP | Not Known | #N/A | #N/A | #N/A | Not Known | 25 |
| 2484 | APE Projects,C2 | Keith | Prudential Stakeholder, Money Purchase, Defined Contribution Scheme | 1107.60 | 5059.70 | 4 x Basic Salary | #N/A | N/K | N/A | N/K | N/K | Yes | N/A | 6 weeks OSP, 140 days SSP | Not Known | #N/A | #N/A | #N/A | Not Known | 25 |
| 2485 | APE Projects,C2 | White | | 0.00 | 0.00 | N/A | #N/A | N/K | N/A | N/K | N/K | Yes | N/A | 6 weeks OSP, 140 days SSP | Not Known | #N/A | #N/A | #N/A | Not Known | 25 |
| 2487 | APE Projects,C2 | Tomkins | | 0.00 | 0.00 | N/A | #N/A | N/K | N/A | N/K | N/K | Yes | N/A | 6 weeks OSP, 140 days SSP | Not Known | #N/A | #N/A | #N/A | Not Known | 25 |
| 2487 | APE Projects,C2 | Peterson | | 0.00 | 0.00 | N/A | #N/A | N/K | N/A | N/K | N/K | Yes | N/A | 6 weeks OSP, 140 days SSP | Not Known | #N/A | #N/A | #N/A | Not Known | 25 |
| 2488 | APE Sales and Admin,C1 | Lightfoot | | 0.00 | 0.00 | N/A | #N/A | N/K | N/A | N/K | N/K | Yes | N/A | 6 weeks OSP, 140 days SSP | Not Known | #N/A | #N/A | #N/A | Not Known | 25 |
| 3495 | APE Projects,C2 | Freeman | | 1750.50 | 5251.56 | 4 x Basic Salary | BUPA Single | N/K | N/A | N/K | N/K | Yes | N/A | 6 weeks OSP, 140 days SSP | Not Known | #N/A | #N/A | #N/A | Not Known | 25 |
| 4388 | APE Projects,C2 | Swindlehurst | UTC (UK) Pension Scheme, Defined Benefit, Contracted Out | 1560.84 | 4682.52 | 4 x Basic Salary | #N/A | N/K | N/A | N/K | N/K | Yes | N/A | 26 weeks OSP, 140 days SSP | Not Known | #N/A | #N/A | #N/A | Not Known | 25 |
| 4551 | APE Projects,C2 | Stathearns | UTC (UK) Pension Scheme, Defined Benefit, Contracted Out | 1406.84 | 4019.80 | 4 x Basic Salary | #N/A | N/K | N/A | N/K | N/K | Yes | N/A | 26 weeks OSP, 140 days SSP | Not Known | #N/A | #N/A | #N/A | Not Known | 25 |
| 4561 | APE Projects,C2 | Dugdale | UTC (UK) Pension Scheme, Defined Benefit, Contracted Out | | | | | | | | | | | | | | | | | | |

| ID | Dept Name/Cost Centre Code | Surname | Home Relocation/New Spouse Assistance | Stock Option Scheme | Share Save Scheme | Share Purchase Scheme | Employee Savings Plan | Childcare Assistance | Season Ticket/Travel Assistance Loan | Other Employee Loan | Educational Assistance | Professional Subscriptions | Subsidised Canteen | Corporate Discounts | Concessionary Travel Scheme | Sports and Social Clubs | Car Parking | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Salary Sacrifice Scheme | | BA Lifeworks: £340 paid by company and then reclaimed over 12 months: 1 payment £85 and 11 payments of £24 | HNCU and Employee Scholar Programme | | | Yes, When on the Bentham Site | Not Known | | | Car Parking is available to all staff at Bentham. In April 2012 Nottingham City Council are introducing a parking levy of £279.00 per space | |
| 14 | AFE Projects.C2 | Curzon | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 118 | AFE Projects.C2 | Hodger | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 242 | AFE Projects.C2 | King | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 511 | AFE Projects.C2 | Chandler | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 1558 | AFE Sales and Admin.C1 | King | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 1557 | AFE Projects.C2 | Burr | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 1567 | AFE Projects.C2 | Woodbridge | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 1446 | AFE Sales and Admin.C1 | Hopcroft | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 2001 | AFE Projects.C2 | Patey | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 2020 | AFE Projects.C2 | Williams | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 2144 | AFE Projects.C2 | Anderson | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 2185 | AFE Projects.C2 | Simpson | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 2253 | AFE Projects.C2 | Barnes | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 2254 | AFE Projects.C2 | Southwood | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 2264 | AFE Projects.C2 | Jones | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 2287 | AFE Projects.C2 | Tipping | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 2292 | AFE Projects.C2 | Breah | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 2301 | AFE Projects.C2 | Scott | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 2312 | AFE Projects.C2 | Walker | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 2362 | AFE Sales and Admin.C1 | Dandy | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 2383 | AFE Projects.C2 | Lee | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 2416 | AFE Projects.C2 | Boustight | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 2422 | AFE Projects.C2 | Nylam | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 2444 | AFE Projects.C2 | Hele | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 2455 | AFE Projects.C2 | White | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 2466 | AFE Projects.C2 | Fenton | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 2467 | AFE Projects.C2 | Parsons | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 2489 | AFE Sales and Admin.C1 | Lightfoot | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 2693 | AFE Projects.C2 | Freeman | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 4593 | AFE Projects.C2 | Hebbelhoven | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 4933 | AFE Projects.C2 | Bielkowicz | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |
| 6941 | AFE Projects.C2 | Dughle | N/A | N/K | N/A | N/A | N/A | Salary Sacrifice Scheme | N/A | N/A | #N/A | Yes, When on the Bentham Site | Not Known | | No | Yes | |

**Part 2**
**US Relevant Employees**