**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | |
| KIDDE-FENWAL, INC.,[1] | Chapter 11 |
| Debtor. | Case No. 23-10638 (___) |

**MOTION OF DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS**
**(I) AUTHORIZING THE DEBTOR TO PAY PREPETITION TRADE CLAIMS,**
**(II) GRANTING ADMINISTRATIVE EXPENSE PRIORITY TO ALL UNDISPUTED**
**OBLIGATIONS ON ACCOUNT OF OUTSTANDING ORDERS, (III) AUTHORIZING**
**FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS**
**AND TRANSFERS AND (IV) GRANTING RELATED RELIEF**

Kidde-Fenwal, Inc. (the "Debtor") hereby submits this motion (this "Motion") for

entry of an interim order, substantially in the form attached hereto as Exhibit A (the "Interim

Order"), and a final order, substantially in the form attached hereto as Exhibit B (the "Final

Order" and together with the Interim Order, the "Orders"), pursuant to sections 105(a), 363,

503(b)(9), 1107(a) and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the

"Bankruptcy Code"), (a) authorizing the Debtor, in its sole discretion, to pay prepetition Trade

Claims (as defined below), (b) granting administrative expense priority to all undisputed

obligations on account of Outstanding Orders (as defined below), (c) authorizing applicable

banks and other financial institutions to honor and process related checks and transfers and

(d) granting certain related relief, including scheduling a hearing to consider approval of the

Motion on a final basis (the "Final Hearing").  Certain facts supporting this Motion are set forth

in the *Declaration of James A. Mesterharm in Support of Chapter 11 Petition and First Day*

---

[1]    The last four digits of Kidde-Fenwal, Inc.'s tax identification number are 5282.  The Debtor's corporate
headquarters is located at 400 Main Street, Ashland, Massachusetts 01721.

*Pleadings* (the "<u>First Day Declaration</u>").  In further support of the Motion, the Debtor respectfully states as follows:

## <u>Background</u>

1.      The Debtor is a Delaware corporation with its headquarters in Ashland, Massachusetts.  The Debtor manufactures fire protection and suppression systems, including fire detectors, alarm notification appliances, fire-suppression control units and fire suppression-agent delivery systems.  The Debtor also manufactures electronic gas burner controls, mechanical temperature controls and fire and overheat detectors.

2.      On the date hereof (the "<u>Petition Date</u>"), the Debtor filed with the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") a voluntary petition for relief under the Bankruptcy Code.  The Debtor continues to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no creditors' committee, trustee or examiner has been appointed in the Debtor's chapter 11 case (the "<u>Chapter 11 Case</u>").

3.      Additional factual background relating to the Debtor's business and the commencement of this Chapter 11 Case is set forth in the First Day Declaration.

## <u>Facts Specific to the Relief Requested</u>

**I.      Critical Vendors**

4.      The Debtor's supply chain consists of certain indispensable vendors and suppliers (collectively, the "<u>Critical Vendors</u>") that provide raw materials and services that are essential to the Debtor's operations (collectively, the "<u>Critical Products and Services</u>").  Without these Critical Products and Services, the Debtor would be unable to meet the needs of its business, produce its products, effectively serve its customers or maintain its market share and reputation within the fire suppression and safety industry.

5.      The Debtor obtains the Critical Products and Services from highly specialized vendors, often on an order-by-order basis and without long-term contracts.  The Debtor believes that the trade relationships with the Critical Vendors may materially deteriorate if, due to the commencement of this Chapter 11 Case, the Debtor is unable to pay the Critical Vendor Claims (as defined below) as requested herein.  As such, it is essential that the Debtor retains the ability to pay a portion of prepetition Critical Vendor Claims that are necessary to maintain the stability of the Debtor's supply chain.

6.      The Debtor relies on the Critical Vendors to fulfill its customer obligations.  Many of the Critical Vendors provide unique materials and services that would be difficult, if not impossible, to replace without incurring significant costs or significant disruption to the Debtor's business.  These essential materials and services include high/low pressure cylinders, specialized fire suppressant gases, flex hoses and couplings, valves, storage for compressed chemicals, electronics, fabrication, switches, relays, sensors, castings and chemicals. Given their nature, many of the Critical Products and Services are available only from a sole or limited source.  If the Critical Vendors cease providing the Critical Products and Services to the Debtor, the Debtor may not be able to locate alternative sources on reasonable commercial terms, or at all.  Further, a change in vendor or materials due to the failure of Critical Vendors to fulfill their obligations to the Debtor would result in the requirement of new governmental or regulatory and customer approvals such that replacing such vendors may take six to eight months, if not more.  Even a temporary halt of the provision of Critical Products and Services would significantly reduce the efficiency of the Debtor's operations and, in certain instances, could require the suspension of operations altogether.  Such a delay would also prevent the Debtor from honoring existing commitments to customers.  This potential harm and disruption

would far outweigh the costs of payment of the Critical Vendor Claims.  Accordingly, maintaining the ability to pay Critical Vendor Claims will stabilize the Debtor's operations, assist with the Debtor's reorganization efforts and ultimately maintain stakeholder value.

7.      In the 12 months prior to the Petition Date, the Debtor paid approximately $147 million on account of all accounts payable to the Debtor's vendors and suppliers.  By this Motion, the Debtor is only seeking authority to pay an amount necessary to preserve the value of its estate, which shall not exceed $1.68 million on an interim basis and $3.35 million on a final basis, on account of prepetition claims held by Critical Vendors and accrued in the ordinary course of business (collectively, the "Critical Vendor Claims").  The Debtor is not seeking to pay all Critical Vendor Claims immediately.  Rather, if authorized by the Court, the Debtor will process only those payments it determines in its business judgment to be critical in accordance with its normal accounts payable procedures, as they become due and payable in the ordinary course of business and consistent with past practice.

## II.      Foreign Vendors

8.      A critical component of the Debtor's business also involves transactions with foreign vendors (collectively, "Foreign Vendors").  In the ordinary course of business, the Debtor incurs obligations to numerous suppliers of goods and services that are crucial to the Debtor's ongoing operations and whose assets are located exclusively outside of the United States.  Maintaining existing relationships with the Foreign Vendors is critical to continuing the Debtor's business, and replacing these Foreign Vendors would be time-consuming, impracticable (and in many local jurisdictions, impossible) and cost prohibitive.

9.      Foreign Vendors are also often skeptical and unfamiliar with the United States bankruptcy process.  Short of severing their contractual relations with the Debtor, nonpayment of prepetition claims may cause the Foreign Vendors to take other precipitous

actions, including delaying shipments or the provision of services, or initiating a lawsuit in a foreign court to collect prepetition amounts owed to them.  Although the automatic stay applies to protect the Debtor's assets wherever located, the Foreign Vendors may erroneously believe that they are not subject to, or otherwise ignore, the automatic stay of section 362 of the Bankruptcy Code.  Moreover, attempting to enforce the Bankruptcy Code in foreign countries may be impractical or uneconomical.

10.    In light of this, the Debtor believes that payment of all prepetition claims held by Foreign Vendors and accrued in the ordinary course of business (the "Foreign Vendor Claims") is essential to avoid disruption of the Debtor's operations during this Chapter 11 Case. In the 12 months prior to the Petition Date, the Debtor paid approximately $34.5 million on account of all accounts payable to the Debtor's Foreign Vendors.  As of the Petition Date, the Debtor estimates that there is approximately $1.65 million owed on account of Foreign Vendor Claims.  By this Motion, the Debtor is seeking authority to pay the Foreign Vendor Claims in an amount not to exceed $825,000 on an interim basis and $1.65 million on a final basis.  The Debtor is not seeking to pay all Foreign Vendor Claims immediately.  Rather, if authorized by the Court, the Debtor will process only those payments as they become due and payable in the ordinary course of business and consistent with past practice.

III.    **Health and Safety Claims**

11.    In the ordinary course of business, the Debtor also incurs obligations to certain suppliers of goods and services utilized in the Debtor's operations, payment of which may be reasonably necessary to ensure the health, safety, environmental and regulatory compliance and integrity of the Debtor's operations (collectively, the "HSE Vendors").  The HSE Vendors provide services such as health and safety inspections and evaluations of the production environment, equipment and processes in working areas to ensure compliance with

government safety regulations and industry standards.  Health suppliers typically provide goods
or services that test, measure and report effects of the Debtor's materials on the physical
environment, customers and employees.  Safety suppliers provide goods or services that protect
personnel from risk involved during any type of operation and duties, such as providing safety
uniforms and defining protocols for onsite hazards.  The environmental suppliers provide
products, services and recommendations to promote protection of environments, which may be
affected by certain activities associated with the Debtor's operations.  Finally, certain of the HSE
Vendors also provide back-office goods and services, the interruption of which would pose
significant safety risks to on-site operations.

12.    The Debtor needs to satisfy the HSE Claims in the ordinary course to
ensure the continued health, safety and environmental compliance of its operations.
Accordingly, the Debtor believes that payment of all prepetition claims held by HSE Vendors
and accrued in the ordinary course of business (the "HSE Claims") is essential.  In the 12 months
prior to the Petition Date, the Debtor paid approximately $78,500 on account of all accounts
payable to the HSE Vendors.  As of the Petition Date, the Debtor does not believe that it owes
any amounts on account of the HSE Claims.  Out of an abundance of caution, however, the
Debtor is seeking authority to pay any HSE Claims that may exist, in an amount not to exceed
$20,000 on an interim basis and $40,000 on a final basis.

## IV.    503(b)(9) Claims

13.    Certain Critical Vendors, Foreign Vendors or HSE Vendors may have
delivered goods to the Debtor within 20 days prior to the Petition Date.  Section 503(b)(9) of the
Bankruptcy Code provides that such claims (the "503(b)(9) Claims") hold administrative
expense priority against the applicable Debtor's estate.  Such 503(b)(9) Claims, therefore, must
be paid in full to confirm a plan of reorganization.  *See* 11 U.S.C. §§ 1129(a)(9)(A) (requiring

payment in full of claims entitled to priority).  Consequently, payment of such claims now only provides such parties with what they would be entitled to receive under a confirmed plan. Moreover, the Bankruptcy Code does not prohibit a debtor from paying administrative claims prior to confirmation.  The Debtor believes that payment of such 503(b)(9) Claims is in the best interest of the Debtor's estate and will prevent detrimental changes to trade terms or a refusal to do business together.

14.     The Debtor also believes that such payments will further induce Critical Vendors, Foreign Vendors or HSE Vendors to adhere to favorable trade terms and continue business on a go-forward basis.  Failure to honor these claims in the ordinary course of business—which may merely accelerate the timing of payment and not the ultimate treatment of such claims—may also cause the Debtor's vendor base to withhold support for the Debtor during the chapter 11 process.  The payment of 503(b)(9) Claims will prevent material disruptions to the Debtor's business, and failure to pay could impair the Debtor's ability to stabilize its business at this critical juncture to the detriment of all stakeholders.  The Debtor estimates that, as of the Petition Date, approximately $3.6 million is owed to Critical Vendors, Foreign Vendors or HSE Vendors on account of 503(b)(9) Claims.  For the avoidance of doubt, the Critical Vendor Claims, Foreign Vendor Claims and HSE Claims are inclusive of the 503(b)(9) Claims and the Debtor is not seeking to pay an additional $3.6 million.

## V.     Outstanding Orders

15.     Additionally, in the ordinary course of business, the Debtor may have ordered goods prior to the Petition Date which were not, or will not be, delivered until after the Petition Date (the "Outstanding Orders").  In the mistaken belief that they would be general unsecured creditors of the Debtor's estate with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such

Outstanding Orders unless the Debtor issues substitute purchase orders postpetition. To prevent any disruption to the Debtor's business operations, and given that goods delivered after the Petition Date are afforded administrative expense priority under section 503(b) of the Bankruptcy Code, the Debtor seeks authorization to (a) grant administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtor arising from the postpetition acceptance of goods subject to Outstanding Orders and (b) pay amounts due on account of Outstanding Orders in the ordinary course of business.

## VI.    Lien Claims

16.    The Debtor transacts business with third parties (the "Lien Claimants") who (a) may assert various statutory liens against the Debtor and its property if the Debtor fails to pay for services rendered or (b) subcontract with parties who may assert various statutory liens against the Debtor and its property if the Debtor fails to pay the contractor (the "Lien Claims" and, together with the Critical Vendor Claims, the Foreign Vendor Claims, the HSE Claims and the 503(b)(9) Claims, the "Trade Claims" and the holders of the Trade Claims, collectively, the "Vendors"). The Lien Claimants consist of vendors who provide shipping, freight, storage, construction and other related services.

17.    To the extent any Lien Claimant has perfected a lien on any of the Debtor's property or, in the Debtor's estimation, could assert and perfect a lien on any such property, it is imperative that the Debtor be authorized to pay such Lien Claimant, regardless of whether their claim arose prior to or after the Petition Date. Such payment will be conditioned on the release of any perfected lien and the Debtor's continued uninterrupted access to the goods and services provided by the Lien Claimants. Further, if amounts owed to the Lien Claimants are not paid, certain of the Lien Claimants may be able to assert and perfect liens against certain of the Debtor's goods or property, notwithstanding the automatic stay imposed by section 362 of

the Bankruptcy Code.  Accordingly, by this Motion, the Debtor is seeking authority to pay Lien

Claims in an amount not to exceed $730,000 on an interim basis and $1.46 million on a final

basis.

**VII.    Proposed Trade Terms and Conditions**

18.    To facilitate the payment of Trade Claims, the Debtor also requests that all

payments be subject to the following conditions:

a.    The Debtor, in its sole discretion, subject to the terms set forth below, shall determine which Trade Claims, if any, will be paid pursuant to the Orders;

b.    If a Vendor accepts payment, such Vendor is deemed to have agreed to continue to provide goods and/or services to the Debtor, on terms that are as good as, or better than, the terms and conditions (including credit terms) contained in any binding prepetition contract with the Debtor or, in the absence of such contract, such terms and conditions that existed as of 120 days prior to the Petition Date (collectively, the "Customary Terms"), during the pendency of this Chapter 11 Case;

c.    In the event that a Vendor does not have a binding prepetition contract with the Debtor, and the relationship between such Vendor and the Debtor does not extend to 120 days before the Petition Date, the Customary Terms shall mean the terms that the Vendor generally extends to its customers or such terms as are acceptable to the Debtor in the reasonable exercise of its business judgment;

d.    If a Vendor accepts payment and thereafter does not continue to provide goods and/or services on at least the Customary Terms (or as otherwise agreed by the Debtor) during the pendency of this Chapter 11 Case, then the Debtor may, in its sole discretion, deem (a) any payment on a prepetition claim received by such Vendor to be an unauthorized voidable postpetition transfer under section 549 of the Bankruptcy Code and, therefore, (i) recoverable by the Debtor in cash upon written request and (ii) upon recovery by the Debtor, any such prepetition claim shall be reinstated as if the payment had not been made; or (b) such payment to apply instead to any postpetition amount that may be owing to such Vendor;

e.    If the Debtor seeks to recover a payment from a Vendor because the Vendor does not continue to provide goods and/or services to

the Debtor on at least the Customary Terms during the pendency of and after this Chapter 11 Case, the Vendor may contest such action by making a written request (a "Request") to the Debtor to schedule a hearing before this Court.  If such a Request is made, the Debtor shall provide notice of a hearing on such Request to the Vendor making the Request and other interested parties; and

f.   Prior to making a payment on a disputed claim to a Vendor under the Orders, the Debtor may settle all or some of the disputed prepetition claims of such Vendor for less than their face amount without further notice or hearing.

### Jurisdiction

19.    The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105(a), 363, 503(b)(9), 1107(a) and 1108 of the Bankruptcy Code.  Pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtor consents to the entry of a final order or judgment by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

### Relief Requested

20.    By this Motion, the Debtor requests entry of the Interim and Final Orders, substantially in the forms attached hereto as Exhibit A and Exhibit B, respectively, (a) authorizing the Debtor, in its sole discretion, to pay prepetition Trade Claims as set forth below, (b) granting administrative expense priority to all undisputed obligations on account of Outstanding Orders, (c) authorizing applicable banks and other financial institutions to honor and

process related checks and transfers and (d) granting certain related relief, including scheduling the Final Hearing.

| Category | Final Amount (inclusive of the Interim Amount) | Interim Amount |
|---|---|---|
| Critical Vendors | $3,350,000 | $1,675,000 |
| Foreign Vendors | $1,650,000 | $825,000 |
| Health and Safety Claims | $40,000 | $20,000 |
| Lien Claims | $1,460,000 | $730,000 |
| **Total** | **$6,500,000** | **$3,250,000** |

## Basis for Relief

**I.     Payment of the Trade Claims Is Appropriate Under Sections 105(a), 363(b), 1107(a) and 1108 of the Bankruptcy Code.**

21.     The relief requested is appropriate under sections 105(a), 363(b), 1107(a) and 1108 of the Bankruptcy Code.  The Debtor is operating its business as a debtor-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code, and is therefore a fiduciary "holding the bankruptcy estate and operating the business for the benefit of its creditors and (if the value justifies) equity owners."  *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the duties of a chapter 11 debtor-in-possession is the duty "to protect and preserve the estate, including an operating business's going-concern value."  *Id.*  Consistent with a debtor's fiduciary duties to preserve the estate, courts have authorized payment of prepetition obligations pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.  *See, e.g.*, *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("the bankruptcy court has considerable discretion" in granting motions pursuant to section 363(b)); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (stating that section 363(b) provides a court "broad flexibility" to authorize a debtor to satisfy prepetition claims where supported by a proper business justification); *In re Just for Feet, Inc.*, 242 B.R. 821, 824 (D. Del. 1999) ("Section 105(a) of the

Code provides a statutory basis for the payment of pre-petition claims.").  Indeed, courts have recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim." *In re CoServ, L.L.C.*, 273 B.R. at 497.

22.     Section 363(b) of the Bankruptcy Code empowers the Court to allow a debtor, in the exercise of its sound business judgment and after notice and a hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate." *See* 11 U.S.C. § 363(b)(1); *see also In re Just For Feet, Inc.*, 242 B.R. at 825 ("The Supreme Court, the Third Circuit, and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11."). For a court to approve the use, sale, or lease of estate property under section 363(b) of the Bankruptcy Code, including the payment of prepetition claims, the debtor must "articulate some business justification, other than mere appeasement of major creditors . . . ." *In re Ionosphere Clubs, Inc.*, 98 B.R. at 175; *see also In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 939 (Bankr. D. Del. 1992) (recognizing that "[i]f payment of a pre-petition claim 'is essential to the continued operation of [the debtor], payment may be authorized'") (citing *In re Lehigh & N.E. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981)).  Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted).  Under this section, a court may authorize a debtor to pay certain prepetition claims.  *See In re Ionosphere Clubs, Inc.*, 98 B.R. at 175 (stating that the bankruptcy court's prior determination to permit payment of prepetition claims under section 363(b) was justified).

23.    Additionally, section 105(a) of the Bankruptcy Code authorizes the Court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *In re Ionosphere Clubs, Inc.*, 98 B.R. at 175. Under section 105(a), the Court "can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor." *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992); *see also In re Just for Feet, Inc.*, 242 B.R. at 825 ("To invoke the necessity of payment doctrine, a debtor must show that payment of the pre-petition claims is critical to the debtor's reorganization."); *see also In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996) (recognizing that the doctrine of necessity "permits the bankruptcy court to authorize the payment of prepetition claims prior to confirmation").

24.    Courts in this district have recognized the "necessity of payment" doctrine. *See, e.g.*, *In re Energy Future Holdings Corp.*, 561 B.R. 630, 642-43 (Bankr. D. Del. 2016) ("The Third Circuit has explained that a 'necessity of payment' rule is intended to benefit all parties and is applicable when such payment is critical to the Debtors' reorganization."); *In re Lehigh & N. E. Ry. Co.*, 657 F.2d at 581 ("[T]he 'necessity of payment' doctrine . . . teaches no more than, if payment of a claim which arose prior to reorganization is essential to the continued operation of the [debtor] during reorganization, payment may be authorized even if it is made out of corpus.").

25.    The necessity of payment doctrine is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs, Inc.*, 98 B.R. at 176; *In re Chateaugay Corp.*, 80 B.R. 279, 287

(S.D.N.Y. 1987) (authorizing payment of prepetition workers' compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately"); *In re Just for Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[A] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re CoServ, L.L.C.*, 273 B.R. at 497 ("[I]t is only logical that the bankruptcy court be able to use Section 105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process").

26.     The payment of the Trade Claims represents a sound exercise of the Debtor's business judgment and is necessary for the Debtor's operations and the going concern value of its estate.  Payment of the Trade Claims as they become due in the ordinary course of business is critical to the Debtor's uninterrupted operations as such payments will facilitate the ongoing delivery of goods and services required by the Debtor to fulfill customer orders and continue generating revenue.  Nonpayment of the Trade Claims would likely result in Vendors refusing to provide essential goods and services and/or conditioning the delivery of such goods and services in compliance with onerous and commercially unreasonable terms.  This could cause irreparable harm to the Debtor's business, goodwill and market share.  Replacement

vendors and the search for such vendors, to the extent even available, would likely result in substantially higher costs for the Debtor and subject the Debtor to risk of operational shutdown and noncompliance with health and safety regulations.

27.    Moreover, the Debtor cannot rely on bringing individual motions to compel the Vendors to perform.  Disruptions may occur before the Debtor would be able to successfully bring an action before the Court to compel performance or otherwise enforce the automatic stay.  In addition, the Debtor interacts with the Vendors pursuant to a variety of arrangements, including many arrangements that may not be executory in nature.  These counterparties may decide not to continue to conduct business with the Debtor unless paid on account of prepetition amounts, and would be under no obligation to do so.

28.    Courts in this district have routinely granted relief similar to the relief requested herein.  *See, e.g.*, *In re Boxed, Inc.*, No. 23-10397 (BLS) (Apr. 25, 2023), D.I. 162 (approving payment to critical vendors, foreign vendors and lien claimants); *In re TPC Group Inc.*, No. 22-10493 (CTG) (June 7, 2022), D.I. 341 (authorizing payment to critical vendors, certain suppliers and lien claimants); *In re Akorn, Inc.*, No. 20-11177 (KBO) (June 11, 2020), D.I. 161 (authorizing payment to critical vendors, foreign vendors and lien claimants); *In re Bluestem Brands, Inc.*, No. 20-10566 (MFW) (Mar. 30, 2020), D.I. 151 (authorizing payment to foreign vendors and lien claimants); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (July 13, 2020), D.I. 239 (authorizing payment to foreign vendors, lien claimants and health and safety suppliers, among others);  *In re Mallinckrodt PLC*, No. 20-12522 (JTD) (Nov. 14, 2020), D.I. 465 (authorizing payment to critical vendors and foreign vendors).  Accordingly, the Debtor submits that the relief requested herein is necessary, appropriate and in the best interest of the Debtor's estate.

II.        **The Court Should Authorize the Payment of 503(b)(9) Claims.**

29.        Section 503(b)(9) of the Bankruptcy Code provides administrative priority

for the "value of any goods received by the debtor within 20 days before the date of

commencement of a case under this title in which goods have been sold to the debtor in the

ordinary course of such debtor's business."  These claims must be paid in full for the Debtor to

confirm a chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(9)(A).  Consequently, payment of such

claims now only provides such parties with what they would be entitled to receive under a

chapter 11 plan.  Moreover, the timing of such payments also lies squarely within the Court's

discretion.  *See In re Global Home Prods., LLC*, No. 06-10340 (KG), 2006 WL 3791955, at *3

(Bankr. D. Del. Dec. 21, 2006) (agreeing with parties that "the timing of the payment of that

administrative expense claim is left to the discretion of the Court"); 4 Collier on Bankruptcy ¶

503.16[3] (Richard Levin & Henry J. Sommer eds., 16th ed.) ("[P]rior to confirmation

bankruptcy courts have discretion to determine when section 503(b)(9) claims should be paid.").

The Debtor's ongoing ability to obtain goods as provided herein is key to its survival and

necessary to preserve its operations.  Absent payment of the 503(b)(9) Claims at the outset of

this Chapter 11 Case—which merely accelerates the timing of payment and not the ultimate

treatment or recovery of such claims—the Debtor could be denied access to the goods necessary

to maintain the Debtor's business and maximize the value of the Debtor's estate.

30.        Moreover, the Bankruptcy Code does not prohibit a debtor from paying

such claims prior to confirmation.  As administrative claims incurred in the ordinary course of

business, the Debtor believes it may pay such claims in accordance with its business judgment

pursuant to section 363(c)(1) of the Bankruptcy Code.  *See, e.g.*, Hr'g Tr. at 49:21–23, *In re

Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), D.I. 153 ("THE COURT: . . . I think arguably the

debtor could pay its 503(b)(9) claimants without court approval.").  Again, the timing of such

payments lies squarely within the Court's discretion.  *See In re Glob. Home Prods., LLC*, No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006).

31.     Courts in this district have routinely granted relief similar to the relief requested herein.  *See, e.g.*, *In re Boxed, Inc.*, No. 23-10397 (BLS) (Apr. 25, 2023), D.I. 162 (authorizing payment to 503(b)(9) claimants); *In re Gold Standard Baking, LLC*, No. 22-10559 (JKS) (July 18, 2022), D.I. 136 (same); *In re TPC Group Inc.*, No. 22-10493 (CTG) (June 7, 2022), D.I. 341 (same); *In re Akorn, Inc*., No. 20-11177 (KBO) (June 11, 2020), D.I. 161 (same). Accordingly, the Debtor submits that the payment of 503(b)(9) Claims is necessary, appropriate and in the best interest of the Debtor's estate.

### III.     Failure to Pay Certain of the Lien Claims Could Subject the Debtor's Assets to the Perfection of Statutory Liens.

32.     Certain potential Lien Claimants may be entitled under applicable non-bankruptcy law to assert certain possessory liens on the Debtor's goods or equipment in its possession (notwithstanding the automatic stay under section 362 of the Bankruptcy Code) in an attempt to secure payment of their prepetition claims.

33.     Without payment, the potential Lien Claimants may be unwilling to release the goods in their possession against which they may be entitled to assert liens because doing so may convert their claims against the Debtor from secured to unsecured.  Pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting certain possessory liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.  As a result, the Debtor anticipates that certain of the potential Lien Claimants may assert or perfect liens, refuse to turn over goods in their possession or stop performing their ongoing obligations.  Even absent a valid lien, to the extent certain potential Lien Claimants have possession over the Debtor's goods, mere possession or retention may be problematic for the

Debtor's ongoing business.  Further, even a temporary halt of the provision of Critical Products and Services because of a failure to pay the potential Lien Claimants would reduce the efficiency of the Debtor's operations and, in certain instances, could require the suspension of operations altogether.  Payment of the potential Lien Claimants as they become due in the ordinary course of business will therefore facilitate the flow of goods to the Debtor, allow the Debtor to continue its operations uninterrupted and ultimately maximize the value of the Debtor's estate.

34.     Courts in this district have routinely granted relief similar to the relief requested herein.  *See, e.g.*, *In re Boxed, Inc.*, No. 23-10397 (BLS) (Apr. 25, 2023), D.I. 162 (approving payment to lien claimants); *In re TPC Group Inc.*, No. 22-10493 (CTG) (June 7, 2022), D.I. 341 (same); *In re Akorn, Inc.*, No. 20-11177 (KBO) (June 11, 2020), D.I. 161 (same); *In re Bluestem Brands, Inc.*, No. 20-10566 (MFW) (Mar. 30, 2020), D.I. 151; *In re Dura Auto. Sys.*, LLC, No. 19-12378 (KBO) (Nov. 19, 2019), D.I. 337 (same).  Accordingly, the Debtor submits that the relief requested herein is necessary, appropriate and in the best interest of the Debtor's estate.

## IV.   The Court Should Confirm that Outstanding Orders Are Administrative Expense Priority Claims and that Payment of Such Claims Is Authorized.

35.     Pursuant to section 503(b) of the Bankruptcy Code, most obligations that arise in connection with the postpetition delivery of goods and services, including goods ordered prepetition, are administrative expense priority claims because they benefit the estate prepetition. *See* 11 U.S.C. § 503(b)(1)(A) (providing that the "actual [and] necessary costs and expenses of preserving the estate" are administrative expenses); *see also In re John Clay & Co.*, 43 B.R. 797, 809-10 (Bankr. D. Utah 1984) (holding that goods ordered prepetition but delivered postpetition are entitled to administrative priority).  Thus, the granting of the relief sought herein with respect

to the Outstanding Orders will not provide the suppliers with any greater priority, and will not prejudice any other party-in-interest.

36.     Absent such relief, however, the Debtor may be required to expend substantial time and effort reissuing the Outstanding Orders to provide certain suppliers with assurance of such administrative priority.  The attendant disruption and delay to the continuous and timely flow of goods and services to the Debtor could further disrupt the Debtor's business, and lead to a loss of revenue, all to the detriment of the Debtor and its creditors.

37.     Courts in this district have routinely granted relief similar to the relief requested herein.  *See*, *e.g.*, *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (July 13, 2020), D.I. 239 (granting administrative expense priority to all undisputed obligations on account of outstanding orders); *In re Akorn, Inc*., No. 20-11177 (KBO) (June 11, 2020), D.I. 161 (same); *In re 24 Hour Fitness Worldwide, Inc.*, No. 20-11558 (KBO) (July 13, 2020), D.I. 539 (same). Accordingly, the Debtor submits that the relief requested herein is necessary, appropriate and in the best interest of the Debtor's estate.

**V.     Cause Exists to Authorize Applicable Banks and/or Financial Institutions to Honor Checks and Electronic Fund Transfers.**

38.     In order to stabilize the Debtor's operations and to smoothly transition into chapter 11, it is imperative that the Debtor maintains its ability to perform its most basic functions.  The Debtor therefore requests that all applicable banks and other financial institutions should be authorized, when requested by the Debtor in its discretion, to receive, process, honor and pay any and all checks and fund transfer requests made by the Debtor related to the Trade Claims, whether such checks or fund transfer requests were submitted prior to or after the Petition Date.  Any such financial institution may rely on the representations of the Debtor as to which checks and fund transfer requests are made and authorized to be paid in accordance with

this Motion without any duty of further inquiry and without liability for following the Debtor's instructions. The Debtor also seeks authority to issue new postpetition checks, or effect new electronic funds transfers, to replace any prepetition checks or electronic funds transfer requests that may be dishonored or rejected as a result of the commencement of this Chapter 11 Case with respect to amounts owed in connection with the Trade Claims.

### **Bankruptcy Rule 6003 Is Satisfied**

39.     In order for a debtor to obtain relief to make payments within 21 days of the Petition Date, it must establish that making such payments satisfies the requirements mandated by rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") —namely, the relief requested is necessary to avoid "immediate and irreparable harm."  If a debtor's prospect of reorganizing is threatened, or swift diminution in value of the debtor's estate is likely absent the granting of the requested relief, immediate and irreparable harm likely exists. *See In re WorldSpace, Inc.*, 2008 WL 8153639, at *2 (Bankr. D. Del. Oct. 20, 2008) (finding that relief requested by the debtors was necessary to avoid irreparable harm to the debtors and their estates because such relief was essential for the continued operation of the debtors' businesses).

40.     Immediate and irreparable harm would result if the relief requested herein is not granted.  Access to the goods and services supplied by the Vendors is essential to the preservation of the value of the Debtor's business and assets.  Should any Vendor refuse or discontinue service, even for a brief period, the Debtor's business could be severely disrupted, and such disruption would jeopardize the Debtor's operations. These effects would have an adverse impact to the Debtor's business, thereby causing immediate and irreparable harm.

41.     Failure to receive the requested relief during the first 21 days of this Chapter 11 Case would severely disrupt the Debtor's operations at this important juncture.  For the reasons discussed herein, the relief requested is necessary for the Debtor to operate its

business in the ordinary course and preserve the value of the Debtor's assets and maximize the value of the estate for the benefit of all stakeholders.  Accordingly, the Debtor respectfully submits that it has satisfied Bankruptcy Rule 6003 as it relates to the relief requested herein.

### Waiver of Bankruptcy Rules 6004(a) and 6004(h)

42.      Given the nature of the relief requested herein, the Debtor respectfully requests a waiver of (a) the notice requirements under Bankruptcy Rule 6004(a) and (b) the 14-day stay under Bankruptcy Rule 6004(h).  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until expiration of 14 days after entry of the order, unless the court orders otherwise."  For the reasons described above, the relief requested is essential to prevent potentially irreparable damage to the Debtor's operations, value and ability to reorganize.

### Reservation of Rights

43.      Nothing in this Motion:  (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtor or its estate; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Debtor or its estate to contest the validity, priority, or amount of any claim against the Debtor or its estate; (c) shall impair, prejudice, waive, or otherwise affect the rights of the Debtor or its estate with respect to any and all claims or causes of action against any third party; or (d) shall be construed as a promise to pay a claim or continue any applicable program postpetition, which decision shall be in the discretion of the Debtor.  Any payment made pursuant to an order of the Court granting the relief requested herein is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtor's rights to subsequently dispute such claim.

## **Notice**

44.    No creditors' committee, trustee or examiner has been appointed in this Chapter 11 Case.  Notice of this Motion has been provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) the Securities and Exchange Commission; (c) the Internal Revenue Service; (d) the United States Department of Justice; (e) the Office of the United States Attorney for the District of Delaware; (f) liaison counsel to the tort claimants; (g) the state attorneys general who have commenced litigation proceedings against the Debtor; (h) the parties identified on the Debtor's list of top 20 counsel; and (i) to the extent not listed herein, those parties requesting notice pursuant to Bankruptcy Rule 2002.  Notice of this Motion and any order entered in connection with this Motion will be served on all parties in accordance with Local Rule 9013-1(m).  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be provided.

## Conclusion

WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests that the Court (a) enter the Interim Order, substantially in the form attached hereto as Exhibit A, (b) enter the Final Order, substantially in the form attached hereto as Exhibit B, and (c) grant such other and further relief as is just and proper.

Dated: May 14, 2023
      Wilmington, Delaware

**MORRIS NICHOLS ARSHT & TUNNELL LLP**

*/s/ Derek C. Abbott*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Daniel B. Butz (No. 4227)
Tamara K. Mann (No. 5643)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
dabbott@morrisnichols.com
aremming@morrisnichols.com
dbutz@morrisnichols.com
tmann@morrisnichols.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (*pro hac vice* pending)
Brian D. Glueckstein (*pro hac vice* pending)
Justin J. DeCamp (*pro hac vice* pending)
Alexa J. Kranzley (*pro hac vice* pending)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
       gluecksteinb@sullcrom.com
       decampj@sullcrom.com
       kranzleya@sullcrom.com

*Proposed Counsel for the Debtor and Debtor-in-Possession*