## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | |
| KIDDE-FENWAL, INC.,[1] | Chapter 11 |
| Debtor. | Case No. 23-10638 (____) |

### MOTION OF DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO (A) CONTINUE TO OPERATE ITS CASH MANAGEMENT SYSTEM, (B) PAY OR HONOR CERTAIN PREPETITION OBLIGATIONS RELATED THERETO AND (C) MAINTAIN ITS BANK ACCOUNTS AND EXISTING BUSINESS FORMS, (II) AUTHORIZING AFFILIATE TRANSACTIONS AND (III) GRANTING RELATED RELIEF

Kidde-Fenwal, Inc. (the "Debtor") hereby submits this motion (this "Motion") for entry of an interim order, substantially in the form attached hereto as Exhibit A (the "Interim Order"), and a final order, substantially in the form attached hereto as Exhibit B (the "Final Order" and together with the Interim Order, the "Orders"), pursuant to sections 105(a), 363(b), 363(c), 503, 1107(a) and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") and rule 2015-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (a) authorizing the Debtor, in its sole discretion, to (i) continue to operate its Cash Management System (as defined below), (ii) pay or honor certain prepetition obligations related thereto and (iii) maintain its existing Bank Accounts (as defined below) and existing Business Forms (as defined below), (b) authorizing Affiliate Transactions (as defined below) and (c) granting certain related relief, including scheduling a hearing to consider approval of the Motion on a final basis (the "Final Hearing").  Certain facts supporting this Motion are set forth in the *Declaration of*

---

[1]    The last four digits of Kidde-Fenwal, Inc.'s tax identification number are 5282.  The Debtor's corporate headquarters is located at 400 Main Street, Ashland, Massachusetts 01721.

*James A. Mesterharm in Support of Chapter 11 Petition and First Day Pleadings* (the "First Day Declaration").  In further support of the Motion, the Debtor respectfully states as follows:

## Background

1. The Debtor is a Delaware corporation with its headquarters in Ashland, Massachusetts.  The Debtor manufactures fire protection and suppression systems, including fire detectors, alarm notification appliances, fire-suppression control units and fire suppression-agent delivery systems.  The Debtor also manufactures electronic gas burner controls, mechanical temperature controls and fire and overheat detectors.

2. On the date hereof (the "Petition Date"), the Debtor filed with the United States Bankruptcy Court for the District of Delaware (the "Court") a voluntary petition for relief under the Bankruptcy Code.  The Debtor continues to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no creditors' committee, trustee or examiner has been appointed in the Debtor's chapter 11 case (the "Chapter 11 Case").

3. Additional factual background relating to the Debtor's business and the commencement of this Chapter 11 Case is set forth in the First Day Declaration.

## Facts Specific to the Relief Requested

### I.    The Cash Management System

4. The Debtor maintains a cash management system to operate its business in the ordinary course, an illustrative schematic of which is attached as Exhibit C (the "Cash Management System").  The Cash Management System allows the Debtor to efficiently collect, transfer and distribute the funds generated by the Debtor's business operations.

5. The Cash Management System is comprised of four bank accounts (such accounts, together with any other bank accounts the Debtor may open in the ordinary course of

business, the "Bank Accounts").  The Bank Accounts consist of (a) an operating account in the

name of the Debtor (the "Debtor Operating Account"), into which cash receipts from customers

on account of the Debtor's business operations are deposited in the ordinary course and from

which wire and ACH payments are disbursed in the ordinary course, (b) a disbursement account

in the name of the Debtor (the "Debtor Disbursement Account"), which is used primarily to

process check disbursements to third parties and certain non-Debtor affiliates to satisfy

obligations arising from the day-to-day operation of the business and (c) an operating account

(the "Autronica Operating Account" and, together with the Debtor Operating Account, the

"Operating Accounts") and a disbursement account (the "Autronica Disbursement Account" and,

together with the Debtor Disbursement Accounts, the "Disbursement Accounts") which, until

recently, were used to collect receipts and process disbursements attributable to the domestic

business activities of non-Debtor affiliate Autronica Fire & Security AS ("Autronica").  The

Autronica Operating Account will be repurposed to be used as the Debtor's utility deposit

account and the Autronica Disbursement Account will be maintained by the Debtor.

        6.        Historically, subject to certain exceptions, any cash remaining in the

Operating Accounts at the close of each business day was swept upstream to a pooling account

held by Kidde PLC Inc., an indirect parent of the Debtor (the "Kidde Pooling Account"), and

then further swept upstream to a concentration account held by the Debtor's ultimate parent,

Carrier Global Corporation ("Carrier") (the "Carrier Concentration Account" and, together with

the Kidde Pooling Account, the "Prepetition Cash Pooling Accounts").  To the extent that

additional cash was needed to cover disbursements processed from either the Operating

Accounts or the Disbursement Accounts, those amounts were funded from the Prepetition Cash

Pooling Accounts.  Through this cash pooling arrangement (the "Prepetition Cash Pool"), the

Debtor and other non-Debtor affiliates utilized non-Debtor Carrier as a central cash repository,

and accounting records of amounts due from or owing to the Debtor and each Carrier affiliate were maintained based on net amounts swept or funded, as applicable.  The Prepetition Cash Pool also facilitated Affiliate Transactions (as defined below) and enabled Carrier to make payments in satisfaction of certain operational and financial obligations of the Debtor, including (but not limited to) certain payroll, tax, and insurance obligations.[2]

7.      At the close of business on May 5, 2023, the Debtor disabled the "zero balance account" functionality at its Bank Accounts, discontinuing the automatic sweeping of the Debtor's excess cash to the Prepetition Cash Pooling Accounts, and began to pool their excess cash at the Debtor Operating Account.  On the same day, Autronica ceased using the Autronica Operating Account and Autronica Disbursement Account and Autronica's cash was transferred to a separate, non-Debtor bank account.  The Debtor owns, and are authorized parties to, the Autronica Operating Account and the Autronica Disbursement Account.

8.      On May 11, 2023, in connection with the termination of the Prepetition Cash Pool in respect of the Debtor and as part of the ongoing reconciliation of the Debtor's intercompany receivables due from Carrier, Carrier remitted to the Debtor approximately $134 million (the "Pool Balance Undisputed Cash") constituting the Debtor's balance against the Prepetition Cash Pool, net of certain agreed offsets and deductions and approximately $40 million of additional offsets and deductions proposed by Carrier (the "Disputed Offsets").  All parties' rights are reserved with respect to the Disputed Offsets.  As of the Petition Date,

---

[2]     As set forth in the *Motion of Debtor for Entry of (I) An Interim Order Authorizing the Debtor to Continue Operating Under the Shared Services Agreement and (II) A Final Order Authorizing the Debtor's Assumption of the Shared Services Agreement* (the "Shared Services Agreement Motion"), filed concurrently herewith, Carrier also allocated certain charges to the Debtor on account of certain corporate and overhead services. These allocations are not addressed by this Motion and the Debtor is not seeking any relief with respect to such charges or allocations in this Motion.

substantially all of the Debtor's cash on hand is comprised of proceeds from its sales operations and the Pool Balance Undisputed Cash.

## II.    The Bank Accounts and Fees

9.      The Bank Accounts are maintained at Bank of America, N.A. (the "Bank").  A schedule of the Bank Accounts, including the last four digits of each account, is attached hereto as Exhibit D.  Disbursements from the Bank Accounts that are made by wire transfer are manually initiated by the Debtor, while ACH payments may be initiated either by the Debtor or by a select group of third-party payment processors.  As of the Petition Date, the Bank Accounts contained a total of approximately $133 million.

10.      In the ordinary course of business, the Bank charges, and the Debtor pays, honors or allows to be deducted from the applicable Bank Account, certain service charges and other fees, costs and expenses charged by the Bank (collectively, the "Bank Fees").  The Bank Fees total approximately $10,000 per month in the aggregate, which are automatically deducted from the applicable Bank Accounts on or around the 15th day of each calendar month.  The Debtor estimates approximately $15,000 of accrued but unpaid Bank Fees are outstanding as of the Petition Date (collectively, the "Prepetition Bank Fees").

11.      To maximize flexibility for customers wishing to make payments by credit card, the Debtor permits certain credit card processors to auto-debit the Bank Accounts—on a recurring, monthly basis—for payment processing fees incurred by the Debtor in the ordinary course when customers pay with credit cards (collectively, the "Processing Fees").  The Processing Fees are approximately $12,500 per month in the aggregate, and the Debtor estimates approximately $12,500 of accrued but unpaid Processing Fees are outstanding as of the Petition Date (collectively, the "Prepetition Processing Fees").

### III.    Ordinary Course Cash Flows

12.    The Debtor generates cash primarily through sales of its products to third parties and affiliates.  Generally, customers that are not affiliates of the Debtor remit payments to the Debtor in cash directly into the Debtor Operating Account.  Customers that are affiliates of the Debtor remit payments to the Debtor as described in Section IV.

13.    Historically, the Debtor satisfied its obligations via a combination of disbursements (a) made by the Debtor from the Bank Accounts or (b) made by Carrier on behalf of the Debtor.  Disbursements made by the Debtor from the Bank Accounts consisted primarily of payments to third-party vendors or certain non-Debtor affiliates that do not participate in the Prepetition Cash Pool, and historically included, but were not limited to, payments (a) for products and services, (b) for utilities and (c) on account of rent obligations.  Disbursements made by Carrier on behalf of the Debtor historically included, but were not limited to, payments (a) for payroll and employee benefits, (b) on account of certain tax obligations and (c) on account of insurance obligations.  Historically, on average, the Debtor made approximately $12 million per month of third-party and non-Debtor affiliate disbursements from the Bank Accounts.  Carrier made approximately $4 million per month of disbursements on behalf of the Debtor, which were charged to the Debtor by way of an adjustment to the Prepetition Cash Pooling Account as described in Section IV.

14.    By this Motion, the Debtor seeks to continue processing disbursements to third parties and to non-Debtor affiliates that do not participate in the Prepetition Cash Pool from the Bank Accounts, consistent with historical practice and in the ordinary course.[3]

---

[3]    The continuation of Carrier's disbursements on behalf of the Debtor, and the Debtor's reimbursement of Carrier for such payments, is addressed in the Shared Services Agreement Motion.  The Debtor does not seek any relief with respect to disbursements made by Carrier on behalf of the Debtor in this Motion.

**IV.    Affiliate Transactions**

15.    Prior to the Petition Date, in the ordinary course of business, the Debtor engaged in certain affiliate transactions (the "Affiliate Transactions") with non-Debtor affiliates, resulting in receivables and payables (collectively, the "Affiliate Claims").

16.    Up to and including May 5, 2023, ordinary course Affiliate Transactions between the Debtor and non-Debtor affiliates that participated in the Prepetition Cash Pool were settled by debiting or crediting, as applicable, the respective entity's balances with the Prepetition Cash Pooling Accounts.  For example, to settle an Affiliate Claim a non-Debtor affiliate owed the Debtor on account of goods provided by the Debtor, the balance attributed to the Debtor in the Prepetition Cash Pooling Account would be increased, with a corresponding reduction to the balance attributed to the non-Debtor affiliate who received the goods.  The Debtor closely monitored and recorded all Affiliate Transactions, including those settled through the netting process, in general ledgers maintained at non-Debtor Carrier.  At the close of business on May 5, 2023, the Debtor ceased participating in the Prepetition Cash Pooling Account.

17.    Additionally, certain non-Debtor affiliates do not participate in the Prepetition Cash Pool.  When the Debtor engaged in Affiliate Transactions with such non-Debtor affiliates, the resulting Affiliate Claims were settled either by (a) a netting process or (b) by a direct disbursement either from the Debtor to the non-Debtor affiliate or from the non-Debtor affiliate to the Debtor, as applicable.  Affiliate Claims between the Debtor and non-Debtor affiliates that do not participate in the Prepetition Cash Pool are settled periodically in the ordinary course of business.

18.    By this Motion, the Debtor seeks authority to continue engaging in Affiliate Transactions relating to the sale or receipt of goods with non-Debtor affiliates on a postpetition basis, and to pay the resulting Affiliate Claims in cash.  The Affiliate Transactions

are not structured as loans or borrowing of funds by the Debtor and non-Debtor affiliate.  The continuation of Affiliate Transactions for the provision of services and payroll costs with non-Debtor affiliates is addressed in the Shared Services Agreement Motion.

## V.    Commercial Cards

19.    The Debtor provides certain employees with purchasing cards issued by JPMorgan Chase Bank NA ("JPM Chase") under a commercial card program (the "Card Program").  As of the Petition Date, approximately 17 purchasing cards were issued (the "Commercial Cards").  The employees use the Commercial Cards primarily for equipment and supplies relied on by the Debtor in the ordinary course of business.  Payment of costs incurred through the use of the Commercial Cards (the "Card Obligations") is made once a month to JPM Chase.  The Debtor estimates that there are no amounts outstanding with respect to the Commercial Cards as of the Petition Date.  The Debtor seeks authority to (a) continue using the Commercial Cards on a postpetition basis and (b) out of an abundance of caution, honor all prepetition Card Obligations, if any, in an aggregate amount not to exceed $20,000, and postpetition Card Obligations arising under the Card Program.

## VI.    Business Forms

20.    The Debtor uses a variety of checks, preprinted business forms including business letterhead, purchase orders, invoices, envelopes, promotional materials and other business forms and correspondence in the ordinary course of business (collectively, the "Business Forms").  In particular, the Debtor issues a variety of checks on existing stock that cannot be easily altered.  To avoid confusion during this Chapter 11 Case and to minimize expense to the estate, the Debtor requests the authorization to continue using all existing Business Forms, without reference to the Debtor's status as a debtor-in-possession.  Once the Debtor exhausts its existing Business Forms, it will ensure that any new Business Forms are

clearly labeled "Debtor-in-Possession" and, with respect to any Business Forms that exist or are generated electronically, the Debtor shall ensure that such electronic Business Forms are clearly labeled "Debtor-in-Possession" within 15 days of entry of the Interim Order.

**VII.    Compliance with the U.S. Trustee Guidelines and the Bankruptcy Code**

21.    Section 345(b) of the Bankruptcy Code authorizes deposits or investments of money of a bankruptcy estate, such as cash, in a manner that will "yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a).  For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit or the United States," section 345(b) of the Bankruptcy Code provides that the estate must require from the entity with which the money is deposited or invested a bond in favor of the United States secured by the undertaking of an adequate corporate surety.  11 U.S.C. § 345(b).

22.    The Debtor is currently in substantial compliance with section 345(b) of the Bankruptcy Code.  All of the Debtor's cash is held at a Bank that is an approved depository institution in accordance with the operating guidelines established by the United States Trustee for the District of Delaware (the "U.S. Trustee") for debtors-in-possession (the "U.S. Trustee Guidelines").  Likewise, the Bank Accounts are insured by the Federal Deposit Insurance Corporation.  Thus, the Debtor believes that the Bank is well-positioned to perform the necessary depository and cash management functions during this Chapter 11 Case, and that any funds deposited into the Bank Accounts are secure.  Accordingly, the Debtor respectfully submits that it is in compliance with the U.S. Trustee Guidelines and the Bankruptcy Code.

## Jurisdiction

23.     The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105(a), 363(b), 363(c), 503, 1107(a) and 1108 of the Bankruptcy Code and Local Rule 2015-2.  Pursuant to Local Rule 9013-1(f), the Debtor consents to the entry of a final order or judgment by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## Relief Requested

24.     By this Motion, the Debtor requests entry of the Interim and Final Orders, substantially in the forms attached hereto as Exhibit A and Exhibit B, respectively, granting, among other things, the following relief:

a.      authorizing the Debtor, in its sole discretion, to (i) continue to operate its Cash Management System, (ii) continue to use, with the same account numbers, all Bank Accounts and (iii) implement any changes to the Cash Management System as it may deem necessary and appropriate, in the ordinary course of business;

b.      authorizing the Banks to (i) continue to maintain, service and administer the Bank Accounts as accounts for the Debtor as a debtor-in-possession and provide related treasury, accounting and cash management services without interruption and in the ordinary course, (ii) receive, process, honor and pay, to the extent of available funds, any and all checks, drafts, wires, ACH transfers, credit card payments, other electronic transfers or other items presented, issued or drawn on the Bank Accounts and (iii) debit or charge back the Bank Accounts for all undisputed prepetition and postpetition Bank Fees and undisputed prepetition and postpetition Processing Fees;

c.      authorizing the Debtor to continue using the Commercial Cards under the Card Program and paying the Card Obligations in the ordinary course of business;

d.      authorizing the Debtor to continue the Affiliate Transactions relating to the sale or receipt of goods with non-Debtor affiliates on a postpetition basis and to settle such Affiliate Transactions in cash;

e.      authorizing the Debtor to (i) continue to use its existing Business Forms in their present form, without reference to the Debtor's status as a debtor-in-possession, until all existing Business Forms in existence before the Petition Date have been exhausted and (ii) ensure electronic Business Forms are clearly labeled "Debtor-in-Possession" within 15 days of entry of the Interim Order; and

f.      scheduling the Final Hearing.

**Basis for Relief**

I.    **The Court Should Authorize the Debtor's Continued Use of the Cash Management System.**

25.    Section 363(c)(1) of the Bankruptcy Code authorizes the debtor-in-possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). The purpose of section 363(c)(1) is to provide a debtor-in-possession the flexibility to engage in the ordinary course transactions required to operate its business, without undue oversight by its creditors or the court. *See*, *e.g.*, *In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992); *see also Charter Co.* v. *Prudential Ins. Co. of Am.* (*In re Charter Co.*), 778 F.2d 617, 621 (11th Cir. 1985) (holding that a debtor's request for authority to continue using its existing cash management system is consistent with section 363(c)(1) of the Bankruptcy Code).

26.    The Debtor requests authorization to continue using the Cash Management System on a postpetition basis and to honor any related prepetition obligations. Here, the Cash Management System enables the Debtor to efficiently track and control funds, ensure cash availability and reduce administrative costs. Requiring the Debtor to dismantle the Cash

Management System and adopt a new cash management system would, among other things, impair the Debtor's day-to-day operations.  Adopting a new cash management system would also result in the Debtor incurring material expenses, create unnecessary burdens on its employees and disrupt relationships with its key customers and suppliers.

27.      In contrast, maintaining the Cash Management System will facilitate the Debtor's reorganization efforts by preserving a "business as usual" atmosphere and avoiding the costly delays, distraction and unnecessary confusion.  Maintaining the Cash Management System would facilitate the Debtor's transition into chapter 11 by, among other things, minimizing delays in making postpetition payments, eliminating administrative efficiencies and allowing the Debtor's employees to focus on their day-to-day responsibilities.

28.      The Debtor submits that parties-in-interest will not be harmed by maintaining the Cash Management System.  The Debtor has implemented appropriate measures to ensure that payments will not be made on account of obligations incurred before the Petition Date other than those authorized by the Court.  The Debtor will also work closely with the Bank to ensure that appropriate procedures are in place to prevent checks issued prepetition from being honored without the Court's approval.

29.      In addition, the Debtor requests that the Court authorize the Debtor to implement any changes to the Cash Management System it may deem necessary and appropriate in its sole discretion, in the ordinary course of business consistent with past practices, including opening any additional bank account or closing any Bank Account.  The Debtor shall give notice of any material change to the Cash Management System to the U.S. Trustee and counsel to any official statutory committee appointed in this Chapter 11 Case, within 15 days of such change. Any new bank account opened by the Debtor shall be maintained with a bank that is an approved depository institution in accordance with the U.S. Trustee Guidelines.

30. The Debtor also requests authorization for the Bank to charge back returned items to the Bank Accounts, whether such items are dated before, on or after the Petition Date in the ordinary course of business. In addition, to the extent the Bank honors a prepetition check or other item drawn on any account that is the subject of this Motion, either at the direction of the Debtor or in a good faith belief that the Court has authorized such prepetition check or item to be honored, the Debtor requests that such Bank not be deemed to be liable to the Debtor or their estate on account of such prepetition check or other item honored postpetition. The Debtor believes that according such flexibility to the Bank is reasonable and appropriate because the Bank is not in a position to independently verify or audit whether the Debtor may pay a particular item in accordance with a Court order or otherwise. The relief requested is necessary to induce the Bank to continue providing cash management services.

31. Courts in this district have routinely authorized debtors to continue their cash management systems. *See*, *e.g.*, *In re Lincoln Power, L.L.C.*, No. 23-10382 (LSS) (Apr. 27, 2023), D.I. 110 (authorizing the debtor's continued use of existing cash  management system); *In re Clovis Oncology, Inc.*, No. 22-11292 (JKS) (Jan. 18, 2023), D.I. 212) (same); *In re ExpressJet Airlines LLC*, No. 22-10787 (MFW) (September 15, 2022), D.I. 106 (same); *In re WB Supply LLC*, No. 21-10729 (BLS) (May 19, 2021), D.I. 127 (same); *In re Reva Medical, Inc.*, No. 20-10072 (JTD) (February 10, 2020), D.I. 66 (same); *In re L.K. Bennett U.S.A., Inc.*, No. 19-10760 (JTD) (May 8, 2019), D.I. 143 (same). Accordingly, the Debtor submits that the continued used of the Cash Management System is necessary, appropriate and in the best interest of the Debtor's estate.

## II. The Court Should Authorize the Debtor to Maintain Existing Bank Accounts and to Continue Using Debit, Wire and Electronic Transfers.

32. The U.S. Trustee Guidelines require a chapter 11 debtor, among other things, to:  (a) close all existing bank accounts and open one or more accounts designated as

debtor-in-possession accounts; (b) establish one debtor-in-possession bank account for all estate monies required for the payment of taxes; (c) maintain a separate debtor-in-possession account for cash collateral; and (d) obtain checks that bear the designation "Debtor-in-Possession" and reference the bankruptcy number and type of account on such checks.  These requirements are designed to provide a clear line of demarcation between prepetition and postpetition payments and prevent the inadvertent payment of prepetition claims.

33.     The Debtor requests a waiver of the requirement of the U.S. Trustee Guidelines that the Bank Accounts be closed and that new postpetition bank accounts be opened. If enforced in this Chapter 11 Case, such requirements would disrupt and delay the Debtor's operations and ability to efficiently administer this Chapter 11 Case.  The Bank Accounts comprise an established Cash Management System that the Debtor must maintain in order to ensure the uninterrupted collection and disbursement of funds in the ordinary course of its business.  Therefore, to avoid delays in paying obligations incurred postpetition, and to ensure a smooth transition into chapter 11, the Debtor should be permitted to continue to maintain the Bank Accounts and, if necessary, to open new accounts and close existing accounts in the normal course of business operations.  Otherwise, the process of transitioning the Bank Accounts to new bank accounts will be disruptive, time consuming and expensive.

34.     In addition, to the extent the U.S. Trustee Guidelines require the Debtor to make all disbursements by check, the Debtor requests further relief from the U.S. Trustee Guidelines.  The Debtor conducts many transactions on a daily basis by debit, wire, ACH transfer and other similar methods; if the Debtor's ability to conduct transactions through such methods is impaired, the Debtor's operations and ability to preserve a "business as usual" atmosphere may be unnecessarily disrupted and the estate will incur additional costs.  Therefore,

the Debtor submits that authorizing the continuation of the use of debit, wire, ACH transfers and other similar methods is warranted.

III.    **Payment of Fees and Prepetition Obligations Related to the Bank Accounts Is Appropriate Under Sections 105(a), 363(b), 1107(a) and 1108 of the Bankruptcy Code.**

35.    By this Motion, the Debtor seeks authority to pay Prepetition Bank Fees, Prepetition Processing Fees and Card Obligations.  The payment of these fees is appropriate under sections 105(a), 363(b), 1107(a) and 1108 of the Bankruptcy Code.  The Debtor is operating its business as a debtor-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code, and is therefore a fiduciary "holding the bankruptcy estate and operating the business for the benefit of its creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the duties of a chapter 11 debtor-in-possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." *Id*.  Consistent with a debtor's fiduciary duties to preserve the estate, courts have authorized payment of prepetition obligations pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.  *See, e.g.*, *In re Montgomery Ward* Holding *Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("the bankruptcy court has considerable discretion" in granting motions pursuant to section 363(b)); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (stating that section 363(b) provides a court "broad flexibility" to authorize a debtor to satisfy prepetition claims where supported by a proper business justification); *In re Just for Feet, Inc.*, 242 B.R. 821, 824 (D. Del. 1999) ("Section 105(a) of the Code provides a statutory basis for the payment of pre-petition claims.").  Indeed, courts have recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim." *In re CoServ, L.L.C.*, 273 B.R. at 497.

36.    Section 363(b) of the Bankruptcy Code empowers the Court to allow a debtor, in the exercise of its sound business judgment and after notice and a hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate." *See* 11 U.S.C. § 363(b)(1); *see also In re Just For Feet, Inc.*, 242 B.R. at 825 ("The Supreme Court, the Third Circuit, and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11."). For a court to approve the use, sale, or lease of estate property under section 363(b) of the Bankruptcy Code, including the payment of prepetition claims, the debtor must "articulate some business justification, other than mere appeasement of major creditors . . . ." *In re Ionosphere Clubs, Inc.*, 98 B.R. at 175; *see also In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 939 (Bankr. D. Del. 1992) (recognizing that "[i]f payment of a pre-petition claim 'is essential to the continued operation of [the debtor], payment may be authorized'") (citing *In re Lehigh & N.E. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981)).  Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted).  Under this section, a court may authorize a debtor to pay certain prepetition claims.  *See In re Ionosphere Clubs, Inc.*, 98 B.R. at 175 (stating that the bankruptcy court's prior determination to permit payment of prepetition claims under section 363(b) was justified).

37.    Additionally, section 105(a) of the Bankruptcy Code authorizes the Court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *In re Ionosphere Clubs, Inc.*, 98

B.R. at 175.  Under section 105(a), the Court "can permit pre-plan payment of a pre-petition

obligation when essential to the continued operation of the debtor." *In re NVR L.P.*, 147 B.R.

126, 127 (Bankr. E.D. Va. 1992); *see also In re Just for Feet, Inc.*, 242 B.R. at 825 ("To invoke

the necessity of payment doctrine, a debtor must show that payment of the pre-petition claims is

critical to the debtor's reorganization"); *see also In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835

(Bankr. S.D.N.Y. 1996) (recognizing that the doctrine of necessity "permits the bankruptcy court

to authorize the payment of prepetition claims prior to confirmation").

        38.     Courts in this district have recognized the "necessity of payment"

doctrine.  *See, e.g.*, *In re Energy Future Holdings Corp.*, 561 B.R. 630, 642-43 (Bankr. D. Del.

2016) ("The Third Circuit has explained that a 'necessity of payment' rule is intended to benefit

all parties and is applicable when such payment is critical to the Debtors' reorganization."); *In re*

*Lehigh & N. E. Ry. Co.*, 657 F.2d at 581 ("[T]he 'necessity of payment' doctrine . . . teaches no

more than, if payment of a claim which arose prior to reorganization is essential to the continued

operation of the [debtor] during reorganization, payment may be authorized even if it is made out

of corpus.").

        39.     The necessity of payment doctrine is designed to foster a debtor's

rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11."

*In re Ionosphere Clubs, Inc.*, 98 B.R. at 176; *In re Chateaugay Corp.*, 80 B.R. 279, 287

(S.D.N.Y. 1987) (authorizing payment of prepetition workers' compensation claims on grounds

that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to

create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and

payment of creditors in full or at least proportionately"); *In re Just for Feet*, 242 B.R. at 826

(finding that payment of prepetition claims to certain trade vendors was "essential to the survival

of the debtor during the chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391,

396 (Bankr. N.D. Ohio 1991) ("[A] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re CoServ, L.L.C.*, 273 B.R. at 497 ("[I]t is only logical that the bankruptcy court be able to use Section 105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process").

40.     Payment of the Prepetition Bank Fees, Prepetition Processing Fees and Card Obligations represents a sound exercise of the Debtor's business judgment and is necessary for the preservation of the Debtor's operations and going-concern value of its estate.  Payment of the Prepetition Bank Fees, Prepetition Processing Fees and Card Obligations is necessary to maintain the Cash Management System and avoid any disruption in the administration of the Bank Accounts or payment from customers by credit card.

41.     Courts in this district have routinely authorized debtors to honor certain prepetition obligations related to their cash management systems.  *See, e.g., In re Lincoln Power, L.L.C.*, No. 23-10382 (LSS) (Apr. 27, 2023), D.I. 110 (authorizing debtor to honor certain prepetition obligations related to its existing cash management system); *In re Clovis Oncology, Inc.*, No. 22-11292 (JKS) (Jan. 18, 2023), D.I. 212 (same);  *In re ExpressJet Airlines LLC*, No. 22-10787 (MFW) (September 15, 2022), D.I. 106 (same); *In re WB Supply LLC*, No. 21-10729 (BLS) (May 19, 2021), D.I. 127 (same); *In re Reva Medical, Inc.*, No. 20-10072 (JTD) (Feb. 10, 2020), D.I. 66 (same); *In re Sienna Biopharmaceuticals, Inc. (a/k/a Sienna Labs Inc.)*, No. 19-12051 (MFW) (Oct. 10, 2019), D.I. 102 (same); *In re L.K. Bennett U.S.A., Inc.*, No. 19-10760 (JTD) (May 8, 2019), D.I. 143 (same)  Accordingly, the Debtor submits that payment of the

Prepetition Bank Fees, Prepetition Processing Fees and Card Obligations is necessary, appropriate and in the best interest of the Debtor's estate.

**IV.     The Court Should Authorize the Debtor to Perform Postpetition Affiliate Transactions.**

42.     The Debtor engages in Affiliate Transactions with non-Debtor affiliates on a regular basis and such transactions are common among businesses similar to the Debtor.  The Debtor submits that such transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require Court approval. Nevertheless, out of an abundance of caution, the Debtor requests express authority to continue engaging in Affiliate Transactions with non-Debtor affiliates with respect to the purchase and sale of goods postpetition in the ordinary course of business.  With respect to non-Debtor affiliates that participate in the Prepetition Cash Pool, such Affiliate Claims will be settled in cash and with respect to non-Debtor affiliates that do not participate in the Prepetition Cash Pool, such Affiliate Claims will be settled consistent with the Debtor's historical practice.

43.     The Debtor tracks all fund transfers in the Cash Management System and can therefore ascertain, trace and account for all Affiliate Transactions and all resulting Affiliate Claims.  The Debtor will also continue to maintain records of all such Affiliate Transactions and Affiliate Claims.  Continuation of Affiliate Transactions is crucial to the Debtor's overall business operations.  The Debtor generally provides more goods to non-Debtor affiliates than it purchases, and therefore any disruption to Affiliate Transactions would result in a reduction of the Debtor's revenue, to the detriment of the Debtor's estate.  Accordingly, the Debtor submits that continuation of Affiliate Transactions is in the best interests of the Debtor, its estates and all parties-in-interest.

44.     Courts in this district have routinely authorize debtors to engage in transactions with affiliates.  *See*, *e.g.*, *In re Virgin Orbit Holdings, Inc.*, No. 23-10405 (KBO)

(Apr. 26, 2023), D.I. 151 (authorizing the debtors to engage in transactions with affiliates in the ordinary course); *In re Clovis Oncology, Inc.*, No. 22-11292 (JKS) (Jan. 18, 2023), D.I. 212 (same); *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Sept. 22, 2022), D.I. 157 (same); *In re ExpressJet Airlines LLC*, No. 22-10787 (MFW) (Sept. 15, 2022), D.I. 106 (same). Accordingly, the Debtor submits that the relief requested herein is necessary, appropriate and in the best interest of the Debtor's estate.

**V.      The Court Should Authorize the Debtor to Use Existing Business Forms.**

45.      To minimize expenses to its estate, the Debtor requests authority to continue to use all existing Business Forms, without reference to the Debtor's status as a debtor-in-possession.  Upon depleting of the Debtor's stock, the Debtor will obtain new Business Forms reflecting its status as a debtor-in-possession and referencing the case number of this Chapter 11 Case.  Additionally, the Debtor will update any electronically produced checks or Business Forms to reflect the Debtor's status as a debtor-in-possession and include the case number of this Chapter 11 Case within 15 days following entry of the Interim Order.

46.      Courts in this district have routinely granted relief similar to the relief requested herein.  *See, e.g., In re Lincoln Power, L.L.C.*, No. 23-10382 (LSS) (Apr. 27, 2023), D.I. 110 (authorizing the use of existing business forms); *In re Virgin Orbit Holdings, Inc.*, No. 23-10405 (KBO) (Apr. 26, 2023), D.I. 151 (same); *In re Clovis Oncology, Inc.*, No. 22-11292 (JKS) (Jan. 18, 2023), D.I. 212 (same); *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Jan. 12, 2023), D.I. 488 (same); *In re Ector County Energy Center LLC*, No. 22-10320 (JTD) (May 31, 2022), D.I. 184 (same).  Accordingly, the Debtor submits that the relief requested herein is necessary, appropriate and in the best interest of the Debtor's estate.

**Bankruptcy Rule 6003 Is Satisfied**

47.     In order for a debtor to obtain relief to make payments within 21 days of the Petition Date, it must establish that making such payments satisfies the requirements mandated by Bankruptcy Rule 6003—namely, the relief requested is necessary to avoid "immediate and irreparable harm."  If a debtor's prospect of reorganizing is threatened, or swift diminution in value of the debtor's estate is likely absent the granting of the requested relief, immediate and irreparable harm likely exists.  *See In re WorldSpace, Inc.*, 2008 WL 8153639, at *2 (Bankr. D. Del. Oct. 20, 2008) (finding that relief requested by the debtors was necessary to avoid irreparable harm to the debtors and their estates because such relief was essential for the continued operation of the debtors' businesses).

48.     Immediate and irreparable harm would result if the relief requested herein is not granted.  Inability to continue its Cash Management System would expose the Debtor to significant additional expenditure of time and resources in order to implement an alternative cash management system, distract the Debtor from an orderly transition into chapter 11 and disrupt the Debtor's operations and relationships with key customers and suppliers.  These effects would have an adverse impact to the Debtor's business, thereby causing immediate and irreparable harm.  Failure to receive the requested relief during the first 21 days of this Chapter 11 Case would severely disrupt the Debtor's operations at this important juncture.  For the reasons discussed herein, the relief requested is necessary for the Debtor to operate its business in the ordinary course and preserve the value of the Debtor's assets and maximize the value of the estate for the benefit of all stakeholders.  Accordingly, the Debtor respectfully submits that it has satisfied Bankruptcy Rule 6003 as it relates to the relief requested herein.

**Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

49.     Given the nature of the relief requested herein, the Debtor respectfully requests a waiver of (a) the notice requirements under Bankruptcy Rule 6004(a) and (b) the 14-day stay under Bankruptcy Rule 6004(h).  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until expiration of 14 days after entry of the order, unless the court orders otherwise."  For the reasons described above, the relief requested is essential to prevent potentially irreparable damage to the Debtor's operations, value and ability to reorganize.

**Reservation of Rights**

50.     Nothing in this Motion: (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtor or its estate; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Debtor or its estate to contest the validity, priority, or amount of any claim against the Debtor or its estate; (c) shall impair, prejudice, waive, or otherwise affect the rights of the Debtor or its estate with respect to any and all claims or causes of action against any third party; or (d) shall be construed as a promise to pay a claim or continue any applicable program postpetition, which decision shall be in the discretion of the Debtor.  Any payment made pursuant to an order of the Court granting the relief requested herein is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtor's rights to subsequently dispute such claim.

**Notice**

51.     No creditors' committee, trustee or examiner has been appointed in this Chapter 11 Case.  Notice of this Motion has been provided to: (a) the U.S. Trustee; (b) the Securities and Exchange Commission; (c) the Internal Revenue Service; (d) the United States

Department of Justice; (e) the Office of the United States Attorney for the District of Delaware;
(f) liaison counsel to the tort claimants; (g) the state attorneys general who have commenced
litigation proceedings against the Debtor; (h) the Bank; (i) the parties identified on the Debtor's
list of top 20 counsel; and (j) to the extent not listed herein, those parties requesting notice
pursuant to Bankruptcy Rule 2002.  Notice of this Motion and any order entered in connection
with this Motion will be served on all parties in accordance with Local Rule 9013-1(m).  The
Debtor submits that, in light of the nature of the relief requested, no other or further notice need
be provided.

## Conclusion

WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests that the Court (a) enter the Interim Order, substantially in the form attached hereto as Exhibit A, (b) enter the Final Order, substantially in the form attached hereto as Exhibit B, and (c) grant such other and further relief as is just and proper.

Dated: May 14, 2023
      Wilmington, Delaware

**MORRIS NICHOLS ARSHT & TUNNELL LLP**

*/s/ Derek C. Abbott*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Daniel B. Butz (No. 4227)
Tamara K. Mann (No. 5643)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
dabbott@morrisnichols.com
aremming@morrisnichols.com
dbutz@morrisnichols.com
tmann@morrisnichols.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (*pro hac vice* pending)
Brian D. Glueckstein (*pro hac vice* pending)
Justin J. DeCamp (*pro hac vice* pending)
Alexa J. Kranzley (*pro hac vice* pending)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
       gluecksteinb@sullcrom.com
       decampj@sullcrom.com
       kranzleya@sullcrom.com

*Proposed Counsel for the Debtor and Debtor-in-Possession*