## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

KIDDE-FENWAL, INC.,[1]

      Debtor.

Chapter 11

Case No. 23-10638 (___)

## MOTION OF DEBTOR FOR ENTRY OF (I) AN INTERIM ORDER AUTHORIZING THE DEBTOR TO CONTINUE OPERATING UNDER THE SHARED SERVICES AGREEMENT AND (II) A FINAL ORDER AUTHORIZING THE DEBTOR'S ASSUMPTION OF THE SHARED SERVICES AGREEMENT

Kidde-Fenwal, Inc. (the "Debtor") hereby submits this motion (this "Motion") for entry of (a) an interim order, substantially in the form attached hereto as Exhibit A (the "Interim Order"), pursuant to sections 105(a) and 363(c)(1) of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), (i) authorizing the Debtor to continue operating under that certain Amended and Restated Master Services Agreement, dated May 13, 2023, between Carrier Corporation, Carrier Global Corporation and Kidde-Fenwal, Inc., a copy of which is attached hereto as Exhibit C (as may be further amended, modified or supplemented from time to time, the "Shared Services Agreement") and (ii) granting certain related relief, including scheduling a hearing to consider approval of the Motion on a final basis (the "Final Hearing"), and (b) a final order, substantially in the form attached hereto as Exhibit B (the "Final Order" and together with the Interim Order, the "Orders"), pursuant to sections 105(a) and 365(a) of the Bankruptcy Code, authorizing the Debtor, in its sole discretion, to assume, *nunc pro tunc* to the Petition Date (as defined below), the Shared Services Agreement. Certain facts supporting this Motion are set forth in the *Declaration of James A. Mesterharm in Support of Chapter 11*

---

[1] The last four digits of Kidde-Fenwal, Inc.'s tax identification number are 5282. The Debtor's corporate headquarters is located at 400 Main Street, Ashland, Massachusetts 01721.

*Petition* (the "First Day Declaration").  In further support of the Motion, the Debtor respectfully

states as follows:

<strong><u>Background</u></strong>

       1.      The Debtor is a Delaware corporation with its headquarters in Ashland,

Massachusetts.  The Debtor manufactures fire protection and suppression systems, including fire

detectors, alarm notification appliances, fire-suppression control units and fire suppression-agent

delivery systems.  The Debtor also manufactures electronic gas burner controls, mechanical

temperature controls and fire and overheat detectors.

       2.      On the date hereof (the "Petition Date"), the Debtor filed with the United

States Bankruptcy Court for the District of Delaware (the "Court") a voluntary petition for relief

under the Bankruptcy Code.  The Debtor continues to operate its business and manage its

properties as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.  As of the date hereof, no creditors' committee, trustee or examiner has been appointed in

the Debtor's chapter 11 case (the "Chapter 11 Case").

       3.      Additional factual background relating to the Debtor's business and the

commencement of this Chapter 11 Case is set forth in the First Day Declaration.

<strong><u>Facts Specific to the Relief Requested</u></strong>

**I.      Historical Shared Services**

       4.      The Debtor historically has relied upon certain non-Debtor affiliates for

the provision of goods and corporate and other services important to its operation.  Since the

Debtor's spinoff in 2020 to Carrier Global Corporation ("Carrier"), Carrier and its non-Debtor

affiliates (collectively, the "Carrier Group") have provided certain shared services ("Services")

to the Debtor pursuant to that certain Master Services Agreement dated January 1, 2021 (as

amended, modified or supplemented, the "Original Shared Services Agreement").  These

-2-

Services include, but are not limited to, human resources support, operations and sourcing, controllership, collections, finance and accounting, treasury and paymaster services, information technology, legal, tax, facilities, environmental, health, safety and regulatory ("EHSR"), R&D/engineering, marketing and communications/sales, strategy and real estate.  The Debtor also provides certain services to businesses within the Carrier Group that are necessary for those businesses' continued operations.  The Debtor and Carrier negotiated and agreed, in good faith and at arm's length, fees for the Services that were memorialized in the Original Shared Services Agreement.  The Debtor's outsourcing of the Services to the Carrier Group has enabled the Debtor to efficiently operate its business and is critical to the Debtor's ongoing operations. Additionally, pursuant to the Original Shared Services Agreement, Carrier also made payments in satisfaction of certain operational and financial obligations on behalf of the Debtor.

## II.        The Amended and Restated Master Services Agreement

5.        On May 13, 2023, in contemplation of this Chapter 11 Case, the Debtor and Carrier entered into the Shared Services Agreement.  The parties agreed to preserve the historical status quo, and provided for the following changes from the Original Shared Services Agreement:

- Scope of Services.  The Shared Services Agreement updates the scope of services to reflect the services expected to be provided by the Carrier Group to the Debtor, as well as by the Debtor to the Carrier Group, during this Chapter 11 Case.

- Advance Payment Deposit.  Historically, charges for certain Services and goods provided by the Carrier Group or by the Debtor were settled through an intercompany cash pooling arrangement (the "Carrier Cash Pool").  Reimbursements by the Debtor to Carrier for payments made by Carrier on behalf of the Debtor were also settled through the Carrier Cash Pool.  The Shared Services Agreement provides that Carrier shall retain an Advance Payment Deposit (the "Advance Payment Deposit") in the amount of $21,444,553.  The Advance Payment Deposit shall be available to satisfy certain of the Debtor's obligations to Carrier under the Shared Services Agreement on a postpetition basis, since the Debtor is no longer a participant in the Carrier Cash Pool.

- <u>Payment of Fees</u>.  The Shared Services Agreement sets up new fee and payment procedures to facilitate payment of fees between the Debtor and Carrier.  Promptly at the end of each quarter, Carrier will provide the Debtor with an accounting for (i) the proposed charges for the quarter for services provided by Carrier to the Debtor (the "<u>Carrier Balance</u>") and (ii) the proposed charges for the quarter for services provided by the Debtor to Carrier (the "<u>KFI Balance</u>").  The Carrier Balance will be netted against the KFI Balance on a quarterly basis.  If the Carrier Balance exceeds the KFI Balance, Carrier is authorized to debit the Advance Payment Deposit by an amount equal to the difference between (i) the Carrier Balance and (ii) the KFI Balance (the "<u>Quarterly Payment</u>").  To the extent any portion of any Quarterly Payment exceeds the Advance Payment Deposit, the Debtor will promptly pay any remaining balance to Carrier in cash.  If the KFI Balance exceeds the Carrier Services Balance, Carrier will promptly pay such excess amount to the Debtor in cash.  KFI will have 15 days to review the proposed quarterly charges prior to settlement and will work together in good faith to resolve any disputes.[2]

- <u>Qualifying Sale</u>.  The Shared Services Agreement provides that Carrier shall, following the consummation of a Qualifying Sale (as defined in the Shared Services Agreement), offer the purchaser in such Qualifying Sale the opportunity to enter into a transition services arrangement for a period of at least 12 months on terms substantially similar to those Carrier generally offers to similar purchasers in connection with carve-out transactions or dispositions.

- <u>Termination by the Debtor</u>.  The Shared Services Agreement provides the Debtor with the right to terminate the Shared Services Agreement (i) in its entirety upon 30 days' written notice to Carrier and (ii) with respect to any particular service(s) provided by Carrier, upon 30 days' written notice to the extent the Debtor has determined, in its sole discretion, that (x) such service(s) is no longer needed or (y) a replacement of such service(s) by a third party is in the best interest of the Debtor.

- <u>Termination by Carrier</u>.  The Shared Services Agreement provides Carrier with the right to terminate the Shared Services Agreement (i) immediately upon (a) the conversion of this Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, (b) dismissal of this Chapter 11 Case or (c) the

---

[2]    Two payment procedures will take place outside the quarterly reconciliation pursuant to the Shared Services Agreement.  Invoices furnished by the Carrier Group to the Debtor on account of payroll costs or payroll related expenses incurred by the Carrier Group on the Debtor's behalf will be paid promptly (and, in any event, within seven days of receipt of the invoices) by the Debtor in cash.  Additionally, the Shared Services Agreement provides that the Debtor will provide invoices for goods sold to the Carrier Group and the applicable member of the Carrier Group will pay the Debtor in cash on payment terms consistent with past practice, as set forth in the *Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue to Operate its Cash Management System, (B) Pay or Honor Certain Prepetition Obligations Related Thereto and (C) Maintain its Bank Accounts and Existing Business Forms, (II) Authorizing Affiliate Transactions and (III) Granting Related Relief.*

appointment of a trustee in this Chapter 11 Case, (ii) immediately upon 45 days from the Petition Date unless an order in form and substance reasonably satisfactory to Carrier authorizing the assumption of the Shared Services Agreement has been entered, (iii) immediately upon (a) any determination by any court reversing or vacating court approval of the assumption of the Shared Services Agreement, (b) the filing by the Debtor of a motion to reject the assumption of, or otherwise seeking the termination of the Shared Services Agreement, (c) any determination by any court modifying the Shared Services Agreement in a manner materially adverse to Carrier, without the consent of Carrier or (d) the failure of the Debtor to file this Motion on the Petition Date, (iv) no earlier than 60 days following either (a) the termination or expiration of the Debtor's exclusive period to file a chapter 11 plan or (b) the Debtor's failure to file a motion seeking approval of bidding procedures within 90 days of the Petition Date, (v) promptly following the consummation of a Qualifying Sale; *provided* that Carrier has offered the purchaser in a Qualifying Sale the opportunity to enter into a transition services arrangement as contemplated above, (vi) immediately upon a material breach by the Debtor of the terms of the Shared Services Agreement and if such breach is curable, such breach fails to be cured within 30 days to the satisfaction of Carrier, such satisfaction not to be unreasonably withheld, conditioned or delayed, (vii) promptly after the balance of the Advance Payment Deposit is reduced to zero, if the Debtor has failed to provide adequate assurance of continued payment of amounts due to Carrier under the Shared Services Agreement within 30 days of a written request therefor by Carrier or (viii) with respect to any particular service(s) provided by the Debtor, upon 30 days' written notice.

- <u>Indemnification</u>.  The Shared Services Agreement provides that both Carrier and the Debtor agree to indemnify each other from and against any claims incurred, to the extent in connection with the performance of the Shared Services Agreement or any services provided on or after the Effective Date.

6.      Other than the foregoing provisions, the Shared Services Agreement is substantially similar to the Original Shared Services Agreement.  Critically, the changes in the Shared Services Agreement from the Original Shared Services Agreement were not intended to change the relationship between the Debtor and the Carrier Group, but to accurately reflect the historical ordinary course transactions.

**III.    The Affiliate Claims**

7.    As described above, the Debtor had a prepetition balance against the Carrier Cash Pool on account of its prepetition affiliate transactions.  On May 11, 2023, Carrier remitted to the Debtor approximately $134 million in cash (the "Pool Balance Undisputed Cash") constituting the Debtor's balance against the Carrier Cash Pool, net of certain agreed offsets and deductions and approximately $40 million of additional offsets and deductions proposed by Carrier (the "Disputed Offsets").  All parties' rights are reserved with respect to the Disputed Offsets, which are being reviewed by a Special Committee of the Debtor's Board of Directors.  As a result, the ultimate prepetition affiliate balance between the Debtor and Carrier is undetermined at this time.  The Debtor seeks, on an interim basis subject to entry of the Final Order, to continue operating under the Shared Services Agreement and does not seek authorization, prior to the entry of the Final Order, to reimburse Carrier for any expenditure relating to any period prior to the Petition Date.  The Debtor seeks authorization, pursuant to the Final Order, to pay any cure amount by the earlier of (a) when the Debtor and Carrier agree to an amount or (b) the date specified in a final and non-appealable order entered by this Court determining such amount.

**IV.    Employee Wages and Benefits Services**

8.    A summary of the employee wages and benefits services being provided by the Carrier Group to the Debtor pursuant to the Shared Services Agreement is set forth below.

A.    Employee Wages

9.    As of the Petition Date, the Debtor directly employed approximately 250 individuals, with the majority of the workforce located in Massachusetts (collectively, the "Direct Employees").  Approximately 33 employees of certain non-Debtor affiliates of the Debtor also perform services for the Debtor as of the Petition Date (collectively and together

with the Direct Employees, the "Employees").  In the ordinary course of business, Employees are paid base wages or salaries (the "Wage Obligations") through a Carrier payroll system on behalf of the Debtor, and the Debtor then reimburses Carrier.  The Debtor expects to incur costs not exceeding approximately $22.8 million per year on account of the Wage Obligations.

B.     Employee Benefits

10.     Eligible Employees may participate in a shared health and welfare benefits program managed by Carrier, including medical, vision, and dental insurance plans and life, accidental death, short-term disability, long-term disability, and certain other risk and disability insurance benefits (the "Health and Welfare Coverage and Benefits"), which are administered through various third-party providers.  The Debtor expects to incur costs not exceeding approximately $60,000 per year related to the administration of Health and Welfare Coverage and Benefits.  Additionally, Carrier manages for the Debtor's eligible Employees participation in a retirement savings plan that satisfies the requirements of sections 401(a) and 401(k) of the Internal Revenue Code (the "401(k) Plan").  The Debtor expects to incur costs not exceeding approximately $1.8 million per year in connection with matching and automatic contributions on behalf of the Debtor's Employees on account of the 401(k) Plan.

11.     Employees are also eligible for vacation, sick days and holidays (collectively, the "PTO Benefits").  Employees are paid their regular salaried or hourly rate when they elect to exercise PTO Benefits.  Carrier also manages paid leave benefit programs (the "Paid Leave Benefits," and together with the PTO Benefits, the "Time Off Benefits") for the Debtor's eligible Employees.  Employees are eligible to be paid only for specific types of leave, including medical leave, bereavement leave, U.S. military leave, birth & adoption leave, parental leave and jury duty.

C.    <u>Bonus Programs</u>

12.    In order to properly incentivize the Employees, Employees participated in certain bonus programs, including the AIP, SIP, Attendance Bonus Program, Discretionary Bonus Program and Special Awards Policy (as such terms are defined below) (collectively, the "<u>Bonus Programs</u>").  The Bonus Programs include an annual incentive program (the "<u>AIP</u>") and a sales incentive program for sales Employees (the "<u>SIP</u>"), each of which is a program in which eligible Employees are offered the opportunity to earn one or more cash bonus payments (each, a "<u>Bonus</u>").  The AIP is an annual cash incentive program designed to drive short-term, in-year performance based on established business metrics.  Bonuses under the AIP are earned and paid annually, with payment made in the first quarter of the year following the year in respect of which such payment is earned.  The Debtor expects to incur costs not exceeding approximately $450,000 per year on account of the AIP.  The SIP provides eligible Employees with the opportunity to earn a Bonus for achieving applicable sales-based objectives.  Bonuses under the SIP are paid on a quarterly basis after the end of the applicable calendar quarter.  The Debtor expects to incur costs not exceeding approximately $105,000 per year on account of the SIP.

13.    The Perfect Attendance Bonus program (the "<u>Attendance Bonus Program</u>") offers a cash bonus opportunity of up to $750 for achieving perfect attendance each year ($150 per quarter, plus an additional $150 at year end).  The Debtor expects to incur costs not exceeding approximately $50,000 per year on account of the Attendance Bonus Program. The discretionary bonus program (the "<u>Discretionary Bonus Program</u>") offers a $5,000 cash bonus to designated Employees who achieve specified collections targets.  There are two Employees eligible to participate in the Discretionary Bonus Program as of the Petition Date.

14.    Certain Employees are also eligible to participate in the Special Awards Policy (the "<u>Special Awards Policy</u>"), another cash award program managed by Carrier.  The

Special Awards Policy rewards extraordinary performance and contributions through cash awards ranging from $200 up to a maximum of 10% of an Employee's base salary.  The Debtor expects to incur costs not exceeding approximately $18,000 per year on account of the Special Awards Policy.

15.    By this Motion, the Debtor does not seek authorization to reimburse any amounts arising from the Bonus Programs to any Employees who are insiders (as such term is defined in section 101(31) of the Bankruptcy Code), but reserves the right to request such authority upon separate motion to the Court.

D.    Severance Practice

16.    The Debtor maintains a severance practice (the "Severance Practice") in the ordinary course of business that provides for payments to Employees whose employment is involuntarily terminated (each, a "Severance Payment").  Severance Payments are payable in a lump sum following execution and non-revocation of a general release of claims, depending on the Employee's tenure and other factors.  Severance Payments are provided only to Employees who have executed and not revoked a release of claims.  For the avoidance of doubt, the Debtor does not seek permission to reimburse any Severance Payments which would violate section 503(c) of the Bankruptcy Code.

E.    Other Employee Programs

17.    The Debtor also provides certain other benefits to Employees, including tuition reimbursement, reimbursement of business expenses in accordance with applicable policies and relocation expenses (collectively, the "Other Employee Programs").  The Debtor expects to incur costs not exceeding approximately $1,850,000 per year on account of the Other Employee Programs.

F.    <u>Withholding and Deduction Obligations</u>

18.    Various laws require that the Debtor withhold certain amounts from Employees' gross pay for remittance to the appropriate federal, state, or local taxing authorities or as required by statute, including for garnishments, child support, Social Security, and Medicare taxes (the "<u>Withholding Obligations</u>").  Deductions on account of tax obligations to the federal government are remitted immediately while remittances to various state authorities may lag by one or more weeks.

19.    The Debtor also routinely deducts certain amounts from Employees' paychecks, including pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed herein, such as an Employee's share of healthcare benefits and insurance premiums, 401(k) contributions, and miscellaneous deductions (collectively, the "<u>Deductions</u>" and, together with the Withholding Obligations, the "<u>Withholding and Deduction Obligations</u>").  Those amounts are forwarded to various third-party recipients or retained for any self-insured benefit programs as applicable.

20.    In addition to the Withholding and Deduction Obligations, the Debtor incurs obligations on account of U.S. Social Security and income taxes in the states and localities in which the Debtor operates (the "<u>Employer Payroll Taxes</u>") for remittance to the appropriate federal, state, and local taxing authorities.

**V.    Other Shared Services**

21.    Under the Shared Services Agreement, Carrier or the Carrier Group provides other services to the Debtor in the ordinary course of business.  Under the Shared Services Agreement, the Debtor reimburses Carrier for applicable costs incurred by Carrier associated with such services.  These services include, but are not limited to,

- <u>Taxes and Fees</u>.  In the ordinary course of business, the Debtor must process, remit and pay certain taxes and fees, including regulatory and

filing fees and property, income and sales taxes accrued by the Debtor in the ordinary course of business (collectively, the "Taxes and Fees"). Under the Shared Services Agreement, Carrier may pay the Taxes and Fees on the Debtor's behalf directly to the respective taxing authority in the ordinary course as they come due.  Over the past 12 months, costs for such Taxes and Fees were approximately $8 million.

- Insurance.  In the ordinary course of business, the Debtor maintains coverage under a group insurance program (the "Insurance Program") managed by Carrier that provides millions of dollars of coverage on behalf of the Debtor.  The Insurance Program includes coverage for, among other things, property, general liability, automobile liability, cyber liability, workers' compensation, umbrella coverage, employer liability, professional liability, nuclear liability, aircraft products liability, crime, fiduciary liability, marine cargo/transit, excess liability, and directors' and officers' liability.  Over the past 12 months, costs for such Insurance Programs were approximately $5 million.

- Surety Bonds.  In the ordinary course of business, the Debtor is required to provide surety bonds to certain governmental units or other public agencies to secure the Debtor's payment or performance of certain obligations (the "Surety Bond Program").  The Debtor maintains three surety bonds managed by Carrier (the "Surety Bonds"), two with Fidelity and Deposit Company of Maryland and one with Federal Insurance Company.[3]  Over the past 12 months, costs for such Surety Bond Programs were approximately $20,000.

- Customer Programs.  The Debtor offers its customers certain discounts, incentives and other accommodations designed to increase the Debtor's sales and attract and retain customers (the "Customer Programs").  These are typically provided and paid for by the Debtor.  However, in the ordinary course of business, Carrier may also pay on the Debtor's behalf for certain incentives for the Debtor's customers.  This includes an annual incentive-based trip for high volume sales distributors that takes place every May.  Over the past 12 months, costs for such Customer Programs were approximately $150,000.

- Information Technology.  The Carrier Group provides overall IT consulting and infrastructure services to the Debtor, including hardware and software maintenance and management, global network security, emails, website maintenance and updates, and third-party vendors management.  Over the past 12 months, costs for such information technology services were approximately $1-1.5 million.

---

[3]   A standby trust account is maintained to support one of the surety bonds, for which the Debtor reimburses Carrier for the annual fee.

- <u>Finance and Accounting</u>.  The Carrier Group provides finance and accounting services to the Debtor, including accounts receivables services, accounts payable services, treasury, budgets and forecasts.  Over the past 12 months, costs for such finance and accounting services were approximately $750,000.

- <u>EHSR</u>.  The Carrier Group provides EHSR services to the Debtor, including regulatory compliance, permitting, establishing global programs for EHSR practices and procedures, physical security systems, and third party vendor management, which amount to less than $50,000 per year.

**<u>Jurisdiction</u>**

22.     The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105(a), 363(c)(1) and 365(a) of the Bankruptcy Code.  Pursuant to Local Rule 9013-1(f), the Debtor consents to the entry of a final order or judgment by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

**<u>Relief Requested</u>**

23.     By this Motion, the Debtor requests entry of (a) an Interim Order, substantially in the form attached hereto as <u>Exhibit A</u>, (i) authorizing the Debtor, in its sole discretion, to continue operating under the Shared Services Agreement and (ii) granting certain related relief, including scheduling the Final Hearing, and (b) a Final Order, substantially in the form attached hereto as <u>Exhibit B</u>, authorizing the Debtor, in its sole discretion, to assume the Shared Services Agreement.

**Basis for Relief**

I.    **The Court Should Authorize the Debtor to Continue Operating Under the Shared Services Agreement on an Interim Basis.**

24.    Section 363(c)(1) of the Bankruptcy Code provides that a debtor-in-possession may "enter into transactions . . . in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing."  In determining whether a transaction falls within the ordinary course of a Debtor's business, courts in the Third Circuit apply a two-part test containing both a horizontal and vertical inquiry.  *See In re Roth Am., Inc.*, 975 F.2d 949, 952-53 (3d. Cir. 1992) ("In prior cases, the courts have engaged in a two-step inquiry for determining whether a transaction is in "the ordinary course of business": a 'horizontal dimension' test and a 'vertical dimension' test"); *see also In re Blitz USA, Inc.*, 475 B.R. 209 (Bankr. D. Del. July 9, 2012) (applying the horizontal and vertical prongs of the test).  Under the vertical test, courts look at "whether the transaction subjects a hypothetical creditor to economic risk of a nature different from those he accepted when he decided to extend credit."  *In re Roth Am., Inc.*, 975 F2.d at 952-53.  Under the horizontal test, in general courts look at whether "the transaction is of the sort commonly undertaken by companies in that industry."  *Id.* ("The primary focus is on the debtor's pre-petition practices and conduct.").

25.    Here, operating under the Shared Services Agreement is consistent with the Debtor's ordinary course prepetition practice.  The Original Shared Services Agreement was put into place upon the spinoff of the Debtor to Carrier, and had since been relied upon by the Debtor to obtain critical services from the Carrier Group.  The Shared Services Agreement preserved the historical status quo, and implemented certain changes to the Original Shared Services Agreement to better facilitate affiliated transactions.  Accordingly, the Debtor believes that it is authorized, without further order of the Court, to honor its obligations and perform in

the ordinary course under the Shared Services Agreement on a postpetition basis pursuant to

section 363(c)(1) of the Bankruptcy Code.  Nonetheless, for the avoidance of doubt, the Debtor

requests authorization to continue operating, on an interim basis, under the Shared Services

Agreement on a postpetition basis consistent with prepetition practices.

II.    **Assumption of the Shared Services Agreement Is a Proper Exercise of the Debtor's Business Judgment.**

26.    Section 365(a) of the Bankruptcy Code provides, in relevant part, that a

debtor, "subject to the court's approval, may assume or reject an executory contract or an

unexpired lease." 11 U.S.C. 365(a).  The Bankruptcy Code does not define the term "executory

contract," but the Third Circuit has characterized an executory contract as one "under which the

obligation of both the bankrupt and the other party . . . are so far unperformed that the failure of

either to complete performance would constitute material breach excusing the performance of the

other." *See Sharon Steel Corp.* v. *Nat'l Fuel Gas Distribution Corp.*, 872 F.2d 36, 39 (3d Cir.

1989) (quoting Countryman, *Executory Contracts in Bankruptcy, Part 1,* 57 Minn. L. Rev. 439,

460 (1973)).  In short, executory contracts are those contracts "on which performance is due to

some extent on both sides." *N.L.R.B.* v. *Bildisco & Bildisco*, 465 U.S. 513, 522 n. 6 (1984)

(quoting H.R. Rep. No. 95-595, p. 347 (1977)).  The Shared Services Agreement is an executory

contract because both the Debtor and Carrier continue to have performance obligations under the

Shared Services Agreement.

27.    The assumption or rejection of an executory contract or unexpired lease is

subject to review under the business judgment standard.  If a debtor has exercised "reasonable"

business judgment, the court should approve the proposed assumption or rejection.  *See*, *e.g.*,

*NLRB* v. *Bildisco and Bildisco*, 465 U.S. at 523 (1984); *Group of Inst. Investors* v. *Chicago,*

*Milwaukee, St. Paul & Pac. R.R. Co.*, 318 U.S. 523, 550 (1943); *In re Market Square Inn, Inc.*,

978 F.2d 116, 121 (3d Cir. 1992) (the "resolution of [the] issue of assumption or rejection will be

a matter of business judgment by the bankruptcy court"). Debtors are afforded significant

discretion when requesting to assume or reject an executory contract. *In re Tower Air, Inc.*, 416

F.3d 229, 238 (3d Cir. 2005); *In re Riodizio, Inc.*, 204 B.R. 417, 424 (Bankr. S.D.N.Y. 1997)

("[A] court will ordinarily defer to the business judgment of the debtor's management"); *In re

Chipwich, Inc.*, 54 B.R. 427, 430-31 (Bankr. S.D.N.Y. 1985) (finding that a court should not

interfere with a debtor's decision to assume or reject "absent a showing of bad faith or abuse of

business discretion").

28.     The Debtor respectfully submits that assumption of the Shared Services

Agreement is a proper exercise of the Debtor's business judgment. The Shared Services

Agreement is critical to the success of the Debtor's business and, particularly, to the Debtor's

smooth transition into chapter 11. The Debtor has historically outsourced these functions and

continuing to do so, with a service provider with whom the Debtor has an established

relationship and systems already in place for the provisions of such services, is in the best

interest of the Debtor's estate and creditors. Any disruption to the Debtor's and the Carrier

Group's arrangements could severely disrupt the Debtor's operations and cause severe,

irreparable harm to the Debtor's business. Therefore, given the indispensable nature of the

Services and other transactions contemplated by the Shared Services Agreement to the ordinary

course business operations of the Debtor and the economic benefits to the Debtor generated from

the overall fee arrangement thereof, the assumption of the Shared Services Agreement is a proper

exercise of the Debtor's business judgment.

## III.    The Debtor Has Satisfied the Requirements Set Forth in Section 365(b)(1) of the Bankruptcy Code.

29.     Pursuant to section 365(b)(1) of the Bankruptcy Code, to assume an

executory contract or unexpired lease where there has been a default, a debtor must: (a) cure, or

provide adequate assurance that it will promptly cure, any defaults; (b) compensate, or provide

adequate assurance that it will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and (c) provide adequate assurance of future performance under such contract or lease.  *See* 11 U.S.C. § 365(b)(1).

30.     The Debtor respectfully submits that it has satisfied the prerequisites to assume the Shared Services Agreement.  *First*, the Debtor submits that it has cured, or provided adequate assurance that it will promptly cure, any defaults.  As discussed above, the Debtor and Carrier continue to review and reconcile past affiliate charges between the Debtor and the Carrier Group, and all parties' rights with respect to past and future charges are reserved.  On May 11, 2023, as part of the reconciliation, Carrier remitted to the Debtor the Pool Balance Undisputed Cash and netted the Disputed Offsets.  The Final Order authorizes the Debtor to cure the agreed prepetition amount owed to Carrier once reconciliation is complete.  For the avoidance of doubt, the parties have not waived claims or defenses that either may have that are not relating to the shared services.

31.     *Second*, the Debtor submits that Carrier is not expected to incur any actual pecuniary loss resulting from a default of the Debtor in connection with any unpaid prepetition obligations.  As discussed above, Carrier netted the Disputed Offsets from the Debtor for the alleged amount of outstanding prepetition obligations owed by the Debtor.

32.     *Third*, the Debtor has provided adequate assurance of its future performance under the Shared Services Agreement.  As discussed above, pursuant to the Shared Services Agreement, Carrier has retained an Advance Payment Deposit which shall be available to satisfy certain of the Debtor's obligations to Carrier under the Shared Services Agreement on a postpetition basis.  Additionally, under the Shared Services Agreement, Carrier will have a termination right once the balance of the Advance Payment Deposit is reduced to zero, if the

Debtor fails to provide adequate assurance of continued payment of amounts due to Carrier thereof. The arrangements in respect of Advance Payment Deposit and the related termination right by Carrier constitute adequate assurance of the Debtor's future performance under the Shared Services Agreement.

## IV. The Debtor Should Be Authorized to Assume the Shared Services Agreement *Nunc Pro Tunc* to the Petition Date.

33.    The Debtor respectfully submits that it would incur immediate and irreparable harm if the Shared Services Agreement were not assumed *nunc pro tunc* to the Petition Date. As discussed above, the Shared Services Agreement is critical to the success of the Debtor's business and, particularly, to the Debtor's smooth transition into chapter 11. Any disruption to the Debtor's and the Carrier Group's arrangements could severely disrupt the Debtor's operations and cause severe, irreparable harm to the Debtor's business, even if such disruption is temporary and lasts for a few days. Accordingly, the Debtor believes that approval of the assumption of the Shared Services Agreement *nunc pro tunc* to the Petition Date is in the best interest of the Debtors, their estates, their creditors and other parties-in-interest.

### Bankruptcy Rule 6003 Is Satisfied

34.    In order for a debtor to obtain relief to assume the Shared Services Agreement within 21 days of the Petition Date, it must establish that making such payments satisfies the requirements mandated by Bankruptcy Rule 6003—namely, the relief requested is necessary to avoid "immediate and irreparable harm." If a debtor's prospect of reorganizing is threatened, or swift diminution in value of the debtor's estate is likely absent the granting of the requested relief, immediate and irreparable harm likely exists. *See In re WorldSpace, Inc.*, 2008 WL 8153639, at *2 (Bankr. D. Del. Oct. 20, 2008) (finding that relief requested by the debtors was necessary to avoid irreparable harm to the debtors and their estates because such relief was essential for the continued operation of the debtors' businesses).

35.     Immediate and irreparable harm would result if the relief requested herein is not granted.  As described above, the Shared Services Agreement is critical to the success of the Debtor's business and, particularly, to the Debtor's smooth transition into chapter 11.  Any disruption to the Debtor's and the Carrier Group's arrangements could severely disrupt the Debtor's operations and cause severe, irreparable harm to the Debtor's business.  Failure to receive the requested relief during the first 21 days of this Chapter 11 Case would severely disrupt the Debtor's operations at this important juncture.  For the reasons discussed herein, the relief requested is necessary for the Debtor to operate its business in the ordinary course and preserve the value of the Debtor's assets and maximize the value of the estate for the benefit of all stakeholders.  Accordingly, the Debtor respectfully submits that it has satisfied Bankruptcy Rule 6003 as it relates to the relief requested herein.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

36.     Given the nature of the relief requested herein, the Debtor respectfully requests a waiver of (a) the notice requirements under Bankruptcy Rule 6004(a) and (b) the 14-day stay under Bankruptcy Rule 6004(h).  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until expiration of 14 days after entry of the order, unless the court orders otherwise."  For the reasons described above, the relief requested is essential to prevent potentially irreparable damage to the Debtor's operations, value and ability to reorganize.

## Reservation of Rights

37.     Nothing in this Motion: (a) is intended or shall be deemed to constitute an admission as to the validity of any claim against the Debtor or its estate; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Debtor or its estate to contest the validity, priority, or amount of any claim against the Debtor or its estate; (c) shall impair, prejudice,

waive, or otherwise affect the rights of the Debtor or its estate with respect to any and all claims or causes of action against any third party; or (d) shall be construed as a promise to pay a claim or continue any applicable program postpetition, which decision shall be in the discretion of the Debtor.  Any payment made pursuant to an order of the Court granting the relief requested herein is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtor's rights to subsequently dispute such claim.

## Notice

38.    No creditors' committee, trustee or examiner has been appointed in this Chapter 11 Case.  Notice of this Motion has been provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) the Securities and Exchange Commission; (c) the Internal Revenue Service; (d) the United States Department of Justice; (e) the Office of the United States Attorney for the District of Delaware; (f) liaison counsel to the tort claimants; (g) the state attorneys general who have commenced litigation proceedings against the Debtor; (h) the parties identified on the Debtor's list of top 20 counsel; (i) counsel to Carrier; and (j) to the extent not listed herein, those parties requesting notice pursuant to Bankruptcy Rule 2002.  Notice of this Motion and any order entered in connection with this Motion will be served on all parties in accordance with Local Rule 9013-1(m).  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be provided.

## Conclusion

WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests that the Court (a) enter the Interim Order, substantially in the form attached hereto as Exhibit A, (b) enter the Final Order, substantially in the form attached hereto as Exhibit B, and (c) grant such other and further relief as is just and proper.

Dated: May 14, 2023
    Wilmington, Delaware

**MORRIS NICHOLS ARSHT & TUNNELL LLP**

*/s/ Derek C. Abbott*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Daniel B. Butz (No. 4227)
Tamara K. Mann (No. 5643)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
dabbott@morrisnichols.com
aremming@morrisnichols.com
dbutz@morrisnichols.com
tmann@morrisnichols.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (*pro hac vice* pending)
Brian D. Glueckstein (*pro hac vice* pending)
Justin J. DeCamp (*pro hac vice* pending)
Alexa J. Kranzley (*pro hac vice* pending)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
        gluecksteinb@sullcrom.com
        decampj@sullcrom.com
        kranzleya@sullcrom.com

*Proposed Counsel for the Debtor and Debtor-in-Possession*