## EXHIBIT C

**Shared Services Agreement**

EXECUTION VERSION

**AMENDED AND RESTATED MASTER SERVICES AGREEMENT**

**Between**

**Carrier Corporation,**

**Carrier Global Corporation (solely for purposes of Section 4)**

**and**

**Kidde-Fenwal, Inc.**

**AMENDED AND RESTATED MASTER SERVICES AGREEMENT**

This Amended and Restated Master Services Agreement (this "<u>Agreement</u>") is effective as of May 13, 2023 (the "<u>Effective Date</u>") and is entered into by Carrier Corporation, a company incorporated under the laws of Delaware ("<u>Carrier</u>"), Carrier Global Corporation, a company incorporated under the laws of Delaware (solely for the purposes of Section 4 of this Agreement; "<u>CGC</u>") and Kidde-Fenwal, Inc., a company incorporated under the laws of Delaware, as a recipient of Services ("<u>KFI</u>") (Carrier and KFI are collectively referred to as the "<u>Parties</u>" and each a "<u>Party</u>").

**RECITALS**

WHEREAS, KFI, from time to time, has a need for business services in specified areas including human resources support, operations and sourcing, controllership, collections, finance and accounting, treasury and paymaster services, information technology, legal, tax, facilities, environmental, health, safety and regulatory ("<u>EHSR</u>"), R&D/engineering, marketing and communications/sales, strategy and real estate;

WHEREAS, Carrier and KFI are party to that certain Master Services Agreement, dated January 1, 2021 (the "<u>Existing Services Agreement</u>"), pursuant to which Carrier provides (or causes an Approved Subcontractor to provide) certain of such services in the ordinary course of business;

WHEREAS, KFI also currently provides certain services to Carrier and certain Affiliates of Carrier in the ordinary course of business;

WHEREAS, KFI is in the process of implementing a divestiture and business separation from the Carrier corporate family to be implemented through a chapter 11 bankruptcy filing; and

WHEREAS, Carrier and KFI desire to amend and restate the Existing Services Agreement to, among other things (i) institute certain payment arrangements between the Parties, (ii) update the description of the Services to reflect ordinary course activities as of the date hereof and (iii) amend the Term and termination conditions set forth in the Existing Services Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree to act in accordance with the terms and conditions of this Agreement.

1. **DEFINITIONS**

1.1    <u>General Definitions</u>. Terms initially capitalized but not otherwise defined in this Agreement have the following meanings:

1.1.1    "<u>Advance Payment Deposit</u>" means an amount of cash paid to and retained by Carrier pursuant to Section 4.1, as the same may be reduced by Fees due to Carrier from KFI from time to time in accordance with this Agreement.

1

1.1.2    "Affiliate" means any entity of which the relevant Party Controls the equity interests or voting rights or which is under direct control of the relevant Party or under common control with the relevant Party, whether now existing or subsequently created or acquired during the Term of this Agreement, or any person that directly, or indirectly through one or more intermediaries Controls, is Controlled by or is under common Control with one of the Parties.

1.1.3    "Approved Subcontractors" has the meaning set forth in Section 11.1.

1.1.4    "Arm's Length" means that terms and fees for services rendered will reflect those found between independent enterprises in comparable transactions and comparable circumstances. See *The OECD Transfer Pricing Guidelines for Multinational Enterprises and Tax Administrations, July 2017* (as amended or updated from time to time).

1.1.5    "Assumption Motion" has the meaning set forth in Section 9.12.

1.1.6    "Balance" has the meaning set forth in Section 3.1.1.

1.1.7    "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*

1.1.8    "Carrier" has the meaning provided in the preamble.

1.1.9    "Carrier Indemnitees" has the meaning set forth in Section 2.9.

1.1.10  "Carrier Services" has the meaning set forth in Section 2.1.

1.1.11  "Carrier Services Balance" has the meaning set forth in Section 3.1.1.

1.1.12  "CCPA" has the meaning set forth in Section 6.5.

1.1.13  "Claim" has the meaning set forth in Section 2.9.

1.1.14  "Confidential Information" has the meaning set forth in Section 6.1.

1.1.15  "Control" means, as to any Party, the power to direct or cause the direction of the management and policies of such Party, whether through the ownership of voting securities, by contract or otherwise.  The terms "Controlled by" and "under common Control with" will have correlative meanings.

1.1.16  "Corporate Policy Manual" means the Carrier Global Corporation Corporate Policy Manual, as amended from time-to-time, which is published as of the Effective Date on Carrier's ePolicy application.

1.1.17 "Costs" means all direct and indirect charges incurred by Carrier in providing the Carrier Services including personnel expenses as well as other operational expenses plus an appropriate percentage for overhead where applicable. Costs exclude costs from Affiliates that already include a mark-up.

2

1.1.18 "Data Privacy Laws" has the meaning set forth in Section 6.5.

1.1.19 "Effective Date" has the meaning provided in the preamble.

1.1.20 "EHSR" has the meaning provided in the preamble.

1.1.21 "Erroneous Payment" has the meaning set forth in Section 3.3.

1.1.22 "EU Directive" has the meaning set forth in Section 6.5.

1.1.23 "Existing Services Agreement" has the meaning provided in the preamble.

1.1.24 "Fee" has the meaning set forth in Section 3.1.

1.1.25 "Finance and Accounting Services" has the meaning set forth in Exhibit A.

1.1.26 "Instructions" has the meaning set forth in Section 2.7.1.

1.1.27 "KFI" has the meaning provided in the preamble.

1.1.28 "KFI Balance" has the meaning set forth in Section 3.1.1.

1.1.29 "KFI Indemnitees" has the meaning set forth in Section 2.9.

1.1.30 "KFI Services" has the meaning set forth in Section 2.2.

1.1.31  "Party" has the meaning provided in the preamble.

1.1.32 "Personal Information" has the meaning set forth in Section 6.5.

1.1.33 "Qualifying Sale" means (a) a sale of all or substantially all of the assets of KFI in one or a series of related transactions, (b) any sale of securities of KFI after giving effect to which Carrier and its Affiliates no longer beneficially own a majority of the voting securities of KFI, or (c) any plan of reorganization or other transaction that has a substantially similar effect, *provided* that there shall only be one Qualifying Sale during the Term of this Agreement.

1.1.34 "Quarterly Accounting" has the meaning set forth in Section 3.1.1.

1.1.35 "Reports" has the meaning set forth in Section 2.7.2.

1.1.36 "Service Provider" means (a) with respect to Carrier Services, Carrier, and (b) with respect to KFI Services, KFI.

1.1.37 "Service Recipient" means (a) with respect to Carrier Services, KFI, and (b) with respect to KFI Services, Carrier.

1.1.38 "Services" has the meaning set forth in Section 2.2.

3

1.1.39 "Taxes" means any and all present and future stamp, withholding, recording, documentary, excise, property, value added, or similar taxes, together with any levies, imposts, duties, deductions, charges, or other withholdings and all liabilities in any case imposed on KFI by applicable tax authorities with regard to the payment for any Services. Taxes do not include any such amounts to the extent assessed against Carrier and measured by income received by such Carrier.

1.1.40 "Term" has the meaning set forth in Section 8.1.

1.1.41 "Voluntary Chapter 11 Case" means the initiation and filing by KFI of a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

1.2 Interpretation.

1.2.1 The terms "including" and its derivatives such as "include" and "includes" mean "including, without limitation."

1.2.2 References to any document or agreement, including this Agreement and any schedules and exhibits to this Agreement, shall be deemed to include references to such document or agreement as amended, supplemented or replaced from time to time in accordance with its terms and (where applicable) subject to compliance with the requirements set forth therein;

1.2.3 References to any Party to this Agreement or any other document or agreement shall include its successors or permitted assigns;

1.2.4 The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms; and

1.2.5 Except as otherwise expressly provided herein, all references to "dollars" or "$" shall be deemed references to the lawful money of the United States of America.

## 2. SERVICES

2.1 Carrier Services. During the Term of this Agreement, and subject to and in accordance with the terms and conditions hereof, Carrier shall provide (i) the services set forth on Exhibit A to KFI as requested by KFI from time to time and (ii) such other services that are currently provided to KFI and reasonably necessary for the continued operation of KFI (collectively, the "Carrier Services"). The description of Carrier Services in Exhibit A has been updated to reflect the current services offered by Carrier to KFI in the ordinary course as of the date hereof.

2.1.1 The Services may be amended from time to time to include such other services, as may be reasonably requested by KFI and as may be reasonably practicable to be provided by Carrier, in each case to the extent necessary to facilitate efficient and expeditious implementation and execution of the business objectives of the Parties and, more generally, to rationalize overhead and create cost efficiencies. Upon receiving such request from KFI, Carrier

4

will not unreasonably withhold, condition or delay consent to an appropriate amendment of the Services.

      2.2    <u>KFI Services</u>. During the Term of this Agreement, and subject to and in accordance with the terms and conditions hereof, KFI shall provide to Carrier, to the extent requested by Carrier, the services set forth on <u>Exhibit B</u>, whether or not currently allocated, paid or reimbursed by Carrier in the ordinary course of business (collectively, the "<u>KFI Services</u>" and together with Carrier Services, the "<u>Services</u>").

      2.3    The Services shall be provided on terms (including price) and under circumstances that, taken as a whole, are Arm's Length and consistent with the ordinary course past dealings of KFI and Carrier.

      2.4    The Service Recipient's and the Service Provider's responsibilities and obligations under this Agreement are as follows:

      2.4.1    Comply with applicable laws relevant to their respective roles under this Agreement;

      2.4.2    Provide reasonable access to knowledgeable personnel (functional experts) if needed and requested by the other Party;

      2.4.3    Cooperate with the other Party, including by making available management decision, information, approvals and acceptances, as reasonably requested by a Party so that such Party may accomplish its obligations and responsibilities hereunder;

      2.4.4    Resolve issues in a timely fashion to ensure that the Service Provider can meet its obligations and meet specified service levels (if any) as provided in this Agreement; and

      2.4.5    Participate in scheduled meetings to review status.

      2.5    For the successful completion of the Services, the Service Provider undertakes to:

      2.5.1    Comply with applicable laws governing performance of its obligations under this Agreement;

      2.5.2    Perform the Services in accordance with this Agreement;

      2.5.3    Participate in scheduled meetings with the Service Recipient to discuss the Services provided under this Agreement;

      2.5.4    Prioritize and co-ordinate tasks in consultation with the Service Recipient; and

      2.5.5    Report to the Service Recipient any issues that affect (or may potentially affect) the delivery of Services as soon as reasonably practicable and work to address such issues in a timely manner.

5

2.6     Subject to <u>Section 2.7</u>, the Service Recipient shall have the right to receive the Services provided hereunder for the purposes of allowing the services to be passed-through to (and used by) the Service Recipient's subsidiaries, so long as the Service Recipient Controls any such subsidiary (a "<u>Service Recipient Subsidiary</u>"). In order to make available any Services hereunder to a Service Recipient Subsidiary, the Service Recipient must (i) have in effect (and continue to have in effect) a written agreement between the Service Recipient and Service Recipient Subsidiary (the "<u>Underlying Agreement</u>"), which Underlying Agreement (A) limits the receipt of Services to such Service Recipient Subsidiary (and provides that Service Recipient Subsidiary may not, in turn, provide the Services to any third party); (B) provides that the Service Recipient Subsidiary may receive such Services from the Service Recipient, only so long as the Service Recipient continues to receive the Services from the Service Provider under this Agreement; (C) contains terms substantially similar to the terms and conditions of this Agreement, the compliance of this clause (C) being subject to review and approval by the Service Provider at the Service Provider's option, including requiring that such Service Recipient Subsidiary shall protect the Confidential Information of the Service Provider in a manner at least as restrictive as that required of the Service Recipient under <u>Section 6</u> *(Confidentiality)*; and (D) includes applicable procedures and security protocols as approved by the Service Provider and (ii) provide the Service Provider with written notice of any such Service Recipient Subsidiary that shall receive such Services; *provided* that to the extent a Service Recipient Subsidiary is currently receiving Services from a Service Provider as of the Effective Date, such Service Recipient Subsidiary can continue to receive the Services under this Agreement without executing a new Underlying Agreement and without notice to the Service Provider. The Service Provider shall not be a party to the Underlying Agreement, unless otherwise required by law. The Service Provider's relationship shall be with the Service Recipient, and the Service Provider shall have no obligation directly to Service Recipient Subsidiaries. The Service Recipient shall be liable for all acts and omissions of each Service Recipient Subsidiary, as if such acts and omissions were performed by the Service Recipient.

2.7     <u>Provisions Governing Finance and Accounting Services</u>. The following provisions will apply with respect to Finance and Accounting Services described on <u>Exhibit A</u> under the heading "<u>Finance and Accounting</u>."

2.7.1     <u>Instructions</u>. During the Term of this Agreement, Carrier will (subject to the supervision by, and direction of, the Board of Directors of KFI pursuant and in accordance with any written policies of KFI furnished to Carrier (collectively, the "<u>Instructions</u>")), either itself or wholly or in part through its Approved Subcontractors, provide the Finance and Accounting Services and take all appropriate steps to carry out the transactions of the types described on <u>Exhibit A</u> under the heading "Finance and Accounting," *provided* that all such transactions are consistent with the Instructions. KFI will comply promptly with any reasonable request for Instructions that Carrier may make in order to perform its duties under this Agreement.

2.7.2     <u>Records</u>. Carrier will keep on behalf of KFI, in a manner and form consistent with past practice, such books, records, and statements as may be necessary to comply with local statutory requirements and give a complete record of all transactions carried out by Carrier on behalf of KFI and will permit KFI and its employees and agents to inspect such books, records, and statements at all reasonable times.

6

Annually and upon request, Carrier will provide to the Board of Directors of KFI (i) the reports identified in this Section 2.7.2 and (ii) other information as the Board of Directors of KFI may reasonably request (collectively, the "Reports").

2.8     Limitation of Liability; Exculpation.

2.8.1    To the extent authorized by law, the Service Provider will perform the Services under this Agreement in good faith and in accordance with the Instructions (with respect to Finance and Accounting Services) and the professional standards of skill, care, and diligence adhered to by recognized international firms performing services of a similar nature, and hereby disclaim all other warranties, either express or implied, including, without limitation, warranties of merchantability and fitness for a particular purpose.

2.8.2    The Service Provider will not be liable to the Service Recipient for any act or omission in the performance of Services hereunder or for any damages resulting therefrom so long as such act or omission was not due to gross negligence or willful misconduct on the part of the Service Provider. Any Service Provider's liability in respect of damages, losses, costs, and claims, whether arising in contract, in tort, or otherwise, under or in connection with this Agreement and the Services performed pursuant hereto will be limited to the maximum amount of Fees paid (whether directly or through application of all or any portion of the Advance Payment Deposit) for the 12-month period preceding the date on which the act or omission (or the last act or omission in a related sequence of acts or omissions) giving rise to the claim for damages, losses, and costs occurred.

2.8.3    To the extent authorized by law, in no event will the Service Provider or any of their employees, officers, or directors, be liable for incidental, consequential, special, indirect, or punitive damages, or for costs (including attorneys' fees), expenses or losses (including, without limitation, lost profits, lost cost savings, missed or lost opportunities, lost anticipated profits, or any other economic loss) arising out of or in relation to this Agreement.

2.9     Indemnification.

2.9.1    KFI hereby agrees to indemnify, defend and hold harmless Carrier, its agents and Affiliates and its and their respective officers, directors, members, employees, Approved Subcontractors, delegatees, partners, shareholders, agents, advisors and other representatives of each (collectively, "Carrier Indemnitees"), from and against any claims, liabilities, losses, damages, costs or expenses (including legal fees) ("Claims") incurred by them or threatened in connection with any and all actions, suits, investigations, proceedings or claims of any kind whatsoever, in each case, to the extent arising in connection with the performance of this Agreement or any Services provided on or after the Effective Date; *provided* that no Carrier Indemnitee shall be so indemnified with respect to any Claim to the extent that such Claim is finally determined by a final and non-appealable judgment entered by a court of competent jurisdiction, or pursuant to a settlement agreement agreed to by such Carrier Indemnitee, to have resulted from such Carrier Indemnitee's fraud, bad faith, or willful misconduct.  For the sake of clarity, this Section 2.9.1 shall not apply with respect to KFI's sale or purchase of goods to or from

7

Carrier or any Carrier Affiliate (other than KFI), which transactions shall be governed by the liability, warranty and risk allocation provisions of the relevant transaction documents.

2.9.2    Carrier hereby agrees to indemnify, defend and hold harmless KFI, its agents and Affiliates and its and their respective officers, directors, members, employees, Approved Subcontractors, delegatees, partners, shareholders, agents, advisors and other representatives of each (collectively, "KFI Indemnitees"), from and against any Claims incurred by them or threatened in connection with any and all actions, suits, investigations, proceedings or claims of any kind whatsoever, in each case, to the extent arising in connection with the performance of this Agreement or any Services provided on or after the Effective Date; *provided* that no KFI Indemnitee shall be so indemnified with respect to any Claim to the extent that such Claim is finally determined by a final and non-appealable judgment entered by a court of competent jurisdiction, or pursuant to a settlement agreement agreed to by such KFI Indemnitee, to have resulted from such KFI Indemnitee's fraud, bad faith, or willful misconduct.  For the sake of clarity, this Section 2.9.2 shall not apply with respect to KFI's sale or purchase of goods to or from Carrier or any Carrier Affiliate (other than KFI), which transactions shall be governed by the liability, warranty and risk allocation provisions of the relevant transaction documents.

## 3.    FEES AND PAYMENT

3.1    Determination of Fees. In consideration for the provision of the Services, each Service Recipient will be charged fees and reimbursements (the "Fee") on a calendar quarterly basis, and in the case of the Carrier Services, determined in accordance with Schedule A.

3.1.1    Quarterly Accounting. Subject to Section 3.4 and Section 3.5, promptly at the end of each quarter, Carrier shall provide KFI with an accounting for the proposed charges for such quarter (the "Quarterly Accounting"). The Quarterly Accounting shall include a good faith estimate of (i) all Fees payable to Carrier in connection with the provision of the Carrier Services to KFI during such quarter (the "Carrier Services Balance") and (ii) all amounts payable by Carrier or any of its Affiliates in respect of KFI Services during such quarter (the "KFI Balance" and together with the Carrier Services Balance, the "Balances"). KFI shall have fifteen (15) days to review the Quarterly Accounting and either approve or dispute the Balances. Any portion of the Balances not in dispute shall be netted and promptly paid as set forth in Section 3.2. The Parties shall work together in good faith to promptly resolve any disagreements regarding the Balances. To the extent the Parties are unable to resolve any such disagreement, such disagreement shall be resolved by a court of competent jurisdiction as set forth in Section 9.1. After the final determination thereof, all remaining Balances shall be netted and promptly paid as set forth in Section 3.2.  Carrier shall provide, upon request of KFI, supporting documents for the Carrier Services rendered and invoiced under this Agreement, including if requested either (i) copies of all invoices from third parties where costs have been directly allocated and charged to Carrier; or (ii) copies of the books and records demonstrating the accuracy of the cost information provided, as applicable.

3.2    Payment of Fees.  If, after the determination of any quarterly Balance pursuant to Section 3.1, the non-disputed Carrier Services Balance exceeds the non-disputed KFI Balance, then (x) Carrier is authorized to debit the Advance Payment Deposit by an amount equal to (i) the

8

non-disputed Carrier Services Balance *minus* (ii) the non-disputed KFI Balance and (y) if the Advance Payment Deposit has been reduced to zero, KFI shall pay in cash any remaining balance to Carrier within thirty (30) days after the determination of such quarterly Balance. If, after the determination of any quarterly Balance pursuant to Section 3.1, the agreed KFI Balance exceeds the agreed Carrier Services Balance, then Carrier shall pay in cash such amount to KFI within thirty (30) days after the determination of such quarterly Balance.

3.3    Erroneous Payment. If at any time: (x) either Party receives any payment to which it is not entitled, or (y) any additional assets within either Party are determined to be the assets of the other Party ((x) and (y) collectively, an "Erroneous Payment"), the applicable Party shall (i) use commercially reasonable efforts to remit such Erroneous Payment to the other Party within 5 business days or as soon as reasonably practicable thereafter, or (ii) reconcile such Erroneous Payment through the next Quarterly Accounting to occur following discovery of such Erroneous Payment.

3.4    Payment for Goods. Beginning with the Effective Date, (i) invoices furnished by KFI to Carrier (or any of its Affiliates) on account of goods provided by KFI will be paid promptly by Carrier in cash, on payment terms consistent with past practice and (ii) invoices furnished by Carrier to KFI on account of goods provided by Carrier will be paid promptly by KFI in cash, on payment terms consistent with past practice; *provided* that if Carrier procures goods from third parties on behalf of KFI, then KFI may pay such third parties in cash directly for goods provided by such third parties. The Parties shall work together in good faith to resolve any disputes relating to transactions of this type. To the extent the Parties are unable to resolve any such disagreement, such disagreement shall be resolved by a court of competent jurisdiction as set forth in Section 9.1.

3.5    Payroll. Beginning with the Effective Date, invoices furnished by Carrier (or any of its Affiliates) to KFI on account of payroll costs or payroll-related expenses incurred by Carrier (or any of its Affiliates) on or after the Effective Date and on KFI's behalf will be paid promptly (and, in any event, within 7 days of receipt of the invoice) by KFI in cash. The Parties shall work together in good faith to resolve any disputes relating to transactions of this type. To the extent the Parties are unable to resolve any such disagreement, such disagreement shall be resolved by a court of competent jurisdiction as set forth in Section 9.1.

## 4.    ADVANCE PAYMENT

4.1    Advance Payment. Immediately upon the execution of this Agreement (to the extent not transferred prior to the execution of this Agreement), CGC shall transfer to Carrier (or credit to Carrier's cash pool account) the sum of $21,444,553.00 as the Advance Payment Deposit, to be held by Carrier during the Term of this Agreement as security for payment of the Fees and applied to such payment as provided in Section 3.

4.2    Reservation of Rights. The retention by Carrier of the Advance Payment Deposit hereunder shall not, in any way, prejudice any potential arguments, claims, or offset rights that either Party may have in respect to any matter.

4.3    Promptly following the termination of this Agreement (or, in the event of termination by Carrier pursuant to Section 8.2.1, in connection with and as a condition to such

9

termination), Carrier shall remit the balance of the Advance Payment Deposit in immediately available funds to KFI after giving effect to any final deductions in satisfaction of all outstanding Fees.

## 5.    TAXES

5.1    The amounts determined in accordance with <u>Schedule A</u> are exclusive of any VAT or equivalent sales, use, consumption, services or similar taxes and/or duties that are assessed on the provision of the Services as a whole or on any particular Service, and it is the joint responsibility of both the Service Provider and the Service Recipient to ensure that the correct VAT, or equivalent sales, use, consumption or services tax and/or duty treatment is applied to any charge and/or Fee in respect of any Services provided.

5.2    When invoicing, the Service Provider shall separately state any Taxes that the Service Provider is required to collect from the Service Recipient and endeavor to issue invoices that comply with requirements, as to content and format, of tax and civil statutes that have jurisdiction over the transaction(s) performed by the Service Provider.

5.3    The Service Recipient is not responsible for any tax based on the Service Provider's income, payroll or gross receipts.

5.4    <u>Withholding Taxes</u>.

5.4.1    All payments under this Agreement will be made without any deduction or withholding for, or on account of, any Tax unless such deduction or withholding is required by any applicable law in effect at the time that the Tax is due to be paid.

5.4.2    To the extent the Service Recipient (the "<u>payor</u>") is not required to deduct or withhold Tax by virtue of the Service Provider's (the "<u>payee's</u>") exempt status under a specific treaty or law, payee will use its reasonable efforts to provide payor with all necessary documents to support payor's exempt status.

5.4.3    If payor is so required to deduct or withhold Tax, then payor will:

(a)    Promptly notify payee of such requirement;

(b)    Pay to the relevant authorities the full amount required to be deducted or withheld; and

(c)    Promptly forward to the payee an official receipt (or a certified copy), or other documentation reasonably acceptable to the payee, evidencing such payment to the authorities.

5.5    <u>Contest of Taxes</u>. In the case of any Taxes in respect of which indemnity may properly be sought against the Service Recipient by the Service Provider, the Service Recipient will have the right, at its own expense, to contest, or to request the Service Provider (which will have no obligation to do so) to contest the payment, assessment, or other claim related to such

10

Taxes if, in the reasonable opinion of the Service Recipient's tax counsel, there is a reasonable defense to the payment of such Taxes. In such a case, the Service Recipient agrees to further indemnify the Service Provider for any costs or expenses related to any such defense of any Tax claim so undertaken by the Service Recipient or, as the case may be, so undertaken by the Service Provider at the request of the Service Recipient.

## 6.    CONFIDENTIAL INFORMATION

6.1    <u>Definition</u>. For the purposes of this Agreement, "<u>Confidential Information</u>" means non-public information about the disclosing party's business or activities that is proprietary and confidential, which will include, without limitation, all business, financial, technical, and other information, including software (source and object code) and programming code of a party marked or designated "confidential" or "proprietary" or by its nature or the circumstances surrounding its disclosure should reasonably be regarded as confidential. Confidential Information includes not only written or other tangible information, but also information transferred orally, visually, electronically, or by any other means. Confidential Information does not include information that (i) is in or enters the public domain without breach of this Agreement, or (ii) the receiving party lawfully receives from a third party without restriction on disclosure and to the receiving party's knowledge without breach of a nondisclosure obligation.

6.2    <u>Nondisclosure</u>. The parties agree that (i) they will not disclose to any third party or use any Confidential Information disclosed to it by the other except as expressly permitted in this Agreement and (ii) they will take all reasonable measures to maintain the confidentiality of all Confidential Information of the other party in its possession or control, which will in no event be less than the measures it uses to maintain the confidentiality of its own information of similar type and importance.

6.3    <u>Permitted Disclosure</u>. Notwithstanding the foregoing, each party may disclose Confidential Information (i) to the extent required by a court of competent jurisdiction or other governmental authority or otherwise as required by law, including without limitation disclosure obligations imposed under the Bankruptcy Code, federal securities laws or the laws of any taxing authorities or (ii) subject to applicable Data Privacy Laws, on a "need-to-know" basis under an obligation of confidentiality to its consultants, legal counsel, Affiliates, third parties, accountants, banks and other financing sources and their advisors.

6.4    <u>Ownership of Confidential Information</u>. All Confidential Information supplied or developed by either party will be and remain the sole and exclusive property of the party who supplied or developed it.

6.5    <u>Personal information</u>. "<u>Personal Information</u>" means data exchanged in connection with this Agreement that is related to any identified or identifiable natural person (or could reasonably be used, whether standing alone or combined with any other information, to identify a natural person). "<u>Data Privacy Laws</u>" means applicable laws relating to the protection of Personal Information, including without limitation the laws and regulations of the European Union member states under the European Union Directive 95/46/EC (the "<u>EU Directive</u>"), any European Union regulation that may be enacted to replace the EU Directive, the laws and regulations of Canada,

11

the United States, and the individual provinces and/or states of Canada and the United States (including the California Consumer Privacy Act, as amended by the California Privacy Rights Act, and all implementing regulations thereof (the "<u>CCPA</u>")), and the laws of any other country, in each case addressing the collection, processing, storage, use, and/or disclosure of Personal Information, now or hereafter in force.

      6.5.1   Each Party will (i) comply with the provisions of this <u>Section 6.5</u>, the Corporate Policy Manual, and applicable Data Privacy Laws in such manner as to ensure that its acts or omissions in connection with this Agreement do not result in the other Party's being in violation of applicable Data Privacy Laws and (ii) process, share, or transfer Personal Information only in compliance with applicable Data Privacy Laws and this Agreement.

      6.5.2   In order to perform their respective obligations under this Agreement, the Parties must exchange certain Personal Information. Each Party hereby agrees to collect and use that Personal Information only for the following purposes: (i) to perform the Services and other obligations under this Agreement; (ii) to conduct screening against European Union and United States antiterrorism and denied parties lists; (iii) to protect against fraud and other compliance risks, including in the conduct of internal investigations; (iv) to the extent permitted by applicable Data Privacy Laws, to facilitate the sale or transfer of some or all of the assets of either Party; and (v) to comply with legal obligations, including without limitation as may be required in the course of litigation or any bankruptcy proceedings.

      6.5.3   Subject to compliance with the provisions of this <u>Section 6.5</u>, applicable Data Privacy Laws, and the Corporate Policy Manual, each Party may (i) share Personal Information of the other Party with other parties only for the purposes indicated in <u>Section 6.5.2</u> and only to the extent necessary to fulfill such purposes; (ii) share Personal Information of the other Party with its employees only on a need-to-know basis and only to the extent necessary to fulfil the purposes indicated in <u>Section 6.5.2</u>; (iii) store Personal Information of the other Party on servers located and accessible globally by the Parties and their respective service providers, *provided* that such service providers are contractually bound to meet the security measures described in the Corporate Policy Manual in respect of such servers and the Personal Information stored thereon; and (iv) retain Personal Information of the other Party for the Term of this Agreement in accordance with the provisions hereof and only if and to the extent permitted by applicable Data Privacy Laws, following which all such information will be returned to the other Party or destroyed in a manner that that complies with applicable Data Privacy Laws and ensures the confidentiality of such information.

      6.5.4   The Parties will give appropriate notice to any data subjects whose Personal Information is processed under this Agreement, consistent with Corporate Policy Manual and applicable Data Privacy Laws.

      6.5.5   The Service Provider will ensure that any agreements in connection with the Services entered into with Approved Subcontractors are in writing, comply with applicable Data Privacy Laws and Corporate Policy Manual, and contain the same or equivalent obligations and protections regarding Personal Information as those contained in this <u>Section 6.5</u>.

6.5.6    The Parties will cooperate in their efforts to comply with applicable Data Privacy Laws and will enter into any additional agreements as may be required by Data Privacy Laws or any amendments or changes thereto.  Without limiting the generality of the foregoing, each Party will not disclose any Personal Information of any California resident to any other erson in connection with this Agreement until after the Parties have executed all necessary agreements (or exhibits to this Agreement) to ensure compliance with the CCPA.

## 7.    REPORTING AND CONSULTATION; RESTRICTIVE COVENANTS

7.1    Solely to the extent provided to other parties in interest, KFI shall periodically provide to Carrier KFI's 13-week cash flow forecasts and variance reporting against the forecast in effect at that time.

7.2    Carrier shall be a consultation party to KFI in connection with any sale process.

7.3    During the term of this Agreement, without the express written consent of the other Party, neither Party (including its Affiliates) shall (a) solicit or encourage any customer, vendor, supplier or other business partner of the other Party or its Affiliates to terminate or diminish his, her, its or their relationship with the other Party or its Affiliates or (b) seek to persuade any such customer, vendor, supplier or other business partner of the other Party or its Affiliates to conduct with anyone else any business or activity which such customer, vendor, supplier or other business partner conducts with the other Party or its Affiliates; *provided* that the foregoing restriction will be of no further effect at such time as Carrier is no longer an Affiliate of KFI.

7.4    During the term of this Agreement, neither Party (including its Affiliates) shall disparage or encourage or induce others to disparage the other Party or any of its Affiliates, officers, directors, products or services. The term "disparage" includes comments or statements to the press, the other Party's employees or to any individual or entity with whom the other Party has an actual or potential business relationship (including any vendor, supplier, customer or distributor), or any public statement, that in each case is intended to, or can be reasonably expected to, materially damage the other Party or any of its Affiliates, officers, directors, products or services.

## 8.    TERM AND TERMINATION

8.1    <u>Commencement and Term</u>. The term of this Agreement will commence on the Effective Date and will continue thereafter in force until the earliest of (i) 18 months after the Effective Date, (ii) the termination of this Agreement by mutual consent of the Parties and (iii) the termination of this Agreement by the applicable Party pursuant to <u>Section 8.2</u> (such date, the "<u>Termination Date</u>", and the period that begins on the Effective Date and ends on the Termination Date, the "<u>Term</u>"); *provided* that the Parties shall negotiate in good faith for extension of the Term if this Agreement has not been terminated pursuant to <u>Section 8.2.1</u> within 18 months after the Effective Date.

8.2    <u>Termination Events</u>.

13

8.2.1   <u>Termination Rights of Carrier</u>. Carrier shall have the right to terminate this Agreement:

(a)    immediately upon (A) the conversion of any Voluntary Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, (B) the dismissal of any Voluntary Chapter 11 Case or (C) the appointment of a trustee in any Voluntary Chapter 11 Case;

(b)    immediately upon 45 days from the filing of a Voluntary Chapter 11 Case unless an order in form and substance reasonably satisfactory to Carrier authorizing the assumption of this Agreement has been entered by the bankruptcy court with jurisdiction over such Voluntary Chapter 11 Case;

(c)    immediately upon (A) any determination by any court reversing or vacating court approval of the assumption of this Agreement, (B) the filing by KFI of a motion to reject the assumption of, or otherwise seeking the termination of this Agreement, (C) any determination by any court modifying this Agreement in a manner materially adverse to Carrier, without the consent of Carrier or (D) the failure of KFI to file the Assumption Motion on the date of the filing of the Voluntary Chapter 11 Case;

(d)    no earlier than 60 days following either of (A) the termination or expiration of KFI's exclusive period to file a Chapter 11 plan in any Voluntary Chapter 11 Case or (B) KFI's failure to file a motion seeking approval of bidding procedures within 90 days of the date of commencement of any Voluntary Chapter 11 Case;

(e)    promptly following the consummation of a Qualifying Sale; *provided* that Carrier has offered the purchaser in such Qualifying Sale the opportunity to enter into a transition services arrangement for a period of at least 12 months on terms substantially similar to those Carrier generally offers to similar purchasers in connection with carve-out transactions or dispositions, and the purchaser has declined to enter into such agreement;

(f)    immediately upon a material breach by KFI of the terms of the Agreement (for the avoidance of doubt, the failure by KFI to timely pay amounts due to Carrier or to maintain the Advance Payment Deposit (other than by reduction by Fees due to Carrier from KFI in accordance with this Agreement) shall constitute a material breach) and, if such breach is curable, such breach fails to be cured within a period of 30 days to the satisfaction of Carrier, such satisfaction not to be unreasonably withheld, conditioned or delayed;

(g)    promptly after the balance of the Advance Payment Deposit is reduced to zero, KFI has failed to provide adequate assurance of continued payment of amounts due to Carrier under this Agreement within 30 days of a written request therefor by Carrier; and

14

(h)    with respect to any particular KFI Service(s) provided hereunder upon 30 days' written notice.

8.2.2    <u>Termination Rights of KFI</u>. KFI shall have the right to terminate this Agreement:

(a)    in its entirety upon 30 days' written notice to Carrier; and

(b)    with respect to any particular Carrier Service(s) provided hereunder, upon 30 days' written notice to the extent KFI has determined, in its sole discretion, that (i) the Carrier Services are no longer needed, or (ii) replacement of such Carrier Service(s) by a third-party is in the best interest of KFI. To the extent KFI terminates any Carrier Service(s) pursuant to this clause (b)(ii), the Parties shall work together in good faith to efficiently transfer the provision of such Service(s) to the third-party at KFI's cost.

8.3    <u>Effect of Termination</u>. Termination of this Agreement will not relieve any Party of its liability for the performance of obligations imposed upon that Party during the Term of this Agreement if such obligations have not been performed or completed at the time of termination, including the payment of any unpaid amounts due under this Agreement. Notwithstanding anything to the contrary contained in this Agreement, the terms of <u>Section 2.9</u>, <u>Section 6</u>, this <u>Section 8.3</u> and <u>Section 9</u> (including all representations, warranties, covenants and agreements contained therein) shall survive any termination of this Agreement.

8.4    <u>Ownership of Books and Records</u>. It is hereby understood and agreed that each Party will retain ownership of all books, records, software, reports, statistics, and any other materials related to the Services and maintained by, in the possession of, or under the control of such Party and/or their Approved Subcontractors under this Agreement, and the provision of Services from the Service Provider to the Service Recipient shall not alter the ownership of all books, records, software, reports, statistics, or other materials related to the Services. Any such materials, including all copies thereof and all worksheets and written supporting data related thereto, that are shared by the Service Recipient will be promptly returned to the Service Recipient at its request or upon termination of this Agreement for any reason.

## 9.    MISCELLANEOUS

9.1    <u>Governing Law</u>. This Agreement will be governed by and construed in accordance with the laws of the State of Florida, and the parties agree to submit to (x) the jurisdiction of the courts of the State of Florida or (y) in the event of a Voluntary Chapter 11 Case, the bankruptcy court with jurisdiction over such Voluntary Chapter 11 Case.

9.2    <u>Severability</u>. In the event that any term or provision of this Agreement will be held to be invalid, void, or unenforceable, then the remainder of this Agreement will not be affected, impaired, or invalidated, and each such term and provision of this Agreement will be valid and enforceable to the fullest extent permitted by law.

9.3 <u>Governing Language</u>. The governing language for this Agreement is English, notwithstanding any translation made of this Agreement. The Parties acknowledge that they have requested and consented that this Agreement and all documents, notices, correspondence, and legal proceedings consequent upon ancillary or relating directly or indirectly hereto, forming part hereof or resulting here from be drawn up in English.

9.4 <u>Successors & Assigns</u>. This Agreement will be binding upon and inure to the benefit of the Parties and to their respective successors and permitted assigns under this Agreement. Except as provided in <u>Section 11</u>, neither Party may assign, transfer, delegate, or subcontract any of the rights or obligations hereunder without the written consent of the other Party.

9.5 <u>Notice</u>. All notices, requests, demands, or other communications under this Agreement will be in writing and will be given by personal delivery, by a nationally recognized overnight courier service, email transmission, or certified or registered mail, return receipt requested to the address specified with respect to the Service Provider and with respect to the Service Recipient, to the attention of the legal department of the applicable Party.

9.6 <u>Headings and Sections</u>. The section headings contained in this Agreement are inserted for convenience of reference only and will not affect in any way the meaning or interpretation of this Agreement. Unless the context indicates otherwise, references in this Agreement to sections and subsections will be to sections and subsections of this Agreement.

9.7 <u>Parties Beneficiary</u>. This Agreement is solely for the benefit of the Parties and will not confer upon any other person any remedy, claim, liability, reimbursement, or other remedy; *provided* that the Carrier Indemnitees and KFI Indemnitees are intended beneficiaries of <u>Section 2.9</u> of this Agreement.

9.8 <u>Continuing Effect</u>. Except as provided in <u>Section 2.1</u> and in other agreements regarding the licensing of intellectual property, this Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and all prior proposals, representations, quotations, agreements and understandings, written or oral, between the Service Recipient and the Service Provider regarding such subject matter are superseded hereby.

9.9 <u>Independent Contractor Status</u>. The relationship created by this Agreement is one of independent contractor, and employees of one Party will not, under U.S. or any foreign employment law, become employees of the other Party as a result of this Agreement. No Party is, nor will be considered to be, an agent, distributor, partner, joint venture participant, trustee, fiduciary, or representative of the other Party.

9.10 <u>Counterparts</u>. This Agreement may be executed in one or more counterparts (including counterparts regarding multiple signatories with respect to any one Party), each of which will constitute an original, and all of which taken together will constitute a single agreement and contract.

16

9.11    Changes. This Agreement may only be amended, supplemented or changed by a written instrument signed by Carrier and KFI. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

9.12    Assumption. On the date of the filing of the Voluntary Chapter 11 Case, KFI shall file a motion (the "Assumption Motion") to assume this Agreement and authorize KFI to perform all of its obligations under this Agreement. The Assumption Motion and the order granting the Assumption Motion shall be in a form reasonably acceptable to Carrier.

9.13    Existing Services Agreement.  This Agreement amends and restates the Existing Services Agreement as between KFI and Carrier on a go-forward basis. With respect to any other parties thereto, the Existing Services Agreement shall remain in full force and effect.

## 10.    FORCE MAJEURE CLAUSE

10.1    Events of force majeure shall relieve either Party (the "Non-Performing Party") from obligations imposed upon it by this Agreement, for so long as such event and its effect continue. For the purposes of this Agreement, an event of force majeure shall include, without limitation, Acts of God, war, warlike operations or hostilities, riot, fire, explosion, accidents or damages, flood, earthquake, sabotage, strike, or any circumstances beyond the control of the Parties and negatively impacting the due fulfillment of the engagements of the Parties, which cannot reasonably be forecasted or provided against. The Non-Performing Party shall promptly notify the other Party hereto of (a) its best reasonable assessment of the nature and duration of the event of force majeure and (b) the steps it is taking in order to cure or reduce the effect of such event of force majeure. The Non-Performing Party shall use reasonable efforts to cure or reduce the effect of the event of force majeure. The other Party hereto shall have no right to claim damages for any resulting non-performance, partial performance or delay in performance by the Non-Performing Party of its contractual obligations hereunder during an event of force majeure.

10.2    If, due to an event of force majeure, either Party is wholly unable to perform its obligations under this Agreement for more than sixty (60) consecutive days, and the Parties have not agreed upon a revised basis for their obligations, then either Party may, amend the definition of Services to remove the services affected by such event of force majeure upon written notice.

## 11.    DELEGATION AND SUBCONTRACTING

11.1    The Service Provider shall be permitted to delegate or subcontract any or all of its obligations under this Agreement (i) to an Affiliate of Services Provider or (ii) to a third party reasonably acceptable to the Service Recipient (each such entity described in (i) and (ii), an "Approved Subcontractor"). The Service Provider shall in no way be released from its obligations under this Agreement, and the Service Provider shall remain liable for any failure of any Approved Subcontractor to comply with this Agreement.

17

11.2    The Service Provider will manage, supervise and provide direction to its employees and Approved Subcontractors and cause them to comply with the obligations and restrictions applicable to the Service Provider under this Agreement. The Service Provider shall monitor and is responsible for the acts and omissions of its employees and Approved Subcontractors under or relating to this Agreement.

**IN WITNESS WHEREOF, THE PARTIES HAVE CAUSED THIS AGREEMENT TO BE EXECUTED BY THEIR DULY AUTHORIZED REPRESENTATIVES.**

**THE UNDERSIGNED AGREE TO THE TERMS OF THIS AGREEMENT.**

**Carrier Corporation**

By: _Jennifer Anderson_
933B96DB5BAF401...

Name: Jennifer Anderson

Title: Senior Vice President, Head of Business Development, Strategy and Chief Sustainability Officer

Date:

Address:

13995 Pasteur Boulevard, Palm Beach Gardens, FL  33418

**Kidde-Fenwal, Inc**.

By:_____

Name:

Title:

Date:

Address:

400 Main Street
Ashland, MA  01721

**Carrier Global Corporation**, solely for purposes of Section 4

By: _Jennifer Anderson_
933B06DB5BAF401...

Name: Jennifer Anderson

Title: Senior Vice President, Head of Business Development, Strategy and Chief Sustainability Officer

Date:

Address:

13995 Pasteur Boulevard, Palm Beach Gardens, FL  33418

**IN WITNESS WHEREOF, THE PARTIES HAVE CAUSED THIS AGREEMENT TO BE EXECUTED BY THEIR DULY AUTHORIZED REPRESENTATIVES.**

**THE UNDERSIGNED AGREE TO THE TERMS OF THIS AGREEMENT.**

**Carrier Corporation**

By:_____

Name:

Title:

Date:

Address:

13995 Pasteur Boulevard, Palm Beach Gardens, FL  33418

**Kidde-Fenwal, Inc**.

By:_____

Name:  James Mesterharm

Title:  Chief Transformation Officer

Date:  May 13, 2023

Address:

400 Main Street
Ashland, MA  01721

**Carrier Global Corporation**, solely for purposes of Section 4

By:_____

Name:

Title:

Date:

Address:

13995 Pasteur Boulevard, Palm Beach Gardens, FL  33418

## EXHIBIT A

## BUSINESS SERVICES

Carrier provides or arranges for the provision of business and management services in specified areas including human resources support, operations and sourcing, controllership, collections, finance and accounting, treasury and paymaster services, information technology, legal, tax, EH&S, R&D/engineering, marketing, sales and communications, and real estate.

Such services that may be provided by Carrier at the request of KFI in accordance with this Agreement and shall be provided on terms (including price) and under circumstances that, taken as a whole, are Arm's length and consistent with the ordinary course past dealings of Carrier and KFI, including with respect to the nature of the services and the resources and effort required by Carrier to perform such services. In all cases, the types of Carrier Services benefitting KFI that are provided under the Agreement are intended to be limited to the normal scope of services permitted under the applicable law and regulations governing both Carrier and KFI.

| **Information Technology** |
| --- |

Serve as the IT resource team to manage architecture, infrastructure, development, installation, administration and operation of corporate applications, computer systems, hardware networks, data centers, and other IT assets such as computers, servers, network printers, tablets, and cell phones, and support purchases of such assets through management of lease agreements with third-party providers. Carrier may provide information technology services consisting of, but not limited to:

Corporate Applications
- Provide overall support for KFI's corporate applications across commercial, operations and back-office support functions including ERP system (currently Oracle JDE EnterpriseOne, Workday, ServiceNow, etc.)

IT Infrastructure
- Provide infrastructure services consisting of:
  - Connectivity
  - Hardware maintenance and management
  - Software maintenance and management
  - Infrastructure, server, storage, and web hosting
  - Telephonic and electronic communications (including teleconferencing)
  - Global network security
  - Emails
  - Disaster recovery
  - SAP licenses and
  - Procurement and operations software and support

IT Cybersecurity
- Implement, train, and manage information security and security governance procedures and processes; manage network security protocols and employee training

Digital Operations
- Provide overall IT consulting, strategic planning, project management and business analysis

20

- Provide a robust IT problem resolution process, including an issues/resolution log including root cause analysis and corrective action to address and resolve vulnerabilities in applications and infrastructure; and 24/7 Help Desk support to effectively manage the business globally, including managing third party vendor to support day-to-day IT tickets for both software and hardware
- Support website maintenance and updates for all KFI-related websites (including "Kidde-Fenwal.com" and branch sites for Kidde Fire Systems and Fenwal Controls), including uploading of documentation for news, bulletins, product data and product launch information, etc. Maintain and update KFI's electronic ordering portal ('Extranet') and interface servers between ERP system, website, and Extranet, and support design, development, and maintenance of Bill of Material (BOM) Generator and interfaces with said servers, as well as support for uploading of large executable files for KFI's Flow Software
- Manage IT third-party vendors and associated agreements, including service level agreements (including uptime guarantees, response times, resolution times, etc.) agreed upon with KFI
- Assure availability to an adequate number of up-to-date licenses to enable use of Carrier contracts for software, services, support, and hardware

**Legal**

Subject to confirmation that any specific legal service request would not give rise to a conflict of interest, serve as the legal services provider for managing review and drafting of contracts, corporate liability and litigation support, assistance with intellectual property matters, and ITC (International Trade Compliance) support to ensure effective and compliant management of the business. Carrier may provide legal services consisting of, but not limited to:

Contracts and Agreements
- Provide legal services support including business counsel, paralegal support, trade compliance, government contracts support, and legal support for sourcing/procurement, enterprise operations (supply chain and manufacturing), and labor law compliance
- Assist with the drafting of sales and distributor contracts and contract renewals

Corporate Liability and Litigation
- Provide litigation support and subject matter expertise including support for general litigation, antitrust/competition law, privacy/data security, environmental, health, safety and product stewardship, employment benefits and mergers / acquisitions

Local Legal Counsel and Negotiation
- Assist with identifying local legal counsel and negotiation of fees for both US and International matters

Intellectual Property and Infringement
- Provide intellectual property legal services to support registration, protection, and infringement assistance regarding patents, trademarks, copyrights, trade secrets, and confidentiality agreement

Other Legal Matters
- Manage the ethics and compliance program to include code of conduct, training, reporting hotline, compliance investigations and third-party risk assessments
- Provide consultative services on physical security matters
- Provide support in terms of how the business interacts with governments, government regulations and the legislative and regulatory arms of government

21

- Provide Legal support of collection of bad/aged debt with third parties at the request of KFI

## Human Resources[1]

Provide consultative support, policies and systems to KFI HR to facilitate HR operations, learning & development, compensation, benefits & relocation services, recruit, source & select support consistent with support levels provided as of the Effective Date. Carrier may provide human resources services consisting of, but not limited to:

HR Operations
- Design, support, and maintain the global HR information systems, applications and processes, and other embedded and stand-alone HR systems, applications, and processes
- Provide employee self-service Global People Services on Workday, general HR inquires, U.S. leave management, including disability, return to work, HR reporting and other transactions within the Global People Services scope of work
- Provide HR consultative support for employee/labor relations, compliance and investigation processes. Interim direct support may be provided during a reasonable period as KFI hires local HR to backfill the role vacant at separation
- U.S. benefits compliance, such as compensation claims, Medicare, Title 19, company claims, assist with AAP and employee engagement
- Ongoing HR support for Carrier employees located outside of the U.S. that support the KFI business consistent with the Carrier HR Operating model.  As of 11 May 2023, this includes the following resources, which will be amended from time to time:
  - India (4 sales, 17 engineers)
  - UAE (3 sales, 1 business development)
  - Singapore (3 sales, 1 customer service)
  - Canada (1 sales)
  - Brazil (1 sales)
  - Hong Kong (1 sales)
  - Thailand (1 sales)

Learning & Development
- Access to standard Carrier Learning & Development systems and programs

Compensation, Benefits & Relocation
- Benefits program administration, management of benefits, vendor relations and negotiations, and overall cost management for benefits programs; leverage global Total Rewards processes, policies, and procedures to provide benefits and benefits administration
- Coordinate service awards
- Inclusion in Carrier's standard relocation and global assignment policies and 3rd party support

Recruit, Source, Select

---

[1] Carrier does not intend to provide local HR Business Partner support via this Agreement.  It is understood that KFI is in the process of backfilling an open HR Business Partner role, which was recently vacated.  KFI will work diligently and in good faith to promptly hire a qualified individual for that role.  If KFI is unable to hire a qualified backfill, KFI may request an amendment hereto pursuant to Section 2.1.1 of the Agreement.

22

- Access to talent acquisition systems and 3rd party support consistent with Carrier's HR Operating Model for salaried positions
- HR consultative support and benchmarking as needed from time to time for unique and challenging hiring

Talent Management
- Access to performance management systems and standard Carrier tools and training to support performance management, including third party vendors (currently Workday and SAPsuccessfactors)

## Operations Support

Serve as the operational support services provider for inventory management, procurement, logistics and quality support required to effectively manage the business. Carrier may provide operational support services consisting of, but not limited to:

Make-versus-Buy
- Provide consultative support of KFI strategic analysis for make-versus-buy decisions

Inventory Management
- Inventory and demand planning, and supervision and monitoring of inventory levels

Procurement
- Procure raw materials and goods as requested by KFI through Carrier Centre of Excellence
- Assist in developing sourcing strategies across categories, establish and implement sourcing processes, and enable input into global sourcing strategy
- Assist with supplier selection process, supplier performance review, and provide supplier support where needed, including assistance with supplier development, quality, and compliance with established system requirements

Logistics
- Provide assistance regarding group pricing and contracts for shared vendors, including freight rates negotiated through Global Logistics team

Product Importation
- Support importation of materials and goods through Carrier Centre of Excellence as requested by KFI

Quality
- Provide support for the quality function as requested by KFI

## R&D / Engineering

Carrier may provide R&D / Engineering services consisting of, but not limited to:

- Provide support for KFI engineering efforts through Carrier HRDC in India, Carrier/F&S Advanced Solutions / Research (Chemistry Lab), Carrier WHQ Sound & Vibration team and SRDC (Syracuse Research & Development Centre) for failure analysis and metrology, access to Syracuse computing cluster for advanced modeling, and incorporation of Infrasensing with IFPS
- Provide support for engineering training, including Engineering University classes
- Provide access to IHS documents, standards, and reports, as well as any standard work, templates, and related material

- Support joint development projects as mutually agreed, including projects that are in-process and identified as of the Effective Date

## Finance and Accounting

Serve as the finance and accounting services provider for AR, AP, Accounting, FP&A, tax, and treasury support, and payroll services required to effectively manage the business. Carrier may provide finance & accounting services consisting of, but not limited to:

Accounts Receivable
- Maintain records regarding payments and account status
- Credit and collections - review accounts, customer payment history, customer credit history
- Manage collection of bad/aged debt with third parties at the request of KFI
- Report consolidated and customer level DSO KPIs
- Send payment reminders (statements), with copies to appropriate team(s)
- Contact customers to discuss accounts, with coordination from appropriate customer account managers
- Record receipt of customer payments
- Manage credit memos coordinating with appropriate team(s)
- Ensure timely processing of cash receipts and cash applications

Accounts Payable
- Review, code, and record supplier invoices
- Resolve discrepancies
- Review vendor statements
- Process debit memos
- Match invoices, PO's and receipt document for physical goods; for non-physical purchases, assure correct level of entity approval to authorize payment
- With correct supporting documentation and approvals, process supplier invoices for payment
- Data entry, as required, for receipt of vendor invoices and payment
- Review, code and process checks, wires, and ACH payments
- Process recurring payments, with appropriate controls and approvals
- Ensure controls by having invoices approved by a different person than the person paying the invoice
- Manage debit memos coordinating with appropriate team(s)
- Assist suppliers to get set up in the system and maintain accurate data
- Ensure timely processing of invoices and documentation of any issues (invoice approval is the responsibility of KFI)
- Process recurring payments, with appropriate controls and approvals
- Communicate with suppliers and respond to inquiries, coordination with procurement and sourcing teams
- Maintain vendor master file, with input from procurement and sourcing teams and other appropriate teams
- Monitor accounts to make sure payments are up to date, with escalation to procurement and sourcing teams to accelerate delinquent payments
- Report consolidated and supplier level DPO KPIs

Accounting, FP&A, Tax and Treasury Support
- Provide accounting and FP&A services including monthly trial balance and close, financial planning and analysis, financial report (both external and internal), management reporting (e.g., financials, operations) and cash forecasting.

24

- Financial Planning & Analysis review & support of monthly close & forecasting process and provide cross-training support
- Provide support with asset accounting, tracking, and reporting
- Add/remove assets based on inputs from appropriate entity teams
- Manage tax returns, tax support, tax compliance, tax consulting, and tax accounting support
- Administer the bank accounts of the KFI pursuant to duly signed letter of instructions, including management of the authorized signatories
- Maintain the records of KFI's financial transactions, balances, and interest earnings and expenses and reconcile such records to statements issued by KFI's banks
- Provide SWIFTNet connectivity with Bank of America for payment processing, acknowledgements, and electronic statements
- As requested, support day-to-day monitoring and management of bank accounts, including but not limited to (a) generation of reports and leveraging of functionality from Bank of America's CashPro platform, (b) routing and directing of support requests to appropriate Bank of America contact points
- Manage establishment and maintenance of transfer pricing process for all global entities
- Provide support with cash collection, with input from appropriate KFI team(s)

Payroll
- In conjunction with HR, provide payroll services, including self-service support for employees and support for time reporting and analytics, as well as systems and contracts for Payroll processing
- Provide design, support and maintenance of global payroll processing systems, applications, and processes

Provide additional finance/accounting support through Carrier Centers of Excellence, including:
- Maintaining bill of material costing
- Annual costing evaluations
- Excess and Obsolete review, oversight and recording
- Management of costs that require capitalization
- Management of freight accruals
- Oversight and analysis of cycle count program to include updates to inventory balances
- Owner of material ledger
- Management of financial controls (completed documentation, controls testing, results reporting, documentation of failed controls, development and implementation of action plans
- Management and engagement with internal and external auditors during audit process
- Ensure all documents are provided to auditor
- Review audit results and record any audit issue action plans that impact financial reporting
- Perform annual GAP assessment, risk assessment and segregation of duties review
- Annual system access reviews for financial significant systems

**Insurance**

25

Carrier may provide insurance services consisting of, but not limited to:

- Manage global insurable property and global casualty risks and engage in risk assessment and management
- Loss prevention, contingency planning, non-insurance risk transfer techniques
- Develop and implement strategies for risk financing
- Negotiate and procure insurance and insurance services
- Claims management and support
- Management of Carrier's cell captive and accurate accounting of related costs

## Environmental, Health, & Safety (EH&S)

Provide guidance and support services to enable compliance with applicable regulatory requirements including implementing site-specific environmental, health, and safety practices and procedures, risk management, audits, permitting support, environmental site investigation/remediation, and reporting to regulatory agencies. Carrier may provide EH&S services consisting of, but not limited to:

Environmental, Social and Governance
- Verify Environmental, Social, and Governance (ESG) data reported by KFI to ensure compliance with SEC requirements and annual reporting obligations

Environmental Site Investigation and Remediation
- Manage environmental site investigations and remediation activities and reporting to government agencies, with support from third party consultants

Environment, Health, and Safety Compliance
- Provide compliance guidance and support services including industrial hygiene monitoring, EH&S training, personal protective equipment requirements, job hazard assessments, audits and corrective action implementation, incident investigation and reporting, communication of global regulatory changes, product stewardship, and compliance guidance with global chemical regulations, with the support of third-party consultants as needed
- Manage medical claims, track employee medical monitoring and medical records maintenance support systems and processes
- Provide EH&S permitting support and report EH&S compliance information to regulatory agencies on behalf of KFI

## Marketing, Sales and Communications

Carrier may provide marketing, branding and sales services consisting of, but not limited to:

Marketing
- Provide support for marketing surveys, marketing promotion, product literature, and related customer awareness and management tools and processes; manage trade shows and other customer events
- Assist with the planning, design and implementation of branding and trademarks, including branding policy and guidelines approval, and support for web presence, web stat analytics, data analytics, content for trade articles, trade shows, external marketing materials

Sales

- Provide sales training and manage any associated third-party vendors for sales training
- Support sales for KFI globally through non-KFI employees

<u>Communications</u>
- Provide consulting and guidance for crisis communication (including coordination with KFI's external communications service provider), corporate communications and digital communications (including websites and social networks)

| Real Estate |
| --- |

Carrier may provide Real Estate services consisting of, but not limited to:
- Provide support for lease management and real estate project management support

27

## EXHIBIT B

## KFI SERVICES

Below is a list of business services that may be provided by KFI to Carrier and its wholly owned entities at the request of Carrier in accordance with this Agreement. It is not exhaustive but is intended to provide guidance as to the type of KFI Services covered.  In all cases, the types of KFI Services benefitting Carrier that are provided under the Agreement are intended to be limited to those types of services permitted under the applicable law and regulations governing both KFI and Carrier.

As of the Effective Date, KFI will render the KFI Services including but not limited to the following services:

KFI Services and allocated costs from KFI to Marioff US:
- Occupancy at Ashland MA facility – rent, office, utilities
- Management and functional support
- Operations management, shipping, quality
- Engineering management and allocation
- Facilities management
- Supply Chain support
- Sourcing and purchasing
- Inventory maintenance
- Customer Service support
- Local HR allocation
- Local Legal allocation
- Information technology:
  - JDE system licenses
  - LTI Support – IT – JDE Experts
  - ATOS, back-off support, servers, etc.

KFI Services provided to other Carrier entities:
- KFI Services to support Kidde UK and Kidde India include KFI engineering, operations, sales, and supply chain
- KFI Services for management and supervisory engineering support services related to the Kidde India engineering team (~17 headcount as of 5-May-23) and Carrier HRDC (Hyderabad Research & Development Center)
- KFI Services include ERP/JDE information technology support services that serve the broader JDE environments across Carrier's Fire & Safety business

## Schedule A

1. Fee

The Carrier Services covered under this Agreement will be invoiced to KFI (allocated where relevant between KFI and other entities as set out in Section 2 below) at a Fee calculated at an Arm's Length rate by Carrier, which fee shall reflect the total Cost to provide the Carrier Services plus a mark-up (where a mark-up is applicable).

Carrier shall update the methodology outlined in this Schedule A, as necessary to meet the Arm's Length standard. An analysis will be completed from time to time, as needed, by Carrier or its designee to confirm that the methodology employed in calculating Costs under this Agreement meet the Arm's Length standards that govern (i) the provision of the Carrier Services and (ii) each of Carrier and KFI. Carrier shall update the methodology outlined in Schedule A where the results of the comparable analysis indicate the methodology or any of its components no longer meets the Arm's Length standards.

2. Allocation

The Fee chargeable by Carrier shall be determined as follows:

    a.  Direct allocation of the Costs incurred by Carrier for Carrier Services identified at the time the Carrier Service is provided to KFI or based on a periodic survey. To the extent a direct allocation of Costs is impossible by reason of the nature of the Carrier Services, the provisions of paragraph (b) below shall apply.

    b.  For the Carrier Services provided to KFI or KFI and one or more other entities, the relevant Costs shall be identified and allocated to the parties using a reasonable method taking into account the benefits received by KFI and consistent with past practice, updated in accordance with changes in Carrier policy applicable to other subsidiaries. A reasonable method may include, but is not limited to, one of the following allocation methods, for example: time spent, headcount, transactions, contracts, sales, turnover, and average net investment.

    c.  To the extent that Carrier incurs any costs or expenses for the benefit of, or on behalf of, KFI, those amounts shall be allocated entirely to KFI and reimbursed under this Agreement.

4893-0338-0320 v.12

3.   Costs

Costs incurred by Carrier in providing the Carrier Services that form the basis for the Fees may include:

salary and wages, bonuses,

other employee costs, including personnel benefits costs,

training,

travel and living expenses,

contractor expenses,

other outside services and fees,

rent,

other facilities expenses,

equipment maintenance,

communication-related expenses,

office expenses,

legal expenses,

advertising and promotion expenses,

depreciation of fixed assets,

amortization of intangibles,

insurance,

applicable taxes, and

other miscellaneous expenses and apportioned overhead.