## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>KFI WIND-DOWN CORP.,[1]<br><br>    Debtor. | Chapter 11<br><br>Case No. 23-10638 (LSS) |

## DISCLOSURE STATEMENT FOR DEBTOR'S FIRST AMENDED PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Justin J. DeCamp (admitted *pro hac vice*)
Benjamin S. Beller (admitted *pro hac vice*)
Julie G. Kapoor (admitted *pro hac vice*)
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
      gluecksteinb@sullcrom.com
      decampj@sullcrom.com
      bellerb@sullcrom.com
      kapoorj@sullcrom.com

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Daniel B. Butz (No. 4227)
Tamara K. Mann (No. 5643)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
E-mail: dabbott@morrisnichols.com
      aremming@morrisnichols.com
      dbutz@morrisnichols.com
      tmann@morrisnichols.com

Dated: November 25, 2024
      Wilmington, Delaware

> **THIS IS NOT A SOLICITATION OF VOTES OF ACCEPTANCE OR REJECTION OF THE PLAN.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.**

---

[1] The last four digits of KFI Wind-Down Corp.'s tax identification number are 5282. The Debtor's corporate headquarters is located at c/o AlixPartners 909 Third Avenue, New York, NY 10022.

A SOLICITATION OF VOTES IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE DEBTOR'S PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE.

UNLESS EXTENDED BY THE DEBTOR IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER, THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M. (PREVAILING EASTERN TIME) ON [APRIL 4], 2025.

THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS [JANUARY 22], 2025 (THE "<u>VOTING RECORD DATE</u>").

THE DEBTOR'S BOARD OF DIRECTORS HAS APPROVED THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN AND THE TRANSACTIONS CONTEMPLATED AND DESCRIBED HEREIN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT OR REJECT THE CHAPTER 11 PLAN IT DESCRIBES HEREIN. NO PERSON SHOULD USE OR RELY ON THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT IS BEING DISTRIBUTED TO PARTIES-IN-INTEREST AS A SETTLEMENT PROPOSAL AND IS THEREFORE SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND OTHER APPLICABLE RULES, AND DOES NOT CONSTITUTE AND MAY NOT BE CONSTRUED AS AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER IN CONNECTION WITH ANY PENDING, THREATENED AND POTENTIAL LITIGATION, ARBITRATIONS OR DISPUTES. THE DEBTOR AND ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS OR INTERESTS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS OR INTERESTS.

IF THE BANKRUPTCY COURT DOES NOT CONFIRM THE CHAPTER 11 PLAN AND/OR THE CHAPTER 11 PLAN DOES NOT BECOME EFFECTIVE, NO PORTION OF THE CHAPTER 11 PLAN, INCLUDING ANY SETTLEMENTS, WILL BECOME EFFECTIVE.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN AND DOCUMENTS RELATED THERETO, STATUTORY PROVISIONS RELEVANT TO CONFIRMATION OF THE PLAN, EVENTS IN THIS CHAPTER 11 CASE AND FINANCIAL INFORMATION RELATED TO THE DEBTOR AND THE LIQUIDATING TRUST. ALTHOUGH THE DEBTOR BELIEVES SUCH SUMMARIES ARE FAIR AND ACCURATE, THEY ARE QUALIFIED IN THEIR ENTIRETY BY SUCH DOCUMENTS AND STATUTORY

**PROVISIONS TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRETY OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.**

**FACTUAL INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.**

**THE DEBTOR IS MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTOR MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTOR HAS NO AFFIRMATIVE DUTY TO DO SO.  HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED MATERIALLY SINCE THIS DISCLOSURE STATEMENT WAS FILED.  THE DEBTOR RESERVES THE RIGHT TO FILE AN AMENDED DISCLOSURE STATEMENT FROM TIME TO TIME.**

**NO PERSON SHOULD RELY ON ANY OTHER INFORMATION THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED BY REFERENCE HEREIN.  THE DEBTOR HAS NOT AUTHORIZED ANYONE TO PROVIDE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.**

**EACH HOLDER OF A CLAIM OR INTEREST ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE CASTING A BALLOT.  THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  ANY PERSONS DESIRING ANY SUCH ADVICE OR OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS.**

**THE DEBTOR MAKES STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995, AS AMENDED.  THE DEBTOR CONSIDERS ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING**

**STATEMENTS.  FORWARD-LOOKING STATEMENTS REPRESENT THE DEBTOR'S ESTIMATES AND ASSUMPTIONS ONLY AS OF THE DATE SUCH STATEMENTS WERE MADE.  THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTOR'S ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE MATERIALLY DIFFERENT FROM THOSE IT MAY PROJECT, AND THE DEBTOR UNDERTAKES NO OBLIGATION TO UPDATE ANY SUCH STATEMENT.  THE DEBTOR EXPRESSLY CAUTIONS READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF SUCCESS OR THE DEBTOR'S ABILITY TO SATISFY ALL CLAIMS OR INTERESTS TO BE PAID UNDER THE PLAN.  THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT NEED TO BE CONSIDERED.  SEE ARTICLE VIII OF THIS DISCLOSURE STATEMENT, ENTITLED "ADDITIONAL FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM OR INTEREST TO ACCEPT THE PLAN.**

# TABLE OF CONTENTS

Page

**ARTICLE I. EXECUTIVE SUMMARY** ...........................................................................1

    A.    **Purpose of this Disclosure Statement** ...............................................2

    B.    **Classification of Claims and Interests** ..............................................2

    C.    **Voting on the Plan** ...............................................................................3

    D.    **Confirmation of the Plan** ...................................................................5

**ARTICLE II. BACKGROUND** ........................................................................................6

    A.    **Overview of the Debtor's Businesses** ................................................6

    B.    **Factors Leading to the Commencement of This Chapter 11 Case** ...................8

**ARTICLE III. SIGNIFICANT EVENTS AND INITIATIVES IN THIS CHAPTER 11 CASE** ........................................................................................12

    A.    **Commencement of the Chapter 11 Case** ...........................................12

    B.    **First Day Relief** ..................................................................................12

    C.    **Stay of Litigation** ...............................................................................13

    D.    **Appointment of the Committee** ........................................................13

    E.    **Retention of Debtor Professionals** ...................................................14

    F.    **The Ad Hoc Committee of Governmental Claimants** .....................14

    G.    **Schedules and Statements and 341 Meeting** ....................................15

    H.    **Bar Date and Claims Process** ...........................................................15

    I.    **The Future Claimants' Representative** .............................................15

    J.    **Asset Sale** ............................................................................................16

    K.    **The Insurance Adversary Proceedings** ...........................................18

    L.    **The Special Committee Investigation** ..............................................18

    M.    **Mediation** ...........................................................................................18

    N.    **The Plan Support Agreement** ...........................................................19

**ARTICLE IV. SUMMARY OF THE PLAN** ...............................................................20

    A.    **Classification, Treatment and Voting of Claims and Interests** .....................21

    B.    **Implementation of the Plan** ..............................................................29

    C.    **Treatment of Executory Contracts and Unexpired Leases** ...........42

    D.    **Provisions Governing Distributions** ................................................43

    E.    **Settlement, Release, Injunction and Related Provisions** ...............47

    F.    **Conditions Precedent to the Effectiveness of the Plan** ..................53

**ARTICLE V. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN** ..........................................................................................57

    A.    **The Confirmation Hearing** ...............................................................57

    B.    **Confirmation Standards** ...................................................................58

    C.    **Best Interests Test** ..............................................................................59

    D.    **Financial Feasibility** ..........................................................................62

    E.    **Acceptance by Impaired Classes** ......................................................62

    F.    **Confirmation Without Acceptance by All Impaired Classes** .........62

v

**G.**    **Classification** ........................................................................................**64**

**ARTICLE VI. VOTING PROCEDURES** .........................................................**66**

    **A.**    **Parties-in-Interest Entitled to Vote** ..................................................**67**
    **B.**    **Classes Under the Plan** ...................................................................**68**
    **C.**    **Form, Content, and Manner of Notices** ..........................................**68**
    **D.**    **Voting Procedures** .........................................................................**70**

**ARTICLE VII. EFFECT OF CONFIRMATION** ...........................................**73**

    **A.**    **Binding Effect of Confirmation** ......................................................**73**
    **B.**    **Good Faith** ......................................................................................**73**

**ARTICLE VIII. ADDITIONAL FACTORS TO BE CONSIDERED PRIOR TO VOTING** ..................................................................................................**74**

    **A.**    **Risks Relating to the Bankruptcy Process** .....................................**74**
    **B.**    **Additional Risk Factors** .................................................................**79**

**ARTICLE IX. MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ............................................................................................**81**

**ARTICLE XI. RECOMMENDATION** .............................................................**87**

4870-8408-8808 v.6

**Appendices and Exhibits**

Appendix A            Debtor's First Amended Plan of Liquidation under Chapter 11 of the
                     Bankruptcy Code
Appendix B            Liquidation Analysis
Appendix C            Disclosure Statement Order

# ARTICLE I.

# EXECUTIVE SUMMARY

On May 14, 2023 (the "Petition Date"), KFI Wind-Down Corp. f/k/a Kidde-Fenwal, Inc. (the "Debtor") filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") (the "Chapter 11 Case").  The Debtor continues to operate as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

Simultaneous with the filing of this Disclosure Statement, the Debtor filed the *Debtor's First Amended Plan of Liquidation Under Chapter 11 of the Bankruptcy Code* (as may be further amended, supplemented or modified from time to time, including the Plan Supplement and all other exhibits and schedules thereto, in each case, as they may be further amended, modified or supplemented from time to time, the "Plan") [D.I. [●]].  The Plan is annexed hereto as Appendix A and is incorporated herein by reference.

Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan; *provided*, that any capitalized term used herein that is not defined herein or in the Plan, but is defined in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), will have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

The Plan and this Disclosure Statement are being filed in accordance with the Plan Support Agreement, which was entered into on October 18, 2024 by and among the Debtor, Carrier, the Committee and the MDL PEC Co-Leads (together, such parties, the "Settling Parties").  The Plan Support Agreement and the settlements and comprises contained therein were reached following 10 months of good faith, arm's-length mediation, which is described in additional detail below.  Pursuant to, and subject to the terms and conditions of, the Plan Support Agreement, which is described further in Article III.N, Carrier shall pay a $540 million guaranteed cash payment (the "Guaranteed Cash Payment"), split across five payments over five years, into the Primary AFFF Settlement Trust established pursuant to the Plan in exchange for: (i) the resolution, mutual waiver and full and final release of any and all Released Claims capable of being asserted against Carrier and certain other Released Parties by or on behalf of the Debtor or its Estate (the "Estate Claims Settlement") and (ii) a share of the proceeds from the sale of the Debtor's assets and its settlement or recovery under the Insurance Policies.  Pursuant to the Plan and the Settlement Trust Documents, AFFF Claims against the Debtor or its Estate will be channeled to and administered through the Primary AFFF Settlement Trust or the Sovereign State AFFF Settlement Trust, as applicable.  The Primary AFFF Settlement Trust will be funded with the Guaranteed Cash Payment and certain rights to recoveries under the Insurance Policies.  The Plan Support Agreement also provides for a separate settlement of certain direct claims against Carrier in the AFFF MDL, which settlement will be subject to approval in the AFFF MDL.

The Settling Parties believe that the compromises contemplated under the Plan are fair and equitable, maximize the value of the Debtor's Estate, and provide the best recovery to

stakeholders.  The Debtor believes that the Plan represents the best available option for completing this Chapter 11 Case.  The Debtor strongly recommends that you vote to accept the Plan.

## A.      Purpose of this Disclosure Statement

Chapter 11 helps a company maximize recovery to all stakeholders.  The consummation of a plan is the principal objective of a chapter 11 case.  A plan sets forth the means for satisfying claims against, and interests in, the debtor.  Confirmation of a plan by a bankruptcy court binds the debtor and any creditor or interest holder of the debtor.  Subject to certain limited exceptions, the order approving confirmation of a plan enjoins parties from enforcing any debt that arose prior to the date of confirmation of the plan or from bringing any causes of action against the debtor in connection with such debt.

In general, a plan (a) divides claims and interests into separate classes, (b) specifies the property or other distributions that each class is to receive under the plan and (c) contains provisions necessary to implement the plan.  Under the Bankruptcy Code, "claims" and "interests," rather than "creditors" and "equity holders," are classified because creditors and equity holders may hold claims and interests in more than one class.

The Debtor submits this *Disclosure Statement for Debtor's First Amended Plan of Liquidation Under Chapter 11 of the Bankruptcy Code* (this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code for the purpose of soliciting votes on the proposed Plan. The purpose of this Disclosure Statement is to provide the Holders of Claims and Interests who are entitled, and will be solicited, to vote on the Plan with information of a kind and in sufficient detail, to make an informed decision on whether to accept or reject the Plan.  Pursuant to section 1125 of the Bankruptcy Code, acceptances of a chapter 11 plan may be solicited only after a Bankruptcy Court-approved written disclosure statement has been provided to each creditor or interest holder who is entitled to vote on the plan.

This Disclosure Statement includes, among other things, information pertaining to the Debtor's prepetition business operations and corporate history and the events leading up to the Chapter 11 Case.  In addition, an overview of the Plan is included, which overview sets forth certain terms and provisions of the Plan, the effects of Confirmation of the Plan, certain risk factors associated with the Plan and the manner in which distributions will be made under the Plan.  This Disclosure Statement also discusses the Confirmation process and the procedures for voting, which procedures Holders of Claims and Interests entitled to vote under the Plan must follow to ensure their votes are counted.

## B.      Classification of Claims and Interests

Your ability to vote on, and your distribution (if any) under, the Plan depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests, as set forth in Article 4 of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  For each Class, the Plan describes (a) the underlying Claim or Interest, (b) the treatment of Claims or Interests in that Class under the Plan and (c) whether the Class is

-2-

Impaired under the Plan, meaning that each Holder will receive less than full value on account of its Claim or Interest or that the rights of Holders under law will be altered in some way.

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Claims and Priority Tax Claims, which will generally be paid in Cash when approved by the Bankruptcy Court, in the ordinary course on or after the Effective Date.

The classification of Claims and Interests pursuant to the Plan is as follows:

| Class | Designation | Status | Voting Rights |
|-------|-------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Secured Claims | Unimpaired | Deemed to Accept |
| 3A | Water Provider Claims | Impaired | Entitled to Vote |
| 3B | Airport Claims | Impaired | Entitled to Vote |
| 3C | Sovereign State Claims | Impaired | Entitled to Vote |
| 3D | Property Damage and Business Loss Claims | Impaired | Entitled to Vote |
| 3E | Personal Injury Claims | Impaired | Entitled to Vote |
| 3F | Sovereign Tribe Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Affiliate Claims | Impaired | Deemed to Reject |
| 6 | Interests | Impaired | Deemed to Reject |

## C.    Voting on the Plan

### 1.    Parties-in-Interest Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless: (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof; or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, under section 1126(a) of the Bankruptcy Code, the holder of a claim or interest that is allowed under a plan is entitled to vote to accept or reject the plan if such claim or interest is impaired under the plan.  Under section 1126(f) of the Bankruptcy Code, the holder of a claim that is not impaired under a plan is conclusively presumed to have accepted the plan, and the plan proponent need not solicit such holder's vote.  Under section 1126(g) of the Bankruptcy Code, the holder of an impaired claim or impaired interest that will not receive any distribution under the plan in respect of such claim or interest is deemed to have rejected the plan and is not entitled to vote on the plan.  For a detailed description of the treatment of Claims and Interests under the Plan, refer to Article IV below—*Summary of the Plan*.

Classes 1 and 2 are Unimpaired under, and conclusively presumed under section 1126(f) of the Bankruptcy Code to have accepted, the Plan.

-3-

Classes 3A, 3B, 3C, 3D, 3E, 3F and 4 are Impaired under, and entitled to vote to accept or reject, the Plan.

Classes 5 and 6 are Impaired under, and deemed under section 1126(g) of the Bankruptcy Code to have rejected, the Plan.

Except as described in Article V below—*Statutory Requirements for Confirmation of the Plan*, the Bankruptcy Code requires, as a condition to confirmation of the Plan, that each Impaired Class accept the Plan.  Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in such class that have voted to accept or reject the plan.  Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of interests as acceptance by holders of at least two-thirds in dollar amount of interests in such class that have voted to accept or reject the plan.  Holders of claims or interests who fail to vote are deemed neither to accept nor to reject the Plan.  For a more detailed description of the requirements for confirmation of the Plan, refer to Article V below—*Statutory Requirements for Confirmation of the Plan.*

Even if the Plan has not been accepted by all Impaired Classes entitled to vote, section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan, provided that the Plan has been accepted by at least one Impaired Class of creditors.  Notwithstanding the failure of an Impaired Class to accept the Plan, the Plan can be confirmed by a procedure commonly known as cram-down, provided the Plan does not "discriminate unfairly" and is "fair and equitable," for the purposes of the Bankruptcy Code, with respect to each Class of Claims or Interests that is Impaired under, and has not accepted, the Plan.  For a more detailed description of the requirements for confirmation of a nonconsensual plan, refer to Article V below—*Statutory Requirements for Confirmation of the Plan*.

**2.     Submitting a Ballot**

If you are the record Holder of a Claim or Interest in a Class entitled to vote on the Plan, you have received a ballot (the "Ballot") for voting to accept or reject the Plan.

Classes 3A, 3B, 3C, 3D, 3E, 3F and 4 are entitled to and are being solicited to vote to accept or reject the Plan.  If you are entitled to and are being solicited to vote, you should carefully review this Disclosure Statement, including the attached appendices and the instructions accompanying your Ballot or Ballots.  Then, indicate your acceptance or rejection of the Plan by voting for or against the Plan on the enclosed Ballot or Ballots and return the Ballot or Ballots to Stretto, Inc. (the "Solicitation Agent" or "Stretto") or by submitting a Ballot or Ballots through the online electronic ballot portal (as described on the Ballot) maintained by Stretto.

Ballots cast by Holders in Classes entitled to vote must be actually received by the Solicitation Agent by 5:00 p.m. (prevailing Eastern Time) on [April 4], 2025 (the "Voting Deadline").  Ballots received after the Voting Deadline will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected.

For further information, refer to Article VI—*Voting Procedures* below.

**3.      Recommendation**

**The Debtor and the other Settling Parties, including the Committee and the PEC, believe that the compromises contemplated under the Plan are fair and equitable, maximize the value of the Debtor's Estate and provide the best recovery to stakeholders. The Debtor believes that the Plan represents the best available option for completing the Chapter 11 Case.  Accordingly, the Settling Parties strongly recommend that Holders of Claims and Interests entitled to vote on the Plan vote to accept it.**

**D.      Confirmation of the Plan**

**1.      Plan Objection Deadline**

Objections to Confirmation of the Plan must be filed with the Bankruptcy Court and served so as to be actually received on or before 4:00 p.m. (prevailing Eastern Time) on [April 4], 2025.  Unless objections to Confirmation are timely served and filed in compliance with the Disclosure Statement Order, they will not be considered by the Bankruptcy Court.

**2.      Confirmation Hearing**

The Bankruptcy Court has scheduled the hearing to consider confirmation ("Confirmation") of the Plan (the "Confirmation Hearing") to commence at [●] [a.m. / p.m.] (prevailing Eastern Time) on [April 30], 2025.  The Confirmation Hearing may be adjourned by the Bankruptcy Court or the Debtor without further notice other than by announcement in open court and/or notice(s) of adjournment filed on the docket with the Bankruptcy Court's permission.

4870-8408-8808 v.6

**ARTICLE II.**

**BACKGROUND**

A.    **Overview of the Debtor's Businesses**

1.    **The Debtor's Business Lines and Products**

Prior to the closing of the sale of substantially all its assets, discussed further in Article III.J, the Debtor was a U.S.-based manufacturing company located in Ashland, Massachusetts.  Since being formed as a Delaware corporation in 1987, the Debtor continuously owned and operated numerous lines of business related to industrial fire detection and suppression, as well as temperature control products and products to light and control gas burners.  Prior to the closing of the sale, the Debtor was a market leader in the highly-regulated fire detection and suppression industry and offered the broadest array of products of any of its competitors.  The Debtor's business was primarily comprised of two lines: Kidde Fire Systems ("KFS") and Fenwal Controls.

(a)    **Kidde Fire Systems**

The Debtor's primary business line was KFS, which was the world leader in providing total system solutions for special hazard fire protection.  KFS offered a comprehensive portfolio of detection, notification, suppression and control products that could be tailored to fit specific applications.  KFS products protected the U.S. military and a wide range of industries around the world, such as data centers, marine, power, oil and gas, manufacturing, semiconductor, commercial cooking and cultural and heritage.

KFS's product portfolio was comprised of three product groups:  (a) gaseous engineered suppression products, generally suppressing fires that involve certain common combustibles, (b) chemical pre-engineered suppression products, generally suppressing fires that involve cooking liquids, such as cooking oil and greases and (c) detection alarm and control products.

(b)    **Fenwal Controls**

Fenwal Controls was an original equipment manufacturer that manufactured two types of related products, each of which assists in the prevention of fire:  (a) gas ignition controls and (b) temperature controls.  Gas ignition controls operate and monitor gas burners and, if they detect a safety hazard or other malfunction, shut the burner down.  These products are generally used in commercial applications, such as kitchen equipment, recreational vehicles, pools, spas, restaurants, factories and boiler rooms.  Temperature controls perform a function similar to gas ignition controls  but with respect to temperature.  These products are used in a large variety of applications, including MRI machines, agricultural equipment, offshore drilling platforms, gas stations and railways.

2. **The Debtor's Corporate History**

   The Debtor was incorporated in Delaware on September 30, 1987.  On March 8, 2007, the Debtor merged with a sister company, Kidde Fire Fighting, Inc. ("KFFI").  KFFI produced and distributed AFFF as part of its "National Foam" line of business.  Prior to this merger, the Debtor had neither owned nor operated any AFFF-related businesses.

   Following the merger, the Debtor owned and operated the National Foam business, alongside its other businesses, until June 28, 2013, when the National Foam business was sold to an entity controlled by Lloyd's Development Capital and subsequently renamed National Foam, Inc. (together with certain of its affiliates and Related Parties, "New National Foam").  The Debtor has neither owned nor operated any AFFF-related businesses since this 2013 sale.

   The Debtor sold the National Form business to New National Foam pursuant to the Share and Business Sale Agreement, dated as of June 28, 2013 (the "National Foam Sale Agreement").  Under the National Foam Sale Agreement, entities that ultimately became New National Foam assumed all liabilities relating to defective products sold by the acquired businesses prior to June 28, 2013.  New National Foam agreed to indemnify the Debtor against such liabilities.

3. **Ownership of the Debtor**

   The Debtor was originally owned by Hanson Trust, an industrial company based in the United Kingdom.  In 1988, Hanson Trust sold the Debtor and certain affiliated companies comprising the "Kidde" fire protection business to Pilgrim House Group, which, in turn, was subsequently acquired by Williams Holdings plc.  From 1988 to 2000, Williams Holdings plc was the ultimate parent company of the Debtor.

   In November 2000, Williams Holdings plc spun-off its fire protection subsidiaries to a new publicly-listed company, Kidde plc.  From 2000 to 2005, Kidde plc was the ultimate parent company of the Debtor.

   In April 2005, United Technologies Corporation ("UTC," which was succeeded by Raytheon Technologies Corp., now known as RTX Corporation ("RTX")) acquired Kidde plc from the public market.  From 2005 to 2020, UTC was the ultimate parent company of the Debtor.  Following UTC's acquisition of Kidde plc, UTC combined Kidde plc's firefighting business with that of Chubb plc, an affiliate of Chubb Fire, Ltd., which UTC had acquired in 2003.  Chubb Fire, Ltd. was a corporate affiliate of the Debtor during the period when it sold AFFF.

   In April 2020, UTC spun off the Debtor and certain other businesses to Carrier Global Corporation (together with its non-Debtor Affiliates and Related Parties, "Carrier").  Prior to the closing of the sale, the stock of the Debtor was wholly owned by Carrier Global Corporation, other than certain *de minimis* employee shares.  A subsidiary of Carrier Global Corporation, Carrier Fire & Security America Corp, Inc. (f/k/a UTC Fire & Security Americas Corporation), was the indirect parent of the Debtor on the Petition Date.

-7-

As discussed in Article III.J, below, Pacific Erin Opco, LLC ("Buyer"), an acquisition vehicle established by Pacific Avenue Capital Partners, LLC, agreed to purchase substantially all of the Debtor's assets on April 4, 2024.  Following the closing of the Sale on July 1, 2024, the Debtor changed its name to "KFI Wind-Down Corp."

**B.  Factors Leading to the Commencement of This Chapter 11 Case**

**1.  AFFF**

AFFF is a firefighting foam, developed by 3M and the U.S. military in the late 1960s, which is used to extinguish certain types of hydrocarbon-fueled fires primarily at military bases and airports.  National Foam manufactured AFFF for sale to governments (including the U.S. federal government) and non-governmental customers in the U.S. at a single facility in West Chester, Pennsylvania.

AFFF creates a foam "blanket" when sprayed over burning fuel or liquids, which rapidly spreads to block oxygen supply and thus smother the fire and combustible vapors.  The key components of AFFF that contribute to its fire-extinguishing capabilities are known as fluorosurfactants.  Historically, the AFFF products that National Foam produced and distributed were made with fluorosurfactants procured from third-party suppliers.  Neither National Foam nor the Debtor manufactured fluorosurfactants.  The fluorosurfactants in National Foam's AFFF products are alleged to have contained trace amounts of a chemical called perfluorooctanoic acid ("PFOA") and/or other chemicals that allegedly degrade to PFOA over time in the environment.  PFOA is a type of PFAS, a family of chemical compounds that are alleged to be environmentally persistent, bio-accumulative and toxic.  PFAS are found in thousands of products, including food packaging, non-stick cookware, cosmetics, weather-resistant outerwear and firefighting turnout gear.

As discussed above, New National Foam agreed to indemnify the Debtor for liabilities relating to AFFF in the National Foam Sale Agreement.  The Debtor has informed New National Foam of its determination that New National Foam is contractually responsible to indemnify the Debtor and others for substantially all AFFF-related liabilities as a result of allegedly defective products sold by National Foam.  New National Foam has denied that it has an indemnity obligation with respect to AFFF liabilities.  The Debtor has proposed entering into a settlement with New National Foam, pursuant to which Estate Causes of Action against New National Foam will be released for value reasonably acceptable to the Settling Parties, and New National Foam will release the Debtor and each Released Party from any and all Claims based on, relating to, or arising from the National Foam Sale Agreement or any other occurrence taking place before the Effective Date (including New National Foam's Proof of Claim No. 225).  Entering into such an agreement is a condition to the effectiveness of the Estate Claims Settlement and the Consummation of the Plan.

The Debtor also believes that it is entitled to insurance coverage under historical liability policies issued to various corporate entities affiliated with the Debtor and predecessor manufacturers of AFFF beginning in the 1960s.  UTC obtained access to these insurance policies in 2005 when UTC acquired Kidde plc and the National Foam business, and UTC purchased

-8-

insurance coverage during the period from 2005 to 2013 when the National Foam business was owned by subsidiaries of UTC, including the Debtor.  The Debtor obtained or retained access to these policies when UTC spun off Carrier Global Corporation and its subsidiaries, including the Debtor.  The Debtor is aware of at least several billion dollars of potential coverage.  On November 9, 2023 and February 8, 2024, the Debtor commenced adversary proceedings to establish coverage for AFFF claims under some of these policies.  The Causes of Action asserted in these proceedings are Insurance Actions that will be contributed to the Primary AFFF Settlement Trust pursuant to the Insurance Assignment as described in the Plan and set forth in the Insurance Cooperation Agreement.  These proceedings are subject to a motion to stay, which is discussed herein.

> **2.**        **Prepetition AFFF Litigation against the Debtor**

As of the Petition Date, the Debtor and various of its affiliates had been named as defendants in more than 4,400 lawsuits filed by governmental entities, corporate entities and individuals alleging that the historic use of AFFF caused the contamination of drinking water and soil, personal injuries and/or property damage (collectively, the "AFFF Litigation").  As of September 2024, more than 5,600 such lawsuits have been filed naming the Debtor as a defendant.  The Debtor faces claims for its ownership and operation of the National Foam business from 2007-2013 as well as for AFFF produced and distributed by that business prior to the Debtor's ownership or involvement.  In 2018, AFFF-related litigations were consolidated into the AFFF MDL in Charleston, South Carolina, with Judge Richard Gergel presiding.  A Plaintiffs' Executive Committee (the "PEC") was appointed in the AFFF MDL.  A limited number of AFFF-based cases are proceeding outside of the AFFF MDL in state courts.

The AFFF MDL encompasses claims against not only the Debtor and its affiliates, but also against numerous other companies not affiliated with the Debtor that allegedly designed, manufactured, distributed, and sold various AFFF products and/or other components used in the manufacture of AFFF, including fluorosurfactants.  In each particular case within the AFFF MDL, factual questions exist surrounding the presence of PFAS at contamination sites and whether and to what extent various defendants' AFFF products or components thereof allegedly contributed to PFAS contamination at those sites.  The AFFF MDL is comprised of five primary types of litigation involving the Debtor:  (a) water provider cases, (b) airport cases, (c) state attorney general actions, (d) other property damage cases and (e) personal injury cases.  New AFFF cases against various defendants continue to be filed and added to the AFFF MDL on a regular basis.

> (a)        **Water Provider Cases**

In the water provider cases, public water system plaintiffs claim that AFFF manufacturers and AFFF-component manufacturers are liable for PFAS water contamination.  The causes of action in these cases include:  (a) Defective Product – Strict Liability Failure to Warn, (b) Negligent Failure to Warn, (c) Defective Product – Design Defect, (d) Negligence, (e) Private Nuisance, (f) Public Nuisance and (g) Trespass.  Plaintiffs in these cases seek compensatory and punitive damages.  Claims for compensatory damages in these cases are generally premised on alleged remediation costs to treat water and soil to remove two types of PFAS:  PFOA and perfluorooctane sulfonic acid.

(b)      **Airport Cases**

In the airport cases, airport plaintiffs claim that AFFF manufacturers and AFFF-component manufacturers are liable for PFAS contamination at airport facilities, including firefighting training facilities owned by airports.  Alleged causes of action in these cases include: (a) Products Liability, (b) Breach of Warranty, (c) Negligence, (d) Trespass, (e) Private Nuisance, (f) Public Nuisance, and (g) Statutory Causes of Action.  Plaintiffs in these cases seek compensatory and punitive damages, including costs of remediation.

(c)      **State Attorney General Cases**

The state attorney general actions include *parens patriae* cases brought by state attorneys general on behalf of state residents, seeking damages for costs incurred to identify, monitor and remediate PFAS contamination allegedly attributable to AFFF and for associated harm to the state and state residents.  The causes of action in these cases include:  (a) Products Liability and Negligence, (b) Various State or Federal Competition, Consumer or Environmental Protection Laws, (c) Public Nuisance, (d) Trespass and (e) Unjust Enrichment.  The states in these cases seek compensatory and punitive damages, including for harm to natural resources and the costs of remediation.

(d)      **Other Property Damage Cases**

Other property damage cases are actions claiming compensation for damage to property caused by PFAS contamination allegedly attributable to AFFF that does not come within the other groups of cases.  These cases notably include, but are not limited to, cases alleging damage to private wells.  Alleged causes of action in these cases include:  (a) Products Liability, (b) Breach of Warranty, (c) Negligence, (d) Trespass, (e) Nuisance and (f) Conspiracy. Plaintiffs in these cases seek compensatory and punitive damages, including costs of remediation.

(e)      **Personal Injury Cases**

In the personal injury cases, individual plaintiffs claim that they are suffering illness caused by PFAS attributable to AFFF and its components, including various cancers, thyroid diseases, elevated liver enzymes and decreased fertility.  Many of the personal injury actions also include as plaintiffs spouses of individuals allegedly suffering illness, who are suing for loss of consortium.  The causes of action in these cases include:  (a) Negligence/Gross Negligence, (b) Strict Liability, (c) Defective Design, (d) Defective Product – Failure to Warn, (e) Violation of State Consumer Protection, Unfair Competition and Product Liability Laws, (f) Fraudulent Concealment, (g) Medical Monitoring, (h) Battery, (i) Breach of Warranties, (j) Wrongful Death, (k) Loss of Consortium, (l) Nuisance and (m) Conspiracy.  Plaintiffs in these cases seek compensatory and punitive damages, including for the costs of medical monitoring and other personal injury damages.

**3.      The Decision to File for Chapter 11**

On March 29, 2023, Carrier Global Corporation determined that, given the financial situation of the Debtor, it was appropriate for the Debtor's board of directors (the

-10-

"Board") to have a majority of independent directors. Accordingly, the Board was reconstituted to include Francesca Campbell, as the sole representative of Carrier, and two new independent directors: Steve Hannan and Alexander D. Greene. Neither independent director had a prior relationship with the Debtor or Carrier.

Following the appointment of Messrs. Hannan and Greene, the Board immediately began a strategic review process to explore potential alternatives for the Debtor. As part of this process, the Board determined that a sale of the Debtor should be considered among other strategic alternatives. The Board also formed a Special Committee (the "Special Committee"), comprised only of the two independent directors, which was delegated authority to consider all matters relating to investigation of any potential claims against Carrier or RTX.

On May 13, 2023, the Board met and considered the effect of the AFFF overhang on its business prospects and all available strategic options. After consultation with its advisors, the Board determined to authorize the filing of this Chapter 11 Case.

# ARTICLE III.

## SIGNIFICANT EVENTS AND INITIATIVES IN THIS CHAPTER 11 CASE

The following is a general summary of significant events in the Chapter 11 Case, including a discussion of the Debtor's restructuring and business initiatives since the Petition Date.

### A.    Commencement of the Chapter 11 Case

The commencement of a chapter 11 case creates an estate that is composed of all of the legal and equitable interests of the debtor as of that date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."  On the Petition Date, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court, commencing the Chapter 11 Case.  Following the Petition Date, the Debtor has continued to operate its businesses as debtor and debtor-in-possession.

### B.    First Day Relief

On the Petition Date, the Debtor filed a number of "first day" motions and applications designed to ease the Debtor's transition into chapter 11, maximize the value of the Debtor's assets and minimize the effects of the commencement of the Chapter 11 Case.  On May 16, 2024, the Bankruptcy Court entered orders granting the first-day motions, allowing the Debtor to continue certain normal business activities not specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior court approval.  In particular, the Bankruptcy Court entered orders authorizing the Debtor to:

- pay prepetition claims of certain vendors and lienholders [D.I. 57];

- pay prepetition contract worker compensation obligations and continue such obligations postpetition in the ordinary course of business [D.I. 56];

- continue to use its prepetition cash management system, bank accounts and business forms, and to continue postpetition affiliate transactions [D.I. 58];

- provide adequate assurance to utility providers [D.I. 54];

- maintain its customer programs [D.I. 55]; and

- continue operating under the Shared Services Agreement [D.I. 59].

On June 21, 2023, the Bankruptcy Court entered final orders with respect to the Debtor's vendor and lienholder claims [D.I. 192], contract worker obligations [D.I. 191] and maintenance of customer programs [D.I. 190].  On July 7, 2023, the Bankruptcy Court entered a final order with respect to the Debtor's cash management system [D.I. 245].  On July 27, 2023,

the Bankruptcy Court entered a final order authorizing the Debtor to continue operating under the Shared Services Agreement [D.I. 316].

## C.    Stay of Litigation

In addition, the commencement of the Debtor's Chapter 11 Case triggered the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined all collection efforts and actions by creditors, the enforcement of all liens against property of the Debtor and the commencement or continuation of prepetition litigation against the Debtor.

On May 23, 2023, the Debtor initiated an adversary proceeding (1:23-ap-50387 (Bankr. D. Del.)) against parties who are plaintiffs in certain actions that are part of the AFFF MDL [Adv. D.I. 1]. The Debtor filed the *Debtor's Motion for Preliminary Declaratory Injunctive Relief (I) Extending the Automatic Stay in the AFFF Actions and (II) Enjoining the Covered Actions* [Adv. D.I. 2], by which the Debtor sought to stay actions in the AFFF MDL that named the Debtor and/or various affiliated entities as defendants. On July 27, 2023, the Bankruptcy Court entered an order (the "<u>Stay Order</u>") preliminarily enjoining AFFF-related claims against the Debtor, New National Foam and certain of their affiliates and staying certain existing AFFF actions for an initial period of 90 days (the "<u>Stay and Injunction Period</u>"), subject to extension, on the terms set forth therein [Adv. D.I. 69].

On October 19, 2023, the Debtor, the Committee and the AHC (as defined below) filed the *Stipulation Regarding Extension of Stay and Injunction Period* [Adv. D.I. 82], which, pursuant to the Stay Order, extended the Stay and Injunction Period through January 5, 2024. On January 5, 2024, the Debtor, the Committee and the AHC filed the *Second Stipulation Regarding Extension of the Stay and Injunction Period* [Adv. D.I. 82], which extended the Stay and Injunction Period through the later of (a) March 5, 2024 and (b) the date of the first omnibus hearing that is not less than 30 days following the expiration of the Mediation (as defined below), including any extension thereof.

The Mediation, described further below, concluded on September 30, 2024. On November 7, 2024, the Debtor, the Committee and the AHC filed the *Stipulation Regarding Extension of Stay and Injunction Period* [Adv. D.I. 100], which extended the Stay and Injunction Period through January 31, 2025, subject to further extension.

## D.    Appointment of the Committee

On May 31, 2023, Andrew R. Vara, the United States Trustee for Region 3 (the "<u>U.S. Trustee</u>") appointed the Committee pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the Chapter 11 Case [D.I. 83]. The members of the Committee are California Water Service Company, Peoples Water Company of Florida, Inc., Bellflower-Somerset Mutual Water Company, Arthur Schaap d/b/a Highland Dairy, Patrick Williams, Richard M. Bivone, David Hermann, Terry T. Miller and S.O. Sales. The Committee is chaired by California Water Service Company and Arthur Schaap d/b/a Highland Dairy.

The Committee selected Brown Rudnick LLP, Stutzman, Bromberg, Esserman & Plifka, P.C. and Hogan McDaniel as its legal counsel, KTBS Law LLP, as special counsel,

Gilbert LLP, as special insurance counsel, Province, LLC as its financial advisor and Houlihan Lokey Capital, Inc. as its investment banker.  The Bankruptcy Court approved the Committee's retentions of these professional advisors [D.I. 319, 358, 360, 364, 365, 366].

The Committee is a party to the Plan Support Agreement and is supportive of the Plan.

## E.    Retention of Debtor Professionals

The Debtor retained, and the Bankruptcy Court approved the retentions of, the following advisors in the Chapter 11 Case:  (i) Sullivan & Cromwell LLP as  co-counsel  [D.I. 322]; (ii) Morris, Nichols, Arsht & Tunnell LLP as co-counsel [D.I. 196]; (iii) Covington & Burling LLP as special insurance counsel [D.I. 318]; (iv) AP Services, LLC as financial advisor [D.I. 255]; (v) Guggenheim Securities, LLC ("Guggenheim") as investment banker [D.I. 317]; (vi) Schulte Roth & Zabel LLP as counsel to the Special Committee [D.I. 208]; and (vii) Stretto, as claims and noticing agent and administrative advisor [D.I. 53, 203].

On June 2, 2023, the Debtor filed with the Bankruptcy Court the *Motion of Debtor for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [D.I. 97].  The Bankruptcy Court entered an order approving the motion on June 23, 2023 [D.I. 205] (the "Interim Compensation Procedures Order").  The Interim Compensation Procedures Order established procedures for the fee application process and payment of professionals retained by the Debtor and any statutory committees appointed in the Chapter 11 Case.

Also on June 2, 2023, the Debtor filed with the Bankruptcy Court the *Debtor's Motion of Debtor for Entry of an Order Implementing Certain Procedures to Retain, Compensate and Reimburse Professionals Utilized in the Ordinary Course of Business* [D.I. 96] (the "Ordinary Course Professionals Motion").  The Ordinary Course Professionals Motion was approved by the Bankruptcy Court on June 23, 2023 [D.I. 204].  In so doing, the Bankruptcy Court established procedures for the employment and compensation of certain ordinary course professionals used by the Debtor in connection with ongoing business operations.

## F.    The Ad Hoc Committee of Governmental Claimants

On June 14, 2023, a group of governmental claimants that allege claims against the Debtor related to AFFF (the "AHC") filed a verified statement pursuant to Bankruptcy Rule 2019 [D.I. 152].  The AHC has filed twelve amended verified statements  [D.I. 213, 311, 329, 352, 545, 586, 724, 824, 875, 1095, 1234, 1474].

On September 24, 2023, the Debtor filed with the Bankruptcy Court the *Motion of Debtor to Enter Into, and Perform Its Obligations Under, the Reimbursement Agreement With the Professionals Retained By the* Ad Hoc *Committee of Governmental Claimants,* Nunc Pro Tunc *to May 14, 2023* [D.I. 483]. The Bankruptcy Court approved that motion on November 13, 2023 [D.I. 627] and authorized the Debtor to reimburse the reasonable fees and expenses of certain professionals retained by the AHC, subject to a fee cap and termination by the Debtor on 30 days' notice.  These reimbursements follow the procedures established by the Interim Compensation Procedures Order.

-14-

The AHC retained Kelley Drye & Warren LLP and A.M. Saccullo Legal, LLC as co-counsel and Berkeley Research Group, LLC as financial advisor.

## G.    Schedules and Statements and 341 Meeting

Pursuant to section 521 of the Bankruptcy Code, Bankruptcy Rule 1007(c) and an order of the Bankruptcy Court granting an extension of time [D.I. 193], on July 11, 2023, the Debtor filed (i) schedules of assets and liabilities, (ii) a schedule of executory contracts and unexpired leases, and (iii) a statement of financial affairs (collectively, the "Schedules") [D.I. 265, 266].  On June 28, 2024, the Debtor filed amended Schedules that updated certain trademarks on the list of intangibles and intellectual property [D.I. 1298].

On July 20, 2023, the U.S. Trustee conducted a meeting of creditors pursuant to section 341 of the Bankruptcy Code (the "341 Meeting").

## H.    Bar Date and Claims Process

On September 13, 2023, the Debtor filed with the Bankruptcy Court the *Motion of Debtor for Entry of an Order (I)(A) Establishing Deadlines for Filing Non-AFFF Proofs of Claim and (B) Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* [D.I. 425].  On September 29, 2023, the Bankruptcy Court entered an order [D.I. 502] granting the motion and, among other things and subject to certain exceptions, established November 10, 2023 at 5:00 p.m. (prevailing Eastern Time) (the "Non-PFAS Bar Date"), as the deadline for all governmental units and non-governmental units to file claims *other than* AFFF Claims against the Debtor.  No bar date for AFFF Claims has been established to date.

## I.    The Future Claimants' Representative

On January 3, 2024, the Debtor filed a motion requesting that the Bankruptcy Court authorize Randi S. Ellis (the "Future Claimants' Representative") to serve as the legal representative for claimants (a) who, after the deadline to be established by the Bankruptcy Court to file proofs of claim on account of AFFF Claims or, if no such date is established by the Bankruptcy Court, following the occurrence of the effective date of a plan in this Chapter 11 Case (the "FCR Effective Date"), assert one or more Personal Injury Claims against the Debtor or certain of its successors based on the Debtor's conduct before the Petition Date, (b) whose claims are AFFF Claims and (c) who could not assert such Personal Injury Claims in the Chapter 11 Case because, among other reasons, the claimant was (i) unaware of the personal injury as of the FCR Effective Date, (ii) not diagnosed with the personal injury until after the FCR Effective Date or (iii) was otherwise unable or incapable of asserting the Personal Injury Claim(s) based on the personal injury [D.I. 805].  The Bankruptcy Court granted that motion on January 24, 2024 [D.I. 863].

The Future Claimants' Representative retained, and the Bankruptcy Court approved the retentions of, the following advisors in the Chapter 11 Case:  (i) Young Conaway Stargatt & Taylor, LLP as counsel [D.I. 923]; (ii) Gilbert LLP as special insurance counsel (co-retained with the Committee) [D.I. 1100]; (iii) Nera Economic Consulting and Axlor Consulting LLC as

claims evaluation consultants [D.I. 1137]; and (iv) FTI Consulting, Inc. as financial advisor [D.I. 1212].

## J.    Asset Sale

### 1.    Bidding Procedures

The Debtor and its advisors developed bidding and auction procedures in order to market and sell the Debtor's operating business, including the KFS business line and the Fenwal Controls business line (collectively, the "<u>Businesses</u>") in this Chapter 11 Case in an orderly and value-maximizing manner (the "<u>Bidding Procedures</u>").  On November 16, 2023, the Debtor filed the *Motion of Debtor for Entry of Orders (I)(A) Approving Bid Procedures in Connection with the Sale of All or Substantially All of the Debtor's Assets, (B) Approving Stalking Horse Bid Protections, (C) Scheduling an Auction for, and a Hearing to Approve, the Sale of the Debtor's Assets, (D) Approving the Form and Manner of Notices of the Sale, Auction and Sale Hearing, (E) Approving Assumption and Assignment Procedures and (F) Granting Related Relief; and (II)(A) Approving the Sale of All or Substantially All of the Debtor's Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Contribution Agreement and (C) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases* [D.I. 648].  On December 12, 2023, the Bankruptcy Court entered an order (the "<u>Bidding Procedures Order</u>") approving the Bidding Procedures [D.I. 735].

### 2.    Marketing Process

Beginning in October 2023 and in accordance with the Bidding Procedures Order, the Debtor and its advisors engaged in discussions with various interested parties regarding a sale of the Businesses.  The Debtor and its advisors conducted an extensive marketing process of the Businesses, including, among other things, reaching out to approximately 200 parties regarding an acquisition of the Businesses.  Approximately 100 of these parties executed non-disclosure agreements and received first-round marketing materials with an overview of information regarding the Businesses.  25 potential bidders submitted indications of interest for the Businesses and, subsequently, the Debtor's management gave 12 management presentations to interested parties and, along with the Debtor's advisors, participated in numerous calls with interested parties to address diligence and related topics.

The Debtor extended the deadline for potential bidders to submit bids three times pursuant to the Bidding Procedures from January 11 to March 15, 2024.  During that additional time, the Debtor sought to generate bids that satisfied the conditions and procedures set forth in the Bidding Procedures Order ("<u>Qualified Bids</u>") through continued marketing and engagement with parties that had submitted indications of interest and other interested parties.

### 3.    The Contribution Agreement

Between October 16, 2023 and March 15, 2024, in order to facilitate the potential sale, the Debtor also negotiated with Carrier regarding certain assets, contracts and other services necessary to operate the Businesses.  As discussed above, Carrier Global Corporation inherited the indirect equity of the Debtor, along with other businesses, from UTC in connection with the spin-off of Carrier Global Corporation from UTC in April 2020.  During the period in which the

-16-

Debtor and certain affiliates of Carrier have been under common ownership, certain assets that have historically been used in or are related exclusively or primarily to the Businesses (the "Related Assets"), including certain intellectual property assets, have been owned or held by Carrier affiliates other than the Debtor.  The Debtor requested that Carrier assist the Debtor's potential sale by contributing such Related Assets in exchange for a percentage of the proceeds of such sale.  Such Related Assets were necessary for the operation of the Businesses as a going concern and therefore their contribution was critical to maximizing proceeds from the sale.

On March 15, 2024, the Debtor and Kidde US Holdings LLC, a Delaware limited liability company and Carrier subsidiary ("KUHL"), entered into a Contribution Agreement (the "Contribution Agreement"), pursuant to which certain KUHL agreed to contribute, assign and transfer rights, titles and interests to the Related Assets to the Debtor in connection with the Debtor's sale of the Businesses.

### 4.    The Bid

The Debtor's marketing process ultimately yielded a bid (the "Bid") from Buyer, which the Debtor, in consultation with the Consulting Professionals (as defined in the Bidding Procedures Order), deemed to be a Qualified Bid in accordance with the Bidding Procedures.

On March 20, 2024, the Debtor, having received no more than one Qualified Bid on or prior to the Bid Deadline, cancelled the auction and declared Buyer as the successful bidder [D.I. 1007].

As set forth in the Stock and Asset Purchase Agreement, dated as of April 4, 2024, by and between the Debtor and Buyer (as may be amended from time to time and together with any schedules and exhibits thereto, the "Purchase Agreement"), for the Bid, the consideration for the Businesses (including the Related Assets) consisted of a base cash purchase price of $140 million plus an earn-out of up to $60 million in cash, subject to certain adjustments.

On April 2, 2024, the Bankruptcy Court approved the sale of the Businesses to Buyer and the Debtor's entry into, and performance under, the Purchase Agreement and the Contribution Agreement [D.I. 1058].  The Sale closed on July 1, 2024.

### 5.    Name Change

Pursuant to Section 6.13 of the Purchase Agreement, promptly following the closing of the Sale, the Debtor was required to change its legal, registered, assumed, trade and "doing business as" name, as applicable, to a name or names that do not include names included within the Transferred Intellectual Property (as defined in the Purchase Agreement), names containing "Kidde," "Fenwal," or any confusingly similar names to any of the foregoing. Accordingly, on June 17, 2024, the Debtor filed the *Debtor's Motion For Entry of an Order Authorizing Modification of Debtor's Name and Case Caption* [D.I. 1258], requesting authority to change its name from "Kidde-Fenwal, Inc." to "KFI Wind-Down Corp." and to modify the caption of the Chapter 11 Case accordingly.  On July 1, 2024 the Debtor filed the appropriate documentation with the Secretary of State for the State of Delaware to change its name to "KFI

Wind-Down Corp." On July 3, 2024, the Bankruptcy Court approved the Debtor's name change and modification of the caption of the Chapter 11 Case [D.I. 1306].

## K.    The Insurance Adversary Proceedings

The Debtor is currently pursuing its coverage claims against 34 insurers in two adversary proceedings brought before the Bankruptcy Court on November 9, 2023 and February 8, 2024 (consolidated under caption *KFI Wind-Down Corp.* v. *Ace Am. Insurance Co., et al.*, Adv. Proc. No. 23-50758 (LSS)) [Ins. Adv. D.I. 1, 318]. Through the insurance adversary proceedings, the Debtor seeks coverage for approximately $10 million in past defense costs and future indemnity under hundreds of primary, umbrella and excess liability insurance policies issued over a period of decades to several different companies pursuant to which Debtor has rights, for amounts associated with AFFF-related lawsuits.

On November 5, 2024, the Debtor, the Committee and the AHC filed the *Motion of KFI Wind-Down Corp., the Official Committee of Unsecured Creditors, and the Ad Hoc Committee of Governmental Claimants to Stay Adversary Proceeding* [Ins. Adv. D.I. 539], seeking to stay the insurance adversary proceedings through the Effective Date of the Plan in accordance with the Plan Support Agreement.

## L.    The Special Committee Investigation

Following the reconstitution of the Debtor's Board and formation of the Special Committee as described above, the Special Committee evaluated any potential claims that the Debtor could assert against Carrier and/or RTX. This included a review of intercompany disputes and Carrier's potential liability to the Debtor for AFFF-related liabilities. The Special Committee and its counsel conducted an extensive investigation consisting of reviewing a database with over 450,000 documents, participating in depositions of Carrier Global Corporation, Debtor, and RTX witnesses, and interviewing current and former Debtor employees. The Special Committee determined that the Debtor had certain colorable claims it could assert against Carrier, including that the Debtor had a basis to claim that certain Carrier entities (i) share in some or all of the Debtor's liability in connection with AFFF-related claims (*e.g.*, alter ego, veil-piercing and assumption of liability claims) and (ii) could be liable to the Debtor on the basis of non-AFFF-related claims arising out of certain intercompany disputes (*e.g.*, that Carrier entities (a) withheld cash owed to the Debtor prepetition by way of purported offsets, (b) failed to pay interest on the Debtor's cash pool balance prepetition, (c) caused the Debtor to transfer certain trademarks to a subsidiary of Carrier Global Corporation prepetition without compensation, and (d) failed to pay for the Debtor's prepetition research and development expenses as required under an intercompany agreement). The Special Committee acknowledges that Carrier has colorable defenses to these claims. Carrier disputes these claims and theories of liability and believes they are without merit or basis, and the Plan Support Agreement does not constitute an admission of any liability or wrongdoing by Carrier.

## M.    Mediation

On November 21, 2023, the Bankruptcy Court entered an order authorizing and appointing the Hon. Robert D. Drain (Ret.) and Former U.S. District Judge Layn R. Phillips to

serve as Mediators in a mediation of issues among the Debtor, the Carrier Parties (as defined in the Mediation Order), the Committee, the AHC, and the PEC (collectively, the "Mediation Parties") [D.I. 660] (the "Mediation Order").  The issues to be mediated included:  (a) any and all causes of action of the Debtor and its estate; (b) any and all claims held by the Debtor, its estate or any third-party arising out of or relating to AFFF designed, manufactured, distributed or sold by the Debtor or its predecessors, in each of cases (a) and (b), against the Carrier Parties and their Related Parties (as defined in the Mediation Order); and (c) a comprehensive resolution of issues and claims among the Mediation Parties in the Chapter 11 Case.  The mediation was extended nine times by stipulation of the Mediation Parties [D.I. 872, 943, 1033, 1123, 1199, 1303, 1360, 1445, 1463].

The Mediation concluded successfully on September 30, 2024 and, on October 18, 2024, the Debtor filed with the Bankruptcy Court a notice that the Settling Parties had entered into the Plan Support Agreement [D.I. 1570].

## N.    The Plan Support Agreement

Following 10 months of good faith, arms'-length mediation, the Debtor reached an agreement with the other Settling Parties, which is memorialized in the Plan Support Agreement, filed with the Bankruptcy Court on October 18, 2024.  Key terms of the Plan Support Agreement include, but are not limited to, the following:

- The Guaranteed Cash Payment from Carrier, split among five payments beginning on the earlier of (i) the Effective Date or (ii) the one year anniversary of Confirmation of the Plan;

- The contribution by Carrier of certain insurance rights to the Primary AFFF Settlement Trust, which shall be vested with the exclusive right to control the Insurance Actions;

- The resolution, mutual waiver and full and final release of the Released Claims, including all Estate Causes of Action;

- The return of all cash remaining in the Estate as of the Effective Date to Carrier, net of accrued and unpaid administrative expenses and amounts required to fund the Wind-Down Budget;

- Payment to Carrier of its share of any settlement or recovery under the Insurance Policies; and

- The settlement of certain direct claims against Carrier in the AFFF MDL, subject to approval in the AFFF MDL, which approval process will not impact the Estate Claims Settlement and is not a condition precedent to the Consummation of the Plan.

## ARTICLE IV. SUMMARY OF THE PLAN

The confirmation and consummation of a plan is the principal objective of a chapter 11 case. A plan sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a plan makes the plan binding upon the debtor, any issuer of securities under the plan and any creditor of, or equity holder in, the debtor, whether or not such creditor or equity holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the effective date of the plan and substitutes therefor the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual and equitable rights of the holders of claims or interests in certain classes are to remain unaltered by the reorganization effectuated by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are conclusively presumed to accept the plan. Accordingly, a debtor need not solicit votes from the holders of claims or interests in such classes. A chapter 11 plan may also specify that certain classes will not receive any distribution of property or retain any claim against a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any classes that are receiving a distribution of property under the plan but are impaired will be solicited to vote to accept or reject the plan.

Prior to soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan. To satisfy the requirements of section 1125 of the Bankruptcy Code, the Debtor is submitting this Disclosure Statement to Holders of Claims and Interests against the Debtor who are entitled to vote to accept or reject the Plan.

The classification and treatment of Claims and Interests; implementation of the Plan; provisions governing Distributions; effect of Confirmation, including the release, injunction and related provisions; and treatment of Executory Contracts and Unexpired Leases are summarized below. For all other provisions relating to the Plan, including among other things, acceptance or rejection of the Plan, conditions precedent to effectiveness of the Plan, modification, revocation or withdrawal of the Plan, and retention of jurisdiction, please refer to the Plan attached hereto as <u>Appendix A</u>.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN. THIS SECTION IS QUALIFIED IN ITS ENTIRETY BY AND IS SUBJECT TO THE PLAN AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE

STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN. REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR UNDER THE PLAN. UPON THE OCCURRENCE OF THE EFFECTIVE DATE, THE PLAN AND ALL SUCH DOCUMENTS WILL BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR AND ITS ESTATE AND ALL OTHER PARTIES-IN-INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

STATEMENTS AS TO THE RATIONALE UNDERLYING THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN ARE NOT INTENDED TO, AND SHALL NOT, WAIVE, COMPROMISE OR LIMIT ANY RIGHTS, CLAIMS OR CAUSES OF ACTION IN THE EVENT THE PLAN IS NOT CONFIRMED.

## A.      Classification, Treatment and Voting of Claims and Interests

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims, which, pursuant to section 1123(a)(1) of the Bankruptcy Code, need not be and have not been classified). The Debtor is also required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtor into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtor believes that it has complied with such standard. If the Bankruptcy Court finds otherwise, however, it could deny Confirmation of the Plan if the Holders of Claims and Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is Allowed in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

The Debtor believes that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law.

It is possible that a Holder of a Claim or Interest may challenge the Debtor's classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  If such a situation develops, the Debtor intends, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its Confirmation.  Any such reclassification could materially adversely affect Holders of Claims and Interests by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.  EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM OR INTEREST AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM OR INTEREST PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM OR INTEREST REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

Any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to the actual distribution received by Creditors.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below.  The Debtor believes that the consideration, if any, provided under the Plan to Holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority of such Claims and Interests.  The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan.  Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

1.      **Claims Classification and Voting Status**

All Claims and Interests are classified as set forth in Article 4 of the Plan, which is summarized below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, and as set forth in Article 3 of the Plan, the Plan does not classify Administrative Claims and Priority Tax Claims, and such Claims will be paid in accordance with the procedures set forth in Article 7 of the Plan.

The following table designates the Classes of Claims against and Interests in the Debtor, as applicable, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan and (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code or presumed to accept or deemed to reject the Plan.[2]  Each Holder of a Claim or Interest in an Impaired Class that is entitled to vote on the Plan as of the Voting Record Date pursuant to Article 4 of the Plan shall be entitled to vote to accept or reject the Plan.  The classification of Claims and Interests pursuant to the Plan is as follows:

---

[2]     The information in the table is provided in summary form, and is qualified in its entirety by Article 4.2 of the Plan.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Secured Claims | Unimpaired | Deemed to Accept |
| 3A | Water Provider Claims | Impaired | Entitled to Vote |
| 3B | Airport Claims | Impaired | Entitled to Vote |
| 3C | Sovereign State Claims | Impaired | Entitled to Vote |
| 3D | Property Damage and Business Loss Claims | Impaired | Entitled to Vote |
| 3E | Personal Injury Claims | Impaired | Entitled to Vote |
| 3F | Sovereign Tribe Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Affiliate Claims | Impaired | Deemed to Reject |
| 6 | Interests | Impaired | Deemed to Reject |

## 2. Treatment of Claims and Interests

Class 1 – Other Priority Claims

(a) *Classification*:  Class 1 consists of all Other Priority Claims.

(b) *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, settlement and release of and in exchange for its Allowed Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes Allowed and (iii) such other date as may be ordered by the Bankruptcy Court, or otherwise receive treatment consistent with the provisions of section 1129 of the Bankruptcy Code.

(c) *Voting*:  Claims in Class 1 are Unimpaired.  Each Holder of an Other Priority Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of Other Priority Claims is entitled to vote to accept or reject the Plan.

Class 2 – Secured Claims

(a) *Classification*:  Class 2 consists of all Secured Claims.

(b) *Treatment*:  Except to the extent that a Holder of an Allowed Secured Claim agrees to less favorable treatment, and in full and final satisfaction, settlement and release of and in exchange for its Allowed Secured Claim, each Holder of such Allowed Secured Claim shall be paid in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which such Secured Claim becomes Allowed and (iii) such other date as may be ordered by the Bankruptcy Court, or

-23-

otherwise receive treatment consistent with the provisions of section 1129 of the Bankruptcy Code.

(c)    *Voting*:  Claims in Class 2 are Unimpaired.  Each Holder of a Secured Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of Secured Claims is entitled to vote to accept or reject the Plan.

Class 3A – Water Provider Claims

(a)    *Classification*:  Class 3A consists of all Water Provider Claims against the Debtor.

(b)    *Treatment*:  As of the Effective Date, all Water Provider Claims against the Debtor shall automatically and, without further act, deed, or court order, be channeled exclusively to, and all of the Debtor's liability for such Claims, shall be incurred in full and assumed by the Primary AFFF Settlement Trust.  Subject to the Settlement Trust Documents, each Holder of an Allowed Water Provider Claim against the Debtor shall be entitled to receive its Pro Rata share of the Primary AFFF Settlement Trust Allocation with all other Allowed Class 3 Claims other than Sovereign State Claims.  Holders of Allowed Water Provider Claims against the Debtor shall not receive any payment from the Primary AFFF Settlement Trust unless and until such Claims are resolved in accordance with the Settlement Trust Documents, including the TDPs applicable to Water Provider Claims.  The terms, provisions and procedures set forth in the TDPs applicable to Water Provider Claims shall establish the sole method by which Water Provider Claims against the Debtor will be submitted, processed, liquidated and, if applicable, paid.  The sole recourse of any Holder of a Water Provider Claim on account of its Water Provider Claim against the Debtor shall be to the Primary AFFF Settlement Trust.

(c)    *Voting*:  Claims in Class 3A are Impaired and each Holder of a Water Provider Claim against the Debtor is entitled to vote to accept or reject the Plan.

Class 3B – Airport Claims

(a)    *Classification*:  Class 3B consists of all Airport Claims against the Debtor.

(b)    *Treatment*:  As of the Effective Date, all Airport Claims against the Debtor shall automatically and, without further act, deed, or court order, be channeled exclusively to, and all of the Debtor's liability for such Claims, shall be incurred in full and assumed by the Primary AFFF Settlement Trust.  Subject to the Settlement Trust Documents, each Holder of an Allowed Airport Claim against the Debtor shall be entitled to receive its Pro Rata share of the Primary AFFF Settlement Trust Allocation with all other Allowed Class 3 Claims other than Sovereign State Claims.  Holders

-24-

of Allowed Airport Claims against the Debtor shall not receive any payment from the Primary AFFF Settlement Trust unless and until such Claims are resolved in accordance with the Settlement Trust Documents, including the TDPs applicable to Airport Claims.  The terms, provisions and procedures set forth in the TDPs applicable to Airport Claims shall establish the sole method by which Airport Claims against the Debtor will be submitted, processed, liquidated and, if applicable, paid.  The sole recourse of any Holder of an Airport Claim on account of its Airport Claim against the Debtor shall be to the Primary AFFF Settlement Trust.

(c)     *Voting*:  Claims in Class 3B are Impaired and each Holder of an Airport Claim against the Debtor is entitled to vote to accept or reject the Plan.

Class 3C – Sovereign State Claims

(a)     *Classification*:  Class 3C consists of all Sovereign State Claims against the Debtor.

(b)     *Treatment*:  As of the Effective Date, all Sovereign State Claims against the Debtor shall automatically and, without further act, deed, or court order, be channeled exclusively to, and all of the Debtor's liability for such Claims, shall be incurred in full and assumed by the Primary AFFF Settlement Trust.  Subject to the Settlement Trust Documents, each Holder of an Allowed Sovereign State Claim against the Debtor shall be entitled to receive its Pro Rata share of the Sovereign State AFFF Settlement Trust Allocation with all other Allowed Sovereign State Claims.  Holders of Allowed Sovereign State Claims against the Debtor shall not receive any payment from the Sovereign State AFFF Settlement Trust unless and until such Claims are resolved in accordance with the Settlement Trust Documents, including the TDPs applicable to Sovereign State Claims. The terms, provisions and procedures set forth in the TDPs applicable to Sovereign State Claims shall establish the sole method by which Sovereign State Claims against the Debtor will be submitted, processed, liquidated and, if applicable, paid.  The sole recourse of any Holder of a Sovereign State Claim on account of its Sovereign State Claim against the Debtor shall be to the Sovereign State AFFF Settlement Trust.

(c)     *Voting*:  Claims in Class 3C are Impaired and each Holder of a Sovereign State Claim against the Debtor is entitled to vote to accept or reject the Plan.

Class 3D – Property Damage and Business Loss Claims

(a)     *Classification*:  Class 3D consists of all Property Damage and Business Loss Claims against the Debtor.

(b)     *Treatment*:  As of the Effective Date, all Property Damage and Business Loss Claims against the Debtor shall automatically and, without further

-25-

act, deed, or court order, be channeled exclusively to, and all of the Debtor's liability for such Claims, shall be incurred in full and assumed by the Primary AFFF Settlement Trust.  Subject to the Settlement Trust Documents, each Holder of an Allowed Property Damage and Business Loss Claim against the Debtor shall be entitled to receive its Pro Rata share of the Primary AFFF Settlement Trust Allocation with all other Allowed Class 3 Claims other than Sovereign State Claims.  Holders of Allowed Property Damage and Business Loss Claims against the Debtor shall not receive any payment from the Primary AFFF Settlement Trust unless and until such Claims are resolved in accordance with the Settlement Trust Documents, including the TDPs applicable to Property Damage and Business Loss Claims.  The terms, provisions and procedures set forth in the TDPs applicable to Property Damage and Business Loss Claims shall establish the sole method by which Property Damage and Business Loss Claims against the Debtor will be submitted, processed, liquidated and, if applicable, paid.  The sole recourse of any Holder of a Property Damage and Business Loss Claim on account of its Property Damage and Business Loss Claim against the Debtor shall be to the Primary AFFF Settlement Trust.

(c)     *Voting*:  Claims in Class 3D are Impaired and each Holder of an  Property Damage and Business Loss Claim against the Debtor is entitled to vote to accept or reject the Plan.

Class 3E – Personal Injury Claims

(a)     *Classification*:  Class 3E consists of all Personal Injury Claims against the Debtor.

(b)     *Treatment*:  As of the Effective Date, all Personal Injury Claims against the Debtor shall automatically and, without further act, deed, or court order, be channeled exclusively to, and all of the Debtor's liability for such Claims, shall be incurred in full and assumed by the Primary AFFF Settlement Trust.  Subject to the Settlement Trust Documents, each Holder of an Allowed Personal Injury Claim against the Debtor shall be entitled to receive its Pro Rata share of the Primary AFFF Settlement Trust Allocation with all other Allowed Class 3 Claims other than Sovereign State Claims.  Holders of Allowed Personal Injury Claims against the Debtor shall not receive any payment from the Primary AFFF Settlement Trust unless and until such Claims are resolved in accordance with the Settlement Trust Documents, including the TDPs applicable to Personal Injury Claims.  The terms, provisions and procedures set forth in the TDPs applicable to Personal Injury Claims shall establish the sole method by which Personal Injury Claims against the Debtor will be submitted, processed, liquidated and, if applicable, paid.  The sole recourse of any Holder of a Personal Injury Claim on account of its Personal Injury Claim against the Debtor shall be to the Primary AFFF Settlement Trust.

-26-

(c)     *Voting*:  Claims in Class 3E are Impaired and each Holder of a Personal Injury Claim against the Debtor is entitled to vote to accept or reject the Plan.

Class 3F – Sovereign Tribe Claims

(a)     *Classification*:  Class 3F consists of all Sovereign Tribe Claims against the Debtor.

(b)     *Treatment*:  As of the Effective Date, all Sovereign Tribe Claims against the Debtor shall automatically and, without further act, deed, or court order, be channeled exclusively to, and all of the Debtor's liability for such Claims, shall be incurred in full and assumed by the Primary AFFF Settlement Trust.  Subject to the Settlement Trust Documents, each Holder of a Sovereign Tribe Claim against the Debtor shall be entitled to receive its Pro Rata share of the Primary AFFF Settlement Trust Allocation with all other Allowed Class 3 Claims other than Sovereign State Claims. Holders of Allowed Sovereign Tribe Claims against the Debtor shall not receive any payment from the Primary AFFF Settlement Trust unless and until such Claims are resolved in accordance with the Settlement Trust Documents, including the TDPs applicable to Sovereign Tribe Claims. The terms, provisions and procedures set forth in the TDPs applicable to Sovereign Tribe Claims shall establish the sole method by which Sovereign Tribe Claims against the Debtor will be submitted, processed, liquidated and, if applicable, paid.  The sole recourse of any Holder of a Sovereign Tribe Claim on account of its Sovereign Tribe Claim against the Debtor shall be to the Primary AFFF Settlement Trust.

(c)     *Voting*:  Claims in Class 3F are Impaired and each Holder of a Sovereign Tribe Claim against the Debtor is entitled to vote to accept or reject the Plan.

Class 4 – General Unsecured Claims

(a)     *Classification*:  Class 4 consists of all General Unsecured Claims.

(b)     *Treatment*:  In full and final satisfaction, settlement, release and discharge of an Allowed General Unsecured Claim, each Holder of a General Unsecured Claim shall be entitled to receive its Pro Rata share of the GUC Liquidating Trust Allocation with all other Allowed Class 4 Claims.  The sole recourse of any Holder of a General Unsecured Claim on account of its General Unsecured Claim shall be to the GUC Liquidating Trust.

(c)     *Voting*:  Claims in Class 4 are Impaired and each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

Class 5 – Affiliate Claims

(a)     *Classification*:  Class 5 consists of all Affiliate Claims.

(b)     *Treatment*:  All Affiliate Claims shall be canceled, released or extinguished, and the Holders thereof shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Claim under the Plan.

(c)     *Voting*:  Claims in Class 5 are Impaired.  Each Holder of an Affiliate Claim is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of an Affiliate Claim is entitled to vote to accept or reject the Plan.

Class 6 – Interests

(a)     *Classification*:  Class 6 consists of all Interests.

(b)     *Treatment*:  No Holder of an Interest shall receive any Distributions on account of its Interest.  On and after the Effective Date, all Interests in the Debtor shall be canceled and shall be of no further force and effect, whether surrendered for cancelation or otherwise.

(c)     *Voting*:  Claims in Class 6 are Impaired.  Each Holder of an Interest is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of an Interest is entitled to vote to accept or reject the Plan.

**3.     Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, the Plan shall not affect the Debtor's or the Liquidating Administrators' rights in respect of any Unimpaired Claims, including legal and equitable defenses or setoff or recoupment rights with respect thereto.

**4.     Acceptance by Impaired Classes**

An Impaired Class of Claims shall have accepted the Plan if: (i) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Claims entitled to vote actually voting in such Class have voted to accept the Plan; and (ii) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Claims entitled to vote actually voting in such Class have voted to accept the Plan.

**5.     Elimination of Vacant Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or an Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purpose of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

-28-

**6.      Voting Classes; Presumed Acceptance by Non-Voting Classes**

If a Class of Claims or Interests is eligible to vote and no Holder of Claims or Interests, as applicable, in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by such Class.  Classes 1 and 2 are deemed to have accepted the Plan and are not entitled to vote.

**7.      Confirmation Pursuant to Sections 1129(a) and 1129(b) of the Bankruptcy Code**

For purposes of Confirmation, section 1129(a)(10) of the Bankruptcy Code shall be satisfied if any one of Classes 3A, 3B, 3C, 3D, 3E, 3F, or 4 accepts the Plan.  The Debtor shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class or Classes of Claims and Interests.  Classes 5 and 6 are deemed to reject the Plan.

**B.      Implementation of the Plan**

**1.      Operations Between the Confirmation Date and Effective Date**

During the period from the Confirmation Date through and until the Effective Date, the Debtor may continue to operate as a debtor-in-possession, subject to all applicable orders of the Bankruptcy Court.

**2.      Compromise and Settlement**

In consideration for the classification, distributions, releases and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a set of integrated, good-faith compromises and settlements of all Claims, Interests, Causes of Action and controversies resolved pursuant to the Plan.  The Plan shall be deemed a motion by the Debtor to approve such compromises and settlements (including but not limited to the Estate Claims Settlement and the Insurance Assignment) pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromises and settlements under Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, as well as a finding by the Bankruptcy Court that such integrated compromises or settlements are in the best interest of the Debtor, the Estate and Holders of Claims and Interests, and are fair, equitable and within the range of reasonableness.

**3.      Plan Transactions**

On or prior to the Effective Date or as soon as reasonably practicable thereafter, the Debtor or the Liquidating Administrators, as applicable, shall, consistent with the terms of the Plan Support Agreement and subject to the applicable consent and approval rights thereunder, take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan Transactions (including any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan), including, but not limited to, (a) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty or

obligation on terms consistent with the terms of the Plan, and (b) all other actions that the Debtor or the Liquidating Administrators, as applicable, determine are necessary or appropriate in connection with the Plan Transactions and Definitive Documents.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan Transactions (including any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan) and in the Definitive Documents.

### 4.    Estate Claims Settlement

The Plan shall be deemed a motion to approve the Estate Claims Settlement Agreement pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Estate Claims Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as findings by the Bankruptcy Court that the Estate Claims Settlement constitutes a good faith settlement that bars any Cause of Action released or barred thereunder, is in the best interests of the Debtor, its Estate and Holders of Claims and Interests, and is fair, equitable and within the range of reasonableness.

### 5.    Settlement Trusts

### (a)    Creation of the Settlement Trusts

On or before the Effective Date, the Settlement Trust Agreements shall be executed, and all other necessary steps shall be taken to create the Settlement Trusts.  On the Effective Date, the Primary AFFF Settlement Trust shall be automatically appointed as a representative of the Debtor's Estate pursuant to sections 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code.

From and after the Effective Date, the Primary AFFF Settlement Trust shall succeed to all rights and powers of the Debtor and its Estate with respect to all Settlement Trust Retained Causes of Action and Insurance Actions.  The Primary AFFF Settlement Trust shall be substituted and will replace the Debtor, its Estate and the Committee in all such Settlement Trust Retained Causes of Action and Insurance Actions, whether or not such claims are pending in filed litigation.

### (b)    Purpose of the Settlement Trusts

The purpose of the Primary AFFF Settlement Trust shall be to (i) hold, manage, protect and monetize the Settlement Trust Assets and (ii) administer, process and satisfy all Channeled AFFF Claims (other than Sovereign State Claims), which for the avoidance of doubt shall be submitted exclusively to the Primary AFFF Settlement Trust and satisfied by the Primary AFFF Settlement Trust in accordance with the terms, provisions and procedures of the TDPs.  Subject to the Insurance Cooperation Agreement, the Primary AFFF Settlement Trust shall have the exclusive power and authority to, among other things, in accordance with the Settlement Trust Documents and Plan Documents: (a) dispose of Settlement Trust Assets;

-30-

(b) make Distributions or payments to the Sovereign State AFFF Settlement Trust and GUC Liquidating Trust, as applicable; (c) commence, prosecute, and settle all Settlement Trust Retained Causes of Action and Insurance Actions; and (d) perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the Primary AFFF Settlement Trust and carry out the provisions of the Plan relating to the Primary AFFF Settlement Trust. For the avoidance of doubt, no Person that receives a release under the Estate Claims Settlement or the New National Foam Release shall be a beneficiary of the Settlement Trusts or be entitled to receive a Distribution on account of a Claim from the Settlement Trusts, including for indemnification, contribution or otherwise. In furtherance of the foregoing and unless otherwise expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, the Primary AFFF Settlement Trust shall have all defenses, cross-claims, offsets and recoupments, as well as rights of indemnification, contribution, subrogation and similar rights regarding all Channeled AFFF Claims other than Sovereign State Claims that the Debtor has or would have had under applicable law.

   The purpose of the Sovereign State AFFF Settlement Trust shall be to administer, process and satisfy Sovereign State Claims, which for the avoidance of doubt shall be submitted exclusively to, and satisfied by, the Sovereign State AFFF Settlement Trust in accordance with the terms, provisions and procedures of the TDPs. In accordance with the Plan Documents and Settlement Trust Documents, the Sovereign State AFFF Settlement Trust shall have the exclusive power and authority to administer, process and satisfy Sovereign State Claims and make Distributions on account of Sovereign State Claims. In furtherance of the foregoing and unless otherwise expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, the Sovereign State AFFF Settlement Trust shall have all defenses, cross-claims, offsets and recoupments, as well as rights of indemnification, contribution, subrogation and similar rights regarding all Sovereign State Claims that the Debtor has or would have had under applicable law.

   The purpose of the GUC Liquidating Trust shall be to administer, process and satisfy General Unsecured Claims, which for the avoidance of doubt shall be submitted exclusively to, and satisfied by, the GUC Liquidating Trust in accordance with the Plan. In accordance with the Plan Documents and Settlement Trust Documents, the GUC Liquidating Trust shall have the exclusive power and authority to administer, process and satisfy General Unsecured Claims and make Distributions on account of General Unsecured Claims. In furtherance of the foregoing and unless otherwise expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, the GUC Liquidating Trust shall have all defenses, cross-claims, offsets and recoupments, as well as rights of indemnification, contribution, subrogation and similar rights regarding all General Unsecured Claims that the Debtor has or would have had under applicable law. The GUC Liquidating Trust shall be entitled to payment from the Primary AFFF Trust in accordance with the Settlement Trust Documents and the Trust Allocation.

   On the Effective Date, the Settlement Trust Documents, including the TDPs, shall become effective.

(c)      **Funding of the Settlement Trusts**

On the Effective Date, the Primary AFFF Settlement Trust shall be funded with the Settlement Trust Assets.  From and after the Effective Date, the Primary AFFF Settlement Trust shall make one or more payments to the GUC Liquidating Trust and the Sovereign State AFFF Trust, as applicable, pursuant to the Settlement Trust Documents and in accordance with the Trust Allocation.

(d)      **Allocation of Distributable Value From Settlement Trust Assets**

The Primary AFFF Settlement Trust shall allocate or reserve distributable value from the Settlement Trust Assets as follows (the "Trust Allocation"): (i) reserve [•]% at the Primary AFFF Settlement Trust (the "Primary AFFF Settlement Trust Allocation"); (ii) allocate [•]% to the Sovereign State AFFF Settlement Trust (the "Sovereign State AFFF Settlement Trust Allocation"); and (iii) allocate [•]% to the GUC Liquidating Trust (the "GUC Liquidating Trust Allocation"); *provided* that, any residual value in the GUC Liquidating Trust Allocation after satisfaction of all General Unsecured Claims in accordance with the Plan and Settlement Trust Documents shall be ratably re-allocated to the Primary AFFF Settlement Trust Allocation and Sovereign State AFFF Settlement Trust Allocation.

(e)      **Appointment of Trustees**

The Primary AFFF Settlement Trust shall be governed by the Primary AFFF Settlement Trustee.  The powers and duties of the Primary AFFF Settlement Trustee shall include, but shall not be limited to, those powers, duties and responsibilities vested in the Primary AFFF Settlement Trustee pursuant to the terms of the Primary AFFF Settlement Trust Agreement, and shall include the authority to: (a) dispose of Settlement Trust Assets; (b) make Distributions or payments, as applicable, to the Sovereign State AFFF Settlement Trust and the GUC Liquidating Trust in accordance with and pursuant to the Settlement Trust Documents and in accordance with the Trust Allocation; (c) carry out the provisions of the Plan relating to the Primary AFFF Settlement Trust, including commencing, prosecuting, and settling all Settlement Trust Retained Causes of Action and Insurance Actions; and (d) perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the Primary AFFF Settlement Trust.  The preceding list of powers, duties, and responsibilities of the Primary AFFF Settlement Trustee is non-exclusive and the powers, rights and responsibilities of the Primary AFFF Settlement Trustee shall be further specified in the Primary AFFF Settlement Trust Agreement.

The Sovereign State AFFF Settlement Trust shall be governed by one or more trustees as may be appointed from time to time in accordance with the Settlement Trust Documents (the "Sovereign State AFFF Settlement Trustee").  The GUC Liquidating Trust shall be governed by one trustee as may be appointed from time to time in accordance with the Settlement Trust Documents (the "GUC Liquidating Trustee").  The Sovereign State AFFF Settlement Trustee and the GUC Liquidating Trustee shall have the powers and duties conferred to them pursuant to the Settlement Trust Documents.

(f)      **Trust Advisory Committee**

On the Effective Date and pursuant to the Settlement Trust Documents, the Trust Advisory Committee shall be established.  The Trust Advisory Committee shall have the authority to oversee, review and guide the activities and performance of the Primary AFFF Settlement Trustee, in accordance with the Settlement Trust Documents.  The members of the Trust Advisory Committee shall not be entitled to compensation for their services but will be entitled to reimbursement from the Primary AFFF Settlement Trust for reasonable and documented out-of-pocket expenses.

(g)      **TDPs**

On the Effective Date, the Settlement Trusts shall implement the Trust Distribution Procedures that will govern the claims submission, adjudication, and distribution processes for the Primary AFFF Settlement Trust and the Sovereign State AFFF Settlement Trust (as the same may be amended or modified from time to time in accordance with the terms thereof, the "<u>TDPs</u>") in accordance with the terms of the Settlement Trust Documents.  On or after the Effective Date, the Primary AFFF Settlement Trustee and Sovereign State AFFF Settlement Trustee shall have the authority to administer, amend, supplement, or modify the applicable TDPs in a manner consistent with the Plan and in accordance with the terms thereof and the Settlement Trust Documents.  The TDPs shall be binding on all Holders of Channeled AFFF Claims.  Allowed Claims under the TDPs shall be solely enforceable against the applicable Settlement Trust.  The Allowed amount of any Channeled AFFF Claim shall be the amount determined under the TDPs, unless such Channeled AFFF Claim is otherwise Allowed pursuant to Article 2.1.19 of the Plan.  Allowed Channeled AFFF Claims under the TDPs shall be legally enforceable against the Primary AFFF Settlement Trust.  The amount of any installment payments, initial payments, or payments based on payment percentages established under the TDPs, as determined or as actually paid by the Primary AFFF Settlement Trust or Sovereign State AFFF Settlement Trust, as applicable, are not, as such, the equivalent of any Claimant's Allowed amount of its Channeled AFFF Claim.  For the avoidance of doubt, nothing herein determines whether any Insurance Company is obligated to pay the amount of any Allowed Channeled AFFF Claim as determined under the TDPs.

The Allowance of Claims under the TDPs shall not determine, and shall not be used to determine, in any respect the liability of a Released Party for any Independent AFFF Cause of Action, which liability shall be determined through litigation and/or settlement in the tort system separate and apart from the TDPs in all respects.

(h)      <u>**Privileged Information**</u>

On the Effective Date, any attorney-client privilege, work-product privilege, common-interest communications with Insurance Companies, protection or privilege granted by joint defense, common interest, and/or other privilege or immunity of the Debtor relating, in whole or in part, to the Settlement Trust Retained Causes of Action or Insurance Actions shall be irrevocably transferred to and vested in the Primary AFFF Settlement Trust subject to the other terms of Article 5.5.8 of the Plan.  Any such protections, privileges or immunities that are joint with Carrier shall vest with Carrier on the Effective Date.  All other such protections, privileges

-33-

or immunities shall vest in the Liquidating Estate. The transfers or assignment of any privileges or privileged information to the Primary AFFF Settlement Trust in accordance with the foregoing shall vest solely in the Primary AFFF Settlement Trust and not with any other Person, including the Trust Advisory Committee, any committee or subcomponent of the Primary AFFF Settlement Trust or counsel or other professionals who have been engaged by, represent, or have represented any Holder of a Claim that is channeled to the Primary AFFF Settlement Trust. For the avoidance of doubt, the AFFF Data Transfer shall not waive or be deemed to waive any applicable privilege, doctrine or other protection. The Primary AFFF Settlement Trust shall have no authority to waive any applicable privilege, doctrine or other protection on behalf of another Person, nor shall any waiver of any applicable privilege, doctrine or other protection by the conduct of the Primary AFFF Settlement Trust be construed to apply to another Person. All factual information, documents, opinions, strategies, theories, analyses, research, work product or other materials exchanged or communicated to the Debtor prior to the Effective Date by whatever means in connection with the furtherance of common interest in investigations, potential or pending litigation, or coordination with respect to court proceedings shall remain strictly confidential, privileged and subject to any and all common interest protections and shall not be disclosed to any party or entity without the prior written consent of the party that originally held or still holds the privilege or protection.

Notwithstanding the foregoing, nothing in the Plan shall require Carrier or permit the Debtor to provide any materials or information subject to any privilege or immunity owned by Carrier in whole or in part, including any materials or information subject to any privilege or immunity jointly owned with the Debtor, to the Primary AFFF Settlement Trust, and the AFFF Data Transfer shall not encompass any such materials or information, absent Carrier's consent or a court order determining that it is necessary for the Primary AFFF Settlement Trust to obtain the benefit of the Insurance Assignment[; *provided* that nothing in the Plan shall divest the Committee of any protections or rights resulting from any common-interest privilege applicable to materials developed jointly by, or communications between, the Committee, on the one hand, and Carrier or the Debtor, on the other, from and after October 18, 2024 (or such other date than any such common-interest privilege became or becomes applicable with respect to a particular subject matter), and any such protections or rights of the Committee (but not those of the Debtor or Carrier) shall be vested in the Primary AFFF Settlement Trust as of the Effective Date]. For the avoidance of doubt, all of the foregoing is subject to paragraph (c) of the "Insurance Cooperation Provision" of Exhibit A-1 of the Plan Support Agreement.

### (i)    Institution and Maintenance of Legal and Other Proceedings

As of the Effective Date, the Primary AFFF Settlement Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Primary AFFF Settlement Trust, including Insurance Actions and the Settlement Trust Retained Causes of Action. Without limiting the foregoing, on and after the Effective Date, the Primary AFFF Settlement Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all such actions, in the name of the Debtor to the extent deemed necessary or appropriate by the Primary AFFF Settlement Trust. Furthermore, without limiting the foregoing, the Primary AFFF Settlement Trust shall be empowered to maintain, administer, preserve, or pursue Insurance Actions and Insurance Action Recoveries.

(j)        **Primary AFFF Settlement Trust Discovery**

The Primary AFFF Settlement Trust is authorized pursuant to Bankruptcy Rule 2004 and/or other applicable discovery rules to seek discovery necessary to satisfy its obligations under the Plan and the Settlement Trust Documents.  The authorization of any discovery request pursuant to this provision shall not be construed to deprive the target of such discovery request of any applicable privilege or immunity from discovery.  The Primary AFFF Settlement Trust shall be able to take whatever steps are necessary to enforce such discovery obligations pursuant to Bankruptcy Rule 2004, Federal Rule of Civil Procedure 45, other court resolution processes, under bankruptcy law, and applicable non-bankruptcy law.  Nothing herein shall abridge or affect the rights of the Primary AFFF Settlement Trust or the Primary AFFF Settlement Trustee to discovery in any proceeding or litigation brought by the Primary AFFF Settlement Trust or the Primary AFFF Settlement Trustee.

(k)        **Insurance Matters**

(i)        **Insurance Cooperation Agreement**

On the Effective Date, the Primary AFFF Settlement Trust shall enter into the Insurance Cooperation Agreement, pursuant to the terms of the Plan Support Agreement.  The Insurance Cooperation Agreement and the Estate Claims Settlement Agreement shall be executed in reliance upon entry into both agreements, and that the rights and obligations under one agreement serve as consideration for the rights and obligations under the agreement.

(ii)        **Insurance Assignment**

On the Effective Date, the Debtor shall transfer to the Primary AFFF Settlement Trust all of its rights in connection with (a) the Insurance Actions, (b) the Insurance Action Recoveries, (c) any Insurance Settlement Agreement, and (d) all other rights, claims, benefits, or Causes of Action it has with respect to the Insurance Policies (but not the policies themselves). On the Effective Date, subject to the terms of the Insurance Cooperation Agreement, Carrier shall assign to the Primary AFFF Settlement Trust its rights in connection with (a) the Insurance Actions, (b) the Insurance Action Recoveries, (c) any Insurance Settlement Agreement, and (d) all other rights, claims, benefits, or Causes of Action it has with respect to the Insurance Policies (but not the policies themselves). On the Effective Date, the Primary AFFF Settlement Trust and Carrier shall have the rights and obligations with respect to the Insurance Actions, Insurance Policies, and Insurance Policy Rights as set forth in the Insurance Cooperation Agreement.  The Insurance Assignment shall include and be subject to the representations and limitations attested to by RTX and be subject to the terms of the 2020 Separation Agreement.

(l)        **Other Insurance Company Claim Reduction**

If an Other Insurance Company obtains a final and non-appealable judicial determination or binding arbitration award in any Insurance Action, that it would have been entitled to recover a sum certain on its right, claim or cause of action against a Settling Insurance Company for contribution, subrogation, equitable subrogation, indemnification, allocation, reimbursement or offset relating to one or more Channeled AFFF Claims, or agrees to such entitlement to such sum certain, then the liability for such determination, award, or agreement

shall be satisfied solely by the Primary AFFF Settlement Trust reducing or limiting any claim, cause of action or judgment it has against the Other Insurance Company for recovery on any Channeled AFFF Claim that gave rise to such right, claim or cause of action for contribution, subrogation, equitable subrogation, indemnification, allocation, reimbursement or offset. The Primary AFFF Settlement Trust shall not seek to enforce any judicial determination or binding arbitration award it has obtained against an Insurance Company that is seeking such reduction until the Primary AFFF Settlement Trust's judgement or award becomes final and non-appealable. Post-judgment interest shall not accrue with respect to the portion of any such claim that is so reduced by a final order as a result of a claim for contribution, subrogation, equitable subrogation, indemnification, allocation, reimbursement or offset relating to one or more Channeled AFFF Claims.

(m) <b>Single Satisfaction</b>

Holders of AFFF Claims may not recover more than the full amount of their AFFF Claims from the Released Parties and the Primary AFFF Settlement Trust or Sovereign State AFFF Settlement Trust. If a Holder of an AFFF Claim were to recover from the Released Parties and recover from the Primary AFFF Settlement Trust or Sovereign State AFFF Settlement Trust such that the Holder is in a position where they have recovered more than the full amount of their AFFF Claim, then such Holder shall be required to return to the Primary AFFF Settlement Trust or Sovereign State AFFF Settlement Trust, as applicable, the portion of any recovery that causes such Holder's total recovery on account of such AFFF Claim to exceed the full amount of such AFFF Claim. All defenses to liability are reserved by the Released Parties.

(n) <b>Claim-Over Protections</b>

Subject to the terms of the Plan and consistent with applicable law, (a) the contributions made by the Contributing Parties to the Primary AFFF Settlement Trust shall be the sole payments the Released Parties shall make to address the Released Claims; (b) a Claim by the Holder of a Claim against a Party other than a Contributing Party arising out of a Released Claim shall not result in any additional payment by any Released Party; and (c) the Estate Claims Settlement meets the requirements of the Uniform Contribution Among Tortfeasors Act and any similar state or federal law or doctrine that reduces or discharges a Released Party's liability to any other parties. To the extent that on or after the Effective Date, the Primary AFFF Settlement Trust settles any Cause of Action it has against any non-Released Party arising out of, relating to, or involving the Released Claims and provides a release to such non-Released Party, the Primary AFFF Settlement Trust shall include in that settlement a release from such non-Released Party in favor of the Released Parties substantially consistent with the releases provided by the Releasing Parties in the Plan, including for National Foam AFFF Claims, subject to Article 5.5.13 of the Plan. Nothing in the Plan prevents the Primary AFFF Settlement Trust or any Holder of a Claim from pursing litigation against a non-Released Party and collecting the full amount of any judgment. These protections shall not apply to Causes of Action brought by any Sovereign State.

4870-8408-8808 v.6

**6.**    **Common Benefit Fund Assessments**

On the Effective Date, a Common Benefit Escrow shall be established by the Primary AFFF Settlement Trust and funded by a common benefit assessment for attorneys' fees of 8% and reasonable costs, subject to and in accordance with the AFFF MDL orders applicable to common benefit fees and costs, to be made by a reduction to each Distribution made by the Primary AFFF Settlement Trust to Holders of Claims directly administered by the Primary AFFF Settlement Trust.  To the extent the Holder of an Allowed Claim directly administered by Primary AFFF Settlement Trust has retained counsel through a contingency fee arrangement, any contingency fees owed to such contingency counsel payable from the Distributions from the Primary AFFF Settlement Trust shall be reduced by the full amount payable under Article 5.5.15 of the Plan.  The amounts in the Common Benefit Escrow shall be held in escrow and distributed solely pursuant to an order of the MDL District Court approving common benefit fees and assessments in the AFFF MDL.  For the avoidance of doubt, the Common Benefit Escrow shall not be funded from Distributions, payments or other transfers from the Primary AFFF Settlement Trust to the Sovereign State AFFF Settlement Trust or the GUC Liquidating Trust.  Article 5.5.15 of the Plan is severable from the Plan if not approved by the Bankruptcy Court at the Confirmation Hearing and approval of Article 5.5.15 of the Plan by the Bankruptcy Court shall not be a requirement or condition to Confirmation of the Plan.

**7.**    **Liquidating Estate**

(a)    **Purpose of the Liquidating Estate**

The purpose of the Liquidating Estate is to establish and distribute the Wind-Down Reserve to administer the wind-down and dissolution of the Liquidating Estate, with no objective to continue or engage in the conduct of a trade or business.  From and after the Effective Date, the Liquidating Administrators shall be vested with all powers and authorities set forth in the Plan and the Liquidating Administrator Agreement, shall be deemed to have been appointed as the Estate's representatives pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, and shall have the duties of a trustee set forth in sections 704(a)(1), 704(a)(2) and 704(a)5) of the Bankruptcy Code.

(b)    **Funding of Wind-Down Reserve**

The Wind-Down Reserve shall be funded in accordance with the Wind-Down Budget from the following sources: (a) all Remaining Estate Funds; (b) if the Remaining Estate Funds are exhausted, the Net Sale Proceeds in an amount necessary to fund the Wind-Down Budget, *provided* that, to the extent the Debtor or the Liquidating Estate withdraws any amounts from the Net Sale Proceeds pursuant to the foregoing, Carrier shall receive a dollar-for-dollar credit against the next due installment of the Guaranteed Cash Payment as and to the extent provided in the Estate Claims Settlement Agreement; *provided*, further, that if the Effective Date and Estate Claims Settlement Effective Date do not occur, any amounts withdrawn by the Debtor from the Net Sale Proceeds shall be deducted from the Debtor's allocated portion of the Net Sale Proceeds (as to be determined by the Bankruptcy Court or pursuant to an agreement with Carrier subject to Bankruptcy Court approval); and (c) if the Remaining Estate Funds and Net Sale

Proceeds are exhausted, a portion of the Guaranteed Cash Payment released on the Effective Date, and after the Effective Date, the remaining Settlement Trust Assets.

The Wind-Down Reserve shall be maintained independent of, and shall not provide funding for, the Settlement Trusts. Any funds remaining in the Wind-Down Reserve after payment of wind-down costs and expenses shall be transferred to Carrier upon completion of the wind-down of the Liquidating Estate, pursuant to the Estate Claims Settlement Agreement.

(c) **Liquidating Administrators**

(i) **Liquidating Administrator Agreement**. The Liquidating Administrators shall be fiduciaries of the Liquidating Estate and shall be compensated and reimbursed for expenses as set forth in, and in accordance with, the Liquidating Administrator Agreement.

(ii) **Powers and Duties of Liquidating Administrators**. The Liquidating Administrators shall have no duties until the occurrence of the Effective Date, and on and after the Effective Date shall be fiduciaries for the Liquidating Estate. If the Plan is withdrawn or otherwise abandoned prior to the occurrence of the Effective Date, the Liquidating Administrator positions shall never be established. From and after the Effective Date, pursuant to the Wind-Down Budget and the terms and provisions of the Plan and Liquidating Administrator Agreement, the Liquidating Administrators shall be empowered and directed to: (a) take all steps and execute all instruments and documents necessary to make Distributions to Holders of Allowed Liquidating Estate Claims and to perform the duties assigned to the Liquidating Administrators under the Plan or the Liquidating Administrator Agreement; (b) comply with the Plan and the obligations hereunder; (c) employ, retain or replace professionals to represent them with respect to their responsibilities without the need for further Bankruptcy Court approval; (d) object to Liquidating Estate Claims as provided in the Plan, and prosecute such objections; (e) compromise and settle any issue or dispute regarding the amount, validity, priority, treatment or allowance of any Liquidating Estate Claim; (f) establish, replenish or release any reserves as provided in the Plan, as applicable; (g) exercise such other powers as may be vested in the Liquidating Administrators pursuant to the Plan, the Liquidating Administrator Agreement or any other order of the Bankruptcy Court, including the Confirmation Order, or otherwise act on behalf of the Liquidating Estate from and after the Effective Date; (h) file applicable tax returns for the Debtor; (i) liquidate, receive, hold, invest, supervise and protect the Wind-Down Reserve; (j) promptly after completing the wind-down, take any actions necessary to voluntarily dissolve the Debtor or allow the applicable Secretary of State to involuntarily dissolve the Debtor;

-38-

and (k) following the wind-down and dissolution of the Debtor, entry of a final decree in the Chapter 11 Case.

**8.      Vesting of Assets**

(a)      **Liquidating Estate Assets**

As of the Effective Date, all Remaining Estate Funds and all Liquidating Estate Retained Causes of Action shall vest in the Liquidating Estate free and clear of all Liens, Claims, charges or other encumbrances or interests to the extent permitted by section 1141 of the Bankruptcy Code.

(b)      **Settlement Trust Assets**

As of the Effective Date, the Settlement Trust Assets, including without limitation, the Settlement Trust Retained Causes of Action, and the Debtor's rights, title and interests to such Settlement Trust Assets, including without limitation the Settlement Trust Retained Causes of Action, shall vest in the Primary AFFF Settlement Trust free and clear of all Liens, Claims, charges or other encumbrances or interests to the extent permitted by section 1141 of the Bankruptcy Code.  Notwithstanding anything in the Plan to the contrary, the transfer of the Settlement Trust Assets to the Primary AFFF Settlement Trust shall not diminish, and fully preserves, any defenses the Debtor or Liquidating Estate would have if such Settlement Trust Assets had been retained by the Debtor or Liquidating Estate.  The Primary AFFF Settlement Trust and the Primary AFFF Settlement Trustee, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce the Settlement Trust Retained Causes of Action vested, transferred, or assigned to such entity.  The Primary AFFF Settlement Trust or the Primary AFFF Settlement Trustee, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Settlement Trust Retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, subject to the provisions of the Plan and the Insurance Cooperation Agreement, the Settlement Trust Assets held for Distribution pursuant to the Plan will be held by the applicable Settlement Trustee solely in trust for (i) with respect to the Primary AFFF Settlement Trust, Holders of Allowed Channeled AFFF Claims and the Sovereign State AFFF Settlement Trust, (ii) with respect to the Sovereign State AFFF Settlement Trust, Holders of Allowed Sovereign State Claims and (iii) with respect to the GUC Liquidating Trust, Holders of Allowed General Unsecured Claims, in each case in accordance with the Plan, and will not be deemed property of the Debtor or the Liquidating Estate.  For the avoidance of doubt, Article 5.7.2 of the Plan shall be subject in its entirety to the Insurance Cooperation Agreement.

**9.      Insurance Provisions**

Nothing in the Plan shall limit the right of any Insurance Company to assert any defenses to coverage that it may have under applicable law, except for (a) any defense that the Insurance Assignment is invalid or unenforceable or otherwise breaches the terms of such coverage; and/or (b) any defense that (i) the drafting, proposing, confirmation, or consummation

-39-

of the Plan or (ii) the discharge or release of the Debtor from liability for any Claims pursuant to the Plan operates to, or otherwise results in, the elimination of or the reduction of any obligation any Insurance Company may have with respect to the Insurance Policies, including in providing coverage pursuant to the Insurance Assignment for liabilities assumed by the Primary AFFF Settlement Trust.  Except for the transfer of rights to the Primary AFFF Settlement Trust pursuant to the Insurance Assignment (which, with respect to Carrier's rights, shall be subject to Article 5.5.11 of the Plan), or as otherwise provided by the Bankruptcy Code, applicable law, the findings made by the Bankruptcy Court in the Confirmation Order or otherwise, nothing in the Plan shall modify, amend, or supplement the terms of any Insurance Policy issued by any Other Insurance Company, or the rights or obligations under any such Insurance Policy to the extent such rights and obligations are otherwise available under applicable law.  The rights and obligations, if any, of any Other Insurance Company relating to or arising out of the Insurance Policies and any of the Plan Documents shall be determined pursuant to the terms and provisions of the Insurance Policies and applicable law.  Nothing in Article 5.8 of the Plan is intended or shall be construed to preclude otherwise applicable principles of res judicata or collateral estoppel from being applied against any Person.

### 10.    D&O Policies

Nothing in the Plan or the Confirmation Order shall adversely affect the rights to coverage, if any, of any Insured Persons or Organizations under any D&O Policy with respect to alleged Wrongful Acts occurring prior to the Effective Date (as such terms are used in the D&O Policy).  None of the Liquidating Trustees or any officers or directors of the Liquidating Estate in their capacities as such shall have any rights under the D&O Policy or any other directors & officers insurance policy under which Carrier has any rights or obligations in whole or in part.

### 11.    Cancellation of Existing Agreements, Notes and Interests

On the Effective Date, except as otherwise specifically provided for in the Plan or any agreement, instrument, or other document incorporated in the Plan, the obligations of the Debtor under any Certificate, Interest, share, note, purchase right, option, warrant, intercreditor agreement, guaranty, indemnity, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtor or giving rise to any Claim or Interest shall be canceled solely as to the Debtor, and the Debtor shall not have any continuing obligation thereunder and shall be released therefrom.

### 12.    Section 1146 Exemption from Certain Transfer Taxes and Recording Fees

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any transfers from the Debtor to the Liquidating Estate or to any other Person, pursuant to, in contemplation of, or in connection with the Plan (including any transfer pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor; or (b) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan) shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real

-40-

estate transfer tax, sales and use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local government officials or agents shall, and shall be directed to, forgo the collection of any such tax, recordation fee or government assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or government assessment.

### 13.    Preservation of Causes of Action

Other than Causes of Action against a Person that are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to the Estate Claims Settlement, or by a Bankruptcy Court order entered prior to the Effective Date, the Debtor reserves any and all Causes of Action.  On the Effective Date, (i) the Settlement Trust Retained Causes of Action shall vest in the Primary AFFF Settlement Trust and (ii) the Liquidating Estate Retained Causes of Action shall vest in the Liquidating Estate, in each case free and clear of all Claims, Liens, encumbrances and other interests.  The Settlement Trust Retained Causes of Action shall become Settlement Trust Assets and the Liquidating Estate Retained Causes of Action shall become Liquidating Estate Assets.  On and after the Effective Date, the Primary AFFF Settlement Trustee shall have sole and exclusive discretion to pursue and dispose of the Settlement Trust Retained Causes of Action and the Liquidating Administrators shall have sole and exclusive discretion to pursue the Liquidating Estate Retained Causes of Action.  No Person may rely on the absence of a specific reference in the Plan or Disclosure Statement as to any Cause of Action as any indication that the Debtor, and on and after the Effective Date, the Primary AFFF Settlement Trustee or Liquidating Administrators, as applicable, will not pursue any and all available Causes of Action against them.  No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation.  Prior to the Effective Date, the Debtor (and on and after the Effective Date, the Primary AFFF Settlement Trustee and Liquidating Administrators, as applicable) shall retain and shall have, through their authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

### 14.    Effectuating Documents and Further Transactions

On and after the Effective Date, the Debtor or the Liquidating Administrators, as applicable, are authorized to and may take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors or members of the Debtor shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant to applicable law, and without any

-41-

requirement of further action by the shareholders, directors, managers or partners of the Debtor, or the need for any approvals, authorizations, actions or consents.

15.    **Directors, Officers, Managers, Members and Authorized Persons of the Debtor**

On the Effective Date, each of the Debtor's directors and officers shall be discharged from their duties and terminated automatically without the need for any corporate action or approval and without the need for any corporate filings, and, unless subject to a separate agreement with the Administrators, shall have no continuing obligations in their capacities as directors and officers to the Debtor following the occurrence of the Effective Date.

C.    **Treatment of Executory Contracts and Unexpired Leases**

1.    **Rejection of Executory Contracts and Unexpired Leases**

Except as otherwise provided in the Plan, and subject to the occurrence of the Effective Date, all Executory Contracts and Unexpired Leases will be rejected by the Plan on the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code, other than (a) Executory Contracts or Unexpired Leases previously assumed or rejected pursuant to an order of the Bankruptcy Court or (b) Executory Contracts or Unexpired Leases that are the subject of a pending motion to assume, or for which a notice of assumption has been filed pursuant to the assumption and assignment procedures approved by the Bankruptcy Court in connection with the Sale. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejection of such Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code. For the avoidance of doubt, none of the Insurance Policies are Executory Contracts.

2.    **Claims Against the Debtor Upon Rejection**

No Executory Contract or Unexpired Lease rejected on or prior to the Effective Date shall create any obligation or liability of the Debtor or the GUC Liquidating Trust that is not a Claim. Any Proof of Claim arising from or relating to the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan must be filed with the Notice and Claims Agent before the Rejection Bar Date. Any Claim arising from or relating to the rejection of an Executory Contract or Unexpired Lease that is not filed with the Notice and Claims Agent by the Rejection Bar Date will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtor, the Liquidating Estate, the GUC Liquidating Trust or any of their property. Any Allowed Claim arising from the rejection of an Executory Contract or Unexpired Lease shall be classified as a General Unsecured Claim and shall be treated in accordance with Article 4.2.9 of the Plan.

3.    **Modifications, Amendments, Supplements, Restatements or Other Agreements**

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is rejected shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all

Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or are rejected or repudiated under the Plan.

Modifications, amendments, supplements and restatements to Prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the Prepetition nature of such Executory Contracts or Unexpired Leases or the validity, priority or amount of any Claims that may arise in connection therewith.

### 4. Reservation of Rights

Nothing contained in the Plan shall constitute an admission by the Debtor that any contract or lease is in fact an Executory Contract or Unexpired Lease, or that the Debtor has any liability thereunder.

## D. Provisions Governing Distributions

### 1. Provisions Governing Distributions On Account of Liquidating Estate Claims and General Unsecured Claims

#### (a) Distribution Record Date

On the Distribution Record Date, the Claims Register shall be closed and the Distribution Agent, Liquidating Administrators and GUC Liquidating Trustee, as applicable, shall be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim is transferred 20 or fewer days before the Distributions Record Date, the Distribution Agent or the GUC Liquidating Trustee, as applicable, shall make distributions to the transferee only to the extent practical, and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

#### (b) Distribution on Account of Liquidating Estate Claims and General Unsecured Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, a Final Order, or as agreed by the relevant parties, Distributions under the Plan on account of Liquidating Estate Claims and General Unsecured Claims Allowed on or before the Effective Date shall be made on the Initial Distribution Date.  After the Initial Distribution Date, (i) the Liquidating Administrators shall, from time to time, determine the subsequent Distribution Dates for purposes of making additional Distributions under the Plan on account of Liquidating Estate Claims and (ii) the GUC Liquidating Trustee shall, from time to time, determine the subsequent Distribution Dates for purposes of making additional Distributions under the Plan on account of General Unsecured Claims.

(c)      **Distributions on Account of Liquidating Estate Claims and General Unsecured Claims Allowed After the Effective Date**

Except as otherwise provided herein, a Final Order, or as agreed to by the relevant parties, Distributions on account of Disputed Liquidating Estate Claims or Disputed General Unsecured Claims that become Allowed after the Effective Date shall be made on the next applicable Distribution Date that is at least 30 days after such Disputed Claim becomes an Allowed Claim.  Notwithstanding any provision otherwise herein and except as otherwise agreed to by the relevant parties, no partial payments and no partial Distributions shall be made with respect to a Disputed Liquidating Estate Claim or Disputed General Unsecured Claim until all such disputes in connection with such Disputed Claim have been resolved and such Claim has become Allowed.

(d)      **Delivery of Distributions**

The Distribution Agent, at the direction of the Liquidating Administrators, shall make all Distributions, allocations, and/or issuances required under the Plan on account of Liquidating Estate Claims.  The GUC Liquidating Trustee shall make all Distributions, allocations, and/or issuances required under the Plan on account of General Unsecured Claims. In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Distribution Agent or the GUC Liquidating Trustee, as applicable, has determined the then current address of such Holder, at which time such Distribution shall be made to such Holder without interest; *provided, however*, such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the date such Distribution was made.  After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Liquidating Estate or GUC Liquidating Trust, as applicable, automatically and without need for a further order by the Bankruptcy Court for Distribution in accordance with the Plan and the Claim of any such Holder to such property or interest in property shall be released, settled, compromised, and forever barred.  The Debtor, the Liquidating Administrators, the GUC Liquidating Trustee and the Distribution Agent shall not incur any liability whatsoever on account of the delivery of any Distributions under the Plan.

(e)      **Manner of Payment Under Plan**

At the option of the Liquidating Administrators, the Distribution Agent or the GUC Liquidating Trustee, as applicable, any Cash payment to be made hereunder on account of Liquidating Estate Claims or General Unsecured Claims, as applicable, may be made by a check or wire transfer from the Distribution Agent or the GUC Liquidating Trustee, as applicable.  Any wire transfer fees incurred in connection with the transmission of a wire transfer shall be deducted from the amount of the recipient Holder's Allowed Claim.  The wire transfer fee will be deducted from the amount of the Distribution a Holder of an Allowed Claim would otherwise receive.  The Liquidating Administrators, the Distribution Agent and GUC Liquidating Trustee, as applicable, will, to the extent practicable, make aggregate Distributions on account of all the Allowed Claims held by a particular Holder.

(f)     **Minimum Cash Distributions**

No intermediate Distribution shall be required to be made to any Holder of an Allowed Liquidating Estate Claim or Allowed General Unsecured Claim on any applicable Distribution Date of Cash less than $100; *provided, however,* that if any Distribution is not made pursuant to Article 7.1.6 of the Plan, such Distribution shall be added to any subsequent Distribution to be made on behalf of such Allowed Claim.  Other than on account of Unimpaired Claims, the Liquidating Administrators, the Distribution Agent and the GUC Liquidating Trustee shall not be required to make any final Distributions of Cash less than $50 to any Holder of an Allowed Liquidating Estate Claim or Allowed General Unsecured Claim.

(g)     **Setoffs**

The Liquidating Administrators may, but shall not be required to, set off against any Liquidating Estate Claim any Claims of any nature whatsoever that the Debtor or the Liquidating Estate may have against the Holder of such Claim and the GUC Liquidating Trustee may, but shall not be required to, set off against any General Unsecured Claim any Claims of any nature whatsoever that the Debtor or the GUC Liquidating Trust have against the Holder of such Claim; *provided* that neither the failure to do so nor the allowance of any such Claim hereunder shall constitute a waiver or release by the Debtor, the Liquidating Estate or the GUC Liquidating Trust of any such Claim the Debtor, the Liquidating Estate or the GUC Liquidating Trust may have against the Holder of such Claim.

(h)     **Distributions After Effective Date**

Distributions made after the Effective Date to Holders of Disputed Liquidating Estate Claims or Disputed General Unsecured Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

(i)     **Compliance Matters and Allocation of Distributions Between Principal and Interest**

The Debtor, the Liquidating Estate, and the GUC Liquidating Trust shall comply with all withholding, deduction and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Distributions made by the Debtor, the Liquidating Estate and the GUC Liquidating Trust, as applicable, shall be subject to any applicable withholding, deduction and reporting requirements.  The Debtor, the Liquidating Administrators and the GUC Liquidating Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with any such withholding, deduction, and reporting requirements.  All amounts properly withheld or deducted from the Distributions to a Holder of an Allowed Claim as required by applicable law and paid over to the applicable taxing authority for the account of such Holder shall be treated as paid to such Holder.  All such Holders shall be required to provide any information necessary to effect the withholding and reporting of such taxes.  The Debtor, the Liquidating Administrators and the GUC Liquidating Trustee may require any Holder who receives a Distribution to furnish to the Debtor, the Liquidating Administrators or the GUC Liquidating Trustee, as applicable, or its designee, its social security number or

employer or taxpayer identification number as assigned by the IRS and complete any related documentation, including but not limited to a Form W-8BEN, Form W-8BENE-E, or Form W-9 (the "Tax Documents").  The Debtor, Liquidating Administrators or GUC Liquidating Trustee may condition any and all Distributions to any Holder of an Allowed Claim upon the timely receipt of properly executed Tax Documents and receipt of such other documents as the Debtor, Liquidating Administrators or GUC Liquidating Trustee, as applicable, reasonably request in accordance with the Plan.  The GUC Liquidating Trustee may request an expedited determination of taxes of the GUC Liquidating Trust under section 505 of the Bankruptcy Code for all returns filed for, or on behalf of, the GUC Liquidating Trust for all taxable periods through the termination of the GUC Liquidating Trust.

Except as otherwise provided in the Plan, to the extent that any Allowed Liquidating Estate Claim or Allowed General Unsecured Claims entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Liquidating Estate Claim or General Unsecured Claims, as applicable, first, and then to accrued but unpaid interest.

(j)    **No Postpetition Interest on Claims**

Except as otherwise provided in the Plan, the Confirmation Order, or another order of the Bankruptcy Court, or required by the Bankruptcy Code, postpetition interest shall not accrue or be paid on any Liquidating Estate Claims or General Unsecured Claims and no Holder of such Claim shall be entitled to interest accruing on or after the Petition Date.

(k)    **Undeliverable Distributions**

In the event that any Distribution to any Holder is returned as undeliverable, or no address for such Holder is found in the Debtor's records, no further Distribution to such Holder shall be made unless and until the Liquidating Administrators, the Distribution Agent or the GUC Liquidating Trustee, as applicable, is notified in writing of the then-current address of such Holder, at which time such Distribution shall be made to such Holder not less than 30 days thereafter.  Undeliverable Distributions shall remain in the possession of the Liquidating Administrators, GUC Liquidating Trustee or the Distribution Agent until such time as such Distribution becomes deliverable or such Distribution reverts to the Liquidating Estate or GUC Liquidating Trust, as applicable, or is canceled pursuant to Article 7.1.11 in the Plan and shall not be supplemented with any interest, dividends or other accruals of any kind.

(l)    **No Distribution in Excess of Amount of Allowed Claim**

Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Liquidating Estate Claim or Allowed General Unsecured Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim.

2.    **Distributions on Account of Channeled AFFF Claims**

Notwithstanding anything to the contrary in the Plan, all Distributions to Holders of Channeled AFFF Claims shall be made by and from the Primary AFFF Settlement Trust or

Sovereign State AFFF Settlement Trust, as applicable, in accordance with the Settlement Trust Documents.

**E.**     **Settlement, Release, Injunction and Related Provisions**

    **1.**     **Subordinated Claims**

        The allowance, classification and treatment of all Allowed Claims and Interests and the respective Distributions and treatments under the Plan take into account, conform to and satisfy the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto; however, subject to the Settling Parties' consent rights set forth in the Plan Support Agreement, the Debtor reserves the right to reclassify or modify the treatment of any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto, unless otherwise provided in a settlement agreement concerning such Allowed Claim or Interest.

    **2.**     **Release of Liens**

        **Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estate shall be fully released and cancelled, and all of the rights, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Liquidating Estate and their successors and assigns.  Any Holder of such mortgage, deed of trust, Lien, pledge or other security interest (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of the Debtor (including and cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder) and to take such actions as may be reasonably requested by the Liquidating Administrators to evidence such release, including the execution, delivery and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

    **3.**     **Releases by the Estate**

        **As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, pursuant to sections 105(a) and 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, each Released Party, the Debtor, the Liquidating Estate and each Related Party of the Debtor and the Liquidating Estate shall be, and shall be deemed to be, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor, its Estate, or any other Person or Governmental Unit asserting currently or in the future by, under, through, or on behalf of the Debtor or its Estate, and each of their respective successors or assigns, including the Settlement Trusts, of and from any and all Estate Causes of Action based on or relating to, or in any manner arising from any act, omission, transaction, event,**

or other circumstance taking place or existing on or before the Effective Date in connection with or related to the Debtor, the Estate, their respective current or former assets and properties, the Chapter 11 Case, AFFF, AFFF Claims, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated by the Plan, the business or contractual arrangements between one or both of the Debtor, on the one hand, and any Released Party, the Liquidating Estate, or any Related Party of the Debtor and the Liquidating Estate, the restructuring of any Claim or Interest that is treated by the Plan before or during the Chapter 11 Case, any of the Plan Documents, or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Case or the negotiation, formulation, preparation, or implementation thereof, the pursuit of confirmation, the administration and implementation of the Plan, the solicitation of votes with respect to the Plan, the distribution of any property under the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases contained in Article 10.3 of the Plan shall not be construed to release any post-Effective Date obligations under the Estate Claims Settlement or any document, instrument, or agreement executed to implement the Estate Claims Settlement, including the RTX Waiver, which specifically provides that such Estate Claims Settlement can be terminated and releases provided in the Plan or in the Estate Claims Settlement are void if Carrier fails to make the installments of the Guaranteed Cash Payment when due and such failure is not timely cured within 30 days, at which time the Primary AFFF Settlement Trust is entitled to commence, prosecute or continue all Estate Causes of Action against the Released Parties in any court of competent jurisdiction, and take such other actions as the Primary AFFF Settlement Trustee may determine in the exercise of their fiduciary duties.

4.      **Scope of Releases**

Each Person providing releases under the Plan, including the Debtor, the Estate and the Settling Parties, shall be deemed to have waived the provisions, rights, and benefits of California Civil Code § 1542 or any law of the United States or any state of the United States or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to Cal. Civ. Code § 1542, which provides:  A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

5.      **Exculpation**

Notwithstanding anything to the contrary in the Plan, as of the Effective Date, the Debtor and its directors, officers, employees, attorneys, investment bankers, financial advisors, restructuring advisors and other professional advisors, representatives and agents will be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including

-48-

section 1125(e) of the Bankruptcy Code and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with the solicitation.

As of the Effective Date, to the fullest extent permitted by applicable law, and without affecting or limiting the releases set forth in Article 10 of the Plan, the Exculpated Parties shall neither have nor incur any liability to any Person for any act or omission in connection with, related to or arising out of this Chapter 11 Case, including (a) the operation of the Debtor's businesses during the pendency of this Chapter 11 Case; (b) the administration and adjudication of Claims and Interests during this Chapter 11 Case; (c) formulating, negotiating, preparing, disseminating, implementing, administering, confirming and/or effecting the Plan, this Disclosure Statement, the Plan Supplement, or any related contract, instrument, release or other agreement or document created or entered into in connection with the Chapter 11 Case (including the solicitation of votes for the Plan and other actions taken in furtherance of Confirmation and Consummation of the Plan and the distribution of property under the Plan); (d) any other transaction, agreement, event, or other occurrence related to the Chapter 11 Case taking place on or before the Effective Date, other than liability resulting from any act or omission that is determined by Final Order to have constituted gross negligence, willful misconduct, fraud or a criminal act.

6.    Injunction

Except as otherwise expressly provided in the Plan or the Confirmation Order, the satisfaction and release pursuant to Article 10 of the Plan shall also act as a permanent injunction against any Person who has held, holds, or may in the future hold Claims against or Interests in the Debtor or any of its assets or properties based on any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date that are treated, released, settled, discharged, channeled, or exculpated pursuant to the terms of the Plan from taking any of the following actions on account of, or on the basis of, such discharged Claims or Interests:  (a) commencing or continuing any action to collect, enforce, offset, recoup, or recover with respect to any Claims or Interests treated, released, settled, discharged, channeled, or exculpated under the Plan or the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including to the extent provided for or authorized by sections 524 or 1141 thereof, (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order on account of or in connection with or with respect to any such Claim or Interest; (c) creating, perfecting, or enforcing any encumbrance of any kind on account of or in connection with or with respect to any such Claim or Interest against the Debtor, the Liquidating Estate, the Settlement Trusts, or its or their respective property; (d) asserting any right of setoff, subrogation, or recoupment of any kind on account of or in connection with or with respect to any such Claims or Interests, notwithstanding an indication of a Claim or Interest or otherwise that a Holder of such Claim or Interest asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise, against the Debtor, the Liquidating Estate, or the Settlement Trusts; or (e) commencing or continuing any judicial or administrative proceeding, in any forum and in any place in the world, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.  In accordance with the foregoing, except as expressly

-49-

provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge or termination of all Claims, Interests, and other debts and liabilities of the Debtor pursuant to sections 105, 524, and 1141 of the Bankruptcy Code.

7.      **Channeling Injunction**

Notwithstanding anything to the contrary in the Plan, to preserve and promote the settlements contemplated by and provided for in the Plan, including the Insurance Settlement Agreements, and to supplement, where necessary, the injunctive effect of the discharge as provided in sections 1141 and 524 of the Bankruptcy Code, pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under sections 105(a) and 1123(b) of the Bankruptcy Code, the sole recourse of any Holder of a Channeled AFFF Claim against the Debtor or a Released Party on account of such Channeled AFFF Claim shall be to and against the Primary AFFF Settlement Trust, or in the case of a Holder of a Sovereign State AFFF Claim, to and against the Sovereign State AFFF Settlement Trust, pursuant to the Settlement Trust Documents, and such Holder shall have no right whatsoever at any time to assert any such Channeled AFFF Claim or any Estate Cause of Action that is released under the Estate Claims Settlement against the Debtor or any Released Party or any property or interest in property of the Debtor or any Released Party.  For the avoidance of doubt, the sole recourse for any Channeled AFFF Claim covered by any Insurance Policy issued by a Settling Insurance Company shall be to and against the Primary AFFF Settlement Trust, or in the case of a Holder of a Sovereign State AFFF Claim, to and against the Sovereign State AFFF Settlement Trust, pursuant to the Settlement Trust Documents.  Accordingly, on and after the Effective Date, all Holders of AFFF Claims that have held or asserted, currently hold or assert, or that may in the future hold or assert, any Channeled AFFF Claim or any Estate Cause of Action against the Debtor or any Released Party shall be permanently and forever stayed, restrained, and enjoined from taking any action for the purpose of directly, indirectly, or derivatively collecting, recovering, or receiving payment, satisfaction, or recovery from the Debtor or any Released Party with respect to any such Channeled AFFF Claim or Estate Cause of Action, other than from the Primary AFFF Settlement Trust, or in the case of a Holder of a Sovereign State AFFF Claim, to and against the Sovereign State AFFF Settlement Trust, pursuant to the Settlement Trust Documents, including:

(a)      commencing, conducting, or continuing, in any manner, whether directly, indirectly, or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting the Debtor or any Released Party, or any property or interest in property of the Debtor or any Released Party;

(b)      enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, by any manner or means, either directly or indirectly, any judgment, award, decree, or order against

or affecting the Debtor or any Released Party, or any property or interest in property of the Debtor or any Released Party;

(c)     creating, perfecting or otherwise enforcing in any manner, whether directly or indirectly, any encumbrance of any kind against the Debtor or any Released Party, or any property or interest in property of the Debtor or any Released Party;

(d)     asserting, implementing, or effectuating any setoff, right of reimbursement, subrogation, indemnity, contribution, reimbursement, or recoupment of any kind, in any manner, directly or indirectly, against any obligation due to the Debtor or any Released Party, or any property or interest in property of the Debtor or any Released Party; or

(e)     taking any act in any manner, and in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents or the Settlement Trust Documents, or, with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Primary AFFF Settlement Trust, or in the case of a Holder of a Sovereign State AFFF Claim, by the Sovereign State AFFF Settlement Trust, except in conformity and compliance with the Settlement Trust Documents with respect to any such Channeled AFFF Claim.

The Debtor, the Liquidating Estate and/or any Released Party, as applicable, may enforce the Channeling Injunction and/or the Releases contained in the Plan before the Bankruptcy Court, which shall retain jurisdiction for such purpose, at their own cost and expense, and no such cost or expense incurred by a party other than the Primary AFFF Settlement Trust shall be reimbursed or indemnified by the Primary AFFF Settlement Trust under any circumstances.

    8.     Insurance Company Injunction

All Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any Claim or cause of action (including any AFFF Claim or any Claim for or respecting any Primary AFFF Settlement Trust expense) against any Insurance Company based upon, attributable to, arising out of, or in any way connected with any Insurance Policy, whenever and wherever arising or asserted, whether in the United States of America or anywhere else in the world, whether sounding in tort, contract, warranty, statute or any other theory of law, equity or admiralty, shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such Claim or cause of action, including:

(a)     commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including

a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any such Claim, demand, or cause of action against any Insurance Company, or against the property of any Insurance Company, with respect to any such Claim, demand, or cause of action (including, for the avoidance of doubt, directly pursuing any suit, action or other proceeding with respect to any such Claim, demand, or cause of action against any Insurance Company);

(b)     enforcing, levying, attaching, collecting, or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment award, decree, or other order against any Insurance Company, or against the property of any Insurance Company, with respect to any such Claim or cause of action;

(c)     creating, perfecting or enforcing in any manner, directly or indirectly, any lien or encumbrance against any Insurance Company, or the property of any Insurance Company, with respect to any such Claim or cause of action; and

(d)     except as otherwise specifically provided in the Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation of any Insurance Company, or against the property of any Insurance Company, with respect to any such Claim or cause of action;

*provided, however,* that (i) this injunction shall not impair in any way any actions brought by the Primary AFFF Settlement Trust against any Other Insurance Company; (ii) the Primary AFFF Settlement Trust shall have the sole and exclusive authority at any time to terminate, or reduce or limit the scope of, the injunction with respect to any Other Insurance Company, in accordance with the Settlement Trust Documents, upon express written notice to such Other Insurance Company; and (iii) this injunction is not issued for the benefit of any Other Insurance Company, and no Other Insurance Company is a third-party beneficiary of this injunction.

Notwithstanding anything to the contrary in the Plan, this injunction shall not enjoin:

(a)     the rights of any Person to the treatment accorded them under the Plan, as applicable, including the rights of Holders of AFFF Claims to assert such Claims, as applicable, in accordance with the TDPs;

(b)     the rights of the Primary AFFF Settlement Trust to prosecute any action based on or arising from Insurance Policies, except to the extent otherwise released;

(c)     the rights of the Primary AFFF Settlement Trust to assert any Claim, debt, obligation, cause of action or liability for payment against any

**Other Insurance Company based on or arising from the Insurance Policies;**

(d)  **any actions of the Contributing Parties in fulfilling their obligations under the Estate Claims Settlement in consultation and coordination with the Primary AFFF Settlement Trust;**

(e)  **the rights of any Insurance Company to assert any Claim, debt, obligation, cause of action or liability for payment against any Other Insurance Company; or**

(f)  **the Claims for reinsurance under reinsurance contracts or Claims under retrocessional contracts among the Settling Insurance Companies and any Other Insurance Company.**

9.  **Limitations on Exculpations and Releases**

**Notwithstanding anything to the contrary in the Plan, none of the releases or exculpations set forth in the Plan shall operate to waive or release any obligation or Causes of Action of any Person:  (a) arising under any contract, instrument, agreement, release or document delivered pursuant to the Plan or documents, agreements or instruments executed in connection therewith, including all post-Effective Date obligations or (b) expressly set forth in and preserved by the Plan, the Plan Supplement, Plan Documents or related documents.**

10.  **Release Dispute**

In the event of a Release Dispute, a Released Party may, at its sole cost and expense, file a motion with the Bankruptcy Court seeking a determination as to whether an AFFF Claimant's Cause of Action was settled and released pursuant to the Plan, and upon such motion, the Bankruptcy Court shall make such determination and, if appropriate, enjoin the prosecution of such Cause of Action as having been settled and released under the Plan.

F.  **Conditions Precedent to the Effectiveness of the Plan**

1.  **Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article 9.1 of the Plan:

(a)  the Bankruptcy Court or another court of competent jurisdiction shall have entered the Confirmation Order in form and substance consistent with the Plan Support Agreement, such order shall be a Final Order, and to the

extent such order was not entered by the District Court, the District Court shall have affirmed the Confirmation Order;

(b)  the Bankruptcy Court shall have determined that the Estate Claims Settlement is a fair, equitable, and reasonable compromise, in the best interests of the Estate, the product of good faith, arms'-length negotiations, and satisfies all applicable requirements of the Bankruptcy Code and Bankruptcy Rules, including Bankruptcy Rule 9019;

(c)  the Bankruptcy Court shall have determined that the Estate Claims Settlement is a good faith settlement that bars any Cause of Action by a non-Released Party against any Released Party for contribution, indemnification or otherwise seeking to recover any amounts paid by or awarded against that non-Released Party and paid or awarded to any Holder of a Claim by way of settlement, judgment or otherwise on any Claim that would be a Released Claim were such non-Released Party a Released Party to the extent that a good faith settlement has such effect under applicable law;

(d)  the Bankruptcy Court shall have determined that the releases set forth in the Estate Claims Settlement Agreement and Plan are an integral component of the Estate Claims Settlement and that the Estate Claims Settlement is fair, equitable, reasonable, in the best interests of the Estate, and consistent with all applicable provisions of the Bankruptcy Code;

(e)  the New National Foam Release and all related releases (which shall include, but not be limited to, a release of Angus International Safety Group Limited's Claim filed in the Chapter 11 Case) shall have been approved by the Bankruptcy Court and the subject of a Final Order (which for the avoidance of doubt may be through the Confirmation Order);

(f)  the Plan Support Agreement shall remain in full force and effect and shall not have been terminated with respect to the Estate Claims Settlement and the parties thereto shall be in compliance therewith;

(g)  all Definitive Documents contemplated by the Plan Support Agreement shall (i) be consistent with the Plan Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights set forth therein and (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties;

(h)  the Settlement Trusts shall be established and validly existing and the AFFF Data Transfer shall have been completed;

(i)  the Bankruptcy Court shall have determined that the proposed governance for the Settlement Trusts is appropriate, and that the TDPs are fair and

-54-

reasonable based on the evidentiary record offered to the Bankruptcy Court and are proposed in good faith;

(j)     the Bankruptcy Court shall have authorized the Insurance Assignment by the Debtor to the Primary AFFF Settlement Trust as provided in the Plan, notwithstanding any terms or any policies or provisions of non-bankruptcy law that prohibit the delegation, assignment, or other transfer of such rights, and the Bankruptcy Court shall have determined that the Primary AFFF Settlement Trust is a proper defendant for all Holders of applicable Claims against the Debtor and/or Carrier that are settled pursuant to the Estate Claims Settlement Agreement to assert liability to trigger and pursue such insurance rights and that the Primary AFFF Settlement Trust is entitled to pursue insurance coverage for all other AFFF Claims asserted against Carrier or the Debtor as provided in and consistent with the Insurance Assignment (which, with respect to Carrier's rights, shall be subject to Article 5.5.11 of the Plan) and the Insurance Cooperation Agreement;

(k)     the Bankruptcy Court shall have determined that the Plan is proposed in good faith and is sufficient to satisfy the requirements of section 1129(a)(3) of the Bankruptcy Code;

(l)     the Bankruptcy Court shall have determined that the injunctions set forth in the Plan, including the Channeling Injunction and Insurance Entity Injunction, are essential to the Plan and the Estate Claims Settlement, appropriately tailored to implement the applicable provisions of the Estate Claims Settlement and the Plan, and consistent with all applicable provisions of the Bankruptcy Code;

(m)     the Bankruptcy Court shall have entered an order approving the Insurance Cooperation Agreement;

(n)     the Bankruptcy Court shall have determined that it may properly, and upon the Effective Date shall, retain jurisdiction over matters arising in, under, and related to the Chapter 11 Case, including the Plan and Plan Documents and shall retain non-exclusive jurisdiction over any Insurance Action including the Insurance Adversary Proceedings;

(o)     all actions, documents, certificates and agreements necessary to implement the Plan as mutually agreed by the Debtor and the Settling Parties shall have been effected or executed and delivered, as applicable;

(p)     the Bankruptcy Court shall have determined that the Plan, the Plan Documents, and the Confirmation Order are binding on all parties-in-interest to the extent provided therein;

-55-

(q)     the Debtor shall have established and funded the Professional Fee Escrow Account in accordance with Article 3.3.2 of the Plan; and

(r)     all authorizations, consents, regulatory approvals, rulings or documents that are necessary to implement and effectuate the Plan as of the Effective Date shall have been received, waived or otherwise resolved.

For the avoidance of doubt, neither acceptance, approval, nor effectiveness of any settlement of claims against Carrier in the AFFF MDL (nor any other condition to or relating to such settlements) shall be a condition to effectiveness of the Plan.

### 2.     Waiver of Conditions

Subject to the Settling Parties' consent rights pursuant to the Plan Support Agreement, the Debtor may waive conditions to the occurrence of the Effective Date set forth in Article 9 of the Plan at any time without further notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to consummate the Plan.

### 3.     Simultaneous Transactions

Except as otherwise expressly set forth in the Plan, the Confirmation Order or a written agreement by the Debtor, each action to be taken on the Effective Date shall be deemed to occur simultaneously as part of a single transaction.

### 4.     Notice of Effective Date

As soon as practicable after the Effective Date has occurred, the Liquidating Administrators shall file with the Bankruptcy Court a notice specifying the Effective Date.

# ARTICLE V.

## STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code include:  (i) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtor believes that:  (i) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (ii) the Debtor has complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (iii) the Plan has been proposed in good faith.

The following is a brief summary of the process of the Confirmation of the Plan. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or consult their own attorneys.

## A.      The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing at which the Debtor will seek confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to the Confirmation of the Plan.

**THE CONFIRMATION HEARING IS SCHEDULED TO COMMENCE ON [APRIL 30], 2025 AT [●] [A.M. / P.M.] (PREVAILING EASTERN TIME), BEFORE THE HONORABLE LAURIE S. SILVERSTEIN, UNITED STATES BANKRUPTCY JUDGE.  THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT OR THE DEBTOR WITHOUT FURTHER NOTICE OTHER THAN BY ANNOUNCEMENT IN OPEN COURT AND/OR NOTICE(S) OF ADJOURNMENT FILED ON THE DOCKET WITH THE BANKRUPTCY COURT'S PERMISSION.**

**OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE APPLICABLE PARTIES SO AS TO BE ACTUALLY RECEIVED ON OR BEFORE 4:00 P.M. (PREVAILING EASTERN TIME) ON [APRIL 4], 2025 IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER.  UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER, THEY WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**B.    Confirmation Standards**

To confirm the Plan, the Bankruptcy Court must find that the requirements of section 1129 of the Bankruptcy Code have been satisfied.  The Debtor believes that section 1129 has been satisfied because, among other things:

1.    the Plan complies with the applicable provisions of the Bankruptcy Code;

2.    the Debtor, as plan proponent, has complied with the applicable provisions of the Bankruptcy Code;

3.    the Plan has been proposed in good faith and not by any means forbidden by law;

4.    any payment made or promised under the Plan for services or for costs and expenses in or in connection with this Chapter 11 Case, or in connection with the Plan and incident to this Chapter 11 Case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

5.    with respect to each Class of Impaired Claims or Interests, each Holder of a Claim or Interest in such Class has either accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtor was liquidated on such date under chapter 7 of the Bankruptcy Code (*see* Article V.C—*Best Interests Test*);

6.    each Class of Claims or Interests has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such class pursuant to section 1129(b) of the Bankruptcy Code;

7.    except to the extent that the Holder of a certain Claim under Article 3 of the Plan has agreed or will agree to a different treatment of such Claim, the Plan provides that Allowed Administrative Claims will be paid in full in Cash on the Effective Date;

8.    except to the extent that a holder of an Allowed Other Priority Claim has agreed to a different treatment of such Claim, each such Holder will receive Cash in an amount equal to the Allowed amount of such Claim, or treatment in any other manner so that such Claim will otherwise be rendered Unimpaired, (a) on the Effective Date or as soon as reasonably practicable thereafter; (b) if an Other Priority Claim is Allowed after the Effective Date, on the date such Other Priority Claim is Allowed or as soon as reasonably practicable thereafter; (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtor or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court;

-58-

9.     except to the extent that the applicable Holder of an Allowed Priority Tax Claim has been paid by the Debtor before the Effective Date, or such Holder agrees to less favorable treatment, each Holder of an Allowed Priority Tax Claim will receive, on account of such Allowed Priority Tax Claim, at the option of the Debtor or, after the Effective Date, the Liquidating Trust, (i) payment in full in Cash made (a) on or as soon as reasonably practicable after the Effective Date or (b) on the date such payment is due in the ordinary course of business, (ii) regular installment payments in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such other amounts and in such other manner as may be determined by the Bankruptcy Court to provide the Holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim;

10.    at least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of that Class;

11.    Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan (*see* Article V.D—*Financial Feasibility*); and

12.    all fees payable under section 1930 of title 28 of the United States Code will be paid as of the Effective Date of the Plan.

## C.     Best Interests Test

### 1.     Explanation of the Best Interests Test

Pursuant to section 1129(a)(7) of the Bankruptcy Code, Confirmation of the Plan requires that, with respect to each Class of Impaired Claims or Interests, each Holder of a Claim or Interest in such Class either (a) accepts the Plan or (b) receives or retains under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtor was liquidated on such date under chapter 7 of the Bankruptcy Code (this latter clause is known as the "Best Interests Test").

To determine the probable distribution to Holders of Claims and Interests in each Impaired Class if the Debtor was liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in the context of a chapter 7 liquidation.

The Debtor's chapter 7 liquidation value would consist primarily of the cash held by the Debtor at the time of the conversion to a chapter 7 liquidation, the proceeds resulting from the sale of the Debtor's remaining assets and properties by a chapter 7 trustee and Causes of

Action other than those that are expressly waived, relinquished, exculpated, released, compromised or settled.  The gross cash proceeds available for distribution would be reduced by the costs and expenses of the chapter 7 liquidation and any additional Administrative Claims that might arise as a result of the chapter 7 cases.  Costs and expenses incurred as a result of the chapter 7 liquidation would include, among other things, the fees payable to a trustee in bankruptcy and the fees payable to attorneys and other professionals engaged by such trustee.  Additional Administrative Claims could arise by reason of, among other things, the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtor during the pendency of the Chapter 11 Case.  Such Administrative Claims and any other Administrative Claims that might arise in a liquidation case or result from this Chapter 11 Case, such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition Claims.

To determine if the Plan is in the best interests of each Impaired Class, the value of the distributions from the proceeds of a chapter 7 liquidation of the Debtor's assets and properties, after subtracting the amounts attributable to the costs, expenses and Administrative Claims associated with a chapter 7 liquidation, must be compared with the value offered to such Impaired Classes under the Plan.  If the hypothetical chapter 7 liquidation distribution to Holders of Claims or Interests in any non-consenting Impaired Class is greater than the distributions to be received by such parties under the Plan, then the Plan is not in the best interests of the Holders of Claims or Interests in such Impaired Class.

**2.      The Debtor's Liquidation Analysis**

Amounts that a Holder of Claims and Interests in Impaired Classes would receive in a hypothetical chapter 7 liquidation are discussed in the liquidation analysis of the Debtor prepared by the Debtor's management with the assistance of their restructuring advisors, and attached to this Disclosure Statement as Appendix B (the "Liquidation Analysis").

As described in the Liquidation Analysis, underlying this analysis is the extensive use of estimates and assumptions that, although considered reasonable by the Debtor's management, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the Debtor's control.  The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change.  Actual results may vary materially from the estimates and projections set forth in the Liquidation Analysis.

The Liquidation Analysis was developed solely for purposes of the formulation and negotiation of the Plan and to enable Holders of Claims or Interests entitled to vote under the Plan to make an informed judgment about the Plan, and should not be used or relied upon for any other purpose, including the purchase or sale of Claims or Interests in, the Debtor or any of its affiliates.

Events and circumstances subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed, or alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner.  The Debtor does not intend and does not undertake any

obligation to update or otherwise revise the Liquidation Analysis to reflect events or circumstances existing or arising after the date the Liquidation Analysis is initially filed or to reflect the occurrence of unanticipated events.  Therefore, the Liquidation Analysis may not be relied upon as a guarantee or other assurance of actual future results.

In deciding whether to vote to accept or reject the Plan, Holders of Claims or Interests must make their own determinations as to the reasonableness of any assumptions underlying the Liquidation Analysis and the reliability of the Liquidation Analysis.

**3.** **Application of the Best Interests Test to the Liquidation Analysis of the Debtor**

Notwithstanding the difficulties in quantifying with precision the recoveries to Holders of Claims and Interests, the Debtor believes that, based on a comparison between the recoveries under the Plan and the Liquidation Analysis, the Debtor's proposed Plan satisfies the requirements of the Best Interests Test.  As the Plan and the Liquidation Analysis indicate, Confirmation of the Plan will provide each Holder of an Allowed Claim or Interest in an Impaired Class with treatment that is equal to or greater than the value of distributions to Holders in such Class if the Chapter 11 Case was converted to a case under chapter 7 of the Bankruptcy Code.

| Class | Description | Estimated Recovery | |
|---|---|---|---|
| | | **Plan** | **Liquidation** |
| 1 | Other Priority Claims | [●] | [●] |
| 2 | Secured Claims | [●] | [●] |
| 3A | Water Provider Claims | [●] | [●] |
| 3B | Airport Claims | [●] | [●] |
| 3C | Sovereign State Claims | [●] | [●] |
| 3D | Property Damage and Business Loss Claims | [●] | [●] |
| 3E | Personal Injury Claims | [●] | [●] |
| 3F | Sovereign Tribe Claims | [●] | [●] |
| 4 | General Unsecured Claims | [●] | [●] |
| 5 | Affiliate Claims | [●] | [●] |
| 6 | Interests | [●] | [●] |

Further, a chapter 7 liquidation would require the Debtor's Estate to incur additional costs and expenses, including fees payable to the chapter 7 trustee and fees that may be payable to attorneys or other professionals retained by the chapter 7 trustee.  Such costs and expenses would be paid in full from the proceeds of the liquidation of the Debtor's Estate in chapter 7, if any, before the balance of those proceeds would be made available to Holders of Allowed Claims and Interests.

Finally, liquidating the Debtor's Estate under chapter 7 would not provide a timely distribution to Holders of Allowed Claims and Interests because of the potential added time and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtor's Estate.

Accordingly, the Debtor believes that the Plan will allow the realization of greater value for their respective Impaired Classes than a hypothetical liquidation.

**D.    Financial Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to confirmation of the Plan, that the Bankruptcy Court find that confirmation is not likely to be followed by the liquidation of the Debtor or the need for further financial reorganization, unless such liquidation or reorganization is contemplated by the Plan.

The ability to make the distributions described in the Plan does not depend on future earnings or operations of the Debtor.  Accordingly, the Debtor believes that the Plan is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

**E.    Acceptance by Impaired Classes**

Except as described in Article V.F—*Confirmation Without Acceptance by All Impaired Classes*, the Bankruptcy Code requires, as a condition to Confirmation of the Plan, that each Impaired Class accept the Plan.  A class of claims that is unimpaired under a plan is conclusively presumed to have accepted a plan and, therefore, solicitation of acceptances with respect to such class is not required.  Under section 1124 of the Bankruptcy Code, a class is impaired under a plan unless (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class; only those holders that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met.  Under section 1126(d) of the Bankruptcy Code, a class of interests will have voted to accept the plan only if two-thirds in amount of the interests that actually vote to accept or reject the plan cast their ballots in favor of acceptance.  Holders of claims or interests who fail to vote are deemed neither to accept nor to reject the plan.

In addition to these voting requirements, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or interest in an impaired class or that the plan otherwise be found by a court to be in the best interests of each Holder of a claim or interest in such class.  *See* Article V.C—*Best Interests Test*.  Moreover, each impaired class must accept the plan for the plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests set forth in section 1129(b) of the Bankruptcy Code discussed below.  *See* Article V.F—*Confirmation Without Acceptance by All Impaired Classes* below.

**F.    Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan, provided that the Plan has been accepted by at least one Impaired Class of creditors.

Notwithstanding the failure of an Impaired Class to accept the Plan, the Plan will be confirmed in a procedure commonly known as cram-down, so long as the Plan does not "discriminate unfairly" and is "fair and equitable," for the purposes of the Bankruptcy Code, with respect to each Class of Claims or Interests that is Impaired under, and has not accepted, the Plan.  The Debtor reserves the right to seek Confirmation under section 1129(b) of the Bankruptcy Code if necessary.

### 1.    Unfair Discrimination

The Plan does not "discriminate unfairly" for the purposes of section 1129 of the Bankruptcy Code if the Plan gives substantially equivalent treatment to each Class of equal rank; in determining whether a plan discriminates unfairly, courts take into account a number of factors, including the effect of applicable subordination agreements between parties.

### 2.    Fair and Equitable

The "fair and equitable" test applies to Classes of different priority and status and includes the general requirement that no Class of Claims or Interests receive more than 100 percent of the amount of the Allowed Claims or Interests in the Class. As to the dissenting Class, the test sets different standards depending upon the type of Claims or Interests in the Class.

The condition that the Plan be fair and equitable includes the following requirements, as applicable:

(a)    with respect to a non-accepting Class of Secured Claims, that:  (i) the Holders of such Secured Claims retain the Liens securing such Claims to the extent of the Allowed amount of the Secured Claims, whether the property subject to the liens is retained by the Debtor or transferred to another entity under the Plan, (ii) each Holder of a Secured Claim in the Class receives deferred cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date, at least equivalent to the value of such Secured Claim Holder's interest in the Debtor's property subject to the Liens, or (iii) the property securing the Secured Claim is sold free and clear of Liens with such Liens to attach to the proceeds of the sale, and such Liens on proceeds to receive treatment consistent with clause (i) or (ii) above;

(b)    with respect to a non-accepting Class of General Unsecured Claims, that either:  (i) the Plan provide that each Claim Holder in such Class receive or retain, on account of such Claim, property of a value, as of the Effective Date, equal to the Allowed amount of such Claim or (ii) no Holder of any Claim or Interest that is junior to the Claims or Interests of such Class receive or retain any property under the Plan on account of such junior Claim or Interest; and

(c)    with respect to a non-accepting Class of Interests, that either:  (i) the Plan provide that each Holder of an Interest in such Class receive or retain under the Plan, on account of such Interest, property of a value, as of the

Effective Date, equal to the greater of: (1) the Allowed amount of any fixed liquidation preference to which such Holder is entitled; (2) any fixed redemption price to which such Holder is entitled or (3) the value of such Interest or (ii) if the Class does not receive property in the amount required under (i), no Class of Interests junior to the non-accepting Class receive a distribution under the Plan.

**3.      Confirmation of the Plan Pursuant to Section 1129(b)**

The Debtor may seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any Impaired Class presumed to reject the Plan, and reserves the right to do so with respect to any other rejecting Class of Claims, and/or modify the Plan . Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of confirmation of the Plan by the acceptance of the Plan by at least one Class that is Impaired under the Plan.

The Debtor submits that the Plan does not "discriminate unfairly" for the purposes of section 1129(b) of the Bankruptcy Code. The Debtor believes that, under the Plan, all impaired Classes of Claims and Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Interests that are similarly situated, if any, and no class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. Accordingly, the Debtor believes that the Plan does not discriminate unfairly as to any impaired Class of Claims or Interests.

The Debtor submits that the Plan is "fair and equitable" for the purposes of section 1129(b) of the Bankruptcy Code because, as set forth above and in the Plan, although the Holders of Claims in Classes 3A (Water Provider Claims), 3B (Airport Claims), 3C (Sovereign State Claims), 3D (Property Damage and Business Loss Claims), 3E (Personal Injury Claims) 3F (Sovereign Tribe Claims) and 4 (General Unsecured Claims) may not receive a distribution equal to the Allowed amount of their Claims or Interests, as applicable, no Holders of Claims or Interests junior to these Classes will receive a distribution under the Plan on account of such junior Claims or Interests.

Therefore, the requirements of section 1129(b) of the Bankruptcy Code would be satisfied in the event that the Debtor is required to cram down.

**G.      Classification**

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divides the different claims (excluding administrative claims and certain other categories of claims) against, and equity interests in, a debtor into separate classes based upon their legal nature. Pursuant to section 1122 of the Bankruptcy Code, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Debtor believes that the Plan classifies all Claims and Interests in compliance with the provisions of the Bankruptcy Code because valid business, factual and legal reasons exist for separately classifying the various Classes of Claims and

-64-

Interests created under the Plan.  Accordingly, the classification of Claims and Interests in the Plan complies with section 1122 of the Bankruptcy Code.

**ARTICLE VI.**

**VOTING PROCEDURES**

On [●], 2025, the Bankruptcy Court entered an order, among other things, approving this Disclosure Statement, approving procedures for soliciting votes on the Plan, approving the form of the solicitation documents and various other notices, setting the Voting Record Date of [January 22], 2025, the Voting Deadline of [April 4], 2025 at 5:00 p.m. (prevailing Eastern Time) and the date of the Confirmation Hearing and establishing the relevant objection deadlines and procedures associated with Confirmation of the Plan (the "Disclosure Statement Order").  The Disclosure Statement Order, a copy of which is attached hereto as Appendix C, should be read in conjunction with this Article VI—*Voting Procedures* of this Disclosure Statement.

Subject to the AFFF Master Ballot Procedures, if you are entitled to vote to accept or reject the Plan, you will receive a Solicitation Package, including a Ballot (or multiple Ballots, if you hold Claims in multiple Classes), for the purpose of voting on the Plan.  To ensure your vote is counted, you must complete, date, sign, and promptly mail your Ballot(s) to the Solicitation Agent or complete your Ballot(s) using the online portal maintained by the Solicitation Agent.

If you have any questions about (a) the procedures for voting your Claim or with respect to the packet of materials that you have received or (b) the amount of your Claim, please contact the Debtor's Solicitation Agent at https://cases.stretto.com/KFI/ or KFIInquires@Stretto.com.  If you wish to obtain (at no charge) an additional copy of the Plan, this Disclosure Statement or other solicitation documents, you can obtain them from the Debtor's case information website (located at https://cases.stretto.com/KFI/) or by requesting a copy from the Debtor's Solicitation Agent, who can be reached at (866) 887-0488 (Domestic, Toll-Free), +1 (949) 889-0128 (International), or by email at KFIInquiries@Stretto.com.  In addition, a link to the Solicitation Agent's website is included in each of the Ballots, along with instructions detailing how to access the solicitation versions of the Plan and this Disclosure Statement if you received your Ballot in hard copy.

For the avoidance of doubt, all persons that believe they hold an AFFF Claim against the Debtor will be entitled to obtain a Solicitation Package (and a Ballot) and vote on the Plan, so long as any such person makes the required certifications on the applicable Ballot.  All materials included in the Solicitation Packages for Holders of AFFF Claims against the Debtor will be made available free of charge online at the Debtor's website maintained by the Solicitation Agent at https://cases.stretto.com/kfi.  The dedicated webpage will contain an online portal whereby persons may request (and immediately obtain) and submit a Ballot.

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code.  In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law and, under Bankruptcy Rule 3020(b)(2), it may make such a determination without receiving evidence if no objection is timely filed.

In particular, and as described in more detail below, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that: (a) the Plan has been accepted by the requisite votes of all Classes of Impaired Claims unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more such Classes; (b) the Plan is "feasible," meaning there is a reasonable probability that the Debtor will be able to perform its obligations under the Plan; and (c) the Plan is in the "best interests" of all Holders of Claims and Interests, meaning that all such Holders will receive at least as much under the Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code.

The Bankruptcy Court must find that all conditions mentioned above are met before it can confirm the Plan. Thus, even if all classes of Impaired Claims accept the Plan by the requisite votes, the Bankruptcy Court must still make an independent finding that the Plan satisfies these requirements of the Bankruptcy Code, that the Plan is feasible, and that the Plan is in the best interests of the Holders of Claims against and Interests in the Debtor.

UNLESS THE BALLOT BEING FURNISHED IS TIMELY RECEIVED BY THE SOLICITATION AGENT ON OR PRIOR TO 5:00 P.M. (PREVAILING EASTERN TIME) ON [APRIL 4], 2025, TOGETHER WITH ANY OTHER DOCUMENTS REQUIRED TO BE SUBMITTED WITH SUCH BALLOT, THE DEBTOR WILL REJECT SUCH BALLOT AS INVALID AND, ACCORDINGLY, DECLINE TO COUNT IT AS AN ACCEPTANCE OR REJECTION OF THE PLAN; PROVIDED, HOWEVER, THE DEBTOR RESERVES THE RIGHT, IN CONSULTATION WITH THE SETTLING PARTIES, TO REQUEST THE BANKRUPTCY COURT TO ALLOW ANY SUCH BALLOTS TO BE COUNTED. IN NO CASE SHOULD A BALLOT BE DELIVERED TO THE DEBTOR OR ANY OF ITS ADVISORS.

## A.     Parties-in-Interest Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless: (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof; or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, under section 1126(a) of the Bankruptcy Code, the holder of a claim or interest that is allowed under a plan is entitled to vote to accept or reject the plan if such claim or interest is impaired under the plan. Under section 1126(f) of the Bankruptcy Code, the holder of a claim that is not impaired under a plan is conclusively presumed to have accepted the plan, and the plan proponent need not solicit such holder's vote. Under section 1126(g) of the Bankruptcy Code, the holder of an impaired claim or impaired interest that will not receive any distribution under the plan in respect of such claim or interest is deemed to have rejected the plan and is not entitled to vote on the plan. For a detailed description of the treatment of Claims and Interests under the Plan, refer to Article IV—*Summary of the Plan*.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that such vote was not solicited or procured in good

faith or in accordance with the provisions of the Bankruptcy Code.  The Disclosure Statement Order also sets forth assumptions and procedures for tabulating Ballots, including Ballots that are not completed fully or correctly.

**B.      Classes Under the Plan**

**1.      Voting Classes**

Classes 3A (Water Provider Claims), 3B (Airport Claims), 3C (Sovereign State Claims), 3D (Property Damage and Business Loss Claims), 3E (Personal Injury Claims), Class 3F (Sovereign Tribe Claims) and 4 (General Unsecured Claims) are Impaired and entitled to receive distributions under the Plan and, thus, are entitled to vote to accept or reject the Plan.

**2.      Non-Voting Classes**

Claims in Classes 1 (Other Priority Claims) and 2 (Secured Claims) (such Classes, the "Unimpaired Non-Voting Classes"), are Unimpaired and conclusively presumed under section 1126(f) of the Bankruptcy Code to accept the Plan and, accordingly, are not entitled to vote.

Claims and Interests in Classes 5 (Affiliate Claims) and 6 (Interests) (such Classes, the "Impaired Non-Voting Classes," and together with the Unimpaired Non-Voting Classes, the "Non-Voting Classes"), will not receive any distributions under the Plan and are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code and, accordingly, are not entitled to vote.

**C.      Form, Content, and Manner of Notices**

**1.      Solicitation Packages for Voting Classes**

As set forth in the Disclosure Statement Order and subject to the AFFF Master Ballot Solicitation Procedures, the Debtor will distribute, or cause to be distributed, a solicitation package to each Holder of a Claim entitled to vote on the Plan (a "Solicitation Package").  The Solicitation Packages will contain:

(a)      the Cover Letter;

(b)      for Holders of Claims in Classes 3A, 3B, 3C, 3D, 3E, 3F and 4, the Committee Letter;

(c)      for Holders of Claims in Classes 3A and 3B, the PEC Letter;

(d)      the Solicitation Procedures;

(e)      a USB flash drive containing a copy of the Disclosure Statement with all exhibits, including the Plan with its exhibits (to the extent such exhibits are filed with the Court before the Solicitation Mailing Deadline);

-68-

(f)    the Order (without exhibits);

(g)    an appropriate Ballot and voting instructions for the same;

(h)    a preaddressed, return envelope for completed Ballots;

(i)    the Confirmation Hearing Notice; and

(j)    any other materials ordered by the Court to be included as part of the Solicitation Package.

## 2.    Notices for Non-Voting Classes

Under section 1126(f) of the Bankruptcy Code, classes that are not impaired under a plan are deemed to accept the plan.  The Unimpaired Non-Voting Classes are deemed under section 1126(f) of the Bankruptcy Code to accept the Plan.  The Impaired Non-Voting Classes are deemed to reject the Plan.  The votes of these respective Classes to accept or reject the Plan will not be solicited.

As set forth in the Disclosure Statement Order, in lieu of a Solicitation Package, Holders of Claims in the Unimpaired Non-Voting Classes will only receive (a) the Confirmation Hearing Notice and (b) a Notice of Unimpaired Non-Voting Status.  In addition, as set forth in the Disclosure Statement Order, in lieu of a Solicitation Package, Holders of Claims and Interests in the Impaired Non-Voting Classes will only receive (a) the Confirmation Hearing Notice and (b) a Notice of Impaired Non-Voting Status.

The Notice of Unimpaired Non-Voting Status and the Notice of Impaired Non-Voting Status will provide the applicable Holders with instructions for viewing or obtaining a copy of the Plan, the Disclosure Statement and the Disclosure Statement Order, as required by Bankruptcy Rule 3017(d).

## 3.    AFFF Master Ballot Solicitation

If a Firm certifies that (a) the Firm will collect and record the votes of its Eligible Clients through customary and accepted practices (*e.g.*, by email, telephone or other standard communications) or (b) it has the authority under a power of attorney or other applicable law to vote to accept or reject the Plan on behalf of its Eligible Clients, the Firm may direct the Solicitation Agent to serve the Firm with, for each Class in which the Firm represents Eligible Clients, one Solicitation Package and the applicable master ballot (each such master ballot, an "AFFF Master Ballot").  The Firm must record the votes on the Plan for each of its Eligible Clients on the applicable AFFF Master Ballot.  Any Firm that elects this procedure must meet all applicable standards to receive informed consent from its Eligible Clients.  The Solicitation Agent may rely upon the representation of authority presented to the Solicitation Agent in the Solicitation Directive and AFFF Master Ballot without the need to further investigate or verify its validity; *provided* that any Firm that represents that it has authority under a power of attorney must make such power of attorney available to the Debtor upon request.  Each Firm that elects this procedure must either (a) provide the Disclosure Statement, via instructions detailing how to access electronic versions or in hard copy or electronic format, to its Eligible Clients, or

(b) return the completed Client List and request that, for informational purposes and by selecting the applicable box on the Solicitation Directive, the Solicitation Agent serve Solicitation Packages (without Ballots) on its Eligible Clients.  Any Firm that elects this procedure must return the applicable AFFF Master Ballot(s) to the Solicitation Agent so that they are received by the Voting Deadline, as may be extended by the Debtor in writing, in consultation with the Settling Parties.  The AFFF Master Ballot(s) must be returned to the Solicitation Agent pursuant to the instructions thereon.  Firms are strongly encouraged to submit Solicitation Directives and accompanying Client Lists, as well as AFFF Master Ballots, via encrypted email or other secured method of electronic transmission.

**D.    Voting Procedures**

 **1.    Ballots**

  The record date for voting on the Plan is [January 22], 2025 (the "<u>Voting Record Date</u>").  Only Holders of Claims, or representatives of Holders of Claims, that are entitled to vote under the Plan will receive a Ballot and may vote on the Plan; *provided* that the Voting Record Date does not apply to Holders of Claims in Classes 3A, 3B, 3C, 3D, 3E or 3F.

  In voting for or against the Plan, please use (a) only the Ballot sent to you or (b) the online electronic ballot portal.  If you are (a) a Holder of a Claim in Classes 3A, 3B, 3C, 3D, 3E, 3F or 4 and did not receive a Ballot or your Ballot is damaged or lost or (b) counsel to a Holder of a Claim in Classes 3A, 3B, 3C, 3D, 3E or 3F and did not receive a Solicitation Directive Notice, or in each case if you have any questions concerning voting procedures, please contact the Solicitation Agent at (866) 887-0488 (Domestic, Toll-Free), +1 (949) 889-0128 (International), or by email at <u>KFIInquiries@Stretto.com</u>.

 **2.    Submitting Ballots**

  If you are entitled to vote to accept or reject the Plan, you should read carefully, complete and submit your Ballot in accordance with the instructions in your Ballot.

  To be counted, all Ballots that are not AFFF Master Ballots must be properly executed, completed and delivered by:  (a) regular mail (using the reply envelope provided in the Solicitation Package or otherwise), (b) overnight courier, (c) hand delivery or (d) the online voting portal (as described on the Ballot), in each case so that they are actually received NO LATER THAN  5:00 P.M. (PREVAILING EASTERN TIME) ON [APRIL 4], 2025 by the Solicitation Agent.  If you are submitting a Ballot via regular mail, hand delivery or overnight courier it should be sent to:

KFI Ballot Processing
c/o Stretto
410 Exchange, Suite 100
Irvine, CA 92602

AFFF Master Ballots may be sent via encrypted email or other secured method of electronic transmission to KFIInquiries@stretto.com.

The method of delivery of Ballots to be sent to the Solicitation Agent is at the election and risk of each Holder of a Claim. Except as otherwise provided in the Plan, such delivery will be deemed made only when the Debtor's Solicitation Agent actually receives the original executed Ballot. In all cases, sufficient time should be allowed to assure timely delivery. For submissions via regular mail, overnight courier or hand delivery, original, executed Ballots are required. Ballots will not be accepted by facsimile transmission, electronic mail or other electronic means of transmission (other than with respect to AFFF Master Ballots and except via the Solicitation Agent's online voting portal). Ballots received after the Voting Deadline will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected.

Ballots must be signed, legible, and contain sufficient information to identify the Holder of the Claim.

Ballots must be clearly marked to either accept or reject the Plan (but not both) and may not partially accept or partially reject the Plan.

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation or other person acting in a fiduciary or representative capacity, such person must indicate such capacity when signing the Ballot and, if required or requested by the Debtor's Solicitation Agent, the Debtor or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, you must provide your name and mailing address if it is different from that set forth on the mailing label attached to the Ballot or if no such mailing label is attached to the Ballot.

No Ballot should be sent to the Debtor, or the Debtor's financial or legal advisors, agents or representatives (other than the Solicitation Agent), and if so sent will not be counted.

If multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last Ballot timely received will supersede and revoke any earlier received Ballots; *provided*, *however*, where ambiguity exists with respect to which Ballot was the latest dated, the Solicitation Agent has the right to determine the appropriate tabulation of such Ballot and to contact the respective Holder to determine such Holder's intent in connection therewith.

Subject to certain restrictions and requirements set forth in section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan and the Plan Support Agreement, the Debtor may alter, amend or modify the Plan, including the Plan Supplement, without additional disclosure pursuant to section 1125 of the Bankruptcy Code prior to the Confirmation Date. After the Confirmation Date and before the Effective Date, the Debtor may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, including the Plan Supplement, the Disclosure Statement or the

Confirmation Order, relating to such matters as may be necessary to carry out the purposes and effects of the Plan.

Except as set forth in the Plan, after the Confirmation Date, but before the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan, including the Plan Supplement, without further order or approval of the Bankruptcy Court, subject to the Settling Parties' consent rights set forth in the Plan Support Agreement; *provided*, that such adjustments and modifications do not materially and adversely affect the treatment of Holders of Claims or Interests and are otherwise permitted under section 1127(b) of the Bankruptcy Code.

Entry of a Confirmation Order shall mean that all modifications and amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code, and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**3.     Disclosure Statement Order**

All Holders of Claims and Interests are advised to read the Disclosure Statement Order and all attachments thereto, including the Solicitation Procedures attached as Exhibit 1 to the Disclosure Statement Order, which sets forth in greater detail the information disclosed herein.

4870-8408-8808 v.6

# ARTICLE VII.

## EFFECT OF CONFIRMATION

**A.      Binding Effect of Confirmation**

Unless otherwise expressly provided in the Plan, Confirmation will bind the Debtor and all Holders of Claims and Interests to the provisions of the Plan, whether or not the Claim or Interest of any such Holder is impaired under the Plan and whether or not any such Holder of a Claim or Interest has accepted the Plan, and Confirmation will have the effect of converting all Claims and Interests into rights to receive the treatment specified in Article IV—*Summary of the Plan*.

**B.      Good Faith**

Confirmation of the Plan will constitute a finding that:  (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code and (ii) all solicitations of acceptances or rejections of the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

4870-8408-8808 v.6

# ARTICLE VIII.

## ADDITIONAL FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS AND INTERESTS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN OR ITS IMPLEMENTATION.

## A.      Risks Relating to the Bankruptcy Process

### 1.      General

It is impossible to predict with certainty the amount of time that it will take to wind down the Chapter 11 Cases or to assure parties-in-interest that the Plan will be confirmed. A delay in the bankruptcy proceedings to confirm the Plan will also involve additional expense.

### 2.      Plan Confirmation

The Debtor can make no assurances that it will receive the requisite acceptances to confirm that Plan or that the conditions to Confirmation will be satisfied or waived.  Further, if the requisite acceptances are not received, the Debtor may seek to accomplish an alternative restructuring and obtain acceptances to an alternative plan of reorganization or liquidation for the Debtor or otherwise, that may not have the support of the Holders of Claims or Interests, and/or may be required to liquidate the Estate under chapter 7 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Holders of Claims or Interests as those proposed in the Plan.

A non-accepting Holder of a Claim or Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it concludes that any of the statutory requirements for Confirmation have not been met.  If a chapter 11 plan is not confirmed by the Bankruptcy Court, it is unclear what distributions Holders of Claims or Interests would ultimately receive with respect to their Allowed Claims or Allowed Interests in a subsequent plan of reorganization or liquidation.

### 3.      Objections to Classification of Claims and Interests

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Interests in, the Debtor.  The Bankruptcy Code also provides that the Plan may place

a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class.  The Debtor believes that all Claims and Interests have been appropriately classified in the Plan.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtor would seek (i) to modify the Plan to provide for whatever classification might be required for Confirmation and (ii) to use the acceptances received from any Holder of Claims or Interests pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member.  Any such reclassification of Claims or Interests, although subject to the notice and hearing requirements of the Bankruptcy Code, could materially adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.  There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires re-solicitation, the Debtor will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.

### 4. Risks Related to Possible Objections to the Plan

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan.  Although the Debtor believes that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party-in-interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

### 5. Risk of Nonoccurrence of the Effective Date

Although the Debtor believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.  As set forth in Article 9 of the Plan, the Effective Date of the Plan is subject to the satisfaction (or waiver) of a number of conditions precedent.  If such conditions precedent are not met or waived in accordance with the Plan, the Effective Date will not take place, and it is unclear what distributions, if any, Holders of Allowed Claims or Interests would receive with respect to their Allowed Claims or Interests.

### 6. Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a Chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate

unfairly" and is "fair and equitable" with respect to the dissenting class. The Debtor believes that the Plan satisfies these requirements, and the Debtor may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan, financially or otherwise.

### 7.    Risk that TDPs Will Not Be Approved

The Plan and the TDPs provide for the allowance, valuation and payment of Channeled AFFF Claims as set forth therein and further described in <u>Article IV</u>—*Summary of the Plan*. The Debtor believes that the structure proposed in the Plan and the TDPs is appropriate and consistent with applicable law. However, there is a risk that the Plan and the TDPs may not be approved or will need to be modified, including with respect to the Trust Allocation.

### 8.    The Amount and Timing of Available Distributions, If Any, May Vary

The Debtor cannot predict or guarantee the amount and actual timing of Distributions to Holders of Allowed Claims or Interests. Recoveries will necessarily be affected by, among other things, recoveries generated in connection with the liquidation of certain of the Debtor's remaining assets, the outcome of objections to Claims or Interests, resolution of litigation, and the cost and expenses of such actions and generally administering and winding down the Debtor's Estate. In particular, Channeled AFFF Claims and General Unsecured Claims will be resolved pursuant to the Plan and the Settlement Trust Documents, and their treatment will be based upon, among other things, estimates of the number, types and amount of Channeled AFFF Claims and General Unsecured Claims, the value of the Settlement Trust Assets, the liquidity of the Settlement Trusts, the expected future income and expenses, and other matters. Additionally, the timing of actual Distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.

### 9.    Risk of Nonoccurrence of the Channeling Injunction

Under the terms of the Plan, all Channeled AFFF Claims shall automatically be channeled exclusively to the Primary AFFF Settlement Trust and this will, among other things, bar the assertion of any of these Claims against the Debtor or any Released Party. Although the Plan and the Settlement Trust Documents have been drafted with the intention of complying with section 105(a) of the Bankruptcy Code, there is no guarantee that all Channeled AFFF Claims shall automatically be channeled to the Primary AFFF Settlement Trust, or that section 105(a) or the channeling of the all Channeled AFFF Claims to the Primary AFFF Settlement Trust will not be challenged, either before or after Confirmation of the Plan. While the Debtor believes that the Plan satisfies the requirements of the Bankruptcy Code, certain objections might be lodged on grounds that the requirements of the Bankruptcy Code cannot be met given the unique facts of the Chapter 11 Case.

10.    **Plan Modifications**

The Debtor, subject to the Settling Parties' consent rights contained in the Plan and the Plan Support Agreement, reserves the right to modify the Plan or waive any conditions thereto if and to the extent necessary or desirable for Confirmation.  The potential impact of any such amendment or waiver on Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.

11.    **Filing of a Competing Plan**

At the outset of a chapter 11 case, the Bankruptcy Code provides a debtor with the exclusive right to file a plan of reorganization and prohibits third parties from proposing a plan.

On October 24, 2024, the Debtor filed the *Second Motion of Debtor for Entry of an Order Extending the Exclusive Periods During Which Only the Debtor May File a Chapter 11 Plan and Solicit Acceptances Thereof* [D.I. 1579], requesting an extension of the exclusive period during which only the Debtor may file a plan (the "Exclusive Filing Period") through November 14, 2024 and an extension of the exclusive period during which only the Debtor may solicit acceptances of a chapter 11 plan (the "Exclusive Solicitation Period" and, together with the Exclusive Filing Period, the "Exclusive Periods") through January 14, 2025.  On November 6, 2024, the Bankruptcy Court entered an order granting the motion.

The Exclusive Solicitation Period will have expired prior to the Debtor's completion of the solicitation of votes to accept or reject the Plan.  Accordingly, there may be a material adverse effect on the Debtor's ability to have the Plan confirmed, because third parties may attempt to prosecute competing plans.

12.    **The Debtor May Fail to Satisfy the Solicitation Requirements Requiring a Re-Solicitation**

To satisfy the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b), the Debtor will be delivering the Solicitation Package to all Holders of Claims and Interests as of the Voting Record Date in the Classes entitled to vote.  Accordingly, the Debtor believes that the solicitation is proper under section 1125 of the Bankruptcy Code.  The Debtor cannot be certain, however, that the solicitation of acceptances or rejections will be approved by the Bankruptcy Court, and if such approval is not obtained, the Confirmation of the Plan could be denied.  If the Bankruptcy Court were to conclude that the Debtor did not satisfy the solicitation requirements, then the Debtor may seek to re-solicit votes to accept or reject the Plan or to solicit votes from one or more Classes that were not previously solicited.  The Debtor cannot provide any assurances that such a re-solicitation would be successful.  Re-solicitation could delay or jeopardize confirmation of the Plan.  Non-confirmation of the Plan could result in a protracted Chapter 11 Case.

13.    **Certain Creditors May Bring Litigation Against the Debtor**

Even if the Debtor receives the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan.  Further, third parties, including certain of the

-77-

Debtor's creditors, may bring litigation against the Debtor during the course of this Chapter 11 Case, the outcome of which is uncertain. Although the Debtor believes the Plan satisfies all of the requirements necessary for Confirmation by the Bankruptcy Court, creditors and other parties-in-interest may bring objections to challenge Confirmation of the Plan.

### 14.    Delay in Appointment of Settlement Trustees

Parties-in-interest may object to the appointment of the Settlement Trustees. In that case, alternates would have to be nominated, potentially resulting in significant delays in the occurrence of the Effective Date and Distributions. The selection of a different Settlement Trustee for a given Settlement Trust could also materially affect administration of the relevant Settlement Trust.

### 15.    Plan Releases, Injunctions and Exculpation Provisions May Not Be Approved

There can be no assurance that the Plan releases, injunctions and exculpation provisions, as provided in Article 10 of the Plan, will be granted. Furthermore, the releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties and Exculpated Parties) provided in the Plan are subject to objection by parties-in-interest. Failure of the Bankruptcy Court to grant such relief may result in a plan of reorganization that differs from the Plan or the Plan not being confirmed.

### 16.    Insurance Actions Risk

Pursuant to the Plan, the Debtor will contribute to the Primary AFFF Settlement Trust, among other things, rights to the Insurance Actions. It is not currently known whether the Insurance Actions will result in a favorable outcome for the Primary AFFF Settlement Trust. Even if a favorable outcome is realized, the amounts awarded and the costs associated with pursuing such litigation cannot be determined at this time. Therefore, the ultimate value of the Insurance Actions being contributed to the Primary AFFF Settlement Trust is unknown.

### 17.    The Debtor Will Be Subject to Risks and Uncertainties Associated with the Chapter 11 Case

For the duration of the Chapter 11 Case, the Debtor's ability to develop and execute a chapter 11 plan will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (i) ability to develop, confirm, and consummate the Plan; (ii) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Case from time to time; (iii) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtor to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Case to a chapter 7 proceeding; and (iv) the actions and decisions of the Debtor's creditors and other third parties who have interests in the Chapter 11 Case that may be inconsistent with the Debtor's plans.

4870-8408-8808 v.6

18.    **Undue Delay in Confirmation May Result in Additional Costs**

If Confirmation and Consummation of the Plan do not occur expeditiously, the Chapter 11 Case could result in, among other things, increased costs for professional fees and similar expenses.

19.    **Conversion Into Chapter 7 Case**

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.

20.    **The Results of an Actual Chapter 7 Liquidation May Be Different From the Liquidation Analysis**

Underlying the Liquidation Analysis is the extensive use of estimates and assumptions that, although considered reasonable by the Debtor's management and advisors, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtor.  The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change.  Actual results may vary materially from the estimates and projections set forth in the Liquidation Analysis.  Events and circumstances subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed or, alternatively, may have been unanticipated.

B.    **Additional Risk Factors**

1.    **The Debtor Could Withdraw the Plan**

Subject to the terms of the Plan and the Plan Support Agreement, the Plan may be revoked or withdrawn before the Confirmation Date by the Debtor.

2.    **No Representations Outside the Disclosure Statement Are Authorized**

No representations concerning or related to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in the Disclosure Statement.  Any representations or inducements made to secure your vote for acceptance or rejection of the Plan that are other than those contained in, or included with, the Disclosure Statement should not be relied upon in making the decision to vote to accept or reject the Plan.

3.    **No Legal or Tax Advice Is Provided by the Disclosure Statement**

The contents of the Disclosure Statement should not be construed as legal, business, or tax advice.  Each holder of a Claim or Interest should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.  The Disclosure Statement is not legal advice to you.  The Disclosure Statement may not be relied

upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

4.        **No Admission Made**

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtor or Holders of Claims or Interests.

5.        **The Debtor Has No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtor has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

6.        **Claims Could Be More Than Projected**

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which, in turn, could cause the value of Distributions in one or more Classes to be reduced substantially.

4870-8408-8808 v.6

# ARTICLE IX.

## MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtor and certain U.S. Holders entitled to vote on the Plan.  The following summary does not address the U.S. federal income tax consequences to Holders who are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or Holders who will not receive any Distribution and are deemed to reject the Plan.

The discussion of U.S. federal income tax consequences below is based on the IRC, U.S. Treasury regulations ("Treasury Regulations"), judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect) which may result in U.S. federal income tax consequences different from those summarized herein.  The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties.  The Debtor has not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions. The discussion below is not binding upon the IRS or the courts and no assurance can be given that the IRS would not assert, and that a court would not sustain, a different position than any position discussed herein.  If the IRS successfully challenges any aspect of the tax treatments described below, adverse U.S. federal income tax consequences may result.

This summary does not address non-U.S., state, or local tax consequences of the contemplated transactions, nor does it address the U.S. federal income tax consequences of the transactions to special classes of taxpayers, nor does it address all of the U.S. federal income tax consequences of the transactions that might be relevant to special classes of taxpayers in light of their particular circumstances (*e.g.*, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, cooperatives, retirement plans, individual retirement and other tax-deferred accounts, Holders that are, or hold their Claims through, S corporations or other pass-through entities for U.S. federal income tax purposes, persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that elect to use the mark-to-market method of tax accounting for their securities or commodities, persons subject to special tax accounting rules under section 451(b) of the IRC, persons whose Claims are part of a straddle, hedging, constructive sale, or conversion transaction, or part of a "synthetic security" or other integrated financial transaction, U.S. expatriates, or foreign persons or entities ).  In addition, this discussion does not address the alternative minimum tax (including the corporate alternative minimum tax), the "Medicare" tax on net investment income, or U.S. federal taxes other than income taxes.  This summary does not discuss differences in tax consequences to Holders of Claims that otherwise act or receive consideration in a capacity other than as a Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below.

As used herein, the term "U.S. Holder" means a beneficial owner of Claims that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof, or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds Claims, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership.  If you are a partner in such a partnership holding any of such instruments, you should consult your own tax advisor.

***THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON YOUR INDIVIDUAL CIRCUMSTANCES.  ALL HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.***

## A. Tax Treatment of the Sovereign State AFFF Settlement Trust and the Primary AFFF Settlement Trust

The Sovereign State AFFF Settlement Trust and the Primary AFFF Settlement Trust are intended to qualify as "qualified settlement funds" within the meaning of section 1.468B-1 et seq. of the Treasury Regulations promulgated under section 468B of the IRC, as amended.  The applicable Treasury Regulations provide that to be treated as a qualified settlement fund, a fund, account, or trust must be (i) established pursuant to an order of, or be approved by, a governmental authority, including a court, and must be subject to the continuing jurisdiction of that governmental authority; (ii) established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event (or related series of events) that has occurred and that has given rise to at least one claim asserting, among other things, liability arising out of a tort, breach of contract or violation of law; and (iii) a trust under applicable state law or have its assets physically segregated from the other assets of the transferor and persons related to the transferor.

Provided that the Primary AFFF Settlement Trust and the Sovereign State AFFF Settlement Trust are treated each as a qualified settlement fund within the meaning of section 468B of the IRC, the Primary AFFF Settlement Trust and the Sovereign State AFFF Settlement Trust each will generally be subject to an entity level tax at the maximum rate applicable to trusts and estates, and, in determining the respective taxable income of the Primary AFFF Settlement Trust and the Sovereign State AFFF Settlement Trust, (i) any amounts transferred to the Primary AFFF Settlement Trust to resolve or satisfy a liability for which the Primary AFFF Settlement Trust is established or to the Sovereign State AFFF Settlement Trust to resolve or satisfy a liability for which the Sovereign State AFFF Settlement Trust is established generally will be excluded from the Primary AFFF Settlement Trust's or the Sovereign State AFFF Settlement Trust's taxable income; (ii) any interest or dividends generally will constitute taxable income to the Primary AFFF Settlement Trust or the Sovereign State AFFF Settlement Trust, as applicable; (iii) any sale, exchange or distribution of property by the Primary AFFF Settlement Trust or the Sovereign State AFFF Settlement Trust generally will result in the recognition of gain or loss in an amount equal to the difference between the fair market value of the property on the date of disposition and the adjusted tax basis of such property; and (iv) administrative costs (including state and local taxes) incurred by the Primary AFFF Settlement Trust or the Sovereign State AFFF Settlement Trust generally will be deductible.  The foregoing discussion does not address whether the Sovereign State AFFF Settlement Trust will be eligible for special tax treatment because its beneficiaries will be comprised exclusively of entities described in Section 115 of the IRC.

In general, the adjusted tax basis of property received (or treated as received for U.S. federal income tax purposes) by a qualified settlement fund from a transferor will be the fair market value of such property at the time of receipt.

## B.    Tax Consequences to U.S. Holders of Channeled AFFF Claims

The U.S. federal income tax treatment of the receipt of payments from the Primary AFFF Settlement Trust or Sovereign State AFFF Settlement Trust, as applicable, by a U.S. Holder of a Channeled AFFF Claim generally will depend upon the nature of the Channeled AFFF Claim, such as whether the claim is for personal injury, property damage or lost business profits, and the particular circumstances applicable to such U.S. Holder, including whether the U.S. Holder has previously claimed deductions or losses for U.S. federal income tax purposes with respect to such Channeled AFFF Claim.

To the extent that amounts received by a U.S. Holder of a Channeled AFFF Claim are attributable to, and compensation for, such U.S. Holder's personal physical injuries or sickness, within the meaning of section 104 of the IRC, such amounts received by the U.S. Holder generally should be nontaxable to the extent the amount of such compensation does not exceed the amounts paid in respect of such similar property.  To the extent that amounts received by a U.S. Holder of a Channeled AFFF Claim are attributable to, and compensation for, damage to or the destruction of property, amounts received by such U.S. Holder that are used to restore such U.S. Holder's damaged or destroyed property to its original condition, or used to replace destroyed property with similar property within the meaning of Section 1033 of the IRC, generally should be nontaxable to the U.S. Holder.  To the extent that amounts received by a U.S. Holder of a Channeled AFFF Claim are attributable to, and compensation for, property that

-83-

has been destroyed and will not be replaced by the U.S. Holder, the U.S. Holder may recognize gain or loss equal to the difference between (i) such amount received and (ii) the adjusted tax basis of the destroyed property. To the extent that amounts are received by a U.S. Holder of a Channeled AFFF Claim are attributable to, and compensation for, such U.S. Holder's loss of business profits, such amounts generally should be taxable. Because the U.S. federal income tax treatment of any amount received by a U.S. Holder will depend on facts particular to such U.S. Holder, all U.S. Holders should consult their own tax advisors as to the proper tax treatment of such receipts.

## C.      Tax Classification of the GUC Liquidating Trust

The GUC Liquidating Trust shall be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulations Section 301.7701-4(d) and as a grantor trust for federal income tax purposes, pursuant to sections 671 through 679 of the IRC, with no objective to continue or engage in the conduct of a trade or business. In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor trust" (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a Chapter 11 plan. The GUC Liquidating Trust will be structured with the intention of complying with such general criteria.

Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtor, the applicable Trustee, and Holders of General Unsecured Claims) shall treat the transfer of the assets of the GUC Liquidating Trust to the GUC Liquidating Trust as (i) a transfer of the assets of the GUC Liquidating Trust directly to Holders of General Unsecured Claims, followed by (ii) the transfer of such assets by such Holders to the GUC Liquidating Trust in exchange for interests in the GUC Liquidating Trust. Accordingly, Holders of General Unsecured Claims should be treated for U.S. federal income tax purposes as the grantors and deemed owners of the GUC Liquidating Trust and thus, the direct owners of their respective share of GUC Liquidating Trust assets.

While the following discussion assumes that the GUC Liquidating Trust would be so treated for U.S. federal income tax purposes, no ruling will be requested from the IRS concerning the tax status of the GUC Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the GUC Liquidating Trust as a grantor trust. If the IRS were to successfully challenge such classification, the U.S. federal income tax consequences to the GUC Liquidating Trust and the GUC Liquidating Trust beneficiaries could vary from those discussed herein.

## D.      General Tax Reporting by the GUC Liquidating Trust and Holders of General Unsecured Claims

In accordance with the treatment of the GUC Liquidating Trust as a liquidating trust for U.S. federal income tax purposes, all parties must treat the GUC Liquidating Trust as a grantor trust of which the U.S. Holders of General Unsecured Claims are the owners and grantors, and treat the Holders of General Unsecured Claims as the direct owners of an undivided interest in assets of the GUC Liquidating Trust (other than any assets allocable to a disputed

ownership fund) for all U.S. federal income tax purposes, consistent with their economic interests therein.

The U.S. federal income tax obligations of a Holder with respect to its GUC Liquidating Trust interests are not dependent on the GUC Liquidating Trust distributing any cash or other proceeds. Thus, a Holder may incur a U.S. federal income tax liability with respect to its allocable share of the GUC Liquidating Trust's income even if the GUC Liquidating Trust does not make a concurrent distribution to the Holder.

The GUC Liquidating Trustee will file tax returns for the GUC Liquidating Trust treating the GUC Liquidating Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a). The GUC Liquidating Trust's items of taxable income, gain, loss, deduction, and/or credit (other than such items in respect of any assets allocable to, or retained on account of, a disputed ownership fund) will be allocated to the beneficiaries of the GUC Liquidating Trust in accordance with their relative ownership of trust interests. Within a reasonable time following the end of the taxable year, the GUC Liquidating Trust shall send to each beneficiary a separate statement setting forth such beneficiary's items of income, gain, loss, deduction or credit and will instruct each such beneficiary to report such items on his/her applicable income tax return. The GUC Liquidating Trust shall be responsible for payment, from the Trust Operating Reserve (as defined in the GUC Liquidating Trust Agreement), of any taxes imposed on the GUC Liquidating Trust (including any taxes imposed on the disputed ownership fund) or the assets of the GUC Liquidating Trust. In accordance therewith, any taxes imposed on the disputed ownership fund or its assets will be paid from or charged to the disputed ownership fund.

## E.     Withholding on Distributions and Information Reporting

All Distributions to Holders of Allowed Claims under the Plan are subject to tax withholding, if applicable. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the applicable withholding rate. Backup withholding generally applies if the Holder: (a) fails to furnish its social security number or other taxpayer identification number; (b) furnishes an incorrect taxpayer identification number; (c) fails properly to report interest or dividends; or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax, but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Holders of Allowed Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the Distributions contemplated by the Plan would be subject to these Treasury Regulations.

***THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AND DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE U.S.***

*FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.*

4870-8408-8808 v.6

## ARTICLE XI.

## RECOMMENDATION

In the opinion of the Debtor, the Plan is preferable to the alternatives described herein.  Therefore, the Debtor recommends that Holders of Claims and Interests entitled to vote on the Plan vote to accept it.

Dated:  November 25, 2024

Respectfully submitted,

KFI Wind-Down Corp.

By: _____

     Name:
     Title:

## **Appendix A**

### **Plan**

**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| KFI WIND-DOWN CORP., | Case No. 23-10638 (LSS) |
| Debtor. | |

**DEBTOR'S FIRST AMENDED PLAN OF LIQUIDATION UNDER**
**CHAPTER 11 OF THE BANKRUPTCY CODE**

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Justin J. DeCamp (admitted *pro hac vice*)
Benjamin S. Beller (admitted *pro hac vice*)
Julie G. Kapoor (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
          gluecksteinb@sullcrom.com
          decampj@sullcrom.com
          bellerb@sullcrom.com
          kapoorj@sullcrom.com


Dated:  November 25, 2024
          Wilmington, Delaware

**MORRIS NICHOLS ARSHT & TUNNELL LLP**
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Daniel B. Butz (No. 4227)
Tamara K. Mann (No. 5643)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
E-mail: dabbott@morrisnichols.com
          aremming@morrisnichols.com
          dbutz@morrisnichols.com
          tmann@morrisnichols.com

# **TABLE OF CONTENTS**

**Page**

1.   INTRODUCTION ...................................................................................1

2.   DEFINITIONS AND RULES OF INTERPRETATION ...................................2

    2.1.   Defined Terms ......................................................................... 2
    2.2.   Rules of Interpretation ........................................................... 23
    2.3.   Computation of Time .............................................................. 24

3.   ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS..........................25

    3.1.   Administrative Claim Bar Date ............................................... 25
    3.2.   General Administrative Claims................................................ 25
    3.3.   Professional Compensation Claims ......................................... 25
    3.4.   Statutory Fees Payable Pursuant to 28 U.S.C. § 1930 ............. 27
    3.5.   Priority Tax Claims................................................................. 27

4.   CLASSIFICATION, TREATMENT AND VOTING OF CLAIMS AND INTERESTS.28

    4.1.   Classification of Claims and Interests..................................... 28
    4.2.   Treatment of Claims and Interests .......................................... 28
    4.3.   Special Provision Governing Unimpaired Claims.................... 34
    4.4.   Acceptance by Impaired Classes ............................................ 34
    4.5.   Elimination of Vacant Classes ............................................... 34
    4.6.   Voting Classes; Presumed Acceptance by Non-Voting Classes......................... 35
    4.7.   Confirmation Pursuant to Sections 1129(a) and 1129(b) of the Bankruptcy Code ........................................................................ 35

5.   IMPLEMENTATION OF THE PLAN ......................................................36

    5.1.   Operations Between the Confirmation Date and Effective Date .......................... 36
    5.2.   Compromise and Settlement ................................................... 36
    5.3.   Plan Transactions .................................................................. 36
    5.4.   Estate Claims Settlement ....................................................... 36
    5.5.   Settlement Trusts .................................................................. 37
    5.6.   Liquidating Estate ................................................................. 43
    5.7.   Vesting of Assets .................................................................. 45
    5.8.   Insurance Provisions. ............................................................ 45
    5.9.   D&O Policies ........................................................................ 46
    5.10.  Cancellation of Existing Agreements, Notes and Interests.................. 46
    5.11.  Section 1146 Exemption from Certain Transfer Taxes and Recording Fees........ 46
    5.12.  Preservation of Causes of Action............................................ 47
    5.13.  Effectuating Documents and Further Transactions.................... 47
    5.14.  Directors, Officers, Managers, Members and Authorized Persons of the Debtor ......................................................................... 48

6.      TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..........49

        6.1.    Rejection of Executory Contracts and Unexpired Leases....................................49
        6.2.    Claims Against the Debtor Upon Rejection....................................................... 49
        6.3.    Modification, Amendments, Supplements, Restatements or Other
                Agreements ...................................................................................................... 49
        6.4.    Reservation of Rights....................................................................................... 50

7.      PROVISIONS GOVERNING DISTRIBUTIONS ...............................................51

        7.1.    Provisions Governing Distributions On Account of Liquidating Estate
                Claims and General Unsecured Claims. ............................................................ 51
        7.2.    Distributions on Account of Channeled AFFF Claims....................................... 54

8.      CLAIMS ADMINISTRATION PROCEDURES ...............................................55

        8.1.    Claims Administration Procedures With Respect to Liquidating Estate
                Claims and General Unsecured Claims. ............................................................ 55
        8.2.    Claims Administration Procedures With Respect to Channeled AFFF
                Claims. .............................................................................................................. 58

9.      CONDITIONS PRECEDENT TO EFFECTIVENESS OF THE PLAN ..........................59

        9.1.    Conditions Precedent to the Effective Date ...................................................... 59
        9.2.    Waiver of Conditions........................................................................................ 61
        9.3.    Simultaneous Transactions ............................................................................... 61
        9.4.    Notice of Effective Date .................................................................................. 61

10.     SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS ..............62

        10.1.   Subordinated Claims ........................................................................................ 62
        10.2.   **Release of Liens** .............................................................................................. 62
        10.3.   **Releases by the Estate** .................................................................................... 62
        10.4.   **Scope of Releases** .......................................................................................... 63
        10.5.   **Exculpation** ................................................................................................... 63
        10.6.   **Injunction**...................................................................................................... 64
        10.7.   **Channeling Injunction**.................................................................................... 65
        10.8.   **Insurance Company Injunction** ...................................................................... 66
        10.9.   **Limitations on Exculpations and Releases** ...................................................... 67
        10.10.  Release Dispute .............................................................................................. 68

11.     MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN ..................69

        11.1.   Modification of Plan ........................................................................................ 69
        11.2.   Effect of Confirmation on Modification ............................................................ 69
        11.3.   Revocation of Plan........................................................................................... 69

12.     RETENTION OF JURISDICTION .................................................................70

        12.1.   Retention of Jurisdiction .................................................................................. 70

4860-3249-7648 v.12

13.    MISCELLANEOUS PROVISIONS ................................................................................73

    13.1.    Immediate Binding Effect ..........................................................................73

    13.2.    Additional Documents; Further Assurances ..............................................73

    13.3.    Reservation of Rights .................................................................................73

    13.4.    Successors and Assigns ..............................................................................73

    13.5.    Term of Injunction or Stays .......................................................................73

    13.6.    Entire Agreement .......................................................................................74

    13.7.    Exhibits ......................................................................................................74

    13.8.    Nonseverability of Plan Provisions Upon Confirmation ...........................74

    13.9.    Dissolution of Committee ...........................................................................74

    13.10.    Termination of Fee Examiner's Appointment ............................................75

    13.11.    Post-Confirmation Operating Reports .......................................................75

    13.12.    Closing of Chapter 11 Case .......................................................................75

    13.13.    Conflicts .....................................................................................................75

    13.14.    Waiver or Estoppel .....................................................................................75

    13.15.    Post-Effective Date Service .......................................................................76

    13.16.    Notices ........................................................................................................76

4860-3249-7648 v.12

# 1.    INTRODUCTION

KFI Wind-Down Corp., as debtor-in-possession in the above-captioned Chapter 11 Case, proposes the following plan of liquidation (including the Plan Supplement and all other exhibits and schedules thereto, as amended, modified or supplemented, the "*Plan*") pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used but not otherwise defined shall have the meanings ascribed to them in Article 2.

## 2.    DEFINITIONS AND RULES OF INTERPRETATION

### 2.1.    Defined Terms

Except as otherwise provided herein, each capitalized term used in this Plan shall have the meaning set forth below.

2.1.1.    "*2000 Demerger Agreement*" means that certain Demerger Agreement, dated as of November 10, 2000, by and between Chubb plc and Kidde plc.

2.1.2.    "*2020 Separation Agreement*" means that certain Separation and Distribution Agreement, dated as of April 2, 2020, by and among United Technologies Corporation, Carrier Global Corporation, and Otis Worldwide Corporation.

2.1.3.    "*2023 Insurance Adversary Proceeding*" means the adversary proceeding in the Chapter 11 Case captioned Kidde-Fenwal, Inc. v. Ace American Insurance Co., et al., Adv. No. 23-50758 (LSS).

2.1.4.    "*2024 Insurance Adversary Proceeding*" means the adversary proceeding in the Chapter 11 Case captioned Kidde-Fenwal, Inc. v. Hartford Accident and Indemnity Company, Adv. No. 24-50015 (LSS).

2.1.5.    "*3M*" means 3M Company.

2.1.6.    "*Acquisition Agreement*" means that certain Stock and Asset Purchase Agreement, dated as of March 15, 2024 by and between Buyer and the Debtor, as such agreement may be amended or modified from time to time.

2.1.7.    "*Administrative Claim*" means an Allowed Claim for costs and expenses of administration of the Chapter 11 Case pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estate; (b) Allowed Professional Claims; and (c) all fees and charges assessed against the Estate pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

2.1.8.    "*Administrative Claim Bar Date*" means: (a) 4:00 p.m. (Eastern Time) on the 30th day after the Effective Date or (b) such other date established by order of the Bankruptcy Court by which Proofs of Claim in respect of Administrative Claims must be filed.

2.1.9.    "*AFFF*" means aqueous film-forming foam containing PFAS or alleged to contain PFAS or substances that degrade or are alleged to degrade into PFAS.

2.1.10. "*AFFF Claim*" means a Claim that arises from the design, manufacture, storage, marketing, use, distribution, discharge, or sale of AFFF or AFFF-containing products, or that relates directly or indirectly to alleged harm from precursor, derivative or resultant chemicals from AFFF.

2.1.11. "*AFFF Claimant*" means a Holder of an AFFF Claim.

2.1.12. "*AFFF Data Transfer*" means the transfer of all files, documents and information which the Debtor has in its possession, custody or control, subject in all respects to the privilege and other limitations set forth in Article 5.5.8 herein, containing evidence related to the Channeled AFFF Claims to the Primary AFFF Settlement Trust so as to enable the Primary AFFF Settlement Trust to have full access and utilization of the such records to the same extent available to the Debtor.

2.1.13. "*AFFF MDL*" means the multi-district litigation captioned *In re Aqueous Film-Forming Foams Product Liability Litigation*, MDL No. 2:18-mn-2873-RMG (D.S.C.) in the United States District Court for the District of South Carolina.

2.1.14. "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

2.1.15. "*Affiliate Claim*" means any prepetition Claim held by an Affiliate of the Debtor against the Debtor.

2.1.16. "*AHC*" means the Ad Hoc Committee of Governmental Claimants formed in the Chapter 11 Case, whose members are listed in the *Verified Statement of the Ad Hoc Committee of Governmental Claimants of Kidde-Fenwal, Inc. Pursuant to Bankruptcy Rule 2019* [D.I. 152] and as subsequently amended.

2.1.17. "*Airport*" means: (a) all airports categorized by the FAA in the National Plan of Integrated Airport Systems, including all airports that have been issued operating certificates by the FAA pursuant to 14 CFR Part 139; and (b) any facility operated on airport property, including any firefighter training facility, whether or not operated by the airport itself.

2.1.18. "*Airport Claim*" means an AFFF Claim asserted by or on behalf of an Airport; *provided* that Airport Claim does not include any Sovereign State Claim or Sovereign Tribe Claim.

2.1.19. "*Allowed*" means, with reference to any Claim:  (a) a Claim listed in the Debtor's Schedules, as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009, as liquidated, non-contingent, and undisputed, and for which no contrary timely Proof of Claim has been filed; (b) a Claim expressly allowed under the Plan; (c) a Liquidating Estate Claim or General Unsecured Claim to which the Debtor (with the consent of the Committee), the Liquidating Administrators or the GUC Liquidating Trustee, as applicable, and the holder of such Claim agree to the amount and priority of the Claim, which agreement is approved by a Final Order; (d) an AFFF Claim against the Debtor that is compromised, settled, or otherwise resolved in a manner consistent with the TDPs; (e) a Claim against the Debtor that is compromised, settled, or otherwise resolved or Allowed pursuant to a Final Order (including any omnibus or procedural Final Order relating to the compromise, settlement, resolution, or allowance of any Claims); or (f) a Proof of Claim, with respect to such Claim, that has been timely filed, has not been withdrawn and no objection thereto has been filed by the applicable deadlines set forth in the Plan, the Bankruptcy Code, the Bankruptcy Rules, or as determined by the Bankruptcy Court; *provided* that notwithstanding the foregoing, unless expressly waived by the Plan, the Allowed amount of Claims shall be subject to, and shall not exceed the limitations

or maximum amounts permitted by, the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable. "*Allowance*" and "*Allowing*" have correlative meanings.

2.1.20. "*Amended Schedules Non-PFAS Bar Date*" means, for Claims that are not AFFF Claims affected by any amendment or supplement to the Schedules, 5:00 p.m. (prevailing Eastern Time) on the date that is 30 days after the date that notice is provided of any such amendment of or supplement to the Schedules.

2.1.21. "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination or other Claims, Causes of Action or remedies that may be brought by or on behalf of the Debtor or its Estate or other authorized parties-in-interest under the Bankruptcy Code or applicable non-bankruptcy law, including claims, Causes of Action or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code, or under similar or related local, state, federal, or foreign statutes or common law, including preference and fraudulent transfer and conveyance laws, in each case whether or not litigation to prosecute such Claim(s), Cause(s) of Action or remedy(ies) was commenced prior to the Effective Date.

2.1.22. "*Ballots*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the Disclosure Statement Order, and which must be actually received on or before the Voting Deadline.

2.1.23. "*Bankruptcy Code*" means chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*, as in effect on the Petition Date.

2.1.24. "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

2.1.25. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under 28 U.S.C. § 2075, as applicable to the Chapter 11 Case, and the general, local and chambers rules of the Bankruptcy Court, each as amended from time to time.

2.1.26. "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" as such term is defined in Bankruptcy Rule 9006(a).

2.1.27. "*Buyer*" means Pacific Erin Opco, LLC, as the purchaser of substantially all of the Debtor's assets pursuant to the Acquisition Agreement and the Sale Order.

2.1.28. "*Carrier*" means Carrier Global Corporation, a Delaware corporation, and its non-Debtor affiliates and Related Parties.

2.1.29. "*Cash*" means the legal tender of the United States of America or the equivalents thereof, including bank deposits, checks and other similar items.

2.1.30. "*Causes of Action*" means any current or future actions, Claims, cross-claims, third-party claims, causes of action, controversies, disputes, demands, rights, liens,

indemnities, contributions, guaranties, suits, obligations, liabilities, losses, debts, fees or expenses, damages, interest, judgments, costs, accounts, defenses, remedies, offsets, powers, privileges, proceedings, licenses, and franchises of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or noncontingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, choate or inchoate, capable of being asserted directly or derivatively (including any alter ego theories), including any Claims for recovery of attorneys' fees, turnover, fraud, gross negligence, or willful misconduct, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws, consumer protection laws, environmental laws, or nuisance or trespass theories). Causes of Action also includes (a) any right of setoff, counterclaim, or recoupment and any Claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to or otherwise contest Claims or Interests, (c) any claim pursuant to section 362 of the Bankruptcy Code, (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (e) any Avoidance Actions.

2.1.31. "*Certificate*" means any instrument evidencing a Claim or an Equity Interest.

2.1.32. "*Channeled AFFF Claims*" means all AFFF Claims against the Debtor or the Estate channeled to the Primary AFFF Settlement Trust under the Plan and Settlement Trust Documents. For the avoidance of doubt, Channeled AFFF Claims shall exclude (a) Sovereign State Retained Causes of Action, (b) any Independent AFFF Causes of Action, (c) any Claim or Cause of Action for contribution, indemnification, reimbursement, or subrogation asserted by a Non-Debtor Party against another Non-Debtor Party, (d) Administrative Claims, (e) Priority Tax Claims, (f) Other Priority Claims, (g) Secured Claims, (h) General Unsecured Claims and (i) Affiliate Claims.

2.1.33. "*Chapter 11 Case*" means the case filed by the Debtor under chapter 11 of the Bankruptcy Code, which is administered under Case No. 23-10638 (LSS).

2.1.34. "*Claim*" has the meaning ascribed to such term under section 101(5) of the Bankruptcy Code.

2.1.35. "*Claims Bar Date*" means, as applicable, (a) the Non-PFAS Bar Date; (b) the Amended Schedules Non-PFAS Bar Date; (c) the Rejection Bar Date; (d) the Governmental Non-PFAS Bar Date; (e) the Administrative Claims Bar Date; or (f) such other date established by order of the Bankruptcy Court by which Proofs of Claim must have been filed.

2.1.36. "*Claims Objection Deadline*" means: (a) the date that is the later of (i) 180 days after the Effective Date or (ii) as to Proofs of Claim on account of Claims that are not AFFF Claims filed after the applicable Claims Bar Date, the 60th day after a Final Order is entered by the Bankruptcy Court deeming the late-filed Proof of Claim to be treated as timely filed or (b) such later date as may be established by order of the Bankruptcy Court upon a motion by the Debtor or Liquidating Administrators, as applicable, with notice only to those parties entitled to

receive notice pursuant to Bankruptcy Rule 2002.  The Claims Objection Deadline is not applicable to AFFF Claims.

2.1.37. "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

2.1.38. "*Class*" means a class of Claims or Interests as set forth in Article 4 herein pursuant to section 1122(a) of the Bankruptcy Code.

2.1.39. "*Committee*" means the official committee of unsecured creditors of the Debtor appointed by the U.S. Trustee in the Chapter 11 Case under section 1102(a) of the Bankruptcy Code pursuant to the *Notice of Appointment of Committee of Unsecured Creditors* [D.I. 83] and any amendments thereto.

2.1.40. "*Common Benefit Escrow*" means the fund to be established as set forth in Article 5.5.15 herein.

2.1.41. "*Community Water System*" means a Public Water System that serves at least fifteen (15) service connections used by year-round residents or regularly serves at least twenty-five (25) year-round residents, consistent with the use of that term in the Safe Drinking Water Act, 42 U.S.C. § 300f(15), and 40 C.F.R. Part 141.

2.1.42. "*Confirmation*" means the entry of the Confirmation Order on the docket of this Chapter 11 Case.

2.1.43. "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case within the meaning of Bankruptcy Rules 5003 and 9021.

2.1.44. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

2.1.45. "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to the Settling Parties.

2.1.46. "*Contributing Parties*" means any of the following Persons: (a) Carrier Global Corporation, (b) RTX (other than for purposes of the definition of "Insurance Policy/ies" hereunder), and (c) each such Person's Related Parties.  No Person may be added to this definition, or receive the benefits conferred on Contributing Parties in this Plan without the Committee's prior written consent.

2.1.47. "*Consummation*" means the occurrence of the Effective Date.

2.1.48. "*Current Personal Injury Claim*" means a Personal Injury Claim other than a Future Personal Injury Claim.

2.1.49. "*D&O Policy*" means that certain Chubb Primary Directors & Officers and Entity Security Liability Insurance Policy issued by Federal Insurance Company to Carrier Global Corporation effective as of May 1, 2024 (Policy Number J06009232), and any predecessor, replacement or successor policy.

2.1.50. "*Debtor*" means Kidde-Fenwal, Inc., the debtor and debtor in possession in the Chapter 11 Case, now known as KFI Wind-Down Corp.  In 2007, KFFI (formerly known as National Foam, Inc.) merged into Kidde-Fenwal, Inc., with Kidde-Fenwal, Inc. as the surviving entity.  Pursuant to this merger, KFFI's liabilities were assumed by, and KFFI's causes of action were transferred to, Kidde-Fenwal, Inc. directly or indirectly by merger or other agreement.  The term "Debtor" includes Kidde-Fenwal, Inc. as successor by merger or other agreement by which Kidde-Fenwal, Inc. obtained or assumed the liabilities and Causes of Action of any Person.

2.1.51. "*Definitive Documents*" means all material documents (including any related Bankruptcy Court or other judicial or regulatory orders, agreements, schedules, pleadings, motions, filings, or exhibits) necessary or otherwise desirable to implement the Plan Transactions, including (a) the Plan, (b) the Confirmation Order, (c) the Disclosure Statement, (d) the Solicitation Materials, (e) the Plan Documents, (f) the Plan Supplement and any documents included in the Plan Supplement, including the Settlement Trust Documents, (g) any motions or pleadings filed by the Debtor in the Chapter 11 Case seeking relief material to the Plan Transactions, (h) any other operative documents and/or agreements relating to the Plan or the Plan Transactions, and (i) any exhibits, appendices, or schedules contemplated by the foregoing clauses (a) – (h).

2.1.52. "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto, as the same may be amended, supplemented, or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to the section 1125 of the Bankruptcy Code.

2.1.53. "*Disclosure Statement Hearing*" means the hearing on the Disclosure Statement Motion.

2.1.54. "*Disclosure Statement Motion*" means the motion filed by the Debtor on the docket of the Chapter 11 Case seeking entry of the Disclosure Statement Order.

2.1.55. "*Disclosure Statement Order*" means one or more orders entered by the Bankruptcy Court, in form and substance reasonably acceptable to the Settling Parties: (a) finding that the Disclosure Statement (including any amendment, supplement, or modification thereto) contains adequate information pursuant to section 1125 of the Bankruptcy Code, (b) fixing the amounts of Claims solely for voting purposes and not for purposes of distributions, (c) approving voting procedures, and (d) authorizing solicitation of the Plan.

2.1.56. "*Disputed Claim*" means any Claim that has not been Allowed and not disallowed under the Plan, the Bankruptcy Code or a Final Order as of the Effective Date. Channeled AFFF Claims shall be treated, liquidated, or disputed solely in accordance with the TDPs.

2.1.57. "*Disputed General Unsecured Claim*" means any General Unsecured Claim that is a Disputed Claim.

2.1.58. "*Disputed Liquidating Estate Claim*" means any Liquidating Estate Claim that is a Disputed Claim.

2.1.59. "*Distribution*" means a distribution of property pursuant to the Plan, to take place as provided for herein, and "*Distribute*" shall have a correlative meaning.

2.1.60. "*Distribution Agent*" means one or more Entities chosen by the Liquidating Administrators, which may include the Notice and Claims Agent, to make any Distributions at the direction of the Liquidating Administrators.

2.1.61. "*Distribution Date*" means a date or dates, including the Initial Distribution Date, as determined by the Liquidating Administrators or the GUC Liquidating Trustee, as applicable, in accordance with the terms of the Plan, on which the Liquidating Administrators or the GUC Liquidating Trustee, as applicable, make a Distribution to Holders of Allowed Liquidating Estate Claims or General Unsecured Claims, as applicable.

2.1.62. "*Distribution Record Date*" means, for the purpose of making Distributions hereunder, the Confirmation Date.

2.1.63. "*District Court*" means the United States District Court for the District of Delaware.

2.1.64. "*Drinking Water*" means water provided for human consumption (including uses such as drinking, cooking, and bathing), consistent with the use of that term in the Safe Drinking Water Act, 42 U.S.C. §§ 300f to 300j-27.  The term "*Drinking Water*" includes raw or untreated water that a Public Water System has drawn or collected from a Water Source so that the water may then (after any treatment) be provided for human consumption but does not include raw or untreated water that is not drawn or collected from a Water Source.

2.1.65. "*DuPont*" means Corteva, Inc., DuPont de Nemours, Inc., The Chemours Company, EIDP, Inc. (f/k/a E. I du Pont de Nemours and Company) and their current and former affiliates and Related Parties.

2.1.66. "*Effective Date*" means the first Business Day on which all of the conditions precedent to the occurrence of the Effective Date set forth in the Plan shall have been satisfied or waived and on which a notice indicating the Effective Date has been filed on the docket of the Chapter 11 Case.

2.1.67. "*Estate*" means the estate created in the Chapter 11 Case under sections 301 and 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

2.1.68. "*Estate Causes of Action*" means Causes of Action owned, held, or capable of being asserted by or on behalf of either the Debtor or its Estate, or any Person or Governmental Unit asserting currently or in the future by, under, through or on behalf of the Debtor or its Estate, and each of their respective successors or assigns, whether known or

-8-

unknown, in law, at equity or otherwise, whenever and wherever arising under the laws of any jurisdiction, including actions that arise out of or are based on breach of contract, fraudulent conveyances and transfers, breach of fiduciary duty, breach of duty of loyalty or obedience, legal malpractice, recovery of attorneys' fees, turnover of property and avoidance or recovery actions of the Debtor or its Estate, and all other actions that constitute property of the Estate under section 541 of the Bankruptcy Code that are or may be pursued by a representative of the Estate, including pursuant to section 323 of the Bankruptcy Code, and actions, including Avoidance Actions, that may be commenced by a representative of the Estate under section 362 or chapter 5 of the Bankruptcy Code, seeking relief in the form of damages (actual and punitive), imposition of a constructive trust, turnover of property, restitution, and declaratory relief with respect thereto or otherwise.  Without limiting the foregoing, Estate Causes of Action shall include: (a) Causes of Action that on or after the Petition Date may be exclusively asserted by or on behalf of the Debtor or its Estate under applicable law, or that prior to the Petition Date could have been asserted by the Debtor on its own behalf under applicable law, including Causes of Action based on (i) the doctrine of successor liability that seek to impose the Debtor's (including KFFI's or National Foam, Inc.'s) liabilities on an alleged successor, whether based on a contractual assumption of liability, consolidation or de facto merger, acquisition of the Debtor's product line, fraud, domination, direction of the Debtor's affairs, defects in or misuse of the corporate form, single business enterprise, common enterprise, or mere continuation, or (ii) the doctrines of alter ego or veil piercing involving alter egos of the Debtor or the piercing of the Debtor's (including KFFI's or National Foam, Inc.'s) corporate veil, whether based on inadequate capitalization, insolvency, failure to observe corporate formalities, fraud, domination, or misuse of the corporate form; (b) Causes of Action or theories for recovery or remedies that seek to impose liability for a Claim against the Debtor on any non-Debtor based on a theory of liability that is not specific to one or more particular creditors and is generally common to creditors of the Debtor and can be asserted by the Debtor under applicable law; and (c) all other Causes of Action that are property of the Estate under the Bankruptcy Code, including any other form of derivative or vicarious liability for liabilities of the Debtor.  Subsections (a), (b) and (c) immediately above expressly encompass any Causes of Action based on:  (i) the alleged assumption of the Debtor's (including KFFI's or National Foam, Inc.'s) liabilities (but not a non-Debtor's liabilities) by Kidde plc (n/k/a Kidde Limited) pursuant to the 2000 Demerger Agreement, or any alleged subsequent assumption of such liabilities of the Debtor from Kidde plc by any other Released Party; or (ii) the alleged assumption of the Debtor's liabilities (but not a non-Debtor's liabilities), including any liabilities resulting from acts or omissions of National Foam, Inc. or KFFI, by a Released Party pursuant to the 2020 Separation Agreement.  For the avoidance of doubt, Estate Causes of Action shall not include any Independent AFFF Causes of Action or any Sovereign State Retained Causes of Action or Insurance Actions against any Released Party based on acts or omissions occurring after entry into the Plan Support Agreement with respect to rights under the 2020 Separation Agreement or the RTX Waiver to access and make Claims under any Insurance Policy or otherwise obtain the benefit of the Insurance Assignment.

2.1.69. "*Exchange Rate*" means the closing exchange rate on the Petition Date as published by *The Wall Street Journal*.

2.1.70. "*Estate Retained Causes of Action*" means any Estate Causes of Action and any Causes of Action held by the Debtor other than the Released Claims, including:  (a) all

defenses to any AFFF Claim, including all defenses under section 502 of the Bankruptcy Code; (b) with respect to AFFF Claims, all rights of setoff, recoupment, contribution, reimbursement, subrogation, or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) and any other indirect Claim of any kind whatsoever, whenever and wherever arising or asserted, (c) any other Causes of Action with respect to AFFF that the Debtor would have had under applicable law if the Chapter 11 Case had not occurred (including any Causes of Action against co-defendants); (d) any Cause of Action of the Debtor under the laws of any jurisdiction, for reimbursement, indemnity, contribution, breach of contract, or otherwise arising from or relating to AFFF; and (e) all Insurance Actions.

2.1.71. "*Estate Claims Settlement*" means the settlement, including the release of all Estate Causes of Action against the Released Parties, pursuant to the Estate Claims Settlement Agreement.

2.1.72. "*Estate Claims Settlement Agreement*" means that certain settlement agreement contemplated by the Plan Support Agreement to be filed with the Plan Supplement.

2.1.73. "*Estate Claims Settlement Effective Date*" means the date upon which all Conditions to Settlement enumerated in the Settlement Term Sheet attached as Exhibit B to the PSA are either satisfied or waived in accordance with the terms thereof.

2.1.74. "*Exculpated Parties*" means the (a) directors and officers of the Debtor during the Chapter 11 Case in their capacities as such, (b) the Committee and its members, in their capacity as members of the Committee, (c) the Future Claimants' Representative in her capacity as such, (d) the Fee Examiner in her capacity as such, (e) the AHC and its members, in their capacity as members of the AHC, and (f) the Professionals.

2.1.75. "*Executory Contract*" means a contract to which the Debtor is a party and that the Debtor may assume or reject under section 365 or 1123 of the Bankruptcy Code.

2.1.76. "*FAA*" means the Federal Aviation Administration.

2.1.77. "*Fee Examiner*" means Diana G. Adams, as Fee Examiner appointed under the *Order Appointing Fee Examiner and Establishing Related Procedures for the Review of Applications of Retained Professionals* [D.I. 501].

2.1.78. "*Final Order*" means an order, ruling, or judgment of the Bankruptcy Court or the MDL District Court (or any other court of competent jurisdiction), as applicable, entered by the clerks of such courts on the docket in the Chapter 11 Case or the AFFF MDL, as applicable (or by the clerk of such other court of competent jurisdiction on the docket of such court), which has not been reversed, stayed, modified, amended, or vacated, and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or motion for new trial, stay, reargument, or rehearing has been timely taken or is pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or MDL District Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order or judgment was appealed, or certiorari shall have been denied, or a new trial, stay, reargument, or rehearing shall

-10-

have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules or Rule 4 of the Federal Rules of Appellate Procedure, as applicable; *provided*, *however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause an order not to be a Final Order.

2.1.79. "*Future Claimants Representative*" means Randi S. Ellis, as legal representative for certain Holders of Claims pursuant to the *Order Appointing Randi S. Ellis as Legal Representative for Future PFAS Personal Injury Claimants* Nunc Pro Tunc *to December 27, 2023* [D.I. 863].

2.1.80. "*Future Personal Injury Claim*" means a Personal Injury Claim asserted by any Person, (a) who, following the occurrence of the Effective Date, asserts one or more Personal Injury Claims against the Debtor or successor of the Debtor's business based on the Debtor's conduct before the Petition Date and (b) who could not assert such Personal Injury Claims in the Chapter 11 Case because, among other reasons, such Person was (i) unaware of the personal injury as of the Effective Date, (ii) not diagnosed with the personal injury until after the Effective Date or (iii) as of the Effective Date, was otherwise unable or incapable of asserting the personal injury claim(s) based on the personal injury.

2.1.81. "*General Administrative Claim*" means an Administrative Claim other than a Professional Claim.

2.1.82. "*General Unsecured Claim*" means any Claim, including Claims involving environmental remediation or other similar obligations of the Debtor, other than an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, a Secured Claim, an AFFF Claim, or an Affiliate Claim.

2.1.83. "*Governmental Non-PFAS Bar Date*" means 5:00 p.m. (Eastern Time) on November 10, 2023.

2.1.84. "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code and also includes any national, central, federal, Sovereign Tribe, state, provincial, municipal, local or other domestic, foreign or supranational governmental, legislative, administrative or regulatory authority, agency, court, arbitration tribunal, board, department or commission, instrumentality thereof or other governmental or regulatory entity, including any competent governmental authority responsible for the determination, assessment, or collection of taxes.

2.1.85. "*Guaranteed Cash Payment*" means the $540 million payable by Carrier to the Primary AFFF Settlement Trust pursuant to the Estate Claims Settlement Agreement as consideration for the Estate Claims Settlement, to be funded by Carrier on the payment schedule set forth in the Estate Claims Settlement Agreement.

2.1.86. "*GUC Liquidating Trust*" means the trust established under the Plan and the Settlement Trust Documents to assume all liability of the Debtor and the Estate for, and to

administer, all General Unsecured Claims, which shall have the powers, duties and obligations set forth in the Settlement Trust Documents.

2.1.87. "*GUC Liquidating Trust Agreement*" means the Liquidating Trust Agreement governing the GUC Liquidating Trust, dated as of the Effective Date, as the same may be amended or modified from time to time in accordance with the terms thereof.

2.1.88. "*GUC Liquidating Trust Allocation*" shall have the meaning set forth in Article 5.5.4.

2.1.89. "*GUC Liquidating Trustee*" shall have the meaning set forth in Article 5.5.5.

2.1.90. "*Holder*" means a Person holding a Claim against or an Interest in the Debtor.

2.1.91. "*Impaired*" means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

2.1.92. "*Independent AFFF Cause of Action*" means any Cause of Action that could be asserted by an AFFF Claimant against a Non-Debtor Party based on the Non-Debtor Party's own conduct and breach of duty (*i.e.*, duty owed to the AFFF Claimant and not owed to the Debtor), including (a) Causes of Action arising from such acts or omissions of such Non-Debtor Party, and (b) Causes of Action based on allegations that a Non-Debtor Party is responsible for such conduct under theories of liability or recovery or remedies that could have been asserted by an AFFF Claimant on its own behalf under applicable state or federal law in respect of such Causes of Action prior to the Petition Date based on (i) the doctrine of successor liability involving a Non-Debtor Party that is alleged to be a successor to another Non-Debtor Party with respect to liabilities not directly or indirectly assumed from the Debtor, whether based on a contractual assumption of liability (including under the 2020 Separation Agreement), consolidation or de facto merger, acquisition of product line, fraud, domination, direction of affairs, defects in or misuse of the corporate form, single business enterprise, common enterprise, or mere continuation, (ii) the doctrines of alter ego or veil piercing involving alter egos of a Non-Debtor Party, or piercing the corporate veil between Non-Debtor Parties, whether based on inadequate capitalization, insolvency, failure to observe corporate formalities, fraud, domination, or misuse of the corporate form, or (iii) alleged derivative or vicarious liability of a Non-Debtor Party for liabilities of another Non-Debtor Party not directly or indirectly assumed from the Debtor; *provided* that, if any Cause of Action falls within the definition of Estate Cause of Action, it is not an Independent AFFF Cause of Action.

2.1.93. "*Initial Distribution Date*" means the Business Day as soon as practicable after the Effective Date when Distributions under the Plan shall commence that is selected by (i) with respect to Liquidating Estate Claims, the Liquidating Administrators or (ii) with respect to General Unsecured Claims, the GUC Liquidating Trustee.

2.1.94. "*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

2.1.95. "*Insurance Action*" means any Claim, Cause of Action, or right of the Debtor and Carrier, under the laws of any jurisdiction, (i) against any Insurance Company, arising from or related to an Insurance Policy, including: (a) any such Insurance Company's failure to provide coverage or otherwise pay under an Insurance Policy; (b) the refusal of any Insurance Company to compromise and settle any Claim or provide defense to any claim; (c) the interpretation or enforcement of the terms of any Insurance Policy with respect to any Claim; (d) any conduct by any Insurance Company constituting "bad faith" conduct or that could otherwise give rise to extra-contractual damages, or other wrongful conduct under applicable law; or (e) any right to receive proceeds held by the Debtor and Carrier with respect to an Insurance Policy or a coverage action, and (ii) arising out of or related to the rights under the 2020 Separation Agreement to access and make Claims under any Insurance Policy, enter an Insurance Settlement Agreement, or otherwise obtain the benefit of the Insurance Assignment, including under the RTX Waiver. For the avoidance of doubt, the Insurance Adversary Proceedings, and the Causes of Action asserted therein, are Insurance Actions.

2.1.96. "*Insurance Action Recoveries*" means the rights to the proceeds or benefits of any Insurance Action.

2.1.97. "*Insurance Adversary Proceedings*" means the 2023 Insurance Adversary Proceeding and the 2024 Insurance Adversary Proceeding.

2.1.98. "*Insurance Assignment*" means the transfer by the Debtor and Carrier to the Primary AFFF Settlement Trust of certain rights in connection with the Insurance Policies as set forth in Article 5 herein.

2.1.99. "*Insurance Company*" means any insurance company, insurance syndicate, coverage holder, insurance broker or syndicate insurance broker, guaranty association, or any other Person that has issued, or that has any actual, potential, demonstrated, or alleged liabilities, duties, or obligations under or with respect to, any Insurance Policy.

2.1.100.    "*Insurance Cooperation Agreement*" means that certain Cooperation Agreement contemplated by the Plan Support Agreement to be filed with the Plan Supplement.

2.1.101.    "*Insurance Policy/ies*" means: (i) any insurance policies listed on Schedule 1 hereto, (ii) to the extent not listed on Schedule 1, any "general liability" insurance (which, for the avoidance of doubt, shall exclude director & officer, automobile, or workers' compensation insurance) contract, binder, certificate, insurance policy, or reinsurance policy, whether currently known or unknown, discovered after the Effective Date, in effect at any time on or before the Petition Date naming the Debtor, the Contributing Parties, or any of their predecessors, subsidiaries, or past or present affiliates as an insured (whether as the primary or additional insured) or that provides or may provide coverage to Carrier or the Debtor for AFFF Claims, (iii) "Aviation" policies to which Carrier or the Debtor has rights as listed in Schedule 2 hereto solely to the extent of Insurance Policy Rights applicable to or arising from AFFF Claims and (iv) any other subsequently discovered insurance policies of the same types as listed in Schedules 1 and 2 hereto to the extent that Carrier or the Debtor have rights under such policies (whether or not such policies are specifically titled as "General Liability" or "Aviation" policies).

4860-3249-7648 v.12

For the avoidance of doubt, "Insurance Policies" shall not include any D&O Policies, automobile policies or worker's compensation insurance.

2.1.102. "*Insurance Policy Rights*" means any and all rights subject to the Insurance Assignment.

2.1.103. "*Insurance Settlement Agreement*" means any settlement agreement or sale and purchase or repurchase agreement entered into after the Petition Date and before the Effective Date by and among (a) any Insurance Company, on the one hand, and (b) Carrier, the Debtor, and the Committee, on the other hand, under which any Insurance Policy Rights are released, compromised, sold, or repurchased.

2.1.104. "*Interest*" means any "equity security" in the Debtor as defined in section 101(16) of the Bankruptcy Code.

2.1.105. "*IRC*" means the Internal Revenue Code.

2.1.106. "*IRS*" means the Internal Revenue Service.

2.1.107. "*Joint Prosecution Agreement*" means that certain Joint Prosecution Agreement by and among the Debtor, Carrier and the Committee contemplated by the Plan Support Agreement to be filed with the Plan Supplement.

2.1.108. "*KFFI*" means Kidde Fire Fighting, Inc. (formerly known as National Foam, Inc.).

2.1.109. "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

2.1.110. "*Liquidating Administrator Agreement*" means the Liquidating Administrator Agreement dated as of the Effective Date, as the same may be amended or modified from time to time in accordance with the terms thereof, and which shall be filed with the Plan Supplement.

2.1.111. "*Liquidating Administrators*" means the board of directors of the post-Effective Date Debtor, which shall be composed of Steve Hannan and Alex Greene (or such successor(s) as they jointly may designate) and vested with sole authority to administer the Liquidating Estate.

2.1.112. "*Liquidating Estate*" means the Estate after the Effective Date, which shall be administered by the Liquidating Administrators.

2.1.113. "*Liquidating Estate Assets*" means the assets of the Liquidating Estate, including the Wind-Down Reserve.  For the avoidance of doubt, the Liquidating Estate Assets shall exclude the Settlement Trust Assets.

2.1.114. "*Liquidating Estate Claims*" means Administrative Claims, Priority Tax Claims, Other Priority Claims and Secured Claims.

-14-

2.1.115. "*Liquidating Estate Retained Causes of Action*" means Estate Retained Causes of Action that are counterclaims or defenses with respect to any Claim that is not directly administered by the Settlement Trusts.

2.1.116. "*MDL District Court*" means the United States District Court for the District of South Carolina overseeing the AFFF MDL.

2.1.117. "*MDL PEC Co-Lead*" means a co-lead of the plaintiffs' executive committee appointed in the AFFF MDL.

2.1.118. "*National Foam*" means the "National Foam" line of business and any entity that owned or operated that business, including but not limited to National Foam, Inc., KFFI, the Debtor, and each of their Related Parties.

2.1.119. "*National Foam AFFF Claim*" means any Claim or Cause of Action attributable to, arising out of or relating to, directly or indirectly, the design, manufacture, storage, marketing, use, distribution, discharge, or sale of AFFF, AFFF-containing products, or any precursor, derivative, or resultant chemicals from PFAS or AFFF by National Foam, including (a) Independent AFFF Causes of Action, (b) any such Claim or Cause of Action that was brought or could have been brought in the AFFF MDL, and (c) any Claim or Cause of Action for contribution or indemnification of losses or liabilities incurred by a Person related to a National Foam AFFF Claim.  National Foam AFFF Claim shall not include any Causes of Action against DuPont, 3M, or their current or former affiliates and Related Parties, or any other party that is not a Released Party.

2.1.120. "*Net Sale Proceeds*" means net sale proceeds of approximately $115 million generated by the Sale of the Debtor's assets (including proceeds generated from the assets contributed by Carrier) that have been deposited in an escrow account.

2.1.121. "*New National Foam*" means National Foam, Inc. f/k/a Eurostar US Tradeco, Inc., Angus Fire Ltd. f/k/a Eurostar Tradeco Limited, Angus International Safety Group Limited f/k/a/ Eurostar Holdco Limited, and each of their Related Parties.

2.1.122. "*New National Foam Release*" means a settlement between the Debtor and New National Foam pursuant to which (a) Estate Causes of Action against New National Foam are resolved for value reasonably acceptable to the Settling Parties and (b) New National Foam agrees to absolutely, unconditionally, and irrevocably release and discharge the Debtor and each Released Party from any and all Claims and Causes of Action, whether known or unknown, based on or relating to, or in any manner arising from that certain Share and Business Sale Agreement, dated as of June 28, 2013, or any other occurrence taking place on or before the Effective Date, including Proof of Claim No. 225, and otherwise in form and substance reasonably acceptable to the Settling Parties.

2.1.123. "*Non-Debtor Party*" means any Person other than the Debtor.  For the avoidance of doubt, the term "*Non-Debtor Party*" does not include KFFI or National Foam, Inc.

2.1.124. "*Non-PFAS Bar Date*" means 5:00 p.m. (Eastern Time) on November 10, 2023.

-15-

2.1.125. "*Non-Transient Non-Community Water System*" means a Public Water System that is not a Community Water System and that regularly serves at least twenty-five (25) of the same persons over six (6) months per year, consistent with the use of that term in 40 C.F.R. Part 141.

2.1.126. "*Notice and Claims Agent*" means Stretto, Inc., located at 410 Exchange, Suite 100, Irvine, California 92602, retained and approved by the Bankruptcy Court as the Debtor's notice and claims agent.

2.1.127. "*Other Insurance Company*" means an Insurance Company that is not a Settling Insurance Company.

2.1.128. "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

2.1.129. "*Person*" means a "person" or "entity" as defined in the Bankruptcy Code.

2.1.130. "*Personal Injury Claim*" means an AFFF Claim for or related to, directly or indirectly, personal injuries, whether a Current Personal Injury Claim or a Future Personal Injury Claim; *provided* that Personal Injury Claim does not include any Sovereign State Claim or Sovereign Tribe Claim.

2.1.131. "*Petition Date*" means May 14, 2023, the date on which the Debtor commenced the Chapter 11 Case.

2.1.132. "*PFAS*" means per- and polyfluroalykl substances, including but not limited to perfluorooctanoic acid and perfluorooctanesulfonic acid.

2.1.133. "*Plan*" has the meaning set forth in the Introduction hereto.

2.1.134. "*Plan Documents*" means, collectively, the Plan and all documents to be executed, delivered, assumed, or performed in connection with the Plan, the Plan Transactions, and the occurrence of the Effective Date, including the documents to be included in the Plan Supplement.

2.1.135. "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, exhibits, and annexes to the Plan, and additional documents filed with the Bankruptcy Court before the Effective Date as amendments, modifications, or supplements to the Plan Supplement. The Plan Supplement shall include the identification of the initial Settlement Trustees. Each document in the Plan Supplement shall be in form and substance reasonably acceptable to each of the Settling Parties.

2.1.136. "*Plan Support Agreement*" means that certain *Settlement Support Agreement With Respect to Estate Claims Settlement, Chapter 11 Plan of Liquidation, and Class Settlements of Certain AFFF MDL Claims*, dated as of October 18, 2024, by and among the

Settling Parties, including all exhibits and attachments thereto, and as amended, restated and supplemented from time to time in accordance with its terms.

2.1.137. "*Plan Transactions*" means all transactions described in, approved by, contemplated by, or necessary to effectuate the Plan or any other Plan Transaction.

2.1.138. "*Prepetition*" means prior to the Petition Date.

2.1.139. "*Primary AFFF Settlement Trust*" means the settlement trust organized under the laws of the state of Delaware and established under the Plan and the Settlement Trust Documents, which shall (i) have the powers, duties and obligations set forth in the Plan and the Settlement Trust Documents, (ii) assume all liability of the Debtor and the Estate for, and administer, all Channeled AFFF Claims and (iii) be a "qualified settlement fund" within the meaning of the Treasury Regulations issued under Section 468B of the Internal Revenue Code.

2.1.140. "*Primary AFFF Settlement Trust Agreement*" means the Settlement Trust Agreement governing the Primary AFFF Settlement Trust, dated as of the Effective Date, as the same may be amended or modified from time to time in accordance with the terms thereof.

2.1.141. "*Primary AFFF Settlement Trust Allocation*" shall have the meaning set forth in Article 5.5.4.

2.1.142. "*Primary AFFF Settlement Trustee*" means one or more trustees selected by the Committee after consultation with the Debtor, or such successors as may be appointed from time to time after the Effective Date in accordance with the Settlement Trust Documents, to be the trustee(s) of the Primary AFFF Settlement Trust, which shall be identified in the Settlement Trust Documents and subject to approval of the Bankruptcy Court.

2.1.143. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

2.1.144. "*Private Well Claims*" means any AFFF Claim relating to any privately owned well that provides water only to its owner's (or its owner's tenant's) individual household and any other system for the provision of water for human consumption that is not a Public Water System; *provided* that Private Well Claim does not include any Sovereign State Claim or Sovereign Tribe Claim.

2.1.145. "*Pro Rata*" means, with respect to an Allowed Claim, the percentage represented by a fraction (a) the numerator of which shall be an amount equal to such Claim and (b) the denominator of which shall be an amount equal to the aggregate amount of Allowed Claims in the same Class as such Claim, except in cases where Pro Rata is used in reference to multiple Classes, in which case Pro Rata means the proportion that such Holder's Claim in a particular Class bears to the aggregate amount of all Allowed Claims in such multiple Classes.

2.1.146. "*Professional*" means (a) a Person employed in the Chapter 11 Case pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code, excluding any

ordinary course professional retained pursuant to a Bankruptcy Court order; (b) a Person awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code; or (c) the professionals employed by the AHC and compensated from the Debtor's Estate throughout the Chapter 11 Case pursuant to the *Order Authorizing the Debtor to Enter Into, and Perform its Obligations Under, the Reimbursement Agreement With the Professionals Retained by the Ad Hoc Committee of Governmental Claimants, Nunc Pro Tunc to May 14, 2023* [D.I. 627].

2.1.147. "*Professional Compensation Claim*" means a Claim for professional services rendered and costs incurred on or after the Petition Date by a Professional, including estimates through the Confirmation Date, in connection with the Chapter 11 Case.

2.1.148. "*Professional Fee Escrow Account*" means an account to be funded by the Debtor upon the Effective Date in an amount equal to the Professional Fee Reserve Amount.

2.1.149. "*Professional Fee Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* entered by the Bankruptcy Court on June 23, 2023 [D.I. 205].

2.1.150. "*Professional Fee Reserve Amount*" means the aggregate amount of unpaid Professional Claims for all Professionals through and including the Confirmation Date as estimated in accordance with Article 3.3.3 herein.

2.1.151. "*Proof of Claim*" means a proof of Claim filed against the Debtor in this Chapter 11 Case.

2.1.152. "*Property Damage and Business Loss Claim*" means any AFFF Claim that is not a Water Provider Claim, Airport Claim, Sovereign State Claim, Personal Injury Claim or Sovereign Tribe Claim.

2.1.153. "*Public Water System*" means a system for the provision to the public of water for human consumption through pipes or other constructed conveyances, if such system has at least fifteen (15) service connections or regularly serves an average of at least twenty-five (25) individuals daily at least sixty (60) days out of the year, consistent with the use of that term in the Safe Drinking Water Act, 42 U.S.C. § 300f(4)(A), and 40 C.F.R. Part 141.  The term "Public Water System" includes (i) any collection, treatment, storage, and distribution facilities under control of the operator of such system and used primarily in connection with such system, (ii) any collection or pretreatment storage facilities not under such control which are used primarily in connection with such system, (iii) a Community Water System of any size,  (iv) a Non-Transient Non-Community Water System that serves more than 3,300 people, according to SDWIS, and (v) any Person (but not any financing or lending institution) that has legal authority or responsibility (by statute, regulation, other law, or contract) to fund or incur financial obligations for the design, engineering, installation, operation, or maintenance of any facility or equipment that treats, filters, remediates, or manages water that has entered or may enter Drinking Water or any Public Water System.  "Public Water System" does not include a Non-Transient Non-Community Water System that serves 3,300 or fewer people, according to SDWIS, or a Transient Non-Community Water System of any size.

2.1.154. "*Rejection Bar Date*" means, with respect to any Executory Contract or Unexpired Lease that is rejected pursuant to this Plan, 5:00 p.m. prevailing Eastern Time on the earlier of (a) the 30th day after entry by the Bankruptcy Court of an order providing for the rejection of such Executory Contract or Unexpired Lease and (b) the 30th day after the Effective Date; *provided*, *however*, that the deadline for filing any rejection damages claim in connection with any Executory Contract or Unexpired Lease rejected pursuant to a prior order of the Bankruptcy Court shall be the date set forth in the respective order authorizing such rejection.

2.1.155. "*Release Dispute*" means a dispute regarding whether a Cause of Action alleged by an AFFF Claimant against one or more of the Released Parties is a Cause of Action that was an Estate Cause of Action or otherwise settled and released under the Plan.

2.1.156. "*Released Claims*" means all Claims or Causes of Action, including all Estate Causes of Action, that are released under the Plan and the Confirmation Order. For the avoidance of doubt, no Independent AFFF Causes of Action or Sovereign State Retained Causes of Action shall be Released Claims.

2.1.157. "*Released Party*" means Carrier, RTX, and each of their Related Parties in their capacities as such. Released Parties shall not include DuPont, 3M, or their current or former affiliates and Related Parties. If a Person is a current or former affiliate or Related Party of DuPont or 3M, and such Person is also a current or former affiliate or Related Party of Carrier or RTX, then such Person shall not be a Released Party. For the avoidance of doubt, New National Foam shall not be a Released Party unless the New National Foam Release is provided by the Effective Date.

2.1.158. "*Related Party*" means, with respect to any Person, such Person's (a) predecessors, successors, assigns, and current and former affiliates and subsidiaries, (b) current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, board members, advisory board members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, all only in their capacity as a representative of such Person, and (c) respective heirs, executors, estates, and nominees, in each case solely in its capacity as such.

2.1.159. "*Remaining Estate Funds*" means all remaining cash in the Estate as of the Effective Date net of accrued and unpaid administrative expenses and amounts required to fund the Wind-Down Budget.

2.1.160. "*RTX*" means RTX Corporation (formerly known as Raytheon Technologies Corporate and successor to United Technologies Corporation).

2.1.161. "*RTX Waiver*" shall have the meaning set forth in Article 5.5.11(b).

2.1.162. "*Sale*" means the sale of substantially all of the Debtor's assets pursuant to the Acquisition Agreement and approved by the Sale Order.

2.1.163. "*Sale Order*" means the *Order (I) Approving the Sale of All or Substantially All of the Debtor's Assets, Free and Clear of Liens, Claims, Interests and Encumbrances, (II) Approving Debtor's Entry, and Performance Under the Contribution*

*Agreement, (III) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases and (IV) Granting Related Relief*, entered by the Bankruptcy Court on April 2, 2024 [D.I. 1058].

2.1.164. "*Schedules*" means, with respect to the Debtor, the schedules of assets and liabilities and the statement of financial affairs filed by the Debtor with the Bankruptcy Court pursuant to sections 521 and 1106(a)(2) of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules and statements may be amended or supplemented from time to time prior to the Effective Date after consultation with the Committee.

2.1.165. "*SDWIS*" means the U.S. EPA Safe Drinking Water Information System Federal Reporting Services system.

2.1.166. "*Secured*" means, with respect to any Claim, the extent to which the Claim is: (a) secured by a valid, perfected and enforceable Lien on property of the Debtor's Estate (i) as set forth in the Plan, (ii) as agreed to by the holder of such Claim and the Liquidating Administrators or Debtor, as applicable, with the consent of the Committee, not to be unreasonably withheld, conditioned or delayed or (iii) pursuant to applicable law or as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code; (b) subject to any setoff right of the holder of such Claim under section 553 of the Bankruptcy Code, but, with respect to both of the foregoing clauses (a) and (b), only to the extent of the value of the interest of such holder in the Estate's interest in the property securing such Claim or the amount subject to setoff, as applicable.

2.1.167. "*Securities Act*" means the United States Securities Act of 1933, as amended.

2.1.168. "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

2.1.169. "*Settlement Trust Agreements*" means, collectively, (i) the Primary AFFF Settlement Trust Agreement, (ii) the Sovereign State AFFF Settlement Trust Agreement and (iii) the GUC Liquidating Trust Agreement.  To the extent that any provision of a Settlement Trust Agreement impacts the rights of Carrier, such provision shall not be included in such Settlement Trust Agreement unless reasonably acceptable to Carrier.

2.1.170. "*Settlement Trust Assets*" means contents of the AFFF Data Transfer, the Guaranteed Cash Payment, any and all funds, proceeds or other consideration contributed to the Primary AFFF Settlement Trust pursuant to the Insurance Assignment, and all other assets contributed or Causes of Action assigned to the Primary AFFF Settlement Trust, including the Settlement Trust Retained Causes of Action.

2.1.171. "*Settlement Trust Documents*" means, collectively, (a) the Settlement Trust Agreements, (b) the TDPs, (c) the Confirmation Order, and (d) any other agreements, instruments, and documents governing the establishment, administration, and operation of the Settlement Trusts.

2.1.172. "*Settlement Trust Retained Causes of Action*" means all Estate Causes of Action other than Liquidating Estate Retained Causes of Action.

2.1.173. "*Settlement Trustees*" means the Primary AFFF Settlement Trustee, the Sovereign State AFFF Settlement Trustee and the GUC Liquidating Trustee.

2.1.174. "*Settlement Trusts*" means the Primary AFFF Settlement Trust, Sovereign State AFFF Settlement Trust and GUC Liquidating Trust.

2.1.175. "*Settling Insurance Company*" means any Insurance Company that contributes funds, proceeds, or other consideration to or for the benefit of the Primary AFFF Settlement Trust pursuant to an Insurance Settlement Agreement that is approved by an order of the Bankruptcy Court (including the Confirmation Order) and is designated as a Settling Insurance Company in the Confirmation Order.  No Insurance Company shall be considered a Settling Insurance Company without the Committee's prior written consent.

2.1.176. "*Settling Parties*" means the Debtor, Carrier, the Committee and the MDL PEC Co-Leads.

2.1.177. "*Solicitation Materials*" means all documents, forms, and other materials distributed in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code, including, without limitation, the Disclosure Statement, and the forms of ballots with respect to votes on the Plan, which shall be in form and substance reasonably acceptable to each of the Settling Parties.

2.1.178. "*Sovereign State*" means any sovereign state or territory of the United States, including each of the 50 states, the Commonwealth of the Northern Mariana Islands, Guam, Puerto Rico, American Samoa, the U.S. Virgin Islands, the District of Columbia, and each of their respective attorneys general and representatives in their capacities as such.

2.1.179. "*Sovereign State Claim*" means any AFFF Claim asserted by a Sovereign State solely to the extent such AFFF Claim can be asserted in its capacity as a sovereign and could not be asserted in any other capacity.

2.1.180. "*Sovereign State AFFF Settlement Trust*" means the trust established under the Plan and the Settlement Trust Documents to assume all liability of the Debtor and the Estate for, and to administer, all Sovereign State Claims against the Debtor.  The Sovereign State AFFF Settlement Trust shall be a "qualified settlement fund" within the meaning of the Treasury Regulations issued under Section 468B of the Internal Revenue Code and shall have the powers, duties and obligations set forth in the Settlement Trust Documents.

2.1.181. "*Sovereign State AFFF Settlement Trust Agreement*" means the Settlement Trust Agreement governing the Sovereign State AFFF Settlement Trust, dated as of the Effective Date, as the same may be amended or modified from time to time in accordance with the terms thereof.

2.1.182. "*Sovereign State AFFF Settlement Trust Allocation*" shall have the meaning set forth in Article 5.5.4.

2.1.183. "*Sovereign State AFFF Settlement Trustee*" shall have the meaning set forth in Article 5.5.5.

2.1.184. "*Sovereign State Retained Cause of Action*" means any Claim or Cause of Action against a Contributing Party that may be asserted by a Sovereign State arising from a specific statute or common law promulgated by such Sovereign State that creates a unique theory of liability (as opposed to a general theory on behalf or for the benefit of the Sovereign State's beneficiaries including, but not limited to, any Claims brought pursuant to *parens patriae* authority or the public trust doctrines) by which only a Sovereign State (but not in whole or in part private parties, including the Debtor) could impose liability and recover damages against a Contributing Party.  Sovereign State Retained Cause of Action does not include Estate Causes of Action.

2.1.185. "*Sovereign Tribe*" means any American Indian or Alaskan Native Tribe, band, nation, pueblo, village or community, that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. § 5130, and as periodically listed by the U.S. Secretary of the Interior in the Federal Register pursuant to 25 U.S.C. § 5131; and any "Tribal Organization" as provided in the Indian Self-Determination and Education and Assistance Act of 1975, as amended, 25 U.S.C. § 5304(1).

2.1.186. "*Sovereign Tribe Claim*" means any AFFF Claim asserted by a Sovereign Tribe solely to the extent such AFFF Claim can be asserted in its capacity as a sovereign and could not be asserted in any other capacity.

2.1.187. "*Subordinated Claim*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code.

2.1.188. "*Subsequent Distribution Date*" means a date after the Initial Distribution Date selected by the Liquidating Administrators for Distributions.

2.1.189. "*TDPs*" means the Trust Distribution Procedures for the Settlement Trusts, as the same may be amended or modified from time to time in accordance with the terms thereof, that will govern the claims submission, adjudication, and distribution processes for the Settlement Trusts in a manner that is fair and equitable to Holders of Allowed Channeled AFFF Claims.  To the extent that any provision of the TDPs impacts the rights of Carrier, such provision shall not be included unless reasonably acceptable to Carrier.

2.1.190. "*Transient Non-Community Water System*" means a Public Water System that is not a Community Water System and that does not regularly serve at least twenty-five (25) of the same persons over six (6) months per year, consistent with the use of that term in 40 C.F.R. Part 141.

2.1.191. "*Trust Advisory Committee*" means the Trust Advisory Committee established pursuant to the terms of the Plan and having the powers, duties, and obligations set forth in the Settlement Trust Documents.

2.1.192. "*Trust Allocation*" shall have the meaning set forth in Article 5.5.4.

2.1.193. "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

2.1.194. "*Unimpaired*" means any Claim or Interest that is not Impaired.

2.1.195. "*U.S. Trustee*" means the Office of the United States Trustee for the District of Delaware.

2.1.196. "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

2.1.197. "*Voting*" means the process by which a Holder of a Claim may vote to accept or reject the Plan, pursuant to the conditions in Article 4 herein.

2.1.198. "*Voting Deadline*" means [•] p.m. prevailing Eastern Time on [•], by which time all Ballots must be actually received by the Notice and Claims Agent.

2.1.199. "*Voting Record Date*" means [•], 2025.

2.1.200. "*Water Provider Claim*" means an AFFF Claim asserted by or on behalf of any Public Water System; *provided* that Water Provider Claim does not include any Sovereign State Claim or Sovereign Tribe Claim.

2.1.201. "*Water Source*" means a groundwater well, a surface-water intake, or any other intake point from which a Public Water System draws or collects water for distribution as Drinking Water, and the raw or untreated water that is thus drawn or collected.

2.1.202. "*Wind Down Budget*" means the wind-down budget for the Liquidating Estate following the Effective Date as approved by the Bankruptcy Court in connection with the Confirmation of the Plan, which shall provide for the payment of Allowed Administrative Claims, Priority Tax Claims, Other Priority Claims, Secured Claims, and any other Claims or administrative expenses not being administered by the Settlement Trusts, and which shall be reasonably acceptable to and shared with all Settling Parties upon request.

2.1.203. "*Wind Down Reserve*" means the reserve account established and maintained by the Liquidating Estate to administer the wind-down and dissolution of Liquidating Estate, including the payment of Allowed Professional Compensation Claims, and other costs and expenses of the Debtor and Liquidating Estate, which shall be funded consistent with the Wind-Down and from the sources set forth in Article 5 herein.

2.2.  Rules of Interpretation

For the purposes of this Plan:  (a) any reference herein to the word "including" or word of similar import shall be read to mean "including without limitation"; (b) unless otherwise specified, all references herein to "Articles" are references to Articles herein, hereof or hereto; (c) unless otherwise specified, the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than a particular portion of the Plan; (d) captions and headings to Articles are inserted for the convenience of reference only and are not intended to be a part of or to affect the

interpretation of the Plan; (e) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (f) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (g) all references to docket numbers of documents filed in this Chapter 11 Case are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (h) all references to statutes, regulations, orders, rules of courts and the like shall mean as amended from time to time, and as applicable to this Chapter 11 Case, unless otherwise stated; (i) any reference herein to a contract, agreement, lease, plan, policy, document or instrument being in a particular form or on particular terms and conditions means that the same shall be substantially in that form or substantially on those terms and conditions; (j) any reference herein to a contract, agreement, lease, plan, policy, document or instrument or schedule or exhibit thereto, whether or not filed, shall mean the same as amended, restated, modified or supplemented from time to time in accordance with the terms hereof or thereof; (k) any immaterial effectuating provisions may be interpreted by the Debtor, the Settlement Trustees and the Liquidating Administrators, as applicable, in such a manner that is consistent with the overall purpose and intent of the Plan, all without further Bankruptcy Court order; (l) any reference to a Person as a Holder of a Claim or Interest includes that Person's successors and permitted assigns; (m) except as otherwise expressly provided in this Plan, after the Confirmation Date, where this Plan contemplates that the Debtor, the Settlement Trustees, or the Liquidating Administrators shall take any action, incur any obligation, issue any security or adopt, assume, execute or deliver any contract, agreement, lease, plan, policy, document or instrument on or prior to the Effective Date, the same shall be duly and validly authorized by the Plan and effective against and binding upon the Debtor, the Settlement Trustees and/or the Liquidating Administrators, as applicable, on and after the Effective Date without further notice to, order of or other approval by the Bankruptcy Court, action under applicable law, regulation, order or rule, or the vote, consent, authorization or approval of the board of directors of the Debtor or any other Person; (n) any effectuating provisions relating to the Settlement Trusts may be reasonably interpreted by the applicable Settlement Trustee without further notice to or action, order, or approval of the Bankruptcy Court; (o) reference herein to the Settlement Trustees and the Liquidating Administrators, or any right of the Settlement Trustees or Liquidating Administrators, shall be subject in all respects to the Settlement Trust Agreements and Liquidating Administrator Agreement, as applicable, and (p) except as otherwise provided in the Plan, anything required to be done by the Debtor, the Settlement Trustees or the Liquidating Administrators, as applicable, on the Effective Date may be done on the Effective Date or as soon as reasonably practicable thereafter.

2.3.    <u>Computation of Time</u>

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein, and all dates and times shall be determined based on prevailing time in Wilmington, Delaware. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

### 3.    ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Claims or Priority Tax Claims, payment of which is provided for below.

### 3.1.    Administrative Claim Bar Date

Any request for payment of an Administrative Claim must be filed and served on the Debtor or the Liquidating Administrators, as applicable, pursuant to the procedures specified in the notice of entry of the Confirmation Order and the Confirmation Order on or prior to the Administrative Claim Bar Date; *provided* that no request for payment is required to be filed and served pursuant to this Article 3.1 with respect to any:

>    (a)    Administrative Claim that is Allowed as of the Administrative Claim Bar Date;

>    (b)    Professional Compensation Claim; or

>    (c)    Claim for U.S. Trustee Fees.

Any Holder of an Administrative Claim who is required to, but does not, file and serve a request for payment of such Administrative Claim pursuant to the procedures specified in the Confirmation Order on or prior to the Administrative Claim Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claim against the Debtor or the Liquidating Estate and such Administrative Claim shall be deemed satisfied as of the Effective Date without the need for any objection from the Liquidating Administrators or any notice to or action, order or approval of the Bankruptcy Court.

Any objection to a request for payment of an Administrative Claim that is required to be filed and served pursuant to this Article 3.1 must be filed and served on the requesting party creditor (a) no later than 90 days after the Administrative Claim Bar Date or (b) by such later date as may be established by order of the Bankruptcy Court upon a motion by the Debtor or the Liquidating Administrators, as applicable, with notice only to those parties entitled to receive notice pursuant to Bankruptcy Rule 2002.

### 3.2.    General Administrative Claims

Except to the extent that a Holder of an Allowed General Administrative Claim agrees to less favorable treatment, the Holder of each Allowed General Administrative Claim shall receive Cash in an amount equal to the full unpaid amount of such Allowed General Administrative Claim on or as reasonably practicable after the later of (a) the Effective Date or (b) the date on which such Claim is Allowed.

### 3.3.    Professional Compensation Claims

3.3.1.    Final Fee Applications.  All final requests for payment of Professional Compensation Claims shall be filed and served no later than 60 days after the Confirmation Date, in accordance with the procedures established under the Professional Fee Order and the

-25-

Confirmation Order.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Compensation Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules and prior Bankruptcy Court orders.

3.3.2.  <u>Professional Fee Escrow Account.</u>  The Debtor or the Liquidating Administrators, as applicable, shall establish and fund the Professional Fee Escrow Account on or prior to the Effective Date; *provided* that the Debtor's and the Liquidating Estate's obligations with respect to the Professional Compensation Claims shall not be limited by, nor deemed limited to, the balance of funds held in the Professional Fee Escrow Account.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Except as provided in the last sentence of this paragraph, such funds shall not be considered property of the Debtor, Liquidating Estate or the Liquidating Administrators.  The Liquidating Administrators shall pay Professional Compensation Claims in Cash no later than five Business Days after such Claims are Allowed by Final Order of the Bankruptcy Court.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of accrued Allowed Professional Compensation Claims owing to any Professional, such Professional shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article 3.2 of the Plan (but for the avoidance of doubt, shall not be subject to any Administrative Claims Bar Date).  Any funds remaining in the Professional Fee Escrow Account following the approval of all Professionals' final fee applications provided for in Article 3.3.1 herein and payment of all Professionals 'Allowed Professional Compensation Claims shall revert to the Wind-Down Reserve.

3.3.3.  <u>Professional Fee Reserve Amount.</u>  Professionals shall provide good-faith estimates of their Professional Compensation Claims for purposes of the Professional Fee Escrow Account and shall deliver such estimates to the Debtor and the Liquidating Administrators no later than seven days prior to the anticipated Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to the fees and expenses of such Professionals.  If a Professional does not provide such an estimate, the Debtor or the Liquidating Administrators, as applicable, may estimate, in their reasonable discretion, the Professional Compensation Claims of such Professional.

3.3.4.  <u>Post-Confirmation Date Fees and Expenses.</u>  Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtor or the Liquidating Administrators, as the case may be, shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional or other fees and expenses related to implementation and Consummation of the Plan incurred by the Professionals, in each case in accordance with the Wind Down Budget.  Except as otherwise specifically provided in the Plan, upon the Confirmation Date, any requirement that Professionals comply with section 327, 328, 329, 330, 331 or 1103 of the Bankruptcy Code or the Professional Fee Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtor, the Liquidating Administrators and, solely with respect to the matters set forth in Article 13.9 herein, the Committee, may employ and pay any Professional in the ordinary course of business, in each case subject to the Wind Down Budget.

4860-3249-7648 v.12

3.3.5.   <u>Fee Examiner</u>.  The Fee Examiner appointed pursuant to the Fee Examiner Order shall continue to act in such capacity unless and until all final Professional Compensation Claims have been adjudicated by an order of the Bankruptcy Court.  The Liquidating Administrators shall pay the fees and expenses incurred by the Fee Examiner in rendering services after the Effective Date.

3.4.   <u>Statutory Fees Payable Pursuant to 28 U.S.C. § 1930</u>

All fees due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date, including any applicable interest payable under section 3717 of Title 31 of the United States Code, shall be paid by the Debtor.  On and after the Effective Date, to the extent applicable, the Liquidating Administrators shall pay any and all such fees and interest when due and payable (including any fraction thereof) until the earliest of the Chapter 11 Case being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

3.5.   <u>Priority Tax Claims</u>

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, or as ordered by the Bankruptcy Court, the Holder of an Allowed Priority Tax Claim shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

## 4.    CLASSIFICATION, TREATMENT AND VOTING OF CLAIMS AND INTERESTS

4.1.    Classification of Claims and Interests

All Claims and Interests except for Administrative Claims and Priority Tax Claims are classified in the Classes set forth in this Article 4.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest also is classified in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is Allowed as a Claim or Interest in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

4.1.1.    Summary of Classification and Treatment.

The classification of Claims and Interests pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Secured Claims | Unimpaired | Deemed to Accept |
| 3A | Water Provider Claims | Impaired | Entitled to Vote |
| 3B | Airport Claims | Impaired | Entitled to Vote |
| 3C | Sovereign State Claims | Impaired | Entitled to Vote |
| 3D | Property Damage and Business Loss Claims | Impaired | Entitled to Vote |
| 3E | Personal Injury Claims | Impaired | Entitled to Vote |
| 3F | Sovereign Tribe Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Affiliate Claims | Impaired | Deemed to Reject |
| 6 | Interests | Impaired | Deemed to Reject |

4.2.    Treatment of Claims and Interests

4.2.1.    Class 1 – Other Priority Claims

(a)    *Classification*:  Class 1 consists of all Other Priority Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final

4860-3249-7648 v.12

satisfaction, settlement and release of and in exchange for its Allowed Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes Allowed and (iii) such other date as may be ordered by the Bankruptcy Court, or otherwise receive treatment consistent with the provisions of section 1129 of the Bankruptcy Code.

(c)     *Voting*:  Claims in Class 1 are Unimpaired.  Each Holder of an Other Priority Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of Other Priority Claims is entitled to vote to accept or reject the Plan.

### 4.2.2.    Class 2 – Secured Claims

(a)     *Classification*:  Class 2 consists of all Secured Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Secured Claim agrees to less favorable treatment, and in full and final satisfaction, settlement and release of and in exchange for its Allowed Secured Claim, each Holder of such Allowed Secured Claim shall be paid in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which such Secured Claim becomes Allowed and (iii) such other date as may be ordered by the Bankruptcy Court, or otherwise receive treatment consistent with the provisions of section 1129 of the Bankruptcy Code.

(c)     *Voting*:  Claims in Class 2 are Unimpaired.  Each Holder of a Secured Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of Secured Claims is entitled to vote to accept or reject the Plan.

### 4.2.3.    Class 3A – Water Provider Claims

(a)     *Classification*: Class 3A consists of all Water Provider Claims against the Debtor.

(b)     *Treatment*:  As of the Effective Date, all Water Provider Claims against the Debtor shall automatically and, without further act, deed, or court order, be channeled exclusively to, and all of the Debtor's liability for such Claims, shall be incurred in full and assumed by the Primary AFFF Settlement Trust.  Subject to the Settlement Trust Documents, each Holder of an Allowed Water Provider Claim against the Debtor shall be entitled to receive its Pro Rata share of the Primary AFFF Settlement Trust Allocation

-29-

with all other Allowed Class 3 Claims other than Sovereign State Claims. Holders of Allowed Water Provider Claims against the Debtor shall not receive any payment from the Primary AFFF Settlement Trust unless and until such Claims are resolved in accordance with the Settlement Trust Documents, including the TDPs applicable to Water Provider Claims. The terms, provisions and procedures set forth in the TDPs applicable to Water Provider Claims shall establish the sole method by which Water Provider Claims against the Debtor will be submitted, processed, liquidated and, if applicable, paid. The sole recourse of any Holder of a Water Provider Claim on account of its Water Provider Claim against the Debtor shall be to the Primary AFFF Settlement Trust.

(c)     *Voting*: Claims in Class 3A are Impaired and each Holder of a Water Provider Claim against the Debtor is entitled to vote to accept or reject the Plan.

### 4.2.4.   Class 3B – Airport Claims

(a)     *Classification*: Class 3B consists of all Airport Claims against the Debtor.

(b)     *Treatment*: As of the Effective Date, all Airport Claims against the Debtor shall automatically and, without further act, deed, or court order, be channeled exclusively to, and all of the Debtor's liability for such Claims, shall be incurred in full and assumed by the Primary AFFF Settlement Trust. Subject to the Settlement Trust Documents, each Holder of an Allowed Airport Claim against the Debtor shall be entitled to receive its Pro Rata share of the Primary AFFF Settlement Trust Allocation with all other Allowed Class 3 Claims other than Sovereign State Claims. Holders of Allowed Airport Claims against the Debtor shall not receive any payment from the Primary AFFF Settlement Trust unless and until such Claims are resolved in accordance with the Settlement Trust Documents, including the TDPs applicable to Airport Claims. The terms, provisions and procedures set forth in the TDPs applicable to Airport Claims shall establish the sole method by which Airport Claims against the Debtor will be submitted, processed, liquidated and, if applicable, paid. The sole recourse of any Holder of an Airport Claim on account of its Airport Claim against the Debtor shall be to the Primary AFFF Settlement Trust.

(c)     *Voting*: Claims in Class 3B are Impaired and each Holder of an Airport Claim against the Debtor is entitled to vote to accept or reject the Plan.

4.2.5. Class 3C – Sovereign State Claims

(a)  *Classification*: Class 3C consists of all Sovereign State Claims against the Debtor.

(b)  *Treatment*:  As of the Effective Date, all Sovereign State Claims against the Debtor shall automatically and, without further act, deed, or court order, be channeled exclusively to, and all of the Debtor's liability for such Claims, shall be incurred in full and assumed by the Primary AFFF Settlement Trust.  Subject to the Settlement Trust Documents, each Holder of an Allowed Sovereign State Claim against the Debtor shall be entitled to receive its Pro Rata share of the Sovereign State AFFF Settlement Trust Allocation with all other Allowed Sovereign State Claims. Holders of Allowed Sovereign State Claims against the Debtor shall not receive any payment from the Sovereign State AFFF Settlement Trust unless and until such Claims are resolved in accordance with the Settlement Trust Documents, including the TDPs applicable to Sovereign State Claims.  The terms, provisions and procedures set forth in the TDPs applicable to Sovereign State Claims shall establish the sole method by which Sovereign State Claims against the Debtor will be submitted, processed, liquidated and, if applicable, paid.  The sole recourse of any Holder of a Sovereign State Claim on account of its Sovereign State Claim against the Debtor shall be to the Sovereign State AFFF Settlement Trust.

(c)  *Voting*: Claims in Class 3C are Impaired and each Holder of a Sovereign State Claim against the Debtor is entitled to vote to accept or reject the Plan.

4.2.6. Class 3D – Property Damage and Business Loss Claims

(a)  *Classification*: Class 3D consists of all Property Damage and Business Loss Claims against the Debtor.

(b)  *Treatment*:  As of the Effective Date, all Property Damage and Business Loss Claims against the Debtor shall automatically and, without further act, deed, or court order, be channeled exclusively to, and all of the Debtor's liability for such Claims, shall be incurred in full and assumed by the Primary AFFF Settlement Trust.  Subject to the Settlement Trust Documents, each Holder of an Allowed Property Damage and Business Loss Claim against the Debtor shall be entitled to receive its Pro Rata share of the Primary AFFF Settlement Trust Allocation with all other Allowed Class 3 Claims other than Sovereign State Claims.  Holders of Allowed Property Damage and Business Loss Claims against the Debtor

-31-

shall not receive any payment from the Primary AFFF Settlement Trust unless and until such Claims are resolved in accordance with the Settlement Trust Documents, including the TDPs applicable to Property Damage and Business Loss Claims. The terms, provisions and procedures set forth in the TDPs applicable to Property Damage and Business Loss Claims shall establish the sole method by which Property Damage and Business Loss Claims against the Debtor will be submitted, processed, liquidated and, if applicable, paid. The sole recourse of any Holder of a Property Damage and Business Loss Claim on account of its Property Damage and Business Loss Claim against the Debtor shall be to the Primary AFFF Settlement Trust.

(c)    *Voting*: Claims in Class 3D are Impaired and each Holder of an Property Damage and Business Loss Claim against the Debtor is entitled to vote to accept or reject the Plan.

### 4.2.7.    Class 3E – Personal Injury Claims

(a)    *Classification*: Class 3E consists of all Personal Injury Claims against the Debtor.

(b)    *Treatment*:  As of the Effective Date, all Personal Injury Claims against the Debtor shall automatically and, without further act, deed, or court order, be channeled exclusively to, and all of the Debtor's liability for such Claims, shall be incurred in full and assumed by the Primary AFFF Settlement Trust.  Subject to the Settlement Trust Documents, each Holder of an Allowed Personal Injury Claim against the Debtor shall be entitled to receive its Pro Rata share of the Primary AFFF Settlement Trust Allocation with all other Allowed Class 3 Claims other than Sovereign State Claims.  Holders of Allowed Personal Injury Claims against the Debtor shall not receive any payment from the Primary AFFF Settlement Trust unless and until such Claims are resolved in accordance with the Settlement Trust Documents, including the TDPs applicable to Personal Injury Claims.  The terms, provisions and procedures set forth in the TDPs applicable to Personal Injury Claims shall establish the sole method by which Personal Injury Claims against the Debtor will be submitted, processed, liquidated and, if applicable, paid.  The sole recourse of any Holder of a Personal Injury Claim on account of its Personal Injury Claim against the Debtor shall be to the Primary AFFF Settlement Trust.

(c)    *Voting*: Claims in Class 3E are Impaired and each Holder of a Personal Injury Claim against the Debtor is entitled to vote to accept or reject the Plan.

4860-3249-7648 v.12

4.2.8.    Class 3F – Sovereign Tribe Claims

(a)    *Classification*: Class 3F consists of all Sovereign Tribe Claims against the Debtor.

(b)    *Treatment*:  As of the Effective Date, all Sovereign Tribe Claims against the Debtor shall automatically and, without further act, deed, or court order, be channeled exclusively to, and all of the Debtor's liability for such Claims, shall be incurred in full and assumed by the Primary AFFF Settlement Trust.  Subject to the Settlement Trust Documents, each Holder of a Sovereign Tribe Claim against the Debtor shall be entitled to receive its Pro Rata share of the Primary AFFF Settlement Trust Allocation with all other Allowed Class 3 Claims other than Sovereign State Claims. Holders of Allowed Sovereign Tribe Claims against the Debtor shall not receive any payment from the Primary AFFF Settlement Trust unless and until such Claims are resolved in accordance with the Settlement Trust Documents, including the TDPs applicable to Sovereign Tribe Claims.  The terms, provisions and procedures set forth in the TDPs applicable to Sovereign Tribe Claims shall establish the sole method by which Sovereign Tribe Claims against the Debtor will be submitted, processed, liquidated and, if applicable, paid.  The sole recourse of any Holder of a Sovereign Tribe Claim on account of its Sovereign Tribe Claim against the Debtor shall be to the Primary AFFF Settlement Trust.

(c)    *Voting*: Claims in Class 3F are Impaired and each Holder of a Sovereign Tribe Claim against the Debtor is entitled to vote to accept or reject the Plan.

4.2.9.    Class 4 – General Unsecured Claims

(a)    *Classification*:  Class 4 consists of all General Unsecured Claims.

(b)    *Treatment*:  In full and final satisfaction, settlement, release and discharge of an Allowed General Unsecured Claim, each Holder of a General Unsecured Claim shall be entitled to receive its Pro Rata share of the GUC Liquidating Trust Allocation with all other Allowed Class 4 Claims.  The sole recourse of any Holder of a General Unsecured Claim on account of its General Unsecured Claim shall be to the GUC Liquidating Trust.

(c)    *Voting*:  Claims in Class 4 are Impaired and each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

4860-3249-7648 v.12

4.2.10.   Class 5 – Affiliate Claims

(a)     *Classification*:  Class 5 consists of all Affiliate Claims.

(b)     *Treatment*:  All Affiliate Claims shall be canceled, released or extinguished, and the Holders thereof shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Claim under the Plan.

(c)     *Voting*:  Claims in Class 5 are Impaired.  Each Holder of an Affiliate Claim is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of an Affiliate Claim is entitled to vote to accept or reject the Plan.

4.2.11.   Class 6 – Interests

(a)     *Classification*:  Class 6 consists of all Interests.

(b)     *Treatment*:  No Holder of an Interest shall receive any Distributions on account of its Interest.  On and after the Effective Date, all Interests in the Debtor shall be canceled and shall be of no further force and effect, whether surrendered for cancelation or otherwise.

(c)     *Voting*:  Claims in Class 6 are Impaired.  Each Holder of an Interest is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of an Interest is entitled to vote to accept or reject the Plan.

4.3.    Special Provision Governing Unimpaired Claims

Except as otherwise provided herein, the Plan shall not affect the Debtor's or the Liquidating Administrators' rights in respect of any Unimpaired Claims, including legal and equitable defenses or setoff or recoupment rights with respect thereto.

4.4.    Acceptance by Impaired Classes

An Impaired Class of Claims shall have accepted the Plan if: (i) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Claims entitled to vote actually voting in such Class have voted to accept the Plan; and (ii) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Claims entitled to vote actually voting in such Class have voted to accept the Plan.

4.5.    Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or an Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of

the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purpose of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

4.6.    <u>Voting Classes; Presumed Acceptance by Non-Voting Classes</u>

If a Class of Claims or Interests is eligible to vote and no Holder of Claims or Interests, as applicable, in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by such Class.  Classes 1 and 2 are deemed to have accepted the Plan and are not entitled to vote.

4.7.    <u>Confirmation Pursuant to Sections 1129(a) and 1129(b) of the Bankruptcy Code</u>

For purposes of Confirmation, section 1129(a)(10) of the Bankruptcy Code shall be satisfied if any one of Classes 3A, 3B, 3C, 3D, 3E, 3F, or 4 accepts the Plan.  The Debtor shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class or Classes of Claims and Interests.  Classes 5 and 6 are deemed to reject the Plan.

4860-3249-7648 v.12

**5.** **IMPLEMENTATION OF THE PLAN**

5.1.    Operations Between the Confirmation Date and Effective Date

During the period from the Confirmation Date through and until the Effective Date, the Debtor may continue to operate as a debtor-in-possession, subject to all applicable orders of the Bankruptcy Court.

5.2.    Compromise and Settlement

In consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a set of integrated, good-faith compromises and settlements of all Claims, Interests, Causes of Action and controversies resolved pursuant to the Plan. The Plan shall be deemed a motion by the Debtor to approve such compromises and settlements (including but not limited to the Estate Claims Settlement and the Insurance Assignment) pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromises and settlements under Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, as well as a finding by the Bankruptcy Court that such integrated compromises or settlements are in the best interest of the Debtor, the Estate and Holders of Claims and Interests, and are fair, equitable and within the range of reasonableness.

5.3.    Plan Transactions

On or prior to the Effective Date or as soon as reasonably practicable thereafter, the Debtor or the Liquidating Administrators, as applicable, shall, consistent with the terms of the Plan Support Agreement and subject to the applicable consent and approval rights thereunder, take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan Transactions (including any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan), including, but not limited to, (a) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan, and (b) all other actions that the Debtor or the Liquidating Administrators, as applicable, determine are necessary or appropriate in connection with the Plan Transactions and Definitive Documents.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan Transactions (including any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan) and in the Definitive Documents.

5.4.    Estate Claims Settlement

The Plan shall be deemed a motion to approve the Estate Claims Settlement Agreement pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall

-36-

constitute the Bankruptcy Court's approval of the Estate Claims Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as findings by the Bankruptcy Court that the Estate Claims Settlement constitutes a good faith settlement that bars any Cause of Action released or barred thereunder, is in the best interests of the Debtor, its Estate and Holders of Claims and Interests, and is fair, equitable and within the range of reasonableness.

5.5.    Settlement Trusts

5.5.1.    Creation of the Settlement Trusts.  On or before the Effective Date, the Settlement Trust Agreements shall be executed, and all other necessary steps shall be taken to create the Settlement Trusts.  On the Effective Date, the Primary AFFF Settlement Trust shall be automatically appointed as a representative of the Debtor's Estate pursuant to sections 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code.

From and after the Effective Date, the Primary AFFF Settlement Trust shall succeed to all rights and powers of the Debtor and its Estate with respect to all Settlement Trust Retained Causes of Action and Insurance Actions.  The Primary AFFF Settlement Trust shall be substituted and will replace the Debtor, its Estate and the Committee in all such Settlement Trust Retained Causes of Action and Insurance Actions, whether or not such claims are pending in filed litigation.

5.5.2.    Purpose of the Settlement Trusts.  The purpose of the Primary AFFF Settlement Trust shall be to (i) hold, manage, protect and monetize the Settlement Trust Assets and (ii) administer, process and satisfy all Channeled AFFF Claims (other than Sovereign State Claims), which for the avoidance of doubt shall be submitted exclusively to the Primary AFFF Settlement Trust and satisfied by the Primary AFFF Settlement Trust in accordance with the terms, provisions and procedures of the TDPs.  Subject to the Insurance Cooperation Agreement, the Primary AFFF Settlement Trust shall have the exclusive power and authority to, among other things, in accordance with the Settlement Trust Documents and Plan Documents: (a) dispose of Settlement Trust Assets; (b) make Distributions or payments to the Sovereign State AFFF Settlement Trust and GUC Liquidating Trust, as applicable; (c) commence, prosecute, and settle all Settlement Trust Retained Causes of Action and Insurance Actions; and (d) perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the Primary AFFF Settlement Trust and carry out the provisions of the Plan relating to the Primary AFFF Settlement Trust.  For the avoidance of doubt, no Person that receives a release under the Estate Claims Settlement or the New National Foam Release shall be a beneficiary of the Settlement Trusts or be entitled to receive a Distribution on account of a Claim from the Settlement Trusts, including for indemnification, contribution or otherwise.  In furtherance of the foregoing and unless otherwise expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, the Primary AFFF Settlement Trust shall have all defenses, cross-claims, offsets and recoupments, as well as rights of indemnification, contribution, subrogation and similar rights regarding all Channeled AFFF Claims other than Sovereign State Claims that the Debtor has or would have had under applicable law.

The purpose of the Sovereign State AFFF Settlement Trust shall be to administer, process and satisfy Sovereign State Claims, which for the avoidance of doubt shall be submitted exclusively to, and satisfied by, the Sovereign State AFFF Settlement Trust in accordance with

-37-

the terms, provisions and procedures of the TDPs.  In accordance with the Plan Documents and Settlement Trust Documents, the Sovereign State AFFF Settlement Trust shall have the exclusive power and authority to administer, process and satisfy Sovereign State Claims and make Distributions on account of Sovereign State Claims.  In furtherance of the foregoing and unless otherwise expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, the Sovereign State AFFF Settlement Trust shall have all defenses, cross-claims, offsets and recoupments, as well as rights of indemnification, contribution, subrogation and similar rights regarding all Sovereign State Claims that the Debtor has or would have had under applicable law.

The purpose of the GUC Liquidating Trust shall be to administer, process and satisfy General Unsecured Claims, which for the avoidance of doubt shall be submitted exclusively to, and satisfied by, the GUC Liquidating Trust in accordance with the Plan.  In accordance with the Plan Documents and Settlement Trust Documents, the GUC Liquidating Trust shall have the exclusive power and authority to administer, process and satisfy General Unsecured Claims and make Distributions on account of General Unsecured Claims.  In furtherance of the foregoing and unless otherwise expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, the GUC Liquidating Trust shall have all defenses, cross-claims, offsets and recoupments, as well as rights of indemnification, contribution, subrogation and similar rights regarding all General Unsecured Claims that the Debtor has or would have had under applicable law.  The GUC Liquidating Trust shall be entitled to payment from the Primary AFFF Trust in accordance with the Settlement Trust Documents and the Trust Allocation.

On the Effective Date, the Settlement Trust Documents, including the TDPs, shall become effective.

5.5.3.    <u>Funding of the Settlement Trusts</u>.  On the Effective Date, the Primary AFFF Settlement Trust shall be funded with the Settlement Trust Assets.  From and after the Effective Date, the Primary AFFF Settlement Trust shall make one or more payments to the GUC Liquidating Trust and the Sovereign State AFFF Trust, as applicable, pursuant to the Settlement Trust Documents and in accordance with the Trust Allocation.

5.5.4.    <u>Allocation of Distributable Value From Settlement Trust Assets</u>.  The Primary AFFF Settlement Trust shall allocate or reserve distributable value from the Settlement Trust Assets as follows (the "<u>Trust Allocation</u>"): (i) reserve [•]% at the Primary AFFF Settlement Trust (the "<u>Primary AFFF Settlement Trust Allocation</u>"); (ii) allocate [•]% to the Sovereign State AFFF Settlement Trust (the "<u>Sovereign State AFFF Settlement Trust Allocation</u>"); and (iii) allocate [•]% to the GUC Liquidating Trust (the "<u>GUC Liquidating Trust Allocation</u>"); *provided* that, any residual value in the GUC Liquidating Trust Allocation after satisfaction of all General Unsecured Claims in accordance with the Plan and Settlement Trust Documents shall be ratably re-allocated to the Primary AFFF Settlement Trust Allocation and Sovereign State AFFF Settlement Trust Allocation.

5.5.5.    <u>Appointment of Trustees</u>.  The Primary AFFF Settlement Trust shall be governed by the Primary AFFF Settlement Trustee.  The powers and duties of the Primary AFFF Settlement Trustee shall include, but shall not be limited to, those powers, duties and

responsibilities vested in the Primary AFFF Settlement Trustee pursuant to the terms of the Primary AFFF Settlement Trust Agreement, and shall include the authority to: (a) dispose of Settlement Trust Assets; (b) make Distributions or payments, as applicable, to the Sovereign State AFFF Settlement Trust and the GUC Liquidating Trust in accordance with and pursuant to the Settlement Trust Documents and in accordance with the Trust Allocation; (c) carry out the provisions of the Plan relating to the Primary AFFF Settlement Trust, including commencing, prosecuting, and settling all Settlement Trust Retained Causes of Action and Insurance Actions; and (d) perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the Primary AFFF Settlement Trust. The preceding list of powers, duties, and responsibilities of the Primary AFFF Settlement Trustee is non-exclusive and the powers, rights and responsibilities of the Primary AFFF Settlement Trustee shall be further specified in the Primary AFFF Settlement Trust Agreement.

The Sovereign State AFFF Settlement Trust shall be governed by one or more trustees as may be appointed from time to time in accordance with the Settlement Trust Documents (the "Sovereign State AFFF Settlement Trustee"). The GUC Liquidating Trust shall be governed by one trustee as may be appointed from time to time in accordance with the Settlement Trust Documents (the "GUC Liquidating Trustee"). The Sovereign State AFFF Settlement Trustee and the GUC Liquidating Trustee shall have the powers and duties conferred to them pursuant to the Settlement Trust Documents.

5.5.6. Trust Advisory Committee. On the Effective Date and pursuant to the Settlement Trust Documents, the Trust Advisory Committee shall be established. The Trust Advisory Committee shall have the authority to oversee, review and guide the activities and performance of the Primary AFFF Settlement Trustee, in accordance with the Settlement Trust Documents. The members of the Trust Advisory Committee shall not be entitled to compensation for their services but will be entitled to reimbursement from the Primary AFFF Settlement Trust for reasonable and documented out-of-pocket expenses.

5.5.7. TDPs. On the Effective Date, the Settlement Trusts shall implement the TDPs in accordance with the terms of the Settlement Trust Documents. On or after the Effective Date, the Primary AFFF Settlement Trustee and Sovereign State AFFF Settlement Trustee shall have the authority to administer, amend, supplement, or modify the applicable TDPs in a manner consistent with the Plan and in accordance with the terms thereof and the Settlement Trust Documents. The TDPs shall be binding on all Holders of Channeled AFFF Claims. Allowed Claims under the TDPs shall be solely enforceable against the applicable Settlement Trust. The Allowed amount of any Channeled AFFF Claim shall be the amount determined under the TDPs, unless such Channeled AFFF Claim is otherwise Allowed pursuant to Article 2.1.19. Allowed Channeled AFFF Claims under the TDPs shall be legally enforceable against the Primary AFFF Settlement Trust. The amount of any installment payments, initial payments, or payments based on payment percentages established under the TDPs, as determined or as actually paid by the Primary AFFF Settlement Trust or Sovereign State AFFF Settlement Trust, as applicable, are not, as such, the equivalent of any Claimant's Allowed amount of its Channeled AFFF Claim. For the avoidance of doubt, nothing herein determines whether any Insurance Company is obligated to pay the amount of any Allowed Channeled AFFF Claim as determined under the TDPs.

The Allowance of Claims under the TDPs shall not determine, and shall not be used to determine, in any respect the liability of a Released Party for any Independent AFFF Cause of Action, which liability shall be determined through litigation and/or settlement in the tort system separate and apart from the TDPs in all respects.

5.5.8.   Privileged Information.  On the Effective Date, any attorney-client privilege, work-product privilege, common-interest communications with Insurance Companies, protection or privilege granted by joint defense, common interest, and/or other privilege or immunity of the Debtor relating, in whole or in part, to the Settlement Trust Retained Causes of Action or Insurance Actions shall be irrevocably transferred to and vested in the Primary AFFF Settlement Trust subject to the other terms of this Article 5.5.8.  Any such protections, privileges or immunities that are joint with Carrier shall vest with Carrier on the Effective Date.  All other such protections, privileges or immunities shall vest in the Liquidating Estate.  The transfers or assignment of any privileges or privileged information to the Primary AFFF Settlement Trust in accordance with the foregoing shall vest solely in the Primary AFFF Settlement Trust and not with any other Person, including the Trust Advisory Committee, any committee or subcomponent of the Primary AFFF Settlement Trust or counsel or other professionals who have been engaged by, represent, or have represented any Holder of a Claim that is channeled to the Primary AFFF Settlement Trust.  For the avoidance of doubt, the AFFF Data Transfer shall not waive or be deemed to waive any applicable privilege, doctrine or other protection.  The Primary AFFF Settlement Trust shall  have no authority to waive any applicable privilege, doctrine or other protection on behalf of another Person, nor shall any waiver of any applicable privilege, doctrine or other protection by the conduct of the Primary AFFF Settlement Trust be construed to apply to another Person.  All factual information, documents, opinions, strategies, theories, analyses, research, work product or other materials exchanged or communicated to the Debtor prior to the Effective Date by whatever means in connection with the furtherance of common interest in investigations, potential or pending litigation, or coordination with respect to court proceedings shall remain strictly confidential, privileged and subject to any and all common interest protections and shall not be disclosed to any party or entity without the prior written consent of the party that originally held or still holds the privilege or protection.

Notwithstanding the foregoing, nothing in this Article 5.5.8 or the Plan shall require Carrier or permit the Debtor to provide any materials or information subject to any privilege or immunity owned by Carrier in whole or in part, including any materials or information subject to any privilege or immunity jointly owned with the Debtor, to the Primary AFFF Settlement Trust, and the AFFF Data Transfer shall not encompass any such materials or information, absent Carrier's consent or a court order determining that it is necessary for the Primary AFFF Settlement Trust to obtain the benefit of the Insurance Assignment[; *provided* that nothing herein shall divest the Committee of any protections or rights resulting from any common-interest privilege applicable to materials developed jointly by, or communications between, the Committee, on the one hand, and Carrier or the Debtor, on the other, from and after October 18, 2024 (or such other date that any such common-interest privilege became or becomes applicable with respect to a particular subject matter), and any such protection or rights of the Committee (but not those of the Debtor or Carrier) shall be vested in the Primary AFFF Settlement Trust as of the Effective Date].  For the avoidance of doubt, all of the foregoing is subject to paragraph (c) of the "Insurance Cooperation Provision" of Exhibit A-1 of the Plan Support Agreement.

-40-

5.5.9.    <u>Institution and Maintenance of Legal and Other Proceedings</u>.  As of the Effective Date, the Primary AFFF Settlement Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Primary AFFF Settlement Trust, including Insurance Actions and the Settlement Trust Retained Causes of Action.  Without limiting the foregoing, on and after the Effective Date, the Primary AFFF Settlement Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all such actions, in the name of the Debtor to the extent deemed necessary or appropriate by the Primary AFFF Settlement Trust.  Furthermore, without limiting the foregoing, the Primary AFFF Settlement Trust shall be empowered to maintain, administer, preserve, or pursue Insurance Actions and Insurance Action Recoveries.

5.5.10.  <u>Primary AFFF Settlement Trust Discovery</u>.  The Primary AFFF Settlement Trust is authorized pursuant to Bankruptcy Rule 2004 and/or other applicable discovery rules to seek discovery necessary to satisfy its obligations under the Plan and the Settlement Trust Documents.  The authorization of any discovery request pursuant to this provision shall not be construed to deprive the target of such discovery request of any applicable privilege or immunity from discovery.  The Primary AFFF Settlement Trust shall be able to take whatever steps are necessary to enforce such discovery obligations pursuant to Bankruptcy Rule 2004, Federal Rule of Civil Procedure 45, other court resolution processes, under bankruptcy law, and applicable non-bankruptcy law.  Nothing herein shall abridge or affect the rights of the Primary AFFF Settlement Trust or the Primary AFFF Settlement Trustees to discovery in any proceeding or litigation brought by the Primary AFFF Settlement Trust or the Primary AFFF Settlement Trustee.

5.5.11.  <u>Insurance Matters</u>.

(a)    <u>Insurance Cooperation Agreement</u>.  On the Effective Date, the Primary AFFF Settlement Trust shall enter into the Insurance Cooperation Agreement, pursuant to the terms of the Plan Support Agreement.  The Insurance Cooperation Agreement and the Estate Claims Settlement Agreement shall be executed in reliance upon entry into both agreements, and that the rights and obligations under one agreement serve as consideration for the rights and obligations under the agreement.

(b)    <u>Insurance Assignment</u>.  On the Effective Date, the Debtor shall transfer to the Primary AFFF Settlement Trust all of its rights in connection with (a) the Insurance Actions, (b) the Insurance Action Recoveries, (c) any Insurance Settlement Agreement, and (d) all other rights, claims, benefits, or Causes of Action it has with respect to the Insurance Policies (but not the policies themselves).  On the Effective Date, subject to the terms of, the Insurance Cooperation Agreement, Carrier shall assign to the Primary AFFF Settlement Trust its rights in connection with (a) the Insurance Actions, (b) the Insurance Action Recoveries, (c) any Insurance Settlement Agreement, and (d) all other rights, claims, benefits, or

-41-

Causes of Action it has with respect to the Insurance Policies (but not the policies themselves). On the Effective Date, the Primary AFFF Settlement Trust and Carrier shall have the rights and obligations with respect to the Insurance Actions, Insurance Policies, and Insurance Policy Rights as set forth in the Insurance Cooperation Agreement. The Insurance Assignment shall include and be subject to the representations and limitations attested to by RTX (the "RTX Waiver"), and be subject to the terms of the 2020 Separation Agreement.

5.5.12. <u>Other Insurance Company Claim Reduction</u>. If an Other Insurance Company obtains a final and non-appealable judicial determination or binding arbitration award in any Insurance Action, that it would have been entitled to recover a sum certain on its right, claim or cause of action against a Settling Insurance Company for contribution, subrogation, equitable subrogation, indemnification, allocation, reimbursement or offset relating to one or more Channeled AFFF Claims, or agrees to such entitlement to such sum certain, then the liability for such determination, award, or agreement shall be satisfied solely by the Primary AFFF Settlement Trust reducing or limiting any claim, cause of action or judgment it has against the Other Insurance Company for recovery on any Channeled AFFF Claim that gave rise to such right, claim or cause of action for contribution, subrogation, equitable subrogation, indemnification, allocation, reimbursement or offset. The Primary AFFF Settlement Trust shall not seek to enforce any judicial determination or binding arbitration award it has obtained against an Insurance Company that is seeking such reduction until the Primary AFFF Settlement Trust's judgement or award becomes final and non-appealable. Post-judgment interest shall not accrue with respect to the portion of any such claim that is so reduced by a final order as a result of a claim for contribution, subrogation, equitable subrogation, indemnification, allocation, reimbursement or offset relating to one or more Channeled AFFF Claims.

5.5.13. <u>Single Satisfaction</u>. Holders of AFFF Claims may not recover more than the full amount of their AFFF Claims from the Released Parties and the Primary AFFF Settlement Trust or Sovereign State AFFF Settlement Trust. If a Holder of an AFFF Claim were to recover from the Released Parties and recover from the Primary AFFF Settlement Trust or Sovereign State AFFF Settlement Trust such that the Holder is in a position where they have recovered more than the full amount of their AFFF Claim, then such Holder shall be required to return to the Primary AFFF Settlement Trust or Sovereign State AFFF Settlement Trust, as applicable, the portion of any recovery that causes such Holder's total recovery on account of such AFFF Claim to exceed the full amount of such AFFF Claim. All defenses to liability are reserved by the Released Parties.

5.5.14. <u>Claim-Over Protections</u>. Subject to the terms of the Plan and consistent with applicable law, (a) the contributions made by the Contributing Parties to the Primary AFFF Settlement Trust shall be the sole payments the Released Parties shall make to address the Released Claims; (b) a Claim by the Holder of a Claim against a Party other than a Contributing Party arising out of a Released Claim shall not result in any additional payment by any Released Party; and (c) the Estate Claims Settlement meets the requirements of the Uniform Contribution Among Tortfeasors Act and any similar state or federal law or doctrine that reduces or discharges a Released Party's liability to any other parties. To the extent that on or after the

-42-

Effective Date, the Primary AFFF Settlement Trust settles any Cause of Action it has against any non-Released Party arising out of, relating to, or involving the Released Claims and provides a release to such non-Released Party, the Primary AFFF Settlement Trust shall include in that settlement a release from such non-Released Party in favor of the Released Parties substantially consistent with the releases provided by the Releasing Parties herein, including for National Foam AFFF Claims, subject to Article 5.5.13.  Nothing herein prevents the Primary AFFF Settlement Trust or any Holder of a Claim from pursing litigation against a non-Released Party and collecting the full amount of any judgment.  These protections shall not apply to Causes of Action brought by any Sovereign State.

      5.5.15.  <u>Common Benefit Fund Assessments</u>.  On the Effective Date, a Common Benefit Escrow shall be established by the Primary AFFF Settlement Trust and funded by a common benefit assessment for attorneys' fees of 8% and reasonable costs, subject to and in accordance with the AFFF MDL orders applicable to common benefit fees and costs, to be made by a reduction to each Distribution made by the Primary AFFF Settlement Trust to Holders of Claims directly administered by the Primary AFFF Settlement Trust.  To the extent the Holder of an Allowed Claim directly administered by Primary AFFF Settlement Trust has retained counsel through a contingency fee arrangement, any contingency fees owed to such contingency counsel payable from the Distributions from the Primary AFFF Settlement Trust shall be reduced by the full amount payable under this Article 5.5.15.  The amounts in the Common Benefit Escrow shall be held in escrow and distributed solely pursuant to an order of the MDL District Court approving common benefit fees and assessments in the AFFF MDL.  For the avoidance of doubt, the Common Benefit Escrow shall not be funded from Distributions, payments or other transfers from the Primary AFFF Settlement Trust to the Sovereign State AFFF Settlement Trust or the GUC Liquidating Trust.  This Article 5.5.15 is severable from the Plan if not approved by the Bankruptcy Court at the Confirmation Hearing and approval of this Article 5.5.15 by the Bankruptcy Court shall not be a requirement or condition to Confirmation of the Plan.

    5.6.    <u>Liquidating Estate</u>

      5.6.1.  <u>Purpose of the Liquidating Estate</u>.  The purpose of the Liquidating Estate is to establish and distribute the Wind-Down Reserve to administer the wind-down and dissolution of the Liquidating Estate, with no objective to continue or engage in the conduct of a trade or business.  From and after the Effective Date, the Liquidating Administrators shall be vested with all powers and authorities set forth in this Plan and the Liquidating Administrator Agreement, shall be deemed to have been appointed as the Estate's representatives pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, and shall have the duties of a trustee set forth in sections 704(a)(1), 704(a)(2) and 704(a)5) of the Bankruptcy Code.

      5.6.2.  <u>Funding of Wind-Down Reserve</u>.  The Wind-Down Reserve shall be funded in accordance with the Wind-Down Budget from the following sources: (a) all Remaining Estate Funds; (b) if the Remaining Estate Funds are exhausted, the Net Sale Proceeds in an amount necessary to fund the Wind-Down Budget, *provided* that, to the extent the Debtor or the Liquidating Estate withdraws any amounts from the Net Sale Proceeds pursuant to the foregoing, Carrier shall receive a dollar-for-dollar credit against the next due installment of the Guaranteed Cash Payment as and to the extent provided in the Estate Claims Settlement Agreement; *provided*, further, that if the Effective Date and Estate Claims Settlement Effective

Date do not occur, any amounts withdrawn by the Debtor from the Net Sale Proceeds shall be deducted from the Debtor's allocated portion of the Net Sale Proceeds (as to be determined by the Bankruptcy Court or pursuant to an agreement with Carrier subject to Bankruptcy Court approval); and (c) if the Remaining Estate Funds and Net Sale Proceeds are exhausted, a portion of the Guaranteed Cash Payment released on the Effective Date, and after the Effective Date, the remaining Settlement Trust Assets.

The Wind-Down Reserve shall be maintained independent of, and shall not provide funding for, the Settlement Trusts. Any funds remaining in the Wind-Down Reserve after payment of wind-down costs and expenses shall be transferred to Carrier upon completion of the wind-down of the Liquidating Estate, pursuant to the Estate Claims Settlement Agreement.

5.6.3.    Liquidating Administrators.

(a)    Liquidating Administrator Agreement. The Liquidating Administrators shall be fiduciaries of the Liquidating Estate and shall be compensated and reimbursed for expenses as set forth in, and in accordance with, the Liquidating Administrator Agreement.

(b)    Powers and Duties of Liquidating Administrators. The Liquidating Administrators shall have no duties until the occurrence of the Effective Date, and on and after the Effective Date shall be fiduciaries for the Liquidating Estate. If this Plan is withdrawn or otherwise abandoned prior to the occurrence of the Effective Date, the Liquidating Administrator positions shall never be established. From and after the Effective Date, pursuant to the Wind-Down Budget and the terms and provisions of the Plan and Liquidating Administrator Agreement, the Liquidating Administrators shall be empowered and directed to: (a) take all steps and execute all instruments and documents necessary to make Distributions to Holders of Allowed Liquidating Estate Claims and to perform the duties assigned to the Liquidating Administrators under the Plan or the Liquidating Administrator Agreement; (b) comply with this Plan and the obligations hereunder; (c) employ, retain or replace professionals to represent them with respect to their responsibilities without the need for further Bankruptcy Court approval; (d) object to Liquidating Estate Claims as provided in this Plan, and prosecute such objections; (e) compromise and settle any issue or dispute regarding the amount, validity, priority, treatment or allowance of any Liquidating Estate Claim; (f) establish, replenish or release any reserves as provided in the Plan, as applicable; (g) exercise such other powers as may be vested in the Liquidating Administrators pursuant to this Plan, the Liquidating Administrator Agreement or any other order of the Bankruptcy Court, including the Confirmation Order, or otherwise act on behalf of the Liquidating Estate from and after the Effective Date; (h) file applicable tax returns for the Debtor; (i) liquidate, receive, hold,

invest, supervise and protect the Wind-Down Reserve; (j) promptly after completing the wind-down, take any actions necessary to voluntarily dissolve the Debtor or allow the applicable Secretary of State to involuntarily dissolve the Debtor; and (k) following the wind-down and dissolution of the Debtor, entry of a final decree in the Chapter 11 Case.

5.7. <u>Vesting of Assets</u>

5.7.1. <u>Liquidating Estate Assets</u>. As of the Effective Date, all Remaining Estate Funds and all Liquidating Estate Retained Causes of Action shall vest in the Liquidating Estate free and clear of all Liens, Claims, charges or other encumbrances or interests to the extent permitted by section 1141 of the Bankruptcy Code.

5.7.2. <u>Settlement Trust Assets</u>. As of the Effective Date, the Settlement Trust Assets, including without limitation, the Settlement Trust Retained Causes of Action, and the Debtor's rights, title and interests to such Settlement Trust Assets, including without limitation the Settlement Trust Retained Causes of Action, shall vest in the Primary AFFF Settlement Trust free and clear of all Liens, Claims, charges or other encumbrances or interests to the extent permitted by section 1141 of the Bankruptcy Code. Notwithstanding anything herein to the contrary, the transfer of the Settlement Trust Assets to the Primary AFFF Settlement Trust shall not diminish, and fully preserves, any defenses the Debtor or Liquidating Estate would have if such Settlement Trust Assets had been retained by the Debtor or Liquidating Estate. The Primary AFFF Settlement Trust and the Primary AFFF Settlement Trustee, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce the Settlement Trust Retained Causes of Action vested, transferred, or assigned to such entity. The Primary AFFF Settlement Trust or the Primary AFFF Settlement Trustee, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Settlement Trust Retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, subject to the provisions of this Plan and the Insurance Cooperation Agreement, the Settlement Trust Assets held for Distribution pursuant to the Plan will be held by the applicable Settlement Trustee solely in trust for (i) with respect to the Primary AFFF Settlement Trust, Holders of Allowed Channeled AFFF Claims and the Sovereign State AFFF Settlement Trust, (ii) with respect to the Sovereign State AFFF Settlement Trust, Holders of Allowed Sovereign State Claims and (iii) with respect to the GUC Liquidating Trust, Holders of Allowed General Unsecured Claims, in each case in accordance with this Plan, and will not be deemed property of the Debtor or the Liquidating Estate. For the avoidance of doubt, this Article 5.7.2 shall be subject in its entirety to the Insurance Cooperation Agreement.

5.8. <u>Insurance Provisions.</u>

Nothing in the Plan shall limit the right of any Insurance Company to assert any defenses to coverage that it may have under applicable law, except for (a) any defense that the Insurance Assignment is invalid or unenforceable or otherwise breaches the terms of such coverage; and/or (b) any defense that (i) the drafting, proposing, confirmation, or consummation

-45-

of the Plan or (ii) the discharge or release of the Debtor from liability for any Claims pursuant to the Plan operates to, or otherwise results in, the elimination of or the reduction of any obligation any Insurance Company may have with respect to the Insurance Policies, including in providing coverage pursuant to the Insurance Assignment for liabilities assumed by the Primary AFFF Settlement Trust.  Except for the transfer of rights to the Primary AFFF Settlement Trust pursuant to the Insurance Assignment (which, with respect to Carrier's rights, shall be subject to Article 5.5.11 herein), or as otherwise provided by the Bankruptcy Code, applicable law, the findings made by the Bankruptcy Court in the Confirmation Order or otherwise, nothing in the Plan shall modify, amend, or supplement the terms of any Insurance Policy issued by any Other Insurance Company, or the rights or obligations under any such Insurance Policy to the extent such rights and obligations are otherwise available under applicable law.  The rights and obligations, if any, of any Other Insurance Company relating to or arising out of the Insurance Policies and any of the Plan Documents shall be determined pursuant to the terms and provisions of the Insurance Policies and applicable law.  Nothing in this Article 5.8 is intended or shall be construed to preclude otherwise applicable principles of res judicata or collateral estoppel from being applied against any Person.

5.9.    D&O Policies

Nothing in this Plan or the Confirmation Order shall adversely affect the rights to coverage, if any, of any Insured Persons or Organizations under any D&O Policy with respect to alleged Wrongful Acts occurring prior to the Effective Date (as such terms are used in the D&O Policy).  None of the Liquidating Trustees or any officers or directors of the Liquidating Estate in their capacities as such shall have any rights under the D&O Policy or any other directors & officers insurance policy under which Carrier has any rights or obligations in whole or in part.

5.10.    Cancellation of Existing Agreements, Notes and Interests

On the Effective Date, except as otherwise specifically provided for in the Plan or any agreement, instrument, or other document incorporated in the Plan, the obligations of the Debtor under any Certificate, Interest, share, note, purchase right, option, warrant, intercreditor agreement, guaranty, indemnity, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtor or giving rise to any Claim or Interest shall be canceled solely as to the Debtor, and the Debtor shall not have any continuing obligation thereunder and shall be released therefrom.

5.11.    Section 1146 Exemption from Certain Transfer Taxes and Recording Fees

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any transfers from the Debtor to the Liquidating Estate or to any other Person, pursuant to, in contemplation of, or in connection with the Plan (including any transfer pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor; or (b) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan) shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real

-46-

estate transfer tax, sales and use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local government officials or agents shall, and shall be directed to, forgo the collection of any such tax, recordation fee or government assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or government assessment.

### 5.12. Preservation of Causes of Action

Other than Causes of Action against a Person that are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to the Estate Claims Settlement, or by a Bankruptcy Court order entered prior to the Effective Date, the Debtor reserves any and all Causes of Action. On the Effective Date, (i) the Settlement Trust Retained Causes of Action shall vest in the Primary AFFF Settlement Trust and (ii) the Liquidating Estate Retained Causes of Action shall vest in the Liquidating Estate, in each case free and clear of all Claims, Liens, encumbrances and other interests. The Settlement Trust Retained Causes of Action shall become Settlement Trust Assets and the Liquidating Estate Retained Causes of Action shall become Liquidating Estate Assets. On and after the Effective Date, the Primary AFFF Settlement Trustee shall have sole and exclusive discretion to pursue and dispose of the Settlement Trust Retained Causes of Action and the Liquidating Administrators shall have sole and exclusive discretion to pursue the Liquidating Estate Retained Causes of Action. No Person may rely on the absence of a specific reference in the Plan or Disclosure Statement as to any Cause of Action as any indication that the Debtor, and on and after the Effective Date, the Primary AFFF Settlement Trustee or Liquidating Administrators, as applicable, will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation. Prior to the Effective Date, the Debtor (and on and after the Effective Date, the Primary AFFF Settlement Trustee and Liquidating Administrators, as applicable) shall retain and shall have, through their authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

### 5.13. Effectuating Documents and Further Transactions

On and after the Effective Date, the Debtor or the Liquidating Administrators, as applicable, are authorized to and may take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors or members of the Debtor shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant to applicable law, and without any

-47-

requirement of further action by the shareholders, directors, managers or partners of the Debtor, or the need for any approvals, authorizations, actions or consents.

5.14.  <u>Directors, Officers, Managers, Members and Authorized Persons of the Debtor</u>

On the Effective Date, each of the Debtor's directors and officers shall be discharged from their duties and terminated automatically without the need for any corporate action or approval and without the need for any corporate filings, and, unless subject to a separate agreement with the Administrators, shall have no continuing obligations in their capacities as directors and officers to the Debtor following the occurrence of the Effective Date.

## 6.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 6.1.    Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided herein, and subject to the occurrence of the Effective Date, all Executory Contracts and Unexpired Leases will be rejected by the Plan on the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code, other than (a) Executory Contracts or Unexpired Leases previously assumed or rejected pursuant to an order of the Bankruptcy Court or (b) Executory Contracts or Unexpired Leases that are the subject of a pending motion to assume, or for which a notice of assumption has been filed pursuant to the assumption and assignment procedures approved by the Bankruptcy Court in connection with the Sale.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejection of such Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code.  For the avoidance of doubt, none of the Insurance Policies are Executory Contracts.

### 6.2.    Claims Against the Debtor Upon Rejection

No Executory Contract or Unexpired Lease rejected on or prior to the Effective Date shall create any obligation or liability of the Debtor or the GUC Liquidating Trust that is not a Claim.  Any Proof of Claim arising from or relating to the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan must be filed with the Notice and Claims Agent before the Rejection Bar Date.  Any Claim arising from or relating to the rejection of an Executory Contract or Unexpired Lease that is not filed with the Notice and Claims Agent by the Rejection Bar Date will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtor, the Liquidating Estate, the GUC Liquidating Trust or any of their property.  Any Allowed Claim arising from the rejection of an Executory Contract or Unexpired Lease shall be classified as a General Unsecured Claim and shall be treated in accordance with Article 4.2.9 herein.

### 6.3.    Modification, Amendments, Supplements, Restatements or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is rejected shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or are rejected or repudiated under the Plan.

Modifications, amendments, supplements and restatements to Prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the Prepetition nature of such Executory Contracts or Unexpired Leases or the validity, priority or amount of any Claims that may arise in connection therewith.

-49-

6.4.    <u>Reservation of Rights</u>

Nothing contained in the Plan shall constitute an admission by the Debtor that any contract or lease is in fact an Executory Contract or Unexpired Lease, or that the Debtor has any liability thereunder.

4860-3249-7648 v.12

# 7. PROVISIONS GOVERNING DISTRIBUTIONS

7.1. Provisions Governing Distributions On Account of Liquidating Estate Claims and General Unsecured Claims.

7.1.1. Distribution Record Date. On the Distribution Record Date, the Claims Register shall be closed and the Distribution Agent, Liquidating Administrators and GUC Liquidating Trustee, as applicable, shall be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distribution Record Date. If a Claim is transferred 20 or fewer days before the Distributions Record Date, the Distribution Agent or GUC Liquidating Trustee, as applicable, shall make distributions to the transferee only to the extent practical, and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

7.1.2. Distribution on Account of Liquidating Estate Claims and General Unsecured Claims Allowed as of the Effective Date. Except as otherwise provided in the Plan, a Final Order, or as agreed by the relevant parties, Distributions under the Plan on account of Liquidating Estate Claims and General Unsecured Claims Allowed on or before the Effective Date shall be made on the Initial Distribution Date. After the Initial Distribution Date, (i) the Liquidating Administrators shall, from time to time, determine the subsequent Distribution Dates for purposes of making additional Distributions under the Plan on account of Liquidating Estate Claims and (ii) the GUC Liquidating Trustee shall, from time to time, determine the subsequent Distribution Dates for purposes of making additional Distributions under the Plan on account of General Unsecured Claims.

7.1.3. Distributions on Account of Liquidating Estate Claims and General Unsecured Claims Allowed After the Effective Date. Except as otherwise provided herein, a Final Order, or as agreed to by the relevant parties, Distributions on account of Disputed Liquidating Estate Claims or Disputed General Unsecured Claims that become Allowed after the Effective Date shall be made on the next applicable Distribution Date that is at least 30 days after such Disputed Claim becomes an Allowed Claim. Notwithstanding any provision otherwise herein and except as otherwise agreed to by the relevant parties, no partial payments and no partial Distributions shall be made with respect to a Disputed Liquidating Estate Claim or Disputed General Unsecured Claim until all such disputes in connection with such Disputed Claim have been resolved and such Claim has become Allowed.

7.1.4. Delivery of Distributions. The Distribution Agent, at the direction of the Liquidating Administrators, shall make all Distributions, allocations, and/or issuances required under the Plan on account of Liquidating Estate Claims. The GUC Liquidating Trustee shall make all Distributions, allocations, and/or issuances required under the Plan on account of General Unsecured Claims. In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Distribution Agent or GUC Liquidating Trustee, as applicable, has determined the then current address of such Holder, at which time such Distribution shall be made to such Holder without interest; *provided, however*, such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the date such Distribution was

made. After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Liquidating Estate or GUC Liquidating Trust, as applicable, automatically and without need for a further order by the Bankruptcy Court for Distribution in accordance with the Plan and the Claim of any such Holder to such property or interest in property shall be released, settled, compromised, and forever barred. The Debtor, the Liquidating Administrators, the GUC Liquidating Trustee and the Distribution Agent shall not incur any liability whatsoever on account of the delivery of any Distributions under the Plan.

7.1.5.    Manner of Payment Under Plan. At the option of the Liquidating Administrators, the Distribution Agent or the GUC Liquidating Trustee, as applicable, any Cash payment to be made hereunder on account of Liquidating Estate Claims or General Unsecured Claims, as applicable, may be made by a check or wire transfer from the Distribution Agent or the GUC Liquidating Trustee, as applicable. Any wire transfer fees incurred in connection with the transmission of a wire transfer shall be deducted from the amount of the recipient Holder's Allowed Claim. The wire transfer fee will be deducted from the amount of the Distribution a Holder of an Allowed Claim would otherwise receive. The Liquidating Administrators, the Distribution Agent and GUC Liquidating Trustee, as applicable, will, to the extent practicable, make aggregate Distributions on account of all the Allowed Claims held by a particular Holder.

7.1.6.    Minimum Cash Distributions. No intermediate Distribution shall be required to be made to any Holder of an Allowed Liquidating Estate Claim or Allowed General Unsecured Claim on any applicable Distribution Date of Cash less than $100; *provided, however,* that if any Distribution is not made pursuant to this Article 7.1.6, such Distribution shall be added to any subsequent Distribution to be made on behalf of such Allowed Claim. Other than on account of Unimpaired Claims, the Liquidating Administrators, the Distribution Agent and the GUC Liquidating Trustee shall not be required to make any final Distributions of Cash less than $50 to any Holder of an Allowed Liquidating Estate Claim or Allowed General Unsecured Claim.

7.1.7.    Setoffs. The Liquidating Administrators may, but shall not be required to, set off against any Liquidating Estate Claim any Claims of any nature whatsoever that the Debtor or the Liquidating Estate may have against the Holder of such Claim and the GUC Liquidating Trustee may, but shall not be required to, set off against any General Unsecured Claim any Claims of any nature whatsoever that the Debtor or the GUC Liquidating Trust have against the Holder of such Claim; *provided* that neither the failure to do so nor the allowance of any such Claim hereunder shall constitute a waiver or release by the Debtor, the Liquidating Estate or the GUC Liquidating Trust of any such Claim the Debtor, the Liquidating Estate or the GUC Liquidating Trust may have against the Holder of such Claim.

7.1.8.    Distributions After Effective Date. Distributions made after the Effective Date to Holders of Disputed Liquidating Estate Claims or Disputed General Unsecured Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

7.1.9.    Compliance Matters and Allocation of Distributions Between Principal and Interest. The Debtor, the Liquidating Estate, and the GUC Liquidating Trust shall comply

with all withholding, deduction and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Distributions made by the Debtor, the Liquidating Estate and the GUC Liquidating Trust, as applicable, shall be subject to any applicable withholding, deduction and reporting requirements.  The Debtor, the Liquidating Administrators and the GUC Liquidating Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with any such withholding, deduction, and reporting requirements.  All amounts properly withheld or deducted from the Distributions to a Holder of an Allowed Claim as required by applicable law and paid over to the applicable taxing authority for the account of such Holder shall be treated as paid to such Holder.  All such Holders shall be required to provide any information necessary to effect the withholding and reporting of such taxes.  The Debtor, the Liquidating Administrators and the GUC Liquidating Trustee may require any Holder who receives a Distribution to furnish to the Debtor, the Liquidating Administrators or the GUC Liquidating Trustee, as applicable, or its designee, its social security number or employer or taxpayer identification number as assigned by the IRS and complete any related documentation, including but not limited to a Form W-8BEN, Form W-8BENE-E, or Form W-9 (the "Tax Documents").  The Debtor, Liquidating Administrators or GUC Liquidating Trustee may condition any and all Distributions to any Holder of an Allowed Claim upon the timely receipt of properly executed Tax Documents and receipt of such other documents as the Debtor, Liquidating Administrators or GUC Liquidating Trustee, as applicable, reasonably request in accordance with the Plan.  The GUC Liquidating Trustee may request an expedited determination of taxes of the GUC Liquidating Trust under section 505 of the Bankruptcy Code for all returns filed for, or on behalf of, the GUC Liquidating Trust for all taxable periods through the termination of the GUC Liquidating Trust.

Except as otherwise provided in this Plan, to the extent that any Allowed Liquidating Estate Claim or Allowed General Unsecured Claims entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Liquidating Estate Claim or General Unsecured Claims, as applicable, first, and then to accrued but unpaid interest.

7.1.10.   No Postpetition Interest on Claims.  Except as otherwise provided in the Plan, the Confirmation Order, or another order of the Bankruptcy Court, or required by the Bankruptcy Code, postpetition interest shall not accrue or be paid on any Liquidating Estate Claims or General Unsecured Claims and no Holder of such Claim shall be entitled to interest accruing on or after the Petition Date.

7.1.11.   Undeliverable Distributions.  In the event that any Distribution to any Holder is returned as undeliverable, or no address for such Holder is found in the Debtor's records, no further Distribution to such Holder shall be made unless and until the Liquidating Administrators, the Distribution Agent or the GUC Liquidating Trustee, as applicable, is notified in writing of the then-current address of such Holder, at which time such Distribution shall be made to such Holder not less than 30 days thereafter.  Undeliverable Distributions shall remain in the possession of the Liquidating Administrators, GUC Liquidating Trustee or the Distribution Agent until such time as such Distribution becomes deliverable or such Distribution reverts to the Liquidating Estate or GUC Liquidating Trust, as applicable, or is canceled as provided for herein and shall not be supplemented with any interest, dividends or other accruals of any kind.

7.1.12.   <u>No Distribution in Excess of Amount of Allowed Claim</u>. Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Liquidating Estate Claim or Allowed General Unsecured Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim.

7.2.   <u>Distributions on Account of Channeled AFFF Claims.</u>

Notwithstanding anything to the contrary herein, all Distributions to Holders of Channeled AFFF Claims shall be made by and from the Primary AFFF Settlement Trust or Sovereign State AFFF Settlement Trust, as applicable, in accordance with the Settlement Trust Documents.

## 8.    CLAIMS ADMINISTRATION PROCEDURES

8.1.    Claims Administration Procedures With Respect to Liquidating Estate Claims and General Unsecured Claims.

8.1.1.    Objections to Liquidating Estate Claims and General Unsecured Claims. As of the Effective Date, objections to, and requests for estimation of (i) Liquidating Estate Claims may only be interposed and prosecuted by the Liquidating Administrators and (ii) General Unsecured Claims may only be interposed and prosecuted by the GUC Liquidating Trustee. Such objections and requests for estimation shall be served and filed on or before the Claims Objection Deadline. The Claims Objection Deadline may be extended by the Liquidating Administrators or GUC Liquidating Trustee by filing a motion to extend on or before the Claims Objection Deadline, and the filing of such motion shall automatically extend the Claims Objection Deadline until the Bankruptcy Court rules on such motion. The Liquidating Administrators and GUC Liquidating Trustee shall have standing to object to Liquidating Estate Claims and General Unsecured Claims, as applicable.

8.1.2.    Allowance of Liquidating Estate Claims and General Unsecured Claims. After the Effective Date, the Liquidating Estate and the GUC Liquidating Trust shall have and shall retain any and all rights and defenses that the Debtor had with respect to any Liquidating Estate Claim and General Unsecured Claim, respectively, against the Debtor except with respect to any such Claim expressly Allowed under this Plan. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Liquidating Estate Claim or General Unsecured Claim shall become an Allowed Claim unless and until such Claim is expressly Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim.

8.1.3.    Estimation of Liquidating Estate Claims and General Unsecured Claims. The Debtor, the Liquidating Administrators, or the GUC Liquidating Trustee, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Liquidating Estate Claim or General Unsecured Claim, as applicable, pursuant to section 502(c) of the Bankruptcy Code regardless of whether any party in interest previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any such Claim or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Liquidating Estate Claim or Disputed General Unsecured Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or the maximum limit of such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Liquidating Administrators or the GUC Liquidating Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Liquidating Estate Claims and General Unsecured Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court or under the Plan.

4860-3249-7648 v.12

8.1.4.    No Distributions Pending Allowance.  No payment or Distribution provided under the Plan shall be made on account of a Disputed Liquidating Estate Claim or a Disputed General Unsecured Claim unless and until such Disputed Claim becomes an Allowed Claim.

8.1.5.    Distributions After Allowance.  To the extent that a Disputed Liquidating Estate Claim or Disputed General Unsecured Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the applicable provisions of the Plan; *provided* that interest shall not accrue or be paid on any such Claim during the period from the Effective Date to the date a final distribution is made on account of such Claim.

8.1.6.    Resolution of Liquidating Estate Claims and General Unsecured Claims.

(a)    Except as otherwise provided herein (including the release provisions hereof) or in the Confirmation Order, or in any contract, instrument, release, or other agreement or document entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, on and after the Effective Date, the Liquidating Administrators may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, Disputed Liquidating Estate Claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Liquidating Estate may hold against any Person, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith.  From and after the Effective Date, the Liquidating Administrators may (i) file, withdraw or litigate to judgment objections to Liquidating Estate Claims, (ii) settle or compromise any Disputed Liquidating Estate Claim and (iii) administer and adjust, or cause to be administered and adjusted, the Claims Register to reflect any such settlements or compromises.

(b)    Except as otherwise provided herein (including the release provisions hereof) or in the Confirmation Order, or in any contract, instrument, release, or other agreement or document entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, on and after the Effective Date, the GUC Liquidating Trustees may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, Disputed General Unsecured Claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the GUC Liquidating Trust may hold against any Person, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith.  From and after the Effective Date, the GUC Liquidating Trustee may (i) file, withdraw or litigate to judgment objections to General Unsecured

-56-

Claims, (ii) settle or compromise any Disputed General Unsecured Claims and (iii) administer and adjust, or cause to be administered or adjusted, the Claims Register to reflect any such settlements or compromises.

    8.1.7.    Expungement and Disallowance of Liquidating Estate Claims and General Unsecured Claims.

        (a)    Paid, Satisfied, Amended, Duplicated or Superseded Claims.  Any Liquidating Estate Claim or General Unsecured Claim that has been paid, satisfied, amended, duplicated, superseded or otherwise dealt with or treated in the Plan, may be adjusted or expunged on the Claims Register at the direction of the Liquidating Administrators or GUC Liquidating Trustee, as applicable, on or after 14 calendar days after the date on which notice of such adjustment or expungement has been filed with the Bankruptcy Court, without an objection to such Claim having to be filed, and without any further action, order or approval of the Bankruptcy Court.

        (b)    Claims by Persons From Which Property Is Recoverable.  Unless otherwise agreed to by the Liquidating Administrators or GUC Liquidating Trustee, as applicable, or ordered by the Bankruptcy Court, any Liquidating Estate Claims or General Unsecured Claims held by any Person from which property is recoverable under section 542, 543, 550 or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and any Holder of such Claim may not receive any Distributions on account of such Claim until such time as such Cause of Action against that Person has been resolved.

    8.1.8.    Amendments to Liquidating Estate Claims and General Unsecured Claims;  Late Filed Liquidating Estate Claims and General Unsecured Claims.  Following the Effective Date, except as otherwise provided in this Plan, or the Confirmation Order,  no Proof of Claim on account of a Liquidating Estate Claim or General Unsecured Claim may be filed, amended, or supplemented without the approval of the Bankruptcy Court or without the prior written authorization of the Liquidating Administrators or GUC Liquidating Trustee, as applicable, and any such amended Proof of Claim filed without such prior authorization shall be deemed disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

8.1.9.    <u>Liquidating Estate Claims and General Unsecured Claims Paid or Payable by Third Parties</u>.

The Liquidating Administrators or GUC Liquidating Trustee shall reduce a Liquidating Estate Claim or General Unsecured Claim, as applicable, and such Claim (or portion thereof) shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not the Liquidating Administrators or GUC Liquidating Trustee, as applicable.  To the extent a Holder of a Claim receives a Distribution on account of such Claim and also receives payment from a party that is not the Liquidating Administrators or GUC Liquidating Trustee, as applicable, on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the Distribution to the Liquidating Estate or GUC Liquidating Trust, as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Allowed Claim as of the applicable Distribution Date.

No Distributions under this Plan shall be made on account of an Allowed Liquidating Estate Claim or Allowed General Unsecured Claim that is payable pursuant to one of the Debtor's insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtor's insurers agrees to satisfy in full or in part a Liquidating Estate Claim or General Unsecured Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such insurers' satisfaction, such Claim may be expunged to the extent of such satisfaction without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

8.2.    <u>Claims Administration Procedures With Respect to Channeled AFFF Claims.</u>

Notwithstanding anything to the contrary herein, administration of all Channeled AFFF Claims shall be subject to and in accordance with the Settlement Trust Documents.

4860-3249-7648 v.12

## 9.    CONDITIONS PRECEDENT TO EFFECTIVENESS OF THE PLAN

### 9.1.    Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of this Article 9.1:

(a)    The Bankruptcy Court or another court of competent jurisdiction shall have entered the Confirmation Order in form and substance consistent with the Plan Support Agreement, such order shall be a Final Order, and to the extent such order was not entered by the District Court, the District Court shall have affirmed the Confirmation Order;

(b)    the Bankruptcy Court shall have determined that the Estate Claims Settlement is a fair, equitable, and reasonable compromise, in the best interests of the Estate, the product of good faith, arms'-length negotiations, and satisfies all applicable requirements of the Bankruptcy Code and Bankruptcy Rules, including Bankruptcy Rule 9019;

(c)    the Bankruptcy Court shall have determined that the Estate Claims Settlement is a good faith settlement that bars any Cause of Action by a non-Released Party against any Released Party for contribution, indemnification or otherwise seeking to recover any amounts paid by or awarded against that non-Released Party and paid or awarded to any Holder of a Claim by way of settlement, judgment or otherwise on any Claim that would be a Released Claim were such non-Released Party a Released Party to the extent that a good faith settlement has such effect under applicable law;

(d)    the Bankruptcy Court shall have determined that the releases set forth in the Estate Claims Settlement Agreement and Plan are an integral component of the Estate Claims Settlement and that the Estate Claims Settlement is fair, equitable, reasonable, in the best interests of the Estate, and consistent with all applicable provisions of the Bankruptcy Code;

(e)    the New National Foam Release and all related releases (which shall include, but not be limited to, a release of Angus International Safety Group Limited's Claim filed in the Chapter 11 Case) shall have been approved by the Bankruptcy Court and the subject of a Final Order (which for the avoidance of doubt may be through the Confirmation Order);

(f)    the Plan Support Agreement shall remain in full force and effect and shall not have been terminated with respect to the Estate

Claims Settlement and the parties thereto shall be in compliance therewith;

(g)     all Definitive Documents contemplated by the Plan Support Agreement shall (i) be consistent with the Plan Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights set forth therein and (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties;

(h)     the Settlement Trusts shall be established and validly existing and the AFFF Data Transfer shall have been completed;

(i)     the Bankruptcy Court shall have determined that the proposed governance for the Settlement Trusts is appropriate, and that the TDPs are fair and reasonable based on the evidentiary record offered to the Bankruptcy Court and are proposed in good faith;

(j)     the Bankruptcy Court shall have authorized the Insurance Assignment by the Debtor to the Primary AFFF Settlement Trust as provided in the Plan, notwithstanding any terms or any policies or provisions of non-bankruptcy law that prohibit the delegation, assignment, or other transfer of such rights, and the Bankruptcy Court shall have determined that the Primary AFFF Settlement Trust is a proper defendant for all Holders of applicable Claims against the Debtor and/or Carrier that are settled pursuant to the Estate Claims Settlement Agreement to assert liability to trigger and pursue such insurance rights and that the Primary AFFF Settlement Trust is entitled to pursue insurance coverage for all other AFFF Claims asserted against Carrier or the Debtor as provided in and consistent with the Insurance Assignment (which, with respect to Carrier's rights, shall be subject to Article 5.5.11 herein) and the Insurance Cooperation Agreement;

(k)     the Bankruptcy Court shall have determined that the Plan is proposed in good faith and is sufficient to satisfy the requirements of section 1129(a)(3) of the Bankruptcy Code;

(l)     the Bankruptcy Court shall have determined that the injunctions set forth in the Plan, including the Channeling Injunction and Insurance Entity Injunction, are essential to the Plan and the Estate Claims Settlement, appropriately tailored to implement the applicable provisions of the Estate Claims Settlement and the Plan, and consistent with all applicable provisions of the Bankruptcy Code;

4860-3249-7648 v.12

(m)    the Bankruptcy Court shall have entered an order approving the Insurance Cooperation Agreement;

(n)    the Bankruptcy Court shall have determined that it may properly, and upon the Effective Date shall, retain jurisdiction over matters arising in, under, and related to the Chapter 11 Case, including the Plan and Plan Documents and shall retain non-exclusive jurisdiction over any Insurance Action including the Insurance Adversary Proceedings;

(o)    all actions, documents, certificates and agreements necessary to implement the Plan as mutually agreed by the Debtor and the Settling Parties shall have been effected or executed and delivered, as applicable;

(p)    the Bankruptcy Court shall have determined that the Plan, the Plan Documents, and the Confirmation Order are binding on all parties-in-interest to the extent provided therein;

(q)    the Debtor shall have established and funded the Professional Fee Escrow Account in accordance with Article 3.3.2 herein; and

(r)    all authorizations, consents, regulatory approvals, rulings or documents that are necessary to implement and effectuate the Plan as of the Effective Date shall have been received, waived or otherwise resolved.

9.1.2.    For the avoidance of doubt, neither acceptance, approval, nor effectiveness of any settlement of claims against Carrier in the AFFF MDL (nor any other condition to or relating to such settlements) shall be a condition to effectiveness of the Plan.

9.2.    <u>Waiver of Conditions</u>

Subject to the Settling Parties' consent rights pursuant to the Plan Support Agreement, the Debtor may waive conditions to the occurrence of the Effective Date set forth in this Article 9 at any time without further notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to consummate the Plan.

9.3.    <u>Simultaneous Transactions</u>

Except as otherwise expressly set forth in the Plan, the Confirmation Order or a written agreement by the Debtor, each action to be taken on the Effective Date shall be deemed to occur simultaneously as part of a single transaction.

9.4.    <u>Notice of Effective Date</u>

As soon as practicable after the Effective Date has occurred, the Liquidating Administrators shall file with the Bankruptcy Court a notice specifying the Effective Date.

## 10.    SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

10.1.    <u>Subordinated Claims</u>

The allowance, classification and treatment of all Allowed Claims and Interests and the respective Distributions and treatments under the Plan take into account, conform to and satisfy the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto; however, subject to the Settling Parties' consent rights set forth in the Plan Support Agreement, the Debtor reserves the right to reclassify or modify the treatment of any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto, unless otherwise provided in a settlement agreement concerning such Allowed Claim or Interest.

10.2.    **<u>Release of Liens</u>**

**Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estate shall be fully released and cancelled, and all of the rights, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Liquidating Estate and their successors and assigns.  Any Holder of such mortgage, deed of trust, Lien, pledge or other security interest (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of the Debtor (including and cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder) and to take such actions as may be reasonably requested by the Liquidating Administrators to evidence such release, including the execution, delivery and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

10.3.    **<u>Releases by the Estate</u>**

**As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, pursuant to sections 105(a) and 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, each Released Party, the Debtor, the Liquidating Estate and each Related Party of the Debtor and the Liquidating Estate shall be, and shall be deemed to be, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor, its Estate, or any other Person or Governmental Unit asserting currently or in the future by, under, through, or on behalf of the Debtor or its Estate, and each of their respective successors or assigns, including the Settlement Trusts, of and from any and all Estate Causes of Action based on or relating to, or in any manner arising from any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date in connection with or related to the Debtor, the Estate, their respective current or former assets and properties, the Chapter 11 Case, AFFF, AFFF Claims, the subject matter of, or the**

-62-

transactions or events giving rise to, any Claim or Interest that is treated by the Plan, the business or contractual arrangements between one or both of the Debtor, on the one hand, and any Released Party, the Liquidating Estate, or any Related Party of the Debtor and the Liquidating Estate, the restructuring of any Claim or Interest that is treated by the Plan before or during the Chapter 11 Case, any of the Plan Documents, or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Case or the negotiation, formulation, preparation, or implementation thereof, the pursuit of confirmation, the administration and implementation of the Plan, the solicitation of votes with respect to the Plan, the distribution of any property under the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases contained in this Article 10.3 shall not be construed to release any post-Effective Date obligations under the Estate Claims Settlement or any document, instrument, or agreement executed to implement the Estate Claims Settlement, including the RTX Waiver, which specifically provides that such Estate Claims Settlement can be terminated and releases provided in the Plan or in the Estate Claims Settlement are void if Carrier fails to make the installments of the Guaranteed Cash Payment when due and such failure is not timely cured within 30 days, at which time the Primary AFFF Settlement Trust is entitled to commence, prosecute or continue all Estate Causes of Action against the Released Parties in any court of competent jurisdiction, and take such other actions as the Primary AFFF Settlement Trustee may determine in the exercise of their fiduciary duties.

10.4.    **Scope of Releases**

Each Person providing releases under the Plan, including the Debtor, the Estate and the Settling Parties, shall be deemed to have waived the provisions, rights, and benefits of California Civil Code § 1542 or any law of the United States or any state of the United States or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to Cal. Civ. Code § 1542, which provides:  A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

10.5.    **Exculpation**

Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtor and its directors, officers, employees, attorneys, investment bankers, financial advisors, restructuring advisors and other professional advisors, representatives and agents will be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with the solicitation.

-63-

As of the Effective Date, to the fullest extent permitted by applicable law, and without affecting or limiting the releases set forth in Article 10 of the Plan, the Exculpated Parties shall neither have nor incur any liability to any Person for any act or omission in connection with, related to or arising out of this Chapter 11 Case, including (a) the operation of the Debtor's businesses during the pendency of this Chapter 11 Case; (b) the administration and adjudication of Claims and Interests during this Chapter 11 Case; (c) formulating, negotiating, preparing, disseminating, implementing, administering, confirming and/or effecting the Plan, the Disclosure Statement, the Plan Supplement, or any related contract, instrument, release or other agreement or document created or entered into in connection with the Chapter 11 Case (including the solicitation of votes for the Plan and other actions taken in furtherance of Confirmation and Consummation of the Plan and the distribution of property under the Plan); (d) any other transaction, agreement, event, or other occurrence related to the Chapter 11 Case taking place on or before the Effective Date, other than liability resulting from any act or omission that is determined by Final Order to have constituted gross negligence, willful misconduct, fraud or a criminal act.

10.6.  **Injunction**

Except as otherwise expressly provided in the Plan or the Confirmation Order, the satisfaction and release pursuant to this Article 10 shall also act as a permanent injunction against any Person who has held, holds, or may in the future hold Claims against or Interests in the Debtor or any of its assets or properties based on any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date that are treated, released, settled, discharged, channeled, or exculpated pursuant to the terms of the Plan from taking any of the following actions on account of, or on the basis of, such discharged Claims or Interests:  (a) commencing or continuing any action to collect, enforce, offset, recoup, or recover with respect to any Claims or Interests treated, released, settled, discharged, channeled, or exculpated under the Plan or the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including to the extent provided for or authorized by sections 524 or 1141 thereof, (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order on account of or in connection with or with respect to any such Claim or Interest; (c) creating, perfecting, or enforcing any encumbrance of any kind on account of or in connection with or with respect to any such Claim or Interest against the Debtor, the Liquidating Estate, the Settlement Trusts, or its or their respective property; (d) asserting any right of setoff, subrogation, or recoupment of any kind on account of or in connection with or with respect to any such Claims or Interests, notwithstanding an indication of a Claim or Interest or otherwise that a Holder of such Claim or Interest asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise, against the Debtor, the Liquidating Estate, or the Settlement Trusts; or (e) commencing or continuing any judicial or administrative proceeding, in any forum and in any place in the world, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.  In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge or termination of all Claims, Interests, and other debts

and liabilities of the Debtor pursuant to sections 105, 524, and 1141 of the Bankruptcy Code.

      10.7.   **<u>Channeling Injunction</u>**

      **Notwithstanding anything to the contrary herein, to preserve and promote the settlements contemplated by and provided for in the Plan, including the Insurance Settlement Agreements, and to supplement, where necessary, the injunctive effect of the discharge as provided in sections 1141 and 524 of the Bankruptcy Code, pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under sections 105(a) and 1123(b) of the Bankruptcy Code, the sole recourse of any Holder of a Channeled AFFF Claim against the Debtor or a Released Party on account of such Channeled AFFF Claim shall be to and against the Primary AFFF Settlement Trust, or in the case of a Holder of a Sovereign State AFFF Claim, to and against the Sovereign State AFFF Settlement Trust, pursuant to the Settlement Trust Documents, and such Holder shall have no right whatsoever at any time to assert any such Channeled AFFF Claim or any Estate Cause of Action that is released under the Estate Claims Settlement against the Debtor or any Released Party or any property or interest in property of the Debtor or any Released Party.  For the avoidance of doubt, the sole recourse for any Channeled AFFF Claim covered by any Insurance Policy issued by a Settling Insurance Company shall be to and against the Primary AFFF Settlement Trust, or in the case of a Holder of a Sovereign State AFFF Claim, to and against the Sovereign State AFFF Settlement Trust, pursuant to the Settlement Trust Documents.  Accordingly, on and after the Effective Date, all Holders of AFFF Claims that have held or asserted, currently hold or assert, or that may in the future hold or assert, any Channeled AFFF Claim or any Estate Cause of Action against the Debtor or any Released Party shall be permanently and forever stayed, restrained, and enjoined from taking any action for the purpose of directly, indirectly, or derivatively collecting, recovering, or receiving payment, satisfaction, or recovery from the Debtor or any Released Party with respect to any such Channeled AFFF Claim or Estate Cause of Action, other than from the Primary AFFF Settlement Trust, or in the case of a Holder of a Sovereign State AFFF Claim, to and against the Sovereign State AFFF Settlement Trust, pursuant to the Settlement Trust Documents, including:**

      **a)     commencing, conducting, or continuing, in any manner, whether directly, indirectly, or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting the Debtor or any Released Party, or any property or interest in property of the Debtor or any Released Party;**

      **b)     enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, by any manner or means, either directly or indirectly, any judgment, award, decree, or order against or affecting the Debtor or any Released Party, or any property or interest in property of the Debtor or any Released Party;**

      **c)     creating, perfecting or otherwise enforcing in any manner, whether directly or indirectly, any encumbrance of any kind against the Debtor or any Released Party, or any property or interest in property of the Debtor or any Released Party;**

d)        asserting, implementing, or effectuating any setoff, right of reimbursement, subrogation, indemnity, contribution, reimbursement, or recoupment of any kind, in any manner, directly or indirectly, against any obligation due to the Debtor or any Released Party, or any property or interest in property of the Debtor or any Released Party; or

e)        taking any act in any manner, and in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents or the Settlement Trust Documents, or, with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Primary AFFF Settlement Trust, or in the case of a Holder of a Sovereign State AFFF Claim, by the Sovereign State AFFF Settlement Trust, except in conformity and compliance with the Settlement Trust Documents with respect to any such Channeled AFFF Claim.

The Debtor, the Liquidating Estate and/or any Released Party, as applicable, may enforce the Channeling Injunction and/or the Releases contained in the Plan before the Bankruptcy Court, which shall retain jurisdiction for such purpose, at their own cost and expense, and no such cost or expense incurred by a party other than the Primary AFFF Settlement Trust shall be reimbursed or indemnified by the Primary AFFF Settlement Trust under any circumstances.

10.8.    **Insurance Company Injunction**

All Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any Claim or cause of action (including any AFFF Claim or any Claim for or respecting any Primary AFFF Settlement Trust expense) against any Insurance Company based upon, attributable to, arising out of, or in any way connected with any Insurance Policy, whenever and wherever arising or asserted, whether in the United States of America or anywhere else in the world, whether sounding in tort, contract, warranty, statute or any other theory of law, equity or admiralty, shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such Claim or cause of action, including:

a)        commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any such Claim, demand, or cause of action against any Insurance Company, or against the property of any Insurance Company, with respect to any such Claim, demand, or cause of action (including, for the avoidance of doubt, directly pursuing any suit, action or other proceeding with respect to any such Claim, demand, or cause of action against any Insurance Company);

b)        enforcing, levying, attaching, collecting, or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment award, decree, or other order against any Insurance Company, or against the property of any Insurance Company, with respect to any such Claim or cause of action;

       **c)**      **creating, perfecting or enforcing in any manner, directly or indirectly, any lien or encumbrance against any Insurance Company, or the property of any Insurance Company, with respect to any such Claim or cause of action; and**

       **d)**      **except as otherwise specifically provided in the Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation of any Insurance Company, or against the property of any Insurance Company, with respect to any such Claim or cause of action;**

*provided, however,* **that (i) this injunction shall not impair in any way any actions brought by the Primary AFFF Settlement Trust against any Other Insurance Company; (ii) the Primary AFFF Settlement Trust shall have the sole and exclusive authority at any time to terminate, or reduce or limit the scope of, the injunction with respect to any Other Insurance Company, in accordance with the Settlement Trust Documents, upon express written notice to such Other Insurance Company; and (iii) this injunction is not issued for the benefit of any Other Insurance Company, and no Other Insurance Company is a third-party beneficiary of this injunction.**

       **Notwithstanding anything to the contrary in the Plan, this injunction shall not enjoin:**

       **a)**      **the rights of any Person to the treatment accorded them under the Plan, as applicable, including the rights of Holders of AFFF Claims to assert such Claims, as applicable, in accordance with the TDPs;**

       **b)**      **the rights of the Primary AFFF Settlement Trust to prosecute any action based on or arising from Insurance Policies, except to the extent otherwise released;**

       **c)**      **the rights of the Primary AFFF Settlement Trust to assert any Claim, debt, obligation, cause of action or liability for payment against any Other Insurance Company based on or arising from the Insurance Policies;**

       **d)**      **any actions of the Contributing Parties in fulfilling their obligations under the Estate Claims Settlement in consultation and coordination with the Primary AFFF Settlement Trust;**

       **e)**      **the rights of any Insurance Company to assert any Claim, debt, obligation, cause of action or liability for payment against any Other Insurance Company; or**

       **f)**      **the Claims for reinsurance under reinsurance contracts or Claims under retrocessional contracts among the Settling Insurance Companies and any Other Insurance Company.**

    10.9.   **<u>Limitations on Exculpations and Releases</u>**

**Notwithstanding anything to the contrary herein, none of the releases or exculpations set forth herein shall operate to waive or release any obligation or Causes of Action of any Person:  (a) arising under any contract, instrument, agreement, release or document delivered pursuant to the Plan or documents, agreements or instruments executed in connection therewith, including all post-Effective Date obligations or (b) expressly set forth in and preserved by the Plan, the Plan Supplement, Plan Documents or related documents.**

      10.10.  <u>Release Dispute</u>

      In the event of a Release Dispute, a Released Party may, at its sole cost and expense, file a motion with the Bankruptcy Court seeking a determination as to whether an AFFF Claimant's Cause of Action was settled and released pursuant to the Plan, and upon such motion, the Bankruptcy Court shall make such determination and, if appropriate, enjoin the prosecution of such Cause of Action as having been settled and released under the Plan.

-68-

## 11.    MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

### 11.1.    Modification of Plan

Subject to the limitations contained in the Plan and the Settling Parties' consent rights in the Plan Support Agreement: (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order and (b) after the entry of the Confirmation Order, the Debtor or the Liquidating Administrators, as applicable, may, upon order of the Bankruptcy Court, (i) amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code or (ii) remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

### 11.2.    Effect of Confirmation on Modification

Entry of a Confirmation Order shall mean that all modifications and amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code, and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

### 11.3.    Revocation of Plan

Subject to the limitations and Settling Parties' consent rights contained in the Plan Support Agreement, the Debtor reserves the right to revoke or withdraw the Plan prior to the Effective Date and to file subsequent plans of reorganization or liquidation.  If the Debtor revokes or withdraws the Plan, or if the Confirmation Order is not entered or the Effective Date does not occur, then:  (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases affected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any Causes of Action, Claims by or Claims against, or any Interests in, the Debtor or any other Person; (ii) prejudice in any manner the rights of the Debtor or any other Person; or (iii) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Person.

4860-3249-7648 v.12

## 12.    RETENTION OF JURISDICTION

12.1.   Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain its exclusive jurisdiction over all matters arising in or out of, or related to, this Chapter 11 Case or the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

(a)    Allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any General Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

(b)    Decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

(c)    Resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including any disputes regarding cure obligations; and (ii) any dispute regarding whether a contract or lease is, or was, executory or expired;

(d)    Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the Plan and adjudicate any and all disputes from, or relating to Distributions under the Plan;

(e)    Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and Causes of Action, and grant or deny any applications, involving the Debtor that may be pending before the Bankruptcy Court on the Effective Date;

(f)    Adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(g)    Adjudicate, decide or resolve any and all matters related to section 1146 of the Bankruptcy Code;

(h)    Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and

other agreements or documents created in connection with the Plan, Plan Supplement, Plan Documents or the Disclosure Statement;

(i)      Enter, adjudicate, and enforce any order for the sale of property pursuant to section 363, 1123 or 1146(a) of the Bankruptcy Code;

(j)      Adjudicate, decide or resolve any and all disputes as to the ownership of any Claim or Interest;

(k)      Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with enforcement of the Plan;

(l)      Resolve any cases, controversies, suits, disputes or Causes of Action with respect to the existence, nature and scope of the releases, injunctions and other provisions contained in the Plan, including whether a Cause of Action alleged by an AFFF Claimant against one or more Released Parties is a Cause of Action that was an Estate Cause of Action or otherwise settled and released under the Plan, and enter such orders as may be necessary or appropriate to implement and enforce such releases, injunctions and other provisions;

(m)      Adjudicate, decide or resolve any and all matters arising out of, in connection with or related to the Estate Claims Settlement;

(n)      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(o)      Determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Plan Documents, including the Settlement Trust Documents, the Liquidating Administrator Agreement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, the Plan Supplement, the Plan Documents or the Disclosure Statement;

(p)      Enter an order or final decree concluding or closing this Chapter 11 Case;

(q)      Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

-71-

(r)     Hear and determine disputes, cases, controversies or Causes of Action arising in connection with the interpretation, implementation or enforcement of the Plan, including the releases or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

(s)     Hear and determine all disputes relating to any liability arising out of the termination of employment or the termination of any employee or retirement benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

(t)     Enforce and adjudicate all orders previously entered by the Bankruptcy Court;

(u)     Hear any other matter not inconsistent with the Bankruptcy Code, the Plan, or the Confirmation Order.

For the avoidance of doubt, the Bankruptcy Court's jurisdiction over Insurance Actions will be non-exclusive after the Effective Date.

4860-3249-7648 v.12

## 13.   MISCELLANEOUS PROVISIONS

### 13.1.   Immediate Binding Effect

Notwithstanding Bankruptcy Rule 3020(e), 6004(h) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtor, the Settlement Trustees, the Liquidating Administrators, any and all Holders of Claims and Interests (irrespective of whether Holders of such Claims or Interests are deemed to have accepted the Plan), all Persons that are parties to or are subject to the settlements, compromises, releases and injunctions described in the Plan, each Person acquiring property under the Plan, any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor and any other parties-in-interest.

### 13.2.   Additional Documents; Further Assurances

On or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtor, the Settlement Trustees, the Liquidating Administrators and all Holders of Claims or Interests receiving Distributions pursuant to the Plan and all other parties-in-interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

### 13.3.   Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by the Debtor or any other Person with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (a) the Debtor with respect to the Holders of Claims or Interests or any other Person or (b) any Holder of a Claim or an Interest or any other Person prior to the Effective Date.

### 13.4.   Successors and Assigns

The rights, benefits and obligations of any Person named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person.

### 13.5.   Term of Injunction or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in this Chapter 11 Case pursuant to section 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their

-73-

terms. For the avoidance of doubt, no stay or injunction contained herein shall apply to Independent AFFF Causes of Action or Sovereign State Retained Causes of Action.

13.6.  <u>Entire Agreement</u>

The Plan Support Agreement and the Plan Documents set forth the entire agreement and undertakings relating to the subject matter thereof.  On the Effective Date, the Plan Documents shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations with respect to the subject matter hereof and thereof, all of which have become merged and integrated into the Plan.

13.7.  <u>Exhibits</u>

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  Copies of such exhibits and documents may be obtained upon written request to the Debtor's counsel at the address below or by downloading such exhibits and documents from the website of the Debtor's Notice and Claims Agent, at https://cases.stretto.com/KFI/ or the Bankruptcy Court's electronic docket for the Debtor's Chapter 11 Case at https://ecf.deb.uscourts.gov (a PACER login and password are required and can be obtained through the PACER Service Center at www.pacer.uscourts.gov). In addition, copies of such exhibits and documents may be requested from the Notice and Claims Agent at (866) 887-0488 (U.S./Canada) or (949) 889-0128 (International).

13.8.  <u>Nonseverability of Plan Provisions Upon Confirmation</u>

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Debtor; and (c) nonseverable and mutually dependent. Notwithstanding anything to the contrary herein, Article 5.5.15 shall be severable from the Plan if not approved by the Bankruptcy Court at the Confirmation Hearing and approval of Article 5.5.15 by the Bankruptcy Court shall not be a requirement or condition to Confirmation of the Plan.

13.9.  <u>Dissolution of Committee</u>

On the Effective Date, the Committee shall dissolve and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Case; *provided*, *however*, that the Committee will stay in existence solely for the limited purpose of (a) applications filed pursuant to sections 330 and 331 of the Bankruptcy

Code and (b) motions or litigation, including pending appeals, seeking enforcement of the provisions of the Plan or under the Confirmation Order; *provided, further*, that with respect to pending appeals and related proceedings, the Committee shall continue to comply with sections 327, 328, 329, 330, 331 and 1103 of the Bankruptcy Code and the Professional Fee Order in seeking compensation for services rendered.

13.10.  <u>Termination of Fee Examiner's Appointment</u>

Upon the resolution of all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code by Professionals subject to review by the Fee Examiner, the Fee Examiner's appointment shall terminate, and the Fee Examiner shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Case.

13.11.  <u>Post-Confirmation Operating Reports</u>

The Liquidating Administrators, on behalf of the Debtor and the Liquidating Estate, shall file and serve on the U.S. Trustee quarterly reports of the disbursements made pursuant to the Plan until the Chapter 11 Case is converted, dismissed or closed by entry of a final decree.  Any such reports shall be prepared consistent with (both in terms of content and format) the applicable Bankruptcy Court's and U.S. Trustee's guidelines for such matters.

13.12.  <u>Closing of Chapter 11 Case</u>

The Liquidating Administrators shall, promptly after the full administration of this Chapter 11 Case, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close this Chapter 11 Case.

13.13.  <u>Conflicts</u>

Except as set forth in the Plan, to the extent that any provisions of the Disclosure Statement, the Plan Supplement, the Plan Documents, or any order of the Bankruptcy Court (other than the Confirmation Order) referenced in the Plan (or any exhibits, appendices, supplements or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of the Plan, the Plan shall govern and control.  To the extent any provision of the Plan, Disclosure Statement, the Plan Supplement, any other Plan Document or document referenced in the Plan (or any exhibits, appendices, supplements or amendments to any of the foregoing), conflicts with or is in any way inconsistent with the Confirmation Order, the Confirmation Order shall govern and control.

13.14.  <u>Waiver or Estoppel</u>

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtor or its counsel, or any other Person, if such agreement was not disclosed in the Plan, the Disclosure Statement or papers filed with the Bankruptcy Court prior to the Confirmation Date.

13.15.  <u>Post-Effective Date Service</u>

After the Effective Date, the Liquidating Administrators are authorized to limit the list of Persons receiving documents pursuant to Bankruptcy Rule 2002 to those Persons that have filed renewed requests for service.

13.16.  <u>Notices</u>

All notices, requests, pleadings and demands to or upon the Debtor to be effective shall be in writing (including by facsimile transmission and via email) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)    If to the <u>Debtor</u>, to:

Sullivan & Cromwell LLP
125 Broad St.
New York, NY 10004
Attn:   Andrew G. Dietderich
Brian D. Glueckstein
Justin D. DeCamp
Benjamin S. Beller
Julie G. Kapoor

and

Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
Attn:   Derek C. Abbott
            Andrew R. Remming

(b)    If to the <u>Committee</u>, to:

Brown Rudnick LLP
Seven Times Square
New York, NY 10036
Attention: David J. Molton
Cathrine M. Castaldi
Eric R. Goodman

and

Stutzman, Bromberg, Esserman & Pilfka, A Professional
Corporation

-76-

2323 Bryan Street, Suite 2200
Dallas, TX 75201-2689
Attention: Sander L. Esserman
Peter C. D'Apice

(c)    If to the <u>Future Claimants' Representative</u>, to:
Young Conaway Stargatt & Taylor, LLP
Rodney Square, 1000 North King Street
Wilmington, DE 19801
Attn:   Sharon M. Zieg

(d)    If to the <u>U.S. Trustee</u>, to:

United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Room 2207
Wilmington, DE 19801
Attn:   Timothy J. Fox

4860-3249-7648 v.12

Dated: November 25, 2024
      Wilmington, Delaware

                KFI Wind-Down Corp.

                By: _____

                    Name:
                    Title:

## Schedule 1

| POLICYHOLDER | INSURANCE CO | POLICY NO | POLICY PERIOD BEGIN | POLICY PERIOD END |
|---|---|---|---|---|
| National Foam System, Inc | INA | XBC 6269 | 2/15/1966 | 2/15/1967 |
| National Foam System, Inc | INA | ENP 1117 | 1/1/1967 | 1/1/1968 |
| National Foam System, Inc | INA | XBC 6773 | 2/15/1967 | 2/15/1968 |
| National Foam System, Inc | INA | ENP 1117 | 1/1/1968 | 1/1/1969 |
| National Foam System, Inc | INA | XBC 7276 | 2/15/1968 | 2/15/1969 |
| National Foam System, Inc | INA | ENP 1117 | 1/1/1969 | 1/1/1970 |
| National Foam System, Inc | INA | XBC 7548 | 2/15/1969 | 2/15/1970 |
| National Foam System, Inc | INA | XBC 7883 | 2/15/1970 | 2/15/1971 |
| Philadelphia Suburban Corp | Hartford Accident & Indemnity Co. | 39CE16300E | 8/1/1972 | 8/1/1973 |
| Philadelphia Suburban Corp | Hartford Accident & Indemnity Co. | 39CE16304E | 8/1/1973 | 8/1/1974 |
| Philadelphia Suburban Corp | Hartford Accident & Indemnity Co. | 39CE16312E | 8/1/1974 | 8/1/1975 |
| Philadelphia Suburban Corp | Hartford Accident & Indemnity Co. | 39CE16320E | 8/1/1975 | 8/1/1976 |
| Philadelphia Suburban Corp | First State | 922102 | 9/9/1975 | 8/1/1976 |
| Philadelphia Suburban Corp | Home | TBD | 9/9/1975 | 8/1/1976 |
| Philadelphia Suburban Corp | Hartford Accident & Indemnity Co. | 39CE16328E | 8/1/1976 | 8/1/1977 |
| Philadelphia Suburban Corp | Allstate | 63 002 090 | 8/1/1976 | 8/1/1977 |
| Philadelphia Suburban Corp | Columbia Cas | RDX 1864271 | 8/1/1976 | 8/1/1977 |
| Philadelphia Suburban Corp | Allstate | 63 003 444 | 8/1/1977 | 8/1/1978 |
| Philadelphia Suburban Corp | Allstate | 63 003 769 | 8/1/1977 | 8/1/1978 |
| Philadelphia Suburban Corp | Columbia Cas | RDX 3652509 | 8/1/1977 | 8/1/1978 |
| Philadelphia Suburban Corp | Admiral | ZCV 0294 | 8/1/1977 | 8/1/1978 |
| Philadelphia Suburban Corp | California Union | ZCX 001735 | 8/1/1977 | 8/1/1978 |
| Philadelphia Suburban Corp | Allstate | 63 004 859 | 1/1/1978 | 1/1/1979 |
| Philadelphia Suburban Corp | Admiral | 8CU 0493 | 8/1/1978 | 8/1/1979 |
| Philadelphia Suburban Corp | California Union | ZCX 003278 | 8/1/1978 | 8/1/1979 |
| Philadelphia Suburban Corp | Aetna C&S | 04 XS 2707 | 8/1/1979 | 8/1/1980 |
| Philadelphia Suburban Corp | Allstate | 63 005 939 | 8/1/1979 | 8/1/1980 |
| Philadelphia Suburban Corp | Puritan | ML 652416 | 8/1/1979 | 8/1/1980 |
| Philadelphia Suburban Corp | California Union | ZCX 003760 | 8/1/1979 | 8/1/1980 |
| Philadelphia Suburban Corp | California Union | ZCX 003770 | 8/1/1979 | 8/1/1980 |
| Philadelphia Suburban Corp | Aetna C&S | 04 XS 2716 | 8/1/1980 | 8/1/1981 |
| Philadelphia Suburban Corp | Allstate | 63 007 002 | 8/1/1980 | 8/1/1981 |
| Philadelphia Suburban Corp | Puritan | ML 652455 | 8/1/1980 | 8/1/1981 |
| Philadelphia Suburban Corp | California Union | ZCX 004103 | 8/1/1980 | 8/1/1981 |
| Enterra Corporation | First State | 932556 | 8/1/1981 | 8/1/1982 |
| Enterra Corporation | Aetna C&S | 04 GL 55479 SRA | 8/1/1981 | 8/1/1982 |
| Enterra Corporation | Aetna C&S | 04 XN 202 WCA | 8/1/1981 | 8/1/1982 |
| Enterra Corporation | Integrity | ISX 106205 | 8/1/1981 | 8/1/1982 |
| Enterra Corporation | Mission | MN880116 | 8/1/1981 | 8/1/1982 |
| Enterra Corporation | Transit Casualty | SCU 956009 | 8/1/1981 | 8/1/1982 |
| Enterra Corporation | California Union | ZCX 004578 | 8/1/1981 | 8/1/1982 |
| Enterra Corporation | First State | 934633 | 8/1/1982 | 8/1/1983 |
| Enterra Corporation | First State | 934633 | 8/1/1982 | 8/1/1983 |
| Enterra Corporation | Aetna C&S | 04 GL 55478 SRA | 8/1/1982 | 8/1/1983 |
| Enterra Corporation | Federal | 7928-51-42 | 8/1/1982 | 8/1/1983 |
| Enterra Corporation | Admiral | A2UX0133 | 8/1/1982 | 8/1/1983 |
| Enterra Corporation | GEICO | GXU30170 | 8/1/1982 | 8/1/1983 |
| Enterra Corporation | Integrity | ISX 109393 | 8/1/1982 | 8/1/1983 |
| Enterra Corporation | Employers Mut | MMO73210 | 8/1/1982 | 8/1/1983 |
| Enterra Corporation | Mission | MN880116 | 8/1/1982 | 8/1/1983 |
| Enterra Corporation | Columbia Casualty | RDX 9176157 | 8/1/1982 | 8/1/1983 |
| Enterra Corporation | Columbia Casualty | RDX 9176159 | 8/1/1982 | 8/1/1983 |
| Enterra Corporation | Continental | SRX1591755 | 8/1/1982 | 8/1/1983 |
| Enterra Corporation | Transit Casualty | TBD | 8/1/1982 | 8/1/1983 |
| Enterra Corporation | Aetna C&S | TBD | 8/1/1982 | 8/1/1983 |
| Enterra Corporation | Twin City Fire | TXS 100518 | 8/1/1982 | 8/1/1983 |
| Enterra Corporation | Twin City | TXS100518 | 8/1/1982 | 8/1/1983 |
| Enterra Corporation | California Union | ZCX006329 | 8/1/1982 | 8/1/1983 |
| Enterra Corporation | Federal | (84) 7928-5142 | 8/1/1983 | 8/1/1984 |
| Enterra Corporation | Aetna C&S | 04 GL 402022 SRA | 8/1/1983 | 8/1/1984 |
| Enterra Corporation | Admiral | A3UX0166 | 8/1/1983 | 8/1/1984 |
| Enterra Corporation | First State | EU936124 | 8/1/1983 | 8/1/1984 |

| Enterra Corporation | TIG | GMX02348 | 8/1/1983 | 8/1/1984 |
|---|---|---|---|---|
| Enterra Corporation | GEICO | GXU30285 | 8/1/1983 | 8/1/1984 |
| Enterra Corporation | Home | HEC 1200431 | 8/1/1983 | 8/1/1984 |
| Enterra Corporation | Integrity | ISX 112137 | 8/1/1983 | 8/1/1984 |
| Enterra Corporation | London Guarantee | LX2107859 | 8/1/1983 | 8/1/1984 |
| Enterra Corporation | London Guarantee | LX2107859 | 8/1/1983 | 8/1/1984 |
| Enterra Corporation | Employers Mut | MMO73441 | 8/1/1983 | 8/1/1984 |
| Enterra Corporation | Mission | MN024330 | 8/1/1983 | 8/1/1984 |
| Enterra Corporation | Continental | SRX1592029 | 8/1/1983 | 8/1/1984 |
| Enterra Corporation | Twin City Fire | TXS 100518 | 8/1/1983 | 8/1/1984 |
| Enterra Corporation | Twin City | TXS100518 | 8/1/1983 | 8/1/1984 |
| Enterra Corporation | Atlanta Int'l | XL06167 | 8/1/1983 | 8/1/1984 |
| Enterra Corporation | California Union | ZCX006388 | 8/1/1983 | 8/1/1984 |
| Enterra Corporation | Aetna C&S | 04 GL 460897 SRA | 8/1/1984 | 8/1/1985 |
| Enterra Corporation | Federal | 7928-5142 | 8/1/1984 | 8/1/1985 |
| Enterra Corporation | Centaur | CML101061 | 8/1/1984 | 8/1/1985 |
| Enterra Corporation | Royal Indemnity | ED 102857 | 8/1/1984 | 8/1/1985 |
| Enterra Corporation | Royal Indemnity | ED102857 | 8/1/1984 | 8/1/1985 |
| Enterra Corporation | First State | EU002250 | 8/1/1984 | 8/1/1985 |
| Enterra Corporation | Western Employers | EX10-0884-10368 | 8/1/1984 | 8/1/1985 |
| Enterra Corporation | Evanston | EX11479 | 8/1/1984 | 8/1/1985 |
| Enterra Corporation | Home | HEC 1200431 | 8/1/1984 | 8/1/1985 |
| Enterra Corporation | Harbor | HI178526 | 8/1/1984 | 8/1/1985 |
| Enterra Corporation | Integrity | ISX 114440 | 8/1/1984 | 8/1/1985 |
| Enterra Corporation | Employers Mut | MMO73441 | 8/1/1984 | 8/1/1985 |
| Enterra Corporation | Mission | MN034232 | 8/1/1984 | 8/1/1985 |
| Enterra Corporation | Highlands | SR22300 | 8/1/1984 | 8/1/1985 |
| Enterra Corporation | Highlands | SR22301 | 8/1/1984 | 8/1/1985 |
| Enterra Corporation | Twin City Fire | TXS101883 | 8/1/1984 | 8/1/1985 |
| Enterra Corporation | Safety National Cas | UF1846PA | 8/1/1984 | 8/1/1985 |
| Enterra Corporation | Pacific Empl | XCC014536 | 8/1/1984 | 8/1/1985 |
| Enterra Corporation | Pacific Employers | XCC014536 | 8/1/1984 | 8/1/1985 |
| Enterra Corporation | United National | XTP-11026 | 8/1/1984 | 8/1/1985 |
| Enterra Corporation | California Union | ZCX007054 | 8/1/1984 | 8/1/1985 |
| Enterra Corporation | Aetna C&S | 04 GL 544144 SRA | 8/1/1985 | 12/27/1985 |
| Enterra Corporation | Aetna C&S | 04 XS 205504 SRA | 8/1/1985 | 12/27/1985 |
| Enterra Corporation | Aetna C&S | 04 GL 554165 SRA | 12/27/1985 | 12/27/1986 |
| Enterra Corporation | Aetna C&S | 04 XS 205509 SRA | 12/27/1985 | 12/27/1986 |
| Racal-Chubb | City Insurance | GL 994852 | 4/1/1987 | 3/1/1988 |
| Racal-Chubb | Royal Indemnity | RIG550721 | 3/1/1988 | 3/31/1989 |
| Racal-Chubb | Royal Indemnity | RIW550911 | 3/31/1989 | 3/31/1990 |
| Racal-Chubb | Royal Indemnity | RIW550912 | 3/31/1990 | 3/31/1991 |
| Racal-Chubb | Royal Indemnity | RIW550913 | 3/31/1991 | 3/31/1992 |
| Racal-Chubb | Royal Indemnity | RIW754971 | 3/31/1992 | 3/31/1993 |
| Racal-Chubb | Royal Indemnity | RIW754972 | 3/31/1993 | 3/31/1994 |
| Racal-Chubb | London Companies | B3C5016 | 4/1/1993 | 3/31/1994 |
| Racal-Chubb | Royal Indemnity | RIW755101 | 3/31/1994 | 3/31/1995 |
| Racal-Chubb | London Companies | B4C5016 | 4/1/1994 | 3/31/1995 |
| Racal-Chubb | London Companies | B4C5017 | 4/1/1994 | 3/31/1995 |
| Racal-Chubb | Royal Indemnity | RIW762951 | 3/31/1995 | 3/31/1996 |
| Racal-Chubb | London Companies | B5C5016 | 4/1/1995 | 3/31/1996 |
| Racal-Chubb | London Companies | B5C5017 | 4/1/1995 | 3/31/1996 |
| Racal-Chubb | Royal Indemnity | TBD | 3/31/1996 | 1/1/1997 |
| Racal-Chubb | London Cos | B6C6429 | 4/1/1996 | 1/1/1997 |
| Racal-Chubb | London Cos | B6C6430 | 4/1/1996 | 1/1/1997 |
| Racal-Chubb | London Cos | B6C6431 | 4/1/1996 | 1/1/1997 |
| Williams Holdings plc | London Cos | 820/QE001EOH / 9700202S0110 | 1/1/1997 | 12/31/1997 |
| Williams Holdings plc | London Cos | 820/QE001FOH / 9700202Q0111 | 1/1/1997 | 12/31/1997 |
| Williams Holdings plc | Royal Indemnity | RIW7650810000 | 1/1/1997 | 1/1/1998 |
| Williams Holdings plc | Royal & Sun Alliance | YMM817226/7 | 1/1/1997 | 12/31/1997 |
| Williams Holdings plc | London Cos | 820/QE006XOJ / 9800201S0110 | 1/1/1998 | 12/31/1998 |
| Williams Holdings plc | Royal & Sun Alliance | 9805709S0110 | 1/1/1998 | 12/31/1998 |
| Williams Holdings plc | Royal Indemnity | RIW7650810098 | 1/1/1998 | 1/1/1999 |
| Williams Holdings plc | London Cos | 820 / QE006XOK / 9900201S0110 | 1/1/1999 | 12/31/1999 |
| Williams Holdings plc | Royal & Sun Alliance | 9600372S0110 | 1/1/1999 | 12/31/1999 |
| Williams Holdings plc | Royal Indemnity | RIW7650810099 | 1/1/1999 | 1/1/2000 |

| | | | | |
|---|---|---|---|---|
| Williams Holdings plc | London Cos | 823/KL0000185 | 1/1/2000 | 11/13/2000 |
| Williams Holdings plc | Royal & Sun Alliance | 9600372S0111 | 1/1/2000 | 11/13/2000 |
| Williams Holdings plc | Royal Indemnity | RIW765081000Y | 1/1/2000 | 11/13/2000 |
| Kidde plc | London Cos | 823/KL00002466 | 11/13/2000 | 12/31/2001 |
| Kidde plc | London Cos | 823/KL00002467 | 11/13/2000 | 12/31/2001 |
| Kidde plc | Royal Indemnity | RIW003840000 | 11/13/2000 | 12/31/2001 |
| Kidde plc | Royal & Sun Alliance | YMM817665 | 11/13/2000 | 12/31/2001 |
| Kidde plc | Royal Indemnity | R2IW0034630000 | 12/31/2001 | 12/31/2002 |
| Kidde plc | Royal & Sun Alliance | YMM817665 | 12/31/2001 | 12/31/2002 |
| Kidde plc | Starr Excess | 6394062 | 1/1/2002 | 12/31/2002 |
| Kidde plc | Zurich Int'l (UK) | 716/WRS022138009 | 1/1/2002 | 12/31/2002 |
| Kidde plc | London Cos | 716/WRS022141937 | 1/1/2002 | 12/31/2002 |
| Kidde plc | London Cos | 716/WRS022141945 | 1/1/2002 | 12/31/2002 |
| Kidde plc | Liberty Int'l | DU003216002 | 1/1/2002 | 1/1/2003 |
| Kidde plc | Starr Excess | 6340140 | 1/1/2003 | 12/31/2003 |
| Kidde plc | Zurich Ins Co (UK) | 716/WRS032141937 | 1/1/2003 | 12/31/2003 |
| Kidde plc | AIG Europe | 716/WRS032141937 / 716/WRS032138009 | 1/1/2003 | 12/31/2003 |
| Kidde plc | London Cos | 716/WRS032141945 | 1/1/2003 | 12/31/2003 |
| Kidde plc | AIG Europe | 716/WRS032153600 | 1/1/2003 | 12/31/2003 |
| Kidde plc | AWAC (Europe) | C001442-001 | 1/1/2003 | 12/31/2003 |
| Kidde plc | Zurich American | GLO 3373845-00 | 1/1/2003 | 1/1/2004 |
| Kidde plc | Zurich Insurance Co (UK) | 716/WRS042138005 | 1/1/2004 | 5/31/2005 |
| Kidde plc | AIG Europe & AWAC Europe | 716/WRS042141937 | 1/1/2004 | 5/31/2005 |
| Kidde plc | London Cos | 716/WRS042141945 | 1/1/2004 | 5/31/2005 |
| Kidde plc | London Cos | 716/WRS042141949 | 1/1/2004 | 5/31/2005 |
| Kidde plc | AIG Europe | 716/WRS04218009 | 1/1/2004 | 5/31/2005 |
| Kidde plc | Zurich American | GLO 3373845-01 | 1/1/2004 | 6/1/2005 |
| UTC Corporation | Starr Excess Liab | 4009874 | 6/1/2005 | 6/1/2006 |
| UTC Corporation | National Union Fire | 4484724 | 6/1/2005 | 6/1/2006 |
| UTC Corporation | American Guar & Liab | AEC534681500 | 6/1/2005 | 6/1/2006 |
| UTC Corporation | Arch Re Ltd | B4URP0339500 | 6/1/2005 | 6/1/2006 |
| UTC Corporation | AWAC | C003511002 | 6/1/2005 | 6/1/2006 |
| UTC Corporation | Great American | EXC5750137 | 6/1/2005 | 6/1/2006 |
| UTC Corporation | Endurance Specialty | P005341001 | 6/1/2005 | 6/1/2006 |
| UTC Corporation | Gerling Konzern | UK7361700 | 6/1/2005 | 6/1/2006 |
| UTC Corporation | XL Insurance Co | UK7361800 | 6/1/2005 | 6/1/2006 |
| UTC Corporation | ACE Insurance Co | UTX5117/5 | 6/1/2005 | 6/1/2006 |
| UTC Corporation | ACE Insurance Co | UTX5117/5 | 6/1/2005 | 6/1/2006 |
| UTC Corporation | Arch Specialty | UXP000705300 | 6/1/2005 | 6/1/2006 |
| UTC Corporation | XL Insurance Co | XLUMB601542 | 6/1/2005 | 6/1/2006 |
| UTIV | TBD | TBD | 6/1/2005 | 6/1/2006 |
| UTC Corporation | Starr Excess Liab | 311011 | 6/1/2006 | 9/1/2007 |
| UTC Corporation | Lexington | 5577432 | 6/1/2006 | 9/1/2007 |
| UTC Corporation | Federal | 79844829 | 6/1/2006 | 9/1/2007 |
| UTC Corporation | Gerling Konzern | 576UL73617 | 6/1/2006 | 9/1/2007 |
| UTC Corporation | London Cos | 576UL73935 | 6/1/2006 | 9/1/2007 |
| UTC Corporation | American Guar & Liab | AEC534681501 | 6/1/2006 | 9/1/2007 |
| UTC Corporation | National Union Fire | BE4485396 | 6/1/2006 | 9/1/2007 |
| UTC Corporation | AWAC | C003511003 | 6/1/2006 | 9/1/2007 |
| UTC Corporation | Great American | EXC9251752 | 6/1/2006 | 9/1/2007 |
| UTC Corporation | Landmark American | LHA035155 | 6/1/2006 | 9/1/2007 |
| UTC Corporation | Endurance Specialty | P005341002 | 6/1/2006 | 9/1/2007 |
| UTC Corporation | XL Europe – Ireland | UL73618 | 6/1/2006 | 9/1/2007 |
| UTC Corporation | Liberty Mutual EU | UL73937 | 6/1/2006 | 9/1/2007 |
| UTC Corporation | Arch Re Ltd | URP001583000 | 6/1/2006 | 9/1/2007 |
| UTC Corporation | ACE Insurance Co | UTX5117/5 | 6/1/2006 | 9/1/2007 |
| UTC Corporation | ACE Insurance Co | UTX5517/5 | 6/1/2006 | 9/1/2007 |
| UTC Corporation | Arch Specialty | UXP001568300 | 6/1/2006 | 9/1/2007 |
| UTC Corporation | ACE American | XCPG23713822 | 6/1/2006 | 9/1/2007 |
| UTC Corporation | XL Insurance Co | XLUMB601542 | 6/1/2006 | 9/1/2007 |
| UTIV | Swiss Re | 327652 | 6/1/2006 | 9/1/2007 |
| UTIV | SCOR | 576/UL73936 | 6/1/2006 | 9/1/2007 |
| UTIV | TBD | TBD | 6/1/2006 | 9/1/2007 |
| UTC Corporation | AIG Excess Liab | 9495583 | 9/1/2007 | 9/1/2008 |
| UTC Corporation | Federal | 79844829 | 9/1/2007 | 9/1/2008 |

| | | | | |
|---|---|---|---|---|
| UTC Corporation | American Guar & Liab | AEC534681502 | 9/1/2007 | 9/1/2008 |
| UTC Corporation | National Union Fire | BE9835138 | 9/1/2007 | 9/1/2008 |
| UTC Corporation | Great American | EXC9253321 | 9/1/2007 | 9/1/2008 |
| UTC Corporation | Endurance Amer | LD10000720800 | 9/1/2007 | 9/1/2008 |
| UTC Corporation | Landmark American | LHA040990 | 9/1/2007 | 9/1/2008 |
| UTC Corporation | Arch Specialty | UXP001568301 | 9/1/2007 | 9/1/2008 |
| UTC Corporation | ACE American | XCPG23885682 | 9/1/2007 | 9/1/2008 |
| UTIV | Lexington | 5577738 | 9/1/2007 | 9/1/2008 |
| UTIV | XL Europe | 576UM73618 | 9/1/2007 | 9/1/2008 |
| UTIV | Berkshire Hathaway Int'l | 576UM74235 | 9/1/2007 | 9/1/2008 |
| UTIV | Munich Re | 9412671 | 9/1/2007 | 9/1/2008 |
| UTIV | AWAC | C003511004 | 9/1/2007 | 9/1/2008 |
| UTIV | Swiss Re | MH327652 | 9/1/2007 | 9/1/2008 |
| UTIV | Swiss Re | MH327653 | 9/1/2007 | 9/1/2008 |
| UTIV | Endurance | P005341-003 | 9/1/2007 | 9/1/2008 |
| UTIV | Arch Re Ltd. | URP001583001 | 9/1/2007 | 9/1/2008 |
| UTIV | ACE Bermuda | UTC1318005RE | 9/1/2007 | 9/1/2008 |
| UTIV | XL Ins. Bermuda | XSRE601542 | 9/1/2007 | 9/1/2008 |
| UTC Corporation | Lexington | 2213721 | 9/1/2008 | 9/1/2009 |
| UTC Corporation | AIG Excess Liab | 2350648 | 9/1/2008 | 9/1/2009 |
| UTC Corporation | Chubb Atlantic | 33101638 | 9/1/2008 | 9/1/2009 |
| UTC Corporation | Federal | 79844829 | 9/1/2008 | 9/1/2009 |
| UTC Corporation | American Guar & Liab | AEC534681503 | 9/1/2008 | 9/1/2009 |
| UTC Corporation | American Guar & Liab | AEC967326200 | 9/1/2008 | 9/1/2009 |
| UTC Corporation | National Union Fire | BE6081844 | 9/1/2008 | 9/1/2009 |
| UTC Corporation | Great American | EXC2195181 | 9/1/2008 | 9/1/2009 |
| UTC Corporation | Arch Specialty | UXP002854900 | 9/1/2008 | 9/1/2009 |
| UTC Corporation | ACE American | XCPG2468163 | 9/1/2008 | 9/1/2009 |
| UTIV | Lexington | 2213721 | 9/1/2008 | 9/1/2009 |
| UTIV | Munich Re | 3011593 | 9/1/2008 | 9/1/2009 |
| UTIV | Berkshire Hathaway Int'l | 495711 | 9/1/2008 | 9/1/2009 |
| UTIV | XL Ins. Ltd. | 576/UN73618 | 9/1/2008 | 9/1/2009 |
| UTIV | SJCatlin | 576/UN74544 | 9/1/2008 | 9/1/2009 |
| UTIV | XL Ins. Bermuda | BM0023848LI08A | 9/1/2008 | 9/1/2009 |
| UTIV | AWAC Specialty | C003511005 | 9/1/2008 | 9/1/2009 |
| UTIV | Aspen Ins. UK | K0A065908A0E | 9/1/2008 | 9/1/2009 |
| UTIV | Swiss Re American | MH32765310 | 9/1/2008 | 9/1/2009 |
| UTIV | Endurance Specialty | P005341-004 | 9/1/2008 | 9/1/2009 |
| UTIV | TBD | TBD | 9/1/2008 | 9/1/2009 |
| UTIV | Canopius Re | UTX-008/UTIVOCCRE-08 | 9/1/2008 | 9/1/2009 |
| UTIV | ACE Bermuda | UTX200809OCCCRE | 9/1/2008 | 9/1/2009 |
| UTC Corporation | AIG Excess Liab | 21472658 | 9/1/2009 | 9/1/2010 |
| UTC Corporation | American Guar & Liab | AEC534681504 | 9/1/2009 | 9/1/2010 |
| UTC Corporation | American Guar & Liab | AEC967326201 | 9/1/2009 | 9/1/2010 |
| UTC Corporation | National Union Fire | BE27471365 | 9/1/2009 | 9/1/2010 |
| UTC Corporation | Great American | EXC8634502 | 9/1/2009 | 9/1/2010 |
| UTC Corporation | Arch Insurance | UXP002854901 | 9/1/2009 | 9/1/2010 |
| UTC Corporation | ACE American | XCPG24896468 | 9/1/2009 | 9/1/2010 |
| UTIV | Lexington London | 2214028 | 9/1/2009 | 9/1/2010 |
| UTIV | Argo Re | ARGO-CAS-OCC-RE-000116.1 | 9/1/2009 | 9/1/2010 |
| UTIV | Liberty Mutual Insurance Europe Ltd. | B080110588U09 | 9/1/2009 | 9/1/2010 |
| UTIV | SJ Catlin | B080110591U09 | 9/1/2009 | 9/1/2010 |
| UTIV | XL Europe UK | B080111977U09 | 9/1/2009 | 9/1/2010 |
| UTIV | XL Bermuda | BM00023848LI08A | 9/1/2009 | 9/1/2010 |
| UTIV | AWAC | C003511006 | 9/1/2009 | 9/1/2010 |
| UTIV | AWAC | C012739/001 | 9/1/2009 | 9/1/2010 |
| UTIV | Aspen Ins. UK | K0A065909A0E | 9/1/2009 | 9/1/2010 |
| UTIV | Liberty Mutual Ins. Europe Ltd. | LO842215001 | 9/1/2009 | 9/1/2010 |
| UTIV | Swiss Re | MH32765.2.16 | 9/1/2009 | 9/1/2010 |
| UTIV | Endurance Specialty | P005341 005 | 9/1/2009 | 9/1/2010 |
| UTIV | Canopius Undw. Bermuda | UTX-113/UTIVOCCRE-09 | 9/1/2009 | 9/1/2010 |
| UTIV | ACE Bermuda | UTX-200910/OCCRE | 9/1/2009 | 9/1/2010 |
| UTC Corporation | National Union Fire | 15972413 | 9/1/2010 | 9/1/2011 |
| UTC Corporation | Chartis Excess | 60703823 | 9/1/2010 | 9/1/2011 |
| UTC Corporation | Federal | 79861188 | 9/1/2010 | 9/1/2011 |

| UTC Corporation | American Guar & Liab | AEC53468150 | 9/1/2010 | 9/1/2011 |
|---|---|---|---|---|
| UTC Corporation | American Guar & Liab | AEC96732620 | 9/1/2010 | 9/1/2011 |
| UTC Corporation | Great American | EXC2098183 | 9/1/2010 | 9/1/2011 |
| UTC Corporation | Arch Insurance | UXP00285490 | 9/1/2010 | 9/1/2011 |
| UTC Corporation | ACE American | XCPG4907764 | 9/1/2010 | 9/1/2011 |
| UTIV | Munich Re | 10052792 | 9/1/2010 | 9/1/2011 |
| UTIV | Argo Re | ARGO-CAS-OCC-RE-000116.2 | 9/1/2010 | 9/1/2011 |
| UTIV | Liberty Mutual UK | B080110588U10 | 9/1/2010 | 9/1/2011 |
| UTIV | SJCatlin | B080110591U10 | 9/1/2010 | 9/1/2011 |
| UTIV | Lexington UK | B080111972U10 | 9/1/2010 | 9/1/2011 |
| UTIV | XL (UK) | B080111977U10 | 9/1/2010 | 9/1/2011 |
| UTIV | Liberty Mutual UK | B080113281U10 | 9/1/2010 | 9/1/2011 |
| UTIV | XL Bermuda | BM00025047LI10A | 9/1/2010 | 9/1/2011 |
| UTIV | AWAC | C003511007 | 9/1/2010 | 9/1/2011 |
| UTIV | AWAC | C012739/002 | 9/1/2010 | 9/1/2011 |
| UTIV | Aspen | K0A065910AOE | 9/1/2010 | 9/1/2011 |
| UTIV | Swiss Re | MH32765.2.21 | 9/1/2010 | 9/1/2011 |
| UTIV | Swiss Re | MH32765.4.3 | 9/1/2010 | 9/1/2011 |
| UTIV | Endurance Specialty | P005341 006 | 9/1/2010 | 9/1/2011 |
| UTIV | Canopius | UTX-165/UTIVOCCRE-10 | 9/1/2010 | 9/1/2011 |
| UTIV | ACE Bermuda | UTX-201011/OCCRE | 9/1/2010 | 9/1/2011 |
| UTC Corporation | National Union Fire | 25030360 | 9/1/2011 | 9/1/2012 |
| UTC Corporation | Chartis Excess | 60703823 | 9/1/2011 | 9/1/2012 |
| UTC Corporation | Federal | 79861188 | 9/1/2011 | 9/1/2012 |
| UTC Corporation | American Guar & Liab | AEC534681506 | 9/1/2011 | 9/1/2012 |
| UTC Corporation | American Guar & Liab | AEC967326203 | 9/1/2011 | 9/1/2012 |
| UTC Corporation | Argo Re | ARGOCASOCCRE 0001163 | 9/1/2011 | 9/1/2012 |
| UTC Corporation | Great American | EXC2105915 | 9/1/2011 | 9/1/2012 |
| UTC Corporation | Arch | UXP002854903 | 9/1/2011 | 9/1/2012 |
| UTC Corporation | ACE American | XCPG25831184 | 9/1/2011 | 9/1/2012 |
| UTIV | Munich Re | 10052792-2011 | 9/1/2011 | 9/1/2012 |
| UTIV | Lexington London | 62785200 | 9/1/2011 | 9/1/2012 |
| UTIV | Argo Re | ARGO-CAS-OCC-RE-000116.3 | 9/1/2011 | 9/1/2012 |
| UTIV | Liberty Int'l Underwriters UK | B080110588U11 | 9/1/2011 | 9/1/2012 |
| UTIV | SJCatlin | B080110591U11 | 9/1/2011 | 9/1/2012 |
| UTIV | XL UK Ltd. | B080111977U11 | 9/1/2011 | 9/1/2012 |
| UTIV | SCOR Re | B080113965U11 | 9/1/2011 | 9/1/2012 |
| UTIV | Alterra Europe UK | B080113976U11 | 9/1/2011 | 9/1/2012 |
| UTIV | XL Bermuda | BM00025749LI11A | 9/1/2011 | 9/1/2012 |
| UTIV | AWAC | C003511/008 | 9/1/2011 | 9/1/2012 |
| UTIV | AWAC | C012739/002 | 9/1/2011 | 9/1/2012 |
| UTIV | Iron Starr Excess | IS0000630 | 9/1/2011 | 9/1/2012 |
| UTIV | Iron Starr Excess | IS0000631 | 9/1/2011 | 9/1/2012 |
| UTIV | Aspen UK | K0A065911A0E | 9/1/2011 | 9/1/2012 |
| UTIV | Swiss Re | MH32765.2.24 | 9/1/2011 | 9/1/2012 |
| UTIV | Swiss Re | MH32765.4.6 | 9/1/2011 | 9/1/2012 |
| UTIV | Endurance Specialty | P005341 007 | 9/1/2011 | 9/1/2012 |
| UTIV | ACE Bermuda | UTX-201112/OCCRE | 9/1/2011 | 9/1/2012 |
| UTIV | Canopius | UTX-214/UTIVOCCRE-11 | 9/1/2011 | 9/1/2012 |
| UTC Corporation | National Union Fire | 13273307 | 9/1/2012 | 10/1/2013 |
| UTC Corporation | Chartis Excess | 60703823 | 9/1/2012 | 10/1/2013 |
| UTC Corporation | Federal | 79861188 | 9/1/2012 | 10/1/2013 |
| UTC Corporation | American Guar & Liab | AEC534681507 | 9/1/2012 | 10/1/2013 |
| UTC Corporation | American Guar & Liab | AEC967326204 | 9/1/2012 | 10/1/2013 |
| UTC Corporation | Great American | EXC4646473 | 9/1/2012 | 10/1/2013 |
| UTC Corporation | North American Specialty | H2X000059400 | 9/1/2012 | 10/1/2013 |
| UTC Corporation | ACE American | XCPG27043367 | 9/1/2012 | 10/1/2013 |
| UTIV | Lexington London | 62785200 | 9/1/2012 | 10/1/2013 |
| UTIV | Argo Re | ARGO-CAS-OCC-RE-116.4 | 9/1/2012 | 10/1/2013 |
| UTIV | Aspen UK | B080110581U12 | 9/1/2012 | 10/1/2013 |
| UTIV | Liberty Mutual UK | B080110588U12 | 9/1/2012 | 10/1/2013 |
| UTIV | SJCatlin | B080110591U12 | 9/1/2012 | 10/1/2013 |
| UTIV | XL Ins. Ltd. | B080111977U12 | 9/1/2012 | 10/1/2013 |
| UTIV | SCOR Re | B080113965U12 | 9/1/2012 | 10/1/2013 |
| UTIV | Alterra UK | B080113976U12 | 9/1/2012 | 10/1/2013 |
| UTIV | Torus Ins. UK | B080114778U12 | 9/1/2012 | 10/1/2013 |

| UTIV | XL Bermuda | BM00026436LI12A | 9/1/2012 | 10/1/2013 |
| UTIV | AWAC | C003511/009 | 9/1/2012 | 10/1/2013 |
| UTIV | AWAC | C012739/004 | 9/1/2012 | 10/1/2013 |
| UTIV | Iron Starr Excess | IS0001053 | 9/1/2012 | 10/1/2013 |
| UTIV | Iron Starr | IS0001054 | 9/1/2012 | 10/1/2013 |
| UTIV | Swiss Re | MH97422.1 | 9/1/2012 | 10/1/2013 |
| UTIV | Endurance Specialty | P005341 008 | 9/1/2012 | 10/1/2013 |
| UTIV | TBD | TBD | 9/1/2012 | 10/1/2013 |
| UTIV | ACE Bermuda | UTX-201213/OCCRE | 9/1/2012 | 10/1/2013 |
| UTIV | Canopius | UTX-232/UTIVOCCRE-12 | 9/1/2012 | 10/1/2013 |

## Schedule 2

| POLICYHOLDER | INSURANCE CO | POLICY NO | POLICY PERIOD BEGIN | POLICY PERIOD END |
|---|---|---|---|---|
| Racal-Chubb | Lloyd's & London | 551/VV5203 | 4/1/1987 | 3/31/1988 |
| Racal-Chubb | Lloyd's & London | 551/VV5204 | 4/1/1987 | 3/31/1988 |
| Racal-Chubb | Lloyd's & London | 551/VA5309 | 4/1/1988 | 3/31/1989 |
| Racal-Chubb | Lloyd's & London | 551/V1K272 | 4/1/1991 | 3/31/1992 |
| Racal-Chubb | Lloyd's & London | 551/V2K158 | 4/1/1992 | 4/1/1993 |
| Racal-Chubb | Lloyd's & London | 551/V60302 | 4/1/1996 | 3/31/1997 |
| Williams Holdings plc | Lloyd's & London | 823/AK9725001<br>823/AK9725001(B)<br>823/AK9725002 | 1/1/1997 | 12/31/1997 |
| Williams Holdings plc | Lloyd's & London | 823/AB9800121<br>823/AB9800121(B)<br>823/AB9800122 | 1/1/1998 | 12/31/1998 |
| Williams Holdings plc | Lloyd's & London | 823/AB9900121<br>823/AB9900122 | 1/1/1999 | 12/31/1999 |
| Williams Holdings plc | Lloyd's & London | 823/AB0000121<br>823/AB0000122 | 1/1/2000 | 1/1/2001 |
| Kidde plc | Lloyd's & London | 823/AB0033011<br>823/AB0033012 | 11/13/2000 | 12/31/2001 |
| Kidde plc | Lloyd's & London | 576/AGP1722 | 1/1/2002 | 12/31/2002 |
| Kidde plc | Lloyd's & London | 576/AHP1722 | 1/1/2003 | 10/1/2003 |
| Kidde plc | Lloyd's & London | 576/AHP1839 | 10/1/2003 | 5/31/2004 |
| Kidde plc | Lloyd's & London | 576/AJP1839 | 6/1/2004 | 5/31/2005 |

**<u>Appendix B</u>**

**Liquidation Analysis**

## Appendix C

## Disclosure Statement Order