## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| KFI WIND-DOWN CORP.,[1] | Case No. 23-10638 (LSS) |
| Debtor. | |

## OBJECTION OF THE STATES OF MAINE AND VERMONT
## TO THE DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF
## LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**GRANT & EISENHOFER P.A.**

Frank H. Griffin (Del. Bar No. 7318)
123 Justison Street
Wilmington, DE 19801
Tel: 302-622-7047
Fax: 302-622-7100
fgriffin@gelaw.com

**GRANT & EISENHOFER P.A.**

Gordon Z. Novod (*pro hac vice* application to be filed)
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8523
Fax: 646-722-8501
gnovod@gelaw.com

**STATE OF MAINE**

AARON M. FREY
ATTORNEY GENERAL

Scott Boak (*pro hac vice* application to be filed)
Robert Martin (*pro hac vice* application to be filed)
Assistant Attorneys General
6 State House Station
Augusta, Maine 04333
(207) 626-8566
(207) 626-8897
Scott.Boak@maine.gov
Robert.Martin@maine.gov

**STATE OF VERMONT**

CHARITY R. CLARK
ATTORNEY GENERAL

Laura B. Murphy (*pro hac vice* application to be filed)
Assistant Attorney General
109 State Street
Montpelier, VT 05609-1001
(802) 828-3186
laura.murphy@vermont.gov

---

[1]    The last four digits of KFI Wind-Down Corp.'s tax identification number are 5282. The Debtor's corporate headquarters is located at c/o AlixPartners, 909 Third Avenue, New York, NY 10022.

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

RELEVANT BACKGROUND ............................................................................................ 5

ARGUMENT ........................................................................................................................ 14

I.      THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED
        BECAUSE IT DESCRIBES A PLAN THAT IS PATENTLY
        UNCONFIRMABLE. ............................................................................................... 14

II.     PROPERTY OF THE DEBTOR'S ESTATE ONLY INCLUDES CAUSES
        OF ACTION THAT BELONGED TO THE DEBTOR PRIOR TO THE
        PETITION DATE, BUT NOT CLAIMS THAT MAY ONLY BE PURSUED
        BY THE SOVEREIGNS, INCLUDING MAINE AND VERMONT ........................... 16

        A.      BANKRUPTCY CODE SECTION 541 LIMITS THE SCOPE OF PROPERTY
                BELONGING TO THE DEBTOR .............................................................. 16

                1.      Successor Liability Is Not a Cause of Action Under
                        State Law. ............................................................................... 17

                2.      Alter Ego and Veil Piercing Are Not Causes of Action
                        Under State Law .................................................................... 19

                3.      There is a Split of Authority in the Third Circuit as to
                        Whether Equitable Theories of Liability are "Property
                        of the Estate" ........................................................................ 21

III.    CONCLUSION ....................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Const. Corp. v. Pilecki*,
    2006 ME 84 (Me. 2006)........................................................................24

*Agway, Inc. v. Brooks*,
    790 A.2d 438 (2001)........................................................................24, 25

*In re Air Passenger Computer Reservations Sys. Antitrust Litig.*,
    724 F. Supp. 744 (C.D. Cal. 1989)........................................................23

*In re Am. Cap. Equip., LLC*,
    688 F.3d 145 (3rd Cir. 2012)...........................................................19, 20

*Argo Mktg. Grp., Inc. v. Nutramedics, Inc.*,
    2011 WL 4054655 (Me. Super. Ct. July 13, 2011)..........................24, 25

*Bd. of Trs. of Teamsters Local 863 v. Foodtown, Inc.*,
    296 F.3d 164 (3d Cir. 2002)........................................................ *passim*

*Bonnar-Vawter, Inc. v. Johnson*,
    173 A.2d 141 (1961)........................................................................24

*In re Buildings by Jamie, Inc.*,
    230 B.R. 36 (Bankr. D.N.J. Oct. 27, 1998)..........................................30

*Butner v. United States*,
    440 U.S. 48 (1979)........................................................................21

*Caplin v. Marine Midland Grace Trust Co.*,
    406 U.S. 416 (1972)........................................................................31, 33

*Ed Peters Jewelry Co. v. C & J Jewelry Co.*,
    124 F.3d 252 (1st Cir. 1997)...............................................................22

*Emoral, Inc. v. Diacetyl Plaintiffs (In re Emoral, Inc.)*,
    740 F.3d 875 (3d Cir. 2014)........................................................ *passim*

*In re Filex, Inc.*,
    116 B.R. 37 (Bankr. S.D.N.Y. 1990)...................................................20

*Gladstone v. Stuart Cinemas, Inc.*,
    2005 VT 44, 178 Vt. 104, 878 A.2d 214 ............................................23

*Golden State Bottling Co. v. N.L.R.B.*,
414 U.S. 168 (1973)..................................................................................................23

*Harrington v. Purdue Pharma L.P.*,
144 S. Ct. 2071 (2024).................................................................................................8

*Jack C. Keir, Inc. v. Robinson & Keir P'ship*,
560 A.2d 957 (1989)..................................................................................................25

*Lee Acad. Educ. Ass'n v. Acad.*,
556 A.2d 218 (Me. 1989)...........................................................................................24

*Mahar v. Sullivan & Merritt*,
2013 Me. Bus. & Consumer LEXIS 27 (Maine Business and Consumer Court
July 18, 2013)............................................................................................................22

*Mahoney v. Beacon Hill Builders & Assocs.*,
2021 Vt. Super. LEXIS 41 (Vt. Super. Ct. Nov. 16, 2021) ......................................25

*In re Main St. AC, Inc.*,
234 B.R. 771 (Bankr. N.D. Cal. 1999) .....................................................................20

*In re Market Square Inn, Inc.*,
163 B.R. 64 (Bankr. W.D. Pa. 1994) ........................................................................20

*In re Motors Liquidation Co.*,
529 B.R. 510 (Bankr. S.D.N.Y. 2015), *aff'd in part, vacated in part, rev'd in
part sub nom.*

*In Matter of Motors Liquidation Co.*, 829 F.3d 135 (2d Cir. 2016), *and aff'd in
part, vacated in part, remanded,* 590 B.R. 39 (S.D.N.Y. 2018), *aff'd,* 943 F.3d
125 (2d Cir. 2019).....................................................................................................31

*Ostrowski v. Hydra-Tool Corp.*,
479 A.2d 126 (1984)..............................................................................................22, 23

*In re Phoenix Petroleum Co.*,
278 B.R. 385 (Bankr. E.D. Pa. 2001) .......................................................................19

*Picard v. JPMorgan Chase Bank & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*,
721 F.3d 54 (2d Cir. 2013).........................................................................................31

*Rhode Island v. Atl. Richfield Co.*,
357 F. Supp. 3d 129 (D.R.I. 2018).............................................................................7

*Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., v. Navimpex
Centrala Navala*,
989 F.2d 572 (2d Cir. 1993)......................................................................................23

*In re Smallhold, Inc.*,
    No. 24-10267 (CTG), 2024 WL 4296938 (Bankr. D. Del. Sept. 25, 2024) ...........................21

*State v. Exxon Mobil Corp.*,
    126 A.3d 266 (N.H. 2015) ............................................................................................................7

*State v. Exxon Mobil Corp.*,
    406 F. Supp. 3d 420 (D. Md. 2019) ...........................................................................................7

*United States v. Whiting Pools*, Inc.
    462 U.S. 198 (1983)...................................................................................................................21

*In re Vermont Toy Works, Inc.*,
    135 B.R. 762 (D. Vt. 1991)......................................................................................................25

*In re Wilton Armetale, Inc.*,
    968 F.3d 273 (3d Cir. 2020)........................................................................................26, 32, 33

## Statutes

11 U.S.C. §§ 101 et seq............................................................................................... *passim*

11 U.S.C. § 541 ........................................................................................................................21

11 U.S.C. § 541(a)(1).........................................................................................................21, 27

11 U.S.C. § 1102 ......................................................................................................................14

11 U.S.C. § 1107(a) ..................................................................................................................10

11 U.S.C. § 1108 ......................................................................................................................10

11 U.S.C. § 1123(b)(3)(A)........................................................................................................20

11 U.S.C. § 1129 ......................................................................................................................20

11 U.S.C. § 1129(a)(1)..............................................................................................................20

Me. Rev. Stat. Ann. tit. 38, § 401 ..............................................................................................7

10 Vt. Stat. Ann. § 1390(3)........................................................................................................7

10 Vt. Stat. Ann. § 1410 ...........................................................................................................12

## Other Authorities

Fed. R. Bankr. P. 2019 ..............................................................................................................15

The State of Maine ("Maine") and the State of Vermont ("Vermont"), by and through their undersigned counsel, hereby object to the Approval of the Debtor's Motion For Entry Of An Order (I) Approving The Adequacy Of The Disclosure Statement And Form And Manner Of Notice Of Hearing Thereon; (II) Establishing Solicitation Procedures; (III) Approving The Form And Manner Of Notice To Attorneys And Solicitation Directive; (IV) Approving The Form Of Ballots; (V) Approving The Form, Manner And Scope Of Confirmation Notices; (VI) Establishing Certain Deadlines In Connection With Approval Of Disclosure Statement And Confirmation Of Plan; And (VII) Granting Related Relief (the "Disclosure Statement Motion"), and thus request that this Court deny the Debtor's request for approval to solicit votes on the Plan.

## PRELIMINARY STATEMENT

1.      In May 2023, the Debtor filed for protection under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). The Debtor's filing followed an onslaught of thousands of lawsuits relating to the manufacturing, marketing, and sales of aqueous film-forming foams containing PFAS chemicals ("AFFF") by the Debtor.[2] Plaintiffs in these cases include Maine, Vermont, and other sovereigns, as well as individuals and public water providers, who generally allege that the manufacturing, marketing, and sales of AFFF caused contamination and other injuries.

2.      PFAS are humanmade chemicals that do not exist naturally in the environment. PFAS are referred to as "forever chemicals" because they do not degrade, and so once they are released into the environment they remain there for long periods of time absent the use of expensive technologies to remove them. PFAS bioaccumulate in humans and are associated with a wide variety of adverse health effects.

---

[2]    PFAS refers to per- and polyfluoroalkyl substances.

1

3.      Maine and Vermont sued the Debtor and other manufacturers, marketers, and sellers of AFFF as trustees of natural resources, in their *parens patriae* capacities on behalf of all of their residents, and pursuant to their statutory, common law, and other authorities and powers to protect public health and the environment in their states. Sovereigns such as Maine and Vermont are uniquely situated to remedy risks to public health and the environment compared to other plaintiffs. *See, e.g., State v. Exxon Mobil Corp.*, 126 A.3d 266, 290 (N.H. 2015) (upholding judgment for State awarding damages for, inter alia, costs of monitoring and treating public water systems and holding that the "State was the proper party to bring suit against the MTBE defendants, because it has a quasi-sovereign interest in protecting the health and well-being, both physical and economic, of its residents with respect to the statewide water supply" (internal quotations omitted)).[3] Vermont holds its groundwater resources in trust for all citizens of the state, and the Vermont General Assembly has declared that it "is the policy of the State that the State shall protect its groundwater resources to maintain high-quality drinking water." 10 Vt. Stat. Ann. § 1390(3); *see also id.* § 1390(5) ("It is the policy of the State that the groundwater resources of the State are held in trust for the public."). The Maine Legislature likewise has declared that the "protection of ground water resources is critical to promote the health, safety and general welfare of the people of the State"; that aquifers "provide a significant amount of the water used by the people of the State" and are "critical elements in the hydrologic cycle"; and that an "adequate supply of safe drinking water is a matter of the highest priority and that it is the policy of the State to protect, conserve and maintain ground water supplies in the State." 38 Me. Stat. § 401.

---

[3]     *See also State v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420, 470 (D. Md. 2019) ("The State brings this suit for the widespread contamination of its waters. This is an injury that is properly redressed in *parens patriae*."); *Rhode Island v. Atl. Richfield Co.*, 357 F. Supp. 3d 129, 135, 144 (D.R.I. 2018) (suit for statewide contamination of public drinking water wells; upholding trespass claim: "While possessory interests are usually for individual owners themselves to protect, when the harm to such interests is as widespread as alleged in the State's complaint, it counts as injury not just to the affected individuals, but to the state as a whole.").

4.      Maine and Vermont, unlike non-sovereign plaintiffs, have the unique ability to seek natural resource damages including restoration of AFFF-contaminated groundwater, surface waters, soils, and other natural resources to their pre-discharge condition to remove AFFF-related PFAS to non-detect. Such natural resource restoration damages will be substantial because it is very expensive to remove AFFF-related PFAS from the environment. In this regard, each state, such as Maine and Vermont, is uniquely situated to recover categories of damages that were caused by the manufacturing, marketing, and sales of AFFF that may not be sought by other plaintiffs who seek damages for personal injuries, medical monitoring, and other types of losses.

5.      The Debtor sought chapter 11 protection, with an eye to selling its assets and unwinding its relationship with the Debtor's owner, Carrier Global Corporation ("Carrier"). A global mediation commenced in the late fall of 2023. But in June 2024, the Debtor and Carrier hit a major roadblock. The Supreme Court issued its decision in *Purdue Pharma* holding that the Bankruptcy Code does not authorize the confirmation of plans of reorganization containing the release of a creditor's claim against a non-debtor without that creditor's consent. *See Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071 (2024). In the wake of the landmark *Purdue* decision, the Debtors and Carrier struck out on a new path to get to the same result by granting Carrier an expansive release via an overly broad, and unlawful definition of "Estate Causes of Action." This 'work-around' relies on the Plan's broad 'estate' release from the Debtor for all of Carrier's and RTX's AFFF liability to the States of Maine and Vermont. The Plan impermissibly permits the Debtor to take control over and to settle causes of action that uniquely belong to Maine and Vermont, along with the other sovereigns, against Carrier. In doing so, the Plan effectively treats Carrier as a 'debtor' under chapter 11 of the Bankruptcy Code without subjecting Carrier to the

requirements of chapter 11, including those governing the Court's consideration of confirmation of the Plan.

6.      For decades, the Debtor and other non-debtor entities manufactured, marketed, and sold AFFF containing PFAS, which resulted in AFFF-related PFAS contamination at specific locations in Maine and Vermont, as well as other locations across the country.

7.      The Debtor and its predecessor entities manufactured, marketed, and sold AFFF products, and promoted AFFF products as safe and appropriate for widespread use even though they knew, or at the very least should have known, that in their intended and common use, their PFAS-containing AFFF products would pose substantial risks to the environment and human health.

8.      As relevant here, Maine and Vermont have sued (i) RTX (formerly known as UTC), (ii) Carrier Fire & Security Americas LLC (formerly known as Carrier Fire & Security Americas Corporation and successor to UTC Fire & Security Americas Corporation, Inc.), and (iii) Carrier Global Corporation. The states allege that RTX and Carrier Fire & Security Americas LLC are liable based upon separate and independent theories and claims involving their direct, successor, and contractual assumption of liabilities for designing, manufacturing, distributing, and selling PFAS-containing AFFF and that Carrier Global Corporation is liable based upon contractual assumption of liabilities.

9.      The Plan seeks to permit Carrier (and indirectly RTX), to evade responsibility for their AFFF Liability. Carrier and the Debtor seek to accomplish this through the Plan's broad 'estate' release from the Debtor for all of Carrier's and RTX's AFFF liability to the States of Maine and Vermont. At issue here is whether the Debtor can settle causes of action possessed by Maine

and Vermont, along with the other sovereigns, against Carrier (the Debtor's current owner), RTX, and Carrier Fire & Security Americas LLC in connection with AFFF Liability (as defined below).

## RELEVANT BACKGROUND

10.     The Debtor is a Delaware corporation with its headquarters in New York, NY. Prior to the consummation of the Sale (as defined below), the Debtor used to manufacture AFFF products, as well as fire protection and suppression systems, including fire detectors, alarm notification appliances, fire suppression control units, fire suppression-agent delivery systems, electronic gas burner controls, mechanical temperature controls, and fire and overheat detectors.

11.     On May 14, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court"). The Debtor continues to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12.     Prior to the Petition Date, "KFI and various of its affiliates ha[d] been named as defendants in more than 4,400 lawsuits filed by governmental entities, corporate entities and individuals alleging that the historic use of AFFF caused the contamination of drinking water and soil, personal injuries and/or property damage (collectively, the "AFFF Litigation")." D.I. 3, ¶ 46. "In 2018, AFFF-related litigations were consolidated into multi-district litigation (the "MDL") in Charleston, South Carolina, with Judge Richard Gergel presiding." *Id.* The MDL is captioned *In re Aqueous Film-Forming Foams Products Liability Litigation*, MDL No. 2:18-mn-2873-RMG (D.S.C.). The MDL Court appointed a plaintiffs' leadership structure in the MDL, with (i) the following law firms serving as the MDL's "Plaintiffs' Co-Lead Counsel": Baron & Budd, P.C., Douglas & London, P.C., and Motley Rice LLC, (ii) the following law firms, *inter alia*, serving on the MDL's Plaintiffs' Executive Committee: Kennedy & Madonna, LLP, Napoli Shkolnik PLLC, SL Environmental Law Group P.C., and Weitz & Luxenberg, P.C., and (iii) the law firm

of Taft Stettinius & Hollister LLP serving as the MDL's 'Plaintiffs' Advisory Committee.' *See* https://www.scd.uscourts.gov/mdl-2873/contact.asp#plcounsel.

13. On June 24, 2024, Maine filed its Amended Complaint against (i) Carrier Fire & Security Americas LLC (formerly known as Carrier Fire & Security Americas Corporation), (ii) Carrier Global Corporation, and (iii) RTX Corporation. *See State of Maine v. 3M Company, et al.*, Civil Action No. 2:23-cv-02573-RMG (D.S.C.), D.I. 23 (the "Maine Amended Complaint" or "ME Am. Compl."). The Maine Amended Complaint asserts direct and indirect claims against Carrier, Carrier Fire & Security Americas LLC, and RTX Corporation. *See id.*, ¶¶ 357- 428. Claims asserted in the Maine Amended Complaint are as follows: (i) Public Nuisance; (ii) Statutory Nuisance under 17 M.R.S. §§ 2701 & 2802; (iii) Common-Law Trespass; (iv) Strict Liability for Design Defect and/or Defective Product under 14 M.R.S. § 221; (v) Strict Liability for Failure to Warn under 14 M.R.S. § 221; (vi) Negligence. *See id.*, ¶¶ 357- 428.

14. Maine brings these claims in its capacity as trustee of State natural resources, in its *parens patriae* capacity on behalf of State citizens, and to protect its own interests in property pursuant to its statutory, common law, and other authorities and powers to protect public health and the environment in Maine. *Id.* ¶¶ 21, 23-25. State natural resources, including groundwater, are "vital to the health, safety, and welfare of Maine citizens, and to the State's economy and ecology." *Id.* ¶ 217. Numerous locations in Maine are contaminated and injured by AFFF-related PFAS, including at extremely high levels in groundwater, and AFFF-related PFAS contamination "has injured State natural resources and/or adversely impacted their beneficial trust uses including those for drinking water, recreation, and fishing," and has "substantially damaged the intrinsic value of these State natural resources." *Id.* ¶¶ 209-210. AFFF-related PFAS contamination of Maine's natural resources and property, "absent large-scale and costly remediation and/or

treatment, will continue indefinitely, and will continue to indefinitely threaten such natural resources and property." *Id.* ¶ 248.

15.    On September 4, 2024, Vermont filed its Amended Complaint against (i) Carrier Fire & Security Americas LLC (formerly known as Carrier Fire & Security Americas Corporation), (ii) Carrier Global Corporation, and (iii) RTX Corporation. *See* State of Vermont v. 3M Company et al., Civil Action No. 2:19-cv-02281-RMG (D.S.C.), D.I. 104 (the "<u>Vermont Amended Complaint</u>" or "<u>VT Am. Compl.</u>"). The Vermont Amended Complaint asserts direct and indirect claims against Carrier, Carrier Fire & Security Americas LLC, and RTX Corporation. *See id.*, ¶¶ 385- 470. Claims asserted in the Vermont Amended Complaint include: (i) Civil Action for Natural Resource Damages and Restoration; (ii) violation of Vermont's Groundwater Protection Act, 10 V.S.A. § 1410; (iii) Strict Liability for Design Defect and/or Defective Product; (iv) Strict Liability for Failure to Warn; (v) Negligence; (vi) Public Nuisance; (vii) Private Nuisance; and (viii) Trespass. *See id.*, ¶¶ 385- 470.

16.    Vermont brings claims in its capacity as trustee of State natural resources, in its *parens patriae* capacity on behalf of State citizens, and to protect its own interests in property pursuant to its statutory, common law, and other authorities and powers to protect public health and the environment in Vermont. *Id.* ¶¶ 14, 19-20. State natural resources, including groundwater, are "vital to the health, safety, and welfare of Vermont citizens, and to the State's economy and ecology." *Id.* ¶ 355. AFFF-related PFAS contamination and injury of State natural resources including groundwater and soil has been found at a number of locations in Vermont, "has injured State natural resources and/or adversely impacted their beneficial trust uses including those for drinking water," and has "substantially damaged the intrinsic value of these State natural resources." *Id.* ¶¶ 327-348. AFFF-related PFAS contamination of Vermont's natural resources and

property, "absent large-scale and costly remediation and/or treatment, will continue indefinitely, and will continue to indefinitely threaten such natural resources and property." *Id.* ¶ 384.

17.    The Maine and Vermont complaints allege that Carrier, Carrier Fire & Security Americas LLC, and RTX Corporation knew, or should have known, that their PFAS-containing AFFF products would injure each state's natural resources. ME Am. Compl., ¶ 189; VT Am. Compl., ¶ 198. The states' complaints further allege that these defendants were members of the Firefighting Foam Coalition ("FFFC"), an AFFF trade group formed in 2001 to advocate for AFFF's continued use and that highlighted that only one PFAS chemical, PFOS, had been taken off the market, and that their products did not contain PFOS. ME Am. Compl., ¶¶ 191-194; VT Am. Compl., ¶¶ 200-207. But the FFFC defendants' products did contain a different toxic PFAS chemical known as PFOA, and the FCCC defendants misled the U.S. EPA during a September 29, 2001 meeting that their AFFF "does not contain any PFOA-based product." ME Am. Compl., ¶ 196. UTC (now RTX) knew that the FFFC falsely told the federal government that UTC's AFFF did not contain C8 surfactants including PFOA. ME Am. Compl., ¶¶ 38, 348; VT Am. Compl., ¶ 318. In a 2008 email exchange, one of UTC's employees observed that the FFFC had been "economical with the truth" when it led "the EPA to believe that fire fighting foam agents were only made with [non-PFOA] surfactants." ME Am. Compl., ¶ 348; VT Am. Compl., ¶ 318. Thus, the FFFC defendants repeatedly asserted that their products were safe because they did not contain PFOS even though they knew (or should have known) that PFOA was equally harmful to public health and the environment, and these efforts "were designed to conceal information on PFOA's risks to human health and the environment from the public and regulators." ME Am. Compl., ¶ 191-194, 196; VT Am. Compl., ¶¶ 200-209.

18.    On May 31, 2023, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "UCC") pursuant to section 1102 of the Bankruptcy Code in the Debtor's chapter 11 case (the "Chapter 11 Case") [D.I. 83]. The UCC is comprised of nine (9) members: (i) California Walter Service Company, represented by the law firm of Baron & Budd; (ii) Peoples Water Company of Florida, Inc., represented by the law firm of Kennedy & Madonna, LLP; (iii) Bellflower-Somerset Mutual Water Company, represented by the law firm of SL Environmental Law Group P.C.; (iv) Arthur Schaap d/b/a Highland Dairy, represented by the law firm of NSPR Law Services d/b/a Napoli Shkolnik; (v) Patrick Williams, represented by the law firm of Douglas & London PC; (vi) Richard M. Bivone, represented by the law firm of Slater Slater Schulman LLP; (vii) David Hermann, represented by the law firm of Weitz & Luxenberg, PC; (viii) Terry T. Miller, represented by the law firm of Alystock Witkin Kreis & Overholtz.; and (ix) S.O. Sales, represented by the law firm of Seder Law. As a result, almost all members of the UCC are represented by the same law firms who hold leadership roles in the MDL, as follows in Table 1:

**TABLE 1**

| Law Firm | Counsel for UCC Member | MDL | | |
|---|---|---|---|---|
| | | Plaintiffs' Co-Lead Counsel | Plaintiffs' Executive Committee | Plaintiffs' Advisory Committee |
| Baron & Budd, P.C. | X | X | | |
| Douglas & London PC | X | X | | |
| Motley Rice LLC | | X | | |
| NSPR Law Services d/b/a Napoli Shkolnik LLC | X | | X | |
| Kennedy & Madonna, LLP | X | | X | |
| SL Environmental Law Group P.C. | X | | X | |
| Weitz & Luxenberg, P.C. | X | | X | |
| Taft Stettinius & Hollister LLP | X | | | X |
| Slater Slater Schulman LLP | X | | | |
| Alystock Witkin Kreis & Overholtz | X | | | |
| Seder Law | X | | | |

9

19.     On April 2, 2024, this Court entered an Order (I) Approving the Sale of All or Substantially All of the Debtor's Assets, Free and Clear of Liens, Claims, Interests and Encumbrances, (II) Approving Debtor's Entry, and Performance Under the Contribution Agreement, (III) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases and (IV) Granting Related Relief [D.I. 1058] (the "Sale Order"). Among other things, the Sale Order approved the sale of substantially all of the Debtor's assets (the "Sale") to a third party purchaser. The Sale was made on July 1, 2024.

20.     Maine and Vermont are members of the Ad Hoc Committee of Governmental Claimants (the "AHC") in the above-captioned bankruptcy case (the "Case"). The AHC, which is comprised of 27 states and territories of the United States (each a "Sovereign"), was formed in the Chapter 11 Case to protect the interests of Sovereign claimants whose interests are not formally represented by the UCC or the Plaintiffs' Co-Lead Counsel in the Chapter 11 Case.[4] While the resolution of claims against the Debtor related to AFFF-related PFAS are of paramount importance in the Chapter 11 Case, so are the interests of Sovereigns like Maine and Vermont in pursuing remedies against Carrier and its affiliates for the damages caused by AFFF. And it is those interests of Sovereigns like Maine and Vermont that cannot be extinguished by Kidde's Chapter 11 plan.

21.     On October 18, 2024, the Debtor filed a document titled "Notice of Entry of Plan Support Agreement." *See* D.I. 1570. Attached as Exhibit A to that filing was a support agreement (the "Plan Support Agreement") by and among the Debtor, the UCC, the MDL's "Plaintiffs' Co-Lead Counsel," and Carrier regarding: (i) the settlement of the estate's claims against Carrier (the "Estate Claims"); (ii) the terms of a proposed chapter 11 plan and exit strategy for the Chapter 11

---

[4]     The AHC's members are listed on the *Twelfth Amended Verified Statement of the Ad Hoc Committee of Governmental Claimants of Kidde-Fenwal, Inc. Pursuant to Bankruptcy Rule 2019*, filed on September 10, 2024. *See* D.I. 1474.

Case; and (iii) the settlement of certain claims that have been, or could be, asserted by certain plaintiffs in the MDL directly against Carrier and/or UTC (the "Independent Claims").

22.    On November 14, 2024, the Debtor filed its Plan of Liquidation Under Chapter 11 of the Bankruptcy Code, D.I. 1619. On April 11, 2025, the Debtor filed its Third Amended Plan of Liquidation Under Chapter 11 of the Bankruptcy Code (the "Plan"), D.I. 2053-1.

23.    The Plan adopts an unlawfully broad definition of "Estate Causes of Action" and related "Releases by the Estate." The Plan defines "*Estate Causes of Action*" to mean:

> ***Causes of Action owned*** or held ***by either the Debtor or its Estate***, ***or capable of being asserted*** (currently, or in the future) ***by any*** Person or ***Governmental Unit*** on behalf of, under or through, either the Debtor or its Estate, and each of their respective successors or assigns, whether known or unknown, in law, at equity or otherwise, whenever and wherever arising under the laws of any jurisdiction, including actions that arise out of or are based on breach of contract, fraudulent conveyances and transfers, breach of fiduciary duty, breach of duty of loyalty or obedience, legal malpractice, recovery of attorneys' fees, turnover of property and avoidance or recovery actions of the Debtor or its Estate, and ***all other actions that constitute property of the Estate under section 541 of the Bankruptcy Code that are or may be pursued by a representative of the Estate***, including pursuant to section 323 of the Bankruptcy Code, and actions, including Avoidance Actions, that may be commenced by a representative of the Estate under section 362 or chapter 5 of the Bankruptcy Code, seeking relief in the form of damages (actual and punitive), imposition of a constructive trust, turnover of property, restitution, and declaratory relief with respect thereto or otherwise. Without limiting the foregoing, ***Estate Causes of Action shall include***: (a) ***Causes of Action that*** on or after the Petition Date ***may be exclusively asserted by or on behalf of the Debtor or its Estate*** under applicable law, or ***that prior to the Petition Date could have been asserted by the Debtor on its own behalf under applicable law***, ***including Causes of Action based on*** (i) ***the doctrine of successor liability that seek to impose the Debtor's (including KFFI's or National Foam, Inc.'s) liabilities on an alleged successor***, whether ***based on a contractual assumption of liability***, consolidation or de facto merger, acquisition of the Debtor's product line, fraud, domination, direction of the Debtor's affairs, defects in or misuse of the corporate form, single business enterprise, common enterprise, or mere continuation, or ***(ii) the doctrines of alter ego or veil piercing involving alter egos of the Debtor or the piercing of the Debtor's (including KFFI's or National Foam, Inc.'s) corporate veil***, whether based on inadequate capitalization, insolvency, failure to observe corporate formalities, fraud, domination, or misuse of the corporate form; (b) ***Causes of Action or theories***

11

*for recovery or remedies that seek to impose liability for a Claim against the Debtor on any non-Debtor based on a theory of liability that is not specific to one or more particular creditors and is generally common to creditors of the Debtor and can be asserted by the Debtor under applicable law*; and (c) all other Causes of Action that are property of the Estate under the Bankruptcy Code, including any other form of derivative or vicarious liability for liabilities of the Debtor. *Subsections (a), (b) and (c) immediately above expressly encompass any Causes of Action based on: (i) the alleged assumption of the Debtor's (including KFFI's or National Foam, Inc.'s) liabilities (but not a non-Debtor's liabilities) by Kidde plc (n/k/a Kidde Limited) pursuant to the 2000 Demerger Agreement, or any alleged subsequent assumption of such liabilities of the Debtor from Kidde plc by any other Released Party*; or (ii) the *alleged assumption of the Debtor's liabilities* (but not a non-Debtor's liabilities), *including any liabilities* resulting from acts or omissions of National Foam, Inc. or KFFI, by a Released Party *pursuant to the 2020 Separation Agreement*. For the avoidance of doubt, Estate Causes of Action shall not include any Independent AFFF Causes of Action or any Sovereign State Retained Causes of Action or Insurance Actions against any Released Party based on acts or omissions occurring after entry into the Plan Support Agreement with respect to rights under the 2020 Separation Agreement or the RTX Waiver to access and make Claims under any Insurance Policy or otherwise obtain the benefit of the Insurance Assignment.

Plan, §2.1.74 (emphasis added).

24.     The Plan also defines "*Estate Claims Settlement*" as "the settlement, including the release of all Estate Causes of Action against the Released Parties, pursuant to the Estate Claims Settlement Agreement." Plan, §2.1.77.

25.     The Plan defines "*Released Claims*" as "all Claims or Causes of Action, including all Estate Causes of Action, that are released under the Plan and the Confirmation Order. For the avoidance of doubt, no Independent AFFF Causes of Action or Sovereign State Retained Causes of Action shall be Released Claims." Plan, §2.1.172.

26.     The Plan defines "*Released Party*" to include "Carrier, RTX, and each of their Related Parties in their capacities as such." Plan, §2.1.173.

27.     The Plan defines "*Related Party*" as follows:

with respect to any Person, such Person's (a) predecessors, successors, assigns, and current and former affiliates and subsidiaries, (b) current and former

12

officers, directors, principals, equity holders, trustees, members, partners, managers, officials, board members, advisory board members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, all only in their capacity as a representative of such Person, and (c) respective heirs, executors, estates, and nominees, in each case solely in its capacity as such.

Plan, §2.1.174.

28.     The Plan defines "*Sovereign State Retained Cause of Action*" as follows:

any Claim or Cause of Action asserted, or which may be asserted, by a Sovereign State against a Contributing Party that (1) is not an Estate Cause of Action and (2) arises from a statute, regulation, or common law that creates a theory of liability, by which a Sovereign State could recover damages or penalties, or obtain equitable or injunctive relief, against a Contributing Party. For the avoidance of doubt, a Sovereign State may assert a Sovereign State Retained Cause of Action irrespective of whether such Sovereign State Retained Cause of Action could also be considered an Independent AFFF Cause of Action.

Plan, §2.1.200.

29.     The Plan provides for releases by the Debtor's estate, as follows:

*As of the Effective Date*, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, pursuant to sections 105(a) and 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, *each Released Party*, the Debtor, the Liquidating Estate and each Related Party of the Debtor and the Liquidating Estate *shall be, and shall be deemed to be, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by* the Debtor, its Estate, or *any* other Person or *Governmental Unit asserting currently or in the future* by, under, through, or on behalf of the Debtor or its Estate, and each of their respective successors or assigns, including the Settlement Trusts, *of and from any and all Estate Causes of Action based on or relating to, or in any manner arising from any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date in connection with or related to the Debtor, the Estate, their respective current or former assets and properties*, the Chapter 11 Case, *AFFF, AFFF Claims*, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated by the Plan, the business or contractual arrangements, including the Shared Services Agreement, between one or both of the Debtor, on the one hand, and any Released Party, the Liquidating Estate, or any Related Party of the Debtor and the Liquidating Estate, the restructuring of any Claim or Interest that is treated by the Plan before or during the Chapter 11 Case, any of the Plan

13

> Documents, or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Case or the negotiation, formulation, preparation, or implementation thereof, the pursuit of confirmation, the administration and implementation of the Plan, the solicitation of votes with respect to the Plan, the distribution of any property under the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. …

Plan, § 10.3 (original emphasis removed, and new emphasis added).

30. In plain English, these Plan provisions build on each other and ultimately result in the broad release of Carrier and RTX of claims and causes of action that could only be prosecuted by Maine and Vermont, and could never be prosecuted by the Debtor. The Plan permits Carrier and RTX to be released by the Debtor of all claims, including those that the Debtor purports to be permitted to assert notwithstanding that the states of Maine and Vermont may be asserting claims and causes of action that are exclusively the sovereigns to pursue, such as those in their capacities as trustees of natural resources and in their *parens patriae* capacities on behalf of all of their residents. *See supra* ¶¶ 3-4, 13-16.

## ARGUMENT

## I.   THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE IT DESCRIBES A PLAN THAT IS PATENTLY UNCONFIRMABLE.

31. This Court should not approve the Disclosure Statement because the Plan that the Disclosure Statement describes is patently unconfirmable. Where it is clear that a plan cannot be confirmed, a court may refuse to approve the disclosure statement. *See e.g., In re Am. Cap. Equip., LLC*, 688 F.3d 145, 154 (3rd Cir. 2012) ("[A] '[c]ourt [should] not proceed with the time-consuming and expensive proposition of hearings on a disclosure statement … when the plan may not be confirmable because it does not comply with [confirmation requirement]'.") (citations omitted); *see also In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) (where plan is so fatally flawed that confirmation is not possible, the court should refuse to consider the

14

adequacy of disclosure); *In re Market Square Inn, Inc.*, 163 B.R. 64, 67-8 (Bankr. W.D. Pa. 1994) ("Where it is clear that a plan of reorganization is not capable of confirmation, it is appropriate to refuse the approval of the disclosure statement."); *In re Filex, Inc.*, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990) ("[The] court will not approve a disclosure statement for an admittedly unconfirmable plan"). While Plan confirmation issues are typically reserved for the confirmation hearing, "[c]ourts have recognized that 'if it appears there is a defect that makes a plan inherently or patently unconfirmable, the [c]ourt may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing.'" *Am. Cap. Equip.*, 688 F.3d at 153 (citations omitted); *see also In re Main St. AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999) ("It is now well accepted that a court may disapprove of a disclosure statement ... if the plan could not possibly be confirmed."). In this case, the Plan described by the Disclosure Statement cannot be confirmed because it violates various confirmation requirements under section 1129 of the Bankruptcy Code.

32.     More specifically, the Plan's definition of "Estate Causes of Action" violates Bankruptcy Code section 1129(a)(1), as Bankruptcy Code section 1123(b)(3)(A) only permits "the settlement … of any claim … belonging to the debtor or to the estate." Here, however, the "Estate Causes of Action" that would be released under the Plan include claims that belong to Maine and Vermont ( not to the Debtor's estate) against Carrier and other released parties. Maine and Vermont believe that this issue may be decided without resort to any evidence at the confirmation hearing that "might inform the question of the release's propriety."[5]

33.     As a result, there is no reason to delay consideration of this matter to the confirmation hearing and the Court should disapprove the Disclosure Statement now prior to

---

[5] The states reserve the right to address any evidence, if any, that the Court may consider.

solicitation. *See In re Smallhold, Inc.*, No. 24-10267 (CTG), 2024 WL 4296938, at \*6 (Bankr. D. Del. Sept. 25, 2024) ("in circumstances in which a release is obviously overbroad or unjustified, a court could take up the issue at the disclosure statement stage").

## II. PROPERTY OF THE DEBTOR'S ESTATE ONLY INCLUDES CAUSES OF ACTION THAT BELONGED TO THE DEBTOR PRIOR TO THE PETITION DATE, BUT NOT CLAIMS THAT MAY ONLY BE PURSUED BY THE SOVEREIGNS, INCLUDING MAINE AND VERMONT.

### A. BANKRUPTCY CODE SECTION 541 LIMITS THE SCOPE OF PROPERTY BELONGING TO THE DEBTOR

34.     Upon the filing of a bankruptcy petition, the Bankruptcy Code creates an estate that includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Section 541(a)(1) defines "property of the estate" to include "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Such "property" includes any causes of action that belong to or could be asserted by the debtor absent any bankruptcy filing. *See, e.g.*, *United States v. Whiting Pools, Inc.* 462 U.S. 198, 205 n.9 (1983); *Emoral, Inc. v. Diacetyl Plaintiffs (In re Emoral, Inc.)*, 740 F.3d 875, 879 (3d Cir. 2014).

35.     While causes of action that belong to a debtor prior to filing of a voluntary petition for relief under the Bankruptcy Code constitute estate property, the determination of the scope of the estate – including which causes of action belong to a debtor – is ultimately one of state law. *See Butner v. United States*, 440 U.S. 48, 49 (1979).

36.     Consistent with this, the *Collier on Bankruptcy* treatise states:

> The Supreme Court has stated that "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law. … Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."

5 *Collier on Bankruptcy*, ¶ 541.03 (16th Ed. 2024) (citing to *Butner*, and stating that "[t]his general principal was reaffirmed in *Travelers Casualty & Surety Co. v. Pacific Gas & Electric Co.*, 549 U.S. 443, 127 S. Ct. 1199, 1205, 167 L. Ed. 2d 178, 186 (2007), and in *Raleigh v. Ill. Dep't of Rev. (In re Stoecker)*, 530 U.S. 15, 20, 120 S. Ct. 1951, 147 L. Ed. 2d 13, 43 C.B.C.2d 869 (2000)).

37.    Accordingly, it should be beyond serious dispute that a claim can only be property of the debtor's estate if the debtor (or bankruptcy trustee) can assert that claim as a matter of state law. And, of course, if there is no state law right for the debtor to asset the claim, then Bankruptcy Code section 541(a) does not create such a right for the debtor to assert (or settle) that claim.

### 1.    Successor Liability Is Not a Cause of Action Under State Law.

38.    Successor liability is not a cause of action, but rather an equitable doctrine or a theory of liability that imposes the liabilities of a corporate predecessor on its successor. *See Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 124 F.3d 252, 267 (1st Cir. 1997) ("successor liability is an equitable doctrine, both in origin and nature"). In Maine, Vermont, and elsewhere, it is an exception to the default rules regarding the transfer of corporate liabilities.

39.    For example, under Maine law, "absent a contrary agreement by the parties, or an explicit statutory provision in derogation of the established common law rule, a corporation that purchases the assets of another corporation in a bona fide, arm's-length transaction is not liable for the debts or liabilities of the transferor corporation." *Mahar v. Sullivan & Merritt*, 2013 Me. Bus. & Consumer LEXIS 27, at *4 (Maine Business and Consumer Court July 18, 2013).

40.    Similarly, under Vermont law, as a general rule of corporate liability, the "liabilities of a predecessor corporation will pass to the successor only when the change is occasioned by statutory merger or consolidation." *Ostrowski v. Hydra-Tool Corp.,* 144 Vt. 305, 307, 479 A.2d 126, 127 (1984) (finding a successor company liable where it agrees to assume liabilities where corporate change effected was through a sale of assets only). If a corporation sells all of its assets

17

to another, the latter is generally not responsible for the seller's debts or liabilities that were not

part of the sale. *Golden State Bottling Co. v. N.L.R.B.*, 414 U.S. 168, 182 n.5 (1973); *Ostrowski*,

144 Vt. at 307, 479 A.2d at 127.

41.     Nonetheless, under the doctrine of successor liability, a successor entity may be

responsible for the seller's liabilities where, for example:

> (1) the buyer expressly or impliedly agrees to assume such liabilities; (2) the
> transaction amounts to a de facto merger or consolidation; (3) the purchasing
> corporation is merely a continuation of the selling corporation; (4) the sale is a
> fraudulent transaction intended to avoid debts and liabilities; [or] (5) inadequate
> consideration was given for the sale.

*Ostrowski*, 144 Vt. at 307, 479 A.2d at 127 (emphasis added) (quoting L. Frumer & M. Friedman,

Products Liability § 5.06[2] (1983)); *see also In re Air Passenger Computer Reservations Sys.*

*Antitrust Litig.,* 724 F. Supp. 744, 753 (C.D. Cal. 1989) (holding transferee liable for transferor's

debt to attorney by agreement); *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co.,*

*Kommanditgesellschaft v. Navimpex Centrala Navala,* 989 F.2d 572, 580 (2d Cir. 1993) ("[T]he

law in this country is clear that where one company transfers all its assets to another company, the

latter is responsible for the debts and liabilities of the transferor if, *inter alia,* the transferee

expressly or impliedly agrees to assume such debts."); *Gladstone v. Stuart Cinemas, Inc.,* 2005

VT 44, ¶ 14, 178 Vt. 104, 878 A.2d 214 (reciting the general rule of successor liability and the five

commonly accepted exceptions as set forth in *Ostrowski).*

### 2. Alter Ego and Veil Piercing Are Not Causes of Action Under State Law[6]

42.     Like successor liability, the equitable doctrines of alter ego and veil piercing impose the liabilities of one party on a related party. Under Maine and Vermont law, these doctrines are also equitable remedies, and not separate causes of action. *See Agway, Inc. v. Brooks*, 173 Vt. 259, 266, 790 A.2d 438, 443 (2001) (*quoting Morris v. Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 603 N.Y.S.2d 807, 623 N.E.2d 1157, 1160 (1993) ("The concept [of piercing the corporate veil] is equitable in nature and assumes that the corporation itself is liable for the obligation sought to be imposed....Thus, an attempt ... to pierce the corporate veil does not constitute a cause of action independent of that against the corporation ...."); *Argo Mktg. Grp., Inc. v. Nutramedics, Inc.*, No. CV-09-208, 2011 WL 4054655, at *7 (Me. Super. Ct. July 13, 2011) ("piercing the corporate veil is not a cause of action, but an equitable remedy").

43.     More specifically, under Maine law, an alter ego is liable for the debts of the predecessor when the entity is subject to the control or right of control of the predecessor entity. *Lee Acad. Educ. Ass'n v. Acad.*, 556 A.2d 218, 220 (Me. 1989); *see also Bonnar-Vawter, Inc. v. Johnson*, 157 Me. 380, 388, 173 A.2d 141, 145 (1961) ("The theory of the alter ego has been adopted by the courts to prevent injustice, in those cases where the fiction of a corporate entity has been used as a subterfuge to defeat public convenience or to perpetuate a wrong."). For its part, veil piercing is available to pursue the debts of a parent company if the parent company "abused the privilege of a separate corporate identity" or "an unjust or inequitable result would occur if the court recognized the separate corporate existence." *See, e.g., Advanced Const. Corp.*

---

[6]     While neither Maine nor Vermont asserted the equitable doctrines of alter ego and veil piercing to impose the liabilities of the Debtor on Carrier, Carrier Fire & Security Americas LLC, or RTX in the Maine Amended Complaint and the Vermont Amended Complaint, Maine and Vermont reserve the right to amend those complaints to assert such doctrines to impose liability of the Debtor on Carrier, Carrier Fire & Security Americas LLC, and/or RTX based upon ongoing discovery or new information.

*v. Pilecki*, 2006 ME 84, 901 A.2d 189, 194–95 (Me. 2006) (citing *State v. Weinschenk*, 2005 ME 28, 868 A.2d 200, 207 (Me. 2005)).

44.     Under Vermont law, courts have examined alter ego liability in the context of a former owner dominating the corporation. *See Agway, Inc. v. Brooks*, 173 Vt. 259, 262, 790 A.2d 438, 441 (2001) (stating Vermont courts "will look beyond the corporation to its shareholders for liability . . . [and] pierce the corporate veil, where the corporate form has been used to perpetrate a fraud . . . and also where the needs of justice dictate"); *see also Mahoney v. Beacon Hill Builders & Assocs.*, 2021 Vt. Super. LEXIS 41, at *22 (Vt. Super. Ct. Nov. 16, 2021) (Teachout, J.) ("Even in an absence of fraud, a debtor corporation and an individual owner of all the stock may be treated 'as identical' when justice will be served thereby."). Veil piercing is available to pursue the debts of a parent company where "recognition of corporate status would result in fraud or injustice." *Jack C. Keir, Inc. v. Robinson & Keir P'ship*, 151 Vt. 358, 360, 560 A.2d 957, 959 (1989); *see also In re Vermont Toy Works, Inc.*, 135 B.R. 762, 770 (D. Vt. 1991) ("Courts generally list as reasons for piercing the corporate veil the following: using the corporation to perpetrate a fraud; the personal use of corporate funds; the failure to observe corporate formalities; and undercapitalization.").

45.     Accordingly, under Maine and Vermont law, the alter ego and veil piercing doctrines are remedies, not independent causes of action. *Agway, Inc. v. Brooks*, 173 Vt. 259, 266, 790 A.2d 438, 443 (Vt. 2001) (*quoting Morris v. Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 603 N.Y.S.2d 807, 623 N.E.2d 1157, 1160 (1993)); *Argo Mktg. Group, Inc. v. Nutramedics, Inc.*, No. CV-09-208, 2011 WL 4054655, at *7 (Me. Super. Ct. July 13, 2011).

### 3.    There is a Split of Authority in the Third Circuit as to Whether Equitable Theories of Liability are "Property of the Estate"

46.    Courts within the Third Circuit are divided on the scope of the Debtor's estate and whether it includes causes of action that seek recovery from third parties on the basis of the equitable doctrines of successor liability, alter ego, or veil piercing. *Compare Bd. of Trs. of Teamsters Local 863 v. Foodtown, Inc.*, 296 F.3d 164 (3d Cir. 2002) *to In re Emoral, Inc.,* 740 F.3d 875 (3d. Cir. 2014) and *In re Wilton Armetale, Inc.*, 968 F.3d 273 (3d Cir. 2020).

47.    In *Foodtown*, a multiemployer pension fund sued several non-debtor corporate affiliates and individuals of the debtor in their capacity as alleged alter ego of the employer/debtor pursuant to New Jersey's veil piercing laws. 296 F.3d at 167. The *Foodtown* court held that the pension fund's claims were unique creditor causes of action (i.e., could not be asserted by the debtor), and that those claims did not become "property of the estate" simply because they sought to impose the debtor's liability on a related party pursuant to a veil piercing theory. *Id*. at 169. Thus, under *Foodtown*, a unique claim that may be asserted by a plaintiff against a third party on a theory that the third party is an alter ego or a successor to the debtor is *not* "property of the estate," in that it cannot be pursued by a debtor-in-possession or a trustee on behalf of the debtor's estate. *Id*.

48.    The Third Circuit in *Foodtown* started with a post-petition suit by the pension fund for withdrawal liability under the Employee Retirement Income Security Act of 1974. *Id*. at 170. The Third Circuit held that the pension's "claim for withdrawal liability is also not a legal or equitable interest of the debtor." *Id*. The *Foodtown* court further held that "[i]n order for the claim to be the "legal or equitable interest of the debtor in property," the claim must be a "general one, with no particularized injury arising from it." *Id.* (citing *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989)). The *Foodtown* court then continued that "if the

claim is specific to the creditor, it is a 'personal' one and is a legal or equitable interest only of the creditor. A claim for an injury is personal to the creditor if other creditors generally have no interest in that claim." *Id*. (citation omitted).

49.     The *Foodtown* court then reasoned that the injury in question was the defendants' evasion of withdrawal liability, and not insolvency stemming from the defendants' actions. *Id*. As the court explained, "[w]ithdrawal liability is not owed to [the debtor]; rather, it is owed to the pension fund. Because the liability is owed only to the fund, the claim is personal to the [fund]." Thus, the court concluded, "absent a general creditors' interest, a [bankruptcy] trustee can only collect money that may be owing to the bankrupt entity." *Id*. (citing *Steinberg v. Buczynski*, 40 F.3d 890, 892 (7th Cir.1994)). The *Foodtown* court continued:

> [T]here is no general creditors' interest in the statutorily imposed withdrawal liability owed to the fund. Rather, the action to recover the withdrawal liability has the character of an action for damages flowing from an alleged illegality against the fund. The alleged illegality may have caused other injuries in addition to those caused to the fund, but the direct injury to the fund—the evasion of its statutory entitlement—defines the nature of plaintiffs' claim as a personal one.

*Id*. (citing *Apostolou v. Fisher*, 188 B.R. 958, 968 (N.D. Ill. 1995)).

50.     On that reasoning, the court held that the "[debtor's] withdrawal liability is not part of the bankruptcy estate pursuant to section 541(a)(1) or (7)" and "[c]onsequently, the claim here cannot be the property of the estate." *Id*. at 170-71 (citation omitted).

51.     Notably, the *Foodtown* court also observed that "under New Jersey law an alter ego action is an equitable remedy that may only be asserted by a corporation when it suffers harm" and that the "[*Foodtown* debtor] did not suffer harm from the Appellees' evasion of withdrawal liability; only the [fund] suffered such harm." *Id*. (citation omitted). And as a result, "the injury is personal to the Appellants and only the creditor, not the bankruptcy trustee, can pursue the claim." *Id*.

22

52.     Nonetheless, the Third Circuit in *Emoral*, *supra,* reached a different result.  There, the court held that a debtor's bankruptcy estate includes creditor claims and causes of action that could be asserted against a related party based on a theory of successor liability. 740 F.3d at 882. Thus, according to the *Emoral* court, those creditor claims may be pursued by a debtor-in-possession or trustee notwithstanding any argument that such claims involve particularized injury to the creditor and not generalized injury to all creditors. *Id.*

53.     In *Emoral*, the plaintiffs were injured by exposure to chemicals manufactured by Emoral, Inc. *Id.* at 877. Prior to seeking the protection under Chapter 7 of Title 11 of the United States Code, Emoral sold its assets to Aaroma Holdings LLC. *Id.* The purchase agreement provided that Aaroma (f/k/a Duane Street, LLC) would not assume any liabilities relating to diacetyl-related litigation, referring to potential claims related to diacetyl, a chemical used in the food flavoring industry. *Id.*

54.     Post-petition, Emoral's Chapter 7 Trustee asserted fraudulent transfer claims against Aaroma based on the Aaroma asset sale. *Id.* Ultimately, Emoral and Aaroma settled (subject to bankruptcy court approval) those fraudulent claims for $500,000. *Id.*

55.     Pursuant to the Emoral/Aaroma settlement agreement, the Emoral chapter 7 trustee agreed to release, on behalf of Emoral, Emoral's estate, and their respective successors and assigns, any causes of action "that are property of the Debtor's Estate arising out of, in connection with or relating to any matters occurring before the date of this Agreement, whether known or unknown, direct or derivative, in law or in equity (the "Estate's Released Claims")." *In re Emoral, Inc. f/k/a Polarome Int'l, Inc.*, Case No. 11-27667 (RG) (Bankr. D. N.J.), Dkt. No. 59-23, Ex. B, at 1.

56.     Notwithstanding this broad language, in response to an objection interposed by the 'Diacetyl Plaintiffs', and after "[a] representative for the [Chapter 7] Trustee stated its view that

the Diacetyl Plaintiffs' successor liability claims against Aaroma 'do[ ] not belong to the Estate'

and that the [Chapter 7] Trustee, therefore, 'can't release [them],'" Counsel for Aaroma deferred

argument on the issue, and agreed to include text in the Bankruptcy Court's order approving the

Emoral/Aaroma settlement agreement, stating:

> Nothing contained in this Order or in the Aaroma Settlement Agreement will
> operate as a release of, or a bar to prosecution of any claims held by any person
> which do not constitute Estate's Released Claims as defined in the Aaroma
> Settlement Agreement.

*Emoral,* 740 F.3d at 877; *see also In re Emoral, Inc.*, Case No. 11-27667, Dkt. No. 59-23.

57.    Almost a month prior to the bankruptcy court's approval of the Emoral/Aaroma

settlement agreement, the 'Diacetyl Plaintiffs' filed individual complaints against Aaroma in New

Jersey state court. *See, e.g., In re Emoral, Inc.*, Case No. 11-27667, Dkt. No. 193-9. And three and

a half months *after* the bankruptcy court's approval of the Emoral/Aaroma settlement agreement,

counsel for Aaroma notified counsel for the 'Diacetyl Plaintiffs' that Aaroma believed that the

settlement order bared and enjoined pursuit of that action. *See In re Emoral, Inc.*, Case No. 11-

27667, Dkt. No. 193-3, ¶9, Ex. G. Aaroma subsequently filed a motion to enforce the order

approving the Emoral/Aaroma settlement agreement. *See In re Emoral, Inc.*, Case No. 11-27667,

Dkt. No. 193.

58.    After notice and a hearing, the *Emoral* bankruptcy court denied Aaroma's motion,

holding that "the Diacetyl Plaintiffs' personal injury causes of action were not property of the

estate because the Diacetyl Plaintiffs alleged 'a particular injury not generalized injury suffered by

all … creditors of Emoral.'" *Emoral*, 740 F.3d at 878. The *Emoral* bankruptcy court also observed

that "[w]hile successor liability has been imposed derivatively, [the Emoral Bankruptcy] Court

finds that the underlying injury that is alleged to be the basis and premise of the state court actions

is personal harm ... to the individual plaintiffs" and that "Emoral has not suffered any personal harm nor have the creditors as a general whole." *Id.* (quotations in original).

59.     On appeal, the *Emoral* district court reversed the bankruptcy court, holding that a

cause of action for successor liability was a 'generalized' claim belonging to the estate because the facts giving rise to the cause of action were not specific to the Diacetyl Plaintiffs but common to all creditors, and because if the Diacetyl Plaintiffs were to succeed in establishing that Aaroma constituted a "mere continuation" of Emoral, this would benefit the creditors of Emoral generally.

*Emoral,* 740 F.3d at 878.

60.     The Third Circuit in *Emoral* affirmed the district court's ruling, holding that the

Diacetyl Plaintiffs' personal injury claims against non-debtor Aaroma belonged to the Emoral

debtor's estate because the Diacetyl Plaintiffs' pursued those claims against Aaroma under a state

law theory of successor liability. *Id.* at 879-82.

61.     The *Emoral* court quoted a 1994 opinion from the bankruptcy court for the Southern

District of New York, which involved the application of New York law with respect to successor

liability, wherein the bankruptcy court for the Southern District of New York wrote that:

[T]he remedy against a successor corporation for the tort liability of the predecessor is, like the piercing remedy, an equitable means of expanding the assets available to satisfy creditor claims. The class action plaintiffs that invoke it allege a general injury, their standing depends on their status as creditors of Keene, and their success would have the effect of increasing the assets available for distribution to all creditors.

*Id.* at 880 (citing *In re Keene Corp.*, 164 B.R. 844, 853 (Bankr. S.D.N.Y. 1994)).

62.     The *Emoral* court also considered *In re Buildings by Jamie, Inc.*, 230 B.R. 36

(Bankr. D.N.J. Oct. 27, 1998), which applied New Jersey law, concluding that a debtor's individual

creditors lacked standing to bring an "alter ego veil-piercing cause of action seeking recovery from

non-debtor third-party defendants," explaining

that cause of action constituted property of the bankruptcy estate. It held that because New Jersey law permits a corporation to pierce its own veil and because

25

recovery on the alter ego claim [] would benefit the estate as a whole, the cause of action was 'properly characterized as a general claim as to which the trustee alone has standing as representative of the estate.'

*Emoral*, 740 F.3d at 880-81 (internal citation omitted).

63.    Thus, under the *Emoral* court's reasoning, "the Diacetyl Plaintiffs' cause of action against Aaroma would be based on facts generally available to any creditor, and recovery would serve to increase the pool of assets available to all creditors."[7] *Id.* at 881.

64.    The dissenting judge on the *Emoral* panel, Circuit Judge Cowen wrote:

> ***The successor liability theory alleged by the*** Diacetyl ***Plaintiffs is inextricably tied to—and cannot be considered separate or apart from—their underlying personal injury and product liability allegations***. Because the Diacetyl Plaintiffs' underlying allegations are clearly individualized in nature, their claims against Aaroma —which seek to hold this third party liable for their alleged injuries as the "mere continuation" of Emoral—must also be considered as individualized claims. In short, "any creditor of the debtor" could not allege that the third party should be held responsible on this specific theory of successor liability for injuries allegedly suffered as a result of exposure to a product made and sold by the debtor itself. For instance, a trade creditor of the debtor could not make such a claim.

*Emoral*, 740 F.3d at 883 (***emphasis added***).

65.    Judge Cowen's dissenting opinion in *Emoral* cites to and discusses *Picard v. JPMorgan Chase Bank & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 721 F.3d 54 (2d Cir. 2013), in which the Second Circuit rejected a trustee's effort to assert what he claimed were "generalized" claims of Madoff creditors with heavy reliance on *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972), a Bankruptcy Act case holding that bankruptcy trustees and their estates do not acquire causes of action that belong to individual creditors. . *See also In re Motors Liquidation Co.,* 529 B.R. 510 (Bankr. S.D.N.Y. 2015), *aff'd in part, vacated in part, rev'd in part sub nom.*

---

[7]    The *Emoral* court rejected the Diacetyl Plaintiffs' arguments that *Foodtown* supports their position, writing that the cause of action in *Foodtown* "did not constitute a general claim for successor liability based on a mere continuation theory, but instead a specific claim for liability pursuant to ERISA." 740 F.3d at 882. The *Emoral* court also observed, *inter alia*, that the cause of action in *Foodtown* "did not arise until after the debtor's bankruptcy filing, and thus could not be considered property of the estate." *Id.*

*In Matter of Motors Liquidation Co.*, 829 F.3d 135 (2d Cir. 2016), *and aff'd in part, vacated in part, remanded,* 590 B.R. 39 (S.D.N.Y. 2018), *aff'd*, 943 F.3d 125 (2d Cir. 2019), *and aff'd,* 792 F. App'x 28 (2d Cir. 2019), *and aff'd*, 957 F.3d 357 (2d Cir. 2020) (explaining how "*Emoral*, a 2-1 decision with a cogently articulated dissent by Judge Cowen, probably was not" correctly decided for several reasons).

66.    In 2020, Judge Cowen reversed course, joining his other panel members in *In re Wilton Armetale, Inc.*, 968 F.3d 273 (3d Cir. 2020). Judge Cowen did so without explaining why he was deviating from his dissenting opinion in *Emoral*.

67.    *Wilton* involved breach of fiduciary duty claims and fraudulent transfer claims. In *Wilton*, the Third Circuit wrote:

> ***Individual creditors have the statutory authority to bring only personal claims***. *Emoral*, 740 F.3d at 879. That is because a general claim "inures to the benefit of all creditors" by enlarging the estate, and so " 'the trustee is the proper person to assert the claim.'" *Id*. (quoting *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989)). ***The distinction between general and personal claims "promotes the orderly distribution of assets in bankruptcy" by funneling all asset-recovery litigation through a single plaintiff: the trustee***. *Id.*

*Wilton*, 968 F.3d at 282 (emphasis added).

68.    The Third Circuit continued:

> To distinguish general from personal claims, we focus not on the nature of the injury, but on the "theory of liability." *Emoral*, 740 F.3d at 879. Claims alleging that "third parties ... wrongfully deplete[d] the debtor's assets" are general or derivative because "[e]very creditor has a similar claim for the diversion of assets of the debtor's estate." *Tronox Inc. v. KerrMcGee Corp. (In re Tronox Inc.)*, 855 F.3d 84, 103 (2d Cir. 2017); *accord Emoral*, 740 F.3d at 879–80. The theory of recovery for those claims is "not tied to the harm done to the creditor by the debtor." [] *Tronox*, 855 F.3d at 103. Rather, it is "based on an injury to the debtor's estate that creates a secondary harm to all creditors regardless of the nature of their underlying claim[s] against the debtor." *Id*. at 104.

> So harm done mainly to the debtor can indirectly injure the creditors, making the claim a general one. If the theory of recovery "would be based on facts generally available to any creditor, and recovery would serve to increase the pool of assets

> available to all creditors," then the claim is general, not personal. *Emoral*, 740 F.3d at 881. Only when a particular creditor suffers a direct, particularized injury that can be "directly traced" to the defendant's conduct is the claim personal to that creditor and not property of the estate. *Tronox*, 855 F.3d at 100 (quoting *Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, 740 F.3d 81, 89 (2d Cir. 2014)); *see id.* at 100–02 (collecting cases).

*Wilton*, 968 F.3d at 282-283.

69.     Conspicuously, *Wilton* does address Judge Cowen's dissent in *Emoral* notwithstanding the fact that Judge Cowen joined the other two panelists to decide *Wilton*.

70.     Lastly, the legal principle recited in *Emoral* (and *Wilton*) does not address the Supreme Court's holding in a Bankruptcy Act case that bankruptcy trustees and estates do not acquire the right to pursue causes of action that would belong to individual creditors outside of bankruptcy, without regard to whether those causes of action asserted "generalized" damages or not. *See Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972).

71.     Accordingly, there is a split of authority in the Third Circuit as to whether a creditor's claims, against a third party for the liabilities of debtor as an equitable remedy, become property of the estate. Maine and Vermont believe that the result reached in *Foodtown* was correct and should be applied here.

72.     Maine's and Vermont's claims against the Debtor, Carrier, RTX, and others, are unique to each respective Sovereign (*see* ¶¶ 14, 16, *supra*) and arise out of the damage that AFFF contamination has caused in their respective states. They are not "general" claims that could otherwise be asserted by the Debtor or a trustee for the Debtor's estate, or that "inure[] to the benefit of all creditors" by enlarging the estate. *See Wilton*, 968 F.3d at 282.

73.     Neither Sovereign's claims should be transformed into "property of the estate" simply because the Sovereign seeks to invoke an equitable remedy and recover on their particularized claims from a party related to the Debtor. The Court can and should adopt the

*Foodtown* court's reasoning and hold that the Plan is patently unconfirmable. Accordingly, the Court should deny the Motion to Approve the Disclosure statement on that basis.

## III.    CONCLUSION

WHEREFORE the State of Maine and the State of Vermont respectfully request this Court deny approval of the Disclosure Statement for Debtor's Plan of Liquidation under Chapter 11 of the Bankruptcy Code as well as the relief sought in the Debtor's motion seeking approval of the procedures and deadlines requested in the Debtor's motion seeking approval of the Disclosure Statement, and grant such other and further relief as the Court deems just and proper.

Dated May 19, 2025

**STATE OF MAINE**                        **STATE OF VERMONT**

AARON M. FREY                     CHARITY R. CLARK
ATTORNEY GENERAL              ATTORNEY GENERAL

*/s/ Robert Martin*                     */s/ Laura B. Murphy*
Scott Boak (*pro hac vice* application to be filed)    Laura B. Murphy (*pro hac vice* application to be filed)
Robert Martin (*pro hac vice* application to be filed)    Assistant Attorney General
Assistant Attorneys General          109 State Street
6 State House Station              Montpelier, VT 05609-1001
Augusta, Maine 04333           (802) 828-3186
(207) 626-8566                   laura.murphy@vermont.gov
(207) 626-8897
Scott.Boak@maine.gov
Robert.Martin@maine.gov

**GRANT & EISENHOFER P.A.**

*/s/ Frank H. Griffin*
Frank H. Griffin (Del. Bar No. 7318)
123 Justison Street
Wilmington, DE 19801
Tel: 302-622-7047
Fax: 302-622-7100
fgriffin@gelaw.com

Gordon Z. Novod (*pro hac vice* application to be filed)
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8523
Fax: 646-722-8501
gnovod@gelaw.com

Dated: May 19, 2025

## <u>CERTIFICATE OF SERVICE</u>

I, Frank H. Griffin, hereby certify that on May 19, 2025, a true and correct copy of the

foregoing and the accompanying exhibits and all related papers were served to all parties identified

in the following Exhibit A via first class mail and/or CM/ECF, as denoted in Exhibit A.

_____*/s Frank H. Griffin*_____