# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| KFI Wind-Down Corp.,[1] | Case No. 23-10638 (LSS) |
| | **Hearing Date:**<br>**June 4, 2025 at 10:00 a.m. (ET)**<br>**Objection Deadline:**<br>**May 19, 2025 at 4:00 p.m. (ET)** |
| Debtor. | |
| | Re: D.I. 1651, 2054, 2107, 2131, 2132 |

**OBJECTION OF THE STATES OF CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, AND NEW YORK, AND THE DISTRICT OF COLUMBIA, TO THE DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT AND FORM AND MANNER OF NOTICE OF HEARING THEREON; (II) ESTABLISHING SOLICITATION PROCEDURES; (III) APPROVING THE FORM AND MANNER OF NOTICE TO ATTORNEYS AND SOLICITATION DIRECTIVE; (IV) APPROVING THE FORM OF BALLOTS; (V) APPROVING THE FORM, MANNER AND SCOPE OF CONFIRMATION NOTICES; (VI) ESTABLISHING CERTAIN DEADLINES IN CONNECTION WITH APPROVAL OF DISCLOSURE STATEMENT AND CONFIRMATION OF PLAN; AND (VII) GRANTING RELATED RELIEF**

---

[1] The last four digits of the Debtor's tax identification number are 5282. The Debtor's corporate headquarters is located at c/o AlixPartners, 909 Third Avenue, New York, NY 10022.

## <u>TABLE OF CONTENTS</u>

Page

I.    PRELIMINARY STATEMENT ................................................................................. 1

II.   FACTUAL BACKGROUND .................................................................................... 3

    A.    The Hazards and Harms of PFAS ............................................................... 3

    B.    The States' AFFF Lawsuits .......................................................................... 4

    C.    Procedural History ........................................................................................ 5

    D.    The Debtor's Proposed Plan ........................................................................ 7

III.  ARGUMENT ........................................................................................................... 9

    A.    The Disclosure Statement Is Deficient Because It Lacks Adequate
        Information About the Plan ........................................................................ 10

        1.    Fails to Adequately Inform Creditors About the Claims
             Released Under the Plan. ........................................................... 11

        2.    Fails to Inform Creditors About Their Potential Recovery
             Under the Plan ............................................................................ 15

        3.    Additional Terms Without Adequate Information ..................... 16

    B.    The Plan Is Unconfirmable Because It Imposes Nonconsensual
        Third-Party Releases. .................................................................................. 19

        1.    The Plan Is Unconfirmable Because It Contravenes the
             Holding of *Purdue* and the Plain Text Reading of Section 541
             That *Purdue* Demands. ............................................................. 20

        2.    *Emoral* Addressed Only a Theory of Successor Liability That
             Was Common to All Creditors; This Plan Clearly Exceeds
             What *Emoral* Permits. ............................................................... 25

    C.    The Plan Includes an Impermissible Channeling Injunction. .............. 28

IV.   RESERVATION OF RIGHTS ................................................................................ 29

V.    CONCLUSION ...................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

Page

*Alden v. Maine*,
  527 U.S. 706, 119 S. Ct. 2240, 144 L. Ed. 2d 636 (1999) ........................................ 27

*Alfred L. Snapp & Son v. P.R.*,
  458 U.S. 592, 102 S. Ct. 3260, 73 L. Ed. 2d 995 (1982) ......................................... 5

*Artesanias Hacienda Real S.A. de C.V. v. North Mill Capital, LLC (In re Wilton Armetale, Inc.)*,
  968 F.3d 273 (3d Cir. 2020) ................................................................ 26

*Bd. of Regents v. Roth*,
  408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972) .......................................... 23

*Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*,
  296 F.3d 164 (3d Cir. 2002) ............................................................ 25, 26

*Butner v. United States*,
  440 U.S. 48, 99 S. Ct. 914, 59 L. Ed. 2d 136 (1979) ......................................... 23, 26

*Caplin v. Marine Midland Grace Tr. Co.*,
  406 U.S. 416, 92 S. Ct. 1678, 32 L. Ed. 2d 195 (1972) .......................................... 23

*Coal. of Abused Scouts for Just. v. Off. of the United States Tr. (In re BSA)*,
  666 B.R. 489 (D. Del. Jan. 13, 2025) ......................................................... 18

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*,
  485 U.S. 568, 108 S. Ct. 1392, 99 L. Ed. 2d 645 (1988) ......................................... 25

*Emoral, Inc. v. Diacetyl (In re Emoral, Inc.)*,
  740 F.3d 875 (3d Cir. 2014) ......................................................... *passim*

*Georgia v. Tenn. Copper Co.*,
  206 U.S. 230, 27 S. Ct. 618, 51 L. Ed. 1038 (1907) .......................................... 5, 27

*Granfinanciera v. Nordberg*,
  492 U.S. 33, 109 S. Ct. 2782, 106 L. Ed. 2d 26 (1989) .......................................... 24

*Harrington v. Purdue Pharma L.P.*,
  603 U.S. 204, 144 S. Ct. 2071, 219 L. Ed. 2d 721 (2024) .................................... *passim*

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
  530 U.S. 1, 120 S. Ct. 1942, 147 L. Ed. 2d 1 (2000) ........................................... 22

iii

*Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.),*
522 F.3d 575 (5th Cir. 2008) ............................................................................................ 23

*In re Am. Capital Equip., LLC,*
688 F.3d 145 (3d Cir. 2012) .............................................................................................. 10

*In re Aqueous Film-Forming Foams Product Liability Litigation,*
MDL No. 18-mn-2873-RMG (D.S.C.) ................................................................................ 4

*In re Boy Scouts of America and Delaware BSA, LLC,*
642 B.R. 504 (Bankr. D. Del. 2022) .............................................................................11, 14

*In re Boy Scouts of America and Delaware BSA, LLC,*
No. 23-1664 (3d Cir. May 13, 2025) ................................................. 3, 21, 22, 29

*In re Energy Future Holdings Corp,*
949 F.3d 806 (3d Cir. 2020) .............................................................................................. 24

*In re Ferretti,*
128 B.R. 16 (Bankr. D.N.H. 1991) ................................................................................10, 11

*In re Messina,*
687 F.3d 74 (3d Cir. 2012) ................................................................................................ 23

*In re Purdue Pharma, L.P.,*
Case No. 19-23649 (Bankr. S.D.N.Y.) .............................................................................. 12

*Integrated Solutions v. Serv. Support Specialties,*
124 F.3d 487 (3d Cir. 1997) .............................................................................................. 23

*Johns-Manville Corp. v. Chubb Indemnity Ins. Co. (In re Johns-Manville Corp.),*
600 F.3d 135 (2d Cir. 2010) .............................................................................................. 24

*Logan v. Zimmerman Brush Co.,*
455 U.S. 422, 102 S. Ct. 1148, 71 L. Ed. 2d 265 (1982) ................................................ 24

*Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC),*
716 F.3d 736 (3d. Cir. 2013) ............................................................................................. 23

*Massachusetts v. E.P.A.,*
549 U.S. 497, 127 S. Ct. 1438, 167 L. Ed. 2d 248 (2007) ............................................... 27

*Myers v. Martin (In re Martin),*
91 F.3d 389 (3d Cir. 1996) .............................................................................................11

iv

*Nobelman v. American Sav. Bank*,
    508 U.S. 324, 113 S. Ct. 2106, 124 L. Ed. 2d 228 (1993) ...................................................... 23

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
    848 F.2d 414 (3d Cir. 1988) ........................................................................................................ 10

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815, 119 S. Ct. 2295, 144 L. Ed. 2d 715 (1999) ...................................................... 24

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797, 105 S. Ct. 2965, 86 L. Ed. 2d 628 (1985) ........................................................ 24

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,
    81 F.3d 355 (3d Cir. 1996) .......................................................................................................... 10

*Steinberg v. Buczynski*,
    40 F.3d 890 (7th Cir. 1994) ........................................................................................................ 23

*Tronox Inc. v. Kerr-McGee Corp. (In re Tronox Inc.)*,
    855 F.3d 84 (2d Cir. 2017) .......................................................................................................... 26

*West Virginia v. EPA*,
    597 U.S. 697, 142 S. Ct. 2587, 213 L. Ed. 2d 896 (2022) ...................................................... 23

**Statutes**

11 U.S.C. § 105(a) .......................................................................................................................... 29

11 U.S.C. § 1102 .............................................................................................................................. 6

11 U.S.C. § 1107 .............................................................................................................................. 6

11 U.S.C. § 1108 .............................................................................................................................. 6

11 U.S.C. § 1123(b)(6).............................................................................................................. *passim*

11 U.S.C. § 1125 ......................................................................................................................... 9, 10

11 U.S.C. § 1125(a)(1) ................................................................................................................... 10

11 U.S.C. § 503(b)(3)(D) .......................................................................................................... 17, 18

11 U.S.C. § 524(e) ..................................................................................................................... 23, 24

11 U.S.C. § 524(g) ..................................................................................................................... 21, 24

11 U.S.C. § 524(g)(2)(B)(i)(I) ................................................................ 29

11 U.S.C. § 524(g)(4)(A) ......................................................................... 24

11 U.S.C. § 524(g)(4)(A)(ii) .................................................................... 29

11 U.S.C. § 541 .................................................................................. *passim*

11 U.S.C. § 541(a)(1) ............................................................................... 22

11 U.S.C. § 541(b)(1) ............................................................................... 23

Cal. Gov't Code § 12607 ........................................................................ 27

Conn. Gen. Stat. § 22a-451 .................................................................... 27

N.Y. ECL § 1-0101 ................................................................................. 27

N.Y. ECL § 3-0301 ................................................................................. 27

N.Y. Executive Law § 63(12) ................................................................. 27

## Other Authorities

EPA, *National Primary Drinking Water Regulations* (Dec. 2024),
   https://www.epa.gov/ground-water-and-drinking-water/national-
   primary-drinking-water-regulations#Inorganics .......................................... 4

Lindsey D. Simon, *Bankruptcy Grifters*, 131 Yale L.J. 1154 (2022) ............................................. 2

National Institute of Environmental Health Sciences,
   *Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS)* (May 2025),
   https://www.niehs.nih.gov/health/topics/agents/pfc. ................................... 4

## Rules

Fed. R. Bankr. P. 3002(a) ........................................................................ 18

Fed. R. Bankr. P. 3003(c)(2) ................................................................... 18

The states of California, Colorado, Connecticut, Delaware, and New York, and the District of Columbia (the "Objecting States"), by and through the Offices of the Attorneys General of the Objecting States, hereby object to Debtor's Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement and Form and Manner of Notice of Hearing Thereon; (II) Establishing Solicitation Procedures; (III) Approving the Form and Manner of Notice to Attorneys and Solicitation Directive; (IV) Approving the Form of Ballots; (V) Approving the Form, Manner and Scope of Confirmation Notices; (VI) Establishing Certain Deadlines in Connection with Approval of Disclosure Statement and Confirmation of Plan; and (VII) Granting Related Relief. D.I. 1651. In support of this Objection, the Objecting States respectfully state as follows:

## I.    PRELIMINARY STATEMENT

1.    The Debtor's Disclosure Statement describes an unconfirmable plan of liquidation ("Plan") that attempts to unlawfully release the Debtor's parent from creditors' claims—including those of the Objecting States—by re-characterizing them as estate claims. The Disclosure Statement should be rejected for numerous deficiencies that mislead creditors about the scope and value of the Plan, including a failure to disclose that the Plan proposes to release its non-debtor parent, Carrier Global Corp. ("Carrier")—as well as other affiliated nondebtors—from billions of dollars of their own liabilities arising from the Debtor's aqueous film-forming foam ("AFFF") products. Indeed, ten months after the Debtor was liquidated, and after $140 million in professional fees, that is the only reason this bankruptcy continues. The Debtor intends to accomplish its objective by unlawful means: the proposed Plan will compel nonconsensual third-party releases disguised as a settlement of claims that are property of the estate.

2.    It does not matter that the Plan *calls* them estate releases instead of third-party releases; what it *does* is take away creditors' claims for their own injuries. This taking is not

authorized by Section 541 of the Bankruptcy Code, 11 U.S.C. § 541, and is unlawful under *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024).

3.    Bankruptcy is "a simple bargain: A debtor can win a discharge of its debts if it proceeds with honesty and places virtually all its assets on the table for its creditors." *Purdue*, 603 U.S. at 209. But "[i]f left unchecked, bankruptcy can serve as an accelerant for the gravest due-process threats facing mass-tort victims." Lindsey D. Simon, *Bankruptcy Grifters*, 131 Yale L.J. 1154, 1159 (2022). Nondebtors may try to obtain a release of their own liability through another's bankruptcy without ponying up all their assets—a play Carrier attempts here. These "grifters" are "like a Trojan horse in the bankruptcy system, undermining the integrity of the bankruptcy process at the expense of claimants who will lose procedural protections and rights." *Id.* at 1158.

4.    The Supreme Court's *Purdue* decision forecloses Carrier's grift. There, threatened by thousands of opioid lawsuits, Purdue Pharma filed for Chapter 11 bankruptcy. The company's owners, the Sackler family, tried to leverage Purdue's bankruptcy to release their own opioid-related liability. The release was sought under 11 U.S.C. § 1123(b)(6) and based upon years of bankruptcy precedent. Last year, the Supreme Court rejected the Sacklers' attempt to take advantage of the benefits of bankruptcy without abiding by its requirements. That landmark decision is fatal to this Plan on two grounds. First, the Supreme Court's plain categorical holding—that "the bankruptcy code does not authorize a release and injunction that . . . effectively seeks to discharge claims against a nondebtor without the consent of affected claimants," 603 U.S. at 227—clearly prohibits the Plan's releases. The *effect* matters, not the words used to name the releases. *Id.* at 223 ("word games cannot obscure the underlying reality"). Second, by rejecting a long-standing and policy-based judicial practice, the Supreme Court made clear that the text of the Code

governs bankruptcy power. And here, the plain meaning of Section 541 does not authorize a bankruptcy court to convert creditors' claims (for their own injuries) into estate property.

5.     The proposed Plan is "an end run around Chapter 11's requirements, including the Supreme Court's holding in *Harrington v. Purdue Pharma L.P.*, that the Bankruptcy Codes does not permit non-consensual third-party releases in a chapter 11 plan." *In re Boy Scouts of America and Delaware BSA, LLC*, No. 23-1664, slip op. at 3 (3d Cir. May 13, 2025) (Rendell, J., concurring). Non-debtor Carrier, much like the Sackler family in *Purdue*, is trying to use another's bankruptcy to buy a release for less than it would have to pay on its own. What it seeks is unlawful, and this Court should not approve the Disclosure Statement until Carrier and the Debtor have submitted a Plan that complies with the Bankruptcy Code.

## II.  FACTUAL BACKGROUND

### A.  The Hazards and Harms of PFAS

6.     AFFF is a product that has been used to extinguish fires involving liquid fuel or other flammable liquids, including aviation fires. The Debtor's AFFF products contained toxic chemical compounds in the family of perfluoroalkyl or polyfluoroalkyl substances ("PFAS") that are characterized as having carbon-fluorine bonds. These substances do not naturally occur in the environment and must be manufactured.

7.     PFAS pose a significant threat to human health and the environment because these substances are: (i) mobile and persistent, meaning that they readily spread through the environment where they break down very slowly; (ii) bioaccumulative and biomagnifying, meaning that they tend to accumulate in organisms and up the food chain; and (iii) toxic, meaning that they pose serious health risks to humans and animals.

8.      The extent of the problem cannot be overstated: the Centers for Disease Control and Prevention estimate that PFAS can be found in the blood of 97% of all Americans.[2] The consequences of exposure can be dire. PFAS exposure is associated with kidney and testicular cancer, thyroid disease, ulcerative colitis, liver damage, pregnancy-induced hypertension (also known as preeclampsia), immune system effects, low birthweight, high uric acid, and high cholesterol. In laboratory testing on animals, PFAS have caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system. In fact, PFAS are so harmful that the Environmental Protection Agency established maximum contaminant levels for these substances in drinking water at 4 parts per trillion, an infinitesimally small amount.[3]

**B.  The States' AFFF Lawsuits**

9.      The Debtor's AFFF products caused and continue to cause widespread harm. The Debtor and its affiliates knew that these products were inflicting and would continue to inflict these injuries but sought to profit to the detriment of others. Responding to the obvious health and environmental dangers, the Objecting States brought civil actions against the Debtor and other companies responsible for AFFF. These lawsuits were consolidated into a multidistrict litigation captioned *In re Aqueous Film-Forming Foams Product Liability Litigation*, MDL No. 18-mn-2873-RMG (D.S.C.), which now includes thousands of lawsuits filed by individuals, governmental units, and corporate entities.

---

[2] National Institute of Environmental Health Sciences, *Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS)* (May 2025), https://www.niehs.nih.gov/health/topics/agents/pfc.

[3] The EPA's level for arsenic, for example, is 10 parts per billion, or 10,000 parts per trillion, which is 2,500 times higher than the levels for certain PFAS. *See* EPA, *National Primary Drinking Water Regulations* (Dec. 2024), https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations#Inorganics.

10.    The Debtor and its affiliates, including Carrier and RTX Corp. (together with its corporate predecessor, United Technologies Corp., "RTX"), face vast liabilities from these lawsuits. The damages incurred by the Objecting States alone are in the many billions of dollars. New York, for example, has determined that the Debtor's AFFF products were sold across the state to approximately 35 discrete locations, where it leaked, spilled, and was sprayed, entering the soil and water at and around these locations and causing damages to the State. At just one of those locations, New York has incurred capital costs of nearly $100 million, and ongoing annual costs of over $3 million, to address PFAS contamination. Similar projects will need to be undertaken in other jurisdictions throughout the country.

11.    The Objecting States presently have claims against the Debtor and its affiliates based on the respective liability of those entities for AFFF products manufactured and sold by the Debtor and its predecessors. Some of the Objecting States' claims are brought as *parens patriae* on behalf of their residents and citizens, which authorizes a state to bring suit to protect its "quasi-sovereign" interests, which are the "set of interests that the State has in the well-being of its populace." *Alfred L. Snapp & Son v. P.R.*, 458 U.S. 592, 602 (1982). Other of the Objecting States' claims are brought pursuant to the public trust doctrine, under which states have "an interest independent of and behind the titles of its citizens, in all the earth and air within its domain," and bear the ultimate responsibility, as trustees, to maintain and restore the natural resources within the public trust. *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907). The Objecting States are also acting on their own behalf in their sovereign and proprietary capacities.

## C.  Procedural History

12.    On May 14, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., in the

United States Bankruptcy Court for the District of Delaware (the "Court"). The Debtor is operating its business and managing its affairs pursuant to 11 U.S.C. §§ 1107 and 1108. No trustee or examiner has been appointed in this case.

13.    On May 31, 2023, pursuant to 11 U.S.C. § 1102, the United States Trustee appointed an Official Committee of Unsecured Creditors.

14.    No bar date has been set by which claims based on the Debtor's AFFF liability must be filed.

15.    On April 2, 2024, the Bankruptcy Court approved the sale of the Debtor's businesses to Pacific Erin Opco, LLC, and the Debtor's entry into, and performance under, the Purchase Agreement and the Contribution Agreement. D.I. 1058. The sale closed on July 1, 2024.

16.    Since the sale, the Debtor has had no business to operate and its estate has been fully liquidated, except for claims the Debtor potentially has against Carrier and its insurers.

17.    On November 25, 2024, the Debtor filed its First Amended Plan of Liquidation, Disclosure Statement for the First Amended Plan, and Motion to Approve the Disclosure Statement. D.I. 1649-1651. On December 20, 2024, the Debtor filed its Second Amended Plan of Liquidation, Plan Supplement for the Second Amended Plan, and Disclosure Statement for the Second Amended Plan. D.I. 1753-1755. On April 11, 2025, the Debtor filed its Third Amended Plan of Liquidation, Plan Supplement for the Third Amended Plan, and Disclosure Statement for the Third Amended Plan. D.I. 2053-2055.[4] On May 5, 2025, the Debtor filed its proposed Revised Order for the Motion to Approve the Disclosure Statement. D.I. 2107. On May 15, 2025, the Debtor filed its proposed further Revised Order for the Motion to Approve the Disclosure

---

[4] For ease of reference, citations to the Third Amended Plan, D.I. 2053, shall be "Plan," and citations to the Disclosure Statement for the Debtor's Third Amended Plan, D.I. 2054, shall be "DS."

Statement. D.I. 2131. On May 16, 2025, the Debtor filed its proposed further Revised Order for the Motion to Approve the Disclosure Statement. D.I. 2132.

## D.  The Debtor's Proposed Plan

18.    The Plan purports to release nondebtors, and Carrier in particular, for their liability derived from the Debtor's AFFF products.[5] Indeed, the Plan appears to be crafted primarily—if not exclusively—for Carrier's benefit. The Plan unlawfully relabels creditors' claims against those nondebtors as "Estate Causes of Action," Plan Art. 2.1.74, which are then released by the estate, *Id.* Art. 10.3.

19.    The Plan defines "Estate Causes of Action" as "Causes of Action owned or held by either the Debtor or its Estate, or capable of being asserted (currently, or in the future) by any Person or Governmental Unit on behalf of, under or through, either the Debtor or its Estate" which shall include, for example, *creditors'* claims based on:

> the doctrine of successor liability that seek to impose the Debtor's [ ] liabilities on an alleged successor, whether based on a contractual assumption of liability, consolidation or de factor merger, acquisition of the Debtor's product line, fraud, domination, direction of the Debtor's affairs, defects in or misuse of the corporate form, single business enterprise, common enterprise, or mere continuation, or

> the doctrines of alter ego or veil piercing involving alter egos of the Debtor or the piercing of the Debtor's [ ] corporate veil, whether based on inadequate capitalization, insolvency, failure to observe corporate formalities, fraud, domination, or misuse of the corporate form.

*Id.* Art. 2.1.74.

20.    And for good measure, the definition also tautologically includes:

> Causes of Action or theories for recovery or remedies that seek to impose liability for a Claim against the Debtor on any non-Debtor based on a theory of liability that

---

[5] The Objecting States recognize that the Plan does not purport to release nondebtors' liability that is independent of the Debtor's conduct. *See* Plan. Art. 2.1.106, 2.1.200. But the definitions of "Independent AFFF Cause of Action" and "Sovereign State Retained Cause of Action," do not preserve those claims if they also fall within the expansive definition of "Estate Causes of Action."

is not specific to one or more particular creditors and is generally common to creditors of the Debtor and can be asserted by the Debtor under applicable law; and

all other Causes of Action that are property of the Estate under the Bankruptcy Code, including any other form of derivative or vicarious liability for liabilities of the Debtor.

*Id.*

21.     The sheer verbiage of this definition—exceeding a single-spaced page—and the broad scope of the remedies implicated leave little doubt that the Plan defines "Estate Causes of Action" maximally. The only apparent limitation to the scope of released causes of action appears to be the exclusion of "Independent AFFF Cause of Action," "Sovereign State Retained Cause of Action," and "Insurance Action." But these exclusions provide little comfort to claimholders who wish to preserve their claims against Carrier and RTX.

22.     The Plan defines "Independent AFFF Cause of Action" in Article 2.1.106 to mean:

any Cause of Action that could be asserted by an AFFF Claimant against a Non-Debtor Party based on the Non-Debtor Party's own conduct and breach of duty . . . *provided* that, if any Cause of Action *falls within the definition of Estate Cause of Action* or Sovereign State Retained Cause of Action, it is not an Independent AFFF Cause of Action.

*Id.* Art. 2.1.106 (emphasis added).

23.     The Plan defines "Sovereign State Retained Cause of Action" to mean:

any Claim or Cause of Action asserted, or which may be asserted, by a Sovereign State against a Contributing Party that (1) *is not an Estate Cause of Action* and (2) arises from a statute, regulation, or common law that creates a theory of liability, by which a Sovereign State could recover damages or penalties, or obtain equitable or injunctive relief, against a Contributing Party.

*Id.* Art. 2.1.200 (emphasis added).

24.     Any overlap between "Independent AFFF Cause of Action" and "Estate Cause of Action" defers to the latter, *id.* Art. 2.1.106, and a "Sovereign State Retained Cause of Action" is circularly defined simply to be "not an Estate Cause of Action." *Id.* Art. 2.1.200.

25.     While the Plan's overlapping definitions are not a model of clarity, it seems clear that the third-party and sovereign claims of the Objecting States will be usurped by the estate. If a sovereign's claims relate to the Debtor's AFFF products—no matter against whom those claims are levelled—they are released under the Plan.

26.     The Debtor clearly intends to reach the statutory limit under Section 541 of the Bankruptcy Code, but it misunderstands what that limit is. As discussed below, Section 541 does not authorize an estate to commandeer creditors' claims against nondebtors. The practical effect of the Plan is to unlawfully make the estate the sole holder of claims against nondebtors based upon the Debtor's AFFF liability.

### III. ARGUMENT

27.     This Court should not approve the Debtor's Disclosure Statement for two fundamental reasons. First, the Disclosure Statement fails to include adequate information necessary for creditors to make informed judgments about the Plan, as required by 11 U.S.C. § 1125. The most glaring omissions are with respect to the Plan's releases of claims against third-party nondebtors. Even if the Plan's third-party releases were permissible (and for the reasons explained herein they are not), they cannot be secretively smuggled into a Plan; they need to be prominently disclosed and include enough information for creditors to understand them. This Disclosure Statement utterly fails that test—it provides no warning that the Plan releases creditors' claims against third parties; instead, it obliquely tells creditors that the Plan releases estate claims.

28.     Second, the Plan is unconfirmable on its face because it contains nonconsensual third-party releases, which are unlawful under *Purdue*. It does not matter that the Plan calls them estate releases because "word games cannot obscure the underlying reality" of what this Plan does, which is to eliminate creditors' claims against nondebtors without their consent. *Purdue*, 603 U.S.

at 223. The Supreme Court clarified the meaning of Section 541—which defines property of the estate—when it held that claims against the non-debtor Sacklers "belong[ed] to their victims" and not to the debtor. *Id.* at 219. So too here; the Debtor simply does not own creditors' claims. Because solicitation of a plan that cannot be confirmed is futile, *In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012), the Debtor's Disclosure Statement should not be approved.

**A.      The Disclosure Statement Is Deficient Because It Lacks Adequate Information About the Plan.**

29.      The adequate information requirement of Section 1125 is "crucial to the effective functioning of the federal bankruptcy system[:] . . . the importance of full and honest disclosure cannot be overstated." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (citing *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417-18 (3d Cir. 1988)). Disclosure statements must provide "adequate information" describing a confirmable plan. 11 U.S.C. § 1125. "[A]dequate information" is "information of a kind . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1). This information must be conveyed in "simple and clear language" and alert creditors to "the consequences of the proposed plan on their claims and the possible Code alternatives so that they can intelligently accept or reject the Plan." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

30.      As set forth below, the Debtor has failed to produce an adequate disclosure statement. Critical components of the Plan are missing entirely while other elements are acknowledged only in summary, leaving creditors in the dark about their potential recovery and how the Plan will affect their claims against various non-debtor third parties. The Disclosure Statement lacks adequate information for the following non-exhaustive list of reasons.

**1.    Fails to Adequately Inform Creditors About the Claims Released Under the Plan.**

31.    The Disclosure Statement fails to inform creditors that their claims against third parties will be released under the Plan. It acknowledges that the Plan releases claims against "Carrier and certain other Released Parties by or on behalf of the Debtor or its Estate," DS Art. I, but fails to disclose that creditors' claims against third parties are being transformed into purportedly releasable "Estate Causes of Action."

32.    This omission obscures the true cost of this Plan to creditors. Just as this Court will need to "assess and balance the value of the claim that is being compromised" to confirm the Plan, *see In re Boy Scouts of America and Delaware BSA, LLC*, 642 B.R. 504, 563 (Bankr. D. Del. 2022) (quoting *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996)), creditors need that information before they vote. While sophisticated creditors may turn to the Plan itself to understand what they will lose, this does not discharge the Debtor's duty to provide "simple and clear language delineating the consequences of the proposed Plan on their claims." *See In re Ferretti*, 128 B.R. at 19.

33.    The Disclosure Statement cannot be approved until it clearly discloses the claims to be released under the Plan. This will require the Debtor to identify the claims included in "Estate Causes of Action" and to provide the legal and factual justification for the release of those claims, as well as a reasonable description of the parties against whom those claims will be released.

    i.    Fails to Disclose the Special Committee's Investigation.

34.    While the core of the Plan is the settlement of claims against Carrier and other nondebtors, the Disclosure Statement provides only a cursory summary of the Special Committee's investigation of these claims. DS Art. III.L. This summary provides no details about the claims the Special Committee believes the Debtor can assert against Carrier with respect to AFFF-related

claims, and only discloses a few generic types of remedies as the results of the investigation–"*e.g.*, alter ego, veil-piercing and assumption of liability claims." *Compare* Disclosure Statement, *In re Purdue Pharma, L.P.*, Case No. 19-23649 (Bankr. S.D.N.Y.), ECF No. 2983, at 136-153. The Special Committee's investigation is essential to understanding the scope of the claims that belong to the estate, if any, and whether those claims are reasonably compromised under the Plan.

35.    The Disclosure Statement also omits key information concerning the "independent" status of the independent directors. *See* DS Art. II.B.3. First, the Disclosure Statement does not make clear how the two independent directors were selected by Carrier to serve on the Debtor's reconstituted board or disclose whether there are any relationships between those directors and Carrier or its counsel. Second, the Disclosure Statement does not disclose the independent directors' compensation. Third, the Disclosure Statement references but does not disclose any information about the "advisors" who recommended that the board file for bankruptcy. *Id.* Fourth, the Disclosure Statement briefly references but does not describe the "strategic review process" wherein the board considered "strategic alternatives" but elected to file this Chapter 11 case—a review process that entirely occurred sometime within the 45-day window between (1) Carrier's decision on March 29 to resurrect KFI's board, and (2) the authorization to file for bankruptcy on May 13, one day before the filing of the Petition and the first-day motions. *See id.*

ii.    Fails to Adequately Disclose the Debtor's Relationship to Carrier.

36.    The Disclosure Statement inadequately describes Carrier's relationship to the Debtor and its role in this bankruptcy. Given that this bankruptcy proceeding, post-liquidation of the Debtor, has served only to develop a plan with a broad release of liability for Carrier and other nondebtors, the Disclosure Statement must provide sufficient detail to justify such a broad release. The details of Carrier's acquisition of the Debtor are relevant and necessary to understand the

genesis of this bankruptcy and the scope of liability to be released by the Debtor's estate. First, the history of how Carrier came to be the parent of the Debtor is given scant details in a single paragraph. *See Id.* Art. II.A.3. The Disclosure Statement needs to explain how exactly "[i]n April 2020, UTC spun off the Debtor and certain other businesses to Carrier," including by what mechanism and under what terms. *Id.* The existing paragraph also asserts that, "[p]rior to the closing of the sale, the stock of the Debtor was wholly owned by Carrier," but does not explain how or when Carrier came to own the stock of the Debtor. *Id.*

37.    Second, the following passage is incomprehensible and should be clarified in plain English: "As discussed above, Carrier Global Corporation inherited the indirect equity of the Debtor, along with other businesses, from UTC in connection with the spin-off of Carrier Global Corporation from UTC in April 2020." *Id.* Art. III.J.3. If "discussed above" refers to the short paragraph in Article II.A.3, then that discussion is inadequate to provide any useful information or context.

38.    Third, the Disclosure Statement inadequately describes the Contribution Agreement of March 15, 2024, between the Debtor and Carrier subsidiary Kidde US Holdings LLC. *See Id.* Art. III.J.3. The terms of the Contribution Agreement are not disclosed within the Disclosure Statement, instead providing only a general summary of the Agreement's purpose. *See id.* ("KUHL agreed to contribute, assign and transfer rights, titles, and interests to the Related Assets to the Debtor in connection with the Debtor's sale of the Businesses."). The Disclosure Statement must explain the context and terms of the Contribution Agreement, including how Carrier came into ownership of the "Related Assets," how the Agreement affected the sale of the Debtor, and what benefit went to Carrier and its subsidiaries.

iii. <u>Fails to Disclose the New National Foam Settlement Agreement and the Underlying Liability.</u>

39.     The Disclosure Statement alleges that New National Foam assumed all AFFF liability when it acquired the National Foam business in 2013. *See Id.* Art. II.A.2. It further represents that the Debtor has proposed a reasonable settlement with New National Foam that will be a condition to confirmation of the Plan. *See id.* Art. II.B.1. These minimal assurances attempt to address critical issues about the relative value of the Plan to creditors but fail to provide any of the information necessary to allow creditors to make an informed judgment.

40.     First, any understanding of the Debtor's AFFF liability is only further confused by the conclusory statement that New National Foam acquired all of the Debtor's AFFF liability through the National Foam Sale Agreement of June 28, 2013. *See id.* Art. II.A.2. This assertion is not substantiated by a single reference to the National Foam Sale Agreement and suggests that the Debtor retains no AFFF liability at all, which puts the validity of the Debtor's bankruptcy into question. The Disclosure Statement cannot be approved without an analysis of (1) whether the indemnification exists, and (2) the extent to which it affects the liability of the Debtor—and any related nondebtors—and the value of the Plan.

41.     Second, the Disclosure Statement cannot be approved without disclosure of the referenced settlement agreement with New National Foam to settle "Estate Causes of Action." *Id.* Art. II.B.1. The Disclosure Statement makes clear that the Plan is conditional upon this settlement agreement between the Debtor and New National Foam. *Id.* The Court cannot approve the New National Foam Settlement without a comprehensive evaluation of whether the agreement is a fair compromise. *In re BSA*, 642 B.R. at 563. Until the Debtor submits the settlement with New National Foam for Court approval and creditor review as part of the Disclosure Statement, the Disclosure Statement cannot be approved.

42.     Third, the Debtor will need to produce the National Foam Sale Agreement of June 28, 2013. The Court and creditors will need to make independent judgments about the value of the claims (against New National Foam) being settled. This will require review of the 2013 Sale Agreement in its entirety.

    iv.    <u>Fails to Identify Parties to be Released.</u>

43.     As defined in the Plan, "Contributing Parties," Plan Art. 2.1.51, and "Released Party," *id.* Art. 2.1.173, include broadly defined and unspecified Related Parties. *See id.* Art. 2.1.174. The Disclosure Statement should identify all Related Parties and disclose any claims held by the Debtor against these parties, including whether any independent investigation of these claims has been conducted and how these claims were valued. It should be similarly disclosed what contributions are being made by each of these nondebtors in return for the releases provided, so it can be determined whether such parties are properly included in the definitions set forth.

**2.    Fails to Inform Creditors About Their Potential Recovery Under the Plan.**

44.     The Disclosure Statement fails to inform creditors about their potential recovery under the Plan.

    i.    <u>Fails to Analyze the Potential Insurance Recovery.</u>

45.     The Disclosure Statement addresses insurance in Articles IV.B.5.(k) and IV.B.9, but it fails to provide the information necessary to assess the Insurance Assignment, including its potential value, how the insurance recovery is to be pursued, or how the insurance assignment is qualified by the "RTX Waiver." *See* DS Art. IV.B.5.(k).(ii). The potential recovery on the insurance policies is expected to provide the bulk of the recovery for creditors (and for Carrier). *See* Exhibit B "CARRIER/KFI/UCC/PEC Settlement Term Sheet" for the Plan Support Agreement, D.I. 1570-1, at 4. The Disclosure Statement should explain in detail the merits of the insurance claims, the

expected defenses of the Insurance Companies, the amount of recovery at stake, and the likelihood of recovery. Furthermore, the Debtor needs to produce the 2020 Separation Agreement and disclose in detail how that document, along with the RTX Waiver, affects or relates to the insurance recovery.

ii. Fails to Provide a Liquidation Analysis and to Properly Consider Whether the Plan Is in the Best Interests of Creditors.

46.     The Disclosure Statement's liquidation analysis at Appendix B is uninformative boilerplate that presents the Plan as more beneficial to creditors than a Chapter 7 liquidation, but without sufficient information for creditors to make that determination. DS Art. VI.C.2, *id.* App. B. The liquidation analysis is incomplete—with recovery to each class of creditors simply listed as "TBD"—and makes no attempt to value, or otherwise characterize, the potential value to creditors of a hypothetical Chapter 7 liquidation.

47.     Likewise, the Debtor's application of this ersatz analysis to the Best Interests Test omits the value of third-party claims released under the Plan. The Disclosure Statement should compare what creditors will receive on account of the "Causes of Action" that will be "expressly waived, relinquished, exculpated, released, compromised or settled" after approval of the Plan, to the value of those "Causes of Action" retained by creditors in a Chapter 7 liquidation. DS Art. VI.C.1. This is especially important here, where the Debtor is not seeking to rehabilitate its business and continue to operate, and where the bankruptcy estate is being administered for the primary—if not the sole—purpose of releasing the Debtor's parent Carrier from liability.

**3. Additional Terms Without Adequate Information**

48.     The Disclosure Statement contains additional terms that lack adequate information that is relevant to creditors. First, the Plan provides for, but includes little explanation or justification for, common benefit fees to be paid to a group of creditors' attorneys. Second, the

Plan claims extensive privileges to be reserved to Carrier after the Effective Date but does not specify whether any relevant agreements or privileges exist.

      i.   <u>Fails to Adequately Disclose Information Related to the "PEC Fees."</u>

49.     Under the "CARRIER/KFI/UCC/PEC Settlement Term Sheet" for the Plan Support Agreement, D.I. 1570-1, attorneys for the Plaintiff's Executive Committee ("PEC") will potentially receive up to 8 percent of all estate assets under the Plan (the "PEC Fees"). *Id.* at 3. As further explained in the Disclosure Statement, "[o]n the Effective Date, a Common Benefit Escrow shall be established by the Primary AFFF Settlement Trust and funded by a common benefit assessment for attorneys' fees of 8% and reasonable costs, subject to and in accordance with the AFFF MDL orders applicable to common benefit fees and costs, to be made by a reduction to each Distribution made by the Primary AFFF Settlement Trust to Holders of Claims directly administered by the Primary AFFF Settlement Trust." DS Art. IV.B.6.

50.     The Disclosure Statement is hopelessly vague as to the meaning of "attorneys' fees of 8% and of reasonable costs." Eight percent of what? Of total estate assets? Of total estate recoveries, including the potentially billions of dollars in insurance recoveries? *See supra*, Section III.A.2.i.[6] Of the allowed amount of fees approved by the district court in the MDL litigation? The Debtor must further explain the meaning of this provision and how it will affect creditors.

51.     More substantively, the Plan's provision for payment of attorneys' fees for the PEC's representation of a set of creditors of the Debtor is an end-run around the Bankruptcy Code, 11 U.S.C. § 503(b)(3)(D), which requires a demonstration by the professionals who represented the creditors of whether they made "a substantial contribution" to the Chapter 11 case. This burden

---

[6] *See also* "CARRIER/KFI/UCC/PEC Settlement Term Sheet," D.I. 1570-1, at 4 ("Net Insurance Proceeds distributable to the Settlement Trust, including the first $125 million of the Net Insurance Proceeds recovered and payable to Carrier, may be subject to a common benefit assessment for attorney fees and reasonable costs as contemplated in the Section entitled 'PEC Fees' above.").

is an exacting one. *See Coal. of Abused Scouts for Just. v. Off. of the United States Tr. (In re BSA),* 666 B.R. 489, 499-505 (D. Del. Jan. 13, 2025) (affirming denial of $21 million in fees to ad hoc committee representing certain creditors with claims of sexual abuse under Bankruptcy Code §§ 363(b) and 503(b)(3)(D) for failure to satisfy burden of proving "(i) it made a substantial contribution to the Debtors' chapter 11 cases (section 503(b)(3)(D)), and (ii) its professionals' requested compensation was reasonable, and their expenses were actual and necessary," and where "the confirmed plan's provision regarding the Coalition's fees required an appropriate motion to be filed, yet '[the] Debtors did not file the Motion'"), *appeal filed* Case No. 25-1136 (3d Cir. Jan. 30, 2025). Further, no explanation is provided to justify diverting creditor recoveries to the PEC Fees, especially since the fees will only be paid "pursuant to an order of the MDL District Court," DS Art. IV.B.6, without reference to 11 U.S.C. § 503(b)(3)(D), and, thus, apparently are instead for services rendered in the MDL litigation. *See* "Glossary of Defined Terms" for the Plan Support Agreement, D.I. 1570-1, at 17 (referring to "MDL PEC Fees" as fees "*for the benefit of the MDL PEC.*" (emphasis added)). The Debtor should amend the Disclosure Statement to describe how, if at all, the PEC Fees benefit the estate.

52.     Moreover, the PEC's attorneys are treated neither as creditors of the estate, since they need not file a proof of claim, nor as professionals of the estate, since they need not file a professional fee statement. *See* Fed. R. Bankr. P. 3002(a), 3003(c)(2). Instead, the PEC's attorneys are treated as a "super-creditor," entitled to a priority payment out of the bankruptcy estate but without having to establish the validity of their fee to the Bankruptcy Court. The Court should disapprove the Disclosure Statement until the Debtor provides sufficient information to allow creditors to evaluate the basis and justification for the PEC Fees.

ii.   Fails to Disclose Any Applicable Information Privileges or Privilege Agreements.

53.    Article IV.B.5.(h) of the Disclosure Statement ("Privileged Information") makes

numerous unspecific references to privileges without disclosing any specific privilege the Debtor

claims to actually be in effect. According to this provision, any applicable privilege would appear

to preclude the disclosure or sharing of information with creditors, which is the essential purpose

of a "disclosure statement." The following language is particularly problematic:

> On the Effective Date, any attorney-client privilege, work-product privilege,
> *common-interest communications with Insurance Companies*, protection or
> privilege granted by joint defense, common interest, and/or other privilege or
> immunity of the Debtor relating, in whole or in part, to the Settlement Trust
> Retained Causes of Action or Insurance Actions shall be irrevocably transferred to
> and vested in the Primary AFFF Settlement Trust subject to the other terms of
> Article 5.5.8 of the Plan. Any such protections, privileges or immunities that are
> joint with Carrier shall vest with Carrier on the Effective Date . . . .

DS Art. IV.B.5.(h) (emphasis added). The Disclosure Statement needs to disclose any specific

privilege that the Debtor believes to be applicable. Furthermore, if there are joint or common

interest privilege agreements, whether with Insurance Companies, Carrier, or any other party, the

Debtor must disclose the particulars of those agreements, including the parties thereto, when and

how the agreements were created, and what information, at least in general, is considered subject

to these agreements.

**B.   The Plan Is Unconfirmable Because It Imposes Nonconsensual Third-Party Releases.**

54.    "[T]he bankruptcy code does not authorize a release and injunction that . . .

effectively seeks to discharge claims against a nondebtor without the consent of affected

claimants." *Purdue*, 603 U.S. at 227. The proposed Plan is unconfirmable because it does exactly

that.

55.    After the Supreme Court rejected nonconsensual third-party releases under Section

1123 of the Code, the Debtor now seeks to achieve the same prohibited result through Section 541

by defining "Estate Causes of Action" to include all creditors' claims against nondebtors, so long as that liability relates to the Debtor's AFFF products. Plan Art. 2.1.74. This attempted workaround should fail. Its bid flies in the face of *Purdue*'s broad holding—as well as the textual and contextual analysis of the Code that it commands—and it is contrary to the Supreme Court's reading of Section 541 itself. Just as the claims by opioid victims against the Sacklers did not belong to Purdue's estate, creditors' claims against Carrier do not belong to the Debtor here. *See Purdue*, 603 U.S. at 219-20.

56.      The only wrinkle in this simple analysis is *Emoral, Inc. v. Diacetyl (In re Emoral, Inc.)*, 740 F.3d 875 (3d Cir. 2014) (2-1 decision), which permitted an estate to release creditors' claims against a purchaser of the debtor's assets. While the Objecting States expect the Debtor to rely on *Emoral*, the decision does not avail them. *Emoral* has been abrogated by *Purdue*. The Supreme Court extinguished the Debtor's interpretation of *Emoral* when it ruled that a Chapter 11 plan cannot "effectively" discharge claims against nondebtors "without the consent of affected claimants." *Purdue*, 603 U.S. at 227. At the very least, any surviving application of *Emoral* must be construed narrowly (and certainly cannot be expanded) in light of *Purdue*. The releases here go far beyond what *Emoral* permitted, and with respect to the claims of sovereign states, they raise very different federalism issues.

**1.   The Plan Is Unconfirmable Because It Contravenes the Holding of *Purdue* and the Plain Text Reading of Section 541 That *Purdue* Demands.**

57.      The Plan purports to release nondebtors, namely Carrier, RTX, and their respective affiliates, whenever their liability derives from the Debtor's AFFF products. *Purdue*'s holding categorically forecloses the Plan's attempt to release nondebtors from liability. It also demands a reading of the Code that is incompatible with *Emoral*'s interpretation of Section 541. *Purdue* makes clear that the powers of a bankruptcy court are limited by the Code's text, and *Emoral*'s test

for determining which claims belong to an estate fails a plain-text and context-based reading of Section 541. Under the prevailing interpretation of the Code, the holding in *Emoral* cannot justify the estate releases under this Plan.

       i.   *Purdue* Forbids Nonconsensual Third-Party Releases, Whatever Form They Take.

58.     The Debtor's Plan, which seeks to allow the Debtor to broadly release claims against Carrier and other nondebtors that the Debtor could never bring on its own, directly contravenes the Supreme Court's holding in *Purdue.* Even to the extent that the Plan releases claims permitted to be released under *Emoral*, such an attempt cannot be reconciled with *Purdue*.

59.     *Purdue* considered whether nonconsensual third-party releases are lawful under Section 1123(b)(6), which permits a plan to "include any other appropriate provision not inconsistent with the applicable provisions of this title." After considering the text and context of the Code, the Supreme Court determined that even that broad provision does not "endow [the bankruptcy court] with the power to extinguish without their consent claims held by nondebtors (here, the opioid victims) against other nondebtors (here, the Sacklers)." *Purdue*, 603 U.S. at 220-21. The Code must specifically authorize the court to release and enjoin claims against a nondebtor without the consent of affected claimants. That authority exists in only one situation—asbestos cases. 11 U.S.C. § 524(g). Any plan that releases the non-asbestos claims of creditors without their consent is categorically inconsistent with Chapter 11 of the Code.

60.     The Third Circuit recently applied this categorical holding in *Boy Scouts* when it disallowed a judgment reduction clause that extinguished claims non-settling insurers held against other insurers without receiving full compensation in return. *In re BSA*, No. 23-1664, slip op. at 75-77 ("We therefore conclude that *Purdue* controls, and the judgement reduction provision is unlawful insofar as it operates to extinguish the Allianz Insurers' claims without their consent.").

21

Like the judgment reduction clause in *Boy Scouts*, the expansive estate release in the proposed Plan effectively discharges creditors' claims against nondebtors without the consent of the affected claimants.

61.     Most damning to the Debtor, *Purdue* also addressed Section 541, which the Debtor invokes here. The Supreme Court made clear that a debtor owns and may resolve derivative claims—where "the named plaintiff 'is only a nominal plaintiff'"—but it cannot settle claims against third parties because those claims belong to the victims. *Purdue*, 603 U.S. at 219-20. "Rather than seek to resolve claims that substantively belong to Purdue, it seeks to extinguish claims against the Sacklers that belong to their victims" and are not "Purdue's own property." *Id.* This was no passing remark. If claims against the Sacklers belonged to and could have been released by Purdue as estate property under Section 541, then there would have been no need for third-party releases under Section 1123 and *Purdue* would have been much ado about nothing.

ii.     *Purdue*'s Text-Based Reading of Section 541 Cannot Be Reconciled with *Emoral*.

62.     Following *Purdue*, proposed plans must comply with the Code as interpreted under *Purdue*'s framework. *See In re BSA*, No. 23-1664, slip op. at 79 (debtor's plan that provided for nonconsensual third-party releases "[i]f proposed today . . . would be unconfirmable in the wake of *Purdue* and [the abuse victims] could not have their claims released without their consent.").

63.     *Purdue* makes clear that bankruptcy courts' powers are limited by both the text of the Code and the Constitution. The words in the Code must be given their plain meaning. *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000). Estate property includes "all legal or equitable interests *of the debtor* in property *as of the commencement of the case.*" 11 U.S.C. § 541(a)(1) (emphasis added). Section 541 does not create "new property rights or value where previously there were none." *Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic*

*Star Casino, LLC)*, 716 F.3d 736, 751 (3d. Cir. 2013) (quoting *In re Messina*, 687 F.3d 74, 82 (3d

Cir. 2012)). Instead, estate property is limited to the debtor's pre-petition rights as "defined by

state law." *Butner v. United States*, 440 U.S. 48, 55 (1979). And critically, estate property does not

include "any power that the debtor may exercise solely for the benefit of an entity other than the

debtor." 11 U.S.C. § 541(b)(1).

64.    Under a plain reading of Section 541, claims against the nondebtors belong to

creditors, not the Debtor. *Purdue* made this obvious in holding that "claims against the Sacklers [

] belong to their victims." *Purdue*, 603 U.S. at 219.

65.    This conclusion is reinforced by Section 541(b). No one could reasonably argue

that the debtor is entitled to anything as a matter of state law if creditors recover on their claims

against Carrier. *Cf. Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972) ("a property interest" requires

"a legitimate claim of entitlement").[7] This concession is fatal under the text of Section 541 because

the debtor must stand to benefit for a claim to be estate property.

66.    Here, context confirms the plain meaning of Section 541. *West Virginia v. EPA*, 597

U.S. 697, 721 (2022). "[C]laims brought by nondebtors against other nondebtors" are not the

purview of bankruptcy. *Purdue*, 603 U.S. at 224. This structurally derived purpose is encapsulated

in 11 U.S.C. § 524(e), which makes clear that bankruptcy "does not affect the liability of any other

entity on . . . such debt." "[W]ord games cannot obscure the underlying reality," *Purdue*, 603 U.S.

---

[7] As Supreme Court and earlier Third Circuit precedent make clear, Congress "left the determination of property rights . . . to state law." *Integrated Solutions v. Serv. Support Specialties*, 124 F.3d 487, 492 (3d Cir. 1997) (quoting *Nobelman v. American Sav. Bank*, 508 U.S. 324, 329 (1993) (citation and internal quotations omitted)). Claims by creditors that seek redress for harm to the debtor are properly property of the estate; claims by creditors to redress their own injuries are not. *Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 584 (5th Cir. 2008) ("if the cause of action does not explicitly or implicitly allege harm to the debtor, then the cause of action . . . is not property of the estate"); *Steinberg v. Buczynski*, 40 F.3d 890, 893 (7th Cir. 1994) ("When a third party has injured not the bankrupt corporation itself but a creditor of that corporation, the trustee in bankruptcy cannot bring suit against the third party."); *accord Caplin v. Marine Midland Grace Tr. Co.*, 406 U.S. 416, 429 (1972). *Emoral* itself recognized that "it is difficult to imagine" that a debtor such as KFI "could bring" such claims. 740 F.3d at 881.

at 223, that the Plan clearly affects the liability of non-debtor third parties in violation of Section 524(e).

67.    Moreover, the fact that Congress made 11 U.S.C. § 524(g) the sole exception to Section 524(e) confirms that it did not intend to broadly confer that same power under Section 541. *See Purdue*, 603 U.S. at 222. In asbestos cases only, Section 524(g) authorizes injunctions against third-party claims where liability is based *inter alia* on "ownership of a financial interest in the debtor," or "involvement in the management of the debtor." *Id.* § 524(g)(4)(A). Notably, that narrow additional power comes with important added safeguards. *See, e.g.*, *In re Energy Future Holdings Corp*, 949 F.3d 806, 812 (3d Cir. 2020) (addressing additional protections for future claimants and requiring 75% plan approval). That authority becomes surplusage and those protections become meaningless if the same effect can be achieved through Section 541.

68.    Finally, by giving the estate authority to release creditors' claims against nondebtors, *Emoral* raises serious constitutional due process (and related Seventh Amendment) concerns. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982) ("a cause of action is a species of property protected by" due process); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) ("due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class"); *Granfinanciera v. Nordberg*, 492 U.S. 33, 61 (1989) ("Congress cannot eliminate a party's Seventh Amendment right to a jury trial merely by relabeling the cause of action."). While claims against a debtor may be releasable in bankruptcy without consent— because those proceedings are *in rem* and require a "special remedial" scheme to avoid a race through the courtroom door, s*ee Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846 (1999); *Johns-Manville Corp. v. Chubb Indemnity Ins. Co. (In re Johns-Manville Corp.)*, 600 F.3d 135, 153-58 (2d Cir. 2010)—those justifications do not support the release of claims against a solvent

nondebtor. This constitutional problem evaporates if Section 541 is given its plain meaning; thus, it must be given that meaning. *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988).

### 2. *Emoral* Addressed Only a Theory of Successor Liability That Was Common to All Creditors; This Plan Clearly Exceeds What *Emoral* Permits.

69.     The Debtor seeks these releases under Section 541 to (presumably) invoke *Emoral*. In that case, a divided panel of the Third Circuit held that asbestos plaintiffs' tort claims against a purchaser of the debtor's assets were estate property under Section 541. There, the majority held— seemingly as a matter of policy—that creditors' claims (for their own injuries) against nondebtors belonged to the estate so long as (1) the theory of the nondebtors' liability was common to all creditors and (2) establishing that liability would benefit all creditors. *Emoral*, 740 F.3d at 880. In so holding, *Emoral* invoked a line of cases recognizing that "general" claims belong to the estate but not "personal" ones. *Id.* at 879 (quoting *Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 170 (3d Cir. 2002)).[8] This Plan is unlawful even under *Emoral*'s test for determining estate property.

70.     First, *Emoral* was clear that only claims that "inure [ ] to the benefit of *all* creditors" can be estate property. 740 F.3d at 879 (emphasis added). Many of the claims that this Plan purports to belong to the estate are based on theories of liability—namely contractual assumption of tort liability, agency and/or control by a parent—that are specific to subsets of creditors, i.e., sovereign claimants and/or tort claimants. This case is thus materially different than *Emoral* where successor liability was based on the theory that the nondebtor was a "mere continuation" of the debtor—a

---

[8] As the dissent rightly observed, *Emoral* departed from precedent by ignoring the heart of the tort claims—creditor's individual and personal injuries—and that such claims are "quintessential examples of an individualized claim." *Emoral*, 740 F.3d at 883 (Cowen, J., dissenting).

theory available to all creditors, sovereign, tort, and commercial alike—and had no involvement in the actual tortious conduct at issue.

71.    The expansion the Debtor seeks demonstrates the problem with judicially created tests that are not textually rooted: they expand little by little until the law looks nothing like what Congress passed. Holding this plan lawful would open the bankruptcy door to all types of third-party nondebtors in similar cases involving joint tortfeasors where liability is based on agency, aiding and abetting, or conspiracy; and it would provide a roadmap for solvent parent corporations to shed their own tort liability by simply abandoning their subsidiary (as was the case here) and letting the debtor commandeer the claims. *Emoral* and its progeny plainly did not consider the potential for that type of abuse of the Bankruptcy Code, and *Purdue* shuts the door on it.

72.    Second, Third Circuit law demonstrates the Objecting States' claims against third parties are not property of the estate. "A cause of action [becomes] property of the estate if the claim existed at the commencement of the [bankruptcy] filing and the debtor could have asserted the claim on his own behalf under state law." *Foodtown*, 296 F.3d at 169 n.5 (citing *Butner*, 440 U.S. at 54). These two elements of causes of action that become property of a bankruptcy estate have persisted through recent Third Circuit decisions like *Emoral* and *Artesanias Hacienda Real S.A. de C.V. v. North Mill Capital, LLC (In re Wilton Armetale, Inc.)*, 968 F.3d 273 (3d Cir. 2020). In determining whether the second element is met, courts in this Circuit look to whether the claim is "based on an injury to the debtor's estate that creates a secondary harm to all creditors regardless of the nature of their underlying claim[s] against the debtor." *Wilton*, 968 F.3d at 283 (quoting *Tronox Inc. v. Kerr-McGee Corp. (In re Tronox Inc.)*, 855 F.3d 84, 104 (2d Cir. 2017)). Therefore, only claims that derive from harm to the estate become property of the estate.

73.    Sovereign state claims against nondebtors are not property of the estate under 11 U.S.C. § 541 because: (1) sovereign state claims are unique and thus do not qualify as "general" claims under *Emoral*; and (2) no Third Circuit decision—or any decision cited favorably by the Third Circuit—has held sovereign state claims to be of the same character as claims of private creditors when analyzing the scope of property of the estate.

74.    States are afforded a "special solicitude" under our system of federalism and as the guardian of their citizens' rights. *See Massachusetts v. E.P.A.*, 549 U.S. 497, 520 (2007); *see also Alden v. Maine*, 527 U.S. 706, 758 (1999) ("Congress must accord States the esteem due to them as joint participants in a federal system."). This is especially true when protecting their citizens and environments. As the Supreme Court announced more than a century ago in *Georgia v. Tennessee Copper*, "[i]n that capacity the State has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain." 206 U.S. at 237.

75.    States have a duty to protect their citizens and their natural resources from the harms of pollution and environmental contamination and have passed laws enshrining this duty. For example, in California, the "Attorney General may maintain an action for equitable relief in the name of the people of the State of California against any person for the protection of natural resources of the state from pollution, impairment, or destruction." Cal. Gov't Code § 12607. In Connecticut, the Attorney General may recover costs from an entity "which directly or indirectly causes pollution and contamination of any land or waters of the state." Conn. Gen. Stat. § 22a-451. In New York, the State has the duty to protect its natural resources and prevent pollution of water, land and air and the Attorney General is provided broad power to prosecute cases of repeated fraudulent or illegal acts. ECL § 1-0101, ECL § 3-0301 and Executive Law § 63(12). State actions protecting health, safety, and the environment are of a different kind and scope than claims brought

27

by private litigants for individualized harm, as were at issue in *Emoral*. There is no support that these types of state claims come within the scope of *Emoral.*

76.     The Objecting States' claims against Carrier and other Debtor affiliates for environmental harm to their states' water and other natural resources, and which are held by no creditor other than the Objecting States, are not "generalized" claims that inure to the benefit of other creditors. Whether brought under the concept of public trust, *parens patriae*, or otherwise, claims for the remediation of environmental harms are "specific" and "personal" to each Objecting State, can only be asserted by the Objecting States, and as such are not "property of the estate" and cannot be released by the Debtor. The Objecting States are not aware of any court that has permitted an estate to commandeer and release the claims of states without their consent under Section 541.

## C.  The Plan Includes an Impermissible Channeling Injunction.

77.     Article 10.7 of the Plan describes a channeling injunction that will bar holders of Channeled AFFF Claims from seeking to recover from the Released Parties. Approval of the channeling injunction is a condition precedent to the Effective Date of the Plan. Plan Art. 9.1.(l). In conjunction with the Plan's overly broad releases and its retention of jurisdiction provision, *see id.* Art. 12.1.L, this channeling injunction will likely impede any rightful assertion of AFFF claims against the Debtor's affiliates unless and until the Bankruptcy Court determines that such claims are not released under this Plan. However, this provision should be stricken from the Plan because channeling injunctions are only permissible in asbestos-related bankruptcies and are otherwise not authorized by the Bankruptcy Code. *Purdue*, 603 U.S. at 222 ("For asbestos-related bankruptcies—*and only for such bankruptcies*—Congress has provided that . . . courts may issue 'an injunction . . . bar[ring] any action directed against a third party' under certain statutorily

28

specified circumstances. 11 U.S.C. § 524(g)(4)(A)(ii)." (emphasis added)); *see also In re BSA*, No. 23-1664, slip op. at 76 n.27. Indeed, the section of the Bankruptcy Code authorizing channeling injunctions explicitly requires the debtor to be a defendant in "actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products." 11 U.S.C. § 524(g)(2)(B)(i)(I). This bankruptcy is not about asbestos.

78.     *Purdue*'s holding also forecloses approving such an injunction under 11 U.S.C. § 105(a) and § 1123(b)(6). Section 105(a) may only "carry out" authorities expressly conferred elsewhere in the Code. *Purdue*, 603 U.S. at 278 n.2. No provision of the Code authorizes a channeling injunction in a non-asbestos case. Likewise, § 1123(b)(6) may only permit the sort of plan provision that concerns a debtor's rights and responsibilities. *Purdue*, 603 U.S. at 218. It may not rob the creditor of its right to adjudicate its surviving claims against nondebtors in a court of its own choosing by forcing it to return to the Bankruptcy Court for approval.

## IV. RESERVATION OF RIGHTS

79.     This Objection is submitted without prejudice to, and with a full reservation of, the Objecting States' rights to object to confirmation of the Plan on any basis, to seek discovery in connection with confirmation related issues, and to supplement this Objection in writing or at the Disclosure Statement hearing including, without limitation, in the event the Debtor amends or otherwise modifies the Disclosure Statement or the Plan. Notwithstanding this Objection, the Objecting States continue to regularly engage with the Debtor, Carrier, the AHC, the UCC, the PEC, and other parties in interest to reach a consensual plan and present it for confirmation as soon as possible.

## V.  CONCLUSION

WHEREFORE, for all of the foregoing reasons, the Objecting States respectfully request that the Court (i) sustain this Objection, (ii) deny the Motion, (iii) disapprove the Disclosure Statement, and (iv) grant such other relief as is just and appropriate.


Dated: May 19, 2025

Respectfully submitted,

**STATE OF CALIFORNIA**

ROB BONTA
Attorney General of California

*/s/ Mitchell E. Rishe*
JEREMY BROWN (SBN 269159)
Supervising Deputy Attorney General
MITCHELL E. RISHE (SBN 193503)
NICHOLAS G. CAMPINS (SBN 238022)
THOMAS SCHUMANN (SBN 324559)
BRENDAN HUGHES (SBN 333690)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
(213) 269-6394
Mitchell.Rishe@doj.ca.gov

*Attorneys for the People of the State of California,*
*ex rel. Rob Bonta, Attorney General of California*

**STATE OF COLORADO**

PHILIP J. WEISER
Attorney General of Colorado

*/s/ Leslie Eaton*
LESLIE EATON
Special Counsel
HEATHER KELLY
First Assistant Attorney General
1300 Broadway
Denver, Colorado 80203
(720) 508-6000
Leslie.Eaton@coag.gov

*Attorneys for the State of Colorado*

**STATE OF CONNECTICUT**

WILLIAM M. TONG
Attorney General of Connecticut

*/s/ Christopher Patrick Kelly*
MATTHEW I. LEVINE
Deputy Associate Attorney General
CHRISTOPHER PATRICK KELLY
KAELAH M. SMITH
JULIA R. SUESSER
Assistant Attorneys General
165 Capitol Avenue
Hartford, CT 06106
860-808-5250
Christopher.Kelly@ct.gov

*Attorneys for the State of Connecticut*

**STATE OF DELAWARE**

KATHLEEN JENNINGS
Attorney General of Delaware

*/s/ Shelley A. Kinsella*
OWEN P. LEFKON (#5672)
Director
Fraud and Consumer Protection Division
MARION QUIRK (#4136)
Director of Consumer Protection
RALPH DURSTEIN III (#912)
SHELLEY A. KINSELLA (#4023)
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8600
Shelley.Kinsella@delaware.gov

*Attorneys for the State of Delaware*

**STATE OF NEW YORK**

LETITIA JAMES
Attorney General of the State of New York

*/s/ Muhammad Umair Khan*
MUHAMMAD UMAIR KHAN
Senior Advisor & Special Counsel
MARTIN A. MOONEY
Assistant Attorney General
Section Chief
ROBERT J. ROCK
MIHIR DESAI
Assistant Attorneys General
28 Liberty Street
New York, New York 10005
(212) 416-6685
Umair.Khan@ag.ny.gov

*Attorneys for the State of New York*

**DISTRICT OF COLUMBIA**

BRIAN L. SCHWALB
Attorney General for the District of
Columbia

*/s/ Wesley Rosenfeld*
SEAN POWERS (#198053)
STEPHON D. WOODS (#1025232)
WESLEY ROSENFELD (#1002428)
Assistant Attorneys General
400 Sixth Steet, NW
Washington, D.C. 20001
(202) 368-2569
Wesley.Rosenfeld1@dc.gov

*Attorneys for the Office of the Attorney
General for the District of Columbia*

31

## CERTIFICATE OF SERVICE

I, Robert Rock of the Office of the Attorney General for the State of New York, hereby certify that on the 19th day of May, 2025, I electronically filed the annexed OBJECTION OF THE STATES OF CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, AND NEW YORK, AND THE DISTRICT OF COLUMBIA, TO THE DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT AND FORM AND MANNER OF NOTICE OF HEARING THEREON; (II) ESTABLISHING SOLICITATION PROCEDURES; (III) APPROVING THE FORM AND MANNER OF NOTICE TO ATTORNEYS AND SOLICITATION DIRECTIVE; (IV) APPROVING THE FORM OF BALLOTS; (V) APPROVING THE FORM, MANNER AND SCOPE OF CONFIRMATION NOTICES; (VI) ESTABLISHING CERTAIN DEADLINES IN CONNECTION WITH APPROVAL OF DISCLOSURE STATEMENT AND CONFIRMATION OF PLAN; AND (VII) GRANTING RELATED RELIEF with the Clerk of the Bankruptcy Court for the District of Delaware, using the CM/ECF system and with service by separate email to the individuals listed below:

Alexa J. Kranzley
Sullivan & Cromwell LLP
kranzleya@sullcrom.com

Derek C. Abbott
Andrew R. Remming
Morris, Nichols, Arsht & Tunnell LLP
dabbott@morrisnichols.com
aremming@morrisnichols.com

Daniel Hogan
Hogan McDaniel
dkhogan@dkhogan.com

Timothy J. Fox
U.S. Trustee
timothy.fox@usdoj.gov

Gerard T. Cicero
Brown Rudnick LLP
gcicero@brownrudnick.com

Sander L. Esserman
Stutzman, Bromberg, Esserman, & Plifka, a
Professional Corporation
esserman@sbep-law.com

Thomas E. Patterson
KTBS LAW LLP
tpatterson@ktbslaw.com

Diana G. Adams
Fee Examiner
diana.goldberg.adams@gmail.com

James S. Carr
Kelley Drye & Warren LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
kdwbankruptcydepartment@kelleydrye.com

Anthony M. Saccullo
Mark T. Hurford
Mary E. Augustine
A.M. Saccullo Legal, LLC
27 Crimson King Drive
Bear, DE 19701
ams@saccullolegal.com
mark@saccullolegal.com
meg@saccullolegal.com

*/s/ Robert J. Rock*
Robert J. Rock