**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| KFI WIND-DOWN CORP.,[1] | Case No. 23-10638 (LSS) |
| Debtor. | **Re: D.I.s 1651, 2054, 2107, 2131, 2133, 2137, 2140, 2141, 2143, 2144, 2146, 2147, 2149, 2150, 2152, 2165, 2170** |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS'**
**REPLY AND JOINDER IN SUPPORT OF THE DISCLOSURE STATEMENT**
**FOR THE THIRD AMENDED PLAN OF LIQUIDATION**

---

[1]    The last four digits of KFI Wind-Down Corp.'s tax identification number are 5282.  The Debtor's corporate headquarters is located at c/o AlixPartners, 909 Third Avenue, New York, NY 10022.

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................ 1

JURISDICTION .................................................................................................................... 5

RESPONSE ............................................................................................................................ 5

I.      The Confirmation Objections Are Premature, Meritless And Should Be Overruled ....... 5

        A.     The Plan, Trust Documents Have Been Proposed in Good Faith Under 11 U.S.C. §
               1129(a)(3) ............................................................................................................... 6

               1.     The Plan Does Not Create a Conflict of Interest and Is Not Patently
                      Unconfirmable Under *Skinner*. ..................................................................... 8

               2.     The Bankruptcy Code Does Not Require Insurer Participation in the
                      Evaluation of Claims, and, in Any Event, the Plan and Trust Documents
                      Provide Appropriate Safeguards Against Inflated Claim Values. ................ 12

               3.     Nothing in the Plan or TDPs Impermissibly Impairs the Objecting Insurers'
                      Rights. .......................................................................................................... 15

               4.     The TDPs Do Not Provide Distributions to Non-Creditors of the Estate .... 18

               5.     The Plan Does Not Impermissibly Pay Administrative Expenses and Various
                      Uninsured Pre-Petition Claims with Insurance Proceeds. ........................... 19

        B.     The Plan Does Not Contain Non-Consensual Third-Party Releases. ..................... 20

        C.     The Plan Does Not Contain Improper and Unnecessary Plan Findings. ................ 22

        D.     The Insurance Assignment Does Not Render the Plan Patently Unconfirmable ..... 23

               1.     The Court Has Jurisdiction to Authorize Carrier's Insurance Assignment .. 23

               2.     The Insurance Assignment Is Authorized and Permissible .......................... 25

                      a.      The Court May Authorize the Transfer of Non-Debtor Rights. ......... 26

                      b.      A Plan Need Not Transfer Obligations. ............................................. 27

        E.     The Plan Does Not Facilitate Bad Faith Schemes to Inflate Insurance Claims ...... 28

II.     The Disclosure Objections Are Unjustified, And At Best, Are Confirmation Issues That
        Should Be Overruled .................................................................................................... 29

i

III.      The Procedural Objections Are Improper And Unjustifiably Burdensome, And Should Be Overruled; And The Solicitation Procedures Should Be Approved. ...................................... 36

CONCLUSION........................................................................................................................... 39

EXHIBIT A ................................................................................................................................... 1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Abengoa Bioenergy Biomass of Kan., LLC*,
    No. 16-10446, 2018 WL 2138620 (Bankr. D. Kan. May 7, 2018).........................................13

*In re ACandS, Inc.*,
    311 B.R. 36 (Bankr. D. Del. 2004) ...............................................................................13, 27

*In re Adelphia Commc'ns Corp.*,
    352 B.R. 592 (Bankr. S.D.N.Y. 2006), *clarified on denial of reconsideration*,
    No. 02-41729, 2006 WL 2927222 (Bankr. S.D.N.Y. Oct. 10, 2006) ....................................30

*In re Am. Cap. Equip., Inc.*,
    405 B.R. 415 (Bankr. W.D. Pa. 2009), *aff'd sub nom. Skinner Engine Co. v.*
    *Allianz Glob. Risk U.S. Ins. Co.*, No. BKY 01-23987, 2010 WL 1337222
    (W.D. Pa. Mar. 29, 2010), *aff'd sub nom. In re Am. Cap. Equip., LLC*, 688
    F.3d 145 (3d Cir. 2012)...........................................................................................................8

*In re Am. Cap. Equip., LLC*,
    688 F. 3d 145 (3d. Cir. 2012)........................................................................................5, 9, 35

*Babcock & Wilcox Co. v. Am. Nuclear Insurers*,
    131 A.3d 445 (Pa. 2015) .......................................................................................................14

*In re Boy Scouts of Am. & Delaware BSA, LLC*,
    642 B.R. 504 (Bankr. D. Del. 2022) .............................................................................. *passim*

*In re Boy Scouts of Am. & Delaware BSA, LLC*,
    650 B.R. 87 (D. Del. 2023), *aff'd in part, rev'd in part, dismissed in part sub*
    *nom. In re Boy Scouts of Am.*, No. 23-1664, 2025 WL 1377408 (3d Cir. May
    13, 2025) ....................................................................................................................... *passim*

*In re Boy Scouts of Am. & Delaware BSA, LLC*,
    No. 20-10343 (LSS), 2022 WL 20541782 (Bankr. D. Del. Sept. 8, 2022),
    *aff'd*, 650 B.R. 87 (D. Del. 2023), *aff'd in part, rev'd in part, dismissed in*
    *part sub nom.*, No. 23-1664, 2025 WL 1377408 (3d Cir. May 13, 2025)...................... *passim*

*In re Boy Scouts of Am.*,
    No. 23-1664, 2025 WL 1377408 (3d Cir. May 13, 2025) ......................................................16

*In re Broad Assocs. Ltd. P'ship*,
    No. 5-89-01070, 1989 Bankr. LEXIS 2248 (Bankr. D. Conn. Dec. 29, 1989) ..................6, 18

*Century Glove, Inc. v. First Am. Bank of New York*,
860 F.2d 94 (3d Cir. 1988) ..................................................................................30

*CNH Am., LLC v. Am. Cas. Co. of Reading, Pa., C.A.*,
No. N12C-07-108 JTV, 2014 WL 626030 (Del. Super. Ct. Jan. 6, 2014) .............26

*In re Congoleum Corp.*,
No. 03-51524, 2008 WL 4186899 (Bankr. D.N.J. Sept. 2, 2008) .........................13

*Cont'l Cas. Co. v. Westerfield*,
961 F. Supp. 1502 (D.N.M. 1997) .......................................................................28

*In re Cybergenics Corp.*,
226 F.3d 237 (3d Cir. 2000) ................................................................................14

*In re Dakota Rail, Inc.*,
104 B.R. 138 (Bankr. D. Minn. 1989) ...............................................................6, 35

*In re Diocese of Buffalo, N.Y.*,
665 B.R. 198 (Bankr. W.D.N.Y. 2024) ................................................................38

*In re Fed.-Mogul Glob., Inc.*,
385 B.R. 560 (Bankr. D. Del. 2008) ....................................................................27

*In re Federal-Mogul Glob. Inc.*,
684 F.3d 355 (3d Cir. 2012) ...........................................................................20, 27

*Fidelity & Guar. Underwriters, Inc. v. Am. Bldgs. Co., Inc.*,
14 F. Supp. 2d 704 (M.D. Pa. 1998) ...................................................................22

*In re Forty-Eight Insulations, Inc.*,
133 B.R. 973 (Bankr. N.D. Ill. 1991) ..................................................................25

*In re Frascella Enters., Inc.*,
360 B.R. 435 (Bankr. E.D. Pa. 2007) ....................................................................7

*In re Glob. Indus. Techs., Inc.*,
No. BR 02-21626-JKF, 2013 WL 587366 (Bankr. W.D. Pa. Feb. 13, 2013).........28

*Harrington v. Purdue Pharma L.P.*,
603 U.S. 204 (2024) ............................................................................................20

*In re Kaiser Aluminum Corp.*,
343 B.R. 88 (D. Del. 2006) ..................................................................................26

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
337 F.3d 314 (3d Cir. 2003) .................................................................................29

*MacArthur Company v. Johns-Manville Corp. (In re Johns Manville Corp.)*,
    837 F.2d 89 (2d Cir. 1988)..............................................................................23

*In re Maremont Corp.*,
    601 B.R. 1 (Bankr. D. Del. 2019) ......................................................................7

*In re Marvel Ent. Grp., Inc.*,
    140 F.3d 463 (3d Cir. 1998)............................................................................14

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
    848 F.2d 414 (3d Cir. 1988)............................................................................29

*Overton's, Inc. v. Interstate Fire & Cas. Ins. Co. (In re Sportstuff, Inc.)*,
    430 B.R. 170 (B.A.P. 8th Cir. 2010).................................................................25

*Pro. Flooring Co., Inc. v. Bushar Corp.*,
    2016 PA Super 274, 152 A.3d 292 (2016).........................................................21

*In re Quigley Co.*,
    377 B.R. 110 (Bankr. S.D.N.Y. 2007)............................................................5, 6

*In re Residential Cap., LLC*,
    497 B.R. 720 (Bankr. S.D.N.Y. 2013)..............................................................25

*Safeco Ins. Co. of Am. v. Parks*,
    170 Cal. App. 4th 992 (Cal. App. 2009)............................................................28

*In re Scioto Valley Mortg. Co.*,
    88 B.R. 168 (Bankr. S.D. Ohio 1988)..........................................................29, 31

*In re Stone & Webster, Inc.*,
    286 B.R. 532 (Bankr. D. Del. 2002) .................................................................26

*Matter of Texas Extrusion Corp.*,
    844 F.2d 1142 (5th Cir. 1988) .........................................................................29

*In re U.S. Brass Corp.*,
    194 B.R. 420 (Bankr. E.D. Tex. 1996) ..........................................................5, 35

*In re W. Asbestos Co.*,
    313 B.R. 832 (Bankr. N.D. Cal. 2003) ...............................................................6

*In re Washington Mut., Inc.*,
    461 B.R. 200 (Bankr. D. Del. 2011), *vacated in part on other grounds*, 2012
    WL 1563880 (Bankr. D. Del. Feb. 24, 2012) ................................................24, 38

*In re Weinstein Co. Holdings LLC*,
    997 F.3d 497 (3d Cir. 2021)............................................................................27

*Wimer v. Pennsylvania Emps. Benefit Tr. Fund*,
  595 Pa. 627 (2007) ................................................................................................21

*In re WR Grace & Co.*,
  729 F.3d 332 (3d Cir. 2013) .....................................................................................7

**Statutes**

11 U.S.C. § 363 ..............................................................................................23, 27

11 U.S.C. § 541(a) ...............................................................................................24

11 U.S.C. § 524(e) ...............................................................................................17

11 U.S.C. § 541(a) ...............................................................................................24

11 U.S.C. § 112 (a) ...............................................................................................26

11 U.S.C. § 1123(b) ..............................................................................................24

11 U.S.C. § 1125(a) ...........................................................................................4, 29

11 U.S.C. § 1126(a) ..............................................................................................36

11 U.S.C. § 1129(a) ..........................................................................................6, 7,9

Fed. R. Bankr. P. 2019 ...................................................................................7, 37, 38

Fed. R. Bankr. P. 3003 ..........................................................................................36

Fed. R. Bankr. P. 9019(a) ...................................................................................24, 25

**Other Authorities**

1 Insurance Claims and Disputes § 3:9 (6th ed. 2021) ......................................................14

16 Couch on Ins. § 223:134 ....................................................................................22

Restatement (Second) of Contracts §§ 317, 322 (Am. L. Inst. 1981) .......................................27

The Official Committee of Unsecured Creditors (the "**Committee**" or "**UCC**") files this reply (the "**Reply**") and joins in the Debtor's reply (to be filed contemporaneously)[2] (generally, the "**Debtor's Reply**") to the objections, joinders, and reservations of rights (collectively, the "**Objections**") identified in <u>**Exhibit A**</u> with respect to the *Debtor's Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement and Form and Manner of Notice of Hearing Thereon, (II) Establishing Solicitation Procedures; (III) Approving the Form and Manner of Notice to Attorneys and Solicitation Directive; (IV) Approving the Form of Ballots; (V) Approving the Form, Manner and Scope of Confirmation Notices; (VI) Establishing Certain Deadlines in Connection with Approval of Disclosure Statement and Confirmation of Plan; and (VII) Granting Related Relief* [D.I. 1651] (the "**Motion**"), which requests, among other things, entry of an order (the "**Solicitation Procedures Order**") approving the Disclosure Statement and the Solicitation Procedures.  In support of the approval of the Disclosure Statement and the Solicitation Procedures, the Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      The Debtor filed for bankruptcy with the stated goal of confirming a plan that would provide equitable compensation to creditors, including the AFFF Claimants.  The proposed plan,[3] is the product of extensive arms' length negotiations among the Debtor, the Committee, Carrier, (the "**Plan Proponents**") and other stakeholders, where the interests of unsecured creditors have been represented by the Committee, the Ad Hoc Committee of States (the "**AHC**") and the FCR.  As the Court is aware, the Committee in these cases has been diligent in protecting the rights of

---

[2]     The Committee understands that the Debtor also intends to file an amended Plan, amended Disclosure Statement, amended Plan Supplement, and amended Solicitation Procedures contemporaneously with its reply, and such amendments are generally referenced, as applicable, herein.

[3]     Capitalized terms used but not defined herein or in the document for which the term is being referenced shall have the meanings ascribed to them in the *Debtor's Third Amended Plan of Liquidation Under Chapter 11 of the Bankruptcy Code* [D.I. 2053] (the "**Plan**").

1

creditors, including in conducting its own investigation into the Debtor's historical operations, ownership and certain aspects of AFFF Claims against the Debtor. *See* Plan § 2.1.10. In addition, the Committee filed a standing motion [D.I. 677] to prosecute claims against the Debtor and its affiliates, including Carrier Global, while simultaneously attempting to negotiate a global resolution of the issues raised by this bankruptcy and the claims identified in the Standing Motion. After more than a year of arms-length negotiations, the Committee, the AHC and the MDL PEC Co-Leads formulated a plan construction with the Debtor that is memorialized in the Debtor's Plan, which maximizes the value of assets available to creditors and ensures that those assets will be distributed fairly and efficiently.

2.    As the Court is aware, the Debtor's operational assets and certain Carrier owned assets were sold at the outset of this case, so the Plan, in its simplest terms, is a pot plan for the benefit of creditors. A fundamental building block of the Plan is the establishment of the Primary AFFF Settlement Trust (the "**Trust**") for the benefit of AFFF Claimants. The Trust will be funded by contributions from the Debtor and Carrier in the amount of $540 million, but also, potentially in large part, by any insurance monies the Trust recovers under the Debtor and Carrier's insurance policies applicable to AFFF Claims (the "**Insurance Policies**"). The trust structure has been used routinely since its genesis in *In re Johns-Manville* over three decades ago to resolve claims in mass-tort bankruptcies. And courts, including this one, continue to confirm such settlement frameworks. *See, e.g.*, *In re Boy Scouts of Am. & Delaware BSA, LLC*, No. 20-10343 (LSS), 2022 WL 20541782 (Bankr. D. Del. Sept. 8, 2022), *aff'd*, 650 B.R. 87 (D. Del. 2023), *aff'd in part, rev'd in part, dismissed in part sub nom.*, No. 23-1664, 2025 WL 1377408 (3d Cir. May 13, 2025).

3.     The Plan incorporates a number of standard provisions that work in tandem to preserve and maximize the value of the Trust's insurance assets—potentially worth billions of dollars—for AFFF Claimants.  Among others:

- Article 5.5.11 of the Plan transfers to the Trust the rights of the Debtor and Carrier under the Insurance Policies (the "**Insurance Assignment**").

- Articles 10.8. and 10.9. of the Plan, (the "**Channeling Injunction**" and "**Insurer Company Injunction**," respectively) enjoin entities other than the Trust from pursuing recoveries under the Insurance Policies, except as specifically permitted.

- Article 9.1. requires that the Confirmation Order include findings of facts and conclusions of law (the "**Findings**") necessary to prevent unnecessary depletion of Trust assets through re-litigation of core bankruptcy issues post-confirmation.

- Article 5.8. of the Plan (the "**Insurance Provisions**") preserves the insurers' pre-petition obligations under the Insurance Policies, as well as the insurers' ability to raise any state law coverage defenses.

4.     All of this information, in addition to other substantial disclosures further discussed below, is conspicuously set forth in the Plan and Disclosure Statement.  These disclosures make clear that the Plan represents a reasonable, equitable, good-faith compromise that satisfies all requirements of the Bankruptcy Code.

5.     Nonetheless, certain parties—primarily insurers (the "**Objecting Insurers**"), as well as the states of California, Colorado, Connecticut, Delaware, New York, and the District of Columbia (the "**Objecting States**") and the Office of the United States Trustee (the "**UST**")— have filed objections to the Disclosure Statement.  Those Objections purport to raise concerns as to: (I) the confirmability of the Plan ("**Confirmation Objections**"); (II) the adequacy of the information contained in the Plan and Disclosure Statement ("**Disclosure Objections**"); or (III) the Debtor's proposed voting and solicitation procedures ("**Procedural Objections**").  In particular, the Objecting Insurers argue that essential components of the Plan are not adequately

3

disclosed or render the Plan unconfirmable by depriving them of their rights and defenses under the Insurance Policies.  Similarly, the Objecting States argue primarily regarding the scope of the Estate Claims Release, and that the Plan and its accompanying documents fail to adequately disclose information related to the Common Benefit Escrow (as defined in § 2.1.46 of the Plan), which is a common feature of bankruptcy plans addressing mass torts (as set forth in greater detail below).

6.    The Objecting Insurers' story—which they have employed, in various forms, for decades—is a transparent attempt to use the Debtor's insolvency to avoid their coverage obligations, in violation of fundamental principles of bankruptcy law and their own policies.  At confirmation, the Plan Proponents will present facts and law to show that the Objecting Insurers' narrative is false.  There is no collusion.  The Plan does not impermissibly impair the Objecting Insurers' rights.  The Plan requires no coverage determinations.  And the Plan and TDPs are consistent with the parties' historical practices.

7.    As set forth in the Debtor's Reply in support of the Disclosure Statement, which the Committee joins, the Disclosure Objections should be overruled because the Debtor has provided more than enough information to enable a "hypothetical investor typical of the holders of claims or interest in the case" to cast an informed vote on the Plan.  11 U.S.C. § 1125(a)(1).  The Confirmation Objections should further be overruled because they raise confirmation issues not appropriate for adjudication at the disclosure statement stage—and, in any event, are wrong on the merits.  The Procedural Objections raised solely by the Objecting Insurers should be overruled because they are merely a transparent attempt by the insurers to delay and obstruct efficient resolution of this case.

8.    The Committee unequivocally supports the Plan and believes that the Disclosure Statement has adequate information to allow creditors to make a determination as to whether or not to vote in favor of the Plan.  Rather than restate the Debtor's Reply, the Committee has elected to address certain issues where its conclusion may be similar to that of the Debtor, but its perspective is unique.

## JURISDICTION

9.    The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 1334 and 157(b)(2) and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.

10.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## RESPONSE

**I.        The Confirmation Objections Are Premature, Meritless And Should Be Overruled.**

11.    Each of the Confirmation Objections should be overruled.  In the Third Circuit, courts find plans to be "patently unconfirmable" only "where (1) confirmation defects [cannot] be overcome by creditor voting results and (2) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing."  *In re Am. Cap. Equip., LLC*, 688 F. 3d 145, 154–55 (3d. Cir. 2012) (internal quotations omitted).  As a result, the party raising a Confirmation Objection bears the heavy burden of proving, as a matter of law, that the plan "is so fatally flawed that confirmation is impossible."  *In re U.S. Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996); *see also In re Quigley Co.*, 377 B.R. 110, 119 (Bankr. S.D.N.Y. 2007) (approving the debtor's disclosure statement despite finding that questions existed regarding good faith, improper voter manipulation, and voter designation because such questions were "confirmation issues that require an evidentiary hearing").  For this reason, "[o]nly where the disclosure statement on its face relates to a plan that cannot be confirmed" is it appropriate to

dismiss a proposed plan prior to the solicitation of votes "otherwise, confirmation issues are left for later consideration." *In re Dakota Rail, Inc*., 104 B.R. 138, 143 (Bankr. D. Minn. 1989).

12.    As set forth below, the Objectors have failed to meet their burden.    Their Confirmation Objections either raise contested legal questions or require a developed factual record to resolve.    Bankruptcy courts generally do not resolve confirmation issues during a disclosure statement hearing without an evidentiary record for that reason.    *See, e.g.*, *In re Broad Assocs. Ltd. P'ship,* No. 5-89-01070, 1989 Bankr. LEXIS 2248, at *7 (Bankr. D. Conn. Dec. 29, 1989) ("[C]are must be taken to ensure that the hearing on the disclosure statement does not turn into a confirmation hearing") (internal citation omitted); *see also In re Quigley Co.*, 377 B.R. at 119.  As demonstrated below and in the Debtor's Reply, the Court should also reject the Objectors' arguments on the merits.

### A.    The Plan, Trust Documents Have Been Proposed in Good Faith Under 11 U.S.C. § 1129(a)(3).

13.    A running theme throughout the Objecting Insurers' objections is that the Plan and the Trust documents, particularly the TDPs, are not proposed in good faith as required by section 1129(a)(3) of the Bankruptcy Code.  D.I. 2144, at 13-14; D.I. 2133 ¶ 38.  And, therefore, the Plan is patently unconfirmable.  The Debtor's good faith in proposing the Plan is a factual matter appropriately addressed at the confirmation hearing, so these objections should be overruled as premature. *See In re W. Asbestos Co*., 313 B.R. 832, 848 (Bankr. N.D. Cal. 2003) (agreeing with the contention that the "issue of good faith should be reserved for the confirmation hearing").

14.    While it need not be decided in evaluating the adequacy of the Disclosure Statement, the objection is also wrong on the merits.  When determining a debtor's good faith, the Third Circuit considers whether the plan: "(a) fosters a result consistent with the [Bankruptcy] Code's objectives; (b) has been proposed with honesty and good intentions and with a basis for

expecting that reorganization can be effected; and (c) [exhibits] a fundamental fairness in dealing with the creditors." *In re WR Grace & Co.*, 729 F.3d 332, 346 (3d Cir. 2013).  The good faith requirement is satisfied "[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success[.]" *In re Frascella Enters., Inc.*, 360 B.R. 435, 446 (Bankr. E.D. Pa. 2007) (quoting *Matter of T–H New Orleans Ltd. P'ship*, 116 F.3d 790, 802 (5th Cir. 1997)).  Bad faith, on the other hand, has been found where there is "no realistic possibility of reorganization and the debtor seeks merely to frustrate efforts of secured creditors." *Id.* (citing *In re United Marine, Inc.*, 197 B.R. 942, 947 (Bankr. S.D. Fla. 1996)).  Under this standard, the relevant inquiry is whether the Plan and the TDPs exhibit fundamental fairness to the AFFF Claimants—the largest creditor constituency in this case.

15.    The Objecting Insurers' attacks on the Plan and Trust documents have nothing to do with the concept of "good faith" under § 1129(a)(3) and applicable case law.  As the Plan Proponents will demonstrate at confirmation: the Plan, Trust documents, and TDPs were proposed with the legitimate purpose of providing a global resolution of present and future AFFF Claims in an equitable manner.  *See In re Maremont Corp.*, 601 B.R. 1, 20–21 (Bankr. D. Del. 2019) (finding good faith pursuant to 11 U.S.C. § 1129(a)(3) where "[t]he Chapter 11 Cases were filed and the Plan was proposed with the legitimate purpose of providing a fair and equitable resolution of the Debtor's Asbestos Personal Injury Claims and maximizing the returns available to creditors and other parties in interest.").  And the Plan's settlement framework, including the Trust documents and particularly the TDPs, achieves this legitimate purpose because it reflects historical tort system practice, provides a mechanism for AFFF Claimants to obtain payment on their legitimate claims, and preserves the assets available to pay those claims.

1.      **The Plan Does Not Create a Conflict of Interest and Is Not Patently Unconfirmable Under *Skinner.***

16.    Objecting Insurers argue that the Plan is patently unconfirmable because it includes a "kickback" that "perverts the incentives of the parties claiming insurance coverage."  D.I. 2144 ¶ 9 (citing *In re Am. Cap. Equip., LLC and Skinner Engine Cos.*, 688 F.3d 145 (3d Cir. 2012) ("*Skinner*")); D.I. 2133 ¶ 37 (same).   The Court should reject their objection because it is premature.  The Objecting Insurers are also wrong.  The Plan does not provide any party with a kickback, does not create a conflict of interest that perverts any parties' incentives, and does not impermissibly deprive insurers of any procedural or substantive safeguards.

17.    In *Skinner*, the debtor was a defunct company that entered into a settlement agreement with certain asbestos claimants over the objection of its insurers.  As part of that agreement, the asbestos claimants were given the right to participate in an alternative dispute resolution process, which the bankruptcy court found to be "indisputably procedurally much more favorable and, thus, advantageous to" the asbestos claimants.  *In re Am. Cap. Equip., Inc.*, 405 B.R. 415, 422 (Bankr. W.D. Pa. 2009), *aff'd sub nom. Skinner Engine Co. v. Allianz Glob. Risk U.S. Ins. Co.*, No. BKY 01-23987, 2010 WL 1337222 (W.D. Pa. Mar. 29, 2010), *aff'd sub nom. In re Am. Cap. Equip., LLC*, 688 F.3d 145 (3d Cir. 2012).   Additionally, claimants who participated in that process were required to pay 20% of any recoveries received from the debtor's insurers to the debtor's estate.  *Id*. at 422–23.  Given that the debtor was defunct, these kickbacks from successful claimants were the only way the debtor could fund its bankruptcy case.  The bankruptcy court found this settlement structure to be collusive and proposed in bad faith, as "the Debtor is nothing but financially incentivized to sabotage its own defense or, more aptly, the Insurers' defense of itself vis-à-vis the [channeled] Asbestos Claims."  *Id.* at 423.

8

18.   The Objecting Insurers' reliance on *Skinner* is misplaced.  *Skinner* was decided based on the unique facts of that case, and the decision expressly cautioned against applying its holding broadly to plans that arise from different circumstances:

> We do not here define the parameters of a bankruptcy court's equitable powers, nor determine that surcharges, or alternative forms of asbestos trusts, or other individual provisions of the Fifth Plan, are never permissible under § 1129(a)(3).  However, under the circumstances of this plan, where: (1) the debtor's bankruptcy is unrelated to asbestos litigation, (2) the debtor will not contribute to the Plan Payment Fund but merely pull from it, (3) Asbestos Claimants provide the sole source of funding to the Plan Payment Fund through the Surcharge, (4) the Plan Payment Fund exists solely to pay off creditors and insurers rather than to pay future asbestos litigants or generate profits to do so, and where (5) the Surcharge creates an inherent conflict of interest while (6) the CADP process simultaneously strips Insurers of certain procedural and substantive rights without the protections of § 524(g), we find a lack of good faith as required for confirmation under § 1129(a)(3).

*In re Am. Cap. Equip., LLC*, 688 F.3d at 160; *see also In re Boy Scouts of Am. & Delaware BSA, LLC*, 650 B.R. 87, 191 (D. Del. 2023), *aff'd in part, rev'd in part, dismissed in part sub nom. In re Boy Scouts of Am.*, No. 23-1664, 2025 WL 1377408 (3d Cir. May 13, 2025) (holding *Skinner* did not prevent confirmation because "'[u]nlike the debtor in that case, BSA has no conflict of interest, has meaningfully contributed to the Settlement Trust, and has not established a surcharge mechanism at the claimants' expense for the BSA's own gain") (hereinafter "*Boy Scouts II*").

19.   The Plan is different from the *Skinner* plan in all the ways that matter.  As presented in this chart and detailed further below, the Plan in this case more closely resembles the one confirmed in *BSA* than the one rejected in *Skinner*.

| Circumstances | *Skinner* Plan | *BSA* Plan | *KFI* Plan |
|---|---|---|---|
| Bankruptcy was related to underlying tort liability. | X | ✓ | ✓ |
| Relevant trust or fund established (in part) to pay future creditors. | X. | ✓ | ✓ |
| Debtor contributed to the relevant fund or trust. | X | ✓ | ✓ |
| Debtor pulled from the relevant fund or trust. | ✓ | X | X |
| Creditors were sole source of funding for the relevant fund or trust. | ✓ | X | X |
| Trust distribution procedures impermissibly strip insurers of procedural or substantive rights. | ✓ | X | X |

20.    The Debtor's bankruptcy was related to the underlying AFFF liability.  *See* D.I. 2054-1 (explaining that the Debtor filed the Petition because it was facing thousands of lawsuits alleging that the historic use of AFFF caused PFAS contamination of property and personal injuries).  No Objecting Insurer has argued otherwise.

21.    The Primary AFFF Settlement Trust was established for the benefit of AFFF Claimants, and the Plan provides for payments to future claimants.  *See* Plan § 5.2 (the purpose of the Trust shall be to "administer, process and satisfy all Channeled AFFF Claims (other than Sovereign State Claims)"); D.I. 2055-01 at 14  (providing "the Trustees shall establish a future PI Reserve Fund as determined with the consent of the FCR for the benefit of the holders of future Class 3E Claims (respectively, the 'Future PI AFFF Claims' and the 'Future PI Reserve Fund')").  Again, no Objecting Insurer has argued otherwise.

22.    The Debtor has contributed to the reorganization.   As the Objecting Insurers observe, the Debtor has already contributed millions of dollars to fund the reorganization.  *See* D.I. 2144 ¶ 54 n.50 (noting the amount in professional fees the Debtor has already paid).  The Plan also establishes a Wind Down Reserve.  Plan § 2.1.230.  The reserve is funded by the Remaining Estate Funds and the Carrier Global Guaranteed Cash Payment, which are both assets contributed by the Debtor to this reorganization effort.  The Objecting Insurers cannot simply erase these contributions by speculating (without evidence) that the Reserve Estate Funds will be completely depleted before the Effective Date and pretending that the Carrier Global Guaranteed Cash Payment does not constitute the proceeds of the Debtor's settlement.

23.    The Debtor does not pull from the Trust.  Objecting Insurers do not even contend that the Debtor will receive a kickback from the Trust.  Instead, they complain that Carrier will receive a kickback, that Carrier will have its incentives changed, and that Carrier will sabotage its defense of the channeled claims.

24.    Carrier does not receive a kickback.  The Plan serves as a motion to approve the Estate Claims Settlement Agreement.  *See* Plan § 5.4.  Pursuant to that agreement, the Debtor releases Carrier of its liability arising from the Estate Claims.  *See* Plan §§ 2.1.175 (definition of "Released Party"); 10.8 (Channeling Injunction).  In exchange for that release, Carrier is required to contribute cash and insurance rights to the Trust for the benefit of AFFF Claimants.  Because the Estate Claims Settlement Agreement was a negotiated settlement, Carrier did not agree to provide all of its cash or forego all of its potentially recoverable insurance proceeds.  Instead, Carrier agreed to provide 540 million dollars in cash, its rights under its Insurance Policies, and a portion of proceeds it might recover under those Insurance Policies.  *Id.*  Objecting Insurers ignore that, pre-settlement, Carrier had rights to pursue at least 10 billion dollars in insurance proceeds.

11

As a result of the settlement agreement, Carrier has lost that right—including under Insurance Policies that may have otherwise paid other non-AFFF tort liabilities—and its potential recovery under those policies is capped at 2.4 billion dollars, regardless of the total insured loss Carrier suffers in the future.  Carrier is not getting a kickback; it is holding onto a remainder.

25.     Carrier has no role at all in the processing and resolution of AFFF Claims channeled to the Trust, let alone the ability to sabotage the defense of those claims, as the Objecting Insurers assert.  Even if it did have a role in Trust operations, Carrier has no incentive to sabotage the defense of AFFF Claims because Carrier is not receiving a total release for its AFFF liability.  *See* Plan § 2.1.174 ("Released Claims" do not include Independent AFFF Cause of Action).  After the Effective Date, Carrier will have to defend Independent AFFF Claims in the tort system, now without the right to control pursuit of insurance coverage for any judgments or settlements against it under the assigned Insurance Policies, and with its recoveries under those Insurance Policies capped.  Carrier has a powerful financial incentive to keep the AFFF Claim values established by the TDPs low because those claims largely mirror the ones that it must still defend and defeat in the tort system.

26.     Finally, the TDPs do not impermissibly strip the Objecting Insurers nor the Objecting States of their procedural or substantive rights.  *See* D.I. 2144 ¶¶ 36–54; D.I. 2149 ¶¶ 49-52.  As demonstrated in the sections that follow, the Plan, the Primary AFFF Settlement Trust Agreement (the "**Trust Agreement**"), and the TDPs are permissible under the Bankruptcy Code and applicable law, and they fall squarely within nearly three decades of historical practice.

**2.      The Bankruptcy Code Does Not Require Insurer Participation in the Evaluation of Claims, and, in Any Event, the Plan and Trust Documents Provide Appropriate Safeguards Against Inflated Claim Values.**

27.     The Objecting Insurers contend that the Plan impermissibly eliminates their rights to participate in the claims allowance process.  *See* D.I. 2144 at 19–22; *see also* D.I. 2165 ¶¶ 7, 48.

12

They argue that the TDPs are too lax and allow inflated claim values without any opportunity for insurers to challenge these valuations.  D.I. 2144 at 21.  According to the Objecting Insurers, this deprives them of their due process rights and renders the Plan unconfirmable.  *Id*. at 22.  In addition to being a premature objection, the Objecting Insurers are wrong on all counts.

28.    Mass tort bankruptcy plans typically provide a post-confirmation trustee with the sole authority to determine and object to claims.  The idea that permitting a trustee to evaluate and determine claims somehow deprives the insurers of an alleged role they would otherwise assert in "fully vett[ing]" claims is without basis.  Indeed, bankruptcy courts have consistently rejected this argument.  *See, e.g.*, *In re Congoleum Corp.*, No. 03-51524, 2008 WL 4186899, at *9 (Bankr. D.N.J. Sept. 2, 2008) (overruling an objection from insurers that channeling asbestos related personal injury claims to a trust eliminated their right to object to claims and holding that that this argument undermines the purpose of channeling injunctions and aims to circumvent trust mechanisms); *In re ACandS, Inc.*, 311 B.R. 36, 42 (Bankr. D. Del. 2004) (rejecting an insurer's argument that the plan violated the Bankruptcy Code by limiting its rights to object to claims under the personal injury trust); *In re Abengoa Bioenergy Biomass of Kan., LLC*, No. 16-10446, 2018 WL 2138620, at *2–3 (Bankr. D. Kan. May 7, 2018) (holding that it was appropriate to vest the rights to object to claims exclusively in a trustee and bar other parties in interest to object).  The architecture of the post-confirmation claims determination and payment process reflected in the TDPs is tried and true and has been widely adopted in comparable cases in this Circuit and elsewhere.

29.    Further, the question of whether the Objecting Insurers have rights under their policies to control the resolution of these claims is itself a coverage issue.  An insurer's purported right to participate in the settlement of a claim typically exists, if at all, only where the insurer

unequivocally accepts its obligation to pay the resulting settlements, and not where, for example, an insurer has denied coverage, reserved its right to deny coverage, abandoned its insured, or engaged in other conduct giving rise to a conflict of interest with the policyholder, or even where a settlement is simply reasonable and not prejudicial.[4]

30.    Ultimately, nothing in the Plan or the TDPs restricts the Trustee(s) from involving the Objecting Insurers in the claims allowance process to the extent the Trustee(s) deem it appropriate to do so.  In other words, while the Trustee(s) are not required to cooperate with the Objecting Insurers, "there is nothing that prohibits the . . . Trustees from taking any and all actions that she believes are appropriate or required to ensure that the . . . Trust's insurance rights are maximized rather than compromised."  *In re Boy Scouts of Am. & Delaware BSA, LLC*, 642 B.R. 504, 648 (Bankr. D. Del. 2022) (approving plan over similar objections from insurers) (hereinafter "*Boy Scouts I*").

---

[4]    Under Pennsylvania law, where an insured settles a claim without their insurer's consent or where the insurer refused to consent to settlement subject to a reservation of rights, the proper standard is whether the settlement was "fair and reasonable from the perspective of a reasonably prudent person in the same position of [Insureds] and in light of the totality of the circumstances." *Babcock & Wilcox Co. v. Am. Nuclear Insurers*, 131 A.3d 445, 463 (Pa. 2015).  Further, there is no requirement for the insured to show bad faith on the insurer's part when the insured accepts a settlement in a reservation of rights case.  *Id.*; *see also* 1 INSURANCE CLAIMS AND DISPUTES § 3:9 (6th ed. 2021) ("If . . . the insured settles a case for a sum that the insurance company would have been obligated to pay in settlement, the company is not prejudiced by the unauthorized settlement."); 14A Couch on Insurance § 203:41 (3d ed. 2021) ("When an insurer wrongfully refuses to settle a claim or refuses to defend the insured altogether, the insured, without the insurer's consent, is free to negotiate a settlement with the claimant. . . . The insurer may be liable for the entire settlement amount, including amounts in excess of policy limits, based upon its wrongful refusal to settle.").  Notably, conflicts of interest between a debtor and its insurers are unavoidable in chapter 11 proceedings that arise out of covered or potentially covered claims.  A debtor's insurers benefit from prolonging the stay of litigation against the debtor and delaying any resolution of claims that would trigger their payment obligations.  Such interests are in direct conflict with the debtor's interest (and fiduciary duty as debtors-in-possession) to maintain and maximize its estate and resolve its liabilities promptly.  *See, e.g.*, *In re Cybergenics Corp.*, 226 F.3d 237, 243 (3d Cir. 2000) (holding that "[a] paramount duty of a trustee or debtor in possession in a bankruptcy case is to act on behalf of the bankruptcy estate, that is, for the benefit of the creditors" and, therefore, courts "enable [debtors in possession] to recover property on behalf of the bankruptcy estate") (citations omitted); *In re Marvel Ent. Grp., Inc.*, 140 F.3d 463, 474 (3d Cir. 1998) (stating that, "among the fiduciary obligations of a debtor-in-possession is the 'duty to protect and conserve property in its possession for the benefit of creditors'") (quoting *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990)).

31.     Nonetheless, to address the Objecting Insurers' concerns about the lack of clarity around claim values and their exclusion from the process of setting and vetting those values,  D.I. 2144 ¶ 64; D.I. 2165 ¶ 48, the Debtor has added language to the Plan that provides insurers with the opportunity to litigate, before the Effective Date, the proposed value of the applicable points with respect to each Claim Category as set forth in the TDPs. [5]  The purpose of this amendment is to eliminate the insurers' due process concerns and provide them with the adversarial forum they desire to challenge the values underlying the TDP awards.  For AFFF Claimants, the process will provide additional clarity around potential claim values.

32.     Moreover, the anticipated changes to §§ 2.1.156 and 5.5.7 of the Plan as well as Article IV.B.5(g) of the Disclosure Statement and further clarify that the proposed Point Values will be filed before the Effective Date (subject to consent rights under the Plan Support Agreement), and further clarifies that such values shall be subject to the approval of the Bankruptcy Court.  This process allows parties in interest to preserve their rights and object if they have any issues with the initial Point Values.  *See, e.g., In re Mallinckrodt PLC*, No. 20-12522 (JTD) (Bankr. D. Del.) (confirming the chapter 11 plan despite the fact that point values were not provided until after the effective date).

### 3.     Nothing in the Plan or TDPs Impermissibly Impairs the Objecting Insurers' Rights.

33.     The Objecting Insurers identify four ways in which they claim that the Plan impermissibly impairs their contractual and substantive rights.  D.I. 2144 at 22.  They are wrong.

34.     First, they object that the Plan assigns only the rights under the Insurance Policies to the Trust, and not any corresponding obligations.  *Id.* ¶ 46.  But, as discussed in detail in Section

---

[5]     *See* Debtor's Reply, Ex. 1, Plan § 2.1.156 (Point Value "shall be approved by the Bankruptcy Court prior to the Effective Date after notice and opportunity for interested parties to object."); and Disclosure Statement, Article IV.B.5(g).

D below, nothing in the Bankruptcy Code requires the transfer of obligations under the Insurance Policies as a prerequisite to Plan confirmation. As this Court ruled in *BSA*, if the Trust fails to fulfill obligations that are conditions precedent to coverage, then depending on state law, the Objecting Insurers "may be able to assert those conditions as a defense to performance." *Boy Scouts I*, 642 B.R. at 669. Nothing in the Plan impacts their ability to raise such a defense. *See* Plan § 5.8 (stating that, "[n]othing in the Plan shall limit the right of any Insurance Company to assert any defenses to coverage that it may have under applicable law"); *see also In re Boy Scouts of Am.*, No. 23-1664, 2025 WL 1377408, at *21 (3d Cir. May 13, 2025) (rejecting arguments that similar language did not adequately preserve insurers' rights and explaining that the coverage court "can interpret the Plan in light of the background principles of bankruptcy law.").

35. Second, the Objecting Insurers incorrectly argue that Insurance Provision at Section 5.8 of the Plan will impermissibly impair their rights. D.I. 2144 ¶ 47. Among other things, they complain that their policies cannot be subject to the Plan, Confirmation Order, and applicable law. *Id*. But this Court, the U.S. District Court for the District of Delaware, and the U.S. Court of Appeals for the Third Circuit already have rejected these same arguments when approving similar language in the *BSA* plan. *Boy Scouts II*, 650 B.R. at 146, *aff'd in part, rev'd in part, dismissed in part sub nom. In re Boy Scouts of Am.*, No. 23-1664, 2025 WL 1377408 (3d Cir. May 13, 2025) (affirming confirmation over insurers objection that the plan only preserved their rights "'subject to the Plan and Confirmation Order, which, for example, assign rights under Policies to the Litigation Trust—an assignment not otherwise contemplate or authorized by the Policies."). The Objecting Insurers offer no reason why the outcome should be different here.

36. They also complain that the Insurance Provision precludes the insurers from challenging the Insurance Assignment or arguing that the Plan or discharge of the debtor cannot

operate to reduce their liability. But as discussed below in Section D herein, the Bankruptcy Code preempts any policy provisions limiting assignment and, to the extent any non-debtor assignment cannot be effectuated, the Plan contains a savings clause under which the relevant non-debtor retains its rights, with the Trust pursuing those rights on its behalf and collecting any proceeds. Accordingly, the Objecting Insurers have no grounds to contest the Insurance Assignment, let alone re-litigate any ruling by this Court as to these issues post-bankruptcy. Similarly, the Insurance Provision's statement that the Debtor's discharge does not operate to reduce an insurer's liability is a mere recitation of section 524(e) of the Bankruptcy Code. The Objecting Insurers have no grounds on which to argue that they are immune from the Bankruptcy Code or rulings of this Court.

37.    Third, the Objecting Insurers argue that Section 5.5.8 of the Plan impairs their rights transferring the Debtor's privilege to the Trust even though it is the Debtor's privilege to waive. D.I. 2144 ¶ 48. But that is an unremarkable proposition, considering that the Trust receives the Debtor's insurance rights and otherwise "steps into the shoes" of the Debtor. This Court approved a similar transfer in Boy Scouts. *See* Plan Appendix re: Document Sharing, *In re Boy Scouts of America and Delaware BSA, LLC*, No. 20-10343, ¶ 14 (Bankr. D. Del. Apr. 22, 2022), ECF No. 9698-1, https://casedocs.omniagentsolutions.com/cmsvol2/pub_47373/03b2b715-3d5d-488f-b803-e8f59e9b0f77_9698.pdf. Their objection exposes their desire to use these proceedings to hinder the Trust's abilities to recover under their policies by hampering the Trust's ability to access information that it needs to value the claims and then justify those values in any subsequent coverage litigation. As with the Objecting Insurers' other concerns, this should be dismissed.

38.    Finally, the Objecting Insurers argue that Section 9.1(c) impairs their rights to pursue subrogation claims and enforce their rights to retrospective premiums, deductibles, and

SIRs against Released Parties.  D.I. 2144 ¶ 48.  But 9.1(c) merely asks the Court to confirm that "the Estate Claims Settlement is a good faith settlement" that bars certain causes of action "*to the extent that a good faith settlement has such effect under applicable law*[.]" (emphasis added). Accordingly, those rights continue to exist subject to the Plan and applicable law.  The Objecting Insurers similarly mischaracterize Section 9.1(j) and complain that it amounts to a coverage finding that their policies are triggered.  D.I. 2144 ¶ 48.  Nonetheless, the Plan Proponents can review this provision to ensure that it is consistent with applicable law.  If the Objecting Insurers are not satisfied with the proposed findings, they may object to such proposed findings at the confirmation hearing.

### 4.    The TDPs Do Not Provide Distributions to Non-Creditors of the Estate.

39.    The Objecting Insurers next argue that the Plan is patently unconfirmable because the TDPs do not require claimants to link their harm directly to a KFI product.  *See* D.I. 2144 ¶ 22, 51; *see also* D.I. 2165 ¶ 4, 11.  They assert, with no support whatsoever, that this will result in distributions to individuals who are not creditors of the estate.  According to them, this would violate the Bankruptcy Code by allowing parties not injured by the Debtor to collect from the Trust.  D.I. 2144 ¶ 51 (citing 11 U.S.C. § 101(10)).

40.    Because the resolution of this objection will require factual findings based on a developed evidentiary record as to whether the TDPs approximate the tort system, it is not an appropriate disclosure hearing objection and should be disregarded.  *See Skinner*, 688 F.3d at 154–55; *see also In re Broad Assocs. Ltd. P'ship*, Bankr. LEXIS 2248, at *7 (explaining "care must be taken to ensure that the hearing on the disclosure statement does not turn into a confirmation hearing[.]") (internal citation omitted).  Nonetheless, the Objections should also be rejected on the merits at confirmation, where the Plan Proponents will demonstrate that the TDPs accurately

reflect the historical settlement practices of AFFF defendants in the tort system, including with respect to causation defenses.

      **5.     The Plan Does Not Impermissibly Pay Administrative Expenses and Various Uninsured Pre-Petition Claims with Insurance Proceeds.**

     41.    The Objecting Insurers argue that the Plan is patently unconfirmable under *Skinner* because it impermissibly uses insurance proceeds to pay administrative expenses, professional fees, and various non-AFFF unsecured claims.  D.I. 2144 ¶ 52.  Their argument mischaracterizes both the source and permissible use of those funds under the Bankruptcy Code.

     42.    As an initial matter, the Objecting Insurers mischaracterize the Plan's funding mechanisms.  The Plan requires the estate to pay administrative expenses with the Wind Down Fund.  The Wind Down Fund is funded with cash, including the Guaranteed Cash Payment contributed by Carrier—not insurance proceeds.  The Trust—not the Liquidating Estate—receives insurance recoveries, and it uses its share of those proceeds to pay AFFF Claims and certain general unsecured claims.

     43.    Regardless, nothing in *Skinner* or Bankruptcy Code prohibits the use of insurance proceeds to fund administrative expenses or general unsecured claims.  Courts have routinely confirmed plans in which trusts funded primarily or exclusively with insurance recoveries were used not only to satisfy tort liabilities but also to pay general unsecured claims, professional fees, and administrative costs.  For example, in *Boy Scouts*, insurance proceeds were used to pay not only channeled abuse claims, but also trust administration expenses and non-abuse liabilities not channeled to the trust, including prepetition trademark infringement claims.  *See Boy Scouts I*, *supplemented*, 20-10343 (LSS), 2022 WL 20541782 (Bankr. D. Del. Sept. 8, 2022), *aff'd,* 650 B.R. 87 (D. Del. 2023), *aff'd in part, rev'd in part, dismissed in part sub nom. In re Boy Scouts of Am.*, 23-1664, 2025 WL 1377408 (3d Cir. May 13, 2025), and *aff'd*, 650 B.R. 87 (D. Del. 2023).

*See also In re Federal-Mogul Glob. Inc.*, 684 F.3d 355, 358–60 (3d Cir. 2012) (approving a trust funded entirely by insurance assets and contributions that paid professional fees, administrative expenses, and (non-insured) general unsecured claims); Lloyd Dixon, Geoffrey McGovern, Amy Coombe, Asbestos Bankruptcy Trusts, RAND Institute for Civil Justice 5, 53–127 (2010) (documenting numerous trusts—such as those for ACandS, Burns and Roe, J.T. Thorpe, Kaiser Aluminum, and others—that were funded largely or entirely through insurance settlements and permitted to pay administrative expenses and non-tort claims).

44.    The Trust, as a vehicle for liquidation, is required to pay allowed claims according to their priority, not to segregate proceeds based on their origin.  Because the Objecting Insurers are wrong to suggest that the use of funds traceable to insurance proceeds renders the Plan unconfirmable, the Court should overrule their objection.

**B.    The Plan Does Not Contain Non-Consensual Third-Party Releases.**[6]

45.    The Objecting Insurers argue that the Plan gives rise to claims they may have against Carrier under certain insurance policies, and then impermissibly releases these same claims in violation of *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024).  The argument—in addition to being premature—rests on a number of unsupported hypotheticals and reflects a fundamental misunderstanding of the nature of the Plan.

46.    The Objecting Insurers' argument goes as follows.  They first note that "the Insurance Provisions in Sections 5.8 and 5.5.11 of the Plan specifically incorporate Carrier Global's putative rights under the Insurance Cooperation Agreement," which, according to them, means that the Insurance Cooperation Agreement itself "assigns Carrier Global wrongful

---

[6]    Both the Objecting Insurers and the Objecting States argue that the Plan Contains Non-Consensual Third-Party Releases.  The Debtor's Reply addresses the Objecting States arguments in this regard at Article IV.A.  In the interest of efficiency, the Committee will not separately address the State arguments here.

recoveries from insurance proceeds that are prohibited under applicable law and the insurance contracts." D.I. 2144 ¶ 66. In other words, they ask the Court to presume that Carrier will profit from the Estate Claims Settlement Agreement because the "insurance recoveries . . . assigned to Carrier Global" will be "well in excess of any alleged insured loss." *Id.* ¶ 69. The Objecting Insurers then ask the Court to assume that they would have the right to bring "contribution, indemnity, subrogation, or any number of other contractual claims" against Carrier under their policies as a result of that hypothetical profit. *Id.* ¶ 73. And finally, based on these ill-supported predicates, they argue that the "proposed injunctions found in section 10.7 of the Plan would impermissibly" release these claims in violation of Purdue. *Id.*

47.   This argument is flawed in a number of respects. First, the Objecting Insurers have no "contribution, indemnity, subrogation, or . . . other contractual claims" against Carrier (or the Debtor) because they have never paid a single AFFF Claim against Carrier (or the Debtor). *See e.g., Wimer v. Pennsylvania Emps. Benefit Tr. Fund*, 595 Pa. 627, 644 (2007) ("a subrogee must first tender payment to the subrogor in satisfaction of a debt before a right to subrogation accrues.").

48.   Second, the Objecting Insurers' argument is premised on the idea that "the insurance recoveries [] assigned to Carrier Global" will be "well in excess of any alleged insured loss." D.I. 2144 ¶ 69. The Objecting Insurers provide no support for that conclusory statement, which, among other things, does not reflect the fact that Carrier faces ongoing insured losses for independent AFFF Claims in the tort system.[7]

---

[7]   Alternatively, the Objecting Insurers appear to argue that any proceeds that Carrier recovers on an insured loss first must go to reimburse its insurers and that the Insurance Cooperation Agreement violates these provisions by allocating those proceeds directly to Carrier. This argument directly contradicts well established state law doctrines and statutes which generally require that an insured must be made whole for all of its damages before insurers can assert claims for reimbursement or subrogation. See, *e.g., Pro. Flooring Co., Inc. v. Bushar Corp.*,

49.     Third, the argument assumes that the Objecting Insurers would be able to assert claims against Carrier in the first place, notwithstanding Carrier's status as an insured under their policies—a conclusion that is inconsistent with applicable law.   *See Fidelity & Guar. Underwriters, Inc. v. Am. Bldgs. Co., In*c., 14 F. Supp. 2d 704, 706 (M.D. Pa. 1998) ("It is well settled that an insurer may not assert a subrogation claim against one of its insureds."); *see also* 16 COUCH ON INS. § 224:1 (collecting cases and explaining that this "prohibition, generally known by the somewhat overbroad name of 'the antisubrogation rule,' extends to forbid subrogation against those persons or entities holding the status of an additional insured or coinsured . . .").

50.     The Objecting Insurers have raised this objection and it is their burden to support that objection by demonstrating that they have viable claims that might be released without their consent.   At best, the question of whether the Plan extinguishes any potential claims held by an Objecting Insurer is premature, and can be more easily resolved at the confirmation stage.   If the Objecting Insurers are able to actually identify a scenario in which their claims will be nonconsensually released, supported by legal and factual evidence, then the Plan Proponents will address such a scenario as appropriate.   As it stands, however, the Objecting Insurers have raised the most contingent of hypotheticals, themselves relying on several incorrect statements of applicable law, on which to derail this Plan.

## C.     The Plan Does Not Contain Improper and Unnecessary Plan Findings.

51.     The Objecting Insurers attack the Plan for seeking certain confirmation findings that they deem unnecessary, unlawful, or already rejected by this Court in *BSA*.   D.I. 2144 ¶ 77. The objections should be overruled because they are premature.   The Debtor is not seeking

---

2016 PA Super 274, 152 A.3d 292, 302 (2016) (asserting that "the 'made whole' doctrine is controlling law in Pennsylvania" and its courts have held that "equity will not allow the subrogee's claim to be placed ahead of the subrogor's.") (citation omitted); *see also* 16 COUCH ON INS. § 223:134 (explaining it is "the general rule under the doctrine of equitable subrogation.").

22

approval of any of these findings at this time, and the Objecting Insurers are free to raise these arguments at confirmation. Nonetheless, the Plan Proponents will review the findings and make any necessary modifications before confirmation. To the extent that the Objecting Insurers have continuing concerns, those can be addressed and resolved at the confirmation hearing.

### D. The Insurance Assignment Does Not Render the Plan Patently Unconfirmable.

52. The Objecting Insurers argue that the Plan is patently unconfirmable because (i) the Court "lacks the necessary jurisdictional and statutory predicates" to approve an assignment of Carrier's non-debtor interests in Insurance Policies to the Primary AFFF Settlement Trust [D.I. 2144 ¶ 75], and (ii) the Insurance Assignment is impermissible on the merits. These objections should be overruled. The Objecting Insurers' unease with a voluntary insurance assignment does not render the Plan "patently unconfirmable." Carrier's interest in the Insurance Policies is property of the estate or otherwise falls within this Court's jurisdiction. This Court previously overruled the exact same arguments the Objecting Insurers raise here as to the merits of the Insurance Assignment in *BSA*.

### 1. The Court Has Jurisdiction to Authorize Carrier's Insurance Assignment.

53. The Objecting Insurers concede that a bankruptcy court may exercise jurisdiction over "property of the debtor's estate, which is defined by Bankruptcy Code section 541." *See* D.I. 2144 ¶ 75. As this Court ruled in *BSA*, policies issued to a debtor are property of the estate, regardless of the presence of any non-debtor additional insureds. *Boy Scouts I*, 642 B.R. at 570 (concluding that "there is no question" insurance policies issued to the debtor "are property of the estate" regardless of additional insureds and holding they may be sold "free and clear of whatever interests [additional insureds] have" under § 363, especially where "no [additional insured] objects to [settlement]"); *see also MacArthur Company v. Johns-Manville Corp. (In re Johns Manville*

*Corp.),* 837 F.2d 89, 90 (2d Cir. 1988) (same).[8]  The same is true of any Debtor Insurance Policies in this case, regardless of whether Carrier is an additional insured under those Insurance Policies.

54.    To the extent the Objecting Insurers identify, in confirmation briefing, Insurance Policies issued directly to Carrier that do not also insure the Debtor, the Court is still well within its jurisdiction to authorize Carrier's assignment of rights under those policies.   Carrier's assignment of its rights under the Insurance Policies is part of the consideration provided by Carrier in exchange for a release.  *See* Plan § 5.5.11(a) ("The Insurance Cooperation Agreement and the Estate Claims Settlement Agreement shall be executed in reliance upon entry into both agreements, and that the rights and obligations under one agreement serve as consideration for the rights and obligations under the agreement.").

55.    Just as this Court has jurisdiction to approve Carrier's financial contributions to the Trust in exchange for the protection of the Estate Claims Release, so, too, does the Court have jurisdiction over the assignment of Carrier's rights in the Insurance Policies.  *See, e.g.*, 11 U.S.C. § 1123(b)(3)(A) (stating that a plan may provide for "settlement or adjustment of any claim or interest belonging to the debtor or to the estate"); Fed. R. Bankr. P. 9019(a) (providing that the bankruptcy court may approve a compromise or settlement after notice and a hearing).   Approval of settlements by bankruptcy courts is "a firmly established historical practice" that stretches back before the enactment of the Bankruptcy Code to the Bankruptcy Act and, therefore, this Court may continue to exercise that jurisdiction.  *In re Washington Mut., Inc.*, 461 B.R. 200, 214–17 (Bankr. D. Del. 2011), *vacated in part on other grounds*, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012)

---

[8]    Carrier's interests in the Insurance Policies are also property of the estate because they are "proceeds" from the settlement of a cause of action belonging to the estate.  *See* 11 U.S.C. § 541(a)(6) (defining estate property to include "[*p*]*roceeds,* product, offspring, rents, or profits of or *from property of the estate*, except such as are earnings from services performed by an individual debtor after the commencement of the case") (emphasis added).  The Estate Claims are undoubtably property of the estate.  *See* 11 U.S.C. § 541(a).

24

(holding that approval of settlements is firmly grounded in the history and structure of bankruptcy law, including Rule 9019 and its predecessors, and that the bankruptcy court has core jurisdiction to approve settlements resolving disputes over property of the estate); *see also In re Residential Cap., LLC*, 497 B.R. 720, 749–50 (Bankr. S.D.N.Y. 2013) (noting that approval of estate settlements lies within the discretion of the bankruptcy court, which may give weight to the debtor's business judgment and is guided by the strong public policy favoring settlements).

56.    The Objecting Insurers rely upon two cases to argue that the Court lacks jurisdiction to approve the Insurance Assignment.  *See* D.I. 2144 ¶ 75.  But both cases addressed the separate question of whether a plan may assign or release policy rights of a non-debtor over its objection, with no or insufficient compensation.  *See In re Forty-Eight Insulations, Inc.*, 133 B.R. 973, 978– 79 (Bankr. N.D. Ill. 1991) (distinguishing case law holding that courts have broad jurisdiction and equitable powers over non-debtor interests in property where "the courts were driven to find a means to protect the asbestos victims and successfully reorganize the company" and cases involving channeling orders and injunctions); *Overton's, Inc. v. Interstate Fire & Cas. Ins. Co.* (*In re Sportstuff, Inc.)*, 430 B.R. 170, 178–79 (B.A.P. 8th Cir. 2010) (holding the bankruptcy court did not have jurisdiction to impose an injunction barring claims by additional insureds because the injunction would impair significant rights of third parties "without compensation or their consent") (emphasis added).  Unlike the additional insureds in both *Forty-Eight Insulations* and *Sportstuff*, Carrier has consented to the assignment of its interests in the Insurance Policies in the Estate Claims Settlement Agreement.

### 2.    The Insurance Assignment Is Authorized and Permissible.

57.    The Objecting Insurers argue that this Court cannot authorize the Insurance Assignment because (i) it purports to transfer non-debtor rights without the insurers' consent, in violation of the Insurance Policies' anti-assignment clauses, and (ii) it fails to transfer obligations

under the Insurance Policies.  As the Plan Proponents will demonstrate at confirmation (just as they did in *BSA*), the Objecting Insurers are wrong on both points.

### a.   The Court May Authorize the Transfer of Non-Debtor Rights.

58.   The Code authorizes the Court to transfer all rights under the Insurance Policies because they are estate property.  *See* 11 U.S.C. § 1123 (a)(5)(B) & (D) (allowing transfer of "property of the estate").  Although these policies may contain certain anti-assignment provisions, numerous courts, including courts in this Circuit, have held that the transfer of rights under a debtor's insurance policies to a trust is valid and enforceable pursuant to section 1123(a)(5) of the Bankruptcy Code, notwithstanding any anti-assignment provisions contained in such insurance policies.  *See, e.g.*, *Boy Scouts II*, 650 B.R. at 144, *aff'd in part, rev'd in part*, *dismissed in part sub nom.*, No. 23-1664, 2025 WL 1377408 (3d Cir. May 13, 2025) (upholding assignment of insurance policies to trust over objection from insurers and noting, "[d]ebtors routinely assign their insurance policy interests to a settlement trust"); *see also In re Kaiser Aluminum Corp.*, 343 B.R. 88, 95 (D. Del. 2006) (holding that under *Combustion Engineering*, section 1123(a)(5) preempts anti-assignment clauses in insurance policies); *In re Stone & Webster, Inc.*, 286 B.R. 532, 543 (Bankr. D. Del. 2002) (same).

59.   Neither the Bankruptcy Code nor state law prohibits the Insurance Assignment with respect to non-debtors.  It is well-established that the applicability of an anti-assignment clause to a transfer of insurance turns on whether the assignment materially increases the insurer's risk of an insured injury occurring during the policy period.  *See, e.g.*, *CNH Am., LLC v. Am. Cas. Co. of Reading, Pa., C.A.*, No. N12C-07-108 JTV, 2014 WL 626030, at *8 (Del. Super. Ct. Jan. 6, 2014) ("In Delaware, an anti-assignment provision in an insurance contract is meant to 'protect the insurer against the possibility of increased risks that might attend a change in the identity of the insured if the policy were assigned before the insured-against loss has occurred.'") (quoting *Int'l*

26

*Rediscount Corp. v. Hartford Acc. & Indem. Co.*, 425 F. Supp. 669, 672 (D. Del. 1977)); *see also* Restatement (Second) of Contracts §§ 317, 322 (Am. L. Inst. 1981).

60.    Courts have agreed—both inside and outside the bankruptcy context—that no such material increase in risk is present where (as here) the events giving rise to a loss already have occurred.  *See, e.g.*, *In re ACandS, Inc.*, 311 B.R. at 41 (ruling, under Pennsylvania law, that policies may be vested in personal injury trust because loss giving rise to liability already accrued). As the Third Circuit has explained, such a transfer merely shifts liabilities "for which the insurers were already potentially responsible" to the trust.  *In re Fed.-Mogul Glob. Inc.*, 684 F.3d at 379 (citing 3 Couch on Ins. § 35.8).

### b.    A Plan Need Not Transfer Obligations.

61.    The Objecting Insurers complain that the Plan assigns the Debtor and Carrier's rights, but not obligations, under the Insurance Policies.  However, "if a contract is not executory, a debtor may assign, delegate, or transfer rights *and/or* obligations under section 363 of the Bankruptcy Code, provided that the criteria of that section are satisfied." *Boy Scouts I*, 642 B.R. at 668 (quoting *In re Am. Home Mortg.*, 402 B.R. 87, 92–93 (Bankr. D. Del. 2009)) (emphasis omitted).  The Insurance Policies are non-executory contracts, and no Objecting Insurer argues otherwise.  *See* Plan § 6.1 ("For the avoidance of doubt, none of the Insurance Policies are Executory Contracts"); *see also In re Fed.-Mogul Glob., Inc.*, 385 B.R. 560, 574 (Bankr. D. Del. 2008) (court rejected insurers' argument that insurance policies are executory contracts, explaining that "[c]ourts have consistently held that insurance policies where the policy coverage period has expired prior to the insured's bankruptcy are not executory contracts despite ongoing obligations of the debtor").  In such a circumstance, conditions precedent and post-transfer obligations are preserved, whereas pre-petition claims or obligations are treated under the Plan.  *See In re Weinstein Co. Holdings LLC*, 997 F.3d 497, 508-09 (3d Cir. 2021).  Accordingly, as this Court

27

concluded in *BSA*, the Debtor "can transfer [their] property rights [to the Primary AFFF Settlement Trust]."[9]  To the extent that there are conditions precedent to coverage under Insurance Policies, or an obligation that arises post-Effective Date, and those conditions or obligations are not met, the consequences of that will be determined by a court in which the coverage dispute is pending.

### E.    The Plan Does Not Facilitate Bad Faith Schemes to Inflate Insurance Claims.

62.    Based on the foregoing, it is clear that the Objecting Insurers' accusations of collusion and bad faith are meritless. None of the Objecting Insurers' cited cases suggest otherwise.  In *Westerfield*, the court found collusion "as a matter of law" where the insured failed to participate in its own defense entered into a settlement with the claimant that included a non-execution agreement and assigned 90% of the insured's rights to recover against his insurers to the claimant—while allowing the insured to retain a 10% financial interest in the outcome. *Cont'l Cas. Co. v. Westerfield*, 961 F. Supp. 1502, 1506 (D.N.M. 1997).  Unlike the parties in *Westerfield*, Carrier has agreed to pay hundreds of millions of dollars in settlement and retains insured liability in the tort system.  And *GIT* and *Safeco* are even further afield because neither court actually found that the parties colluded.  *See In re Glob. Indus. Techs., Inc.*, No. BR 02-21626-JKF, 2013 WL 587366, at *46 (Bankr. W.D. Pa. Feb. 13, 2013) ("Nowhere in the record of this case, before or after the opinion of the Court of Appeals was issued, is there support for an inference of fraud, "ginned-up claims," or abuse of the bankruptcy system."); *Safeco Ins. Co. of Am. v. Parks*, 170 Cal. App. 4th 992, 1013 (Cal. App. 2009) (holding "the trial court correctly determined there was no substantial evidence to support" a defense based on collusion).

---

[9]    *See Boy Scouts I*, 642 B.R. at 668–69 ("Whether obligations under the Non-Settling Insurance Companies' policies are prepetition claims or conditions precedent cannot be decided in a vacuum.  Each contract will need to be interpreted under applicable law in the context of a specific dispute . . . .  If the obligations form the basis for claims, they will be treated accordingly.  If the obligations are conditions precedent, then the Non-Settling Insurance Companies may be able to assert those conditions as a defense to performance."); *Boy Scouts II*, 650 B.R. at 143–46.

## II.    **The Disclosure Objections Are Unjustified, And At Best, Are Confirmation Issues That Should Be Overruled.**

63.    Each of the Disclosure Objections should be overruled.  As set forth above and in the Debtor's Reply, the Disclosure Statement provides adequate information.  Section 1125 of the Bankruptcy Code requires that Disclosure Statement contains "adequate information," which is a flexible determination based on the facts and circumstances of the case and subject to the court's discretion.  *See Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp*., 337 F.3d 314, 321 (3d Cir. 2003) (explaining that "a party seeking chapter 11 bankruptcy protection has an affirmative duty to provide creditors with a disclosure statement containing 'adequate information' to 'enable a creditor to make "an informed judgment" about the Plan.'") (quoting 11 U.S.C. § 1125(a)(1)); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case.") (citing H.R. Rep. No. 595, 97th Cong., 2nd Sess. 266 (1977), U.S. Code Cong. & Admin. News 1978, pp. 5787, 6225); *Matter of Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988) ("The determination of what is adequate information is *subjective* and made on a *case by case* basis. This determination is largely within the discretion of the bankruptcy court.") (emphasis added).[10]  Here, the as-filed Disclosure Statement, Plan, and supplemental documents thereto contain adequate information and the Debtor has undertaken to further clarify certain points to accommodate the reasonable observations of the Objecting Parties.[11]

---

[10]    *See generally In re Scioto Valley Mortg. Co*., 88 B.R. 168, 171 (Bankr. S.D. Ohio 1988) (asserting that "it is noteworthy that a creditor only has standing to object to the adequacy of a disclosure statement as to its own class and not as to the adequacy of the statement as it affects another class.").

[11]    *See generally* Debtor Reply, Ex. 1.

64.     The Debtor has amply addressed this issue in the Debtor's Reply.  Therefore, the
Committee will limit its comments to the adequacy of the disclosures related to the Trust
documentation as the Committee, through its counsel, has been instrumental in drafting the Trust
documents with input from the Debtor, the AHC and other stakeholders.  The Trusts in this case
are designed to serve and administer a confirmed Plan, post-effective date, and will not have
binding authority or effect until successful completion of the confirmation process.  *See* Disclosure
Statement, Articles V ("The Settlement Trusts and TDPs"), IV.B.5 (outlining that, among other
things, summaries of the Trust's creation; purpose; funding; allocation; oversight of the Trustee,
TAC, and FCR; trust distribution processes and procedures; treatment of information, including in
proceedings and with regards to discovery; insurance matters; and releases); Plan § 5.5.

65.     It is typical for such trust documents to be iterative documents that are modified
and supplemented to facilitate the administration of the confirmed Plan.  Issues regarding the Trust
documents are typically resolved as matters of Plan confirmation rather than with respect to a
disclosure statement hearing.  *See, e.g., In re Boy Scouts of America and Delaware BSA, LLC*,
Case No. 20-10343 (LSS) (Bankr. D. Del. Sept. 30, 2021) [D.I. 6443] (approving the disclosure
statement and solicitation package even though certain final post-confirmation trust documents
were not yet filed, including the form of release to be executed by claimants, as well as, Exhibits
1 ("Aggregate Settlement Consideration"), 2 ("Certificate of Trust"), and 4 ("Investment
Guidelines"); *see generally In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 596–97 (Bankr.
S.D.N.Y. 2006), *clarified on denial of reconsideration*, No. 02-41729, 2006 WL 2927222 (Bankr.
S.D.N.Y. Oct. 10, 2006) (recognizing that "the Third Circuit stated, among other things, that the
'adequate information' requirement *merely establishes a floor, and not a ceiling*, for disclosure to
voting creditors . . . I think that *Century Glove* tells us that once the "adequate disclosure" floor is

satisfied, additional information can go into a disclosure statement too, at least so long as the additional information is accurate and its inclusion is not misleading.") (quoting *Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94 (3d Cir. 1988)) (emphasis added); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 171 (Bankr. S.D. Ohio 1988) ("And, as one author warns, 'reorganization is not to be doomed by meaningless disclosure paperwork.'") (quoting *Business Reorganization Under Chapter 11 of the New Bankruptcy Code,* 34 Bus. Law. 1309, 1339 (1979)).

66.    The Objecting Insurers claim there is no information about Claimant Releases, yet the substance of the Claimant Release is adequately described in the Trust TDP.  *See* Trust TDP, Articles V.A. (describing the Claimant Release generally), V.B (describing the contents of the Claimant Release, which will release the Trust and its professionals (the "Trust Released Parties" as defined therein) from "any and all past, present and future" claims, rights, causes of action or otherwise, resulting from, relating to, or otherwise arising out of the Settlement Trust, the Plan, and the Trust Released Parties' duties and responsibilities).  In other words, the actual Claimant Release exhibit document simply memorializes the description within Article V.B of the Trust TDP, and as contemplated therein and in the Plan, the Claimant Release only applies to the actions arising out of or relating to the Trust.

67.    Similarly, it goes without saying that the Trustee(s) will be disclosed by the time of confirmation because, for one, the Trust Agreement makes it clear that the Trustee(s) will be a fiduciary of the Trust who shall oversee and administer the Trust starting on the Effective Date, and further indicates that there will be three initial Trustee(s) as well as a Chairperson (all of which are required signatories).  *See* Trust Agreement, Preamble; §§ 2.1, 5.1, 5.2(a).  Parties with an interest in the Trust will have an opportunity to weigh in and be heard as part of the Plan confirmation process.  *See, e.g., In re Mallinckrodt PLC*, Case No. 20-12522 (JTD) (Bankr. D.

31

Del. June 18, 2021) [D.I. 2916 at 86] (indicating in the solicitation version of the Plan that "[t]he identity of the initial Opioid Creditor Trustees shall be disclosed in the Plan Supplement."). Those assigned to represent the Common Interest of the unsecured creditors who will become beneficiaries of the Trust, including the Committee, the FCR, and the AHC, have been working diligently to select appropriate initial Trustee(s), which will be disclosed with ample opportunity for interested parties to object. The Trust Agreement enumerates how to remove a Trustee (i.e., with consent of the TAC and FCR, subject to certain limitations, and with Court approval). *See* Trust Agreement § 5.2(c).[12] The Trust Agreement also specifies what exactly the Trustee(s) have the power to do and their role as fiduciary to the Trust, which is detailed in 33 subparagraphs under Section 2.1(d) thereto.[13] *See also* Trust Agreement §§ 5.6 (requiring the Trustee's independence), 5.7 (outlining the Trustee's standard of care). There are also carefully crafted and heavily negotiated consultation and consent requirements with TAC and FCR to ensure adequate supervision of the Trustee(s). *See* Trust Agreement §§ 5.13 (outlining matters that require the Trustee to consult with the TAC and FCR), and 5.14 (outlining matters and robust, highly negotiated procedures that require the Trustee to obtain consent of the TAC and the FCR before acting). Moreover, the Disclosure Statement contains an entire paragraph dedicated to the appointment of the Trustee(s), and a summary of powers and duties. *See* Disclosure Statement, Article IV.B.5(e). In sum, the assertion that there is "no information" is categorically false and the Objections fail to cite any caselaw requiring the selection and disclosure of a settlement trust trustee at the Disclosure Statement stage.

---

[12]   Then, in the event of any Trustee vacancy, the Trust Agreement requires that such vacancy be immediately filled by the TAC and the FCR, again, subject to Court approval. *See* Trust Agreement § 5.3(a).

[13]   In alignment with their fiduciary role in the Trust, the Trustee is explicitly forbidden from "hold[ing] a financial interest in, act as attorney or agent for or serve as any other professional for the Debtor or its affiliated persons[;]" during their service. Trust Agreement § 5.6(a).

68.    The States of California, Colorado, Connecticut, Delaware, and New York as well
as the District of Columbia asserted a concern about the adequacy of disclosures surrounding the
Common Benefit Escrow (as defined in § 2.1.46 of the Plan) which is described with particularity
in the Disclosure Statement—in fact, the Disclosure Statement contains the same provision on the
Common Benefit Fund as in the Plan,[14] verbatim:

> On the Effective Date, a Common Benefit Escrow shall be established by the
> Primary AFFF Settlement Trust and funded by a common benefit assessment for
> attorneys' fees of 8% and reasonable costs, *subject to and in accordance with* the
> AFFF MDL orders applicable to common benefit fees and costs, to be made by a
> reduction to each Distribution made by the Primary AFFF Settlement Trust to
> Holders of Claims directly administered by the Primary AFFF Settlement Trust. To
> the extent the Holder of an Allowed Claim directly administered by Primary AFFF
> Settlement Trust has retained counsel through a contingency fee arrangement, any
> contingency fees owed to such contingency counsel payable from the Distributions
> from the Primary AFFF Settlement Trust shall be reduced by the full amount
> payable under this Article 5.5.15. The amounts in the Common Benefit Escrow
> shall be held in escrow and distributed solely pursuant to an order of the MDL
> District Court approving common benefit fees and assessments in the AFFF MDL.
> For the avoidance of doubt, the Common Benefit Escrow shall *not be funded from
> Distributions, payments or other transfers* from the Primary AFFF Settlement Trust
> to the Sovereign State AFFF Settlement Trust or the GUC Liquidating Trust.  This
> Article 5.5.15 is *severable* from the Plan if not approved by the Bankruptcy Court
> at the Confirmation Hearing and approval of this Article 5.5.15 by the Bankruptcy
> Court *shall not be a requirement or condition* to Confirmation of the Plan.

Disclosure Statement, Article IV.B.6; Plan § 5.5.15 (emphasis added).

69.    The common benefit doctrine is a widely-accepted feature of mass tort cases
applied by district courts in multi-district litigation, such as the AFFF MDL, to compensate the

---

[14]    The identical provisions make clear that (i) Article 5.5.15 of the Plan is severable if the Bankruptcy Court does
not approve it "at the Confirmation Hearing[;]" (ii) Bankruptcy Court approval of such Common Benefit Escrow
provision "shall not be a requirement or condition to Confirmation of the Plan[;]" [(iii) the Common Benefit
Escrow shall not apply to any Distributions, payments or transfers from the Trust to the Sovereign State AFFF
Settlement Trust nor to the GUC Liquidating Trust; and, if it survives Bankruptcy Court approval and
confirmation, then (iv)] the Common Benefit Escrow could be established on the Effective Date by the Trust
(which also is established upon the Effective Date and in accordance with the to-be-approved-and-confirmed
Plan). Plan § 5.5.15; Disclosure Statement, Article IV.B.6.  In other words, if the Objecting States or any other
party in interest still has objections regarding the Common Benefit Escrow, then those objections are to be raised
during the confirmation process.

attorneys that performed the work and incurred the expenses to obtain a monetary result that benefits the entire plaintiff class.  In the case of multi-district litigations, district courts enter an order early on recognizing the common benefit doctrine and ordering an assessment for common benefit attorney fees and costs on all future settlements or judgments that may be paid by the defendants.

70.    Here, the MDL PEC Co-Leads played a significant role in developing and litigating the AFFF claims against the Debtor (a defendant in the AFFF MDL) in the MDL up until the eve of the first AFFF MDL bellwether trial when the Debtor filed this bankruptcy.  Further, the MDL PEC Co-Leads and their counsel have played a significant role in facilitating the resulting plan settlement in this case that will benefit the entire classes of claimants that have claims like the ones pursued against the Debtor and its related entities in the AFFF MDL.  MDL Courts utilize the common benefit doctrine to award attorney fees and costs to compensate the attorneys that developed and did the work necessary to pursue the underlying tort claims and achieve settlements. In settlements achieved in the AFFF MDL, the district court applied the common benefit doctrine to award an 8% assessment for common benefit attorney fees in addition to a common benefit cost award for reasonable, actual costs.[15]

71.    Such arrangements, such as the Common Benefit Escrow here, are a common feature of confirmed plans in the mass tort arena.  *See, e.g.*, *In re Mallinckrodt PLC*, Case No. 20-12522 (JTD) (Bankr. D. Del. Jun. 18, 2021) [D.I. 2916 at 89] (establishing the "Opioid Attorneys' Fee Fund," and leaving blank the cap of "$[  ] million from periodic distributions of [  ]%[.]"); *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (SHL) [D.I. 7746] (establishing both a "Common Benefit Fund" and "Common Benefit Escrow" for certain attorneys' fees and costs of

---

[15]    No party objected to these common benefit awards in the AFFF MDL.

public school district claimants pursuant to order(s) of the MDL court) (the disclosure statement hearing is currently noticed for June 18, 2025 [D.I. 7439]).

72.    Should a party take issue with the funding of the Common Benefit Escrow, they will have ample opportunity to be heard when plan confirmation is before the Court.

73.    As set forth in the Debtor's Reply, Ex. 1, Disclosure Statement, Article V ("On the Effective Date, the Primary AFFF Settlement Trust will be created in accordance with the Plan and will implement its trust distribution procedures [and further describes the contents, in detail, of the TDP Schedules contained therein]); Plan §§ 5.5.1 ("On or before the Effective Date, the Settlement Trust Agreements shall be executed, and all other necessary steps shall be taken to create the Settlement Trusts."), 5.5.2 (explaining the purposes of the Settlement Trusts and clarifying that "[o]n the Effective Date, the Settlement Trust Documents, including the TDPs, shall become effective."); Trust Agreement §§ 1.2 (outlining the purposes of the Trust), 1.3 (clarifying that, on the Effective Date, the Trust will receive and hold the title, rights, and interest to the "Settlement Trust Consideration as described in Article V of the Plan").  As a result, these are issues that are not ripe for a disclosure statement hearing—these are confirmation issues—and any parties with the requisite authority retain their rights to object to these issues if they still exist leading up to confirmation.  *See, e.g., In re Am. Cap. Equip., LLC*, 688 F. 3d at 154–55 (outlining the Third Circuit's requirements for rending a plan as "patently unconfirmable"); *In re U.S. Brass Corp.*, 194 B.R. at 422 (discussing the high burden of proof required for a confirmation objection); *In re Dakota Rail, Inc.*, 104 B.R. at 143 (explaining that confirmation issues are to be "left for later consideration" unless the disclosure statement relates to an unconfirmable plan).

35

III.    **The Procedural Objections Are Improper And Unjustifiably Burdensome, And Should Be Overruled; And The Solicitation Procedures Should Be Approved.**

74.    Each of the Procedural Objections should be overruled.  The Objecting Insurers continue their attack on the Solicitation Procedures and the overall voting process.  The Objecting Insurers dovetail, and indeed, largely regurgitate the same arguments set forth in the Objecting Insurers' motion for order establishing a supplement bar date for AFFF Claims, among other things.  D.I. 2156.[16]  At its base, the Objecting Insurers' position concerning the Solicitation Procedures amount to fearmongering: neither the Debtor nor plaintiffs' law firms can be trusted to comply with even the most fundamental ethical obligations, and as such, this Court must remove any and all discretion afforded these parties.  Not only is this position unfounded, but the Objecting Insurers misapply the law and ignore salient facts of this case.  As such, the Committee respectfully asserts that the Objecting Insurers be overruled, and the current Solicitation Procedures approved.[17]

75.    First, the Objecting Insurers argue that the Solicitation Procedures should not be approved because they allow for impermissible voting as a matter of law.  Specifically, the Objecting Insurers assert that section 1126(a) of the Bankruptcy Code and Rule 3003(c) require holders of AFFF Claims to submit proofs of claim to be eligible to vote on a plan, which in turn, necessarily requires the establishment of a bar date.  The Objecting Insurers' argument misstates the law, ignoring well-established precedent and the pertinent facts of this case.  Courts routinely interpret Rule 3003 to provide the bankruptcy court with discretion in fixing a bar date, including

---

[16]    As many of these issues have already been thoroughly briefed in D.I. 2156 and D.I. 2177 (the Committee's objection), the Committee declines to rehash them in detail here, and instead incorporates their objection, D.I. 2177, by reference.

[17]    *See generally* D.I. 2176 (the FCR's objection); D.I. 2177 (the Committee's objection); D.I. 2178 (the Debtor's objection); D.I. 2179 (the AHC of Governmental Claimants' objection); D.I. 2180 (the MDL PEC's joinder objection).

to postpone bar dates indefinitely, particularly for, as here, tort claims with significant latency and discovery periods. This exercise of discretion is not only permissible, but practical. Establishment of a bar date respecting tort claims with long latency periods would cut off future claimants who manifest disease after the bar date, not only violating basic due process considerations, but also creating significant attendant litigation costs. For this reason, courts routinely approve plans that provide for a channeling injunction where a post-confirmation trust may resolve these kinds of claims. Put simply, contrary to the Objecting Insurers' assertions, there is no statutory requirement that a claimant file a proof of claim to be eligible to vote on a plan (indeed, established case law concludes just the opposite), and imposing a bar date in this case would infringe upon basic due process rights for untold numbers of claimants who will manifest disease giving rise to AFFF Claims at some point in the future.

76.    Second, the Objecting Insurers attack the proposed Master Ballots, presupposing that representatives or law firms acting on behalf of multiple AFFF claimants will make up fake claims and inflate the vote. As a "fix," the Objecting Insurers argue that any law firm representing more than one claimant in these cases be required to comply with Rule 2019. Putting aside the obvious absurdity in the underlying assumption that legal representatives will knowingly and willfully violate their ethical duties, the Objecting Insurers' proposed solution is unavailable and unwarranted. Rule 2019 requires disclosure of groups or committees representing multiple creditors that are acting in concert to advance common interests. *See* Fed. R. Bankr. P. 2019(b). For purposes of Rule 2019, "represent" means "to take a position before the court or to solicit votes regarding a plan's confirmation on another's behalf." Fed. R. Bankr. P. 2019(a)(2). The plain language of Rule 2019(a)(2) makes clear that law firms that merely represent more than one claimant in this case are not subject to Rule 2019 disclosure by virtue of such representation.

Indeed, law firms that merely represent more than one creditor in a bankruptcy case have been found exempt from Rule 2019 disclosure. *See, e.g.*, *In re Diocese of Buffalo, N.Y.*, 665 B.R. 198, 204-05 (Bankr. W.D.N.Y. 2024) (denying insurer's request to compel all law firms representing multiple claimants to file Rule 2019 disclosures, finding "the rule applies only to either of two activities. The first occurs when someone 'takes a position before the court ... regarding the confirmation of a plan on behalf of another.' The second involves the solicitation of votes regarding a plan."). Rather, courts find that Rule 2019 disclosure is warranted where a group appears as a collective, and that pleadings and appearances before the court demonstrate that counsel is acting on behalf of the group, not any one individual. *See, e.g.*, *Washington Mut. Inc.*, 419 B.R. 271, 275 (Bankr. D. Del. 2009). The law firms here have not taken any position or action which could reasonably be interpreted as appearing or acting on behalf of a group. Just the opposite is true—these law firms represent their clients' individual interests, including with respect to their vote on a plan.

77.     Moreover, Rule 2019 compliance, particularly for firms representing large numbers of clients in mass tort cases, can be expensive and burdensome. As these firms are not otherwise subject to Rule 2019, the Committee respectfully requests that this Court refrain from exercising any discretion which it may have to nevertheless impose such costly and burdensome disclosure.

78.     Third, the Objecting Insurers assert that discretion afforded to the Debtor in the Solicitation Procedures allows them to manipulate the vote. In particular, the Objecting Insurers argue that the Debtor: (i) should not be able to extend the voting deadline, (ii) may not accept the most recent ballot received on account of a single claim, and (iii) should not be able to waive

irregularities as to a particular ballot.[18]  Again, the Objecting Insurers' attack of the character of a

party in this bankruptcy is baseless.  Furthermore, the provisions that the Objecting Insurers take

issue with are commonplace and routinely approved by courts.[19]  Far from the nefarious weapon

the Objecting Insurers characterize them as, these provisions afford debtors an appropriate amount

of discretion to resolve issues that arise in a human process.

## **CONCLUSION**

79.    In sum, the Objections are just a transparent attempt to obstruct, derail, and delay

the Debtor's reorganization.   At best, these are confirmation issues not properly raised at the

disclosure stage, and as such, the Debtor has ensured that parties in interest, including Objecting

Insurers and Objecting States, will have an opportunity to bring forth any remaining objections

during the confirmation process.

80.    For the foregoing reasons, the Court should overrule the Objections and grant the

Debtor's Motion.

---

[18]    These issues are amply addressed in Section II of the Debtor's Reply, and therefore, the Committee will limit its comments and differ to the Debtor's arguments on these issues.

[19]    *See* D.I. 2177 ¶¶ 5-6, 17; D.I. 2178 ¶¶ 6-7.

Dated:  June 1, 2025

*/s/Daniel K. Hogan*

Daniel K. Hogan, Esquire (DE # 2814)
Garvan F. McDaniel, Esquire (DE # 4167)
Daniel C. Kerrick, Esquire (DE # 5027)
HOGAN♦MCDANIEL
1311 Delaware Avenue
Wilmington, DE 19806
(302) 656-7540; (302) 656-7599 (f)
dkhogan@dkhogan.com
gmcdaniel@dkhogan.com
dckerrick@dkhogan.com

*Local Counsel to the Official Committee of*
*Unsecured Creditors*

*-and-*

David J. Molton, Esquire
Jeffrey L. Jonas, Esquire
Sigmund S. Wissner-Gross, Esquire
D. Cameron Moxley, Esquire
Kenneth Aulet, Esquire
Gerard T. Cicero, Esquire
Susan Sieger-Grimm, Esquire
BROWN RUDNICK LLP
7 Times Square
New York, NY 10036
(212) 209-4800; (212) 209-4801 (f)
dmolton@brownrudnick.com
jjonas@brownrudnick.com
swissner-gross@brownrudnick.com
dmoxley@brownrudnick.com
kaulet@brownrudnick.com
gcicero@brownrudnick.com
ssieger-grimm@brownrudnick.com

*Co-Lead Counsel to the Official Committee of*
*Unsecured Creditors*

*-and-*

Sander L. Esserman, Esquire
Peter C. D'Apice, Esquire
Cliff I. Taylor, Esquire
STUTZMAN, BROMBERG, ESSERMAN,
& PLIFKA, A Professional Corporation
2323 Bryan Street, Ste. 2200
Dallas, TX 75201
(214) 969-4900; (214) 969-4999 (f)
esserman@sbep-law.com
dapice@sbep-law.com
taylor@sbep-law.com

*Co-Lead Counsel to the Official Committee of*
*Unsecured Creditors*

Cathrine M. Castaldi, Esquire
BROWN RUDNICK LLP
2211 Michelson Drive, 7th Floor
Irvine, CA 92612
(949) 752-7100; (949) 525-1514 (f)
ccastaldi@brownrudnick.com

*Co-Lead Counsel to the Official Committee of*
*Unsecured Creditors*

Kami E. Quinn, Esquire
Emily P. Grim, Esquire
Ethan H. Kaminsky, Esquire
GILBERT LLP
700 Pennsylvania Avenue, SE
Suite 400
Washington, DC 20003
(202) 772-2200; (202) 772-3333 (f)
quinnk@gilbertlegal.com
grime@gilbertlegal.com
kaminskye@gilbertlegal.com

*Special Insurance Counsel to the Official
Committee of Unsecured Creditors*

Eric R. Goodman, Esquire
BROWN RUDNICK LLP
601 Thirteenth Street, NW, Ste. 600
Washington, DC 20005
(202) 536-1700; (202) 536-1701 (f)
egoodman@brownrudnick.com

*Co-Lead Counsel to the Official Committee of
Unsecured Creditors*