IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| In re: | Chapter 11 |
|---|---|
| KIDDE-FENWAL, Inc., | Case No. 23-10638 (LSS) |
| Debtor. | |

## RULING ON DISCLOSURE STATEMENT

On June 4, I heard argument on Debtor's motion to approve its disclosure statement. The bulk of the hearing consisted of arguments that the Plan[1] should not be solicited because it is patently unconfirmable. There are two main grounds for this objection. Certain insurance companies argue that the Plan is unconfirmable because it creates an improper disincentive, à la *Skinner*,[2] for Kidde-Fenwal and Carrier to sabotage the defense of the underlying PFAS cases. Numerous States argue that the Plan is unconfirmable because it contains nonconsensual third-party releases by virtue of the expansive definition of Estate Causes of Action.

I took the matter under advisement and now issue this ruling. For the following reasons, I overrule these objections at the disclosure statement stage. I also take the opportunity to provide comments and to seek guidance on the appropriate standard to use to evaluate the Estate Claims Settlement at confirmation, assuming objections remain.

As we all know,[3] a central feature of the Plan is Debtor's settlement with its parent, Carrier Global Corporation. In exchange for Debtor's release of all causes of action against Carrier, RTX Corporation and each of their Related Parties, Carrier will pay Debtor $540 million less net sale proceeds and contribute its insurance rights to the Primary AFFF Settlement Trust. Recoveries from insurance coverage litigation are shared between the Trust and Carrier, with Carrier to receive up to $2.4 billion. This central feature prompts both objections.

---

[1] Debtor's Fourth Am. Plan of Liquidation Under Chapter 11 of the Bankruptcy Code, Dkt. No. 2191-1.

[2] *In re Am. Cap. Equip., LLC*, 688 F.3d 145 (3d Cir. 2012).

[3] This Memorandum is for the benefit of the parties. Familiarity with the proceedings, the Plan and the Disclosure Statement is assumed.

*The Insurers' Objections*

Certain Insurers object that the Plan is patently unconfirmable because it is not filed in good faith under § 1129(a)(3). They contend that the overall scheme of the Plan, which provides Carrier with up to $2.4 billion from insurance recoveries, violates their policies. Additionally, the Insurers contend that this "kickback" of insurance proceeds together with the proposed procedures in the TDP misalign the incentives between the Insurers and its insureds—Carrier and Kidde-Fenwal—such that claims resulting from the settlement trust process will be inflated. For authority, Carrier relies on *Skinner*.

I conclude that *Skinner* is sufficiently distinguishable that it does not mandate a finding that the Plan is patently unconfirmable. In *Skinner*, the Third Circuit affirmed the bankruptcy court's determination that the plan at issue (the fifth) should not be solicited because it was not filed in good faith and contained inherent conflicts of interest. First and foremost, the plan was funded not by debtors, but by the right to receive 20% of the recoveries from insurance actions and policies otherwise payable to asbestos claimants who sought to have their claims determined and paid through a settlement trust process (the "surcharge"). Without that mechanism, estate professionals and general unsecured creditors would not be paid, or as the debtor put it "the Plan would not work . . . ."[4] Second, the Court ruled that the surcharge, together with the "Court Approved Distribution Procedures," created an inherent conflict of interest while at the same time providing the insurers with limited participation in the claims liquidation process and no benefit of a channeling injunction.

In contrast, this Plan is funded by Debtor through Carrier's Guaranteed Cash Payment and the Insurance Policy Rights naming Debtor, Carrier and other specified parties as insured. Further, without evidence, I cannot determine whether the sharing of insurance proceeds improperly disincentivizes Debtor or Carrier with respect to the underlying PFAS litigation. Finally, as in Boy Scouts, I will evaluate arguments made about the proposed trust distribution procedures, proposed findings and/or improper provisions in any order approving the Plan. I will also be guided, to the extent applicable, by the Third Circuit's recent *Boy Scouts* opinion.[5] These issues, therefore, are appropriately addressed at confirmation.

---

[4] *Skinner*, 688 F.3d at 152; *id.* at 156 ("The Fifth Plan also depends on the assumption that Asbestos Claimants will choose to use the [Court Approved Distribution Procedures] rather than the court system, and even then, the Plan will succeed only if enough Asbestos Claimants who use the CADP win recoveries and contribute sufficient Surcharge funds to the Plan Payment Fund.").

[5] *In re Boy Scouts of America*, 137 F.4th 126 (3d Cir. 2025).

*The States' Objections*

The States contend that the Plan is patently unconfirmable because it provides for third-party releases in a different guise. This position is prompted by what can charitably be described as a lengthy and detailed written definition of the term "Estate Causes of Action"[6] and the interlocking definitions of "Independent AFFF Causes of Action"[7] and "Sovereign

---

[6] Plan, 2.1.75. "Estate Causes of Action" means Causes of Action owned or held by either the Debtor or its Estate, or capable of being asserted (currently, or in the future) by any Person or Governmental Unit on behalf of, under or through, either the Debtor or its Estate, and each of their respective successors or assigns, whether known or unknown, in law, at equity or otherwise, whenever and wherever arising under the laws of any jurisdiction, including actions that arise out of or are based on breach of contract, fraudulent conveyances and transfers, breach of fiduciary duty, breach of duty of loyalty or obedience, legal malpractice, recovery of attorneys' fees, turnover of property and avoidance or recovery actions of the Debtor or its Estate, and all other actions that constitute property of the Estate under section 541 of the Bankruptcy Code that are or may be pursued by a representative of the Estate, including pursuant to section 323 of the Bankruptcy Code, and actions, including Avoidance Actions, that may be commenced by a representative of the Estate under section 362 or chapter 5 of the Bankruptcy Code, seeking relief in the form of damages (actual and punitive), imposition of a constructive trust, turnover of property, restitution, and declaratory relief with respect thereto or otherwise. Without limiting the foregoing, Estate Causes of Action shall include: (a) Causes of Action that on or after the Petition Date may be exclusively asserted by or on behalf of the Debtor or its Estate under applicable law, or that prior to the Petition Date could have been asserted by the Debtor on its own behalf under applicable law, including Causes of Action based on (i) the doctrine of successor liability that seek to impose the Debtor's (including KFFI's or National Foam, Inc.'s) liabilities on an alleged successor, whether based on a contractual assumption of liability, consolidation or de facto merger, acquisition of the Debtor's product line, fraud, domination, direction of the Debtor's affairs, defects in or misuse of the corporate form, single business enterprise, common enterprise, or mere continuation, or (ii) the doctrines of alter ego or veil piercing involving alter egos of the Debtor or the piercing of the Debtor's (including KFFI's or National Foam, Inc.'s) corporate veil, whether based on inadequate capitalization, insolvency, failure to observe corporate formalities, fraud, domination, or misuse of the corporate form; (b) Causes of Action or theories for recovery or remedies that seek to impose liability for a Claim against the Debtor on any non-Debtor based on a theory of liability that is not specific to one or more particular creditors and is generally common to creditors of the Debtor and can be asserted by the Debtor under applicable law; and (c) all other Causes of Action that are property of the Estate under the Bankruptcy Code, including any other form of derivative or vicarious liability for liabilities of the Debtor. Subsections (a), (b) and (c) immediately above expressly encompass any Causes of Action based on: (i) the alleged assumption of the Debtor's (including KFFI's or National Foam, Inc.'s) liabilities (but not a non-Debtor's liabilities) by Kidde plc (n/k/a Kidde Limited) pursuant to the 2000 Demerger Agreement, or any alleged subsequent assumption of such liabilities of the Debtor from Kidde plc by any other Released Party; or (ii) the alleged assumption of the Debtor's liabilities (but not a non-Debtor's liabilities), including any liabilities resulting from acts or omissions of National Foam, Inc. or KFFI, by a Released Party pursuant to the 2020 Separation Agreement. For the avoidance of doubt, Estate Causes of Action shall not include any Independent AFFF Causes of Action or any Sovereign State Retained Causes of Action or Insurance Actions against any Released Party based on acts or omissions occurring after entry into the Plan Support Agreement with respect to rights under the 2020 Separation Agreement or the RTX Waiver to access and make Claims under any Insurance Policy or otherwise obtain the benefit of the Insurance Assignment.

[7] Plan, 2.1.107. "Independent AFFF Cause of Action" means any Cause of Action that could be asserted by an AFFF Claimant against a Non-Debtor Party based on the NonDebtor Party's own conduct and breach of duty (i.e., duty owed to the AFFF Claimant and not owed to the Debtor), including (a) Causes of Action arising from such acts or omissions of such Non-Debtor Party, and (b) Causes of Action based on allegations that a Non-Debtor Party is responsible for such conduct under theories of liability or recovery or remedies that could have been asserted by an AFFF Claimant on its own behalf under applicable state or federal law in respect of such Causes of Action prior to the Petition Date based on (i) the doctrine of successor liability

3

State Retained Causes of Action."[8] Simply put, the States contend that this expansive definition impinges on their rights to assert claims against Carrier and other non-debtors including in their capacities as *parens patriae*, which are claims only the States are able to assert on behalf of their respective citizens. Debtor counters that these definitions simply reflect Third Circuit binding precedent on what constitutes a cause of action belonging to the estate, which Debtor, as trustee, can prosecute, or as is the case here, settle.

The nub of the issue that will need to be decided at confirmation is whether causes of action against Carrier and other non-debtors based on theories of alter ego, veil piercing, successor liability or the like constitute assets of the estate, and if so, whether Debtor's settlement of those actions should be approved.

I am finding that this issue is becoming more prevalent as it has recently surfaced in three of my cases. I call this issue the *Emoral* issue because it arises from the Third Circuit's 2014 decision of that name.[9] *Emoral* is the second of a trilogy of Third Circuit decisions the States discuss, the two other decisions being *Foodtown* and *Wilton Armetale*.[10] In each of these decisions, the Third Circuit discusses whether certain causes of action are property of the estate.

In *Emoral*, certain individuals, called the Diacetyl Plaintiffs, were creditors of Emoral having sued Emoral in state court asserting claims for personal injury and product liability based on their exposure to diacetyl. Pre-bankruptcy, Aaroma Holdings LLC purchased certain of Emoral's assets, but did not take any diacetyl liability. When Emoral filed its bankruptcy case, a chapter 7 trustee brought a motion to settle disagreements between

---

involving a Non-Debtor Party that is alleged to be a successor to another Non-Debtor Party with respect to liabilities not directly or indirectly assumed from the Debtor, whether based on a contractual assumption of liability (including under the 2020 Separation Agreement), consolidation or de facto merger, acquisition of product line, fraud, domination, direction of affairs, defects in or misuse of the corporate form, single business enterprise, common enterprise, or mere continuation, (ii) the doctrines of alter ego or veil piercing involving alter egos of a NonDebtor Party, or piercing the corporate veil between Non-Debtor Parties, whether based on inadequate capitalization, insolvency, failure to observe corporate formalities, fraud, domination, or misuse of the corporate form, or (iii) alleged derivative or vicarious liability of a Non-Debtor Party for liabilities of another Non-Debtor Party not directly or indirectly assumed from the Debtor; provided that, if any Cause of Action falls within the definition of Estate Cause of Action or Sovereign State Retained Cause of Action, it is not an Independent AFFF Cause of Action.

[8] Plan, 2.1.202. "Sovereign State Retained Cause of Action" means any Claim or Cause of Action asserted, or which may be asserted, by a Sovereign State against a Contributing Party that (1) is not an Estate Cause of Action and (2) arises from a statute, regulation, or common law that creates a theory of liability, by which a Sovereign State could recover damages or penalties, or obtain equitable or injunctive relief, against a Contributing Party. For the avoidance of doubt, a Sovereign State may assert a Sovereign State Retained Cause of Action irrespective of whether such Sovereign State Retained Cause of Action could also be considered an Independent AFFF Cause of Action.

[9] *In re Emoral, Inc.*, 740 F.3d 875 (3d Cir. 2014).

[10] *Bd. of Trs. of Teamsters Loc. 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164 (3d Cir. 2002); *Artesanias Hacienda Real S.A. DE C.V. v. N. Mill Cap., LLC (In re Wilton Armetale, Inc.)*, 968 F.3d 273 (3d Cir. 2020).

4

Emoral and Aaroma, which he settled for a payment of $500,000 and mutual releases. The Diacetyl Plaintiffs objected to the settlement to the extent that the trustee's release might bar successor liability claims against Aaroma. In response, the Order approving the settlement provided that "[n]othing contained in this Order or in the Aaroma Settlement Agreement will operate as a release of, or bar to the prosecution of any claims held by any person which do not constitute Estate's Released Claims as defined in the Aaroma Settlement Agreement."[11] The Trustee also confirmed at the hearing to approve the settlement that the estate release did not include the Diacetyl Plaintiffs' claims against Aaroma based on successor liability.

Notwithstanding, post-settlement, Aaroma relied on the trustee's release as a defense to the Diacetyl Plaintiffs' complaints against it to recover damages based on successor liability. Consistent with its approval of the settlement, the bankruptcy court ruled that the settlement did not release Aaroma from those claims.

The Third Circuit reversed. In its decision, the Court cites to § 541 and styles its discussion as a traditional analysis of what is property of the estate, but it is not.[12] Rather, citing *Foodtown*, the Court imports the concept of "general" versus "particularized" claims and rules that general claims belong to the estate, whereas particularized claims belong to creditors. In its analysis, the theory of liability is paramount. As the Court puts it:

> [t]he Diacetyl plaintiffs fail to demonstrate how any of the factual allegations that would establish their cause of action based on successor liability are unique to them as compared to other creditors of Emoral. Likewise, they fail to demonstrate how recovery on their successor liability cause of action would not benefit all creditors of Emoral given that Aaroma, as a mere continuation of Emoral, would succeed to all of Emoral's liabilities. Thus, the Diactetyl Plaintiffs' cause of action against Aaroma is "general" rather than "individualized."[13]

*Wilton Armetale* picks up on this theme and makes it more explicit. It also answers the question of which prong of the § 541 analysis embodies the general/particularized analysis. To quote:

> The second element hinges on whether the claim is "general" to the estate or "personal" to a specific creditor. *Emoral*, 740 F.3d at 879 (quoting *Foodtown*, 296

---

[11] *Emoral*, 740 F.3d at 877.

[12] *Id.* at 879 (Section 541 "includes causes of action, which are considered property of the bankruptcy estate 'if the claim existed at the commencement of the filing and the debtor could have asserted the claim on his own behalf under state law.'"); *Foodtown*, 296 F.3d at 169 n.5 ("A cause of action is considered property of the estate if the claim existed at the commencement of the filing and the debtor could have asserted the claim on his own behalf under state law. *Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).").

[13] *Emoral*, 440 F.3d at 880.

F.3d at 170); *accord* 5 *Collier on Bankruptcy* ¶541.07 & n.1 (16th ed. 2020) (citing *Emoral*). Individual creditors have the statutory authority to bring only personal claims. *Emoral*, 740 F.3d at 879. That is because a general claim "inures to the benefit of all creditors" by enlarging the estate, and so " 'the trustee is the proper person to assert the claim.'" *Id.* (quoting *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989)). The distinction between general and personal claims "promotes the orderly distribution of assets in bankruptcy" by funneling all asset-recovery litigation through a single plaintiff: the trustee. *Id.*[14]

This reasoning and the rationale supporting it import concepts from the avoidance context, such as promoting equity and fairness, increasing the pool of assets available to all creditors and a determination that a trustee is in a better position to pursue such causes of action.[15] While some of this may not seem to square with § 541 and *Butner*,[16] *Emoral* and *Wilton Armetale* are controlling law in this jurisdiction.[17]

The lesson from *Emoral* is clear: to know whether a settlement of estate causes of action should be approved, you must first know what the causes of action are. In other words, it is best (and, maybe imperative) not to leave the issue for another day.

So, to better frame the issues at confirmation, Debtor should work with the plan supporters (and others, to the extent necessary) to create a schedule of the Released Claims,[18] Independent AFFF Causes of Action and Sovereign State Retained Causes of Action. That schedule should include a breakdown, by count, of each cause of action contained in complaints that were filed prepetition against Carrier, RTX, Related Parties

---

[14] *Wilton Armetale*, 968 F.3d at 282.

[15] That rationale breaks down—and may require other remedies—if prepetition the debtor-in-possession (now the trustee) advocated that no underlying liability exists and that any alter ego, veil piercing or similar causes of action had no viability. Finding that these types of action are property of the estate may also impact issues the trilogy does not discuss, such as defenses available to defendants (*see, e.g., Hays and Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149 (3d Cir. 1989)) and privilege assertions (*see, e.g.,* Letter Ruling on Further Discovery Disputes,
*In re Exactech, Inc.*, Case No. 24-12441 (Bankr. D. Del. May 20, 2025), Dkt. No. 1183).

[16] *Butner v. United States*, 440 U.S. 48 (1979).

[17] *Emoral* distinguishes *Foodtown* on at least two grounds. First, the Court observes the federal interest supported by ERISA in disregarding corporate separateness. Second, the disputed claim in *Foodtown* arose postpetition. While the States say this creates a split in the Third Circuit over what claims are property of the estate, I disagree. Having addressed and distinguished *Foodtown*, there is no split; disagreement with the Court's distinction does not make one. **Briefing on whether a State's interest could provide a similar distinction would be of assistance.**

[18] Plan, 2.1.174. "Released Claims" means any all Claims or Causes of Action, including all Estate Causes of Action, that are released under the Plan and the Confirmation Order. For the Avoidance of Doubt, no Independent AFFF Causes of Action or Sovereign Sate Retained Causes of Action shall be Released Claims.

and any other Released Party under the Plan.[19] It should also specifically list which counts are not being released.

Further, the parties should provide guidance in the confirmation briefing on the appropriate standard to evaluate a settlement that includes release of *Emoral*-type estate causes of action, that is, causes of action that creditors can bring on their own behalf prepetition, and, perhaps, debtors can also bring. Approving a settlement in this context clearly has an impact on third parties' causes of action because they are no longer able to bring them.[20]

The *Martin* standard was developed in the context of a prepetition real estate contract dispute. In *Martin*, the Court articulates the settlement standard as follows:

> This particular process of bankruptcy court approval requires a bankruptcy judge to assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal. Taking our cue from *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25, 88 S.Ct. 1157, 1163–64, 20 L.Ed.2d 1 (1968), we recognize four criteria that a bankruptcy court should consider in striking this balance: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors. *See In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D.Pa.1986).[21]

This standard may certainly be adaptable here even though it does not specifically take into account a situation in which the claim deprives a non-debtor of its cause of action against another non-debtor (and, in particular, outside the traditional context of § 544). Adapting it might mean that the court needs evidence on both the underlying PFAS claims as well as

---

[19] For example, *see State of Maine v. 3 M Company, et al.*, MDL 2873, Master Docket No. 2:18-mn-2873-RMG, Civil Action No. 2:23-cv-02573-RMG, Entry No. 23 (Amended Complaint).

[20] I see (at least) three different types of debtor/estate causes of action. <u>One</u>, is the traditional type of lawsuit, such as a breach of contract action which the debtor could have pursued prepetition. These traditional types of action also include breach of fiduciary lawsuits, which belong to the debtor outside of bankruptcy, but are largely brought derivatively because the debtor will not sue its own directors/parent/sponsor. <u>Two</u>, are fraudulent conveyance actions which belong to creditors outside of bankruptcy. It is the Code (§ 544) that vests the trustee with the statutory power to pursue avoidance actions for the benefit of the estate. <u>Three</u>, are the *Emoral*-type causes of actions (or, shared actions). Outside bankruptcy, depending on state law, non-debtors may bring such causes of action or seek remedies based on theories of alter ego, veil piercing or successor liability. Again, depending on state law, outside bankruptcy a debtor may also be able to pursue those very same claims or remedies.

[21] *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).

the alter ego/veil piercing claims; it can mean that the court needs evidence on all of Debtor's liabilities, as all are being settled.[22]

Alternatively, or additionally, other more searching standards, such as *Continental*'s now-abrogated standard for third-party releases may provide guidance, as may the *Master Mortgage* standard which has been used for both third-party and debtor releases.[23] In any event, the approval of any settlement that just rises above "the lowest rung in the ladder" seems particularly ill-suited for this situation. I look forward to reading the results of the parties' research and their considered thoughts on the appropriate standard.

Finally, the States argue that the Plan is unconfirmable because *Purdue* "abrogated" *Emoral* and the releases here are simply disguised third-party releases. As we all know, *Purdue* forecloses third-party releases. But, it does no more than that. Justice Gorsuch was clear to cabin his decision, "[c]onfining [the court] to the question presented" and holding "only that the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants."[24] The analysis in *Purdue* focuses on whether third-party releases are permissible under § 1123(b)(6) because no one argued that the causes of action against the Sacklers belonged to Purdue or were otherwise property of the estate or that the Sacklers could get a discharge under the Code. *Emoral*, on the other hand, addresses the underlying question of whether the settled causes of action <u>are</u> property of the estate. If they are, then *Purdue* does not apply. In other words, *Purdue* drew the line as to what claims may be compromised in bankruptcy. *Emoral, Foodtown* and *Wilton Armetale* decide which side of the line claims for alter ego, veil piercing and successor liability fall on. In order to know that here, Debtor must identify the claims at issue.

*Conclusion*

"[A] bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure statement stage that a later confirmation hearing would be futile because

---

[22] *See supra* at 5 ("Aaroma, as a mere continuation of Emoral, would succeed to all of Emoral's liabilities.").

[23] *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 214 (3d Cir. 2000) (hallmarks of permissible, nonconsensual releases are fairness and necessity to the reorganization supported by specific findings); *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937-38 (Bankr. W.D. Mo. 1994) ((1) an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (2) substantial contribution by the non-debtor of assets to the reorganization; (3) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success; (4) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and (5) provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction); *In re Zenith Elecs. Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999) (applying *Master Mortgage* standard to debtor releases).

[24] 603 U.S. 204, 227 (2024).

the plan described by the disclosure statement is patently unconfirmable."[25] After considering the arguments of counsel, I conclude that evidence and further legal argument is needed to determine whether the Plan is confirmable. For that reason, I overrule the disclosure statement objections on this ground. But, as reflected above and at the hearing, certain additions must be made before the disclosure statement can be approved. Debtor should make the appropriate changes and re-submit for further consideration.

Laurie Selber Silverstein
United States Bankruptcy Judge

Dated: June 16, 2025

---

[25] *Skinner*, 688 F.3d at 154.